Consolidated Case Nos. 13-55017, 12-56867, 12-56874

———————————————————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————————————————

Yassir Fazaga, Ali Uddin Malik, Yasser Abdelrahim,
Plaintiffs,

v.

Federal Bureau of Investigation; United States of America; Robert Mueller,
Director of the Federal Bureau of Investigation, in his official capacity; Steven M.
Martinez, Assistant Director in Charge, Federal Bureau of Investigation's Los
Angeles Division, in his official capacity; J. Stephen Tidwell; Barbara Walls; Pat
Rose; Kevin Armstrong; Paul Allen; Does 1-20
Defendants.

———————————————————————

On Appeal from the United States District Court, Central District of California
No. CV 11-301-CJC (VBK)

———————————————————————

## PLAINTIFFS-APPELLANTS' PRINCIPAL BRIEF

———————————————————————

PETER BIBRING
pbibring@aclu-sc.org
AHILAN T. ARULANANTHAM
aarulanantham@aclu-sc.org
ACLU Foundation
  of Southern California
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-5295
Facsimile: (213) 977-5297

AMEENA MIRZA QAZI
aqazi@cair.com
Council on American-Islamic
  Relations, California
2180 W. Crescent Avenue, Suite F
Anaheim, CA 92801
Telephone: (714) 776-1847
Facsimile: (714) 776-8340

DAN STORMER
dstormer@hadsellstormer.com
MOHAMMAD TAJSAR
mtajsar@hadsellstormner.com
Hadsell Stormer Keeny & Renick, LLP
128 N. Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079

## CORPORATE DISCLOSURE STATEMENT

There are no corporations involved in this case.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION..................................................5

STATEMENT OF FACTS ...................................................................7

STATEMENT OF THE CASE............................................................13

QUESTIONS PRESENTED ON APPEAL........................................22

STANDARD OF REVIEW ...............................................................23

SUMMARY OF ARGUMENT ..........................................................24

ARGUMENT .....................................................................................27

I.    THE DISTRICT COURT ERRED BY PREMATURELY
      DISMISSING NEARLY ALL CLAIMS UNDER THE REYNOLDS
      PRIVILEGE, EVEN THOUGH IT COULD NOT HAVE BEEN
      "CERTAIN" THAT STATE SECRETS WOULD BE DIVULGED
      DURING LITIGATION ...............................................................27

      A.    THE DISTRICT COURT ERRED BY DISMISSING THE
            SEARCH CLAIMS UNDER THE *REYNOLDS* PRIVILEGE...........29

            i.    The District Court Erred by Dismissing Plaintiffs' Fourth
                  Amendment and Privacy Act Claims Without Explanation
                  When the Government Did Not Seek Their Dismissal............31

            ii.   The District Court Erred in Dismissing Plaintiffs' FTCA
                  Claims Arising From Allegations of Unlawful Search ..........33

B.  THE DISTRICT COURT COULD NOT HAVE CONCLUDED "WITH CERTAINTY" THAT LITIGATION OF PLAINTIFFS' DISCRIMINATION CLAIMS WOULD REQUIRE DISCLOSURE OF STATE SECRETS ......................................................36

   i.  Plaintiffs Allege Facial Religious Discrimination That Triggers Strict Scrutiny, and Can Establish a *Prima Facie* Case Without Resort to Secret Evidence ..................................37

   ii.  The District Court Erred in Concluding "With Certainty" that State Secrets Would Deprive the Government of a Defense to the Discrimination Claims or that Litigating Those Defenses Would Pose an Unacceptable Risk of Disclosing State Secrets.......................................................42

II.  THE DISTRICT COURT SHOULD HAVE ALLOWED THE LITIGATION TO PROCEED GIVEN THE EXISTENCE OF ALTERNATIVE MECHANISMS TO MANAGE ANY SECRET INFORMATION THAT COULD ARISE ....................................................50

   A.  THE DISTRICT COURT SHOULD NOT HAVE DISMISSED BASED ON THE REYNOLDS PRIVILEGE WHEN IT COULD HAVE UTILIZED FISA'S PROCEDURES TO HANDLE ANY INFORMATION "RELATING TO ELECTRONIC SURVEILLANCE" AT ISSUE IN THIS CASE ...............................50

      i.  The District Court Should Apply FISA's Procedures to All Information "Relating to Electronic Surveillance," Whether or Not that Information Arises In the Course of Litigating the FISA Claim, Because FISA's Procedures Apply to Claims Arising Under Other Statutes....................................................52

      ii.  FISA Preempts the Reynolds Privilege as to All Information "Relating to Electronic Surveillance" ........................................53

iii.    The District Court Should Have Applied FISA's Procedures, Rather Than the Reynolds Privilege, to Any Secret Evidence Relating to Electronic Surveillance Needed to Litigate the Non-FISA Claims, Because Doing so Comports With the Purpose of the Reynolds Privilege ............................................59

iv.    The District Court Should Not Have Dismissed the Discrimination Claims Because Evidence Concerning Discrimination Will Arise in the Litigation of the FISA Claims ......................................................................................62

B.    THE COURT SHOULD HAVE APPLIED FISA OR OTHER ALTERNATIVE PROCEDURES TO HANDLE ANY SECRET EVIDENCE THAT DOES NOT RELATE TO ELECTRONIC SURVEILLANCE ..............................................................................66

II.    DISMISSAL OF PLAINTIFFS' CLAIMS SEEKING RELIEF FROM ONGOING CONSTITUTIONAL VIOLATIONS BY THE FBI MERELY BECAUSE THE GOVERNMENT HAS DECLARED THEIR ALLEGEDLY ILLEGAL CONDUCT TO BE SECRET RAISES SERIOUS CONSTITUTIONAL PROBLEMS ............................................69

A.    WHERE IT HAS JURISDICTION, A FEDERAL COURT MAY NOT DISMISS A CASE SEEKING RELIEF FROM ONGOING CONSTITUTIONAL VIOLATIONS WITHOUT ADDRESSING THE CLAIMS ON THEIR MERITS ..................................................72

B.    THE GOVERNMENT'S PRACTICE IN OTHER NATIONAL SECURITY CASES STRONGLY SUGGESTS THAT THE REYNOLDS PRIVILEGE DOES NOT PERMIT DISMISSAL OF CLAIMS CHALLENGING ONGOING UNCONSTITUTIONAL CONDUCT ..........................................................................77

C.    EXISTING STATE SECRETS DOCTRINE DOES NOT RESOLVE WHETHER THE PRIVILEGE PERMITS DISMISSAL OF CLAIMS SEEKING RELIEF FROM ONGOING CONSTITUTIONAL VIOLATIONS ..........................................................................81

CONCLUSION ...........................................................................87

# TABLE OF AUTHORITIES

## Cases

*In re A Commn. To Take Evidence Pursuant To The Crim. Code Of*
    *Canada & The U.S. Code & Fed. Rules*,
    788 F.2d 566 (9th Cir. 1986) ...............................................54, 55, 56

*ACLU v. Nat'l Sec. Agency*,
    493 F.3d 644 (6th Cir. 2007) .......................................................56, 60

*Al-Aulaqi v. Obama*,
    727 F.Supp.2d 1 (D.D.C. 2010) ........................................................71

*Al-Haramain Islamic Found., Inc. v. Bush*,
    507 F.3d 1190 (9th Cir. 2007) ...........................................31, 45, 84

*Alliance to End Repression v. City of Chicago*,
    237 F.3d 799 (7th Cir. 2001) .............................................................64

*American Civil Liberties Union v. Brown*,
    619 F.2d 1170 (7th Cir. 1980) ..........................................................87

*Ashwander v. TVA*,
    297 U.S. 288 (1936).........................................................................69

*Bismullah v. Gates*,
    501 F.3d 178 (D.C. Cir. 2007).........................................................78

*Bivens v. Six Unknown Fed. Narcotics Agents*,
    403 U.S. 388 (1971)....................................................................14, 61

*Boumediene v. Bush*,
    553 U.S. 723 (2008)................................................................*passim*

*Branzburg v. Hayes*,
    408 U.S. 665 (1972).........................................................................64

*Braunfeld v. Brown*,
    366 U.S. 599 (1961).........................................................................38

*Burnsworth v. Gunderson*,
179 F.3d 771 (9th Cir. 1999) .............................................................80

*Carlson v. Green*,
446 U.S. 14 (1980).............................................................................73

*Childers v. United States*,
40 F.3d 973 (9th Cir.1994) ................................................................35

*Church of Lukumi Babalu Aye v. City of Hialeah*,
508 U.S. 520 (1993)...........................................................................38

*Cohens v. Virginia*,
19 U.S. 264 (1821) (Marshall, C.J.) ..................................................24

*Correctional Servs. Corp. v. Malesko*,
534 U.S. 61 (2001).............................................................................73

*Dichter-Mad Family Partners, LLP v. United States*,
709 F.3d 749 (9th Cir. 2013) .............................................................35

*Ellsberg v. Mitchell*,
709 F.2d 51 (D.C. Cir. 1983)..............................................................49

*Emp't Div. v. Smith*,
494 U.S. 872 (1990)...........................................................................38

*Funk v. United States*,
290 U.S. 371 (1933)...............................................................62, 66, 67

*Galvin v. Hay*,
361 F.3d 1134 (9th Cir. 2004) ...........................................................34

*Gasho v. United States*,
39 F.3d 1420 (9th Cir. 1994) ...............................................................5

*General Dynamics Corporation v. United States*,
131 S. Ct. 1900 (2011).............................................................17, 82, 5

*Giordano v. United States*,
394 U.S. 310 (1969)...........................................................................67

v

*In re Golinski*,
    587 F.3d 901 (9th Cir. 2009) ...............................................................69

*Gratz v. Bollinger*,
    539 U.S. 244 (2003).............................................................................39

*Guaranty Nat. Ins. Co. v. Gates*,
    916 F.2d 508 (9th Cir. 1990..............................................................74

*Halkin v. Helms*,
    598 F.2d 1 (D.C. Cir. 1979) ...............................................................87

*Halpern v. United States*,
    258 F.2d 36 (2d Cir. 1958) .................................................................68

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006).............................................................................78

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004).............................................................................78

*Handschu v. Special Servs. Div.*,
    475 F. Supp. 2d 331 (S.D.N.Y. 2007) ..............................................64

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982).............................................................................73

*Horn v. Huddle*,
    647 F. Supp. 2d 55 (D.D.C. 2009)......................................................85

*Ibrahim v. Dep't of Homeland Security*,
    No. 06-00545 (N.D. Cal. Jan. 14, 2014)............................................86

*Imbler v. Pachtman*,
    424 U.S. 409 (1976)...............................................................................3

*Jabara v. Webster*,
    691 F.2d 272 (6th Cir. 1982) ......................................................68, 87

*James v. Price Stern Sloan*,
    283 F.3d 1064 (9th Cir. 2002) ..............................................................7

*Jewel v. NSA,*
   673 F.3d 902 (9th Cir. 2011) ...............................................................55

*Jewel v. NSA,*
   965 F. Supp. 2d 1090 (N.D. Cal. 2013).......................................54, 58

*Kasza v. Browner,*
   133 F.3d 1159 (9th Cir. 1998) ..........................................53, 2, 66, 84

*Korematsu v. United States,*
   323 U.S. 214 (1944)...........................................................................70

*Larson v. Domestic & Foreign Commerce Corp.,*
   337 U.S. 682 (1949)...........................................................................74

*Larson v. Valente,*
   456 U.S. 228 (1982)....................................................................38, 42

*Latif v. Holder,*
   2014 U.S. Dist. LEXIS 85450 (D. Or. June 24, 2014) ......................47

*MacPherson v. IRS,*
   803 F.2d 479 (9th Cir. 1986) ......................................................33, 80

*Maurer v. Pitchess,*
   691 F.2d 434 (9th Cir. 1982) .............................................................80

*McCarthy v. Madigan,*
   503 U.S. 140 (1992)...........................................................................75

*Miller v. United States,*
   163 F.3d 591 (9th Cir. 1998) .............................................................35

*Ex Parte Milligan,*
   4 U.S. (4 Wall.) 2 (1866) ...................................................................78

*Mirmehdi v. United States,*
   689 F.3d 975 (9th Cir. 2012) .............................................................34

*Mitchell v. Forsyth,*
   472 U.S. 511 (1985).............................................................................7

*Mohammed v. Jeppesen Dataplan*,
　614 F.3d 1070 (9th Cir. 2010) (en banc) .....................................................*passim*

*In re Nat'l Sec. Agency Telecommunications Records Litig.*,
　564 F. Supp. 2d 1109 (N.D. Cal. 2008)................................................54, 55, 58

*Navajo Nation v. United States Forest Serv.*,
　535 F.3d 1058 (9th Cir. 2008) ............................................................................42

*Nurse v. United States*,
　226 F.3d 996 (9th Cir. 2000) ..............................................................................33

*Padilla v. Hanft*,
　432 F.3d 582 (4th Cir. 2005) ..............................................................................78

*Parhat v. Gates*,
　532 F.3d 834 (D.C. Cir. 2008)............................................................................78

*Pickard v. Department of Justice*,
　653 F.3d 782 (9th Cir. 2011) ..............................................................................46

*Ex Parte Quirin*,
　317 U.S. 1 (1942)................................................................................................78

*Reporters Committee for Freedom of Press v. Am. Tel. & Tel. Co.*,
　593 F.2d 1030 (D.C. Cir. 1978)..........................................................................64

*Shipp v. Todd*,
　568 F.2d 133 (9th Cir. 1978) ..............................................................................80

*Sklar v. C.I.R.*,
　549 F.3d 1252 (9th Cir. 2008) ............................................................................38

*Socialist Workers Party v. Attorney Gen. of United States*,
　642 F. Supp. 1357 (S.D.N.Y. 1986) ...................................................................34

*Spock v. United States*,
　464 F. Supp. 510 (S.D.N.Y. 1978) .....................................................................80

*Tenet v. Doe*,
　544 U.S. 1 (2005)..........................................................................................82, 83

*Totten v. United States*,
92 U.S. 105 (1876) ...................................................................*passim*

*United States v. Aguilar*,
883 F.2d 662 (9th Cir. 1989) .....................................63, 64, 65, 66

*United States v. Ajlouny*,
629 F.2d 830 (2d Cir. 1980) .................................................67

*United States v. Mayer*,
503 F.3d 740 (9th Cir. 2007) .............................................63, 64, 65

*United States v. Reynolds*,
345 U.S. 1 (1953) ....................................................................*passim*

*United States v. Sterling*,
724 F.3d 482 (4th Cir. 2013) .....................................................66, 68

*Weston v. Lockheed Missiles & Space Co.*,
881 F.2d 814 (9th Cir. 1989) ...............................................84

*Whren v. United States*,
517 U.S. 806 (1996) ................................................................33

## Statutes

5 U.S.C. 552a ...........................................................................14

18 U.S.C. app. III ....................................................................69

28 U.S.C. 1291 ...........................................................................7

28 U.S.C. 1331 ......................................................................6, 61

28 U.S.C. 1346(b) ..............................................................*passim*

42 U.S.C. 1985 .........................................................................14

42 U.S.C. 2000bb-1....................................................14, 42, 48

50 U.S.C. 1801(f) ...................................................................60

50 U.S.C. 1806(c) ......................................................................50, 52, 57

50 U.S.C. 1806(f) .................................................................................*passim*

50 U.S.C. 1810 .....................................................................................*passim*

Cal. Civil Code § 52.1 ..............................................................................14

**Other Authorities**

FBI's Domestic Investigations and Operations Guide (2008)
    (Section 4.2(B) at 27–28),
    http://vault.fbi.gov/FBI%20Domestic%20Investigations
    %20and%20Operations%20Guide%20%28DIOG%29/fbi-
    domestic-investigations-and-operations-guide-diog-2008-version ....................40

Attorney General's Guidelines for Domestic FBI Operations (2008)
    (Section 8 at 39), http://justice.gov/ag/readingroom/guidelines.pdf ..................44

Permanent Select Committee on Intelligence, Foreign Intelligence
    Surveillance Act of 1978, H.R. Rep. 95-1283, Pt. I, 95th Cong., 2d
    Sess. 21 (1978) .................................................................................54

Select Committee on Intelligence, Foreign Intelligence Surveillance
    Act of 1978, S. Rep. No. 95-701, 95th Cong., 2nd Sess. 16 (1978) ............54, 55

Ian MacDougall, *CIPA Creep: The Classified Information Procedures
    Act and Its Drift into Civil National Security Litigation*, 45
    COLUM. HUM. RTS. L. REV. 668 (2014) ........................................................69

John Stanton, *Government Declares Undocumented Immigrant Child,
    Mother A "National Security Threat"* (August 5, 2014),
    http://www.buzzfeed.com/johnstanton/government-declares-
    undocumented-immigrant-child-mother-a-na ..................................................71

Erwin Chemerinsky, FEDERAL JURISDICTION § 9.1, at 632
    (6th ed. 2012) .................................................................................74

Henry Hart, *The Power of Congress to Limit the Jurisdiction of
    Federal Courts: An Exercise in Dialectic*, 66 HARV. L. REV. 1362
    (1953) .........................................................................................74

Richard H. Fallon, Jr. et al., HART AND WECHSLER'S THE FEDERAL
    COURTS AND THE FEDERAL SYSTEM 845 (6th ed. 2009).....................................74

Richard Fallon, *Jurisdiction-Stripping Reconsidered*, 96 VA. L. REV.
    1043, (2010)........................................................................................................75

ACLU, *Muslims Need Not Apply* (2013),
    https://www.aclusocal.org/CARRP ...................................................................80

## INTRODUCTION

Do the federal courts have any role to play in assessing the legality of FBI investigations undertaken in the name of "counterterrorism"? That is the basic question presented on this appeal. The district court essentially answered, "No," by dismissing nearly all of Plaintiffs' claims under the state secrets privilege. That decision was both incorrect and unnecessary.

Plaintiffs' complaint describes in extraordinary detail a prolonged program by Defendants — FBI agents, their supervisors, and the United States — to deliberately and explicitly target Muslims in Southern California for surveillance. According to the complaint, just weeks after Defendant Tidwell (then the head of the FBI's Los Angeles Field Office) visited local Muslim leaders and assured them the FBI would not conduct covert surveillance in mosques, the FBI inserted a paid *agent provocateur* who, by misrepresenting his identity, infiltrated several large mosques in Orange County for the purpose of gathering information on Muslims. Over the course of fourteen months, under the name "Operation Flex," Defendants directed the informant to indiscriminately collect personal information on hundreds and perhaps thousands of innocent Muslim Americans, gathering hundreds of phone numbers; thousands of email addresses; hundreds of hours of video recordings that captured the interiors of mosques, homes, businesses, and the associations of hundreds of Muslims; thousands of hours of audio recording of

conversations — both where he was and was not present — as well as recordings of religious lectures, discussion groups, classes, and other Muslim religious and cultural events occurring in mosques. Defendants also set up audio and video recording devices in the home of one Plaintiff and the office of another, without any warrant to do so.

Defendants did not limit the informant to specific targets. Instead, they repeatedly made clear that they were interested simply in Muslims; that the informant should gather as much information on as many people in the Muslim community as possible; that "the United States was five to ten years behind Europe in the extent of Islamic presence, and that they needed to build files on as many individuals as possible so that when things started to happen, they would know where to go;" and that "Islam is a threat to our national security." This misguided instruction was consistent with FBI training documents in use at the time, which taught agents to treat Islam itself as a threat.

This dragnet investigation ended when members of the Muslim community reported the informant to the FBI because of his attempts to exhort them to violence and ultimately obtained a restraining order against him. It did not result in even a single conviction related to counterterrorism.

The FBI's operation did not remain a secret. An FBI agent revealed the informant's identity in court, after which the informant himself repeatedly gave

detailed statements to the press. Indeed, the informant filed a detailed 48-page set of declarations in this case supporting Plaintiffs' allegations. *See generally*, Plaintiffs-Appellants' concurrently submitted Excerpts of Record (hereinafter ER) at 85–138 (Declarations of Craig Monteilh, hereinafter Monteilh Dec.). And the FBI has repeatedly acknowledged — including in this case —the existence of Operation Flex and its use of the informant.

Plaintiffs subsequently brought this action, claiming that Defendants engaged in unlawful searches, unlawful discrimination, and the improper retention of unlawfully collected information. They sought both damages and the destruction of the records from the investigation that the Government continues to maintain. But at the very outset of the litigation, on the Government's motion, the district court dismissed nearly all of the claims in this case for only one reason: because the Government asserted that defending against those claims would require disclosure of "state secrets." The only claims the district court did not dismiss were those arising under the Foreign Intelligence Surveillance Act (FISA), which the Government did not move to dismiss on state secrets grounds.

The district court's decision dismissing all but one of Plaintiffs' claims, prior to any discovery, constitutes a remarkable abdication of judicial responsibility. If affirmed, it would effectively close the courthouse doors to *all* constitutional claims brought by United States citizens and lawful residents— even claims for

relief against blatantly illegal activity that remains ongoing— so long as the Government conducts its activities in secret under the banner of counterterrorism. That position is at war with the most fundamental principles of our constitutional system, unauthorized by any controlling authority, and irreconcilable with the Government's practice in other cases, including most obviously the habeas corpus cases involving alleged enemy combatants. At a minimum, the question whether the Constitution permits dismissal of Plaintiffs' claims based on the state secrets privilege, given that Plaintiffs are United States citizens and lawful residents seeking relief from ongoing constitutional violations arising in the United States, presents a very serious constitutional question that the district court should have avoided. *See infra* Section III.

This Court can avoid the serious constitutional problems raised by the district court's dismissal order by reversing it on either of two narrower grounds. First, the Court can hold that the district court acted prematurely in dismissing nearly the entire case at this preliminary stage. The state secrets privilege warrants dismissal only where a court can determine "with certainty … that litigation must be limited or cut off in order to protect state secrets, even before any discovery or evidentiary requests have been made." *Mohammed v. Jeppesen Dataplan*, 614 F.3d 1070, 1081 (9th Cir. 2010) (*en banc*). The district court erred in making that determination here. A proper understanding of Plaintiffs' claims reveals that they

4

likely can be litigated without the need to disclose any secret evidence. *See infra* Section I.

Second, the Court can hold that the district court erred by failing to use alternative procedures for handling any sensitive national security information that may arise. Because the district court correctly declined to dismiss Plaintiffs' FISA claims, it will already be utilizing FISA's procedures for handling sensitive national security information that relates to electronic surveillance. FISA requires that those same procedures be used to handle sensitive information related to electronic surveillance even if it arises in the context of litigating non-FISA claims. And even if FISA, by its terms, does not require the use of its procedures for non-FISA claims, the same information needed to litigate Plaintiffs' FISA claims will likely be at issue in Plaintiffs' other search and discrimination claims. To dismiss Plaintiffs' claims under the state secrets privilege — on grounds that the Court cannot risk secret information being introduced into litigation — when that same information is already in evidence pursuant to FISA's protective procedures, would turn the state secrets privilege into a formalistic excuse to dismiss claims against the Government entirely untied from its rationale. *See infra* Section II.

## STATEMENT OF JURISDICTION

This case presents claims under federal law filed by Plaintiffs against the United States, the FBI, and other federal officials in their individual and official

capacities. First Amended Complaint (hereinafter Complaint or FAC), ER 242–48 at ¶¶ 226–60). The district court had jurisdiction pursuant to 28 U.S.C. 1331 and 1343.

On August 14, 2012, the district court entered two orders adjudicating the Defendants' various motions to dismiss. In one, the district court denied qualified immunity to the Individual Defendants on Plaintiffs' claims under the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. 1810, thus permitting those claims to proceed. *See* Dkt. No. 102 at ER 25. Individual Defendants filed notices of appeal from the denial of qualified immunity on the FISA claims on October 12, 2012. *See* Dkt. Nos. 112, 115 at ER 315, 316.[1]

In its other order, the district court dismissed all other claims — the remaining claims against Individual Defendants and all claims against the Government — under the state secrets privilege. *See* ER 31–66. The district court entered partial final judgment under Federal Rule of Civil Procedure 54(b) in favor of all Defendants on all the remaining claims on December 3, 2012. *See* ER 13–17, 11–12. In severing the judgment under Rule 54(b), the district court determined that the dismissal on state secrets grounds was a "final judgment" that is an "ultimate disposition of an individual claim entered in the course of a multiple

---

[1] Those appeals were consolidated with this one and designated by the Court's briefing schedule as cross-appeals. Plaintiffs therefore do not argue in support of the ruling in Dkt. 102 here, but will do so in their subsequent brief.

claims action." ER 15. The district court also determined that there was no just reason for delay because the only remaining claims in the case — the FISA claims — were already on appeal from the district court's denial of qualified immunity, and the district court had stayed the case pending outcome of that appeal. Therefore, permitting immediate appeal of the state secrets dismissal would permit this Court to resolve related appeals simultaneously, thus serving judicial efficiency, streamlining litigation, and potentially reducing the need for additional appeals. ER 4.

Plaintiffs timely filed a notice of appeal from the partial final judgment on January 3, 2013. ER 1–10; Fed. R. App. P. 3, 4(a)(1)(B). This court has jurisdiction to hear both sides' appeals pursuant to 28 U.S.C. 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *James v. Price Stern Sloan*, 283 F.3d 1064, 1067 n.6 (9th Cir. 2002).

## STATEMENT OF FACTS

This case arose out of a highly publicized set of disturbing incidents involving FBI surveillance of Muslim communities in Southern California over a fourteen month period in 2006 and 2007.

In the face of substantial public concern that the FBI's counterterrorism operations had become a dragnet investigation on Muslims, in June 2006, Defendant Stephen Tidwell (then the Los Angeles FBI Assistant Director) attended

7

a forum for the Muslim community at the Islamic Center of Irvine ("ICOI"), where he assured an audience of about two hundred people that the FBI would only enter mosques openly, to do outreach to the community, and that it would not send covert informants into mosques for the purpose of monitoring the Muslim community. FAC, ER 197 ¶ 47. However, at that time Tidwell had already approved a program to send covert informants into mosques. At some time prior to July 2006, the FBI hired Craig Monteilh to become a paid informant for them to covertly gather information about Muslims in the Irvine area. FAC, ER 198 ¶ 48. Monteilh's actions, which he subsequently disclosed to Plaintiffs and other members of the public, would become the basis for many of the allegations in this complaint. FAC, ER 181–82 ¶ 1–8.

The complaint that the district court dismissed on state secrets grounds paints in fine detail a picture of the 14 month-long investigation that explicitly and intentionally discriminated against Muslims because of their religion. *See generally* FAC, ER 179–257; ER 36–38 (district court description of complaint). To summarize, FBI officers ran an undercover operation, the central and explicit purpose of which was to conduct surveillance and gather information on Muslims in Orange County. *See, e.g.*, FAC, ER 207 at ¶¶ 88, 89 (agents did not limit informant to specific targets, but "repeatedly made clear that they were interested simply in Muslims"), *id.* at ¶ 89 (gave informant no specific targets but "told him

8

to gather as much information on as many people in the Muslim community as possible"), *id.* at ¶ 90. Defendants told their informant, "We want to get as many files on [the Muslim] community as possible." *Id.* They told him that "the United States was five to ten years behind Europe in the extent of Islamic presence, and that they needed to build files on as many individuals as possible so that when things started to happen, they would know where to go." *Id.* They told him that "Islam is a threat to our national security." FAC, ER 215 ¶ 121, 225 ¶ 162. They told him to focus on Muslims who appeared more devout (for example, as demonstrated by a willingness to attend late evening or early morning prayers) because they were "more suspicious." FAC, ER 212 ¶ 110; *see also* FAC, ER 207 ¶ 89, 209 ¶ 96, 211 ¶104). They instructed him to get the names of any leadership figures within mosques, and told him that they considered the leaders in the Muslim community — board members and leadership of mosques and leaders of Muslim organizations — to be potential threats. FAC, ER 207–08 ¶ 91, 209 ¶ 96, 221 ¶ 144.

As the district court described, the complaint alleges that "through Monteilh, Defendants gathered information on Muslims and their associates consisting of hundreds of phone numbers and thousands of email addresses; background information on hundreds of individuals; hundreds of hours of video recordings that captured the interiors of mosques, homes, businesses, and the associations of

9

Muslims; and thousands of hours of audio recordings of conversations as well as recordings of religious lectures, discussion groups, classes, and other Muslim religious and cultural events occurring in mosques." ER 38.

The complaint alleges that Defendants collected this information in a discriminatory manner by consistently giving instructions that made religion the primary criterion for suspicion. They focused explicitly on Muslims and the Muslim community: they gave Monteilh daily quotas on the number of Muslims he should get contact information from, FAC, ER 217 ¶ 131; told him to work out at the gym with members of the Muslim community in order to get close to them and obtain information, FAC, ER 213¶ 114; gave him a standing order to report on Muslims' charitable giving, travel plans, or fundraising activities, FAC, ER 105–07 ¶¶ 105–07, as well as any lectures, classes or any other events held at mosques, FAC, ER 212 ¶¶ 108–09, 218 ¶ 133. And while they discarded information inadvertently gathered on non-Muslims, FAC, ER ¶ 120, within the targeted group of Muslims they were indiscriminate: they instructed Monteilh to unearth as much information about as many Muslims as possible through as many methods as possible, without specific targets. FAC, ER 207 ¶¶ 101–03.

Plaintiffs' allegations were largely consistent with the FBI's prior practices, internal policies, and agent training. Over the previous few years, the FBI had interviewed hundreds of people in the Southern California Muslim community,

often by sending agents to appear unannounced at their homes or workplaces, and often asking questions about religious practices that had no discernible relationship to criminal activity, such as what mosque interviewees attended, how many times a day they prayed, or what they thought of particular religious scholars. FAC, ER 197 ¶ 46. Documents obtained through records requests show that the FBI had collected information about law-abiding Muslim community leaders, as well as information about lawful activities and events organized by mosques and other Muslim organizations — including events on political issues such as the war in Iraq or immigration reform, and a wide variety of fundraising events. *Id.*

Plaintiffs' allegations were also consistent with Defendant Rose's own statements. In May 2006, Rose (who was at that time a supervisor of the FBI's Orange County counterterrorism operations) spoke at a private event, where she indicated that the FBI's counterterrorism operations had been active in the area, that there were "a lot of individuals of interest right here in Orange County," and that the FBI frequently received calls from people who wanted to tell them about situations like a Muslim neighbor who is changing his license plates or someone who has an apartment with only a mattress and five computers, which she followed by saying, "I can't tell you how many" tips like that paid off. FAC, ER 195–96 ¶ 43.

11

During this time period, the FBI's policies had also moved toward allowing the explicit reliance on religion as a basis for investigation. Starting in 2002, the Attorney General's Guidelines and FBI internal policies moved towards policies and practices that explicitly focused on Muslims and Islam, *see, e.g.*, FAC, ER 187–94 ¶¶ 24–37, and the FBI trained its agents that Islam itself is inherently violent. The FBI even recommended to its agents readings that instructed that "Islam teaches that Muslims must wage war to impose Islamic law on non-Muslim states" and "American Muslim groups are engaged in a huge cover-up of Islamic doctrine and history," FAC, ER 195 ¶¶ 38, 39.

Aside from these allegations of religious discrimination, Plaintiffs also pled violations of the Fourth Amendment and related statutory protections with great specificity. The FAC alleges that Defendants told Monteilh that they did not need warrants for national security investigations, FAC, ER 218–19 ¶ 136, and engaged in several types of clearly unlawful warrantless surveillance. Defendants instructed him to take secret video of the interior of mosques, including any security, and used the information to enter mosques. FAC, ER 229 ¶ 174. Defendants secretly planted electronic surveillance devices in mosques, including in Plaintiff Fazaga's office. FAC, ER 208–09 ¶ 95. Defendants also allowed the informant to use recording devices to capture private conversations at the mosque when he was not present, FAC, ER 209–10 ¶ 98, 216 ¶ 126, 232–33 ¶ 192, 237–38 ¶ 211; to obtain

12

warrantless video surveillance of mosques (including private areas) and even the inside of Plaintiff AbdelRahim's home, FAC, ER 211–12 ¶ 108, 216 ¶ 129, 228–29 ¶¶ 172–73, 230 ¶ 182, 232–33 ¶ 192, 235–36 ¶¶ 201–02); and to record every conversation the informant had with members of the Muslim community in his daily contacts over more than a year, amassing personal information on hundreds if not thousands of Muslims. FAC, ER 181 ¶ 2.

Because this case was dismissed at the pleadings stage, the district court was required to assume that the plausible allegations described above were true. In this case, there could be no serious dispute as to the plausibility of the allegations, because Plaintiffs supported them with extensive evidence, including declarations from the former FBI informant, as well as a wealth of references to publicly-available information. *See generally* Monteilh Dec., ER 85–138. On appeal, this Court must do the same.

## STATEMENT OF THE CASE

Plaintiffs' First Amended Complaint alleges primarily two types of claims: Plaintiffs pled claims alleging unconstitutional searches by Defendants, in violation of the Fourth Amendment; the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. 1810; California tort claims (both under Article 1, section 1 of the California constitution and common law invasion of privacy torts) actionable through the Federal Tort Claims Act (FTCA), 28 U.S.C. 1346(b), 2671 *et seq.*

(collectively the "search claims"). Plaintiffs also pled claims alleging unlawful discrimination on the basis of religion, in violation of the First Amendment and the Fifth Amendment's Equal Protection Clause under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971); and the Ku Klux Klan Act (42 U.S.C. 1985); the Religious Freedom Restoration Act (RFRA), 42 U.S.C. 2000bb-1; and in violation of California's constitution and the Bane Act, Cal. Civil Code § 52.1 through the FTCA (collectively the "discrimination claims"). Plaintiffs also brought a claim under the Privacy Act, 5 U.S.C. 552a, alleging Defendants are improperly retaining unlawfully collected information about Plaintiffs' First Amendment activity. The FTCA claim also includes liability for intentional infliction of emotional distress under California law.[2]

Plaintiffs bring these claims against two categories of Defendants. Plaintiffs seek damages against five FBI agents in their individual capacities (collectively the "Individual Defendants") who directly authorized, supervised, and executed Operation Flex. These include Defendants Paul Allen and Kevin Armstrong, who directly participated in and handled day-to-day execution of Operation Flex and dealt with the informant, FAC, ER 185 ¶¶ 18–19; and three individuals who

---

[2] For ease of reference, Plaintiffs have included in the Excerpts of Record a "claims map" that they provided to the district court, showing which claims were brought against which Defendants, what relief they sought, and whether the Government had moved to dismiss it under the *Reynolds* privilege. ER 152–54.

directly supervised those Agents: Pat Rose, a supervisor of FBI's Orange County counterterrorism operations; J. Stephen Tidwell, the Assistant Director in Charge of the FBI's Los Angeles Field Office; and Barbara Walls, the Assistant Special Agent in Charge of that same office, FAC, ER 185–87 ¶ 20–22.

Plaintiffs also sought damages, injunctive relief, or both against certain government entities and individuals in their official capacities (collectively the "Government" or "Government Defendants"). These include the FBI as a defendant in the Privacy Act Claim, FAC, ER 245–46 ¶¶ 245–49, the United States as a defendant in the FTCA claim, FAC, ER 247–48 ¶¶ 254–60, then-FBI director Robert Mueller and Assistant-Director-in-Charge of the FBI's Los Angeles Division, Steven M. Martinez, both in their official capacity, and all of these Defendants for purposes of the constitutional claims, FAC, ER 242–44 ¶¶ 226–37, 244–45 ¶¶ 240–44, 246 ¶ 250–51.[3]

On November 4, 2011, the Government filed its Motion to Dismiss the Amended Complaint and for Summary Judgment. In it, the Government argued that all of Plaintiffs' statutory and constitutional claims failed on various non-privilege grounds. In addition, the Government asserted that all of Plaintiffs'

---

[3] The injunctive relief Plaintiffs seek would take the form of an order compelling the Government Defendants to destroy or return information unlawfully gathered and maintained on Plaintiffs and putative class members by the FBI in the course of Operation Flex. *See* FAC, ER 248–49 ¶¶ 68–69.

discrimination-related claims, but *not* the unlawful search claims, had to be dismissed because litigating them would require disclosure of state secrets. *See* Defendants' Notice of Motion and Motion to Dismiss Amended Complaint and for Summary Judgment (hereinafter Gov't Br.), ER 161–62.[4]

Specifically, the Government asserted privilege over three broad categories of information: 1) evidence identifying whether anyone "was or was not the subject of an FBI counterterrorism investigation," 2) the "reasons for" and "results" of any FBI counterterrorism investigation, and 3) information "that could tend to reveal whether particular sources and methods were used in a counterterrorism investigation." Gov't Br., ER 169.

At the same time, however, the Government made clear that its assertion of the state secrets privilege in this case was "limited," both as a factual and legal matter. Gov't Br., ER 160. As a factual matter, the Government stated explicitly that it did not assert the state secrets privilege over much of the evidence collected by its informant. The Government noted that it had previously disclosed that Monteilh collected "audio and video information," had previously disclosed some of that surveillance in other proceedings, and "expect[ed] that the majority of the

---

[4] Specifically, the Government characterized the discrimination claims as Counts 1–7. The remaining claims, including those clearly defined as search claims (Counts 9 and 10) as well as Count 8 (Privacy Act) and at least some portions of Count 11 (FTCA) are not covered by the Government's privilege assertion. Gov't Br., ER 162.

16

audio and video will be available in connection with further proceedings," Gov't Br., ER 161–62.

As a legal matter, the Government limited its assertion by seeking to assert only the state secrets *evidentiary privilege*, rather than the state secrets *justiciability bar*. The concept of the state secrets doctrine encompasses two very different federal common law rules. One consists of a justiciability bar that requires dismissal of lawsuits "where the very subject matter of the action is a matter of state secret," *Jeppesen*, 614 F.3d at 1077–78 (discussing *Totten v. United States*, 92 U.S. 105, 107 (1876)) (internal quotation marks omitted) (hereinafter the "*Totten* bar"). The other is an evidentiary doctrine (hereinafter "*Reynolds* privilege"), that protects "against revealing military [or state] secrets" by requiring removal of "privileged evidence from the litigation." *Id*. at 1079 (citing *United States v. Reynolds*, 345 U.S. 1, 6–7 (1953); *see also General Dynamics Corporation v. United States*, 131 S. Ct. 1900, 1905–06 (2011) (distinguishing between justiciability bar, which invokes the court's "common-law authority to fashion contractual remedies in Government-contracting disputes," and the "quite different" evidentiary privilege, which protects the Government's "sometimes-compelling" interest in secrecy through "a Government privilege against court-ordered disclosure of state and military secrets"). Assertion of the *Reynolds* privilege also may lead to dismissal of a lawsuit, but only where "the plaintiff

cannot prove the prima facie elements of her claim with nonprivileged evidence …
the privilege deprives the defendant of information that would otherwise give the
defendant a valid defense to the claim … [or it is] impossible to proceed with the
litigation because … litigating the case to a judgment on the merits would present
an unacceptable risk of disclosing state secrets." *Jeppesen*, 614 F.3d at 1083
(internal quotation marks omitted).

The Government did not seek dismissal of any claims on the basis of the
*Totten* bar. It stated explicitly that the only basis for dismissal arose from the
*Reynolds* privilege, where it claimed that litigating Plaintiffs' discrimination-
related allegations "will risk or require the disclosure" of state secrets. Declaration
of Mark F. Giuliano (hereinafter Giuliano Dec.), ER 264 ¶ 6; *see also* Gov't Br.,
ER 160. The Government also did *not* seek dismissal of Plaintiffs' search-related
challenges on state secrets grounds, Gov't Br., ER 161. *See also* Government
Defendants' Reply in Support of Motion to Dismiss (hereinafter Gov't Reply), ER
72 ("[T]he Government … [is] not seeking to exclude all information collected by
the FBI's former confidential source … and [is] not seeking dismissal of all claims
based on the privilege. However, privileged information is clearly at issue in
plaintiffs' religious discrimination claims."); Gov't Reply, ER 76–77 ("The
Government has not asserted privilege over the fact that Mr. Monteilh obtained
audio and video information").

18

In support of its privilege claim, the Government submitted for *ex parte*, *in camera* review a classified declaration of Mark F. Giuliano, FBI Assistant Director in its Counterterrorism Division, as well as a classified supplemental memorandum, which, according to the Government, argued why litigating the case would risk disclosure of state secrets. ER 306 at Dkt. No. 35–36. Plaintiffs moved *ex parte* to stay the district court's review of the classified filings until after consideration of the state secrets argument, *id.* at Dkt. No. 39, but the district court denied the application, ER 307 at Dkt. No. 46. In addition to the Government's Motion, the Individual Defendants filed two separate Motions to Dismiss on November 11, 2011, seeking dismissal of all claims against them on state secrets grounds, as well as other grounds not at issue here. ER 306 at Dkt. Nos. 41–42.[5]

Plaintiffs responded to the Government's Motion on the merits, arguing that all of their claims — including their claims for injunctive relief and damages under the Constitution, the Privacy Act, and the Federal Tort Claims Act — were not

---

[5] Individual Defendants raised qualified immunity as well as other grounds for dismissal. Although the district court did not address the merits of the other arguments advanced by any of the Defendants, it stated that, but for the assertion of the *Reynolds* privilege, the other grounds for dismissal were "limited and do not entirely warrant dismissal of Plaintiffs' claims." ER 52 at n.10). For the purposes of this appeal, this Court should assume the validity of the district court's evaluation of the Government's non-*Reynolds* bases for dismissal, which were made on extensive briefing and argument. After reversing the district court's dismissal order, this Court should remand for full consideration of Defendants' other arguments in favor of dismissal.

19

subject to dismissal. In addition, Plaintiffs argued that dismissal based on the *Reynolds* privilege was inappropriate for several reasons, including that that dismissal would be premature because Plaintiffs' claims could likely be litigated without the disclosure of privileged evidence; that the treatment of any secret evidence at issue should be governed by FISA; and that the Constitution does not permit dismissal of claims seeking injunctive relief from ongoing constitutional violations. ER 309 at Dkt. No. 64. Along with their opposition, Plaintiffs filed a lengthy declaration from the informant himself corroborating the allegations in the complaint. *See* Monteilh Dec., ER 85–138.

The district court heard oral arguments on August 14, 2012, and on that same day issued its orders. ER 314 at Dkt. Nos. 101–03. In one order on the Individual Defendants' Motions, the district court ruled that Plaintiffs' FISA claims would survive against the Individual Defendants. That order is not the subject of this brief, as Plaintiffs agree with the decision not to dismiss their FISA claims.

In the other order, the district court granted the Government's Motion to Dismiss on the basis of the *Reynolds* privilege and dismissed every claim in the case other than the FISA claim on that basis. The Order acknowledged that Plaintiffs' FISA claims would survive dismissal under its rulings, but held that Plaintiffs' FISA claims against the Individual Defendants—which the Government

had not sought to dismiss—did not foreclose reliance on the *Reynolds* privilege as to Plaintiffs' other claims, since "litigating those non-FISA claims will require information, including privileged evidence, beyond that contemplated by FISA." ER 48. The court also rejected Plaintiffs' argument that the *Reynolds* privilege is inapplicable to cases that seek relief from ongoing constitutional injury. ER 48–49.

Turning to the state secrets argument itself, the district court ruled that the *Reynolds* privilege protects against the disclosure of three categories of information it viewed as crucial to litigating Plaintiffs' claims: evidence revealing (1) subject identification, (2) reasons for initiating particular counterterrorism investigations, and (3) particular sources and methods used in its counterterrorism investigations. Relying "heavily" upon the classified declarations and supplemental memoranda filed *ex parte* and *in camera* by the Government, the court ruled that the disclosure of these three categories of information "could reasonably be expected to cause significant harm to national security," thereby warranting exclusion. ER 54. The court further ruled that the Government would need to rely on the privileged material to raise defenses to Plaintiffs' claims, and that the secret evidence was in any event so inextricably tied up with non-privileged material that "the risk of disclosure that further litigation would engender cannot be averted through protective orders or restrictions on testimony." ER 64 (citing *Jeppesen*, 614 F.3d at 1089). It therefore chose to dismiss all claims against the

21

Government—even the search claims which the Government itself did not move to dismiss—on the basis of *Reynolds*, except for Plaintiffs' FISA claims.[6]

## QUESTIONS PRESENTED ON APPEAL

1.     Whether the district court erred in dismissing, at the pleading stage, Plaintiffs' unlawful search claims based on the *Reynolds* privilege, even though the Government did not seek dismissal of those claims on *Reynolds* grounds and even though the district court did not— and could not— determine "with certainty" that litigation of those claims must be cut off to protect state secrets.

2.     Whether the district court erred in concluding "with certainty," at the pleadings stage, that litigation of the defenses to Plaintiffs' discrimination claims would necessarily require disclosure of information privileged under *Reynolds*, thus requiring the dismissal of Plaintiffs' discrimination claims.

3.     Whether the district court erred in dismissing Plaintiffs' claims based on the *Reynolds* privilege on grounds that litigation must be cut off to protect privileged evidence, when a) the bulk of that evidence is "relating to electronic

---

[6] The parties also engaged in lengthy settlement negotiations both before and after the district court's rulings on the motions to dismiss and during the pendency of this appeal, with multiple meetings between March 29, 2012, and February 5, 2014, but were unable to reach an agreement. ER 310–20 (Dkt. Nos. 72, 80, 83, 85, 88, 92, 96, 108–10, 134–35, 138–39, 142–48); See also Docket, Case No. 13-55017, Nos. 7-1 (order by Circuit Mediator entered Feb. 1, 2013, vacating briefing schedule), 24 (order entered April 18, 2014, releasing case from mediation program).

surveillance" and therefore subject to FISA's procedures, and b) would in any event be subject to FISA's procedures when Plaintiffs' FISA claim is adjudicated, because the FISA claim will require consideration of largely the same evidence as the non-FISA claims.

4.     Whether the district court erred in refusing to handle any remaining evidence not related to electronic surveillance through FISA procedures or procedures analogous to FISA, even if it could have determined at this early stage that such evidence would have been necessary to the litigation.

5.     Whether the district court erred in not adopting alternative procedural safeguards so as to avoid deciding the constitutional question presented here: whether the Constitution permits dismissal on the *Reynolds* privilege of claims that seek relief from ongoing constitutional violations against U.S. residents and citizens from harms arising in the United States.

## STANDARD OF REVIEW

This Court "review[s] de novo the interpretation and application of the state secrets doctrine and review[s] for clear error the district court's underlying factual findings." *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1077 (9th Cir. 2010) (*en banc*). In addition, if the Court would otherwise affirm the district court based on the *Reynolds* privilege, it must "independently and critically" determine whether the evidence at issue remains properly treated as a state secret. *Id*. at 1086.

23

## SUMMARY OF ARGUMENT

The district court's dismissal of the bulk of Plaintiffs claims based on the *Reynolds* privilege, at this preliminary stage, constitutes a profound abdication of its judicial responsibility. Under our constitutional system, where a federal court has jurisdiction to hear claims by individuals asserting that the Government is violating their constitutional rights, our system does not permit the court to simply decline to grant relief without addressing the claims at all. *See Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (striking down jurisdiction stripping provision in national security context because it would "lead[] to a regime in which Congress and the President, not this Court, say 'what the law is') (citing *Marbury v. Madison*, 1 Cranch 137, 177 (1803)); *Cohens v. Virginia*, 19 U.S. 264, 404 (1821) (Marshall, C.J.) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution.").

The district court shirked that responsibility by accepting the Government's state secrets assertion. On the Government's view, it has the authority to close the courthouse doors to *all* constitutional claims challenging its conduct — even claims for relief against blatantly illegal, ongoing activity — so long as the Government engages in that activity in secret and under the banner of counterterrorism. But no controlling case has ever accepted that radical assertion,

as it cannot be reconciled with the most fundamental principles of our constitutional system. Thus, this Court should avoid resolving the very difficult constitutional question that the district court decided: whether the *Reynolds* privilege can justify dismissal of Plaintiffs' claims on the merits, given that they seek relief against alleged ongoing constitutional violations. *See infra* Section III.

While the district court incorrectly answered the difficult constitutional question this case poses, it also erred by even deciding it, because it should have rejected the Defendants' motions to dismiss on two narrower grounds. First, the district court erred by concluding, at this early stage of this case, that litigation of nearly all of Plaintiffs' claims would "with certainty" require disclosure of *Reynolds*-privileged matter. *See infra* Section I. With respect to Plaintiffs' claims related to unlawful searches — under the Fourth Amendment, California law actionable under the FTCA, and the Privacy Act — the district court's dismissal order was obviously erroneous, as even the Government had not sought dismissal of those claims under the *Reynolds* privilege. As the Government was forced to acknowledge, those claims could be litigated with non-privileged material in light of the substantial disclosures about the surveillance program at issue in this case. *See infra* Section I.A.

The district court's ruling was equally premature with respect to Plaintiffs' discrimination claims, as Plaintiffs can readily prove a *prima facie* case of religious

discrimination based on publicly available evidence as alleged in the complaint, and it is far from a "certainty" that Defendants would be able to rely on secret evidence to establish a defense to those claims. Plaintiffs argue that Defendants adopted a *facially discriminatory classification* by targeting them for surveillance because of their religion. Put simply, Plaintiffs' claim is that religion should be treated like race for purposes of anti-discrimination law — its use must always be justified by strict scrutiny. Plaintiffs need no discovery at all to establish a *prima facie* case that Defendants surveilled them because of their religion. Similarly, the Government need not reveal much, if indeed anything, about its counterterrorism activities in order to admit or deny whether religion was *a factor* in deciding to surveil Plaintiffs. Thus, litigation of this case may well not require disclosure of state secrets at all, and the district court erred by assuming at this early stage that such disclosure would be required. *See infra* Section I.B.

Second, even if the district court were right to conclude that some secret evidence would inevitably arise in litigation of Plaintiffs' claims, it erred in dismissing those claims given that it had also ruled, correctly, that Plaintiffs' FISA claims would be permitted to proceed. The district court's ruling with respect to Plaintiffs' FISA claim has important implications for the rest of this case, because Congress preempted the *Reynolds* privilege in cases involving information "relating to electronic surveillance" through the passage of FISA. *See* 50 U.S.C.

26

1806(f). Because litigation of the other claims — not merely the FISA claim — will require disclosure of information "relating to electronic surveillance," and because the same evidence needed to litigate the FISA claim is also needed to adjudicate the other claims, the district court should have ruled that it could apply FISA's procedures to whatever secret evidence would arise as to the other claims. This is true even as to the discrimination claims, because there is substantial overlap between the evidence needed to litigate those claims and the evidence at issue in the FISA claims. *See infra* Section II.A. And even if some of the evidence that could arise in discovery on the dismissed claims might not arise under litigation "relating to electronic surveillance" under FISA, the Court should have applied its common law authority to utilize FISA's specialized procedures or some comparable analogue for handling that limited evidence. *See infra* Section II.B.

## **ARGUMENT**

### I.    THE DISTRICT COURT ERRED BY PREMATURELY DISMISSING NEARLY ALL CLAIMS UNDER THE *REYNOLDS* PRIVILEGE, EVEN THOUGH IT COULD NOT HAVE BEEN "CERTAIN" THAT STATE SECRETS WOULD BE DIVULGED DURING LITIGATION

The district court erred in dismissing the bulk of Plaintiffs' claims at this early stage of the proceedings, not based on their merit, but based on its conclusion that they could not be litigated without divulging state secrets. Because the Government asserted only the *Reynolds* evidentiary privilege, the district court was

27

only permitted to dismiss Plaintiffs' claims at this stage if it could "determine *with certainty* from the nature of the allegations and the Government's declarations in support of its claim of secrecy that litigation must be limited or cut off in order to protect state secrets, even before any discovery or evidentiary requests have been made." *Jeppesen*, 614 F.3d at 1081 (emphasis added). A court must arrive at such certainty even as it "critically [] examine[s]" the government's invocation, viewing the government's proof with a "skeptical" eye. *Id*. at 1082. Such a showing "may be especially difficult when attempted before any request for specific information or evidence has actually been made." *Id.* at 1081. Here, the district court dismissed Plaintiffs' claims before they had the opportunity to serve any discovery.

The Government asserted the state secrets privilege over three extremely broad categories of information: 1) evidence identifying whether anyone "was or was not the subject of an FBI counterterrorism investigation," 2) the "reasons for" and "results" of any FBI counterterrorism investigation, and 3) information "that could tend to reveal whether particular sources and methods were used in a counterterrorism investigation." ER 169. However, as the Government's brief itself implicitly acknowledged, not all of the information falling into these three broad areas could categorically be labeled state secrets, particularly when understood in light of Plaintiffs' merits claims. To give perhaps the most obvious example, the Government itself acknowledged that the FBI used an informant —

Monteilh — to conduct electronic audio and video surveillance, ER 161–62, and his declaration and publicly-available evidence documents his surveillance on them at great length. Monteilh Dec., ER 85–138. That information obviously reveals that "particular sources and methods were used" here.

While Plaintiffs do not argue that no evidence in these three categories could ever be categorized as secret, a "rigorous" and "skeptical" review of the Government's state secrets assertions coupled with a careful analysis of Plaintiffs' claims makes clear that its attempt to obtain dismissal at this early stage should have been rejected.[7]

### A. THE DISTRICT COURT ERRED BY DISMISSING THE SEARCH CLAIMS UNDER THE *REYNOLDS* PRIVILEGE

In asserting the *Reynolds* privilege, the Government explicitly declined to seek dismissal of the search claims. The Government noted that it had previously disclosed that Monteilh collected "audio and video information," had previously disclosed some of that surveillance in other proceedings, and "expect[ed] that the majority of the audio and video will be available in connection with further proceedings." ER 161–62. The Government went on to assert:

[T]he FBI and official capacity defendants do not seek to dismiss

---

[7] The Government's invocation of the *Reynolds* privilege may also suffer from a procedural defect. Attorney General Holder's declaration strongly suggests that he did not review the evidence that the Government alleges to be secret, but instead only reviewed Mr. Giuliano's declarations. *See* Declaration of Eric H. Holder (hereinafter Holder Dec.) ER 284–85 at ¶ 3.

> plaintiffs' Fourth Amendment and FISA claims based on the state secrets
> privilege. At least at this stage of the proceedings, sufficient non-
> privileged evidence may be available to litigate these claims should they
> otherwise survive motions to dismiss on non-privilege grounds.

*Id.* Instead, the Government only sought dismissal of "the claims based on

allegations of discrimination based on religion," arguing that an inquiry into

whether Defendants had good reasons for their investigations, or improperly relied

on religion, would necessarily require disclosing whom they investigated and why.

*See* Gov't Br., ER 162, 171, 173–76.

The district court nonetheless dismissed all of Plaintiffs' claims other than

the FISA claims, including the other search claims (i.e., the Fourth Amendment

claims, the Privacy Act claims, and the FTCA claims based on unlawful search

torts). *See* ER 52 at n.10. But the court gave no explanation as to why Defendant's

assertion of the *Reynolds* privilege required dismissing Plaintiffs' Fourth

Amendment and Privacy Act claims, and there was no basis to reach that

conclusion. In addition, the court incorrectly concluded that litigation of the

discretionary function exception to the FTCA would require disclosure of state

secrets. *See* ER 60–62.

30

### i. The District Court Erred by Dismissing Plaintiffs' Fourth Amendment and Privacy Act Claims Without Explanation When the Government Did Not Seek Their Dismissal

To the extent the district court implied that evidence needed to litigate the search-related claims should remain secret even though the Government had not asserted the privilege over that evidence, that was clearly error. The court lacked the authority *sua sponte* to determine that evidence should be protected under *Reynolds*, because only the Government has authority to assert the privilege. *Reynolds*, 345 U.S. at 7 (state secrets privilege "belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party"); *Jeppesen*, 614 F.3d at 1080; *see also Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007) (state secrets privilege "permits *the government* to bar the disclosure of [certain] information") (emphasis added).

To the extent the district court determined that it should *sua sponte* dismiss the search claims because those claims could not be litigated without divulging information the Government had designated as privileged, that too was error, because the Government itself had stated that those claims could be litigated without dismissal and the district court had no basis on which to reject that assertion. *See* Gov't Br., ER 161. As the Government itself recognized, a large amount of "audio and video information" that Monteilh collected for the FBI, as well as information concerning "whether the FBI instructed or permitted Monteilh

to leave recording devices unattended in order to collect non-consenting communications," Gov't Br., ER 161–62, *was not secret* for purposes of the *Reynolds* privilege. As a result, even the Government recognized that the search-related claims did not have to be dismissed, and chose not to move for their dismissal on that basis. The district court's unexplained conclusion that litigation of the unlawful search claims would reveal privileged evidence cannot be justified in light of the Government's conclusion to the contrary. Indeed, Plaintiffs are unaware of any other case in which a court has dismissed claims against the Government based on the *Reynolds* privilege where the Government did not request dismissal on that basis.

A district court should dismiss a claim based on the *Reynolds* privilege only where it can "determine with certainty from the nature of the allegations and the government's declarations in support of its claim of secrecy that litigation must be limited or cut off in order to protect state secrets." *Jeppesen*, 614 F.3d at 1081. The district court made no such determination with respect to Plaintiffs' Fourth Amendment or Privacy Act claims, and its dismissal of those claims should be reversed.[8]

---

[8] The district court could not have made such a determination in any event, because, as the Government recognized, litigation of Plaintiffs' search claims would not require disclosure of privileged evidence. *See infra* Section I.B.ii. As the Government conceded below, the Privacy Act claim should be treated as a search claim for purposes of its privilege assertion, because that claim requires

### ii. The District Court Erred in Dismissing Plaintiffs' FTCA Claims Arising From Allegations of Unlawful Search

Plaintiffs' FTCA claims encompass both search claims and discrimination claims. As to search claims for which subjective motives are irrelevant, dismissal was plainly improper. *See generally Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *but see infra* Section II.A.iv (noting limited exception under good faith exception to invited informer doctrine).

The district court nonetheless dismissed Plaintiffs' FTCA claim because it concluded that litigation of the "discretionary function" defense to Plaintiffs' FTCA claims would require disclosure of privileged information. *See* ER 62. "The discretionary function exception precludes [FTCA] claims against the United States which are 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion was abused.'" *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000) (citing 28 U.S.C. 2680(a)). This conclusion was error.

_____

only proof that the Government collected and maintained records of Plaintiffs' First Amendment activities, including their religious activities such as prayer and congregational discussion, and that the continued maintenance of such records is neither "expressly authorized by statute" nor "pertinent to and within the scope of an authorized law enforcement activity." *See MacPherson v. IRS*, 803 F.2d 479, 485 n.9 (9th Cir. 1986).

33

This circuit and others have recognized that "governmental conduct cannot be discretionary if it violates a legal mandate." *Galvin v. Hay*, 361 F.3d 1134, 1151–52 (9th Cir. 2004) (quoting *Nurse*, 226 F.3d at 1002). As Plaintiffs' claims allege violations of federal statutory and constitutional law, the discretionary function exception would not apply to such conduct as a matter of law, and the district court need not probe Defendants' motives to so hold. *See, e.g.*, *Socialist Workers Party v. Attorney Gen. of United States*, 642 F. Supp. 1357, 1416–17 (S.D.N.Y. 1986) (holding that the discretionary function exception did not immunize from liability an FBI surveillance program that was "patently unconstitutional" and consisted of "obvious violations of the Fourth Amendment" because "the FBI exceeded any reasonable definition of its mandate and had no discretion to do so"); *cf. Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2012) (holding that the discretionary function exception applied in part "because the Mirmehdis do not allege that this decision itself violated the Constitution").

Even if Plaintiffs' FTCA claims did cover some conduct that is not otherwise unlawful, a court's evaluation of the discretionary function exception does not depend on factual evidence regarding the Government's actual reasons for acting in a particular instance and so would not require an examination of any privileged evidence. The discretionary function exception will shield liability if the conduct implements social, economic, or political policy considerations. *See*

34

*Gasho v. United States*, 39 F.3d 1420, 1435 (9th Cir. 1994). But the challenged

decision "need not be *actually* grounded in policy considerations" so long as it is,

"by its nature, susceptible to a policy analysis." *Miller v. United States*, 163 F.3d

591, 593 (9th Cir. 1998) (emphasis added). Thus, evidence relating to what reasons

Defendants actually acted on in the course of their investigation — who they

actually targeted and why — would not be relevant. Rather, the district court

would have to review whether "established governmental policy, as expressed or

implied by statute, regulation, or agency guidelines, allows a Government agent to

exercise discretion" in the manner alleged. *Dichter-Mad Family Partners, LLP v.*

*United States*, 709 F.3d 749, 763 (9th Cir. 2013) (internal quotation marks

omitted); *Childers v. United States*, 40 F.3d 973, 974 n. 1 (9th Cir.1994) ("The

application of the exception does not depend, however, on whether federal officials

actually took public policy considerations into account."). Because the court would

review only the applicable statutory and regulatory framework for the exemption,

no privileged evidence about this actual investigation would need be disclosed in

order to litigate the FTCA claims.

*       *       *

For all of these reasons, the district court acted prematurely in dismissing the

search claims based on the *Reynolds* privilege.

35

### B. THE DISTRICT COURT COULD NOT HAVE CONCLUDED "WITH CERTAINTY" THAT LITIGATION OF PLAINTIFFS' DISCRIMINATION CLAIMS WOULD REQUIRE DISCLOSURE OF STATE SECRETS

The district court also acted prematurely in dismissing Plaintiffs' discrimination claims at the pleading stage, because the Government cannot show *with certainty* that the litigation of those claims would require revealing state secrets. The district court assumed, rightly, that Plaintiffs did not need secret information to prove their *prima facie case*. Plaintiffs' discrimination claim is extremely narrow — it alleges that the Government engaged in a practice of *explicit*, *facial discrimination* — a practice that would be constitutional only if it could survive strict scrutiny. Plaintiffs can establish that the Government engaged in that practice without resort to secret evidence. *See infra* Section I.B.i.

The district court nonetheless held that dismissal of Plaintiffs' discrimination claims was required because "privileged information provides essential evidence for Defendants' full and effective *defense* against Plaintiffs' claims—namely, showing that Defendants' purported 'dragnet' investigations were not indiscriminate schemes to target Muslims, but were properly predicated and focused." ER 61 (emphasis in original). This was error. To warrant dismissal, the state secret evidence would have to show not merely why Defendants might have had cause to conduct a counterterrorism investigation, but also why they had to focus their investigation on a religion, treating the mere fact that someone practices

36

Islam as suspicious in and of itself. Even if some information related to the underlying reasons for the FBI's nearly decade-old activities in Orange County might properly remain a state secret today, it is far from "certain" that such evidence would be relevant to justifying the explicitly discriminatory manner in which Plaintiffs allege this investigation was conducted. *See infra* Section I.B.ii.

### i. Plaintiffs Allege Facial Religious Discrimination That Triggers Strict Scrutiny, and Can Establish a *Prima Facie* Case Without Resort to Secret Evidence

Understanding why it is far from certain that state secrets would arise during litigation of Plaintiffs' discrimination claims, and why the district court's dismissal was therefore premature, begins with an understanding of the nature of Plaintiffs' discrimination claims. Put simply, Plaintiffs' argument is that, except where religion is considered for purposes of accommodating religious exercise, religion should be treated like race for purposes of anti-discrimination law — its use must always be justified by strict scrutiny. *See* Plaintiffs' Combined Opposition to Individual Capacity Defendants' Motion to Dismiss, ER 31–40.[9]

---

[9] In the district court, Defendants contested that assertion by arguing that the religious discrimination at issue here should not be evaluated under strict scrutiny. *See, e.g.*, Gov't Reply, ER 78 at n.25; Reply Memorandum of Points and Authorities in Support of Motion to Dismiss by Defendants Pat Rose, Kevin Armstrong and Paul Allen (hereinafter AAR Reply), ER 67–71. At a minimum, the district court should have resolved that dispute before deciding whether the discrimination claims had to be dismissed under *Reynolds*.

Plaintiffs' complaint alleges that Defendants adopted a facially discriminatory classification by targeting them for surveillance because of their religion. *See generally* FAC, ER 179–257. Under both Free Exercise and Establishment Clause analysis, facially discriminatory treatment on the basis of religion is impermissible unless it satisfies strict scrutiny. *Larson v. Valente*, 456 U.S. 228, 246–47 (1982) (holding that statute granting a denominational preference must be analyzed under strict scrutiny); *Emp't Div. v. Smith*, 494 U.S. 872, 886 n.3 (1990) ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, or on the content of speech, so too we strictly scrutinize governmental classifications based on religion.") (citations omitted); *Braunfeld v. Brown*, 366 U.S. 599, 607 (1961) ("If the purpose or effect of a law … is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden [on the observance of religion] may be characterized as being only indirect."); *cf. Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531–32 (1993) (holding that Free Exercise Clause requires that government action that is not "neutral and of general applicability … must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest"); *Sklar v. C.I.R.*, 549 F.3d 1252, 1256 n.3 (9th Cir. 2008) (following *Larson*).

The fact that religion was not the *sole* factor in determining suspicion, but rather was only *one* factor, even if true, would not render the classification Defendants drew immune from analysis under strict scrutiny.[10] A government action that expressly classifies persons on the basis of a suspect classification constitutes facial discrimination that triggers strict scrutiny — even if it employs the suspect classification as only one factor rather than the sole factor that triggers classification. *See Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (holding use of race as one factor in college admissions unconstitutional because it failed to satisfy strict scrutiny).

Plaintiffs need no discovery at all to establish a *prima facie* case that Defendants surveilled them because of their religion—indeed, the district court assumed they could prove their claims without resort to state secrets evidence. ER 61. Plaintiffs already have evidence sufficient to show that Defendants engaged in intentional discrimination against Muslims, in the form of a declaration from the FBI's own informant. *See* Monteilh Dec., ER 85–138. Plaintiffs' complaint also points to substantial evidence that the FBI has engaged in intentional

---

[10] The district court wrongly asserted that Plaintiffs had contradicted their complaint in making this argument. ER 62 at n.11. While Plaintiffs did allege, as a factual matter, that they were surveilled "solely" due to their religion, FAC, ER 206 ¶ 86, it is not inconsistent to maintain that, as a legal matter, *any* use of Plaintiff's religion in targeting them for surveillance would need to satisfy strict scrutiny, even if it was not the sole factor.

discrimination against Muslims as a matter of official policy, including official policy changes that refuse to limit the use of religion in investigative activities while simultaneously weakening requirements that FBI agents' investigations be rooted in a factual basis that criminal activity is afoot, FAC, ER 188–93 ¶¶ 28–37, 195–97 ¶¶ 41–46; a recent history of FBI agents targeting thousands of Muslims for interviews, engaging in efforts to map, list, or investigate Muslim communities, mosques, and "Muslim sites," FAC, ER 187–88 ¶¶ 24–27, 181 ¶ 3; FBI training materials telling FBI agents that Islam is inherently dangerous; and other materials. *See* FAC, ER 194–97 ¶¶ 38–46. Indeed, the 2008 FBI Domestic Investigations and Operations Guide stated that the FBI can consider "the role that religion may play in the membership or motivation of criminal or terrorist enterprise," and that religious behavior is relevant if practiced by a target group. *See* FBI's Domestic Investigations and Operations Guide (2008) (Section 4.2(B) at 27–28);[11] *see also* FAC, ER 192–95.

While of course the Government is entitled to present its own evidence to rebut Plaintiffs' showing that it employed a facially discriminatory criterion, extremely limited discovery would be sufficient either to establish or refute the claim that the FBI, in this investigation, considered an individual's Muslim faith

---

[11] Available at http://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29/fbi-domestic-investigations-and-operations-guide-diog-2008-version.

and religious practices as a factor when determining whether to target someone for surveillance in the name of counterterrorism. Even if the FBI intended to prove that its uses of the informant were for some reason far more sensitive to the use of religion than were its own training materials and Guidelines, Defendants would be hard-pressed to assert that the state secrets privilege protects information about their conversations with a convicted felon whom they paid to act as an informant — an informant who was not an FBI agent, had no security clearance, and has given extensive public statements about the operation, including the declaration he filed in this case. As Defendants acknowledge, much of the informant's activities have already been made public and are not the subject of the Government's assertion of privilege, and, as discussed below, discovery regarding his activities would not reveal any privileged "sources and methods" or "subjects" of an investigation. *See infra* Section I.B.ii; Gov't Br., ER 161–62. Moreover, none of the evidence about whether and how Defendants used religion in their investigation would necessarily touch on any *other* reasons for Defendants' investigation — reasons over which the Government could potentially assert the *Reynolds* privilege. Thus, no state secrets likely need to be divulged in order for the Court to determine whether Plaintiffs have established a *prima facie* case of facial discrimination.

### ii. The District Court Erred in Concluding "With Certainty" that State Secrets Would Deprive the Government of a Defense to the Discrimination Claims or that Litigating Those Defenses Would Pose an Unacceptable Risk Of Disclosing State Secrets

Once Plaintiffs establish that the Government has engaged in facial discrimination on the basis of religion, the district court would still have to consider whether the use of religion in this context could satisfy strict scrutiny. Gov't Br., ER 173. *Larson*, 456 U.S. at 247 (under strict scrutiny, government can defend use of religion as "justified by a compelling governmental interest, and … closely fitted to further that interest") (citation omitted); *see also Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (describing "least restrictive means" test under RFRA). The district court stated that a narrow tailoring inquiry requires consideration of "fact-intensive questions that necessitate a detailed inquiry into the nature, scope, and reasons for the investigations under Operation Flex" and would require that the "Government must marshal facts that fall within the three privileged categories of information related to Operation Flex." ER 62.

This conclusion was premature. Dismissal on the basis of the *Reynolds* privilege is only appropriate where a court can "determine with certainty from the nature of the allegations and the government's declarations … that litigation must

42

be limited or cut off in order to protect state secrets." *Jeppesen*, 614 F.3d at 1081. The court did not have such certainty at this early stage.

Taking as true the complaint's allegations of pervasive and explicit targeting of Muslims for surveillance, it is hard to imagine how the Government could even argue, let alone prove, that a policy that treats one's status as a Muslim (or one's practice of the Muslim religion) as *itself* a basis for suspicion could be narrowly tailored to any government interest. It is premature at this stage to assume both that the Government will make such a claim and that resolution of it will require disclosure of state secrets. While Defendants stated below that the "disclosure of the reason for an investigation could provide insights to terrorists as to what type of information is sufficient to trigger an inquiry by the FBI," Gov't Br., ER 171, this surely cannot be true for the only reason that the Court need inquire into here — that *being Muslim* was a legitimate factor in triggering investigation by the FBI. Even if the Government were to make that remarkable claim, it would have to prove it through general information about *all Muslims*, not information specific to any particular counterterrorism investigation. Secret evidence that meets that standard is highly unlikely to arise.

To the extent that the district court relied separately on the Government's asserted need to keep secret the "results of" counterterrorism investigations, Plaintiffs almost certainly need to know nothing about such "results" to prevail on

43

their claim of facial discrimination — if Plaintiffs show that Defendants intentionally and explicitly targeted Muslims, the fact that some of the discriminatory investigations may have yielded evidence would not justify the discrimination (any more than a roadblock in which police stopped and searched only African-Americans would be constitutional as to those searches that happened to uncover contraband). Moreover, Defendants' claim that all "results of" counterterrorism investigations must remain secret cannot be reconciled with the substantial public disclosure that often occurs about such results, particularly given that the underlying events occurred eight years ago.

Therefore, contrary to Defendants' claim, it is not at all clear at this stage of the proceedings that Plaintiffs need even to learn what reasons *other than religion* were employed by Defendants in their decision to target Plaintiffs, and similarly unlikely that other purportedly secret information would have to be disclosed to determine whether the Government's use of religion would satisfy strict scrutiny. The Court cannot say "with certainty" at this preliminary stage that "litigation must be … cut off in order to protect state secrets." *Jeppesen*, 614 F.3d at 1081.

Nor does the analysis require disclosure of the subjects of Defendants' investigations. While the district court's decision appears to assume that any individual who is in fact surveilled must necessarily be the "subject" of an investigation, *see* ER 56–58, that is not the case. In fact, the FBI routinely conducts

44

surveillance on individuals who are *not* classified as "subjects" of an

investigation.[12] Indeed, while Plaintiffs complain of Defendants' discriminatory

surveillance of "hundreds and perhaps thousands of innocent Muslim Americans,"

FAC, ER 181 ¶ 2, Defendants are concerned with preserving secrecy as to the

"fewer than 25 individuals" on whom their investigation focused. Giuliano Dec.,

ER 268 ¶ 11. But Plaintiffs do not need to know who the FBI's ultimate "subject"

or "subjects" were for purposes of this surveillance. They already know that they

were surveilled by the FBI because an acknowledged FBI informant made

repeated, intense contact with all of them for the purpose of collecting information

while he operated as an informant conducting surveillance for the FBI. *See*

*generally* FAC, ER 200 ¶ 59, 203–04 ¶¶ 70–76, 205–06 ¶¶ 81–84; Gov't Br., ER

161–62. Because those facts are not secret, they cannot be the basis for the

Government's *Reynolds* assertion, and Plaintiffs need rely on no other facts

regarding the "subjects" of surveillance to prove their search claims. *See Al-*

*Haramain*, 507 F.3d at 1200 (rejecting government's assertion that subject matter

of warrantless wiretapping program was a state secret because, although "there are

_____

[12] For example, the FBI can conduct "assessments" of individuals, which can include surveilling them, even if they are not "subjects" of any investigation. *See* Attorney General's Guidelines for Domestic FBI Operations (2008) (Section 8 at 39), available at http://justice.gov/ag/readingroom/guidelines.pdf. Had the case proceeded further, Plaintiffs would have presented publicly available evidence establishing the widespread use of assessments.

details about the program that the Government has not yet disclosed," the program was no longer a state secret because of official disclosure); *cf. Pickard v. Department of Justice*, 653 F.3d 782 (9th Cir. 2011) (holding that government could not provide Glomar response to FOIA request seeking information otherwise covered by Section 552(c) where government had officially disclosed informant in court proceeding).

Furthermore, even if the litigation poses some risk of identifying those individuals who were targets of the investigation, it is far from clear that information about whom the FBI targeted for investigation more than eight years ago should properly be classified as a state secret *today*. The Government argued below that parties who discover they are subject to monitoring could take steps to destroy evidence or evade detection, Gov't Br., ER 169–70 — but that is a realistic concern only if a subject of investigation eight years ago still remains the subject of FBI investigation and a potential threat (despite the lack of any legal proceedings in the intervening years) while also remaining ignorant of the FBI's scrutiny despite eight years of active investigation. Even more far-fetched, the Government claimed that disclosure posed a threat by identifying individuals who were *not* the subjects of investigation, because it would allow "individuals inclined to commit terrorist acts [to be] motivated to do so while they are not subject to investigation," Gov't Br., ER 170, or that, "even if the former subjects are entirely

law-abiding," disclosing who was a subject would "provide valuable information to terrorist[s] … about the FBI's intelligence and suspicions," *Id*. But the fact that a person was (or was not) the subject of investigation eight years ago, in an operation that (the district court recognized) comprised only a small part of the FBI's larger counterterrorism investigations, "which predate and go beyond Monteilh's work" ER 64, hardly provides any indication of the present state of the FBI's intelligence, suspicions or investigation years later.

Besides being implausible on their face, the Government's arguments prove far too much, as numerous individuals already know that they are or are not targets of government surveillance. Most recently, a district court in *Latif v. Holder* rejected the Government's argument concerning subject identification in the context of the No Fly List, holding on summary judgment that due process entitled several individuals to notice of whether they were in fact on the list (as well as the reasons for their respective inclusion). *See* Or. Denying Defs.' Mot. P.S.J. and Granting Pls.' Mot. Partial P.S.J., *Latif v. Holder,* 2014 U.S. Dist. LEXIS 85450 at 68 (D. Or. June 24, 2014). Importantly, while the court discussed procedural options for managing disclosure of classified information regarding the *reasons* why the individuals had been placed on the list, the court made no such accommodations for disclosing the *fact of their inclusion* — even though the list

47

disclosures reflect *current* subjects of the list, not eight year old information. *Id.* at 68–69. The Government did not appeal the ruling.[13]

Moreover, in this case, the Government's abstract fears about state secrets cannot be reconciled with what has actually happened over the past eight years. Because the FBI publicly revealed the informant's identity, and the informant has spoken at length with the press, people in the Muslim community certainly know who was (and was not) subject to the attentions of the FBI's informant. But no parade of horribles has come to pass. As of today, not a single individual has been convicted of any offense as a result of the informant's investigation. *See* FAC, ER 181 ¶ 3.[14]

---

[13] Nor are these the only examples of the Government having confirmed that people are or are not subject to investigation in national security cases. The Government has identified various people as both subjects and non-subjects in the context of national security litigation over the past several years. *See* ER 139b.

[14] Indeed, the only federal crime of any kind that was charged through the informant's work was a naturalization fraud case that the government dismissed. *See* FAC, ER 224 ¶¶ 155–58. Mr. Giuliano's declaration also makes reference to one plot by three prisoners in Los Angeles that sought to storm a military recruiting center and, afterward, attack people at a nearby temple. But there is no suggestion that they were discovered through RFRA terrorism investigation of the Muslim community. In fact, Torrance police arrested the men because they tried to rob a gas station and then discovered the plot because they had written their plans down on papers left at their homes. The only one of the plotters with any connection to Southern California's resident Muslim community was never convicted, as he was found incompetent to stand trial due to mental illness. *See* ER 139a n.18.

Finally, Defendants made a distinct argument in the district court concerning the need to keep secret their "sources and methods," but they made no attempt to reconcile that portion of their *Reynolds* assertion with their disclosures about Monteilh himself. Both the Government's briefing below and Mr. Holder's declaration make only conclusory statements with respect to that portion of the claim. *See* Gov't Br., ER 171; Holder Dec., ER 285 ¶ 4(iii); *compare Ellsberg v. Mitchell*, 709 F.2d 51, 64 (D.C. Cir. 1983) (holding that "before conducting an in camera examination of the requested materials, the trial judge should be sure that the Government has justified its claim in as much detail as is feasible"). Mr. Giuliano's declaration says slightly more, but what he says contradicts the official acknowledgment concerning the informant. *Compare* Giuliano Dec., ER 279–80 ¶ 3 ("The disclosure of sources and methods, such as confidential human sources, the existence of surveillance, and the use of other techniques, *would* provide a roadmap to adversaries") (emphasis added) *with* Gov't Br., ER 161 ("The FBI has previously disclosed in a separate criminal proceeding that Monteilh collected audio and video information for the FBI, and some of that audio and video information was produced in that prior case."). To the extent the Government is concerned with "sources and methods" other than those already described in Monteilh's declaration and other publicly available information, Plaintiffs likely will not require information about whether or how any particular sources and

49

methods — other than Monteilh himself and the surveillance he assisted in conducting — were employed as part of Operation Flex in order to resolve the discrimination claims. Again, the Court cannot say with "certainty" at this stage of the proceeding that no alternative method short of dismissal would suffice to deal with any secret information that arises concerning any sources or methods, and it was therefore error to dismiss the discrimination claims on that basis.

## II. THE DISTRICT COURT SHOULD HAVE ALLOWED THE LITIGATION TO PROCEED GIVEN THE EXISTENCE OF ALTERNATIVE MECHANISMS TO MANAGE ANY SECRET INFORMATION THAT COULD ARISE

Rather than dismissing nearly all of Plaintiffs' claims, the district court should have ordered the utilization of alternative mechanisms to manage the information over which the Government asserted the *Reynolds* privilege, including most obviously the procedures that Congress set forth in FISA for handling purportedly secret information relating to electronic surveillance.

### A. THE DISTRICT COURT SHOULD NOT HAVE DISMISSED BASED ON THE *REYNOLDS* PRIVILEGE WHEN IT COULD HAVE UTILIZED FISA'S PROCEDURES TO HANDLE ANY INFORMATION "RELATING TO ELECTRONIC SURVEILLANCE" AT ISSUE IN THIS CASE

The district court erred by not ordering the use of FISA's procedures to handle all of the evidence "relating to electronic surveillance," 50 U.S.C. 1806(f), at issue in this case, including any evidence "obtained or derived from an electronic surveillance" that the Government wants to use. 50 U.S.C. 1806(c). The

court correctly ruled that the FISA claims could not be dismissed. *See* ER 49–50. And neither the court nor the Government disputed that the vast majority of the evidence at issue here relates to electronic surveillance, in part because the FBI's informant was always recording. ER 216 ¶ 124 (allegation that "because of his criminal background…Monteilh used to record all day, every moment he worked undercover, regardless of whom he was meeting or what was discussed").

The district court believed that it could not utilize FISA's procedures when adjudicating non-FISA claims, but that conclusion was error, as FISA establishes procedures that apply by their plain terms to claims arising under other statutes, so long as the evidence at issue is "relating to electronic surveillance." *See infra* Section A.i.

There should be no serious dispute that FISA's procedures preempt the *Reynolds* privilege as to evidence to which they apply. Because the privilege is a common law doctrine, Congress can displace it by legislative action, and it has clearly done so through FISA with respect to information relating to electronic surveillance. *See infra* Section A.ii.

Even apart from FISA's plain text, the rationale underlying the *Reynolds* privilege does not support its application to dismiss claims that rest on the same evidence at issue in the FISA claims. Because the evidence at issue in the FISA claims is largely the same as the evidence at issue under the other search claims, it

serves no purpose to dismiss those claims when the court will consider *the very same evidence* under FISA's controlled procedures. To allow the Government to invoke *Reynolds* to force dismissal of the non-FISA claims under such circumstances would render application of the *Reynolds* privilege an empty formalism that serves no purpose other than to allow the Government to avoid scrutiny of its actions. *See infra* Section A.iii.

### i. The District Court Should Apply FISA's Procedures to All Information "Relating to Electronic Surveillance," Whether or Not that Information Arises In the Course of Litigating the FISA Claim, Because FISA's Procedures Apply to Claims Arising Under Other Statutes

The district court concluded that it could not apply FISA's procedures to adjudicate non-FISA claims because FISA's procedures do not "preempt the state secrets privilege as to matters that are not within FISA's purview." ER 47. However, that formulation only begs the question as to what is "within FISA's purview." The district court presumed that Congress intended to apply FISA's procedures only to the adjudication of claims asserting violations of FISA's substantive provisions, but this is contrary to the statute's plain text. FISA's procedures govern the treatment of electronic surveillance information whenever it arises in litigation; they are not limited to the use of such evidence to litigate substantive FISA violations. *See* 50 U.S.C. 1806(c) (describing procedures applicable "whenever the Government intends to enter into evidence or otherwise

use or disclose in any trial, hearing, or other proceeding in or before any court…

against an aggrieved person, any information obtained or derived from an

electronic surveillance … pursuant to … [this subchapter]"); 1806(f) (describing

procedures applicable under subsection (c) as well as those applicable to "any

motion or request … by an aggrieved person pursuant to *any other statute* or rule

of the United States … to discover or obtain … materials relating to electronic

surveillance") (emphasis added). Thus, as a textual matter, FISA's procedures

apply to the handling of information related to electronic surveillance that arises

"pursuant to any other statute," not just if it arises when litigating under FISA's

substantive provisions.

### ii. FISA Preempts the *Reynolds* Privilege as to All Information "Relating to Electronic Surveillance"

Given that FISA's procedures govern the handling of all information relating

to electronic surveillance at issue here, the district court should have concluded

that the Government could not invoke the *Reynolds* privilege as to such

information. When considering whether a federal statute preempts the *Reynolds*

privilege, because the "state secrets privilege is an evidentiary privilege rooted in

federal common law, the relevant inquiry … is whether the statute speaks directly

to the question otherwise answered by federal common law." *Kasza v. Browner*,

133 F.3d 1159, 1167 (9th Cir. 1998) (internal citations and quotation marks

omitted).

Analysis of FISA's text and manifest purpose makes clear that Congress has

spoken directly to the question that the *Reynolds* privilege addresses, such that the

procedures Congress set forth in FISA displace those that the federal courts have

developed through common law adjudication for purposes of information relating

to electronic surveillance. Although this Court has not had occasion to squarely

address whether FISA preempts the *Reynolds* privilege, the two district courts to

do so have concluded that "[b]oth the plain text and the legislative history make

clear that Congress intended FISA to 'occupy the field through the establishment

of a comprehensive regulatory program supervised by an expert administrative

agency.'" *In re Nat'l Sec. Agency Telecommunications Records Litig.*, 564 F.

Supp. 2d 1109, 1118 (N.D. Cal. 2008); *Jewel v. NSA*, 965 F. Supp. 2d 1090, 1103–

06 (N.D. Cal. 2013) (holding same).

FISA was enacted against the backdrop of the Church Committee's

investigations into abusive domestic intelligence-gathering by various executive

agencies. Congress was motivated in large part by the executive branch's abusive

use of surveillance in violation of civil rights.[15]

---

[15] The House Select Committee on Intelligence explained that "[i]n the past several years, abuses of domestic national security surveillances have been disclosed. This evidence alone should demonstrate the inappropriateness of relying solely on executive branch discretion to safeguard civil liberties." Permanent Select Committee on Intelligence, Foreign Intelligence Surveillance Act of 1978, H.R. Rep. 95-1283, Pt. I, 95th Cong., 2d Sess. 21 (1978) (hereinafter House Report). *See also* Select Committee on Intelligence, Foreign Intelligence Surveillance Act of

The detailed statute enacted after that debate creates both *substantive rules* to govern the conduct of electronic surveillance undertaken in the name of national security as well as *procedural rules* for litigation to challenge unlawful electronic surveillance. Thus, it created both "procedures for the use of electronic surveillance in gathering foreign intelligence information," *In re A Commn. To Take Evidence Pursuant To The Crim. Code Of Canada & The U.S. Code & Fed. Rules*, 788 F.2d 566, 569 (9th Cir. 1986), and a remedy for allegedly unlawful electronic surveillance undertaken in the name of national security "spelled out [in] a private right of action in the FISA." *Jewel v. NSA*, 673 F.3d 902, 912 (9th Cir. 2011) (reversing district court's dismissal of FISA claim on standing grounds).

FISA's treatment of the field of domestic electronic surveillance is comprehensive. With respect to substantive rules, "FISA set out in detail roles for all three branches of government, providing judicial and congressional oversight of the covert surveillance activities by the executive branch combined with measures to safeguard secrecy necessary to protect national security." *In re Nat'l Sec. Agency*, 564 F. Supp. 2d at 1115. For the executive branch specifically, it established rules by which it "could undertake electronic surveillance and physical

---

1978, S. Rep. No. 95-701, 95th Cong., 2nd Sess. 16 (1978), U.S. Code Cong. & Admin. News 1978, pp. 3904, 3985.

searches for foreign intelligence purposes in the domestic sphere." *Id.* This, of course, is precisely what Defendants claim to have done here.

FISA also created procedures to protect the rights of people alleging that the Government had violated their rights, as it sought to strike "a sound balance between the need for such surveillance and the protection of civil liberties.'" *In re A Commn. To Take Evidence,* 788 F.2d at 569 (quoting S. Rep. No. 604, 95th Cong., 2d Sess. 9, *reprinted in* 1978 U.S. Code Cong. & Ad. News 3904, 3910). Those procedures were created specifically "to curb the practice by which the Executive [B]ranch may conduct warrantless electronic surveillance on its own unilateral determination that national security justifies it." *ACLU v. Nat'l Sec. Agency*, 493 F.3d 644, 709 (6th Cir. 2007) (Gilman, J., dissenting) (quoting S. Rep. No. 95-604, pt. I, at 8).

Of greatest relevance here, FISA provides that individuals subject to electronic surveillance may challenge its legality via a civil action pursuant to Section 1810, the statute that Plaintiffs utilize here. That provision states:

> An aggrieved person … who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation …

Recognizing the likelihood that information gathered by the Government's electronic surveillance might contain sensitive material relating to national

security, Congress crafted a procedure that allows an aggrieved person to challenge their surveillance under Section 1810 while also protecting such information.

The core of that procedure, and the provision that makes most clear that FISA preempts the *Reynolds* privilege, is 50 U.S.C. 1806(f). It provides that whenever materials relating to electronic surveillance arise in litigation of any kind, if the Attorney General files an affidavit attesting that "disclosure or an adversary hearing would harm the national security of the United States," the court "shall … review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." *Id.* The provision specifies that its procedures shall apply "notwithstanding any other law." *Id*.[16]

As this description makes clear, FISA's detailed procedures for reviewing national security information in cases involving electronic surveillance speak directly to the same issues addressed by the common law *Reynolds* privilege. Congress clearly contemplated that litigation requiring discovery of electronic surveillance information could occur under some circumstances, and through

---

[16] FISA also permits the Government to introduce information related to electronic surveillance, such as where it seeks to defend against a suit under Section 1810. The procedures by which the Government may introduce such evidence are set forth in Section 1806(c) as well as 1806(f).

Section 1806(f) it set forth the procedure under which such cases must proceed. That procedure "preempts the state secrets privilege as to matters to which it relates." *In re Nat'l Sec. Agency*, 564 F. Supp. 2d at 1119. As the two courts to squarely consider the issue have found, FISA "is in effect a codification of the state secrets privilege" for all cases involving foreign intelligence and electronic surveillance, and its procedures were designed to displace assertion of the *Reynolds* privilege in cases involving electronic surveillance. *Id.*; *see also id.* ("[T]he *Reynolds* protocol has no role where section 1806(f) applies"); *Jewel*, 965 F. Supp. 2d at 1104 (FISA provides "secure procedures under which courts can consider national security evidence that the application of the state secrets privilege would otherwise summarily exclude").

*     *     *

Finally, it is important to recognize that, although FISA authorizes procedures very similar to those that the federal courts have established under the *Reynolds* privilege, there is a critical difference between FISA's provision for the treatment of secret information and the procedures that have developed as common law under *Reynolds* (and that the district court used below). The purpose of a court's review of secret evidence under FISA is *not* merely to determine whether the Government's information is properly labeled secret, but rather to determine the merits of the claim: whether the surveillance was *lawful*. *See* 50 U.S.C. 1806(f)

58

(court must review "materials relating to the surveillance as may be necessary to *determine whether the surveillance of the aggrieved person was lawfully authorized and conducted*") (emphasis added). Thus, a district court conducting FISA review must determine not just whether the information provided by the Government is properly labeled as secret, but also whether the underlying conduct complied with governing law. Because Plaintiffs seek a ruling on the *legality* of the Government's conduct, they have a strong interest in the use of FISA's procedures rather than the *Reynolds* privilege. And because all of the evidence relating to electronic surveillance at issue in this case is governed by FISA, it is those protective procedures that govern Plaintiffs' claims, rather than the *Reynolds* privilege.

   iii.   **The District Court Should Have Applied FISA's Procedures, Rather Than the *Reynolds* Privilege, to Any Secret Evidence Relating to Electronic Surveillance Needed to Litigate the Non-FISA Claims, Because Doing so Comports With the Purpose of the *Reynolds* Privilege**

Even if the plain text of the governing provisions of FISA and Congress' manifest intention to displace the *Reynolds* privilege through its enactment were not sufficient to justify the application of its procedures to the non-FISA claims, the district court should have applied FISA's procedures to the other claims involving information relating to electronic surveillance because the rationale of both FISA and the *Reynolds* privilege compel that result. The district court

operated under the assumption that Plaintiffs' non-FISA claims "rely upon allegations far broader in scope than allegations upon which the FISA claim is predicated," ER 48, and on that basis concluded that the procedures required by FISA could not be utilized in dealing with any secret evidence at issue in those claims. ER 47. As noted above, this reasoning erroneously assumes that FISA's procedures apply only when courts adjudicate alleged violations of its substantive provisions, *see supra* Section I.A.i., but it also ignores the extensive overlap between the evidence needed to adjudicate the substantive FISA claim and Plaintiffs' other claims.

Because FISA itself incorporates the "reasonable expectation of privacy" and warrant requirements that are fundamental to Fourth Amendment law, *see generally* 50 U.S.C. 1801(f), its protections are "coextensive [with], but no broader than, those … under the Fourth Amendment with respect to electronic surveillance." *See ACLU v. Nat'l Sec. Agency*, 493 F.3d at 683 (Batchelder, J.) (citing House Report at 66). Therefore, litigating the claims Plaintiffs brought under FISA challenging unlawful electronic surveillance will involve *the same evidence* as the other unlawful search claims, including those brought under the Fourth Amendment challenging unlawful electronic surveillance and under the FTCA for other forms of intrusive surveillance. Indeed, Plaintiffs' FISA claims are premised on violations of the Fourth Amendment, as they arise from Defendants'

use of an informant to gather "thousands of hours of audio recordings of conversations … as well as recordings of religious lectures, discussion groups, classes, and other Muslim religious and cultural events occurring in mosques," FAC, ER 181 ¶ 2, including conversations to which the informant was not a party, *id.*, ER 216 ¶¶ 124–27, conversations in Plaintiffs' homes and offices, *id.,* ER 219 ¶ 137, and other conversations not lawfully subject to such intrusive surveillance. *See generally* FAC, ER 179–257. These factual assertions constitute the gravamen of several claims that the district court dismissed under the *Reynolds* privilege, including those alleging violations of the Privacy Act, the Fourth Amendment prohibition against unreasonable searches and seizures, and the FTCA. FAC, ER 245–48.

The irrationality of the district court's position is perhaps most clearly manifest when comparing Plaintiffs' FISA claim with their claim for expungement relief under the Fourth Amendment. FAC, ER 246–47 ¶¶ 250–53. In Count Nine, Plaintiffs allege a violation of the Fourth Amendment because of unlawful searches, and seek both damages under *Bivens* and injunctive relief (expungement of unlawfully maintained records) under 28 U.S.C. 1331. In Count Ten, Plaintiffs allege a violation of FISA arising from those same unlawful searches, for which they seek damages under Section 1810. The district court dismissed Count Nine because the evidence required to litigate it would involve state secrets, but did not

dismiss Count Ten, under which the Government will have to submit all evidence related to the legality of *the same searches* for *in camera* inspection pursuant to FISA. This simply makes no sense. The *Reynolds* privilege is a common law rule designed to avoid disclosure of state secrets. *Kasza*, 133 F.3d at 1167. It in no way serves that purpose to consider evidence on these topics (as the Court must) pursuant to Count Ten, but then to dismiss Count Nine (and Plaintiffs' other claims) because the *Reynolds* privilege bars review of the very same evidence that the Court is considering under FISA. Such application would render *Reynolds* an empty formalism, in violation of the underlying purpose it is meant to serve as a common law rule. *See generally Funk v. United States*, 290 U.S. 371, 383 (1933) ("[T]he common law is not immutable but flexible, and by its own principles adapts itself to varying conditions."). No common law rule could compel such an absurd result.

### iv. The District Court Should Not Have Dismissed the Discrimination Claims Because Evidence Concerning Discrimination Will Arise in the Litigation of the FISA Claims

Contrary to the district court's and Defendants' assumptions, the evidence needed to litigate Plaintiffs' discrimination claims also "relat[es] to the electronic surveillance" at issue here, 50 U.S.C. 1806(f), and will also likely arise in litigation of Plaintiffs' FISA claims, such that the district court should not have dismissed those claims given that it will likely have to consider the same evidence when

62

adjudicating the FISA claims. The evidentiary overlap arises because the complaint plausibly alleges that Defendants used the informant to gather "thousands of hours of audio recordings of conversations … as well as recordings of religious lectures, discussion groups, classes, and other Muslim religious and cultural events occurring in mosques." FAC, ER 181 ¶ 2. Defendants argued below that Plaintiffs had no reasonable expectation of privacy when the informant recorded these events in the mosques because of the "invited informer" doctrine. However, for the invited informer doctrine to apply, the "government's investigation must be conducted in good faith; i.e., not for the purpose of abridging first amendment freedoms." *United States v. Aguilar*, 883 F.2d 662, 705 (9th Cir. 1989), *superseded on other grounds by* 8 U.S.C. 1324; *United States v. Mayer*, 503 F.3d 740, 751 (9th Cir. 2007) ("Good faith has been an implicit requirement for investigations under the Fifth Amendment and searches under the Fourth Amendment."). And as explained below, for the district court to determine whether the "good faith" exception to the "invited informer" doctrine applies in this case, it will have to determine whether the Government intended to target Plaintiffs because of their religion — the same exact question at issue in the discrimination claims.

This Court first recognized that good faith analysis plays a role under the invited informer doctrine in *Aguilar*. While it held that the invited informer doctrine applied even in the context of infiltrating sites of religious worship, *id.* at

63

703, it also distinguished between investigations performed in good faith ("i.e., not for the purpose of abridging first amendment freedoms", *id.* at 705) versus those conducted in bad faith (as Plaintiffs here have alleged) — a distinction which it characterized as one of "two limitations on the government's use of undercover informers to infiltrate an organization engaging in protected first amendment activities." *Id.*

This Court has since expanded on the good faith requirement, and held that law enforcement conduct that involves infiltration "require[s] a legitimate law enforcement purpose" measured in part by the burden it places on First Amendment rights. *Mayer*, 503 F.3d at 752 (relying on *Handschu v. Special Servs. Div.*, 349 F. Supp. 766, 770 (S.D.N.Y. 1972)); *Handschu v. Special Servs. Div.*, 475 F. Supp. 2d 331, 350 (S.D.N.Y. 2007), and *Alliance to End Repression v. City of Chicago*, 237 F.3d 799 (7th Cir. 2001)). *See also Branzburg v. Hayes*, 408 U.S. 665, 707–08 (1972) (recognizing "good faith" exception for "grand jury investigations if instituted or conducted other than in good faith"); *Reporters Committee for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1061 (D.C. Cir. 1978) (holding that journalists need not receive notice of government surveillance of billing records *except* "if bad faith harassing subpoenas were employed against them").

Here, the Government has designated as privileged information that, it

contends, would be needed to determine whether it engaged in dragnet surveillance

based on religion. *See* Holder Dec., ER 285 ¶ 4; Giuliano Dec., ER 264 ¶ 6. The

district court agreed, holding:

> because Plaintiffs' claims are premised on their core allegation that
> Defendants conducted an indiscriminate religion-based investigation,
> any rebuttal against this allegation would risk or require disclosure of
> privileged information—whom and what the FBI was investigating
> under Operation Flex and why—in order to establish that the
> investigation was properly predicated and focused.

ER 49. While Plaintiffs disagree that the district court must consider secret

evidence to evaluate that claim, *see supra* Section I, it should be clear that *the same*

*evidence* will be needed to evaluate it whether it arises in the context of the

discrimination claims, or instead in the context of Defendants' attempt to defend

against Plaintiffs' FISA claims under *Aguilar* and *Mayer*. In order to succeed on

their FISA claim, Plaintiffs must demonstrate that the Government's covert

infiltration and surveillance was unlawful by overcoming the Government's

argument that the invited informant doctrine permitted Monteilh to conduct

warrantless surveillance of allegedly public spaces such as mosques. To do so,

Plaintiffs will in part argue that the Government intentionally singled out Plaintiffs

for electronic surveillance because of their religion, *i.e.*, that the Government

conducted its investigations in bad faith.

Thus, the district court's conclusion that "Plaintiffs' non-FISA claims also rely upon allegations far broader in scope than allegations upon which the FISA claim is predicated" is simply incorrect. ER 48. The exceptions laid out in *Aguilar* and *Mayer* make the same evidence relevant both to Plaintiffs' discrimination claims and their FISA claims. Given this, the district court should have applied FISA's procedures to both sets of claims.

### B. THE COURT SHOULD HAVE APPLIED FISA OR OTHER ALTERNATIVE PROCEDURES TO HANDLE ANY SECRET EVIDENCE THAT DOES NOT RELATE TO ELECTRONIC SURVEILLANCE

Even if litigation of Plaintiffs' discrimination claims (or perhaps some aspect of the unlawful search claims) would require consideration of some evidence that does not fall squarely within the purview of FISA's procedures for treating information related to electronic surveillance, and even if the Government could show that such evidence was critical for this litigation to proceed, this Court should nonetheless order the district court to apply FISA or analogous procedures to that evidence, as a matter of common law adjudication.

Given that the state secrets privilege is a common law doctrine, the Court would have ample authority to employ the same procedures set forth in FISA for any residual non-FISA evidence at issue. As stated above, because it is a "common law evidentiary privilege," exercise of the state secrets privilege is not formulaic. *Kasza*, 133 F.3d at 1165. *See also Funk*, 290 U.S. at 383 (the common law is "not

immutable but flexible"); Fed. R. Evid. 501. While Rule 501 as originally

proposed included an explicit codification of the state secrets privilege, that

detailed language was ultimately rejected, leaving the development of law of

privileges in the hands of the courts under the "reason and experience" standard.

*United States v. Sterling*, 724 F.3d 482, 500 (4th Cir. 2013) (internal quotation

marks omitted).

Courts have employed the flexible approach mandated by the federal rules in

national security cases. The federal courts utilized the approach that Plaintiffs

advocate here — assessing the *legality* of the electronic surveillance using *in

camera* and *ex parte* procedures — as a common law practice in criminal cases

involving electronic surveillance prior to FISA. The Supreme Court approved that

procedure. *Giordano v. United States*, 394 U.S. 310, 312–13 (1969) ("the District

Court must develop the relevant facts and decide if the Government's electronic

surveillance was unlawful"); *see also id*. at 314 (Stewart, J., concurring); *see also

United States v. Ajlouny*, 629 F.2d 830, 839 (2d Cir. 1980) (because the Attorney

General certified that disclosure "would prejudice the national interest" and

"accurate resolution of the factual issues would not have been materially advanced

by either disclosure of information to the defendant or an adversary hearing," judge

examined records *in camera* to determine the legality of the surveillance).

Courts have adopted such flexible approaches in civil cases involving national security as well. In *Jabara v. Webster*, 691 F.2d 272, 274–76 (6th Cir. 1982), which involved claims seeking damages and injunctive relief against unlawful electronic surveillance much like this case, the Sixth Circuit chose to consider the evidence over which the Government had asserted the state secrets privilege *in camera* and *ex parte*, but did so in order to rule *on the merits* rather than to dismiss on the ground that the information was secret. Similarly, the Second Circuit rejected the Government's assertion of the *Reynolds* privilege in *Halpern v. United States*, 258 F.2d 36, 44 (2d Cir. 1958), and instead ordered an *in camera* trial of a claim brought by a creator of an invention with secret military applications, because the "scope of the [state secrets] privilege . . . is limited by its underlying purpose," and *in camera* process "will not make the information public or endanger the national security."

As in *Jabara* and *Halpern*, the district court here had common law authority to apply FISA's *in camera* procedures to any non-FISA evidence. *Sterling*, 724 F.3d at 501 ("Rule 501 thus leaves the door open for courts to adopt new common-law privileges, *and modify existing ones*, in appropriate cases.") (emphasis added). Thus, the district court would have ample authority to adapt FISA's procedures to any evidence that arises in this litigation, including by utilizing procedures from the enemy combatant habeas cases, *see infra* n. 18, or the Classified Information

68

Procedures Act. *See generally* 18 U.S.C. app. III; *see also* Ian MacDougall, *CIPA Creep: The Classified Information Procedures Act and Its Drift into Civil National Security Litigation*, 45 COLUM. HUM. RTS. L. REV. 668 (2014).

### III. DISMISSAL OF PLAINTIFFS' CLAIMS SEEKING RELIEF FROM ONGOING CONSTITUTIONAL VIOLATIONS BY THE FBI MERELY BECAUSE THE GOVERNMENT HAS DECLARED THEIR ALLEGEDLY ILLEGAL CONDUCT TO BE SECRET RAISES SERIOUS CONSTITUTIONAL PROBLEMS

The Court should order the district court to employ the alternative procedural mechanisms described above for an additional compelling reason: permitting the dismissal of Plaintiffs' claims seeking relief from ongoing constitutional violations presents very serious constitutional problems. This Court has an obligation to avoid deciding such questions if at all possible, both by interpreting the relevant provisions of FISA and its common law authority to avoid having to consider them, and by resolving the other questions presented in a manner that avoids constitutional adjudication. *See generally In re Golinski*, 587 F.3d 901, 904 (9th Cir. 2009) (Kozinski, C.J.) ("When a statute admits two constructions, one of which requires a decision on a hard question of constitutional law, it has long been our practice to prefer the alternative."); *see also Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.")).

Fidelity to this principle counsels in favor of requiring the district court to utilize alternative procedures for dealing with any secret evidence that will arise here.

The serious constitutional problems arise because Plaintiffs seek not only damages for past violations, but also relief from an ongoing constitutional harm — the continued maintenance of files of information obtained in violation of the Constitution that itself constitutes an injury, and also causes other ongoing harms to Plaintiffs through the Government's various watchlisting systems. *See* FAC, ER 248–49. In other words, Plaintiffs allege (and the Court must assume, for purposes of this appeal) that the Government is engaged in an ongoing violation of their constitutional rights. The Court must also assume, as the district court acknowledged, that there is no basis other than the *Reynolds* privilege on which to dismiss at least some of Plaintiffs' claims to relief from those harms. ER 53 at n.10. Under these circumstances, the Constitution likely does not permit the Court to deny any remedy — whether injunctive or compensatory — for Plaintiffs' constitutional claims without addressing their merits.

While the doctrine discussed below provides ample support for Plaintiffs' constitutional argument, it is worth pausing to note the obvious problem with the Government's view. If it were correct, then the Government could shield itself from litigation to challenge a policy to arrest people solely on the basis of their race, nationality, or political opinion, *see Korematsu v. United States*, 323 U.S. 214

70

(1944), or even a policy to summarily murder American citizens suspected of posing a threat to the present administration, simply by asserting that the policy was secret. *Cf. Al-Aulaqi v. Obama*, 727 F.Supp.2d 1, 54 (D.D.C. 2010) (noting that the government had invoked state secrets to dismiss challenge to government's program of targeted killing abroad, but deciding on other grounds).[17]

The Government's position is that literally *any* practice, no matter how abusive, can be immunized from legal challenge if undertaken in the name of "counterterrorism" and conducted in secret. On the Government's view, even if the Court reviewed the secret evidence and determined that the Government's conduct was *unlawful*, it still would have to dismiss, so long as it determined with certainty that the evidence was properly labeled secret and would risk disclosure during the

---

[17] The fact that the privilege assertions would be limited to cases involving "national security" or "counterterrorism" provides little comfort. One need look no further than the government's discussion of *Presbyterian Church* in the briefing to the district court. Gov't Br., ER 174–75. The Government strongly suggested there that information could also have implicated "national security," even though it involved an investigation by the INS of churches assisting Central American refugees seeking asylum. The Government has repeated the national security mantra with respect to immigrants in recent times as well. *See* John Stanton, *Government Declares Undocumented Immigrant Child, Mother A "National Security Threat"* (August 5, 2014) available at http://www.buzzfeed.com/johnstanton/government-declares-undocumented-immigrant-child-mother-a-na. For other evidence of the malleability of those terms, see ER 139d n.24 (supervisory FBI and DEA agents describing drug trafficking and related problems as "a serious threat to the national security" that is not "a traditional criminal justice problem;" description of proposed legislation that would designate seven cartels as "foreign terrorist organizations" to "give law enforcement in the United States enhanced tools to combat the cartels").

course of the litigation. *See Jeppesen*, 614 F.3d at 1081 (adopting that rule in damage action involving conduct abroad). The Government cannot explain how challenges to the horrific practices described above could ever be litigated against its counterterrorism policies and practices if it could use the privilege to obtain dismissal in cases like this one. In this respect, its position is at war with the most fundamental principles of our constitutional system, irreconcilable with the Government's practice in other cases involving secret information, and unsupported by any controlling authority from the state secrets context. At the very least, it presents a serious constitutional question that this Court should avoid.

### A. WHERE IT HAS JURISDICTION, A FEDERAL COURT MAY NOT DISMISS A CASE SEEKING RELIEF FROM ONGOING CONSTITUTIONAL VIOLATIONS WITHOUT ADDRESSING THE CLAIMS ON THEIR MERITS

The Government's application of the *Reynolds* privilege here is fundamentally misguided because Plaintiffs seek relief from ongoing constitutional violations. Courts have long taken two radically divergent approaches to enforcing the Constitution's provisions depending on whether the relief sought involves relief against ongoing violations or instead damages for violations that occurred in the past. With respect to the latter, courts have long held that not every victim of a completed constitutional violation is entitled to a remedy. The most obvious examples arise from immunity doctrine. Select government officials are given absolute immunity from damage actions for some types of past unlawful conduct,

*see, e.g.*, *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976). A broader range of officials receive qualified immunity, such that they need not compensate victims of their constitutional violations unless the rule they broke was clearly established. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). Similarly, as the individual defendants argued below, in some cases the existence of "special factors" may foreclose damages relief for past constitutional violations even where the violation at issue is clear, *see* AAR Br., ER 155–56, 158–59, while damages suits against the United States itself, even for constitutional violations, are only actionable if permitted under the Federal Tort Claims Act or another statute waiving sovereign immunity. *See generally Carlson v. Green*, 446 U.S. 14 (1980).

In contrast, no doctrines permit the courts to refrain from affording relief in the face of ongoing constitutional violations when they have jurisdiction to consider such claims. The Supreme Court has made clear that, as a general matter, injunctive relief is available in such situations. *See Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). Indeed, the rationale behind the *Ex Parte Young* "fiction" that suits seeking relief against ongoing unconstitutional conduct must be treated as suits against individual officers in their official capacities, notwithstanding any immunity the Government may assert, arises from the Constitution's guarantee that the political branches

cannot eliminate the rights of individuals to seek relief from ongoing

unconstitutional official action by asserting their sovereign immunity. *See*

*Guaranty Nat. Ins. Co. v. Gates*, 916 F.2d 508, 512 (9th Cir. 1990) ("[T]he best

explanation of *Ex parte Young* [209 U.S. 123, 156 (1908)] and its progeny is that

the Supremacy Clause creates an implied right of action for injunctive relief

against state officers who are threatening to violate the federal Constitution or

laws.") (quoting C. Wright, A. Miller, & E. Cooper, FEDERAL PRACTICE AND

PROCEDURE § 3566, at 102 (1984)); *see generally* Richard H. Fallon, Jr. et al.,

HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 845 (6th

ed. 2009) ("[I]t was historically taken for granted that sovereign immunity did not

always or perhaps even typically bar suits against governmental officers.").[18]

However, whether or not the federal courts make any particular avenue for relief

available, they have always remained available to provide *some* form of relief for

individuals alleging ongoing constitutional violations. *See generally* Henry Hart,

*The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in*

---

[18] Although *Ex Parte Young* involved state sovereign immunity, the same rule
applies to the federal government. *See Larson v. Domestic & Foreign Commerce
Corp.*, 337 U.S. 682, 689, 701–02 (1949) (sovereign immunity does not bar an
action against federal officers for non-monetary relief where an "officer's powers
are limited by statute, [and] his actions [exceed] those limitations" or his statutory
powers "are constitutionally void"); Erwin Chemerinsky, FEDERAL JURISDICTION
§ 9.1, at 632 (6th ed. 2012) ("[T]he Supreme Court long has held that federal
officers may be sued for injunctive relief.").

*Dialectic*, 66 HARV. L. REV. 1362, 1371–72 (1953) (asserting that constitutional (unlike statutory) rights require recourse to courts for some form of remedy); Richard Fallon, *Jurisdiction-Stripping Reconsidered*, 96 VA. L. REV. 1043, 1107 (2010) (arguing, based largely on Professor Hart's views, that "congressional attempts to preclude all possible remedies for the systematic or ongoing violation of constitutional rights … should be deemed intolerable. It would be incompatible with the Constitution's evident aspiration to establish a government subject to the rule of law for Congress to be able to license ongoing lawbreaking through the device of a jurisdictional withdrawal.").[19]

That longstanding historical practice is rooted in the fundamental structure of our constitutional system. Where Article III grants this Court jurisdiction to consider claims seeking to remedy ongoing constitutional violations, the Court has no authority to abstain from deciding those claims based on a common law doctrine. *See McCarthy v. Madigan*, 503 U.S. 140, 146 (1992) ("[F]ederal courts are vested with a virtually unflagging obligation to exercise the jurisdiction given them." (citing *Cohens v. Virginia*, 19 U.S. 264, 404 (1821) (Marshall, C.J.) ("We have no more right to decline the exercise of jurisdiction which is given, than to

---

[19] While much of the scholarly literature on this topic concerns Congressional attempts to strip the courts of jurisdiction to hear constitutional claims, the same rationale applies with at least as much force to attempts by the Executive Branch to close the courthouse doors through the use of secret policies and practices.

usurp that which is not given. The one or the other would be treason to the Constitution.")). The principles set forth in such cases give life to perhaps the most fundamental protection of our legal system: where Article III gives the courts authority to do so, they are responsible for ensuring that the other branches of government comply with the Constitution. While "certain matters requiring political judgments are best left to the political branches," such as those involving inquiry into secret government contracts, where the federal courts retain authority to consider a case, "the political branches [do not] have the power to switch the Constitution on or off at will." *Boumediene*, 553 U.S. at 765 (striking down jurisdiction stripping provision in national security context because it would "lead[] to a regime in which Congress and the President, not this Court, say 'what the law is') (citing *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).

The Government's invocation of the *Reynolds* privilege here would lead to a doctrinal law-free zone for secret counterterrorism programs — even if undertaken against United States citizens on U.S. soil — that would be no less corrosive to our legal system than the geographic law-free zone that the Court rejected in *Boumediene*. The Constitution does not permit that result.

76

### B. THE GOVERNMENT'S PRACTICE IN OTHER NATIONAL SECURITY CASES STRONGLY SUGGESTS THAT THE *REYNOLDS* PRIVILEGE DOES NOT PERMIT DISMISSAL OF CLAIMS CHALLENGING ONGOING UNCONSTITUTIONAL CONDUCT

The vast majority of the state secrets caselaw, including all of the Supreme Court and Ninth Circuit cases that bind this Court, comport with the basic principle that the *Reynolds* privilege does not permit dismissal of claims seeking relief from ongoing constitutional violations. The simplest way to illustrate the constitutional problem Plaintiffs identify is by examining the cases in which the Government does *not* assert the *Reynolds* privilege. Although the Government asserted in preliminary briefing below that "the applicability of the state secrets privilege does not turn on the nature of the claim asserted or the relief sought," Government Defendants' Response to Plaintiffs' *Ex Parte* Application, ER 258, that claim is entirely indefensible given the Government's practice in other contexts. Most obviously, no court has ever dismissed a habeas case based on the *Reynolds* privilege, despite the fact that many of those cases involved highly secret counterterrorism information, and despite the fact that the courts have repeatedly required disclosure of such information, subject to various procedural safeguards, as part of the habeas process.

There should be no serious dispute that the Government could not obtain dismissal of a habeas case even if litigating it would require disclosure of state

77

secrets. Indeed, the courts has gone so far as to order disclosure of classified information to Plaintiff's counsel in cases involving enemy combatants. *See Boumediene*, 553 U.S. at 783–84 (finding that Combatant Status Review Tribunals were an inadequate substitute for habeas corpus in part because they failed to provide detainees with sufficient access to classified information).[20]  Courts have even entertained habeas petitions brought by people alleged to have engaged in war against the United States, including on U.S. soil and abroad. *Ex Parte Quirin*, 317 U.S. 1, 20–22 (1942) (habeas petition resolved on merits involving U.S. citizens engaged in war on behalf of a foreign power); *Ex Parte Milligan*, 4 U.S. (4 Wall.) 2 (1866) (same, for citizen plotting insurrection); *Padilla v. Hanft*, 432 F.3d 582, 584 (4th Cir. 2005) (U.S. citizen on U.S. soil captured in United States allegedly plotting to detonate a "dirty bomb"); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (habeas petition granted for U.S. citizen allegedly engaged in war against the U.S. in Afghanistan); *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) (same, for non-citizen detained abroad). None of these cases were dismissed under the state secrets privilege, even though they obviously put at issue equally or more sensitive

---

[20]Even prior to *Boumediene,* the D.C. Circuit had ordered the disclosure of classified information to detainee's counsel in combatant classification review actions. *Bismullah v. Gates*, 501 F.3d 178, 187 (D.C. Cir. 2007); *Parhat v. Gates*, 532 F.3d 834, 837 n.1 (D.C. Cir. 2008) (permitting counsel to see classified information contained in court's decision).

secret information. As these cases make clear, the *Reynolds* privilege does not permit dismissal in at least some cases that involve highly secret information.

The Government offered no coherent argument to the district court as to why it declined to assert the *Reynolds* privilege in the cases described above and how to reconcile its practice there with its assertion here. Gov't Reply, ER 84. It stated that those cases involve the Government's assertion of authority to detain someone, but here the Government asserts authority to gather and maintain personal information on individuals because of their religion. The Government cited no doctrine permitting it to relegate to second class status the constitutional rights that Plaintiffs seek to vindicate here — grounded in the First, Fourth, and Fifth Amendments. The Government also noted that it bears the burden of proof in habeas cases, but that would be true here once Plaintiffs make their *prima facie* case, which they can do without resort to secret evidence. *See supra* Section I.B.i.

The Government also argued below that the injunctive relief at issue in habeas cases was not analogous to the injunctive relief sought here because the relief sought here — expungement of records maintained in violation of the Constitution, *see* Plaintiffs' Statement of Genuine Issues and Evidentiary Objections, ER 139 — is inherently "retrospective in nature." Gov't Reply, ER 81. But that assertion is incorrect, both because the maintenance of records itself constitutes a cognizable ongoing injury, *MacPherson v. IRS*, 803 F.2d 479, 484

(9th Cir. 1986) ("The mere compilation by the government of records describing the exercise of First Amendment freedoms creates the possibility that those records will be used to the speaker's detriment, and hence has a chilling effect on such exercise"), and because Plaintiffs have also pled in the complaint the existence of other ongoing harms arising from the maintenance of those records because of the Government's various watchlists that in turn trigger problems at airports, in the immigration system, and elsewhere. *See* FAC, ER 231 ¶ 185 (Fazaga subject to increased scrutiny during travel); FAC, ER 239 ¶ 215 (AbdelRahim subject to extensive interrogations and searches during travel)]; *see also* ACLU, *Muslims Need Not Apply* (2013), available at https://www.aclusocal.org/CARRP.

In any event, as Plaintiffs argued below, this Court has repeatedly recognized the federal courts' inherent authority to expunge records obtained in violation of constitutional rights in a variety of contexts. *See Maurer v. Pitchess*, 691 F.2d 434, 437 (9th Cir. 1982) (arrest records); *Shipp v. Todd*, 568 F.2d 133, 134 (9th Cir. 1978) (same); *Burnsworth v. Gunderson*, 179 F.3d 771, 774–75 (9th Cir. 1999) (prison disciplinary records). For obvious reasons, that same authority exists to protect people who were *not* arrested, but about whom the Government has collected information in violation of their constitutional rights. Thus, whether the remedy available is expungement or some other form of relief, *some* remedy must be available for these alleged violations of Plaintiffs' constitutional rights. *Cf.*

*Spock v. United States,* 464 F. Supp. 510, 517 (S.D.N.Y. 1978) (finding challenge to unlawful surveillance not moot in part because "the Government is alleged to have kept on file all of the information with respect to plaintiff.").Ultimately, the Government simply has no explanation for how the courts can protect litigants properly before them from its ongoing unconstitutional conduct if it can obtain dismissal of cases like this one through assertion of the *Reynolds* privilege. Nor can the Government explain why, if it can obtain dismissal here, it could not have done the same in numerous habeas cases litigated both in the recent and distant past.

### C. EXISTING STATE SECRETS DOCTRINE DOES NOT RESOLVE WHETHER THE PRIVILEGE PERMITS DISMISSAL OF CLAIMS SEEKING RELIEF FROM ONGOING CONSTITUTIONAL VIOLATIONS

Although most of the existing state secrets doctrine does not speak explicitly in terms of the distinction between ongoing and completed constitutional violations described above, the cases overwhelmingly comport with that distinction. The Government has rarely even asserted the state secrets privilege in cases seeking relief from ongoing constitutional violations, and no Supreme Court or Ninth Circuit case has ever accepted such an assertion.

The Supreme Court has explicitly addressed the state secrets doctrine — whether the justiciability bar or the evidentiary privilege — in only four cases. Each of them involved government contracts for secret employment or services.

81

*See General Dynamics Corp.*, 131 S. Ct. at 1903–04 (defense contract with United States military); *Totten*, 92 U.S. at 105–06 (contract for espionages services); *Tenet v. Doe*, 544 U.S. 1 (2005) (contract for espionage services); *Reynolds*, 345 U.S. at 2–3 (1953) (wrongful death action by widows of civilians observing secret military flight).

Language from the most recent of these cases strongly suggests that the *Reynolds* privilege does not apply in cases seeking relief from ongoing constitutional violations. In *General Dynamics*, the Court rejected as unhelpful the "false analogy" to criminal cases, where the Government cannot proceed against the defendant through use of secret evidence, because *General Dynamics* was a damage action brought against the United States "in a civil forum where the Government is not the moving party, but is a defendant *only on terms to which it has consented*." 131 S. Ct. at 1906 (emphasis added) (citing *Reynolds*). In contrast, the Constitution itself permits the courts to hear Plaintiffs' constitutional claims against Government officials sued in their official capacity; no waiver of sovereign immunity is required. *See supra* Section III.A (citing, *inter alia*, *Ex Parte Young*); *supra* n. 18.

The Government argued below that *Tenet* applied the state secrets privilege to dismiss constitutional claims seeking injunctive relief, but that is plainly incorrect. While the plaintiffs in *Tenet* framed the claim as one seeking "injunctive

relief" under "procedural and substantive due process," *Tenet*, 544 U.S. at 5, the

Court dismissed these claims under the *Totten* justiciability bar, because it

"precludes judicial review … where success depends on the existence of

[Plaintiffs'] secret espionage relationship with the Government." *Id*. at 8. There is

nothing remarkable about a court dismissing a claim — whether for ongoing

constitutional violations or any other reason — where it lacks subject matter

jurisdiction (whether under a justiciability bar or for any other reason), but what

the Government seeks here is something far different — dismissal of claims over

which the district court had jurisdiction on the basis of an evidentiary privilege. *Cf.*

*Boumediene*, 553 U.S. at 765 ("Abstaining from questions involving formal

sovereignty and territorial governance is one thing. To hold the political branches

have the power to switch the Constitution on or off at will is quite another."). *Tenet*

merely reaffirms that the courts lack subject matter jurisdiction over the extremely

narrow category of suits where "the very subject matter of the action" is a state

secret. *Jeppesen*, 614 F.3d at 1078; *see also Tenet*, 544 U.S. at 10 ("[T]here is an

obvious difference, for purposes of *Totten*, between a suit brought by an

acknowledged (though covert) employee of the CIA and one filed by an alleged

former spy. Only in the latter scenario is *Totten*'s core concern implicated:

preventing the existence of the plaintiff's relationship with the Government from

being revealed."). Here, the Government has conceded that the very subject matter

of this case is not a state secret, *see supra* Statement of the Case, so *Tenet* is inapplicable.

This Court's prior state secrets law is also consistent with the rule Plaintiffs advocate here. Three published Ninth Circuit cases apply the state secrets doctrine — either the privilege or the justiciability bar — and while these cases apply the doctrine outside the government contracts context, none have ever dismissed an action based on the *Reynolds* privilege where the plaintiffs sought relief from ongoing constitutional violations. *Jeppesen* was a suit for damages under the Alien Tort Statute for harms that occurred entirely in the past. 614 F.3d at 1075. *Kasza v. Browner* involved no constitutional claims, 113 F.3d at 1163–64, and appears to have involved the justiciability bar. *Id*. at 1170. *Al-Haramain v. Bush* also involved a request for only damages and declaratory relief. While the Government argued below that it also involved injunctive relief, the Ninth Circuit did not decide the case on that basis on appeal, and in any event the Court suggested that the state secrets privilege did not govern that action because it was preempted by FISA. *See Al-Haramain*, 507 F.3d at 1195 ("Al-Haramain sought damages and declaratory relief"); *id*. at 1205–06 (suggesting that FISA preempts state secrets privilege); *see also Weston v. Lockheed Missiles & Space Co.*, 881 F.2d 814, 816 (9th Cir. 1989) (*Reynolds* privilege waived on appeal).

The Government argued below that Plaintiffs' claim makes too much of the distinction between the *Totten* bar and the *Reynolds* privilege, but that view is contrary to governing precedent from both this Court and the Supreme Court. Both have repeatedly made reference to the distinction between the two doctrines. *See General Dynamics*, 131 S.Ct. at 1906 (noting that exercise of courts' "common law-authority to fashion contractual remedies" is "quite different from" their "power to determine the procedural rules of evidence"); *Jeppesen*, 614 F.3d at 1077 (discussing "two applications" of state secrets doctrine separately); *cf. Horn v. Huddle*, 647 F. Supp. 2d 55, 61 (D.D.C. 2009) (vacated after settlement) (ordering *in camera* review with CIPA-like procedures because "[r]egardless of whether the Court accepts or rejects the government's assertion of the privilege over certain information that has already been filed in this case, the Court still must fashion a way for this case to ultimately proceed to discovery and trial, *keeping in mind that the very subject matter of the action is not a state secret*.") (emphasis added).

Moreover, as *Boumediene* recognized, maintaining the distinction also serves a critical constitutional function: whereas a justiciability doctrine barring suits about private individuals who have made contracts with the Government has limited potential to harm our constitutional system, an evidentiary privilege that allows the Government to win dismissal of suits brought by law-abiding

85

individuals whose constitutional rights it continues to violate has no logical

limiting principle. Thus, contrary to the Government's argument below, it makes

perfect sense to permit dismissal of suits whose very subject matter involves state

secrets because they arise from Government contracts or other secret subject

matters. In contrast, to permit dismissal of suits brought by individuals who did not

have contractual dealings even where they suffer from ongoing constitutional

violations would run contrary to the most basic features of our constitutional

system.

Two recent cases involving claims for relief from ongoing constitutional

violations illustrate the federal courts' reluctance to accept assertions of the

*Reynolds* privilege as grounds for dismissal in such cases. District courts in the

recent past have largely rejected the Government's state secrets assertions in two

cases involving the No Fly List. In *Ibrahim v. Dep't of Homeland Security*, after

prior state secrets litigation over certain discrete pieces of evidence, the

Government attempted to dismiss the entire case. The district court rejected that

attempt (as well as a subsequent motion to reconsider that denial) in order "to

provide an opportunity to see how the evidence would actually develop at trial and

the extent to which at least portions of the case could be tried and decided without

regard to state secrets." Findings of Fact, Conclusions of Law and Order for Relief,

*Ibrahim v. Dep't of Homeland Security*, No. C 06-00545 WHA (N.D. Cal. Jan. 14,

2014) Dkt. 682 at 5.[21] *See also* Order, *Mohamed v. Holder*, No. 1:11-cv-50 (AJT/TJR) (E.D. Va. Oct. 30, 2014) Dkt. 144 at 1-2 (rejecting state secrets dismissal, and allowing case to move forward, including through use of protective orders).[22]

As all of these cases make clear, the question whether the Constitution permits dismissal of this suit is, at minimum, a serious constitutional problem which no binding authority resolves. The district court erred in deciding it, and also erred in the decision it made — a decision that allows an ongoing constitutional violation to go unaddressed by the only courts authorized to do so.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order dismissing all but one of Plaintiffs' claims based on the *Reynolds* privilege, in light

---

[21] Trial revealed that FBI agents had placed Ms. Ibrahim on the No Fly List because they had checked the wrong box on a security form. *Id*. at 9. The court ruled that her due process rights had been violated. *Id*. at 26.

[22] The vast majority of out-of-circuit state secrets cases in which the Government prevailed also involve either damage cases (i.e., actions to remedy past illegal conduct) or cases best understood as applications of the *Totten* bar, because they involve employment or contract law rules for secret services with the Government. The handful of cases that do involve challenges to ongoing unconstitutional conduct produced substantial disagreements amongst the judges who considered them. *See Jabara v. Webster*, 691 F.2d 272 (6th Cir. 1982); *American Civil Liberties Union v. Brown*, 619 F.2d 1170 (7th Cir. 1980) (*en banc*); *Halkin v. Helms*, 598 F.2d 1 (D.C. Cir. 1979); *see* ER 139d n.30. These cases further underscore the seriousness of the constitutional problem presented here.

of the serious constitutional problems presented by that result. The Court should order the district court to allow the case to proceed, and to utilize the procedures set forth in FISA for dealing with any information relating to electronic surveillance that the Government asserts must remain privileged in order to protect national security, and to utilize either FISA's or other analogous procedures for handling any other evidence that the Government asserts is both privileged and critical for this case to proceed.

Respectfully submitted,

ACLU OF SOUTHERN CALIFORNIA

Dated:  November 17, 2014            s/ Ahilan T. Arulanantham
AHILAN T. ARULANANTHAM
Counsel for Plaintiffs-Appellants

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiffs-Appellants are not aware of any related cases pending in this Court.

Respectfully submitted,

Dated:  November 17, 2014

 s/ Ahilan T. Arulanantham
AHILAN T. ARULANANTHAM
Counsel for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C), and Ninth Circuit Rule 32-1, I certify that Plaintiffs-Appellants Principal Brief is proportionately spaced, has a typeface of 14 points or more, and contains 20,963 words.

A motion to exceed the page limitations pursuant to Ninth Circuit Rule 32-2 has been concurrently filed with the foregoing brief.


Dated: November 17, 2014        s/ Ahilan T. Arulanantham
                                AHILAN T. ARULANANTHAM
                                Counsel for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2014, I caused to be electronically filed the foregoing PLAINTFFS-APPELLANTS' PRINCIPAL BRIEF, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

　s/Ahilan T. Arulanantham
AHILAN T. ARULANANTHAM
Counsel for Plaintiffs-Appellants