Consolidated Case Nos. 13-55017, 12-56867, 12-56874
_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

Yassir Fazaga, Ali Uddin Malik, Yasser Abdelrahim,
Plaintiffs,

v.

Federal Bureau of Investigation; United States of America; Robert Mueller,
Director of the Federal Bureau of Investigation, in his official capacity; Steven M.
Martinez, Assistant Director in Charge, Federal Bureau of Investigation's Los
Angeles Division, in his official capacity; J. Stephen Tidwell; Barbara Walls; Pat
Rose; Kevin Armstrong; Paul Allen; Does 1-20
Defendants.
_____

On Appeal from the United States District Court, Central District of California
No. CV 11-301-CJC (VBK)
_____

## PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD, VOLUME 2
_____

PETER BIBRING
pbibring@aclu-sc.org
AHILAN T. ARULANANTHAM
aarulanantham@aclu-sc.org
ACLU Foundation
   of Southern California
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-5295
Facsimile: (213) 977-5297

AMEENA MIRZA QAZI
aqazi@cair.com
Council on American-Islamic
  Relations, California
2180 W. Crescent Avenue, Suite F
Anaheim, CA 92801
Telephone: (714) 776-1847
Facsimile: (714) 776-8340

DAN STORMER
dstormer@hadsellstormer.com
MOHAMMAD TAJSAR
mtajsar@hadsellstormner.com
Hadsell Stormer Keeny & Renick, LLP
128 N. Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD**

**INDEX**

**VOLUME 1**

| Document | Docket No. | File Date | Page(s) |
|---|---|---|---|
| Notice of Appeal | 130 | 1/3/13 | 1-10 |
| Partial Final Judgment Under Federal Rule of Civil Procedure 54(b) | 129 | 12/3/12 | 11-12 |
| Order Granting Plaintiffs' Motion for Issuance of Partial Final Judgment Pursuant to Federal Rule of Civil Procedure 54(b) | 128 | 12/3/12 | 13-17 |
| Order Granting in Part Defendants' Motions to Dismiss Plaintiffs' FISA Claim | 102 | 8/14/12 | 18-30 |
| Order Granting Defendants' Motions to Dismiss Based on the State Secrets Privilege | 101 | 8/14/12 | 31-66 |

# VOLUME 2

| Document | Docket No. | File Date | Page(s) |
|---|---|---|---|
| Reply Memorandum of Points and Authorities in Support of Motion to Dismiss by Defendants Pat Rose, Kevin Armstrong and Paul Allen | 70 | 1/20/12 | 67-71 |
| Government Defendants' Reply in Support of Motion to Dismiss Amended Complaint and for Summary Judgment | 69 | 1/20/12 | 72-84 |
| Declarations of Craig Monteilh Submitted by Plaintiffs in Support of Their Oppositions to Motions to Dismiss | 66 | 12/23/11 | 85-138 |
| Plaintiffs' Statement of Genuine Issues and Evidentiary Objections in Opposition to Government Defendants' Motion for Summary Judgment | 64 | 12/23/11 | 139-139d |
| Plaintiffs' Combined Opposition to Individual Capacity Defendants' Motion to Dismiss First Amended Complaint | 63 | 12/23/11 | 140-154 |
| Notice of Motion and Motion by Defendants Pat Rose, Kevin Armstrong and Paul Allen to Dismiss Plaintiffs' First Amended Class Action Complaint; Notice of Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller, and Steven Martinez and (2) Defendants Stephen Tidwell and Barbara Walls | 57 | 11/11/11 | 155-159 |

| | | | |
|---|---|---|---|
| Notice of Motion and Motion to Dismiss Amended Complaint and for Summary Judgment | 55 | 11/4/11 | 160-178 |
| First Amended Complaint Class Action | 49 | 9/13/11 | 179-257 |
| Government Defendants' Response to Plaintiffs' *Ex Parte* Application | 43 | 8/10/11 | 258 |
| Public Declaration of Mark F. Giuliano Federal Bureau of Investigation | 33 | 8/1/11 | 259-282 |
| Declaration of Eric H. Holder Attorney General of the United States | 32-3 | 8/1/11 | 283-294 |
| Civil Docket Sheet | | | 295-320 |

Constitution. *Id.* at 2085. Accordingly, the Agent Defendants respectfully request that each of Plaintiffs' causes of action against them be dismissed.

## II. PLAINTIFFS' CLAIMS FAIL UNDER QUALIFIED IMMUNITY

To overcome qualified immunity, Plaintiffs bear the burden of pleading facts showing "that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd* at 2080. Plaintiffs allege they have a right to be free from any investigation that "used religion as a factor in deciding whom to surveil . . . even if they employ religion as only one factor (rather than the sole factor)." (Opp. at 2:10-17; *see also* Docket No. 64 at 21:15-18 ("Plaintiffs' theory does not require that they prove that religion is the 'sole' reason for their having been targeted for intrusive surveillance, but rather only that religion was 'a' reason that they were targeted").)

To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd* at 2083 (internal cites and quotes omitted). "[C]onduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* The Supreme Court has consistently advised courts "not to define clearly established law at a high level of generality." *Id.* at 2084 (general rule that "an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quote omitted).

### A. Qualified Immunity Bars The First Amendment Claims

#### 1. The Lemon and Sherbert Tests Apply Here

As a threshold matter, Plaintiffs dispute the proper framework to apply to their First Amendment claims. Plaintiffs contend that, "[u]nder long-established precedent, facial discrimination against a given religious group is subject to strict scrutiny under either [the Free Exercise or Establishment] clause." (Opp. at 29:22-

2

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

ER - 67

24.) However, Plaintiffs disregard controlling Ninth Circuit authority (namely *Vernon*) requiring that a challenge to a religiously motivated investigation satisfy the *Lemon* and *Sherbert* tests typically applied to First Amendment claims.

While *Vernon* was discussed in the Agent Defendants' motion, it is worth reviewing the facts of that case in particular detail here in light of Plaintiffs' arguments in the Opposition.  In *Vernon*, the City of Los Angeles investigated Los Angeles Assistant Chief of Police Robert Vernon after City Council members expressed concern that his religious views could "improperly affect[] the operations of the LAPD." *Vernon* at 1389-90. Members of the City Council leaked a letter to the press regarding the potential investigation and made public statements identifying Vernon's religious beliefs as the impetus for the investigation.[1] *Id.* For his part, Vernon responded publicly "that investigating me because of my beliefs is against the law. It's against my rights as an individual." *Id.* The investigation found no wrongdoing, and no action was taken against Vernon. *Id.* After the investigation concluded, Vernon filed a Section 1983 claim alleging that the investigation violated his "rights under the Free Exercise and Establishment Clauses of the First Amendment, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment." *Id.* Particularly, Vernon objected to "an investigation into the potentially improper impact of his religious beliefs upon his job as Assistant Chief of Police." *Id.* at 1396. The district court granted summary judgment to the investigating officers, and Vernon appealed to the Ninth Circuit. *Id.* at 1390-91.

The Ninth Circuit affirmed the district court's application of the *Lemon* and

---

[1] The Ninth Circuit has repeatedly characterized *Vernon* as a First Amendment challenge to a religiously motivated investigation. *See, e.g., Vasquez v. L.A. County*, 487 F.3d 1246, 1256 (9th Cir. 2007); *American Family Association, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1121-22 (9th Cir. 2002); *Lumpkin v. Brown*, 109 F.3d 1498, 1502 (9th Cir. 1997).

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

1  *Sherbert* tests to Vernon's First Amendment claims. With respect to Vernon's Free
2  Exercise claims, the Ninth Circuit held that "[u]nder *Sherbert*, the plaintiff must first
3  establish that the government has placed a substantial burden on his or her free
4  exercise of religion." *Vernon* at 1393; *see also United States v. Gering*, 716 F.2d
5  615, 619 (9th Cir. 1983) (holding that a government investigation did not violate the
6  Free Exercise Clause where appellant failed to show a burden on his free exercise
7  rights). With respect to Vernon's Establishment Clause claims, the Ninth Circuit
8  applied *Lemon* and concluded that the City's investigation "clearly had a valid
9  secular purpose," that "the investigation [could not] be construed to send as its
10  *primary* message the disapproval of Vernon's religious beliefs," and that the
11  investigation posed no risk of excessive entanglement, and therefore affirmed
12  summary judgment against Vernon. *Vernon* at 1396-1401.

13      Plaintiffs' claim is virtually indistinguishable from Vernon's claim. Both
14  cases involve an investigation into wrongdoing by the plaintiff, based at least in part
15  on the targets' religious beliefs. In both cases, nothing ultimately came of the
16  investigation. In both cases, plaintiffs claimed that the investigation infringed the
17  Free Exercise and Establishment clauses of the Constitution. Yet, although the
18  *Vernon* court applied the *Lemon* and *Sherbert* tests to the investigation there,
19  Plaintiffs demand a different test here.

20      First, with respect to the application of *Sherbert* to their Free Exercise claim,
21  Plaintiffs contend that "the Supreme Court in *Smith* sharply narrowed applicability
22  of the 'substantial burden test'" and that the proper test is found in *Church of*
23  *Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993). (Opp. at 35:15-36:12.)
24  However, the Ninth Circuit has repeatedly rejected these arguments. In *Vernon*, the
25  plaintiff also argued that *Smith,* not *Sherbert,* provided the relevant test, but the
26  Ninth Circuit rejected this argument "because this Circuit has held that the *Smith*
27  analysis is ***inapplicable*** to Free Exercise claims such as the plaintiff's." *Vernon* at
28  1393 n. 1 (emphasis added). Similarly, in *American Family*, plaintiffs argued that

4

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

ER - 69

1    under *Lukumi* "they are not required to demonstrate a 'substantial burden' on their

2    religion." 277 F.3d at 1124. The Ninth Circuit flatly rejected that argument, stating

3    that "[p]laintiffs overlook a critical distinction, however: in this case, there is no

4    actual 'law' at issue." *Id.* The court added that post-*Smith* the Ninth Circuit

5    continued "to apply the *Sherbert* substantial burden test to government conduct that

6    did not involve an actual regulation or criminal law." *Id.* After citing *Vernon*

7    favorably, the Ninth Circuit concluded that "there does not appear to be ***any case in***

8    ***this circuit*** applying *Smith* or *Lukumi* to some non-regulatory or non-compulsory

9    governmental action – in other words to something other than an actual *law.*" *Id.*

10   (emphasis added). The distinction drawn in *Vernon* and clarified in *American*

11   *Family* – that allegedly discriminatory *laws* are treated differently than

12   discriminatory *conduct* – applies with equal force here.

13          Second, with respect to the application of *Lemon* to their Establishment

14   Clause claim, Plaintiffs assert that their claim merits strict scrutiny under *Larson v.*

15   *Valente,* 456 U.S. 228 (1982). (Opp. at 33:1-34:13.) Yet, *Larson* is distinguishable

16   for the same reason as *Lukumi* and *Smith:* it did not address *government conduct*

17   generally, but rather a statute that imposed burdens on religious contributions.

18   *Larson*, 456 U.S. at 231. More importantly – especially in light of Plaintiffs' burden

19   to identify a constitutional right that is beyond debate in order to overcome qualified

20   immunity – *Vernon* is also consistent with the law in this Circuit that departures

21   from the *Lemon* test are the exception, not the rule. *Access Fund v. United States*

22   *Dep't of Agric.*, 499 F.3d 1036, 1042 (9th Cir. 2007) (*Lemon* is the general

23   constitutional framework in all but a few narrow exceptions); *see also Card v. City*

24   *of Everett*, 520 F.3d 1009, 1013, 1015 (9th Cir. 2008) (same).

25          Finally, *Vernon* post-dates *Larson* (and *Smith* and *Lukumi),* and has never

26   been overruled or called into question. To the contrary, the Ninth Circuit has

27   repeatedly rejected First Amendment challenges to investigative conduct directed at

28   religion. *United States v. Aguilar,* 883 F.2d 662 (9th Cir. 1989) (First Amendment

5

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

ER - 70

1    did not prohibit undercover investigation targeting members of a particular religious

2    congregation); *Presbyterian Church v. United States*, 870 F.2d 518, 527 (9th Cir.

3    1989) (undercover investigation did not violate church's rights under the Free

4    Exercise Clause); *United States v. Gering*, 716 F.2d 615 (9th Cir. 1983) (approving

5    investigative method directed at a minister). In light of these controlling authorities,

6    the Court should decline Plaintiffs' invitation to depart from the standard *Lemon* and

7    *Sherbert* tests applied by the Ninth Circuit in *Vernon*.

8              ## 2.    *Plaintiffs Fail to Allege a Violation of the Lemon Test*

9                 As *Vernon* makes clear, Plaintiffs must allege a violation of the three-part

10   *Lemon* test to state an Establishment Clause claim. In just a single sentence,

11   Plaintiffs offer a half-hearted attempt to satisfy *Lemon*. (Opp. at 34:14-35:13.) First,

12   Plaintiffs essentially admit that the government had the secular purpose of

13   investigating terrorism. (Opp. at 34:15-35:4). Although Plaintiffs take exception to

14   the alleged scope of the investigation, its actual purpose is not in dispute.

15                Second, Plaintiffs claim that investigating Muslims conveys a message of

16   disapproval, which is irreconcilable with *Vernon*'s conclusion that an investigation,

17   even if motivated by religion, does not offend the Constitution if the primary

18   purpose is the investigation of impermissible conduct by the target. *Vernon* at 1398-

19   98. In *Vernon*, the investigation concerned "whether [Vernon's] *religious views*

20   were having an impermissible effect on his on-duty police department

21   performance." *Id.* at 1388 (emphasis added). The Ninth Circuit took note of several

22   documents that explicitly identified Vernon's religious views as the impetus for the

23   challenged investigation. *Id.* at 1389-90, 1397-99. Notably, the court found that, in

24   spite of the public nature of the investigation, its primary message was not the

25   disapproval of Vernon's religious beliefs: "[n]otwithstanding the fact that one may

26   infer possible city disapproval of Vernon's religious beliefs from the direction of the

27   investigation, this cannot objectively be construed as the primary focus or effect of

28   the investigation." *Id.* at 1399. Here, Plaintiffs admit that the investigation had a

6

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

ER - 71

1  potential covert surveillance are not actionable.  *See* USG at 36-37.

2  **III.    THE STATE SECRETS PRIVILEGE PROPERLY APPLIES HERE.**

3    To the extent that plaintiffs' claims are not dismissed on non-privilege grounds,

4  the Attorney General has properly asserted the state secrets privilege as to information

5  that would be at risk of disclosure in litigation of plaintiffs' religious discrimination

6  claims. Plaintiffs' contention that the Government's state secrets privilege assertion

7  constitutes a "remarkable assertion of power" under which "the courthouse doors

8  would be closed," Opp. at 20, is simply wrong.  Well-established judicial authority

9  recognizes that the protection of national security information may require the

10  dismissal of certain claims.  *See Mohammed v. Jeppesen Dataplan, Inc.,* 614 F.3d

11  1070, 1082 (9th Cir. 2010) (privilege does not "'surrender of judicial control over

12  access to the courts"), *cert. denied,* 131 S.Ct. 2442 (2011).  It remains with the Court

13  to examine the assertion and apply the governing law.  And, contrary to plaintiffs'

14  rhetoric, the Government has proceeded in a narrowly tailored fashion by focusing

15  first on non-privilege grounds for dismissal, not seeking to exclude all information

16  collected by the FBI's former confidential source (Mr. Monteilh), and not seeking

17  dismissal of all claims based on the privilege. However, privileged information is

18  clearly at issue in plaintiffs' religious discrimination claims.

19    **A.    The FISA Does Not Preempt the Privilege in this Case**.

20    Plaintiffs' contention that the state secrets privilege assertion in this case is

21  preempted by the Foreign Intelligence Surveillance Act (FISA) fails for several

22  reasons.  *See* Opp. at 26.[12]  As a threshold matter, this argument is inapplicable in the

23  present posture of this case. The Government has not even moved to dismiss

24  

25    [12]  Plaintiffs rely on *In re: Nat'l Sec. Agency Telecomm. Records Litig., Al-*

26  *Haramain Islamic Found. v. Bush*, 564 F. Supp. 2d 1109 (N.D. Cal. 2008), which is pending on appeal after final judgment.  *See AHIF v. Obama,* 700 F. Supp. 2d

27  1182 (N.D. Cal. 2010).

28  -14-

plaintiffs' FISA claim based on the privilege assertion, and plaintiffs cite no authority for the proposition that the FISA operates beyond the confines of that statute to govern litigation of non-FISA claims. Even if plaintiffs' FISA preemption theory was valid, it would apply to information concerning the alleged electronic surveillance as defined by FISA, which is the subject of their FISA claim. *See* 50 U.S.C. § 1810 (creating cause of action for unlawful electronic surveillance);[13] §1801(f) (defining electronic surveillance). The Government has not asserted privilege here over the fact that Mr. Monteilh collected audio and video information—conduct on which plaintiffs' FISA claim is primarily based—nor as yet sought to exclude any of that information based on the privilege. Rather, the Government seeks to protect information concerning whether or not a person was subject to an FBI investigation and, if so, the reasons for that investigation.[14] That information is distinct from the narrower question of whether or not a person was subject to FISA-defined electronic surveillance. In addition, while the Government seeks to protect sources and methods used in Operation Flex, which might include electronic surveillance subject to FISA if any were utilized,[15] the protection of that information cannot serve to preempt application of the state secrets privilege as to non-FISA information and claims.[16]

---

[13] The Government does seek dismissal of this claim on the ground that 50 U.S.C. § 1810 does not waive sovereign immunity. *See* USG at 22-26.

[14] *See* Declaration of Attorney General Eric H. Holder ¶¶ 4-9 (Dkt. 32-3, filed August 1, 2011); Declaration of Mark Giuliano, Assistant Director of the FBI's Counterterrorism Division ¶¶ 15-29 (Dkt. 33, filed August 1, 2011).

[15] *See* Holder Decl. ¶¶ 4(iii), 10; Giuliano Decl. ¶¶ 15 (iii), 30-31.

[16] Thus, the mere fact that, apart from actions allegedly taken by Mr. Monteilh, plaintiffs also allege that the FBI separately wiretapped the home or office of plaintiffs Fazaga and AbdelRahim, *see* Opp. at 30, could not preempt the privilege assertion beyond this one allegation and claim. Before reaching this

-15-

Assuming *arguendo* that plaintiffs' FISA preemption theory might apply here, the FISA does not displace the state secrets privilege even in the context of alleged electronic surveillance. In order to abrogate the common law, a statute must "speak directly" to the question addressed by the common law. *U.S. v. Texas*, 507 U.S. at 534.[17] The FISA nowhere mentions the state secrets privilege and cannot be construed to have displaced it implicitly.[18] Plaintiffs' contention that the FISA displaces the privilege because it is a "comprehensive scheme" governing foreign intelligence surveillance, *see* Opp. at 26, is incorrect. While the FISA establishes a detailed regime that governs the government's authority to undertake foreign intelligence surveillance, *see, e.g.,* 50 U.S.C. § 1801-1806, that alone cannot supersede litigation privileges. The statute must "speak directly" to that issue.

Likewise, plaintiffs' contention that a particular provision of the FISA—50

_____

narrow claim, the Court should first decide whether FISA Section 1810 waives sovereign immunity. *See* USG at 22-26. The Court may also dismiss this narrow FISA allegation for either a failure to state a claim or for lack of standing. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949-50, 173 L.Ed. 2d 868 (2009) ("'naked assertion[s]'"and mere possibility of unlawful conduct insufficient to state a claim); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380-81 (D.C. Cir. 1984) (generalized allegation of unlawful surveillance insufficient to establish standing).

[17] Plaintiffs' contention that the "clear statement" principle applies only to the preemption of state common law, Opp. at 26 n.14, is wrong. *See U.S. v. Texas*, 507 U.S. at 534. Indeed, this standard has been applied by the Ninth Circuit in deciding whether federal statutory law displaces the state secrets privilege. *Kasza v. Browner*, 133 F.3d 1159, 1167 (9th Cir. 1998).

[18] A clear expression of congressional intent is also required before Congress may abrogate Executive constitutional authority. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01, 112 S.Ct. 2767, 120 L.Ed. 2d 636 (1992); *United States v. Nixon*, 418 U.S. 683, 710-11, 94 S.Ct. 3090, 41 L.Ed. 2d 1039 (1974) (state secrets privilege rooted in President's Article II powers).

-16-

U.S.C. § 1806(f)—"sets forth a clearly defined procedure for the treatment of assertedly-secret evidence[,]" (*see* Opp. at 27)—is also meritless. Section 1806(f) resides within a broader section of the FISA that governs the "[u]se of information" obtained from electronic surveillance conducted pursuant to the FISA. *See* 50 U.S.C. § 1806(a)-(e).[19] In this context, subsection (f) provides a mechanism that the Attorney General may use to protect sensitive intelligence information where the use of surveillance evidence is at issue in three circumstances, none of which speaks directly to waiving the state secrets privilege.[20] The privilege, which permits an agency head to protect information in litigation, serves a "different purpose" and does not "parallel" Section 1806(f). *See Kasza*, 133 F.3d at 1167-68.

Judicial authority applying Section 1806(f) confirms the Government's position. Notably, the D.C. Circuit has held that FISA procedures may not be used to enable a person to discover whether they were in fact subject to surveillance. *ACLU Foundation v. Barr*, 952 F.2d 457, 462 (D.C. Cir. 1991). And courts have

---

[19] "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed. 2d 891 (1989). Section 1806 addresses how information acquired from electronic surveillance conducted pursuant to the FISA may be handled and used in evidence. In particular, subsections (c ) and (d) require notice by the United States if it intends to use such information against an aggrieved person, and subsection (e) authorizes a motion to suppress by a person against whom such information is used. *See* 50 U.S.C. § 1806(c)-(e).

[20] Section 1806(f) applies (i) where the Government provides notice that it "intends to enter into evidence or otherwise use or disclose" surveillance-based information against an "aggrieved person" (see 50 U.S.C. §§ 1806(c),(d)); (ii) where an "aggrieved person" moves to suppress evidence or information obtained or derived from such electronic surveillance" (see 50 U.S.C. §§ 1806(e),(f)); or (iii) where the "aggrieved person" moves to discover or obtain electronic surveillance applications, materials, or evidence. 50 U.S.C. § 1806(f).

-17-

consistently applied Section 1806(f) to review the lawfulness of FISA surveillance where the Government seeks to use evidence against an aggrieved person.[21]

The legislative history of Section 1806(f) also firmly supports the Government's position. *See* S. Rep. No. 95-701, 1978 U.S.C.C.A.N. 4027 (Report of the Select Committee on Intelligence). The purpose of this provision is to strike a "balance" between the aggrieved person's "ability to defend himself" against the Government's use of surveillance-based evidence, and the need to protect "sensitive foreign intelligence information" from disclosure. *Id.* at 64; *see also id*. at 11-12 ("need to preserve secrecy for sensitive counterintelligence sources and methods" would make "notice to the surveillance target" inappropriate "unless the fruits are to be used against him in legal proceedings."). Of particular note, where a court orders information disclosed to the aggrieved person, Congress intended to give the Government a choice: "either disclose the material or forgo the use of the surveillance-based evidence." *See* S. Rep. No. 95-701 at 65. There simply is no clear or direct statement that Congress intended Section 1806(f) to apply otherwise.

### B. Litigation of Plaintiffs' Claims Would Risk or Require the Disclosure of Privileged Information.

Plaintiffs also argue that the information over which the Government has asserted privilege cannot be characterized as state secrets and, even if it can, plaintiffs' claims need not be dismissed at this stage. These arguments also fail.

(1) *Subject Identification*: Plaintiffs first err in arguing that confirmation of whether or not particular persons are or were subject to an FBI investigation is not properly protected. *See* Opp. at 31-35. Plaintiffs reason that because the Government has not asserted privilege over the fact that Mr. Monteilh obtained audio and video

---

[21] *See, e.g. United States v. Ott*, 827 F.2d 473, 474 (9th Cir. 1987); *United States v. Abu-Jihaad,* 531 F. Supp. 2d 299, 300 (D. Conn. 2008)), *aff'd* 630 F.3d 102 (2d Cir. 2010), *cert. denied*, 131 S.Ct. 2062 (2011).

-18-

information, and because plaintiffs encountered the source, they therefore must know they were targets of investigation. That does not follow. The Government is protecting the specific identities of particular persons as to whom the FBI opened an investigation in accordance with the Attorney General's Guidelines. *See* Giuliano Decl. ¶¶ 17-29. The FBI has not confirmed or denied which individuals were subject to investigation among the fewer than 25 Operation Flex subjects. Whatever plaintiffs may believe to be the case, the Attorney General has properly protected the identity of Operation Flex subjects.[22]

Plaintiffs' reference to other matters where investigative suspects were identified publicly does nothing to undercut the privilege assertion here. The Government is not "estopped" by prior disclosures from concluding in another case that a similar disclosure "may lead to an unacceptable risk" of harm to national security. *CIA v. Sims*, 471 U.S. 159, 180-81, 105 S.Ct. 1881, 85 L.Ed. 2d 173 (1985); *Halkin v. Helms*, 690 F.2d 977, 994 (D.C. Cir. 1982); *cf. Public Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1998) (refusing to fashion a rule that would require an agency to release all related materials any time it elected to give the public information about one matter, because "[t]o do so would give the Government a strong disincentive ever to provide its citizenry with briefings of any kind on sensitive topics."); *Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982).[23]

---

[22] *Pickard v. Dep't of Justice*, 653 F.3d 782 (9th Cir. 2011), is not to the contrary. The court there held only that, once a confidential informant's status had been officially confirmed, the Government was precluded from continuing to "neither admit nor deny" the *informant's status* in response to a FOIA request, but could still protect information related to his work. *Id*. at 784.

[23] Lastly, plaintiffs' comparison between the identities of individuals detained at or released from Guantanamo Bay or Bagram Air Base and that of counter-terrorism investigative subjects, *see* Opp. at 34-35, is fundamentally

-19-

(2) *Reasons for Investigation*: Plaintiffs likewise fail to show that the reasons underlying the Operation Flex investigations have not been properly protected by the Government. Indeed, plaintiffs do not seriously challenge the secrecy of this information.[24] Rather, plaintiffs argue principally that, under their "facial challenge" theory, the use of religion as even a single factor in an investigation would be subject to strict scrutiny and they would not have to show a "substantial burden" to the free exercise of religion. *See* Opp. at 36. But even if that view of the law is correct,[25] it does nothing to diminish the centrality of properly privileged investigative information in this case.

Before applying the strict scrutiny standard, the Supreme Court in *Church of the Lukumi* first examined whether the object of the particular policy being challenged

---

misguided. These detainees were members of an enemy force (al Qaeda or Taliban forces) captured in connection with hostilities and taken off the battlefield, *see Hamdi v. Rumsfeld*, 542 U.S. 507, 516-17, 124 S.Ct. 2633, 159 L.Ed. 2d 578 (2004) (plurality). Disclosure of their identities has no bearing on, and certainly cannot justify, revealing whom the FBI has secretly investigated for terrorist threats to the homeland.

[24] Plaintiffs' claim that the Government "routinely" discloses the reasons for investigation in "FISA cases," Opp. at 36, is specious. As shown above, such disclosures occur where the Government seeks to use FISA evidence against someone. *Cf. United States v. Reynolds*, 345 U.S. 1, 12, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (state secrets privilege does not apply where Government seeks to use evidence in criminal proceedings).

[25] Plaintiffs fail to demonstrate that religion may never be considered in an investigation, and their contention that they need not show a substantial burden to religious practices where an investigation is alleged to have been based on religion is inconsistent with Ninth Circuit authority. *See Vernon v. City of Los Angeles*, 27 F.3d 1385, 1393 (9th Cir. 1994). *Vernon* also applies the traditional analysis of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to an Establishment Clause challenge to an investigation, and demonstrates the detailed evidentiary inquiry associated with that claim. *See id*. at 1396-1401.

-20-

(an ordinance against animal slaughter) was to target religious conduct for distinctive treatment. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534-41, 113 S.Ct. 2217, 124 L.Ed. 2d 472 (1993). This entailed a close examination of the record in that case to determine the purpose of the action being challenged. *Id*. at 534-41.[26] Thus, even under plaintiffs' view of the law, the first inquiry is whether the government has applied its policies in a neutral fashion or purposefully targeted religion. In this case, that would entail an examination of what the FBI did in Operation Flex—who was investigated, why, and how. Thereafter, if application of the strict scrutiny standard were reached, that would entail probing into the compelling nature of the Government's interest and specific means utilized to protect that interest. *See Presbyterian Church v. United States*, 752 F. Supp. 1505, 1513 (D. Ariz. 1990); USG at 47-48. This inquiry would also risk or require disclosure of the FBI's actions in Operation Flex, including whether the FBI's actions were narrowly tailored to meet the terrorist threat to the U.S. homeland, *see* Giuliano Decl. ¶¶ 7-10. Thus, plaintiffs' invocation of the strict scrutiny standard does not diminish the fact issues in this case, it magnifies them. While plaintiffs argue that it is "hard to imagine" how the Government could show that Operation Flex was narrowly tailored, *see* Opp. at 38, that merely assume the truth of their own allegations. Plaintiffs have no credible answer to the fact that privileged information would be directly at issue in litigating their religious discrimination claims.[27]

---

[26] Similarly, if *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed. 2d 33 (1982) were applicable to plaintiffs' Establishment Clause claim, the first issue would remain whether the FBI's actions facially differentiated on the basis of religions, before reaching consideration of whether its actions were "closely fitted" to further a compelling governmental interest. *Id*. at 244-256.

[27] Contrary to plaintiffs' contention (Opp. at 39), the results of investigations would be relevant to showing , for example, that investigations concerned terrorist

-21-

(3) *Sources and Methods*: Finally, plaintiffs' challenge to the Government's protection of sources and methods used in Operation Flex is also unavailing. Again, the fact that the Government previously disclosed that Mr. Monteilh had been a source and collected audio and video information, *see* Opp. at 39, has no bearing on whether the Government may protect other sources and methods at issue in the investigation. The privilege assertion encompasses whether court-ordered searches and surveillance were utilized in Operation Flex, as well as other confidential human sources.[28] In a case alleging an indiscriminate "dragnet" investigation based on religion, the *manner* in which the FBI proceeded is directly at issue. For example, whether courts approved searches would be relevant to whether grounds existed to investigate a subject. Similarly, information obtained by the FBI from the intelligence community or other sources that reveals terrorist-related concerns would also be relevant to showing that an investigation was properly focused and not impermissibly based on religion. But such information could not be proffered by the defendants without exposing privileged information concerning the subjects, reasons, and methods of a counter-terrorism investigation.

## C. The State Secrets Privilege May Be Applied to Constitutional Claims Seeking Injunctive Relief.

Plaintiffs' contention that the state secrets privilege cannot apply to claims seeking injunctive relief for alleged ongoing constitutional violations is both misplaced and meritless. Plaintiffs seek damages against all of the defendants, and the Government's privilege assertion would apply to those claims even if plaintiffs' theory was correct. Also, the injunctive relief sought does not concern an alleged

threats, and did not impermissibly focus on religion, or that investigations were closed after concerns had not been substantiated.

[28] *See* Holder Decl. ¶¶ 4(iii), 10; Giuliano Decl. ¶¶ 15 (iii), 30-31.

-22-

"ongoing" constitutional violation. Plaintiffs are challenging actions allegedly taken by the FBI through a confidential source that ceased in 2007. The injunctive relief sought concerns the destruction of records allegedly collected about plaintiffs through Mr. Monteilh. To the extent those records exist, plaintiffs' alleged harm would be "ongoing" only in the sense that records might be presently maintained by the FBI. But the relief sought—the destruction of any such records—is obviously retrospective in nature. Moreover, the availability of that relief is governed by the Privacy Act, not the Constitution (*see supra*), and the Government is seeking to litigate whether such relief is available without reliance on the state secrets privilege.

In any event, were it properly before the Court, plaintiffs' theory finds no support in the law. In the nearly 60 years since *United States v. Reynolds* was decided in 1953, courts have applied the state secrets privilege without regard to the nature of the claim. The relevant inquiry is whether, "from all the circumstances of the case, . . . there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged." *Reynolds,* 345 U.S. at 10. "If this standard is met, the evidence is absolutely privileged, irrespective of the plaintiffs' countervailing need for it." *Jeppesen,* 614 F.3d at 1081 (citing *Reynolds*, 345 U.S. at 11). Courts then consider the impact of removing privileged evidence from the case, *Kasza,* 133 F.3d at 1166, including whether in some cases "application of the privilege may require dismissal of the action" where litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets." *Jeppesen,* 614 F.3d at 1083.

Contrary to plaintiffs' suggestion, the state secrets privilege has been applied in the face of constitutional claims for injunctive relief. Indeed, the *Al-Haramain* action presented constitutional claims for injunctive relief—including for the expungement of records. *See Al-Haramain Islamic Foundation of Oregon v. Bush*,

-23-

ER - 81

451 F. Supp. 2d 1215, 1218 (D. Or. 2006), *rev'd*, 507 F.3d 1190 (9th Cir. 2007).[29]

Plaintiffs also concede that constitutional claims for injunctive relief were dismissed in *Tenet v. Doe*, 544 U.S. 1, 125 S.Ct. 1230, 161 L.Ed. 2d 82 (2005), and their effort to distinguish that case is unavailing. *See* Opp. at 48 n.29. In *Tenet*, the Ninth Circuit had declined to dismiss claims concerning an alleged contractual espionage relationship between plaintiffs and the Government under the *Totten* doctrine in large part because constitutional claims were at issue.[30] Specifically, the Ninth Circuit held that the state secrets doctrine under *Reynolds* must be applied to protect national security interests in that case, and that, "where constitutional issues are raised, the courts must consider the full panoply of alternative litigation methods," including *in camera* proceedings, "before concluding that the only alternative is to dismiss the case and thereby deny the plaintiff's claimed constitutional rights." *See Doe v. Tenet*, 329 F.3d at 1153-54. This is what plaintiffs argue here. But the Supreme Court rejected that view, holding that the *Totten* bar extended beyond espionage contractual claims to include plaintiffs' due process claims, and stressing

---

[29] Similarly, the D.C. Circuit upheld the dismissal of constitutional claims for injunctive relief based on the privilege assertion in *Halkin v. Helms,* 598 F.2d 1 (D.C. Cir. 1979)*.* Likewise, in *ACLU v. NSA,* 493 F.3d 644 (6th Cir. 2007), a case that which also involved constitutional claims for injunctive relief (*id*. at 649, 651), the court held that, where plaintiffs could not produce evidence that they were subject to surveillance due to the state secrets doctrine, their allegations of injury were insufficient to establish standing and dismissal was required. *Id*. at 653-657 (Batchelder, J.); *see also id*. at 688-93 (if state secrets privilege bars evidence of standing, claims must be dismissed) (Gibbons, J.); *see also Molerio v. Federal Bureau of Investigation*, 749 F.2d 815 (D.C. Cir. 1984) (upholding dismissal of constitutional claims for damages and injunctive relief based on state secrets privilege).

[30] *See Doe v. Tenet*, 329 F.3d 1135, 1147 (2003) (discussing *Totten v. United States*, 92 U.S. 105, 23 L.Ed. 605 (1876) (holding that public policy forbade Civil War spy from suing to enforce espionage agreement)).

-24-

that "'[p]ublic policy forbids the maintenance of *any suit* in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential.'" *Tenet*, 544 U.S. at 8 (quoting *Totten*, 92 U.S. at 107).[31]

To counter *Tenet*, plaintiffs rely on a rigid distinction between the *Totten* and *Reynolds* doctrines—that is, between dismissal of constitutional claims for injunctive relief on justiciability grounds (which plaintiffs concede is permissible), and dismissal to prevent the disclosure of state secrets under the *Reynolds* doctrine (not permissible in plaintiffs' view). The Ninth Circuit has made clear, however, that there is no rigid dichotomy between a *Totten* and *Reynolds* dismissal.

In *Al-Haramain*, the Ninth Circuit observed that "a bright line does not always separate the subject matter of the lawsuit from the information necessary to establish a prima facie case." 507 F.3d at 1201. The court stated that, in some cases, "there may be no dividing line" while, in other cases, "the suit itself may not be barred because of its subject matter and yet ultimately, the state secrets privilege may nonetheless preclude the case from proceeding to the merits." *Id*. (describing "continuum of analysis"). Again in *Jeppesen,* the Ninth Circuit declined to set a rigid rule of distinction between dismissals on *Totten* (justiciability) and *Reynolds* (evidentiary) grounds, and specifically recognized that "[m]aintaining that distinction . . . does not mean the *Reynolds* privilege can never be raised prospectively or result in dismissal at the pleading stage." 614 F.3d at 1087-88 n.12 and *id*. at 1089 (citing *Al-Haramain*, 507 F.3d at 1201). The court stated that "[a] case may fall outside the *Totten* bar and yet it may become clear during the *Reynolds* analysis that dismissal is required at the outset." *Id*. at 1089. Dismissal is required where "the claims and

---

[31] The Court in *Tenet* also rejected the view that the constitutional claim at issue there must proceed under *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed. 2d 632 (1988), noting that the CIA employment dispute in that case did not involve an issue of secrecy. *See Tenet*, 544 U.S. at 10.

-25-

possible defenses are so infused with state secrets that the risk of disclosing them is both apparent and inevitable." *Id.* And, linking the two doctrines, the court stated that "[d]ismissal under these circumstances, like dismissal under the *Totten* bar, reflects the general principle" that public policy forbids the maintenance of any suit that would inevitably lead to the disclosure of national security information. *Id.*

Accordingly, the premise on which plaintiffs base their argument against application of the privilege here is not the law. Moreover, it would make little sense if a constitutional claim for injunctive relief could be dismissed on the pleadings as non-justiciable because litigation would risk or require the disclosure of state secrets, but the same claim could not be dismissed when a showing is made under *Reynolds* at the pleading stage that litigation of the claim would risk precisely the same harm. Thus, even if an alleged ongoing constitutional injury is at issue here, there is no impediment to applying the privilege to dismiss claims for injunctive relief.

### D. The Government's Practice in Habeas Matters Does Not Foreclose Dismissal Here Based on State Secrets Privilege.

Plaintiffs also assert that application of the state secrets privilege to dismiss their claims for injunctive relief would be inconsistent with the Government's practice in other cases, notably habeas litigation involving detainees at Guantanamo Bay, Cuba. The Court need not pause long over this argument. There is no parallel in this case to the substantive issues raised by the Guantanamo habeas litigation—in which the Government asserts authority to detain someone and bears the burden of proof to do so. *Al Adahi v. Obama*, 613 F.3d 1102, 1104 (D.C. Cir. 2010), *cert. denied,* 131 S.Ct. 1001 (2011). The Government consented to a protective order in those circumstances to facilitate disclosures it was willing to make in order to litigate the habeas petitions. Plaintiffs cite no authority holding that a protective order of this type would apply where the state secrets privilege has been asserted, and courts have held to the contrary. *See Ellsberg v. Mitchell*, 709 F.2d 51, 61 (D.C. Cir. 1983);

-26-

Peter Bibring (SBN 223981)
  *pbibring@aclu-sc.org*
Ahilan T. Arulanantham (SBN 237841)
  *aarulanantham@aclu-sc.org*
Jennifer L. Pasquarella (SBN 263241)
Mohammad Tajsar (SBN 280152)
Laura Moran  (bar admission pending)
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California  90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

Attorneys for Plaintiffs

(Additional Counsel listed on next page)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YASSIR FAZAGA, *et al.*,<br><br>                    Plaintiffs,<br><br>     v.<br><br>FEDERAL BUREAU OF INVESTIGATION *et al.*,<br><br>                    Defendants. | CASE NO.: SA CV 11-00301 CJC (VBKx)<br><br>**DECLARATIONS OF CRAIG MONTEILH SUBMITTED BY PLAINTIFFS IN SUPPORT OF THEIR OPPOSITIONS TO MOTIONS TO DISMISS**<br><br>Date:          January 30, 2012<br>Time:         1:30 p.m.<br>Judge:       Hon. Cormac J. Carney |

1   Additional Plaintiffs' Attorneys:

2

3   Ameena Mirza Qazi (SBN 250404)
4     *aqazi@cair.com*
    COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA
5   2180 W. Crescent Avenue, Suite F
    Anaheim, California  92801
6   Telephone: (714) 776-1847
7   Facsimile: (714) 776-8340

8

9   Dan Stormer (SBN 101967)
      *dstormer@hadsellstormer.com*
10  Joshua Piovia-Scott (SBN 222364)
      *jps@hskrr.com*
11  Reem Salahi (SBN 259711)
      *reem@hskrr.com*
12
    HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
13  128 N. Fair Oaks Avenue, Suite 204
14  Pasadena, California 91103
    Telephone: (626) 585-9600
15  Facsimile: (626) 577-7079

16

17

18

19

20

21

22

23

24

25

26

27

28

INDEX OF DECLARATIONS

1.   Declaration of Craig Monteilh (April 23, 2010) . . . . . . . . . . . . . . . . . . . . . . 1

2.   Declaration of Craig Monteilh re Fazaga (October 11, 2011) . . . . . . . . . . 30

3.   Declaration of Craig Monteilh re Malik (October 11, 2011) . . . . . . . . . . . 34

4.   Declaration of Craig Monteilh re AbdelRahim (August 11, 2011) . . . . . . 40



Declaration of Craig Monteilh (April 23, 2010)

# DECLARATION OF CRAIG F. MONTEILH

I, Craig F. Monteilh, make this declaration of my own personal knowledge and if called to testify, I could and would do so as follows:

1. From about July 2006 until October 2007, I worked for the United States Federal Bureau of Investigation ("FBI") as an undercover informant assigned to infiltrate the Muslim community in Southern California. During this time, I spent about six or seven days a week posing as a Muslim convert named Farouk al-Aziz, conducting surveillance and gathering information on a wide variety of individuals and organizations in the Muslim community.

## Background, Training, and Placement as an Undercover Informant

2. In around early 2004, I met some police officers in Orange County who were working on a FBI narcotics task force, and discovered that I knew information from time I had spent in prison that was relevant to some of their investigations. I began working for the task force as a confidential informant, under the supervision of an FBI agent assigned to the task force, Special Agent Christopher Gicking, and his supervisor, Special Agent Tracy Hanlon, who worked in the FBI's criminal division in Santa Ana. Over the next two years, I continued to work for the FBI, supervised by Agents Gicking and Hanlon, on a series of assignments as an undercover informant on different criminal enterprises.

3. In about May 2006, Agents Hanlon and Gicking asked if I wanted to work in a new type of assignment for the national security division of the FBI, investigating potential terrorists and infiltrating mosques. I said I was interested and they arranged a meeting in or around June 2006 with FBI Special Agent Kevin Armstrong and another FBI agent, also named Kevin. They told me they worked for the FBI's counterterrorism division in Santa Ana, California, and were assigned to the Orange County Joint Terrorism Task Force ("JTTF"). Agent Armstrong told me that the head of their team, FBI Special Agent Paul Allen, was in Washington, D.C., but wanted to meet with me the following week. Agent

Armstrong told me I would no longer be working with criminal division, but would work for counterterrorism from then on and that he and Agent Allen would be assigned to supervise and direct my work, or to be my "handlers." (References to "my handlers" here mean Agents Armstrong and Allen.)

4.  The next week I met with Agent Armstrong and Agent Allen, who showed me FBI credentials and identified himself as the head of a counterterrorism team at the JTTF. During this meeting, we discussed my physical appearance and skin tone, and Agents Allen and Armstrong suggested that I could pass as Syrian or Algerian. I had another meeting with Agents Armstrong and Allen, just a few days later, where Agent Allen asked me various questions about my background and knowledge of politics and world affairs, which I understood was to gauge my suitability to work as an informant.

5.  When Agents Armstrong and Allen hired me to work for the counterterrorism division, the FBI increased my pay from the $3,000 to $4,000 per month I made working for the criminal division to about $6,000 per month. Over the course of the next fourteen months, the FBI, through my handlers, increased my compensation as I became more accepted by the Muslim community and more useful as an informant, so that my compensation topped out at about $11,200 per month.

6.  Eventually, my handlers told me that the FBI used the name "Operation Flex" for the surveillance program that used me. My handlers told me this repeatedly, and I heard other agents refer to it as well. My handlers told me that this was a reference to me, since I conducted informant work in gyms under the cover of working as a fitness consultant, both when I worked for the criminal division and for counterterrorism. But my handlers told me that Operation Flex was a broader surveillance program that went beyond just my work.

7.  In about July 2006, my FBI handlers put me through a training program in which they had me learn the basics of the Arabic language and the

religion of Islam. They explained that the purpose of this training was to make the account of my background more credible. Agent Armstrong also trained me in the martial art of Krav Maga. My handlers also talked to me extensively about how, once I began my assignment, I should progress in exhibiting the culture and customs of Islam. This training lasted approximately two weeks of twelve to fourteen hour days, with little time off, and took place in a large warehouse that my handlers drove me to while I was blindfolded. Agents Armstrong and Allen supervised the training.

8.      In about late July 2006, my handlers told me to make an appointment to see Sheikh Sadullah Khan, an imam at the Islamic Center of Irvine ("ICOI"), a mosque in Irvine, California. My handlers told me to tell Khan that I was of Syrian and French descent and that I wanted to embrace my Islamic roots and formally convert to Islam. My handlers gave me no background on Khan, but just told me to stick to this story. I made the appointment and then met with Khan a few days later in his office at ICOI, in the presence of two imams from mosques in Garden Grove and Anaheim. After a conversation with Khan, he told me I could take *shahaddah* (make a public declaration of my faith) the next day at the *jummah* prayer (the Friday prayer that is the most important service of the week). I reported this to Agent Allen and he instructed me to do so, so I came back to ICOI the next day and took *shahaddah* before a congregation of hundreds of Muslims. I immediately began to attend the mosque on a daily basis.

9.      About a week after I took *shahaddah*, I took the Muslim name Farouk al-Aziz. I attended prayers daily, often multiple times a day. At first I attended prayers only at ICOI, but as time went on, my handlers encouraged me to go to other mosques around the area as well. Muslims who met me in the mosque generally embraced me as a new convert. On my handlers' instructions, I took every opportunity to meet people, get their contact information, meet them privately to get to know them, find out their background, find out their religious

DECLARATION OF CRAIG F. MONTEILH

and political views, and get any information on them I could for the FBI.

10. My handlers told me that because of my criminal background, any information I collected would have to be recorded. My handlers told me, "If it isn't recorded, it didn't happen." My handlers initially gave me a small audio recording device called an "f-bird," but in about September 2006 replaced that with a cell phone and two key fobs (which looked like remote controls for car locks) with audio recording devices in them that could be used to record conversations that went on around me. I used these recording devices to record all day, every moment I worked undercover, regardless who I was meeting or what was discussed. I would turn on one of the devices in the car before I left my house, and not turn it off until I arrived home. My handlers instructed me to record everything, without any limitations. Agent Allen told me later on that there was a team transcribing all the conversations I recorded, and although I frequently discussed recordings with my handlers, they never stated or even suggested that they attempted to minimize intrusions by listening only to snippets of conversations to see if they were relevant.

11. Beginning in about February 2007, on various occasions, my handlers outfitted me with video surveillance equipment that recorded through a camera hidden in a button in the front of my shirt. They told me that the video surveillance equipment also recorded audio. In the beginning, the video equipment was somewhat difficult to set up, and required my handlers' assistance, so I did not use it regularly. By about April 2007, my handlers had improved the design of the video equipment and I would use video surveillance several days per week. My handlers instructed me to use the video camera for various specific purposes to capture the internal layout of mosques, to film basketball or soccer games to see who associated with whom, to film guest lectures to see what was said and who attended, or when I went into people's houses. My handlers would also instruct me to go open particular doors in homes or mosques and film the

4

DECLARATION OF CRAIG F. MONTEILH

room behind.

12.     On my handlers' instructions, I also composed daily notes of my activities and the surveillance I had undertaken.  These notes were extensive — my handlers instructed me to "empty my head" about what I had learned that day — so that I regularly spent an hour or two each evening writing my notes.  After a while, these notes became voluminous, and my handlers instructed me to prepare separate "supplemental notes" containing any sensitive or particularly valuable information.  These were all handwritten.  I gave them to my handlers when I met them twice a week.

13.     Over the course of my work for the FBI, my handlers at various times discussed with me what happened to these notes.  Agent Armstrong once told me that these notes were used as part of packages to obtain warrants for further surveillance on the individuals or organizations about whom I wrote.  Both handlers talked to me at various times about federal judges reading my notes.  My handlers also told me that their supervisors were reading the notes:  Agent Allen once told me that my notes were seen in "the Beltway," that they were seen by people with "a lot of authority," and that the Assistant Director in Charge in the FBI's Los Angeles field office, who at that time was Stephen Tidwell, read all my notes.

14.     From about August 2006 to October 2007, I met with Agents Allen and Armstrong about twice per week for meetings to discuss my assignments, for me to read through my notes with them so they could ask further questions, for them to give me instructions based on the information I provided, so I could give them my daily notes, and so they could either exchange my recording devices for fresh ones or upload the recordings to a computer while we spoke.  These meetings were held in public places, outside the areas where the Muslim community lived.  About once per month, I met with my handlers in a room at the Anaheim Hilton Hotel, where they questioned me on the information I provided

DECLARATION OF CRAIG F. MONTEILH

and gave me instructions in greater detail.  I would also receive my payment at these monthly meetings.  I would sign off on these payments under my code name, Oracle.  At the meetings in the hotel, other agents were sometimes present.

15.     My handlers also gave me an email address under an alias to use to send time-sensitive information that could not wait until our next meeting, such as a Muslim's imminent travel plans.

16.     Agents Allen and Armstrong monitored and supervised my work as an undercover informant quite closely.  Through my notes and our twice weekly meetings, I told them everything I was doing and every piece of information I could recall.  They gave me instructions, or "tasking orders," regularly.  They gave me both standing instructions on kinds of information to gather whenever I could – for example, to meet and get contact information for a certain number of Muslims per day – and also gave me specific instructions either in response to information I provided or based on information they wanted – such as, for example, instructions to get inside a certain house within the week or to have lunch with a particular person two times.  My handlers also gave me standing orders to call one of them every day, even on my days off.  I did this, and I would call one or both of them each day to apprise them of my day's activities.

17.     Agents Allen and Armstrong did not, however, limit me to specific targets on which they wanted information.  When I first met with Sadullah Khan at ICOI and began infiltrating the community, my handlers did not give me any specific targets, but instead told me to gather as much information on as many people in the Muslim community as possible.  For example, my handlers at first told me I would make my initial contact with the community by attending services at a mosque in Anaheim, but eventually advised me to attend ICOI instead because it was closer to where I lived, so I could spend more time there.

18.     My handlers told me to look for and identify to them people with certain backgrounds or traits, such as anyone who studied *fiqh*, who openly

1   criticized U.S. foreign policy, including the U.S. military's presence in Muslim

2   countries; who had any kind of military training; who was an imam or sheikh;

3   who went on *Hajj*; who played a leadership role at a mosque or in the Muslim

4   community;  who expressed sympathies to *mujahideen*; who was a quiet loner;

5   who was a "white" Muslim; or who went to a *madrassa* overseas.  But my

6   handlers did not tell me to limit the information I collected to those people.  They

7   would occasionally take people I identified and tell me to spend more time with

8   them or find out more about them, but these were always people I identified to

9   them during the course of the operation, not people who had been targeted from

10  the outset.  I had no specific targets at the outset.  To the contrary, my handlers

11  tasked me with immersing myself in the Muslim community and gathering as

12  much information on as many people and institutions as possible.

13  **My Assignments and Activities as an Undercover Informant**

14        19.     My handlers gave me a standing tasking order that applied

15  throughout the duration of my undercover work to get as much information as

16  possible on any Muslim I came into contact with at the mosques or in the Muslim

17  community.  Agent Allen told me, "We want to get as many files on this

18  community as possible."  My handlers explained to me that the United States was

19  five to ten years behind Europe in the extent of Islamic presence, and that they

20  needed to build files on as many individuals as possible so that when things

21  started to happen, they would know where to go.  They said they were building

22  files in areas with the biggest concentrations of Muslim Americans — New York;

23  the Dearborn, Michigan area; and the Orange County/Los Angeles area.

24        20.     One thing my handlers wanted me to collect was contact

25  information, particularly email addresses and phone numbers.  At times, my

26  handlers even gave me a quota to collect contact information for ten new Muslims

27  per day.  I reported this information in my daily notes.  My handlers also told me

28  that they monitored my email and cell phones to obtain the telephone numbers and

1  email addresses of people with whom I corresponded.  Agent Allen instructed me

2  to give out my cell phone number widely so that people would call me or give me

3  their cell numbers in return, so that the FBI could collect those numbers.  My

4  handlers also instructed me to email frequently with people, so that the FBI could

5  collect their email addresses.  My handlers told me that they used the cell phone

6  numbers and email addresses of individuals who contacted me to obtain

7  information from those individuals' phone and email accounts, including the list

8  of people they contacted.  My handlers gave me a particular email address under

9  an alias to which they instructed me to forward these emails.

10      21.    Agents Allen and Armstrong told me that they kept the numbers and

11  emails I collected in a database that could be monitored for international calls, or

12  cross-referenced against phone calls or emails to persons of interest who were

13  believed to be linked to terrorism.  They also told me that the emails could be used

14  to determine if the person was visiting certain websites, and with whom they were

15  emailing.  I also joined email distribution lists for many of the mosques I

16  surveilled so that I could obtain the mosque membership lists and all of the email

17  addresses.  I would forward messages from the mosques to the FBI so they would

18  be informed about events and bulletins, and so they would have the email

19  addresses of anybody else who received the message.

20      22.    During the course of my work, I had discussions with my handlers

21  about whether what I was doing was productive, and whether the information I

22  collected was actually being used.  They assured me that all the information I

23  collected was retained, and that they didn't discard any of the information.  My

24  handlers also told me that this information was used to build files on individuals.

25  My handlers told me that every person who I contacted — whose phone number I

26  got, who I emailed, who I identified through photographs — had an individual

27  file in which the information I gathered was retained.

28      23.    My handlers also tasked me with gathering information on mosques

1    in the Orange County and Los Angeles areas.  They instructed me, among other

2    things, to map the mosques by locating entrances, exits, rooms, bathrooms, locked

3    doors, storage rooms, as well as security measures and whether any security

4    guards were armed.  In some mosques, I used hidden video equipment attached to

5    a camera in my shirt button to take images of the layout of the mosque.  My

6    handlers informed me that this information would be used by the FBI to enter the

7    mosques in case they needed to raid it or if they needed to enter and place

8    electronic surveillance equipment in them.  My handlers also instructed me to try

9    to get the security codes for the alarm systems at several mosques.  I managed to

10   obtain the codes for one mosque by arriving early for dawn prayer and watching

11   the person who opened the mosque punch the code in.  I gave this information to

12   my handlers.  My handlers told me that they had the security codes to at least one

13   other mosque, as well.  They told me that they used the security codes to send

14   agents into these two mosques at night.

15        24.     My handlers also tasked me with getting brochures on charities that

16   were distributed in the mosques, visiting the mosques' libraries or book areas to

17   look for extremist books, collecting newsletters and bulletins to see what activities

18   were going on in the mosque, and collecting names of individuals who attended,

19   as well as their cell phone numbers and license plates.

20        25.     In addition to information about the membership of each mosque, my

21   handlers also wanted the names of all board members, imams, people who taught

22   classes at the mosques, and other leadership within the mosques.

23        26.     Over the course of my work, I went to about ten mosques and

24   conducted surveillance and audio recording in each one.  I spent the most time at

25   ICOI, which I attended daily, but I spent significant time at other mosques,

26   including the Orange County Islamic Foundation mosque in Mission Viejo, Durul

27   Falah in Tustin, Omar al-Farouq mosque in Anaheim, Islamic Society of Orange

28   County in Garden Grove, Al-Fatiha in the West Covina/Azusa area, the mosque in

DECLARATION OF CRAIG F. MONTEILH

1    Lomita, and King Fahd mosque in Culver City.  For about five or six months I

2    went at least once a week to each of these mosques.  I would go to as many as four

3    different mosques in a day.  Even if I didn't pray at each mosque, I would go to

4    the mosque and talk to people, or meet people at the mosque and go to the gym

5    with them.  I also went a few times to West Coast Islamic Center in Anaheim and

6    a mosque in Upland.

7          27.    Agent Armstrong told me that the FBI had every mosque — the ones

8    I went to and the ones I didn't go to — under surveillance.

9          28.    My handlers informed me that electronic surveillance equipment was

10    installed in at least eight area mosques including ICOI, and the mosques in Tustin,

11    Mission Viejo, Culver City, Lomita, West Covina, and Upland.  He told me at one

12    point that they could get in a lot of trouble if people found out what surveillance

13    they had in the mosques, which I understood to mean that they did not have

14    warrants.

15          29.    At times, if I was left alone in a mosque office, I would look in

16    drawers, which I understood to be consistent with my instructions to gather as

17    much information as possible.  I wrote these incidents up in my supplemental

18    reports, and was never told not to do this.

19          30.    My handlers instructed me to keep an eye out for people who tended

20    to attract young Muslims and to identify and gather information on such people.

21    They told me that they wanted to investigate anyone who had the attention of the

22    youth or influence over young people to see if they were radicalizing them.  For

23    example, there was a popular youth group on Tuesdays at ICOI run by the imam,

24    Sadullah Khan.  Students from the Muslim Student Union at the University of

25    California, Irvine ("UCI") would attend.  To implement my handlers' instructions,

26    on many occasions I recorded the youth group meetings at ICOI by leaving my

27    possessions, including my key fob, near where the group met in the prayer hall so

28    that all of their discussions could be recorded.  I did this by going into the prayer

DECLARATION OF CRAIG F. MONTEILH     ER - 98

1    hall during their meetings to pray, and then leaving behind my possessions, as if I

2    had forgotten them or just chosen to leave them there while I did other things. I

3    would go to another part of the mosque or the courtyard, and return sometime

4    later to collect my things. I told my handlers I did this in my written reports. My

5    handlers never instructed me to stop this practice, and in fact discussed with me

6    the contents of the recordings obtained in this manner.

7          31.     Beginning in about September 2006, my handlers gave me a standing

8    task to gather information on Muslims' charitable giving. My handlers instructed

9    me to collect any pamphlet or brochure at any mosque that concerned charitable

10   donations. They also told me to inquire of Muslims about which charities and

11   *madrassas* to give to. I did this, and gave the names of the charities and

12   *madrassas* to my handlers. My handlers specifically told me to ask people about

13   *madrassas* or charities sympathetic to the *mujahideen* or *jihad*; to inquire about

14   charities providing money to Somalia, Yemen, Pakistan and Afghanistan; and to

15   inquire about money going to Lebanon and Palestine. They also instructed me to

16   ask people how to avoid having my donations traced by the U.S. government. My

17   handlers said that if a worshipper paid by check, the FBI could trace that check

18   from the person's bank account to the organization. My handlers, in several

19   conversations, told me that the FBI would open a file on any person who wrote a

20   check to any Islamic charity they were interested in, not just those officially

21   designated as terrorist organizations.

22         32.     My handlers also instructed me to attend Muslim fundraising events,

23   to interact with the community and gather information, to identify people who

24   attended and who they came with, and, if there were any speakers, to record what

25   those speakers said. On my handlers' instruction, I attended a benefit for ICOI at

26   a hotel in Irvine, where on their orders I purchased a vase for about $900 to

27   bolster my credibility among the community.

28         33.     My handlers also instructed me to attend lectures by Muslim scholars

11

DECLARATION OF CRAIG F. MONTEILH

ER - 99

and other guest speakers.  I attended lectures of Yusuf Estes, a white Muslim scholar from Texas, and Hamza Yusuf, another white Muslim scholar from Oakland.  My handlers wanted to know both what the lecturers said and who attended these lectures, so they set me up with a video surveillance device that had a camera in a shirt button.  I went early and got a seat in the front row where I could clearly record the lecture.  Afterwards, when people were socializing, I walked around filming attendees with my camera.  I also collected license plate numbers from the parking lots to identify those who attended.

34.     During my time working on Operation Flex, I told people in the Muslim community that I worked as a fitness consultant.  In about November 2006, Agent Allen instructed me to start going to the gym to work out with people I met from the Muslim community in order to get close to them and obtain information about them.  They did not limit the scope of their instructions; the directive included anyone from any mosque without any specific target, for the purpose of collecting as much information as possible about Muslim men in the community.  I went to various 24-Hour Fitness and L.A. Fitness gyms around the Orange County area.  These workouts provided an easy opportunity to talk with people and to elicit a wide variety of information pursuant to my handlers' instructions.  For example, I would talk to people about their lives and get information about their problems that my handlers could use to pressure them to provide information or become informants.  I also learned people's travel plans and their political or religious views, and could elicit responses that the FBI might use to justify further surveillance by asking pointed questions about Islam or politics.  I recorded these conversations using the equipment on my key fob or cell phone.  This surveillance was so fruitful that my handlers eventually told me they were seeking approval to have me open a Muslim gym.

35.     During my regular meetings with my handlers, they showed me photographs of Muslims from the community and asked me to identify the people

DECLARATION OF CRAIG F. MONTEILH

in them.  Frequently, these were photographs of people I worked out with taken at the entrance to the gym.  My handlers told me that they had an arrangement with the gyms to obtain photographs from the security cameras.  Other photographs came from parking lots, parks, restaurants, or other public places.  When I asked how they got the other photographs, they told me they had "assets in place."  They asked me to provide as much information as possible about each person — they told me to "empty my head" on the individuals.  They wanted to know, among other things, what mosque they attended, their ethnicity or country of origin, the languages they spoke, the people they associated with, what kind of car they drove, their occupation or whether they were a student, as well as any other information I could obtain.

36.  Agent Allen told me that Islamic restaurants in Anaheim and Irvine were under video surveillance, so they could see who associated with whom.  Agent Allen also said they surveilled soccer and basketball games for the same reason.  I frequently met people in restaurants and cafés and recorded conversations there.

37.  I also had standing orders to enter and observe Muslim schools whenever possible.  When I first reported entering a Muslim school, my handlers questioned me intently on whether I had witnessed children chanting from the Quran.  When I said I hadn't, they asked me again and told me that if I had, that would take the case to a "new level."  My handlers more than once told me to look for Quranic reciters at the schools.  My handlers also instructed me to look for photos of extremists, books by extremists, and whether the children were learning subjects besides Islam, like math, English or history.  My handlers said that they did not want an Islamic school to be an "American *madrassa*."

38.  I attended an Arabic language class at ICOI from about December 2006 to March 2007.  My handlers instructed me to obtain the lists of the individuals who attended the class, which I provided to my handlers.  My handlers

DECLARATION OF CRAIG F. MONTEILH

told me that they retained the information about who took the class.

39.     I also attended a course in *fiqh*, or Islamic law which pertains to morals and etiquette.  My handlers were interested in *fiqh* because parts of *fiqh* address military training.  At my handlers' request, I got a copy of the list of people who attended the class.  Because this list included the languages that class members spoke, it provided a clear indication of their ethnicity or country of origin as well.

40.     My handlers were only interested in Muslims, and set aside any non-Muslims who were identified through surveillance I performed.  For example, on several occasions when my handlers asked me to identify individuals from photographs taken by surveillance cameras at the entrances to the gyms, they would present me photographs of individuals who were not Muslim — usually Latino — whom I might have spoken to or who had simply helped me lift weights.  When I indicated to my handlers that the individual was not a Muslim, the picture was discarded.

41.     My handlers were interested in websites that they believed were jihadist, including *MissionIslam.com* and *CagePrisoners.com* (a site devoted to raising awareness about the detainees at Guantanamo Bay).  Agent Allen told me to encourage people I spoke with to go to these websites because they could document people's visits to the website and use that either to pressure them to become informants or to justify further surveillance on them.

42.      My handlers encouraged me to bring up Muslim scholars and thinkers who they believed were extremist in my conversations with individuals in the community.  This included Hassan al-Banna, Sayyid Qutb, Sheikh Suhaib Webb, Yusuf al-Qaradawi, Yusef Estes, Ayman al-Zawahiri, Anwar al-Awlaki, and others.

**Increasing Infiltration of the Muslim Community**

43.     The people I met at the mosques helped me learn how to pray, learn

14

DECLARATION OF CRAIG F. MONTEILH

ER - 102

how to dress, and learn Islamic culture and etiquette.  My handlers told me to allow Muslims I met to "radicalize" me gradually, and saw the help the community was giving me as the first steps toward such radicalization.  I felt the people who helped me were sincere in wanting me to develop in my Muslim faith and wanting to have me as part of the community and part of the mosque.  My handlers instructed me not to talk too openly about *jihad* at first, but to go to prayers at the mosque and be seen.  My handlers were very pleased that I developed a rapport with the community so quickly.

44.     As months went on and I was increasingly accepted by the Muslim community and the leadership at mosques, and I continued to work generally six or seven days a week, my handlers seemed to place increasing trust in me.  While at first they told me as little as possible about what else they knew about the community and what other intelligence efforts were ongoing, after several months they began to tell me more about what other kinds of surveillance they were undertaking, how they knew certain things, and how the intelligence I gathered was being used, so that I could understand how to work effectively.

45.     In about October 2006, on the instruction of Agent Allen, I began to try to appear more Muslim.  I went to the mosque early and prayed loudly, and wore traditional clothes that people at the mosque had given me.  My handlers told me that nobody in the community leadership, people of interest, or youth suspected that I was an informant.  I asked how he knew, and he eventually told me that they listened to a number of conversations in which people were discussing me outside.  I realized that these were conversations that I could not have recorded, which meant that my handlers were getting this information from other electronic surveillance.

46.     My handlers also instructed me to start attending *fajr* (dawn) prayers, which are held about 4 a.m., or *ishaa* (late) prayers, which are held about 9:30 p.m.  My handlers told me that people who attended prayers very early in the

1  morning or late at night, and especially both, were very devout and therefore more

2  suspicious.  They instructed me to obtain the names and the license plate numbers

3  of individuals who attended these prayers.  When I agreed to go to *fajr* prayer four

4  days a week, my pay increased substantially.

5      47.     My handlers instructed me to memorize certain *ayas* and *surahs*

6  (verses and chapters from the Quran) and to ask Muslims about them.  My

7  handlers told me that they had picked these verses because they believed them to

8  be susceptible to a jihadist interpretation, so that people's reactions to them would

9  help discern who was and was not a threat.  They told me that discussions about

10  these verses would elicit responses that could be used to justify additional

11  surveillance measures.  A true and correct copy of a tasking order in Agent

12  Allen's handwriting specifying certain verses is attached hereto as Exhibit A.

13      48.     My handlers also instructed me to elicit reactions from people by

14  talking provocatively about U.S. foreign policy —  for example, by raising the

15  issue of civilian Muslim men, women, and children killed in conflicts in Iraq,

16  Afghanistan, Palestine, and Lebanon.  By stirring people to speak out of anger,

17  they told me, I could again elicit responses that could be used to justify additional

18  surveillance measures against those people.

19      49.     Beginning in about January 2007, an individual who called himself

20  George began coming roughly every month to meetings with my handlers.

21  George said he was "from Langley," which I understood to mean that he worked

22  for the Central Intelligence Agency headquartered in Langley, Virginia.  When I

23  once mentioned him as working for the CIA, Agent Allen said something to the

24  effect, "We don't say that.  Say he is 'from Langley.'"  No one ever told me

25  George's last name.  George spoke Arabic very well and knew a great deal about

26  Islam — he would speak Arabic with me and comment on my improved fluency,

27  as well as ask me questions about Islam and the Quran to monitor my progress in

28  acquiring the appearance of being a devout Muslim.  George also instructed me on

1   my grooming and physical appearance to make it seem that I was increasingly

2   devout.  For example, at one point he instructed me to develop a sore on my

3   forehead from bending my head to the carpet in prayer, to make clear that I was

4   praying all the time.

5        50.     On about four different occasions, during the meetings with my

6   handlers at the hotel room, they showed me a huge photo array on a large board

7   consisting of the photos of around two hundred Muslims from the Orange

8   County/Los Angeles area.  My handlers used different sets of photographs for

9   each of these meetings, so showed me many hundreds of photographs over the

10  four meetings.  They instructed me to arrange the photos from the most dangerous

11  to the least based on my knowledge and experience.  The entire leadership of the

12  Islamic community were in the photos — sheikhs, imams, board members, prayer

13  leaders, leaders of civic organizations, and youth groups.  It took hours.  They also

14  asked me to assist them in organizing the photos according to categories such as

15  financial, operative, and leadership.  We also divided photos into possible cells

16  according to mosques and ethnicity or nationality.  I did not know all of the people

17  in the photographs, but my handlers had information on people I did not know

18  enough to place them in the various arrangements.  The first of these meetings

19  was in about March 2007, and the last was in about September 2007.

20       51.     Over the course of several conversations, my handlers told me that

21  they considered the leaders in the Muslim community — board members and

22  leadership at mosques and leaders of Muslim organizations — to be potential

23  threats and that they regularly surveilled them and maintained more detailed files

24  of information on their background and activities.  They told me that the

25  leadership of the community could give orders or *fatwas* that someone in the

26  community would carry out.

27       52.     Because I was single in my undercover identity, people in the

28  community considered me an eligible Muslim and various individuals wanted to

17

DECLARATION OF CRAIG F. MONTEILH

ER - 105

introduce me to Muslim women.  Agents Allen and Armstrong, and George from Langley, wanted me to date as a way to get information.  When I asked how I should go about dating, and what happened if things began to get intimate, my handlers told me that if I was getting good information, I should let things "take their natural course," and then they said "just have sex."  I had sexual relationships with women in the Muslim community for the purposes of information gathering pursuant to these instructions.

53.    My handlers were always interested in obtaining new informants within the Muslim community.  They spoke to me about "MICE," an acronym for Money Ideology Compromise Ego, or the various ways people can be convinced to be informants.  They often focused on the element "compromise," which consisted of obtaining information on potential informants that could be used against them if they refused to inform.  Subjects that would potentially lead to compromise included immigration issues, sexual activity, business problems, or crimes like drug use.  My handlers instructed me to pay attention to people's problems, to talk about and record them.  I reported problems that several individuals told me about, including marital problems, business problems, and petty criminal issues.  My handlers on several occasions talked to me about different individuals that they believed might be susceptible to rumors about their sexual orientation, so that they could be persuaded to become informants through the threat of such rumors being started, even though my handlers had no evidence that such rumors would be true.

54.    My handlers also often referred to the principle that "everybody knows somebody."  They explained that if someone is from Afghanistan, that meant that they would likely have some distant member of their family or acquaintance who has some connection with the Taliban.  If they are from Lebanon, it might be Hezbollah; if they are from Palestine, it would be Hamas.  By finding out what connections they might have to these terrorist groups, no

18

DECLARATION OF CRAIG F. MONTEILH

1    matter how distant, they could threaten the individuals and pressure them to

2    provide information, or could justify additional surveillance.

3          55.    On one occasion, my handlers instructed me to develop my

4    relationship with a person who told me that his father was sick in a foreign

5    country and in a lot of pain.  I had a significant amount of Vicodin, a prescription

6    pain reliever, left over from a surgery I had previously undergone.  I discussed

7    with Agent Allen that providing this person some Vicodin would help build the

8    relationship and build my reputation as a devout Muslim who had access to black

9    market items.  Agent Allen instructed me to provide the person with 60 tablets of

10    my leftover Vicodin, which I did.  On another occasion, Agent Allen instructed

11    me to provide prescription anabolic steroids to another two individuals to

12    similarly further my credibility, which I did.

13          56.    In about early spring of 2007, after I provided some information my

14    handlers believed was very valuable, my handlers told me, "You're gold in L.A.

15    You're gold in Washington."  They said that higher ranking officials wanted to

16    use me in other places as well.  Agent Allen told me several times that information

17    I provided had been used in presidential daily briefings.  They told me that my

18    work was followed by people "at the highest levels."  They told me that the

19    operation I was working on was among the ten most important intelligence

20    investigations going on in the country.  Agent Allen told me in about March or

21    April 2007 that he had meetings with Stephen Tidwell and one of his supervisors

22    from Washington, D.C., Joseph Billy, Jr., about the operation.  Around the same

23    time period, Agent Allen told me that he had to fly to D.C. with his supervisor, Pat

24    Rose, in part to meet with high-level FBI officials to get approval to open a gym

25    for Muslims that would function in part as a mosque with a prayer room, and that

26    I would run.  He called me from D.C. to tell me that the gym had been approved.

27          57.    During about spring 2007, Agent Allen told me that I needed to be

28    careful how I wrote my notes, and that I needed to be very precise and detailed,

19

DECLARATION OF CRAIG F. MONTEILH

1  because people in Washington were reading and summarizing the reports to make

2  things "sexier" than I had intended so as to accomplish their own goals.  He told

3  me that I needed to be careful always to use precise and detailed language so that

4  more could not be read into the reports than I intended.

5      58.    During the course of the operation, I learned there were a large

6  number of FBI informants in the Orange County Muslim community.  My

7  handlers told me at various times that the Muslim community was "saturated" or

8  "infested" with informants, and said it was like the societies of cold war East

9  Germany and Cuba, where everyone was informing on one another.  During the

10  meetings in the hotel room when my handlers and I arranged photographs of

11  people in the Muslim community, many of the photographs had asterisks by the

12  names.  Several of the people marked were people my handlers had already told

13  me were informants, so I asked my handlers if the asterisks indicated informants,

14  and they eventually confirmed that they did.  At each of the four meetings, there

15  were dozens of people labeled as informants, and I believe over the four meetings

16  I saw well over one hundred people marked as informants.  I personally interacted

17  with more than forty people my handlers told me were informants.  My handlers

18  told me that the other informants had been recruited from the community because

19  the FBI had pressured them in some fashion, and they told me that they did not

20  trust the informants they had recruited from within the Muslim community.

21      59.    As I continued as a constant presence at ICOI and the community

22  became more comfortable with me, I began to participate in the prayers to a

23  greater degree.  I gave the *adhan*, or call to prayer as well as the *al-Fatiha*, or

24  opening to the evening prayer.  On a few occasions, when prayer leaders went out

25  of town, I led the *dhuhr*, or midday prayers, and the *fajr*, or dawn prayers.  My

26  handlers were extraordinarily happy that I had been given the responsibility to

27  lead prayers, as they believed it showed an acceptance of me by the community.

28      60.    After several months of working, my handlers told me more about

DECLARATION OF CRAIG F. MONTEILH

how some aspects of their investigation worked.  Agent Armstrong told me that although the terrorist watchlist was maintained by the Department of Homeland Security, the information in that list was based on information collected by the FBI.  He told me that information I collected would get shared with Homeland Security and other agencies.  For example, my handlers were interested in travel plans of Muslims — after a while I asked why they wanted to know.  They eventually indicated that the reason they wanted to know this was to share it with Homeland Security to monitor or search people during their travels.

61.    My handlers also told me that information I obtained would be shared with other agencies.  They told me that information I obtained on finances or foreign assets was shared with the Treasury Department.  Several times when I had information about people's immigration issues, my handlers told me that they would send the information to immigration officials.  My handlers told me that they were "in the business of sharing information" about terrorism with other agencies.

62.    I also learned about the voluntary interviews the FBI would ask of people from the Muslim community.  My handlers told me that they would usually bring people in to an FBI interview only after I had obtained some useful background on the person — usually by recording some embarrassing personal information or a statement of political beliefs that they would not want to admit to the FBI.  They could then use that information to pressure the person to provide information, or could ask about that information in order to get the person to deny it, which would set up the allegation that they had lied to the FBI during the interview, which would in turn provide leverage to get the person to provide information.  They told me that they tried to put interviewees at ease by saying that they were investigating someone else.

63.    It became clear to me that there was audio surveillance either on the telephones or in offices of a large number of leaders in the Muslim community.

21

DECLARATION OF CRAIG F. MONTEILH

1    For example, on one occasion around when ICOI was attempting to get a

2    restraining order against me, some people were saying I was an informant.  At that

3    time, Agent Allen called me and said words to the effect, "You need to call

4    [Person A] right now.  He's on the fence about you and talking to [Person B] on

5    the phone right now.  Call him and break in and take him to dinner."  I could hear

6    the voices of the people he was talking about in the background.  Agent Allen

7    made similar calls to me several times about different people.

8        64.    During many conversations with my handlers over the course of my

9    work, my handlers told me that not everything our operation was doing was legal.

10   My handlers told me that because the U.S. was fighting an enemy that was not

11   sovereign, they had to carry out policies that were contrary to the Constitution.

12       65.    On several occasions in restaurants, I left my recording devices (a

13   key fob or my cell phone) in a place where it could record a conversation while I

14   went elsewhere.  Sometimes I did this with groups that met in the mosques:  if

15   there was a youth group or a group that met with a particular scholar, I went over

16   to put down my things, including the recording device, and greet people, then

17   went to a different part of the room to pray.  In restaurants or cafés, too, on more

18   than one occasion when I was speaking to one group and saw another group come

19   in, I moved to the new group while leaving my cell phone at the first so as to

20   record both conversations at once.  I stated that I did this in my notes to my

21   handlers and was never instructed to stop.

22       66.    On several occasions, I left my recording devices in locations in

23   mosques in the area.  For example, in King Fahd Mosque in Culver City, several

24   times I came in with a friend who changed in the office from business clothes to

25   more traditional dress before we went into the mosque to pray.  While he did so I

26   left my keys in the office so that the key fob would record staff and board

27   members who came in and talked.  I retrieved my keys from the office when we

28   were finished in the mosque.  I did this several times, and in several different

DECLARATION OF CRAIG F. MONTEILH

mosques. I stated that I did this in my notes to my handlers and was never instructed to stop.

67. I once asked Kevin Armstrong about covert video recording surveillance he had told me was being conducted at a local bookstore. He said that while you needed warrants for criminal investigations, "National security is different. Kevin is God." I understood him to mean that he did not have warrants for the surveillance at the bookstore. Agent Armstrong also told me on more than one occasion that they did not always need warrants, that if they did not have a warrant they could not use the information in court, but that it was still useful to have the information. He mentioned that they could attribute the information to a confidential source if they needed to.

68. In about June 2007, my handlers told me the FBI was planning an action to make a number of arrests based on intelligence that I had gathered. My handlers took me to the Anaheim Hilton hotel where I stayed out of contact for several days at the FBI's expense. My handlers told me that the operation would soon be over. My handlers told me that more than seventy agents had amassed in the Santa Ana office to conduct pre-dawn arrests of twenty-seven people, but that the office of FBI Director Mueller had called from Washington, D.C., and ordered the agents to stand down and not go through with the arrests. My handlers were very upset about this. After the aborted arrests, I returned to my role as an undercover informant, doing exactly the same work as before.

69. Both my handlers and other agents explicitly told me that Islam was a threat to America's national security.

70. One individual I made contact with had a pending federal criminal case. Agent Armstrong, who was a former Assistant U.S. Attorney, initially told me to be careful not to discuss his case because there would be problems because he was represented by counsel. But he was overruled by others, including Agent Allen, and I was then instructed to talk with him about his case. I understand that

DECLARATION OF CRAIG F. MONTEILH

the information I gleaned was used in his criminal case.

71.    Over the course of fourteen months of working as an informant in the Los Angeles and Orange County Muslim community, I estimate that, on my handlers' instructions, I passed hundreds of phone numbers and thousands of email addresses of Muslims to the FBI.  I provided background information on hundreds of individuals.  I made hundreds of hours of video recordings that captured the interiors of mosques, homes, businesses, and the associations of hundreds of people.  I made thousands of hours of audio recording of conversations I participated in and where I was not present, as well as recordings of public discussion groups, classes, and lectures.

**Termination of My Assignment**

72.    In about March 2007, Agent Allen provided me a written letter from an Assistant U.S. Attorney named Deirdre Eliot to engage in jihadist rhetoric and to engage in other criminal activity with immunity.  I understand that this letter gave me blanket immunity for all my conduct as an undercover informant.  I signed the letter, but Agent Allen took the letter back and did not allow me to keep a copy.

73.    My handlers had instructed me to ask general questions about *jihad* from the beginning of my assignment.  In early 2007, my handlers instructed me to start asking more pointedly about *jihad* and armed conflict, then to more openly suggest my own willingness to engage in violence.  In one-on-one conversations, I began asking people about violent *jihad*, expressing frustration over the oppression of Muslims around the world, pressing them for their views and suggesting that I might be willing or able to take action.  In about late spring of 2007, people at ICOI began to get concerned about me.  After one incident where I said some extreme things in order to test the reaction of others, several individuals reported me to local police and to the FBI.  When the authorities did not respond with any urgency, people became suspicious that I might be working

24

DECLARATION OF CRAIG F. MONTEILH

for the FBI. Congregants at ICOI brought an action for a restraining order to bar
me from the mosque. On June 19, 2007, I understand that there was a hearing in
which testimony was presented and the restraining order issued barring me from
entering the mosque. I continued my undercover work at other mosques in the
area, but the restraining order and the fact that various members of the community
had become suspicious about me made it much more difficult to get close to
people and to gather information.

74. During the time ICOI was attempting to obtain a restraining order
against me, Agent Allen instructed me to go back into the mosque. I feared for
my safety since I knew some people suspected I was an informant. I told Agent
Allen I would only go in if I was armed with a knife, and that I would defend
myself if someone gave me reason to. My handlers acknowledged what I said, but
did nothing to stop me from doing so. I went into ICOI on two subsequent
occasions with a knife strapped to my leg.

75. At some point during the spring of 2007, my handlers mentioned to
me that the Assistant Director in Charge of the FBI's Los Angeles Field Office
had told the Muslim community that there would be no undercover informants
placed in mosques at a meeting held only about a month or so before I had taken
*shahaddah*. The Assistant Director in Charge at that time was Stephen Tidwell. I
was surprised, and my handlers said that, at that time, they had already been
looking for someone to send into the mosques and Tidwell had approved
recruitment of an informant.

76. During the summer of 2007, around the time ICOI was seeking the
restraining order and afterwards, I was repeatedly approached for an interview by
a reporter from the Los Angeles Times named H.G. Reza. My handlers disliked
this reporter — they told me that he was an enemy of the United States and that he
was under surveillance. On one occasion, my handler called me to tell me not to
go to a particular gym because Reza was waiting for me in the parking lot. When

1    I asked him how he knew that, he said "We're the fucking FBI. We know

2    everything." In October 2007, FBI counsel Stephen Kramer paid me $25,000

3    cash to assure that I would not disrupt the rest of the case, and explicitly told me

4    that the payment was in part so I would not speak with Reza.

5         77.    In about June 2007, when some people in the community were

6    beginning to suspect I was an informant, I had discussions with my handlers about

7    being paid substantial additional sums of money to go to jail or prison to help

8    bolster my credibility in the community and convince people that I was not a

9    confidential informant. We discussed having me very publicly arrested in the

10    parking lot of a mosque, and the details of the pay and arrangements to make life

11    tolerable in prison. My handlers eventually told me that this plan failed because a

12    federal judge had refused to go along with it.

13         78.    During about the summer of 2007, my handlers told me that the

14    Assistant Special Agent in Charge in Santa Ana, Barbara Walls, did not trust me

15    and did not want me working any more. They told me there was significant

16    conflict between Agent Walls and field agents over how to handle the operation,

17    and that there had been an audit team sent from Washington, D.C., to examine

18    Agent Walls' handling of one potentially valuable piece of information I provided.

19    Because of this conflict and complications surrounding the restraining order, my

20    handlers told me in about September 2007 that I would be going on "hiatus" from

21    my undercover work in the Orange County Muslim community.

22         79.    During one of my final meetings with my handlers, at which Agent

23    Walls was also present, she warned me to stay silent about my participation in the

24    operation. She said that if word got out that the FBI had sent an informant into

25    mosques and the community, that it would destroy the relationship between the

26    Islamic community and the FBI. She said that "we assured them" that the FBI

27    would not send undercover informants into mosques.

28         80.    In October 2007, I had a last meeting, where my handlers had

DECLARATION OF CRAIG F. MONTEILH     ER - 114

1    instructed me to bring back the laptop computer and surveillance equipment they

2    had issued me.  I said to them that I guessed the operation was over.  Agent Allen

3    said emphatically no, the operation had just begun.  He said that my role was over,

4    but that Operation Flex and the FBI's operations in Orange County and Los

5    Angeles would continue.  He also said that the information I had provided was an

6    invaluable foundation for the FBI's continuing work.  He also said that after some

7    down time, I would have the option of working in New York or other places.

8        81.    Prior to February 2009, I never confirmed to anyone outside of law

9    enforcement and my immediate family that I was working as an informant for the

10   FBI.  That month, FBI Agent Thomas Ropel III testified in a bail hearing in a

11   federal criminal case about information used in that prosecution that he said had

12   been provided by an undercover informant, and described the undercover

13   informant such that many people in the Muslim community could clearly identify

14   the informant as me.  Several days later, an article appeared in the Los Angeles

15   Times containing statements I made to a reporter about being an FBI informant.  I

16   am not aware of any information either publicly released by the FBI or otherwise

17   available to any member of the Orange County Muslim community prior to

18   February 2009 that would allow them to do anything more than speculate that I

19   might have been an FBI informant.

20   **Ongoing Surveillance**

21       82.    Between about December 2007 and August 2008, I was incarcerated

22   for reasons that are currently the subject of a federal civil action against the Irvine

23   Police Department, the FBI, and others.  Concerning that matter, my handlers told

24   me that their supervisors in the FBI office did not want me to be publicly

25   identified as an FBI informant, so I ended up pleading guilty on their instructions,

26   and spent eight months in jail as a result.

27       83.    After I got out of prison in about August 2008, I contacted the Irvine

28   Police Department to voice concerns about my safety from members of the

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 54 of 262

1   Muslim community that might suspect me of being an informant.  I was visited by

2   a detective, as well as a sergeant that I recognized as someone who had once

3   escorted me when I was undercover with my handlers.  The sergeant knew very

4   specific information about individuals I had surveilled who I had concerns about,

5   and told me in this meeting that he worked for JTTF.  He told me that several

6   individuals I asked him about were still under surveillance.  He also specifically

7   mentioned that surveillance was ongoing at gyms and at least two mosques.

8        84.    In recent months, I have begun returning to local gyms where

9   Muslims work out.  In one gym in Irvine, on two different occasions since about

10  September 2009, I saw a Muslim who I knew to be an informant, who looked at

11  me and quickly looked away guiltily.  Both times I saw the informant, when I

12  went out to the parking lot, I saw a white SUV with people inside who I

13  recognized as members of the JTTF that I saw when I worked undercover.  On

14  one of these occasions, I saw one of the individuals holding a camera in both

15  hands as if he were using it.  They saw me, looked surprised, and also looked

16  away.  I believe that they were actively engaged in surveillance of the gym,

17  perhaps through the informant.

18

19      I declare under penalty of perjury of the laws of the State of California and

20  the United States that the foregoing is true and correct.  Executed this 23rd day of

21  April, 2010 in Orange, California.

22  _____

23  Craig F. Monteilh

24

25

26

27

28

DECLARATION OF CRAIG F. MONTEILH

ER - 116

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 55 of 262

# Exhibit A

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 56 of 262

Purity    of    Unity  → "Sufan  Al  Niah"

"Fitnah"  rules   of  stopping   conflict

    Surah   2    ✓ 191 + 192
    Surah   8    ✓ 39

- - - - - - -

Rules  of  Engagement

    Surah  5         ✓ 33
                 ✓ 34
                 ✓ 55

- - - - - - -

- Hadith
- Fiqh



Declaration of Craig Monteilh (October 11, 2011)
re Fazaga

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 58 of 262

## DECLARATION OF CRAIG F. MONTEILH

I, Craig F. Monteilh, make this declaration of my own personal knowledge and if called to testify, I could and would do so as follows:

1.      From about July 2006 until about October 2007, I worked for the United States Federal Bureau of Investigation ("FBI") as an undercover informant assigned to infiltrate the Muslim community in Southern California.   During this time, I generally spent about six or seven days a week posing as a Muslim convert named Farouk al-Aziz, conducting surveillance and gathering information on a wide variety of individuals and organizations in the Muslim community.  My "handlers," or the FBI agents who directed my operations, during this time were FBI Special Agent Paul Allen and FBI Special Agent Kevin Armstrong.

2.      On my handlers' instructions, I made audio recordings of everything I did while working as an informant, including all the conversations I had, using recording devices they had given me.  I recorded all day, every day.  My handlers told me that if something was not recorded, it was as if it didn't happen.

3.      My handlers were interested in the mosque at Mission Viejo, the Orange County Islamic Foundation ("OCIF").  They considererd the imam of the mosque, Yassir Fazaga, to be a radical for several reasons:   My handlers told me Fazaga directed students on how to conduct demonstrations and encouraged them to speak out.  They told me that when the FBI Assistant Director in Charge of the Los Angeles Field Office, Stephen Tidwell, attended a meeting at an Orange County mosque in about spring 2006, Fazaga openly pressed Tidwell about FBI informants in mosques, and when Tidwell denied putting informants in mosques, Fazaga had openly said he did not believe Tidwell.  My handlers also told me Fazaga was a person of interest because he was a board member of "In Focus News," a prominent Muslim newspaper that was vocal in speaking out against U.S. government actions that negatively affected Muslims and which my handlers believed was anti-American and linked to Muslim civil rights groups.

1

DECLARATION OF CRAIG F. MONTEILH RE MISSION VIEJO MOSQUE

Page 30

ER 120

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 59 of 262

4.      My handlers also believed that OCIF was linked to another mosque they were interested in, the Islamic Center of Irvine, because the two mosques held joint events and jointly organized foreign trips, including the *hajj* pilgrimage to Mecca.  They referred to OCIF as a "definite hotspot."

5.      My handlers also believed that the mosque was radical because it had certain religious scholars as guest speakers who my handlers believed were radical —particularly Yusef Estes, Suhaib Webb, and a local imam, Ahmad Sakr.  My handlers told me that a moderate mosque would not have chosen these guest speakers.   On my handlers' instructions, I attended the Yusef Estes lecture and video recorded the event using a camera hidden in a shirt button that my handlers provided.  On my handlers' instructions, I video recorded the entire lecture, the literature Estes had set out, and the people who attended.

6.      I attended OCIF a number of times to conduct surveillance.

7.      On my handlers' instructions, I used a video camera hidden in a shirt button that my handlers provided me to take video of the interior of OCIF.  My handlers instructed me to get a sense of the schematics of the place — entrances, exits, rooms, bathrooms, locked doors, storage rooms, as well as security measures and whether any security guards were armed.  I understood that this information would be used to place surveillance equipment inside the mosque.  I later asked Agent Armstrong if they had used the information I had gathered to enter the mosque, and he said that they had.

8.      On my handlers' instructions, I also made video recordings of an area in the back of the mosque where there were religious books available for congregants to use, so that my handlers could determine if any of the literature there was extremist.

9.      My handlers instructed me to make contacts within the Mission Viejo congregation.  I worked out on various different occasions with about 40 of their congregants, usually in groups.  For anyone I worked out with, I got their

DECLARATION OF CRAIG F. MONTEILH RE MISSION VIEJO MOSQUE

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 60 of 262

1   email address and cell phone number and passed that information on to my

2   handlers.  I understood from my handlers that the FBI used this contact

3   information to further track these individuals' communications and conduct

4   surveillance of them.

5        10.    My handlers instructed me to gather additional information on a few

6   individuals within the congregation who seemed to have the most direct access to

7   Fazaga.  I talked to these individuals and obtained their email addresses, cell

8   phone numbers, and addresses, as well as basic background information such as

9   their occupation, whether they were married or had children, and what prayers

10   they attended.  I passed the information on to my handlers.

11        11.    My handlers instructed me to monitor Fazaga at the prayers he

12   conducted:  to record and report on what he said, to talk with him afterwards and

13   see who else talked to him afterwards, and to note individuals who appeared to be

14   close to him.   They wanted me to get into a circle of people close enough to

15   Fazaga that he would talk freely in front of me.  I also monitored what was said by

16   a member of the congregation who substituted for Fazaga during one of the

17   prayers I attended.

18        12.    It was significant to my handlers when a prominent member of the

19   community introduced me to Fazaga while I was recording with a hidden video

20   camera, in about April 2007.  At that meeting, I asked Fazaga to work out with me

21   and he agreed.  My handlers were excited by this prospect, but I never actually

22   worked out with him.  I obtained Fazaga's cell phone number and email address

23   (not through Fazaga, but through others) and passed these on to my handlers.  My

24   handlers told me they used the email addresses and telephone numbers I gathered

25   to monitor communications and conduct further surveillance.

26        13.    I also passed to my handlers the license plate numbers of cars Fazaga

27   traveled in and the people I saw him associate with.

28        14.    My handlers told me that there was another informant within the

3

Page 32

DECLARATION OF CRAIG F. MONTEILH RE MISSION VIEJO MOSQUE

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 61 of 262

mosque with access to Fazaga, but that they did not fully trust him, so I was tasked with getting close to him to establish his reliability.   My handlers also told me there were a number of other informants at the mosque, but that they did not have access to the imam.

15.   My handlers instructed me that whenever I saw Fazaga at another mosque or anywhere outside OCIF, I should call them and let them know immediately.  I did this at least once when I saw him at another mosque.

16.   On one occasion, during Friday afternoon prayer at OCIF, the mosque had booth set up to collect donations for a cause — I believe for some kind of relief for Muslims abroad.  Pursuant to my handlers' standing orders that I monitor donations, I stood near the booth and used the hidden video camera I was wearing to make video recordings of people who went up to the booth to contribute money.

17.   I never observed anything that gave me any reason to believe that Fazaga or any of the congregants or leadership of OCIF were involved in violence or terrorism in any way.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this 11th day of October, 2010 in Los Angeles, California.

Craig F. Monteilh

DECLARATION OF CRAIG F. MONTEILH RE MISSION VIEJO MOSQUE

Declaration of Craig Monteilh (October 11, 2011) re Malik

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 63 of 262

## DECLARATION OF CRAIG F. MONTEILH

I, Craig F. Monteilh, make this declaration of my own personal knowledge and if called to testify, I could and would do so as follows:

1.      From about July 2006 until about October 2007, I worked for the United States Federal Bureau of Investigation ("FBI") as an undercover informant assigned to infiltrate the Muslim community in Southern California.   During this time, I generally spent about six or seven days a week posing as a Muslim convert named Farouk al-Aziz, conducting surveillance and gathering information on a wide variety of individuals and organizations in the Muslim community.  My "handlers," or the FBI agents who directed my operations, during this time were FBI Special Agent Paul Allen and FBI Special Agent Kevin Armstrong.

2.      On my handlers' instructions, I made audio recordings of everything I did while working as an informant, including all the conversations I had, using recording devices they had given me.  I recorded all day, every day.  My handlers told me that if something was not recorded, it was as if it didn't happen.

3.      In some of my earliest meetings with my handlers, they showed me a picture of a young man named Ali Malik.  They told me he had been a surfer kid in Newport Beach who wore dyed hair, but had travelled to Yemen to attend a madrassa, and had returned to the U.S. wearing traditional Muslim dress and a full beard.

4.      My handlers told me Malik's change in behavior in embracing religion and traditional dress was highly suspicious and for that reason they needed to investigate him.  They also told me they were suspicious of Malik because he was involved with people from the "MSU."  "MSU" stands for "Muslim Student Union," which is the name of Muslim student groups at many colleges and universities, including U.C. Irvine.  My handlers told me that they were investigating several individuals who were part of the MSU at U.C. Irvine, because they thought these individuals had ties to extremists, they thought that an

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 64 of 262

1   imam who helped found the MSUs was radical, and they did not like the MSU's

2   activities because it organized demonstrations and was vocal in its criticisms of

3   U.S. foreign policy.  They mentioned several times a mock wall at U.C. Irvine that

4   the MSU had created that was supposed to represent the wall between Palestine

5   and Israel.  They said that the MSU was under surveillance and had its own

6   separate task force dedicated to that surveillance.  But they also used the term

7   "MSU" more broadly to include not just particular student groups on particular

8   campuses, but young Muslims who were active in the Muslim religious

9   community and who associated with other young Muslims who were MSU

10  members.  Malik was lumped in with the MSU because he associated with other

11  people from the MSU at Irvine and other young Muslims, even though he did not

12  go to U.C. Irvine.

13      5.     My handlers also told me Malik's father was a hero who had fought

14  against the Soviets in Afghanistan.  This background was another reason they

15  were suspicious of Malik.

16      6.     Agent Armstrong told me that before he was assigned to be my

17  handler, he had been assigned to investigate the MSUs and young Muslims,

18  including Ali Malik.

19      7.     My handlers told me that the way that Malik groomed his beard

20  indicated that he was a radical.

21      8.     My handlers already had a significant amount of information on

22  Malik and his family before I was assigned to do anything.  They wanted me to

23  get more information on one of his brothers; on another individual who Malik was

24  close to; on Malik's associations from the Irvine mosque, and on who Malik hung

25  out with at the gym.

26      9.     My handlers said that they knew Malik had been to a madrassa (an

27  Islamic religious school) in Yemen, but did not know the name of the school.

28  They also told me that they knew he had been blocked from entering Saudi Arabia

2

DECLARATION OF CRAIG F. MONTEILH RE ALI MALIK

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 65 of 262

1   after he had traveled to Yemen, but they did not know why.  They tasked me with

2   finding out what school he had been to and why he had been denied entry into

3   Saudi Arabia.

4       10.    Very soon after I formally converted to Islam, I met Malik at the gym

5   and began talking to him.  I also spoke with him at the mosque.  Sheikh Sadullah

6   Khan saw me talking to him at the mosque and asked Malik to show me how to

7   pray.  Malik willingly helped me.  He also bought me a very basic book on Islam.

8   On the instructions of my handlers, I later used this book to ask Malik about the

9   sections of the book that mentioned *jihad*, in hopes of eliciting some response that

10   might incriminate Malik or justify further surveillance.  I recall that Malik told me

11   that the best interpretation of *jihad* was as "spiritual" *jihad,* or the personal

12   struggle to improve one's life.  On my handlers instructions, I also asked him

13   about certain imams and religious scholars in order to discern his religious views,

14   and pressed him on questions of U.S. foreign policy, in an attempt to record him

15   saying something that could be construed as extremist that would justify further

16   surveillance, or possibly be used to pressure Malik to give information to the FBI.

17   Malik seemed surprised by my questions during these conversations and

18   repeatedly urged me to concentrate on learning the basics of Islam.

19       11.    I saw Malik frequently during Ramadan in the fall of 2006, but after

20   that only about once a week, at mosque or at the gym, and often in passing.  My

21   handlers urged me to have a meal or tea with Malik, and I tried to make plans

22   several times, but he had a busy schedule and we never did.  I would sometimes

23   time my visits to a local gym to coincide with the time I knew he went there after

24   his classes, and would try to talk to him at the gym, on my handlers' instructions.

25       12.    Sometime in early 2007, Ali Malik suggested to me in some

26   conversations that he was having problems with his wife, who lived in Chicago.

27   When I reported this to my handlers, they told me that I should try to work out

28   with Malik at the gym and act as a comforting friend in order to have him open up

3

DECLARATION OF CRAIG F. MONTEILH RE ALI MALIK

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 66 of 262

1   and offer information.  On my handlers' instructions, I did this and recorded

2   Malik talking about his marital problems.  I provided these recordings to my

3   handlers.  My handlers told me the recordings would be useful in pressuring Malik

4   to provide information, because they thought the recordings contained

5   embarrassing facts he would not want revealed.

6          13.    In about April 2007, my handlers started discussing the possibility of

7   sending me abroad to a madrassa to study Islam and Arabic, in hopes that I would

8   get sent from there to a terrorist training camp.  I started asking about a school to

9   go to, saying I wanted to go to Pakistan.  Malik told me that he had attended Dar

10  al-Mustafa in Tarim, outside Sana, in Yemen.   I reported this to my handlers, who

11  were very excited about the information.  Agent Allen moved quickly to

12  investigate and told me it was a radical school and that he believed that Malik did

13  not get into Saudi Arabia after his trip to Yemen because he had been studying at

14  a radical school.  My handlers also told me they thought people at the school

15  could refer students to terrorist training camps, so that if I went, they might refer

16  me to a camp.

17         14.    I found out from the Dar al-Mustafa brochure online that I needed an

18  imam's signature to apply.  I approached Sadullah Khan, in about early May 2007,

19  about going to the school in that summer.  Khan said he would provide a letter for

20  me, but I ended up not applying because people in the mosque got a restraining

21  order against me.

22         15.    My handlers thought Malik had ties to an organization, the "Islamic

23  Society of North America" ("ISNA"), because it was headquartered in Chicago,

24  where Malik's wife lived.  My handlers instructed me to ask Malik about ISNA,

25  which I did.  Malik said they were doing good things, but did not indicate he was

26  a part of it.  I recorded these conversations and reported them to my handlers.

27         16.    My handlers told me they thought Malik might be selling prescription

28  drugs, because he did not have a job and had money to go out with friends, and to

4

DECLARATION OF CRAIG F. MONTEILH RE ALI MALIK

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 67 of 262

1   travel to see wife in Illinois.   My handlers told me they thought this might be true

2   of several young people at the Irvine mosque.  I never discovered anything in any

3   of my time undercover about Malik or any of the other young people selling

4   prescription drugs or engaging in other illegal activity to make money.

5        17.   On several occasions, I used the recording devices provided to me by

6   my handlers (disguised as a key fob or cell phone) to record groups of young

7   Muslims talking in the prayer hall after *ishaa* prayer.   On these occasions, I

8   greeted people, left my things — including the recording device — near to where

9   they were talking, then went to another part of the mosque or a different part of

10   the prayer hall to pray so that my recording device would capture their

11   conversation when they did not think I could hear.  Several times Ali Malik was

12   one of the people in the group I recorded.   I recorded his conversations when I

13   was not present, then gave my handlers notes that detailed the people I saw there

14   so they would be able to identify the voices.  I put in my notes to my handlers that

15   I did this to record conversations where I was not physically present, and they

16   never told me not to do this.

17        18.   Malik told me more than once that he heard I was going regularly to

18   *fajr*, or early morning prayer.  He commended me on my commitment — he said

19   that he had gotten into the routine of attending *fajr* prayers daily when he had

20   been studying abroad, but that it was easy to fall back in attending prayers only

21   when it was convenient and that he needed to get back to that kind of regimen.

22   My handlers thought this was significant information that indicated Malik was

23   returning to extremist beliefs, which justified further surveillance.

24        19.   I gave significant information on Malik to my handlers.  In addition

25   to the surveillance described above, including giving my handlers recordings of all

26   my conversations, my handlers several times showed me photos with people they

27   said had been seen with Malik and asked me to identify them.  The pictures

28   sometimes had Malik in them.

DECLARATION OF CRAIG F. MONTEILH RE ALI MALIK

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 68 of 262

20.     Malik was one of the individuals who my handlers told me were to be arrested in raids in about June 2007 that were ultimately aborted.

21.     I never observed anything that gave me any reason to believe that Malik was involved in violence or terrorism in any way.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this **11**th day of October, 2010 in Los Angeles, California.

Craig F. Monteilh

6

DECLARATION OF CRAIG F. MONTEILH RE ALI MALIK



Declaration of Craig Monteilh (August 11, 2011)
re AbdelRahim

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 70 of 262

# DECLARATION OF CRAIG F. MONTEILH

I, Craig F. Monteilh, make this declaration of my own personal knowledge and if called to testify, I could and would do so as follows:

1.    From about July 2006 until about October 2007, I worked for the United States Federal Bureau of Investigation ("FBI") as an undercover informant assigned to infiltrate the Muslim community in Southern California.   During this time, I generally spent about six or seven days a week posing as a Muslim convert named Farouk al-Aziz, conducting surveillance and gathering information on a wide variety of individuals and organizations in the Muslim community.  My "handlers," or the FBI agents who directed my operations, during this time were FBI Special Agent Paul Allen and FBI Special Agent Kevin Armstrong.

2.    On my handlers' instructions, I made audio recordings of everything I did while working as an informant, including all the conversations I had, using recording devices they had given me.  I recorded all day, every day.  My handlers told me that if something was not recorded, it was as if it didn't happen.

3.    A few weeks after I publicly made a declaration of faith and started attending mosque, a group of young men approached me at mosque and, impressed that I was still attending mosque so regularly, told me that most of the group lived together and invited me to socialize with them at their house.  My handlers were excited by this invitation.   They told me that the home on Carver Street where the young men lived was already under surveillance because it was shared by five young, unmarried Muslim Egyptian men with different skills and backgrounds — including a computer analyst, a pharmacist, an accountant, and one who handled logistics — and my handlers believed they might be a Muslim Brotherhood cell.

4.    A few days after this invitation, I identified to my handlers that one of the young men who lived at the Carver street house, Yasser Abdel Rahim, was a person who seemed to attract and have influence with young Muslims.  My

1

DECLARATION OF CRAIG F. MONTEILH RE YASSER ABDEL RAHIM

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 71 of 262

1  handlers told me they thought Rahim was the leader of the cell, and that I should

2  spend time at the Carver street house and with Rahim in particular, and gather as

3  much information as I could.   I did so, and recorded all the conversations I had

4  with Rahim and the other members of the house.  I gave these recordings to my

5  handlers, along with notes about my observations.

6       5.     My handlers instructed me to get into every room in the Carver street

7  house to see what was in there, and include that information in my reports, which

8  I did.   Later, in about February or March of 2007, my handlers set me up with a

9  video camera hidden in a shirt button and instructed me to conduct video

10  surveillance of the layout and contents of the house, which I did.

11       6.     On my handlers' instructions, I spent a lot of time at the Carver street

12  house and with Rahim and his roommates.  I never observed anything that gave

13  me any reason to believe that Rahim or his roommates were involved in violence

14  or terrorism in any way.  They spent most of their time watching TV news (mostly

15  Al-Jazeera), sports (football – bowl season, basketball, and soccer), talking

16  politics, eating food, and playing X-box.

17       7.     Shortly after I first met them, Rahim and one of his roommates

18  bought me some books on Islam, and later asked me what I thought of them.

19  Some time after that, Rahim agreed to meet with me weekly to teach me various

20  prayers.  My handlers were excited by this because they thought Rahim was

21  radicalizing me and would want me to be part of the Muslim Brotherhood.  My

22  handlers asked for the first sheet of paper on which Rahim had written a prayer for

23  me to learn.  When they gave it back to me a few days later, they told me they had

24  lifted Rahim's fingerprints from it.

25       8.     I informed my handlers that Rahim always led prayer in the house.

26  This point interested them, because they said it showed leadership, and confirmed

27  that I should focus surveillance on him.

28       9.     My handlers said that Rahim had a criminal record, and they

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 72 of 262

1    suspected he might be dealing drugs, but never suggested any particular evidence

2    or investigation of narcotics activity, and I never observed any indication that any

3    members of the house engaged in criminal activity.

4         10.     I gathered and passed to my handlers information about Rahim's

5    travel plans, particularly when Rahim was going to or from Egypt to see his

6    family or his fiancé's family.  After one of these trips to Egypt, Rahim complained

7    that he had questioned for a long time when he re-entered the country – that he

8    expected some delay but this had been way too long.  I told one of my handlers

9    this and he said, "We're onto him," and indicated that they had been responsible

10   for that questioning.

11        11.     Rahim was very athletic.  He played pick-up soccer with other

12   Muslim youth.  I attended some of these games and took down the license plates

13   of people who attended, and once made a video recording with the hidden camera

14   my handlers provided me, in order to document who was attending and socializing

15   with one another.

16        12.     From my conversations with Yasser, I discovered that he traveled a

17   lot to Portland for his job.  I reported this information to my handlers, who were

18   interested.  They had a particular group of Muslims in Portland surveilled and

19   believed he went there to report or get instructions from this group.  I had a

20   standing order to report all travel plans, and would find out Rahim's travel plans

21   and tell my handlers.  My handlers several times told me that they had Rahim

22   surveilled in Portland after I had informed them he would be traveling there.

23        13.     Rahim offered to introduce me to Sheikh Suhaib Webb, a white

24   American religious scholar who studies in Cario.  My handlers knew Webb and

25   told me that although he portrayed himself as a moderate, he was an extremist, so

26   they were very interested and instructed me to pursue this.  Rahim gave me

27   Webb's telephone number and email address, and my handlers told me to call or

28   email Webb to make contact and establish a relationship, in hopes that Webb

3

DECLARATION OF CRAIG F. MONTEILH RE YASSER ABDEL RAHIM

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 73 of 262

1   might give me some instructions.  I called his cell phone and talked to a family

2   member and emailed with him, but my operation ended before I met him.

3       14.    Rahim's fiancée lived in Detroit.  I talked to Rahim about her and her

4   family, and transmitted what information I learned to my handlers.  I also got her

5   email address from emails he had forwarded that came from her, and passed that

6   on to my handlers. My handlers were suspicious of his fiancé's family because

7   they were prominent people who traveled to Egypt often.  They later told me his

8   fiancé's family in Detroit was under surveillance as well.

9       15.    On different occasions, my handlers told me that the FBI had

10   electronic listening devices in the house, as well as in Rahim's car and phone.  For

11   example, one day, one of my handlers called to tell me that a friend had driven up

12   to the house quickly in an agitated state and asked me to go down there to find out

13   what was going on.  When I asked how he knew this, he indicated they had video

14   outside the house.  Another time, my handlers asked me about something that

15   happened inside the house that I hadn't yet put in my notes.  I asked how they

16   knew, and they told me that they had audio surveillance in the home.

17       16.    My handlers told me that Rahim was donating money to a charitable

18   organization in Egypt.  They told me that these donations had been tracked by the

19   Treasury Department.  They told me that these donations were not unlawful, but

20   that they could make them seem suspicious in order to threaten him and pressure

21   him to provide information and become an informant.

22       17.    On many Tuesday nights, the imam from the Garden Grove mosque,

23   Mustafa Kamil, would give Arabic language teachings at the Islamic Center of

24   Irvine.  Rahim often attended.  On several occasions, I used recording devices

25   provided to me by my handlers to record these teachings and the discussions after.

26   On these occasions, I went into the prayer hall and listened to some of the

27   teaching.  Since I did not want to arouse suspicion by staying when I was just

28   starting to learn Arabic, I would leave my things — including the recording device

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 74 of 262

(disguised as a key fob or cell phone) — near to where the group was talking, and then go to another part of the mosque or a different part of the prayer hall to pray. My recording device would capture their conversation when they did not think I could hear.  Rahim was part of the group I recorded on several occasions.

18.    On my handlers instructions, I asked Rahim questions about *jihad* and pressed him on his views about religious matters and certain religious scholars, particularly Egyptian ones, in order to get him to say something that might be incriminating or provide a way to pressure him to provide information to the FBI.   Rahim told me that there was more to Islam than *jihad*: that *jihad* is a personal struggle, and that to the extent that there is such thing as a fighting *jihad*, the Quran places very strict rules that prohibit harming plants or trees, infants, elderly or women, and that terrorists who say they are engaged in *jihad* are not, they are just committing murder.  When I asked about religious scholars like Hassan al-Banna and Sayid Qutb, who my handlers told me to ask about because they are considered extremist, he said that he did not agree with them, but thought that the Egyptian government should not have executed them.

19.    Rahim was one of the individuals who my handlers told me was to be arrested in the aborted raids of June 2007.


I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this **11**th day of August, 2010 in Orange, California.

Craig F. Monteilh

DECLARATION OF CRAIG F. MONTEILH RE YASSER ABDEL RAHIM

# Responses, Replies and Other Motion Related Documents

8:11-cv-00301-CJC-VBK Yassir Fazaga et al v. Federal Bureau of Investigation et al

(VBKx), DISCOVERY, RELATED-G

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered by Arulanantham, Ahilan on 12/23/2011 at 7:30 PM PST and filed on 12/23/2011

| | |
|---|---|
| **Case Name:** | Yassir Fazaga et al v. Federal Bureau of Investigation et al |
| **Case Number:** | 8:11-cv-00301-CJC-VBK |
| **Filer:** | Yassir Fazaga |
| | Ali Uddin Malik |
| | Yasser Abdelrahim |
| **Document Number:** | 66 |

**Docket Text:**

DECLARATION of Craig Monteilh In Opposition to MOTION to Dismiss Case *First Amended Class Action Complaint and Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez, and (2) Defendants Stephen Tidwell and Ba MOTION to Dismiss Case First Amended Class Action Complaint and Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez, and (2) Defendants Stephen Tidwell and Ba[57], MOTION to Dismiss Case First Amended Complaint[58], MOTION to Dismiss Case Amended Complaint and for Summary Judgment[55] filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Arulanantham, Ahilan)*

*8:11-cv-00301-CJC-VBK Notice has been electronically mailed to:*

*Ahilan T Arulanantham     aarulanantham@aclu-sc.org, gtien@aclu-sc.org*

*Alexander H Cote     acote@scheperkim.com, temp1@scheperkim.com*

*Ameena Mirza Qazi     courtserviceanq@gmail.com*

*Amos Alexander Lowder     alowder@scheperkim.com, jperetz@scheperkim.com*

*Angela Machala     amachala@scheperkim.com, feseroma@scheperkim.com*

*Annie L Owens     annie.owens@wilmerhale.com*

*Anthony Joseph Coppolino     tony.coppolino@usdoj.gov*

*Brian R Michael     brian.michael@wilmerhale.com, joann.ambrosini-bacon@wilmerhale.com*

ER - 137

Carl J Nichols     carl.nichols@wilmerhale.com

Dan Stormer     dstormer@hadsellstormer.com, nmolina@hskrr.com, tgalindo@hskrr.com

David C Scheper     dscheper@scheperkim.com

Howard M Shapiro     howard.shapiro@wilmerhale.com

Jennifer L Pasquarella     jpasquarella@aclu-sc.org, clebano@aclu-sc.org

Joshua Piovia-Scott     jps@hskrr.com, vivian@hskrr.com

Katie Moran     katie.moran@wilmerhale.com

Lynn Y Lee     lynn.lee@usdoj.gov

Peiyin Patty Li     patty.li@wilmerhale.com

Peter Bibring     pbibring@aclu-sc.org, cleb ano@aclu-sc.org, lmoran@aclu-sc.org

Reem Salahi     reem@hskrr.com

Stephen E Handler     stephen.handler@usdoj.gov

W. Scooter Slade     scooter.slade@usdoj.gov

**8:11-cv-00301-CJC-VBK Notice has been delivered by First Class U. S. Mail or by other means to: :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**L:\1437.Fazaga\Pleading\11-09-22 Opp to MTDs\To Be Filed\Decs Monteilh Combined.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=12/23/2011] [FileNumber=12835092-0] [83edc6b52e4d097d3a3be8fcf65151343e9934b79013660e676d8ef1f73dbacc18 ec87ce01f04b8937d9c1848c111e39af5f3f6451e434944df6ce5462611c49]]

ER - 138

1   only by the authority above holding that injunctive relief is available under Section

2   (e)(7), but also by the plain text of the statute.  The statute permits agencies to

3   exempt themselves from *some* of the Act's requirements, but notably missing from

4   the list is the free expression constraint imposed by Section (e)(7).  *See* 5 U.S.C.

5   552a(j) (allowing agency to exempt itself from sections *other* than, *inter alia*,

6   (e)(7)); 552a(k) (listing sections that are exempt, but not listing (e)(7)).  The

7   Government's convoluted argument to the contrary – "the FBI does not contend

8   that any responsive records (if any) would be exempt from (e)(7), but rather that

9   they would be exempt from amendment, and, thus, expungement," Gov. Br. 18 –

10  would render those carve-outs meaningless, violate the Government's own

11  regulations, *see* 28 C.F.R. 16.96(a), (c), and contravene the cases holding that

12  injunctive relief is available for violations of (e)(7).

13      **B.      Plaintiffs State a Claim for Expungement Under the Constitution.**

14          Plaintiffs also seek expungement of all records obtained in violation of the

15  Constitution.  Contrary to the Government's claim, Gov't Br. 19, it is well settled

16  that federal courts have equitable power to order "the expungement of local arrest

17  records as an appropriate remedy in the wake of police action in violation of

18  constitutional rights."  *Maurer v. Pitchess*, 691 F.2d 434, 437 (9th Cir. 1982)

19  (reversing dismissal of suit brought directly under Constitution for expungement of

20  arrest records that occurred without probable cause); *Shipp v. Todd*, 568 F.2d 133,

21  134 (9th Cir. 1978) ("It is established that the federal courts have inherent power to

22  expunge criminal records when necessary to preserve basic legal rights.");

23  *Burnsworth v. Gunderson*, 179 F.3d 771, 774-75 (9th Cir. 1999) (ordering

24  expungement of prison disciplinary record where "no evidence" supported the

25  disciplinary sanction).  As *Todd* explains, while the inherent expungement power is

26  "reserved for unusual or extreme cases," those include cases "where the arrest

27  itself was an unlawful one, or where the arrest represented harassing action by the

28  police, or where the statute under which the arrestee was prosecuted was itself

7

PLAINTIFFS' OPPOSITION TO GOV'T DEFENDANTS' MTN. TO DISMISS

both as pled and as borne out by the years since the FBI's use of the informant became public. The Court must assume for purposes of this motion to dismiss that Plaintiffs are peaceful Americans who have no intent to harm this country, and as of today, five years after the informant surveilled and instigated members of the Southern California Muslim community for an extended period of time and then was publicly revealed as an informant, not a single individual has even been charged with a terrorism-related offense as a result of his investigation. *See* FAC ¶ 3 ("This dragnet investigation did not result in even a single conviction related to counterterrorism. This is unsurprising, because the FBI did not gather the information based on suspicion of criminal activity, but instead gathered the information simply because the targets were Muslim."). Thus, the parade of horribles that should have accompanied their identification as targets of FBI counterterrorism surveillance has not come to pass.[18]

Similarly, the Government proves far too much by its categorical assertion that the release of any information "that could tend to confirm or deny" whether any particular individual is or is not the subject of a counterterrorism investigation

---

[18] Indeed, the only federal crime of any kind that was charged through the informant's work was a naturalization fraud case that the government dismissed. *See* FAC ¶¶ 155-58; Scott Glover, *Federal prosecutors seek dismissal of perjury and fraud charges against Tustin man*, L.A. TIMES (Oct. 1, 2010), http://articles.latimes.com/2010/oct/01/local/la-me-niazi-20101001. Mr. Giuliano's declaration also makes reference to one plot by three prisoners in Los Angeles that sought to storm a military recruiting center and, afterward, attack people at a nearby temple. But there is no suggestion that they were discovered through counterterrorism investigation of the Muslim community. In fact, Torrance police arrested the men because they tried to rob a gas station and then discovered the plot because they had written their plans down on papers left at their homes. The only one of the plotters with any connection to Southern California's resident Muslim community was never convicted, as he was found incompetent to stand trial due to mental illness. *See* Complaint, *United States v. Samana*, No. 05-1662 (C.D.Cal. Aug. 2, 2005); *United States v. James*, No. 05-0214 (C.D.Cal. Aug. 18, 2009) (judgment and probation/commitment order).

---

33

would threaten national security.  The Government has repeatedly confirmed that individuals were or were not subjects of investigation on numerous occasions, including in extremely sensitive investigations.  For example, the Department of Justice publicly identified Steven Hatfill as a "person of interest" in its investigation of the 2001 anthrax attacks, which occurred within months of the 9/11 attacks.  *See* David Freed, *The Wrong Man*, THE ATLANTIC (May 2010), http://www.theatlantic.com/magazine/archive/2010/05/the-wrong-man/8019/.[19] More recently, the FBI disclosed documents in response to a FOIA lawsuit revealing that Naji Hamdan – an American citizen from Southern California who was detained in the United Arab Emirates, allegedly at the behest of the United States government – had been the target of an FBI investigation.  *See* Exh. 3. Conversely, the government publicly disclosed that Brandon Mayfield was *not* a target as part of a settlement agreement for the FBI's unlawful surveillance and detention of him in 2004.[20]  Indeed, every time the government has detained or released any of the several thousand people it has held at Guantanamo Bay,

---

[19] The government later paid Mr. Hatfill over $2.8 million to settle his case.  *See Statement of Brian Roehrkasse, Director of Public Affairs, on Department's Settlement with Steven Hatfill in Hatfill v. Ashcroft*, http://www.justice.gov/opa/pr/2008/June/08-opa-576.html (June 27, 2008).

[20] The government also agreed to destroy documents relating to its surveillance of Mr. Mayfield, apologize to him, and pay him $2 million.  *See* Eric Lichtblau, *U.S. Will Pay $2 Million to Lawyer Wrongly Jailed*, N.Y. TIMES (NOV. 30 2006), http://www.nytimes.com/2006/11/30/us/30settle.html; *Statement on Brandon Mayfield Case*, (May 24, 2004), http://www.fbi.gov/news/pressrel/press-releases/statement-on-brandon-mayfield-case.  Along the same lines, the Department of Justice sent a public letter "clearing" Richard Jewell of suspicion in connection with the Atlanta Olympics bombing in 1996, after the FBI had wrongly suspected him of that terrorist act.  *See Jewell Cleared of Olympic Park Bombing*, (Oct. 26, 1996), http://articles.cnn.com/1996-10-26/us/9610_26_olympic.bombing_1_park -bombing-richard-jewell-1996olympic-park?_s=PM:US.  And the government disclosed that it had targeted particular individuals for surveillance in both *Jabara* and *Ellsberg*.  *See infra* Section IV.D.3.

1  Plaintiffs' constitutional claims without addressing their merits, even if doing so

2  would require the disclosure of state secrets.[23]

3      While the doctrine discussed below provides ample support for Plaintiffs'

4  constitutional argument, it is worth pausing to note the obvious problem with the

5  Government's view.  If it were correct, then the Government could shield itself

6  from litigation to challenge a policy to arrest people solely on the basis of their

7  race, nationality, or political opinion, *see Korematsu v. United States*, 323 U.S. 214

8  (1944), or even a policy to summarily murder American citizens suspected of

9  posing a threat to the present administration, simply by asserting that the policy

10  was secret.  *Cf. Al-Aulaqi v. Obama*, 727 F.Supp.2d 1, 54 (D.D.C. 2010) (noting

11  that the government had invoked state secrets to dismiss challenge to government's

12  program of targeted killing abroad, but deciding on other grounds).[24]

13      The Government's position is that literally any practice, no matter how

14  abusive, can be immunized from legal challenge by being labeled

15

16  ───────────────

[23] If the Court agrees that it cannot dismiss the claims for injunctive relief, it should also decline to dismiss the damage claims, because the underlying evidence involved in both requests for relief is virtually identical.

[24] The fact that the privilege assertions would be limited to cases involving "national security" or "counterterrorism" provides little comfort.  One need look no further than the government's discussion of *Presbyterian Church*.  Gov't Br. 48-49.  The government strongly suggests that information there could also have implicated "national security," even though it involved an investigation by the INS of churches assisting Central American refugees seeking asylum.  For other evidence of the malleability of those terms, *see* Drug Trafficking Violence in Mexico: Implications for the U.S. Before the Senate Caucus on International Narcotics Control, 111th Cong. (May 5, 2010) (joint statement of Kevin Perkins, Ass't Dir., Crim. Invest. Div., FBI and of Anthony Placido, Ass't Admin. and Chief of Intel., DEA) (describing drug trafficking and related problems as "a serious threat to the national security" that is not "a traditional criminal justice problem."); *see also*, *Bill Seeks to Designate Drug Cartels as Terrorists*, N.Y. TIMES, April 21, 2011 (describing proposed legislation that would designate seven cartels as "foreign terrorist organizations" to "give law enforcement in the United States enhanced tools to combat the cartels.").

PLAINTIFFS' OPPOSITION TO GOV'T DEFENDANTS' MTN. TO DISMISS

ER - 139c

the privilege or the justiciability bar – and while these cases apply the doctrine

outside the government contracts context, none have ever dismissed an action

based on the evidentiary privilege where the plaintiffs sought injunctive relief from

constitutional violations. *Jeppesen* was a suit for damages under the Alien Tort

Statute. 614 F.3d at 1075. *Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998)

involved no constitutional claims, *id*. at 1164, and appears to have involved the

justiciability bar. *Id*. at 1166. *Al-Haramain* involved no claim for injunctive relief

on appeal, and in any event the Court strongly suggested that the state secrets

privilege did not govern the case because it was preempted by FISA. *See*

*Al-Haramain*, 507 F.3d at 1195 ("Al-Haramain sought damages and declaratory

relief"); *id*. at 1205 (suggesting that FISA preempts state secrets privilege). *See*

*also Weston v. Lockheed Missiles & Space Co.*, 881 F.2d 814, 816 (9th Cir. 1989)

(state secrets privilege waived on appeal).

　　　　Similarly, the vast majority of out-of-circuit state secrets cases involve

damage actions or actions seeking to enforce employment or contract law rules for

secret services with the Government.[30] While a handful of cases do involve claims

for injunctive relief – most arising out of the same set of revelations concerning

illegal government spying against political activists – the different approaches

adopted in those cases (and the vehement disagreements amongst the judges

---

[30] For damage actions, *see, e.g.*, *El Masri v. United States*, 479 F.3d 296, 300 (4th
Cir. 2007); *Ellsberg v. Mitchell*, 807 F.2d 204, (C.A.D.C. 1986). For cases
involving actions to enforce secret employment or contract rules, *see, e.g.*, *Doe v.
CIA*, 576 F.3d 95, 108 (2d Cir. 2009) (suit by CIA agent's family that appears to be
employment action, in which plaintiffs conceded that the case could not proceed
without disclosure of state secrets); *Edmonds v. United States Dep't of Justice*, 323
F.Supp.2d 65, 70 (D.D.C. 2004) (suit by contract translator who worked for FBI in
aftermath of 9/11 attacks); *Sterling v. Tenet*, 416 F.3d 338, 347 (4th Cir. 2005)
(Title VII suit by CIA employee); *Molerio v. FBI*, 749 F.2d 815, 821 (D.C. Cir.
1984) (discrimination action alleging constitutional violations by individual who
was refused employment by FBI).

ER - 139d

1    not show that they, as supervisors of the operation, acted with the requisite

2    discriminatory intent.  But unlike *Iqbal*, in which the Court held plaintiffs had not

3    alleged facts that showed that the Attorney General and Director of the FBI were

4    motivated by discrimination against Muslims when they set policies on the

5    detention of suspects in the September 11 investigations, Tidwell, Walls and Rose

6    are not heads of agencies, but instead are relatively low-level supervisors who were

7    directly involved in the operation.[22] And unlike in *Iqbal*, their involvement is not

8    alleged to be merely in setting policy — the complaint alleges that they were

9    involved in the ongoing oversight of a months-long, highly sensitive and (within

10   the FBI) high-profile investigation.  The complaint alleges, for example, that

11   Tidwell approved the action in advance and read all the informant's daily notes,

12   that Walls monitored the operation and was involved enough to be audited for her

13   handling of leads from the case, and that Rose (the supervisor of counterterrorism

14   in the Orange County branch office) sought to expand the investigation and flew to

15   D.C. for that purpose.  On these facts, it is easily plausible that these supervisors

16   also knew the instructions being given to the informant and understood that the

17   "central feature" of the operation was that it targeted Muslims.

18   ### 1.   *Under Clearly Established Law, Facial Discrimination on the*
19   ### *Basis of Religion Triggers Strict Scrutiny*

20         The Supreme Court has repeatedly held that one of the First Amendment's

21   central purposes is to guarantee government neutrality by barring governments

22   from favoring or disfavoring particular religions.  *See, e.g.*, *McCreary Cnty. v.*

---

24   [22] Indeed, in *Iqbal*, the Court distinguished its analysis of the supervisory liability
     of the Attorney General and FBI director from that for lower level supervisors.  *See*
25   *Iqbal*, 129 S. Ct. at 1952 ( "Though respondent alleges that various other
     defendants, who are not before us, may have labeled him a person 'of high interest'
26   for impermissible reasons, his only factual allegation against petitioners accuses
     them of adopting a policy approving restrictive conditions of confinement for post-
27   September-11 detainees until they were cleared by the FBI." (quotations omitted)).

28

*ACLU*, 545 U.S. 844, 860 (2005).  This principle of neutrality is contained within both the Establishment Clause and the Free Exercise Clause.  While the law governing facially neutral laws that have a disparate impact on particular religions is more complex, the law governing facial discrimination is clear: any facial classification is unconstitutional unless it can survive strict scrutiny.

*Iqbal* establishes that "the plaintiff must plead and prove that the defendant acted with discriminatory purpose" to establish a claim of intentional religious discrimination, *Iqbal*, 129 S.Ct. at 1948.  But there are several ways to plead such discriminatory purpose.  As one court has described it:

> A plaintiff could point to a law or policy that expressly classifies persons on the basis of [a suspect classification]. . . . Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. . . . A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus.

*Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2nd Cir. 1999).  In *Iqbal*, the plaintiffs advanced the third theory — that a facially neutral policy was motivated by discrimination and had a discriminatory effect.  Here, Plaintiffs plead facts establishing the first: that Defendants had an express policy of surveilling Muslims on the basis of their religion.  Once a plaintiff shows that a government official has made a facially discriminatory classification on the basis of religion, that intentional discrimination action is subject to strict scrutiny under either the Establishment Clause or the Free Exercise Clause.[23]

---

[23] As *Lukumi* recognized, facial religious discrimination is "not often at issue" in the cases addressed by the Court.  508 U.S. at 533.  Indeed, most of the Court's Free Exercise cases have not involved religious discrimination at all, but the burdens placed on religious exercise by neutral laws that plaintiffs did not suggest were discriminatorily motivated, s*ee, e.g.*, *Smith*, *supra*; *Lyng v. Northwest Indian Cemetery Protective Ass'n*,485 U.S. 439, 450 (1988); *Wisconsin v. Yoder*,406 U.S.

*(cont'd)*

a. Establishment Clause

The Establishment Clause clearly forbids the type of explicit discrimination on the basis of religion at issue in this case. "In the course of adjudicating specific cases, [the Supreme Court] has come to understand the Establishment Clause to mean that government . . . *may not discriminate among persons on the basis of their religious beliefs and practices . . . .*" *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 590-91 (1989) (emphasis added); *see also Larson*, 456 U.S. at 244 ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.")

Defendants AAR devote several pages to application of the familiar, three-prong test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), *see* AAR Brief at 24-28, but the Supreme Court has clearly stated that the *Lemon* test simply does not apply to facial discrimination against a particular religion. "[T]he [*Lemon*] 'tests' are intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions . . . that discriminate *among* religions." *Larson*, 456 U.S. at 252 (emphasis in original). Such "denominational preferences . . . must be invalidated unless [they are] justified by a compelling governmental interest, and . . . closely

_____

205 (1972); *Murdock v. Pennsylvania*, 319 U.S. 105 (1943). Similarly, most of the Court's Establishment Clause cases do not involve religious discrimination, but rather funding provisions (that are either neutral or address religion generally) that involve "play in the joints" between Establishment and Free Exercise clauses, *Locke v. Davey*, 540 U.S. 712, 718 (2004); *see also Widmar v. Vincent*, 454 U.S. 263 (1981); *Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970); *Everson v. Board of Ed.*, 330 U.S. 1 (1947); or religious display and similar cases that balance recognition of "the strong role played by religion and religious traditions throughout our Nation's history" with the principle that government may not endorse any religion or religion generally, *Van Orden v. Perry*, 545 U.S. 677, 683 (2005). Of the few cases that do address religious discrimination, most involve claims that facially neutral policies were motivated by discriminatory animus, *see Lukumi*, *supra*; or applied in a discriminatory manner, or cases that addressed facial preferences for religion generally, rather than between religions, *see, e.g.*, *Wallace v. Jaffree*, 472 U.S. 38 (1985).

_____

33

fitted to further that interest." *Id.* at 246-47; *see also Sklar v. C.I.R.*, 549 F.3d 1252, 1256 n.3 (9th Cir. 2008) ("*Larson* [] established an analytical framework to assess the constitutionality of statutes granting denominational preferences.  To survive an Establishment Clause challenge under *Larson*, a statute which grants a denominational preference must be justified by a "compelling governmental interest" to which it is "closely fitted"); *Rouser v. White*, 630 F.Supp.2d 1165, 195 (E.D. Cal. 2009) ("Under *Larson*, when a plaintiff shows that a law or other state action grants a denominational preference among religions, the court must "treat the law as suspect and . . . apply strict scrutiny in adjudging its constitutionality.").  Courts should employ the three-part *Lemon* test only if a government practice does not "facially differentiate[] among religions." *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989). Because Defendants explicitly targeted Muslims on the basis of their religion, strict scrutiny applies.[24]

Moreover, even if the *Lemon* test did apply, the allegations more than satisfy it.  First, while fighting terrorism may be a valid secular purpose, the dragnet

---

[24] None of the cases on which Defendants rely for application of the *Lemon* test involved the allegations of facial discrimination against a particular religious group that are presented here.  Rather, in each case, the government acted in pursuit of anti-establishment interests that were neutral between religions. *See Nurre v. Whitehead*, 580 F.3d 1087, 1089 (9th Cir. 2009) (holding school officials' refusal to allow school band to play religious-themed songs in graduation program did not violate Establishment Clause); *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1397 (9th Cir. 1994) (investigation into whether assistant police chief's on-duty conduct violated the Establishment Clause did not target religion); *Kreisner v. City of San Diego*, 1 F.3d 775, 779 (9th Cir. 1993) (city did not violate Establishment Clause by allowing private group to put on overtly religious holiday display in park's public forum through permit available on first-come, first-serve basis). While the Ninth Circuit employed *Lemon* in one case that arguably involves discrimination against a religious group, *see Catholic League for Religious and Civil Rights v. City and County of San Francisco*, 624 F.3d 1043, 1047 (9th Cir. 2010) (addressing denunciation of Catholic church's stance on same sex adoption), the plaintiffs appear not to have disputed the test, as none of the fragmented opinions in that case mention *Larson* or address whether it commands a different test.

1  investigation of all members of a religious group (absent any indication of criminal

2  or terrorist activity) that is alleged here does not clearly advance such a secular

3  purpose and raises the specter of that it is a "sham," *see McCreary Cnty*, 545 U.S.

4  at 864; *see also, id.* at 859 ("the secular purpose requirement alone may rarely be

5  determinative"); second, the investigation's sweeping target of all Muslims on the

6  basis of their religion conveys the message of disapproval of the religion violates

7  the Establishment Clause's prohibition on "making adherence to a religion relevant

8  in any way to a person's standing in the political community," *Cnty. of Allegheny*,

9  492 U.S. at 594, which the agents' statements that "Islam is a threat to national

10  security" simply confirms; and the Ninth Circuit has continually noted that

11  "comprehensive, discriminating, and continuing surveillance of religion" of the

12  type entailed in this operation that spanned years constitutes the kind of

13  entanglement forbidden by *Lemon*'s third prong.  *See Vernon*, 27 F.3d at 1399.

14  b. Free Exercise Clause

15  Similarly, allegations of facial religious discrimination trigger strict scrutiny

16  under the Free Exercise Clause.  Indeed, *Iqbal* itself relied on *Lukumi*, in which the

17  Court held that the Free Exercise Clause requires that government action that is not

18  "neutral and of general applicability . . . must be justified by a compelling

19  governmental interest and must be narrowly tailored to advance that interest." 508

20  U.S. at 532; *see also Smith*, 494 U.S. at 886 n.3 ("Just as we subject to the most

21  exacting scrutiny laws that make classifications based on race, or on the content of

22  speech, so too we strictly scrutinize governmental classifications based on

23  religion."); *Braunfeld v. Brown*, 366 U.S. 599, 607 (1961) ("If the purpose or effect

24  of a law . . . is to discriminate invidiously between religions, that law is

25  constitutionally invalid even though the burden [on the observance of religion]

26  may be characterized as being only indirect."); *accord Gillette v. United States*,

27  401 U.S. 437, 462 (1971).  Were there any doubt, *Lukumi* held that the inquiry into

28  "neutrality" under the Free Exercise Clause can follow the equal protection

35

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1    analysis of discriminatory intent.  *See id.* at 540-41 ("[n]eutrality in its application

2    requires an equal protection mode of analysis) (quoting *Walz v. Tax Comm'n of*

3    *New York City*, 397 U.S 664, 696 (1970) (Harlan, J., concurring).[25]

4           Defendants AAR again apply the wrong analysis by engaging in the

5    "substantial burden" test for Free Exercise claims.  That test was originally crafted

6    in *Sherbert v. Verner*, 374 U.S. 398 (1963) and held that "[a] regulation neutral on

7    its face may, in its application, nonetheless offend the constitutional requirement

8    for governmental neutrality if it unduly burdens the free exercise of religion."

9    *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 717 (1981);

10   *accord Jimmy Swaggart Ministries v. Bd. of Eqal. of Cal.*, 493 U.S. 378, 384

11   (1990); *Wisconsin v. Yoder*, 406 U.S. 205, 219 (1972).  But the Supreme Court in

12   *Smith* sharply narrowed applicability of the "substantial burden" test to two

13   situations: first, circumstances (applicable to unemployment compensation and

14   perhaps little else) "where the State has in place a system of individual

15   exemptions" such that "it may not refuse to extend that system to cases of

16   'religious hardship' without compelling reason," 494 U.S. at 884; and second,

17   "hybrid" claims, where the government intrusion implicated not just the Free

18   Exercise Clause but another constitutional right as well. *Id.* at 881-82.[26]

19   _____

20   [25] While Justices Scalia and Thomas did not join this section of the *Lukumi* opinion
     out of concern for the difficulty in determining of a "the singular 'motive' of a

21   collective legislative body" *Lukumi*, 508 U.S. at 558 (Scalia, J., concurring), no
     such concern prevents examination of executive officers' motives, as is confirmed

22   by Justices Scalia and Thomas joining the *Iqbal* opinion that cites this standard.

23   [26] While the Ninth Circuit in *Vernon* applied the "substantial burden" test in a
     challenge to a government conduct that was not "regulatory, proscriptive, or

24   compulsory in nature," 27 F.3d 1385, 1394 (9th Cir. 1994), that case did not

25   involve the facial discrimination against a particular religion that is clearly alleged
     here.  *See id.* at 1398 (noting that investigation aimed whether specific person's on-

26   duty conduct violated the Establishment Clause).  Additionally, while the Court

27   rejected Vernon's argument that his claims should be analyzed as a non-neutral
     law under *Smith*, see *id.* at 1393 n.1, it did so on the ground the Ninth Circuit had

28                                                                              *(cont'd)*

But the "substantial burden" test has never applied to facial, intentional discrimination.  Where the Supreme Court has confronted explicit, facial discrimination against a particular religious sect, it has applied strict scrutiny.  In *Fowler v. Rhode Island*, 345 U.S. 67 (1953), the Court held that discriminatory application of an ordinance barring public preaching in parks to Jehovah's Witnesses, when the same law was not enforced against Catholics or Protestants, violated the Free Exercise Clause.  Because the evidence "plainly show[ed] that a religious service of Jehovah's Witnesses is treated differently than a religious service of other sects.  That amounts to the state preferring some religious groups over this one." *See id.* at 69.  In *Niemotko v. Maryland*, 340 U.S 268, 272 (1951), the court held that denial of a permit to Jehovah's Witnesses based on religious discrimination constituted an unconstitutional prior restraint; *see also Fowler*, 345 U.S. at 69 ("[In *Niemotko*,] a public park, open to all religious groups, was denied Jehovah's Witnesses because of the dislike which the local officials had of these people and their views.  That was a discrimination which we held to be barred by

---

earlier held Smith inapplicable to non-criminal cases.  *See id*.  (citing *NLRB v. Hanna Boys Ctr.*, 940 F.2d 1295, 1305 (9th Cir. 1991)).  But the Ninth Circuit has since rejected the rule on which the Vernon court relied.  *See Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999) (characterizing *Hanna Boys* as dicta and holding "*Smith* is not limited to challenges to criminally prohibited conduct").

The Ninth Circuit in *Am. Family Ass'n v. City and County of San Francisco*, 277 F.3d 1114, 1124 (9th Cir. 2002), relied on *Vernon* to apply the "substantial burden" test to a Free Exercise challenge to a letter and two resolutions by San Francisco's Board of Supervisors denouncing anti-gay rhetoric and television announcements sponsored, in part, by religious groups, that did not discriminate against any particular religion.  The court in *Am. Family Ass'n* declined to bypass the "substantial burden" test for the resolutions on grounds that courts had not applied *Lukumi* to a case addressing a "non-regulatory or non-compulsory government action." But the present case can be distinguished in that certainly presents government action beyond mere issuance of a resolution, and the Supreme Court's subsequent citation to *Lukumi* in *Iqbal* makes clear that *Lukumi* governs in cases addressing religious discrimination by law enforcement.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

the First and Fourteenth Amendments.").  In *McDaniel v. Paty*, 435 U.S. 618, 626 (1978), the Court held that a statute barring ministers from holding public office violated the Free Exercise Clause, reasoning that "[i]f the Tennessee disqualification provision were viewed as depriving the clergy of a civil right solely because of their religious beliefs, *our inquiry would be at an end*.  The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such." (emphasis added).  And in *Cooper v. Pate*, 378 U.S. 546, 546 (1964) (*per curiam*), the Court held that a prisoner's allegations that he was denied privileges enjoyed by other prisoners solely because of his religious beliefs stated a First Amendment claim.

No Supreme Court case in decades has addressed the kind of explicit discrimination against a particular religion as the Court perceived in *Niemotko* and *Fowler*.  *See Lukumi*, 508 U.S. at 533 (noting that principles barring facial discrimination are "not often at issue in [the Court's] Free Exercise Clause cases").  However, the Court has repeatedly stated that facial classifications based on religion are subject to strict scrutiny, often on the basis of these early cases.  *See, e.g.*, *Smith*, 494 U.S. at 886 n.3 ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, or on the content of speech, so too we strictly scrutinize governmental classifications based on religion." (citing *McDaniel*)); *id.* at 877 (government may not "impose special disabilities on the basis of religious views or religious status" (citing *McDaniel* and *Fowler*)); *Braunfeld* , 366 U.S. at 607 ("If the purpose or effect of a law . . . is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden [on the observance of religion] may be characterized as being only indirect."); *Sherbert*, 374 U.S. at 402 (citing *Fowler* for proposition that under Free Exercise Clause, government may not "penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities").

Federal appellate courts have also recognized that strict scrutiny, not the

"substantial burden" test, applies in cases that involve facial or intentional discrimination against a particular religious group. *See Vinning-El v. Evans*, 657 F.3d 591, 593 (7th Cir. 2011) ("*Smith* does not apply to such a policy [discriminating against those who hold particular religious beliefs]; it did not change the norm forbidding materially different treatment of different religious faiths."); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 170 (3rd Cir. 2002) ("Under *Smith* and *Lukumi*, however, there is no substantial burden requirement when government discriminates against religious conduct."); *Hartmann v. Stone*, 68 F.3d 973, 979 & n.3 (6th Cir. 1995) (holding substantial burden test applicable to "situations in which a neutral and generally applicable regulation imposes an indirect, albeit substantial, burden on the practice of religion," and applying strict scrutiny where regulation is not neutral and generally applicable); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006) (describing Free Exercise analysis as applying strict scrutiny to any law that is not neutral and generally applicable); *c.f. Wirzburger v. Galvin*, 412 F.3d 271, 281 & n.4 (1st Cir. 2005) (holding challenged statute would not be subject to strict scrutiny in part because it did not "discriminate on the basis of religious belief or status"); *Gary S. v. Manchester School Dist.*, 374 F.3d 15, 18 (1st Cir. 2004) (holding substantial burden test "limited . . . to the unemployment compensation field"); *see also Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 804 (9th Cir. 2011) (reversing grant of summary judgment for defendants where there was evidence plaintiffs had been "treated differently because of their religious status").

Accordingly, under the Free Exercise Clause, as with the Establishment Clause, Plaintiffs must show that the FBI's actions were not neutral, in that they intentionally discriminate on the basis of religion, and that they were not justified by a compelling interest.[27]

---

[27] Even if the plaintiffs required to show a "substantial burden," they satisfy that

*(cont'd)*

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

ER - 148

c. <u>The Ban on Religious Discrimination is Clearly Established</u>

There can be no argument that the First Amendment's prohibition on facial religious discrimination is not clearly established. Supreme Court cases dating back sixty years to *Fowler* and *Niemotko* establish that government actors may not intentionally discriminate against a religious group because of its religion — period. The Supreme Court has announced this principle in denouncing religious discrimination in contexts as diverse as the issuance of permits, *Niemotko*, enforcement of criminal laws, *Fowler*, and selective prosecution, *United States v. Armstrong*, 517 U.S. 456, 464, (1996) (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)), and has repeated throughout its cases the mantra that classifications on the basis of religion are subject to strict scrutiny. *See, e.g.*, *Smith*, 494 U.S. at 886 n.3.

The fact that the Supreme Court has never squarely held that intentional religious discrimination is also forbidden in undercover law enforcement investigations does not entitle Defendants to qualified immunity, where their explicit targeting based on religion is so egregious. "To be established clearly, . . . there is no need that the very action in question have previously been held unlawful. The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that '[t]he easiest cases don't even arise.' But even as to action less than an outrage, "officials can still be on notice that their conduct violates established law . . . in novel factual circumstances." *Safford Unif. Sch. Dist. v. Redding*, 129 S. Ct. 2633, 2643 (2009) (citing *K.H. v. Morgan,* 914 F.2d 846, 851 (7th Cir. 1990)).

2. ***The Complaint Alleges Facial Discrimination Against Muslims***

Defendants AAR make a half-hearted argument that it is not clearly established that facial religious discrimination is unlawful in the context of an undercover investigation where there is "no allegation that the investigation was

requirement. *See infra*, Part II.C (addressing "substantial burden" under RFRA).

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

603; *see also United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir. 1992) (Kozinski, J., concurring); *United States v. Mesa-Rincon*, 911 F.2d 1433, 1442 (10th Cir. 1990); *United States v. Torres*, 751 F.2d 875, 885 (7th Cir. 1984) ("Television surveillance is identical in its indiscriminate character to wiretapping and bugging. It is even more invasive of privacy, just as a strip search is more invasive than a pat-down search . . . ."); *Trujillo*, 428 F.Supp.2d at 1107.

*Nerber* held that individuals lacked an expectation of privacy against video recording by informants when they visited a hotel room "solely to conduct a business transaction at the invitation of the occupants, with whom they were only minimally acquainted." 222 F.3d at 604. In contrast to this "substantially diminished" expectation of privacy, *id.* at 604 n.5, private homes like AbdelRahim's are subject to "the most stringent Fourth Amendment protection," *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976), and Defendants' video surveillance there violated the Fourth Amendment.

### 3. *Conversations to Which the Informant Was a Party*

The complaint also alleges a Fourth Amendment violation arising from that Defendants' use of the informant to gather "thousands of hours of audio recording of conversations . . . as well as recordings of religious lectures, discussion groups, classes, and other Muslim religious and cultural events occurring in mosques." FAC ¶ 2. Defendants argue that the vast majority of this recording was permissible without a warrant under the "invited informer" doctrine. *See* TW Br. 28-30; AAR Br. 29-32. But the Ninth Circuit has been clear that for the invited informer doctrine to apply, the "the government's investigation must be conducted in good faith; i.e., not for the purpose of abridging first amendment freedoms." *United States v. Aguilar*, 883 F.2d. 662, 705 (9th Cir. 1989), *superseded on other grounds by* 8 U.S.C. 1324; *see also United States v. Mayer*, 503 F.3d 740, 751 (9th Cir. 2007) ("Good faith has been an implicit requirement for investigations under the Fifth Amendment and searches under the Fourth Amendment."). Under this good

1    faith requirement, law enforcement must not investigate individuals for the purpose

2    of violating First Amendment rights, and must do so with a legitimate law

3    enforcement purpose.  *Mayer*, 503 F.3d at 752.  The allegations in the FAC paint a

4    detailed portrait of a dragnet surveillance operation undertaken by Defendants' to

5    survey the entire Muslim community in Southern California.  *See supra* Part II.A.

6    Based on the allegations, the Court could conclude that the requisite good faith was

7    absent here, given that the investigation was motivated by the perception, stated by

8    Defendants Allen and Armstrong, that "Islam is a threat to national security."  FAC

9    ¶¶ 121, 162. This is a classic example of a police operation conducted in bad faith

10   that would preclude the applicability of the invited informant doctrine.  *See also*

11   *Handschu v. Special Services Div.*, 349 F.Supp. 766, 770 (S.D.N.Y. 1972) (no

12   legitimate law enforcement purpose in infiltration of anti-war group).

       4.  ***Plaintiffs State A Plausible Claim For Violation Of The Foreign***
13
       ***Intelligence Surveillance Act***
14

15         Defendants argue that Plaintiffs lack standing on their FISA claim because

16   the statute provides relief only for plaintiffs subject to "electronic surveillance"

17   employed "under circumstances in which a person has a reasonable expectation of

18   privacy and a warrant would be required for law enforcement purposes."  50

19   U.S.C. 1801(f)(4); *see also Koyomejian*, 946 F.2d at 1453-54 (holding that FISA's

20   protections cover video surveillance).  For the reasons discussed in connection

21   with the Fourth Amendment claims, *see supra* Part II.F.1-3, the complaint pleads

22   detailed facts that render plausible the allegations that Plaintiffs were monitored

23   without a warrant in circumstances where they had a reasonable expectation of

24   privacy.  *See ACLU v. National Sec. Agency*, 493 F.3d 644, 657 n.16 (6th Cir.

25   2007) (noting FISA's "aggrieved person" status coextensive with Fourth

26   Amendment) (Batchelder, J.).

27         Defendants TW also misread § 1809's *mens rea* for liability, arguing that it

28   requires "intent to violate the law." *See* TW Br. 34.  The complaint sets forth

# ATTACHMENT A
# Claims Chart

## CLAIMS CHART
Fazaga v. FBI

| Claim | Harm | Remedy | General Defenses | | |
|---|---|---|---|---|---|
| | | | State Secrets | No Bivens Cause of Action | Qualified Immunity |
| 1st COA (1st A – Free Exercise; Bivens) | Religious Discrimination | $$$ | X | X | X |
| 1st COA (1st A – Free Exercise; Injunctive) | Religious Discrimination | Expunge Records | X | | |
| 2nd COA (§ 1985 – Free Exercise) | Religious Discrimination | $$$ | X | | X |
| 3rd COA (1st A – Establishment; Bivens) | Religious Discrimination | $$$ | X | X | X |
| 3rd COA (1st A – Establishment; Injunctive) | Religious Discrimination | Expunge Records | X | | |
| 4th COA (§ 1985 – Establishment) | Religious Discrimination | $$$ | X | | X |
| 5th COA: RFRA | Religious Discrimination | $$$ | X | | X |
| 6th COA: EP (Bivens) | Religious Discrimination | $$$ | X | X | X |
| 6th COA: EP (Injunctive) | Religious Discrimination | Expunge Records | X | | |

| Claim | Harm | Remedy | General Defenses | | |
|---|---|---|---|---|---|
| | | | State Secrets | No Bivens Cause of Action | Qualified Immunity |
| 7th COA: § 1985 (EP) | Religious Discrimination | $$$ | X | | X |
| 8th COA: Privacy Act | Religious Discrimination | Expunge Records | X | | |
| 9th COA: 4th A (Bivens) | Unlawful Search | $$$ | | X | X |
| 9th COA: 4th A (Inj.) | Unlawful Search | Expunge Records | | | |
| 10th COA: FISA | Unlawful Search | $$$ | | | X |
| 11th COA: FTCA – Privacy | Unlawful Search | $$$ | X? | | |
| 11th COA: 52.1 | Religious Discrimination | $$$ | X | | |
| 11th COA: IIED | Unlawful Search | $$$ | X? | | |
| | | | | | |

1   cannot prevail on their claim that the government intended to disrupt religion or

2   intended to discriminate on the basis of religion. Similarly, the Agent Defendants

3   will be unable to defend themselves from this charge. Accordingly, dismissal is

4   appropriate. *See Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998.)

5   **V.**     **PLAINTIFFS FAIL TO STATE A CLAIM UNDER *BIVENS***

6       **A.**     <u>**Plaintiffs' *Bivens* Claims Are Precluded By The Privacy Act**</u>

7         Plaintiffs' First, Third and Sixth Causes of Action seek monetary damages for

8   violations of the Free Exercise, Establishment and Equal Protection Clauses directly

9   under the First and Fifth Amendments to the United States Constitution pursuant to

10   *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388

11   (1971). (FAC ¶¶ 227, 232, 241.) However, the Supreme Court has never recognized

12   a *Bivens* action for violations of the Free Exercise, Establishment or Equal

13   Protection Clauses. *See, e.g., Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (noting

14   that the Supreme Court has recognized *Bivens* claims in just three contexts:

15   unreasonable searches in violation of the Fourth Amendment, employment

16   discrimination in violation of the Due Process Clause, and prisoner abuse under the

17   Eighth Amendment). Accordingly, Plaintiffs have no "automatic entitlement" to a

18   judicially devised cause of action for money damages under *Bivens*. *Id.*

19         "In *Wilkie*, the Court distilled its 35-year history of *Bivens* jurisprudence into

20   a two-step analysis for determining congressional intent as to the appropriateness of

21   a *Bivens* remedy." *Western Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116,

22   1120 (9th Cir. 2009). "First, the Court determines whether there is 'any alternative,

23   existing process for protecting' the plaintiff's interests." *Id.* "Such an alternative

24   remedy would raise the inference that Congress 'expected the Judiciary to stay its

25   *Bivens* hand' and 'refrain from providing a new and freestanding remedy in

26

27

28

1  damages.'" *Id.* (*citing Wilkie,* 551 U.S. at 550, 554).[2]

2      The Supreme Court has repeatedly found that Congressional action has

3  foreclosed the creation of a *Bivens* remedy for the same types of constitutional

4  injuries alleged here. *See, e.g., Bush v. Lucas,* 462 U.S. 367, 388 (1983) (claim

5  precluded by an "elaborate remedial system" – culminating with the Civil Service

6  Reform Act – for dealing with federal employee claims of First Amendment

7  discrimination); *Schweiker v. Chilicky,* 487 U.S. 412, 421 (1988) (Social Security

8  Act precluded Fifth Amendment due process claim). The Ninth Circuit has

9  identified several statutory schemes that preclude *Bivens* claims, including claims

10  arising under the Fifth and First Amendments. *See, e.g., Kotarski v. Cooper*, 866

11  F.2d 311, 312 (9th Cir. 1989) (following *Bush*); *Western Radio*, 578 F.3d at 1117

12  (Administrative Procedures Act bars First and Fifth Amendment claims); *Adams v.*

13  *Johnson*, 355 F.3d 1179 (9th Cir. 2004) (Internal Revenue Code bars First and Fifth

14  Amendment claims); *Libas Ltd. v. Carillo*, 329 F.3d 1128, 1130 (9th Cir. 2003)

15  (customs laws bar claims presumably brought under Fifth Amendment); *Berry v.*

16  *Hollander*, 925 F.2d 311, 314 (9th Cir. 1991) (Veterans Administration regulations

17  bar First and Fifth Amendment regulations).

18      In 1974, Congress enacted the Privacy Act in order to set forth "detailed

19  instructions" governing the government's "collection, maintenance, use, and

20  dissemination of information" about individuals in agency records. *Doe v. Chao*,

21  540 U.S. 614, 618 (2004); *see also* 5 U.S.C. § 552a(a)(3). Of particular relevance

22  here, the Privacy Act explicitly requires federal agencies to "maintain no record

23  describing how any individual exercises rights guaranteed by the First Amendment"

24

25  ————————————————

26  [2] The second step involves determining "whether there are nevertheless 'factors
counseling hesitation' before devising such an implied right of action." *Id.* at 1120.

27  The Agent Defendants join in Defendants Walls and Tidwell's and Defendants
United States of America, FBI, Mueller and Martinez's analysis of this second step.

28

ER - 156

1    unless certain exceptions apply. 5 U.S.C. § 552a(e)(7). The term "maintain" as used

2    in subsection (e)(7) includes "collect." *Id.* § 552a(a)(3). Thus, the Privacy Act limits

3    the government's ability to collect information on a citizen's religious activity.

4         Congress also crafted a carefully calibrated set of judicial remedies for

5    violations of the Privacy Act, including violations of the constitutional provisions of

6    subsection (e)(7). A citizen aggrieved by a violation of the Privacy Act may bring a

7    civil suit against the agency, and obtain a minimum $1000 in damages, plus

8    attorneys' fees in all cases where the agency's conduct was willful or intentional. 5

9    U.S.C. § 552a(g)(1)(D), (g)(4); *see generally Cooper v. FAA*, 596 F.3d 538, 543

10   (9th Cir. 2010) (describing remedies available under the Privacy Act).

11        Courts have recognized that the Privacy Act is a comprehensive remedial

12   scheme that supplants *Bivens* claims. In *Downie v. City of Middleburg Heights*, 301

13   F.3d 688 (6th Cir. 2002), a former informant sued federal officers who allegedly

14   disseminated false information about him in violation of the First Amendment,

15   because he criticized an ongoing investigation. The Sixth Circuit refused to imply a

16   *Bivens* remedy under the First Amendment "because the Privacy Act is a

17   comprehensive legislative scheme that provides a meaningful remedy for the kind of

18   wrong" informant alleged. *Id.* at 696. Because each of the informants' constitutional

19   claims arose out of the "the creation, maintenance, and dissemination of false

20   records," dismissal of the *Bivens* claim was warranted. *Id.*

21        More recently, in *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008), *cert. denied*

22   129 S. Ct. 2825 (2009), Valerie Wilson and Joseph Wilson sued, among others, Vice

23   President Richard Cheney, for disclosing Valerie Wilson's status as a covert agent

24   for the CIA. "The Wilsons' *Bivens* claims were based on alleged violations of their

25   Fifth Amendment rights to equal protection of the laws, of Joseph Wilson's First

26   Amendment right to freedom of speech, and of Valerie Wilson's Fifth Amendment

27   rights to privacy and property." *Id.* at 703. As in *Downie*, the *Wilson* court held that

28   the Privacy Act was a "'comprehensive scheme' that stops us from providing

1    additional remedies under *Bivens*." *Id.* at 707. Even though the Wilsons "pled in

2    terms of privacy, property, due process, or the First Amendment," the Court

3    concluded that they sought damages "from the improper disclosure of information

4    covered by the Privacy Act," and therefore dismissed the *Bivens* claim. *Id.*

5          Plaintiffs' *Bivens* claims here allege harm from the improper "collection" of a

6    "record describing how any individual exercises rights guaranteed by the First

7    Amendment" – conduct which is expressly prohibited by the Privacy Act.

8    Throughout the complaint, Plaintiffs allege that the FBI "gathered the information

9    [about Plaintiffs] simply because the targets were Muslim." (*See, e.g.,* FAC ¶ 3.)

10    Indeed, the First, Third and Sixth Causes of Action under *Bivens* each seek relief for

11    a supposed "scheme to target Plaintiffs for surveillance because of Plaintiffs'

12    adherence to and practice of the religion of Islam." (*Id.* at ¶¶ 227, 232, 241.)

13          Congress fashioned the Privacy Act to remedy precisely the injury alleged

14    here: that a federal agency would collect information on how Plaintiffs "exercise

15    rights guaranteed by the First Amendment." 5 U.S.C. § 552a(e)(7). Indeed, Plaintiffs

16    cannot dispute that their complaint falls within the ambit of the Privacy Act, in light

17    of their Eighth Cause of Action, which asserts a violation of the very subsection

18    (e)(7) of the Privacy Act that precludes their *Bivens* claims. Specifically, the Eighth

19    Cause of Action alleges that the FBI "collected and maintained records describing

20    how Plaintiffs exercise their rights to free speech and free exercise of religion

21    guaranteed by the First Amendment." (FAC ¶ 246.) As Plaintiffs admit in their

22    Eighth Cause of Action, the Privacy Act provides them with a remedy for the

23    constitutional violation alleged in the FAC.

24          Admittedly, the Privacy Act limits Plaintiffs to recovery of damages from the

25    United States, and not from the Agent Defendants individually. But this does not

26    save Plaintiffs' *Bivens* claims. When "the design of a Government program suggests

27    that Congress has provided what it considers adequate remedial mechanisms for

28    constitutional violations that may occur in the course of its administration, we have

1    not created additional *Bivens* remedies." *Western Radio,* 578 F.3d at 1120 (citations

2    omitted). Indeed, the plaintiffs in *Wilson* argued that "the Privacy Act should not be

3    found comprehensive and preclusive of Bivens remedies here because three

4    defendants [including Vice President Cheney] in this case are exempted from its

5    terms." *Wilson,* 535 F.3d at 707. However, the D.C. Circuit rejected this argument,

6    noting that "[t]he failure of the Privacy Act to provide complete relief to the

7    Wilsons, however, does not undermine its status as a 'comprehensive scheme' that

8    stops us from providing additional remedies under *Bivens*." *Id.* Congress need not

9    grant a remedy for every constitutional wrong in order to supplant the *Bivens*

10   remedy: that Congress has acted is enough to defeat an implied right of action for

11   damages under *Bivens*. Accordingly, the Agent Defendants' motion to dismiss the

12   First, Third and Sixth Causes of Action should be granted.

13             **B.**      **Plaintiffs Fail To Allege An Unlawful Purpose**

14         Much like Section 1985(3), a discrimination claim under *Bivens* requires that

15   Plaintiffs allege an intentional violation of Plaintiffs' rights. *Iqbal*, 129 S. Ct. at

16   1948-49 (2009). The Court noted that "[w]here the claim is invidious discrimination

17   in contravention of the First and Fifth Amendments, our decisions make clear that

18   the plaintiff must plead and prove that the defendant acted with discriminatory

19   purpose." *Id.* at 1948. This purpose is "more than 'intent as volition or intent as

20   awareness of consequences.'" *Id.* (*quoting Pers. Admin'r of Mass. v. Feeney*, 442

21   U.S. 256, 279 (1979).) "It instead involves a decisionmaker's undertaking a course

22   of action because of, not merely in spite of, the action's adverse effects upon an

23   identifiable group." *Id.* (alterations omitted). In other words, Plaintiffs must show

24   that the policy at issue was adopted "not for a neutral, investigative reason but for

25   the purpose of discriminating on account of … religion." *Id.* at 1949. This intent

26   must be supported by factual allegations, not mere conclusions. *Iqbal*, 129 S. Ct. at

27   1949 ("pleading that offers labels and conclusions or a formulaic recitation of the

28   elements of a cause of action will not do.")

("Holder Decl.") ¶¶ 3-4, 12 (Dkt. 32-3, filed August 1, 2011). The basis for the

Attorney General's privilege assertion is set forth to the extent possible on the

public record in the Attorney General's unclassified declaration, as well as in an

unclassified declaration of Mark Giuliano, Assistant Director of the FBI's

Counterterrorism Division (Dkt. 33, filed August 1, 2011). Details concerning

why this information is properly protected from disclosure are set forth in the

classified declaration of Mr. Giuliano submitted on August 1, 2011, for the Court's

*ex parte, in camera* review. *See* Notice of Lodging at Dkt. 35.[1] In accord with a

policy announced on September 23, 2009, the Attorney General's privilege

assertion in this case is "necessary to protect against the risk of significant harm to

national security." *See* Holder Decl. ¶ 12 and Exhibit 1 thereto (State Secrets

Policy).

Importantly, however, the Attorney General's privilege assertion is limited

in nature, and the Government's request for dismissal is narrowly tailored. The

Government does not seek dismissal of all claims at the outset based on the

privilege assertion, nor to bar disclosure of all information concerning Operation

Flex or Monteilh's activities. The Government's motion relies first on

considerations apart from state secrets that require dismissal of plaintiffs' claims.

The Government's motion then seeks to distinguish between claims for which

---

[1] Mr. Giuliano has executed a supplemental classified declaration that updates the status of certain investigations discussed in his prior classified declaration. *See* Notice of Filing Supplemental Classified Declaration filed herewith. Through these classified *ex parte, in camera* submissions, the Government seeks to inform the Court at the outset of this case as to the sensitive, privileged facts that the Government believes must be protected from disclosure and excluded from the case. The Government does not consent to the disclosure of the information described in the classified Giuliano declarations to plaintiffs or their counsel.

privileged evidence would be required and claims that may not require such evidence.  Where litigation of a claim would risk or require the disclosure of privileged information, and the claim is not otherwise dismissed on non-privilege grounds, the need to protect properly privileged information would require dismissal of that claim.

With respect to non-privilege grounds for dismissal, the United States seeks dismissal of the newly raised FTCA claims for failure to state a claim upon which relief can be granted, for the reasons detailed below.  In addition, the FBI and official capacity defendants first seek dismissal or, in the alternative, summary judgment on the grounds that the relief sought by plaintiffs against these defendants — the disclosure and expungement of alleged records — is not authorized or available under the Privacy Act or other law.  Because this is the only relief plaintiffs seek for all of their claims against these defendants, the Court should dismiss the entire Amended Complaint as to the FBI and Defendants Mueller and Martinez on this ground.  In addition, plaintiffs' claims against the FBI, official capacity defendants, and the United States brought pursuant to Section 1810 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1810, should be dismissed because sovereign immunity bars this cause of action as to the United States and Government officials sued in their official capacities.

Absent dismissal on the non-privilege grounds advanced herein, the FBI and official capacity defendants do not seek to dismiss plaintiffs' Fourth Amendment and FISA claims based on the state secrets privilege.  At least at this stage of the proceedings, sufficient non-privileged evidence may be available to litigate these claims should they otherwise survive motions to dismiss on non-privilege grounds. The FBI has previously disclosed in a separate criminal proceeding that Monteilh collected audio and video information for the FBI, and some of that audio and

video information was produced in that prior case. *See* Public Declaration of Mark. F. Giuliano ("Pub. Giuliano Decl.") ¶ 12 (Dkt. 33). The FBI has been reviewing additional audio and video collected by Monteilh for possible disclosure in connection with further proceedings on the issue of whether the FBI instructed or permitted Monteilh to leave recording devices unattended in order to collect non-consenting communications. *See id.* The FBI expects that the majority of the audio and video will be available in connection with further proceedings. Thus, while it remains possible that the need to protect properly privileged national security information might still foreclose litigation of these claims, at present the FBI and official capacity defendants do not seek to dismiss these claims based on the privilege assertion.

In contrast, however, litigating plaintiffs' allegations of an indiscriminate investigation based solely on religion would risk or require the disclosure of properly privileged information and, unless these claims are dismissed on non-privilege grounds, the Government seeks their dismissal as to all defendants at the outset based on the state secrets privilege. While presented under various statutory and constitutional theories, plaintiffs' discrimination claims raise one issue: whether the FBI, through its agents, impermissibly investigated and collected information on plaintiffs (and other putative class members) based solely on their religion. *See* FAC, Causes of Action 1 to 7, at 62-65; *see also id.* Cause of Action 11 at 67-68 (FTCA). These claims put at issue core privileged information concerning the scope and purpose of Operation Flex. Because plaintiffs allege that the FBI indiscriminately collected information based solely on religion, any rebuttal of this claim would risk or require disclosure of whom and what the FBI was investigating under Operation Flex and why. This is precisely the kind of sensitive investigative information that cannot be disclosed without risking

1  national security.  But the Government does not seek to dismiss all claims in this

2  case based on the privilege assertion.  In order to limit the impact of the Attorney

3  General's privilege assertion, the Government first sets forth reasons, independent

4  of the state secrets privilege, as to why plaintiffs' claims against the FBI and

5  official capacity defendants, as well as against the United States under the FTCA,

6  should be dismissed.  To the extent that plaintiffs' Fourth Amendment and FISA

7  claims survive motions to dismiss by the Government and individual capacity

8  defendants, information needed to litigate these claims may be available, and the

9  Government does not seek to dismiss them based on the privilege assertion at this

10  time.[2]  However, to the extent plaintiffs' claims are not dismissed on non-privilege

11  grounds, the Court should find that litigation of plaintiffs' various claims

12  challenging an alleged discriminatory investigation, *see* FAC, Claims 1-7, 11,

_____

14     [2] During the conferral process prior to this motion under Local Rule 7-3,
plaintiffs indicated that their Fourth Amendment challenge to the alleged
15  collection of communications by Monteilh through an audio device extends solely
to the alleged collection of audio in circumstances where a recording device was
16  allegedly left unattended and there was no consent to Monteilh's presence.  *See*
FAC ¶¶ 98, 125-128, 192; *see also id.* ¶ 251 (alleging Fourth Amendment violation
17  through alleged audio recordings "without a warrant and where no party to the
communication consented").  The law is clear that no Fourth Amendment violation
18  would arise in the warrantless collection of consensual communications by a
confidential informant.  *Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408, 17
19  L. E. 2d 374 (1966); *United States v. Aguilar, et al.*, 871 F.2d 1436, 1471 (9th Cir.
1989).  This "invited informer" doctrine applies regardless of the means by which
20  communications are collected (including by video surveillance) where there was
consent to the informant's presence.  *See, e.g. United States v. Nerber,* 222 F.3d
21  597 (9th Cir. 2000) (warrantless video surveillance of hotel room does not violate
the Fourth Amendment as to communications collected in the consensual presence
22  of a confidential informant); *United States v. Lee*, 359 F.3d 194 (3rd Cir. 2004)
(Alito, J.) (same).  Thus, to the extent plaintiffs seek to challenge the alleged
23  collection of communications where they consented to Monteilh's presence, they
fail to state a Fourth Amendment claim.

communications that occurred in Monteilh's presence, this conduct is not actionable because there is no analogous state law liability. Second, with respect to claims brought under California Civil Code Section 52.1, the Amended Complaint fails to allege facts that, if proven, would establish that the United States acted violently or threatened violence and, therefore, fails to state claims for relief. Third, with respect to plaintiffs' claims for intentional infliction of emotional distress, the Amended Complaint fails to allege facts that, if proven, would establish that plaintiffs suffered severe or extreme emotional distress and, therefore, fails to state claims for relief. In addition, to the extent the emotional distress claims are based on allegations that Monteilh's conduct directly caused plaintiffs' emotional distress, they are barred by the FTCA's two-year statute of limitations. Finally, plaintiffs fail to state an emotional distress claim based on alleged surveillance. Each ground for dismissal of the FTCA claims is discussed in turn below.

**1.  Because California Law Permits Law Enforcement Officers to Conduct Consensual Monitoring, the Alleged Surveillance is Not Actionable**.

To the extent that plaintiffs' claims are based upon the alleged audio and video surveillance of their communications that occurred in Monteilh's presence, this conduct is not actionable against the United States. Because law enforcement officers in California are permitted to monitor communications in situations where one party to the communications provides his consent, the FBI's alleged audio and video surveillance of the Plaintiffs' activities with Monteilh's consent was privileged and, therefore, these particular FTCA claims must be dismissed.

Pursuant to 28 U.S.C. § 2674, "[l]iablity is determined by the tort law of the state where the claim arose." *Galvin v. Hay*, 361 F.3d 1134, 1152 (9th Cir. 2004), citing *Gasho v. United States*, 39 F.3d 1420, 1427 (9th Cir. 1994). As this Court has held, in an action under the FTCA, a district "court must apply the law that the state courts would apply in the analogous tort action, including federal law." *Tekle*

-27-

1   *v. United States*, No. 01-3894, 2009 WL 1303357, at *7 (C.D. Cal. May 8, 2009)

2   (citation omitted).

3           Law enforcement officers are commonly afforded a privilege under state law

4   to engage in conduct that would be tortious if committed by a private citizen.  In

5   such instances, the conduct of law enforcement officers is privileged.  *See, e.g.,*

6   *Hinojosa v. City of Terrell*, 834 F.2d 1223, 1231 (5th Cir. 1988) (privilege to use

7   force when necessary in the performance of police officer duties), *cert. denied*, 493

8   U.S. 822 (1989); *Dalrymple v. United States*, No. 03-20588, 2005 WL 2456213,

9   *7, 12 (S.D. Fla. May 6, 2005) (privilege to use reasonable force, including tear

10  gas); *Andrade v. United States*, 116 F. Supp. 2d 778, 787-88 (W.D. Tex. 2000)

11  (privilege to engage in certain conduct which could be considered tortious where

12  police officer acts in furtherance of the public interest); *Reynolds v. United States*,

13  927 F. Supp. 91, 97 (W.D.N.Y. 1996) (right to enter private property where officer

      acted for a public purpose).

14          For example, in *Galvin v. Hay*, the Ninth Circuit affirmed dismissal of an

15  FTCA suit based on a finding that California law protects law enforcement officers

16  from liability for false arrest if they are acting within the scope of their authority

17  and had a reasonable belief the arrest was lawful.  *Galvin*, 361 F.3d at 1152.

18  Likewise, in *Tekle*, this Court found that "the routine and lawful exercise of law

19  enforcement privileges" of the California penal code are available to the United

20  States as a defense in FTCA actions.  *Tekle*, 2009 WL 1303357 at *12.  It

21  specifically found that "[u]nder California law, law enforcement officers are

22  entitled to use reasonable force to effectuate an arrest or detention, even a

23  temporary detention."  *Id.* (citing Cal. Penal Code § 835).  The court also found

24  that because this privilege covered conduct alleged against the federal agents, the

25  "Plaintiff's FTCA claims are privileged under California law."  *Id.*

26          As pertinent to the instant case, in California, law enforcement officials and

27  agents are permitted to overhear or record communications in situations where a

28                                          -28-

party to the communications has provided his consent. *See Doe v. City of Mateo*, No. C 07-5596, 2010 WL 1541279, *5 (N.D. Cal. Apr. 16, 2010) (finding that officer's recording of telephone conversations with plaintiff was privileged under Cal. Pen. Code § 633, court denied request to amend complaint to add privacy claims under California Constitution, Article 1, section 1, and Cal. Pen. Code "§ 637.2 that provides for a private right of action by any person injured under Section 632"), quoting *People v. Windham*, 51 Cal. Rptr. 3d 884, 889-90 (Cal. Ct. App. 2007) ("[California] courts expressly held that statutory and constitutional prohibitions against the recording of telephone communications did not apply where law enforcement recorded calls with the consent of one of the parties to the conversation,'" relying on *People v. Murphy*, 8 Cal. 3d 348, 358-61 (1972) (monitoring of telephone conversations by police was not unlawful because witnesses agreed to monitoring and to wear a transmitter); *People v. Fulton*, 201 Cal. Rptr. 879, 882, 886 (Cal. Ct. App. 1984) (monitoring of communications by police was not unlawful because informant agreed to wear a "secret transmitter"); and *People v. Canard*, 65 Cal. Rptr. 15 (Cal. Ct. App. 1967)).

Moreover, the California law enforcement privilege is consistent with 18 U.S.C. § 2511(2)(c) (permitting the interception of wire or oral communications where one party has given prior consent to such interception) and "the so-called 'invited informer' cases; the cases permitting consensual recording of conversations without warrants." *United States v. Aguilar*, 871 F.2d 1436, 1471 (9th Cir. 1989). In *Aguilar*, the defendants were convicted on immigration violations for participating in smuggling, transporting, and harboring illegal aliens. "The government stipulated at trial that it had used undercover agents and informants . . . to infiltrate various church meetings and activities." *Id*. at 1470. On appeal, the appellants' principal objection was that government agents tape recorded their activities without a warrant in violation of their constitutional rights, particularly the First Amendment, which rendered the invited informer rationale

-29-

ER - 166

inapplicable.  Rejecting the appellants' arguments, the Ninth Circuit stated:

> In approving this investigative technique the Supreme Court unmistakably declared that persons have no expectation of privacy or confidentiality in their conversations and relations with other persons, no matter how secretive the setting.  While privacy, trustworthiness, and confidentiality are undoubtedly at the very heart of many instances of free association and religious expression and communication, the Court has recognized that legitimate law enforcement interests require persons to take the risk that those with whom they associate may be government agents.

*Id.* at 1472 (relying on *United States v. Caceres*, 440 U.S. 741, 99 S. Ct. 1465, 59 L. Ed. 2d 733 (1979); *United States v. White*, 401 U.S. 745, 91 S. Ct. 1122, 28 L. Ed. 2d 453 (1971); *Hoffa v. United States*, *supra*, 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966); *Lewis v. United States*, 385 U.S. 206, 87 S. Ct. 424, 17 L. Ed. 2d 312 (1966)).

Here, the Amended Complaint alleges that a substantial portion of the communications Monteilh agreed to record[11] occurred "in the [mosques] by invitation, and every conversation which he heard was either directed at him or knowingly carried on in his presence," *Hoffa*, 385 U.S. at 302.  *See* FAC at ¶ 51("Congregants . . . generally welcomed Monteilh . . ., invited him to have meals or tea outside of the mosque . . . and discuss questions he might have"); ¶¶ 73-76 ("Monteilh talked frequently with Malik at the mosque"); ¶ 77 ("Malik noticed that Monteilh spoke with many others at the mosque"); ¶¶ 82-84 ("Monteilh called AbdelRahim and began socializing with AbdelRahim and his roommates");  ¶¶ 100-115 (Monteilh collected information by speaking to large numbers of people, attending events open to the public, collecting literature, and using email); ¶¶ 122-124, 128-129, 200-202 (Monteilh recorded conversations and videotaped in public places or places where he was invited).

---

[11]  *See* FAC ¶ 48 (alleging the FBI hired Monteilh as an informant to covertly gather information).

-30-

Because law enforcement officers in California are permitted to conduct consensual monitoring of communications, the FBI's alleged audio and video surveillance of plaintiffs' communications with Monteilh's consent that occurred in his presence was privileged and not actionable against the United States under the FTCA.

### 2. The Amended Complaint Fails to State Claims for Relief under California Civil Code Section 52.1.

Because the Amended Complaint fails to allege that the Defendants acted violently or threatened plaintiffs with violence, the claims brought under California Civil Code Section 52.1 fail to state claims for relief and, therefore, must be dismissed.

Section 52.1, colloquially known as the Bane Act, "does not provide any substantive protections; instead, it enables individuals to sue for damages as a result of constitutional violations." *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996), *overruled on other grounds by Acri v. Varian Assoc. Inc.*, 114 F.3d 999 (9th Cir. 1997).

The prerequisites for maintaining a claim under section 52.1 are as follows:

> (1) that the defendant interfered with or attempted to interfere with the plaintiff's constitutional or statutory right by threatening or committing violent acts; (2) that the plaintiff reasonably believed that if she exercised her constitutional right, the defendant would commit violence against her or her property; that the defendant injured the plaintiff or her property to prevent her from exercising her right or retaliate against the plaintiff for having exercised her right; (3) that the plaintiff was harmed; and (4) that the defendant's conduct was a substantial factor in causing the plaintiff's harm.

*McCue v. S. Fork Union Elementary Sch.*, No. 10-cv-233, 2010 WL 3958278, at *3 (E.D. Cal. Oct. 8, 2010) (quoting *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 882 (Cal. Ct. App. 2007)).

Subsection j of section 52.1 "explicitly provides that violence is a required element where the 'threat, intimidation or coercion' is based purely upon a

-31-

ER - 168

### B. The Court Should Exclude Information Subject to the Privilege Assertion from Further Proceedings in this Case.

Procedural formalities aside, the next question is whether the privilege should be upheld and the privileged information excluded from the case. As described in general and unclassified terms, the Attorney General's privilege assertion extends to three categories of information:

(i)   *Subject Identification*: Information that could tend to confirm or deny whether a particular individual was or was not the subject of an FBI counterterrorism investigation, including in Operation Flex.

(ii)  *Reasons for Counterterrorism Investigation and Results*: Information that could tend to reveal the initial reasons (i.e., predicate) for an FBI counterterrorism investigation of a particular person (including in Operation Flex), any information obtained during the course of such an investigation, and the status and results of the investigation. This category includes any information obtained from the U.S. Intelligence Community related to the reasons for an investigation.

(iii) *Sources and Methods*: Information that could tend to reveal whether particular sources and methods were used in a counterterrorism investigation of a particular subject, including in Operation Flex. This category includes previously undisclosed information related to whether court-ordered searches or surveillance, confidential human sources, and other investigative sources and methods were used in a counterterrorism investigation of a particular person, the reasons such methods were used, the status of the use of such sources and methods, and any results derived from such methods.

Holder Decl. ¶ 4; Pub. Giuliano Decl. ¶ 15.

The Attorney General, supported by the FBI's Assistant Director for the Counterterrorism Division, has explained on the public record why the disclosure of the above information reasonably could be expected to cause significant harm to national security. *See generally* Holder and Pub. Giuliano Decls. Among other concerns identified by these officials, disclosure of the identities of subjects of counterterrorism investigations could alert those subjects to the FBI's interest in them and cause them to attempt to evade detection, destroy evidence, and undertake counter-actions that could put confidential informants or law

-43-

enforcement officers at risk. *See* Pub. Giuliano Decl. ¶ 23. The disclosure of the subjects of counterterrorism investigations could also cause their associates to take similar steps to avoid FBI scrutiny and hinder investigation. *See id.*

Disclosure that an individual is *not* a subject of a national security investigation likewise could reasonably be expected to cause significant harm to national security in several ways. For example, individuals inclined to commit terrorists acts could be motivated to do so while they know they are not being monitored. Public Giuliano Decl. ¶ 24. In addition, disclosure that some persons are not subject to investigation, while the status of others is left unconfirmed, would enable individuals and terrorists groups alike to manipulate the system to discover whether they or their members are subject to investigation. *See id.*

Similarly, even where an investigation of a subject has been closed, disclosure that an individual was formerly the subject of a counterterrorism investigation could also reasonably be expected to cause significant harm to national security interests. Again, to the extent that an individual had terrorist intentions that were not previously detected, the knowledge that he or she is no longer the subject of investigative interest could embolden him or her to carry out those intentions. *See* Public Giuliano Decl. ¶ 25. And even if the former subjects are entirely law-abiding, disclosure that they had been investigated could still provide valuable information to terrorist and terrorists organizations about the FBI's intelligence and suspicions, particularly where associates of former subjects may still be under investigation. *See id.* ¶ 26. Finally, where new information may arise about a person, the fact that investigations are closed does not mean that the subjects have necessarily been cleared of wrongdoing. *See id.* ¶ 25.

For closely related reasons, disclosure of the reasons for and substance of a counterterrorism investigation reasonably could be expected to cause significant harm to national security by revealing to subjects involved in terrorist activities what the FBI knows or does not know about their plans. *See* Pub. Giuliano Decl.

¶ 29.  Further, disclosure of the reason for an investigation could provide insights to terrorists as to what type of information is sufficient to trigger an inquiry by the FBI, and what sources and methods the FBI employs to obtain information on a person.  *See id.*  Disclosure of these sources and methods would itself reasonably be expected to cause significant harm not only by revealing the identities of particular subjects, but also by providing a road map to adversaries on how the FBI goes about detecting and preventing terrorist attacks.  *See id.* ¶ 31.

The basis for the Attorney General's privilege assertion is set forth further in the classified declaration offered by the FBI.  *See generally* Classified Declaration of Mark F. Giuliano dated August 1, 2011(submitted for *in camera, ex parte* review).  The Government cannot further explain precisely those matters covered by the privilege lest the process asserting privilege jeopardize the very information the privilege is designed to protect.  *Jeppesen*, 614 F.3d at 1086.  But the Court should find that the Government has fully and sufficiently demonstrated the basis for the privilege assertion in this case, and thus should exclude the privileged information from further proceedings in this case.[13]

### C.    The Exclusion of Properly Privileged Information Requires the Dismissal of the Claims Based on Allegations of Discrimination Based on Religion.

As *Jeppesen* explains, once the state secrets privilege is upheld, the next question for the Court to decide is what consequences exclusion of the privileged information will have on further proceeding in the case.  The issue is especially appropriate for consideration at the pleading stage where it is apparent that privileged information would be needed to pursue litigation of the case, or at least

---

[13]  While *ex parte, in camera* classified submissions are not required for an assertion of the privilege, *see Reynolds*, 345 U.S. at 8, the Government has commonly provided such submission in order to assist the Court in ascertaining whether the circumstances for the privilege assertion are appropriate.  *See, e.g. Kasza*, 133 F.3d at 1169-70; *Jeppesen*, 614 F.3d at 1084 n.6.

-45-

certain claims.  This question requires the Court to assess the nature of the proof needed to decide the claims being raised and the extent to which litigation of those claims would risk or require the disclosure of privileged information.  *Jeppesen*, 614 F.3d at 1082-83.

(1) *Individual Capacity Claims*: The Court should address the impact of the privilege assertion on the individual capacity claims first.  Most of the allegations and claims in the case center on the alleged action of the individual capacity defendants, and these defendants are entitled to early consideration of whether the lawsuit should proceed against them.  As set forth below, information properly protected by the Attorney General's privilege assertion should foreclose litigation of at least plaintiffs' claims based on an alleged indiscriminate collection of information based solely on religion.

First, where constitutional claims are raised against federal officers in their personal capacities, a key threshold question is whether a *Bivens* cause of action against the individual defendants exists in the circumstances presented.  Specifically, the Supreme Court has held that there can be no *Bivens* remedy against federal officials where "special factors counselling hesitation" exist.  *Wilkie v. Robbins*, 551 U.S. 537, 550, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007) (quoting *Bush v. Lucas*, 462 U.S. 367, 378, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983)).  National security concerns constitute just such a special factor, *see Arar v. Ashcroft*, 585 F.3d 559, 573, 575 (2d Cir. 2009), particularly where litigation of the claims would subject sensitive and classified intelligence information to judicial scrutiny.  *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008).  Permitting the claims to go forward would run the risk of disclosure that might "undermine ongoing covert operations" aimed at protecting national security.  *Id.*  Moreover, to the extent that allowing litigation to proceed would "very likely mean that some documents or information . . . would be redacted, reviewed *in camera*, and otherwise concealed from the public," the Court's potential reliance on such

-46-

information further counsels "hesitation" that precludes a *Bivens* remedy, "given the strong preference in the Anglo-American legal tradition for open court proceedings." *Arar*, 585 F.3d at 576-77. Thus, the Government's assertion of privilege in this case has a particular bearing first on the individual capacity defendants' threshold defenses under the *Bivens* doctrine.

Second, even apart from whether plaintiffs have a cause of action under *Bivens* for their constitutional claims, full and effective litigation of these claims, as well as the statutory claims plaintiffs have raised against the individual capacity defendants, would risk or require the disclosure of privileged information. Plaintiffs' allegations of a discriminatory investigation based solely on religion directly put at issue information that is subject to the Attorney General's privilege assertion. At their core is the claim that defendants' alleged surveillance and investigation of plaintiffs unlawfully burdened plaintiffs' free exercise of their religion. To advance their claims, plaintiffs would need to proffer evidence in support of their allegations concerning the nature and scope of Operation Flex, including evidence that the FBI impermissibly engaged in indiscriminate surveillance based solely on religion. Any defense would likewise put at issue and thereby risk or require the disclosure of information concerning how Operation Flex was conducted — including who may have been subject to investigation and why, as well as how and why the FBI collected information on the matter. The Court, in turn, would have to determine, whether, in fact, defendants' actions were targeted at plaintiffs based on their religion. If plaintiffs were able to overcome that hurdle, the Court would then have to determine (1) whether the Government acted pursuant to a compelling state interest, and (2) whether the government's actions were narrowly tailored to achieve that interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993); *see also Presbyterian Church v. United States*, 752 F. Supp. 1505,

-47-

1513 (D. Ariz. 1990).[14]  These are fundamentally fact-driven determinations that require detailed inquiry into the nature of, and reason for, any investigative activity undertaken by defendants with respect to plaintiffs, and thus risk or require disclosure of the privileged information.

On this point, *Presbyterian Church* is instructive.  In that case, the plaintiffs alleged that surveillance of their church services by undercover INS agents violated their First and Fourth Amendment rights.  The Ninth Circuit held that plaintiffs had established standing for their First Amendment free exercise claim, and remanded to the district court to determine whether plaintiffs had standing to pursue prospective injunctive relief.  *Presbyterian Church v. United States*, 870 F.2d 518, 528-29 (9th Cir. 1989).  On remand, the district court, finding that plaintiffs had standing and that the case was not moot, proceeded to the free exercise inquiry.  After examining the evidence presented in defendants' summary judgment motion, the court held that the government had a compelling state interest "based on border security and national sovereignty to conduct an investigation into the alleged unlawful activities of the Sanctuary Movement," a network of religious activists that aided Central and South American refugees by bringing them into the United States, and had "demonstrated a significant and intimate relationship between the conduct in which it engaged and the government interest sought to be achieved."  *Presbyterian Church*, 752 F. Supp. at 1508 n.1, 1514, 1515.  Of particular note, the facts underlying the INS investigation were made public during the criminal prosecutions of several individuals who were

---

[14]  Similarly, to evaluate plaintiffs' RFRA claim, assuming the Court finds that defendants' actions substantially burdened plaintiffs' exercise of religion (although defendants do not concede that point), it would have to determine whether that burden was (1) in furtherance of a compelling interest, and (2) the least restrictive means of furthering that interest.  *See* 42 U.S.C. § 2000bb-1(b); *Navajo Nation v. U.S. Forest Svc.*, 535 F.3d 1058, 1068 (9th Cir. 2008).

-48-

involved with the Sanctuary Movement, and thus there was no issue in that case as to whether disclosure of those facts would harm national security. *Presbyterian Church v. United States*, 870 F.2d at 520; 752 F. Supp. at 1507-08.

Here, any inquiry into whether the Government had a compelling interest and whether its actions were narrowly tailored would turn on whether defendants were conducting properly predicated investigations or, as alleged in the Amended Complaint, were indiscriminately gathering information on persons based solely on their religion. Evidence needed to establish that defendants' investigations were, in fact, properly predicated and focused again would include the specific parameters of "Operation Flex," including who may have been subject to investigation, why, and how the investigations were carried out by the FBI. Thus, litigation of plaintiffs' discrimination claims inherently would risk or require the disclosure of evidence concerning who was subject to Operation Flex investigations and the reasons these subjects were under investigation, as well as sources and methods used in these investigations. This information falls squarely within the three categories of information over which the Attorney General has asserted privilege. Thus, for plaintiffs to support their claims of religious discrimination, or for the defendants to mount a full and effective defense against the religious discrimination claims "would create an unjustifiable risk of revealing state secrets, even if plaintiffs could make a prima facie case . . . with nonprivileged evidence." *Jeppesen*, 614 F.3d at 1088 (collecting cases); *see also Kasza*, 133 F.3d at 1166.

Nor can this risk be averted by the implementation of precautionary procedures by the district court. As the Ninth Circuit has made clear:

> Adversarial litigation, including pretrial discovery of documents and witnesses and the presentation of documents and testimony at trial, is inherently complex and unpredictable. Although district courts are well equipped to wall off isolated secrets from disclosure, the challenge is exponentially greater in exceptional cases . . . where the relevant secrets are difficult or impossible

-49-

to isolate and even efforts to define a boundary between
privileged and unprivileged evidence would risk
disclosure by implication.

*Jeppesen*, 614 F.3d at 1089. This is just such an exceptional case. As
demonstrated further in the classified August 1, 2011, Giuliano Declaration, even if
some non-privileged evidence were available for plaintiffs to present a *prima facie*
case or the defendants to respond, properly privileged information would remain at
issue and would either be required to litigate the case or at the very least be at risk
of disclosure in further proceedings on the issues raised by plaintiffs' claims that
the FBI's investigations were improperly based solely on religion.[15]

For these reasons, the Court should, at a minimum, dismiss Causes of Action
1-7 as to the individual capacity defendants. Dismissal of these defendants is
particularly warranted because they have unique threshold arguments. Moreover,
the Government has a separate, independent interest in protecting against the
disclosure of properly privileged information that would inherently be at risk of
disclosure in any litigation of the individual capacity claims.

(2) *Government Defendants*: Finally, the Court should consider the impact of
the privilege assertion on plaintiffs' claims against the FBI and official capacity
defendants, as well as against the United States under the FTCA, to the extent they
are not dismissed on the non-privileged grounds set forth above. The same
privileged evidence at issue in plaintiffs' claims of religious discrimination against
the individual capacity defendants is at issue in the same claims against the
Government. In either case, litigation of the claims would either require that

---

[15] In further support of this point, the Government previously lodged a
classified supplemental brief for the Court's *in camera, ex parte* review that
describes the evidence subject to the Attorney General's privilege assertion that
would be at risk of disclosure or needed by defendants in responding to plaintiffs'
religious discrimination claims. *See* Notice of Lodging of Classified *In Camera,
Ex Parte* Supplemental Memorandum (Dkt. 36, filed August 1, 2011).

-50-

evidence or create an "unacceptable risk of disclosing" this information. *Jeppesen*, 614 F.3d at 1083.

With respect to the FTCA claims in particular, newly added by the Amended Complaint, information subject to the privilege assertion would be at issue with respect to least two specific issues. First, judicial review of the FBI's decisions to initiate counterterrorism investigations and how those investigations should be handled, including the decisions to conduct audio and video surveillance, may be barred by the discretionary function exception to the FTCA. *See e.g.*, *Sabow v. United States*, 93 F.3d 1445, 1453-54 (9th Cir. 1996); *Frigard v. United States*, 862 F.2d 201, 203 (9th Cir. 1988); *Pooler v. United States*, 787 F.2d 868 (3d Cir. 1986). To determine whether the discretionary function exception applies, the appropriate inquiry is "whether the challenged acts . . . are of the nature and quality that Congress intended to shield from tort liability." *United States v. Varig Airlines*, 467 U.S. 797, 813, 104 S. Ct. 2755, 2764, 81 L. Ed. 2d 660, 674 (1984); *Dichter-Mad Family Partners, LLP v. United States*, 707 F. Supp. 2d 1016, 1034 (C.D. Cal. 2010). To assist in this determination, the Supreme Court has prescribed a two-part test. First, the challenged conduct must involve an "element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L. Ed. 2d 335, 346 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)); *see also Dichter-Mad Family*, 707 F. Supp. 2d at 1027. Second, the challenged conduct must involve policy considerations. *See Gaubert*, 499 U.S. at 322; *Dichter-Mad Family*, 707 F. Supp. 2d at 1027. The test's first part is satisfied when there are no mandatory directives that specifically prescribe a course of action for an employee to follow. *Gaubert*, 499 U.S. at 322; *see Jasso v. U.S. Dep't of Agric. Forest Serv.*, No. S-07-2769, 2008 WL 3863503, *7 (E.D. Cal. Aug. 18, 2008) ("[T]he Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply."). Here, the Amended Complaint alleges that the FBI violated plaintiffs' constitutional rights

-51-

by engaging in impermissible counterterrorism investigations "simply because the targets were Muslim" and "that Plaintiffs . . . were surveilled solely due to their religion." *See* FAC §§ 1-3, 83, 86. Thus, in order to litigate the question of whether the discretionary function exception to the FTCA applies in this case, facts concerning the nature and scope of Operation Flex—including who may have been subject to investigation, for what reasons, and how the investigation was undertaken—would be at issue or at risk of disclosure.

In addition, litigating the key issues for the invasion of privacy and intentional infliction of emotional distress claims asserted against the United States would risk or require the disclosure of privileged information. For example, litigation of these claims entails an inquiry into whether the alleged intrusions were highly offensive and/or constituted serious invasions of privacy, which may depend upon the degree and setting of each intrusion and the explanation, justification, motive, and objective. *See generally Hernandez v. Hillsides, Inc.,* 47 Cal. 4th 272, 286-87, 211 P. 2d 1063 (Cal. 2009); *Sheehan v. San Francisco 49ers*, 45 Cal. 4th 992, 998, 201 P. 2d 472 (Cal. 2009). An essential element the plaintiffs must prove to establish intentional infliction of emotional distress claims is whether the conduct was extreme and outrageous with the intention of causing, or reckless disregard of the probability of causing, their emotional distress. The resolution of this element may depend on the explanation and justification for the alleged conduct. *See generally Potter,* 6 Cal. 4th at 1001. Here again, to litigate these issues, evidence concerning what occurred under Operation Flex—who was subject to investigation, why, and how—would be at issue or at risk of disclosure.

\* \* \*

To the extent that the Court wishes to assess the impact of the privilege assertion as to claims against the Government Defendants, it should require plaintiffs to proffer in proceedings under Rules 16 and 26 precisely what discovery it intends to seek against the Government. At that point, the Government

-52-

1  Peter Bibring (SBN 223981)
2   pbibring@aclu-sc.org
   Ahilan T. Arulanantham (SBN 237841)
3   aarulanantham@aclu-sc.org
4  Jennifer L. Pasquarella (SBN 263241)
    jpasquarella@aclu-sc.org
5  ACLU FOUNDATION OF SOUTHERN CALIFORNIA
6  1313 West Eighth Street
   Los Angeles, California  90017
7  Telephone: (213) 977-9500
8  Facsimile: (213) 977-5297

9  Ameena Mirza Qazi (SBN 250404)
10   aqazi@cair.com
   COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA
11  2180 W. Crescent Avenue, Suite F
12  Anaheim, California  92801
   Telephone: (714) 776-1847
13  Facsimile: (714) 776-8340

14
15  Attorneys for Plaintiffs
   Continued on next page
16
17            UNITED STATES DISTRICT COURT
18            CENTRAL DISTRICT OF CALIFORNIA
19
20
21  YASSIR FAZAGA, ALI UDDIN          CASE NO.: SA CV 11-00301 CJC (VBKx)
   MALIK, YASSER ABDELRAHIM,
22                                    **FIRST AMENDED COMPLAINT**
             Plaintiffs,
23                                    **CLASS ACTION**
24       v.
25  FEDERAL BUREAU OF
   INVESTIGATION; UNITED STATES     Judge: Honorable Cormac J. Carney
26  OF AMERICA; ROBERT MUELLER,
   DIRECTOR OF THE FEDERAL
27  BUREAU OF INVESTIGATION, in his
   official capacity; STEVEN M.
28

FILED-SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

SEP 1 3 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY

BY FAX

ORIGINAL

1  MARTINEZ, ASSISTANT DIRECTOR
2  IN CHARGE, FEDERAL BUREAU OF
   INVESTIGATION'S LOS ANGELES
3  DIVISION, in his official capacity; J.
   STEPHEN TIDWELL; BARBARA
4  WALLS; PAT ROSE; KEVIN
5  ARMSTRONG; PAUL ALLEN; Does
   1-20
6

7              Defendants.

8

9  Additional Plaintiffs' Attorneys:

10 Dan Stormer (SBN 101967)
11   dstormer@hadsellstormer.com
   Joshua Piovia-Scott (SBN 22364)
12   jps@hskrr.com
13 Reem Salahi (SBN 259711)
     reem@hskrr.com
14 HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
15 128 N. Fair Oaks Avenue, Suite 204
   Pasadena, California 91103
16 Telephone: (626) 585-9600
17 Facsimile: (626) 577-7079

18

19

20

21

22

23

24

25

26

27

28

## PRELIMINARY STATEMENT

1.    This case concerns an FBI-paid agent provocateur who, by misrepresenting his identity, infiltrated several mainstream mosques in Southern California, based on the FBI's instructions that he gather information on Muslims.

2.    The FBI then used him to indiscriminately collect personal information on hundreds and perhaps thousands of innocent Muslim Americans in Southern California. Over the course of fourteen months, the agents supervising this informant sent him into various Southern California mosques, and through his surveillance gathered hundreds of phone numbers, thousands of email addresses, hundreds of hours of video recordings that captured the interiors of mosques, homes, businesses, and the associations of hundreds of Muslims, thousands of hours of audio recording of conversations — both where he was and was not present — as well as recordings of religious lectures, discussion groups, classes, and other Muslim religious and cultural events occurring in mosques.

3.    This dragnet investigation did not result in even a single conviction related to counterterrorism. This is unsurprising, because the FBI did not gather the information based on suspicion of criminal activity, but instead gathered the information simply because the targets were Muslim.

4.    Ironically, the operation ended when members of the Muslim communities of Southern California reported the informant to the police because of his violent rhetoric, and ultimately obtained a restraining order against him.

5.    After this, the informant's identity was revealed, first in court documents where the FBI and local law enforcement revealed his role, and then through his own statements which were reported widely in the press.[1]

_____

[1] _See, e.g._, Jerry Markon, _Tension grows between Calif. Muslims, FBI after informant infiltrates mosque_, WASH. POST (Dec. 5, 2010); Gillian Flaccus, _Calif. case highlights use of mosque informants_, ASSOC. PRESS (Mar. 1, 2009); Matt (cont'd)

- 1 -

6. By targeting Muslims in the Orange County and Los Angeles areas for surveillance because of their religion and religious practice, the FBI's operation not only undermined the trust between law enforcement and the Southern California Muslim communities, it also violated the Constitution's fundamental guarantee of government neutrality toward all religions.

7. The First Amendment guarantees that no person should be singled out for different treatment by government because of his or her religion. "The First Amendment mandates governmental neutrality between religion and religion. The State may not adopt programs or practices which aid or oppose any religion. This prohibition is absolute." *Larson v. Valente*, 456 U.S. 228, 246 (1982) (quotations and citations omitted).

8. By this class action, Plaintiffs seek injunctive relief for themselves and the class of individuals whom Defendants subjected to surveillance and gathered identifiable information about because they are Muslim. Specifically, they seek an order requiring the federal government to destroy the information about them which it collected through this unlawful operation. The named Plaintiffs also seek damages for themselves as individuals based on the claims set forth below.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Because this lawsuit alleges violation of the United States Constitution and federal statutes, it raises questions of federal law. Because those violations include violations of 42 U.S.C. § 1985 and laws to protect civil rights, this Court also has jurisdiction under 28 U.S.C. § 1343. Because those violations include

---

Coker, *A look at Craig Monteilh*, OC WEEKLY (Mar. 4, 2009); Teresa Watanabe and Paloma Esquivel, *L.A. area Muslims say FBI Surveillance has a chilling effect*, L.A. TIMES (Mar. 1, 2009).

1 | violations of the Privacy Act, *see* 5 U.S.C. 552a(e)(7), this Court also has
2 | jurisdiction under 5 U.S.C. 552a(g)(1)(D).
3 |     10.    This Court has the authority to grant damages, declaratory and
4 | injunctive relief, and any other appropriate relief pursuant to *Bivens v. Six*
5 | *Unknown Agents*, 403 U.S. 388 (1971); 28 U.S.C. 1331; 28 U.S.C. § 1343; 42
6 | U.S.C. § 1985; 42 U.S.C. § 2000bb; 5 U.S.C. 552a; and the Declaratory Judgment
7 | Act, 28 U.S.C. §§ 2201 and 2202. A substantial, actual, and continuing
8 | controversy exists between the parties, with respect to both the class's claim for
9 | injunctive relief in the form of file destruction and the individual claims for
10 | damages.
11 |     11.    Venue is proper in the Central District of California under 28 U.S.C.
12 | § 1391(b) because a substantial part of the events or omissions giving rise to the
13 | claims herein occurred in this District.
14 | **PARTIES**
15 |     12.    Plaintiff Sheikh Yassir Fazaga is a thirty-eight year-old U.S. citizen
16 | born in Eritrea, who moved to the United States at age fifteen and attended high
17 | school in Orange County. From about 1998 to the present, Plaintiff Fazaga served
18 | as an imam, or religious leader, of the Orange County Islamic Foundation, a
19 | mosque in Mission Viejo, California. His duties there have included directing the
20 | religious affairs of the mosque, leading prayer, and conducting educational,
21 | spiritual, and recreational activities for the entire mosque community and its
22 | youth.[2]
23 |     13.    Plaintiff Ali Malik is a twenty-six year-old U.S. citizen born in
24 | Southern California. Malik's parents came to the United States from Pakistan
25 | before he was born. From the time of his birth through the events alleged herein,
26 |
27 | [2] Plaintiff Fazaga's legal name is Yassir Mohammed; but he uses the name "Fazaga" in all his personal and professional dealings.
28 |

- 3 -

1   Plaintiff Malik resided in and around Orange County, California. Plaintiff Malik is

2   a practicing Muslim who, from about 2004 through the events alleged herein,

3   regularly attended religious services at the Islamic Center of Irvine ("ICOI"), a

4   mosque in Irvine, California. ICOI is a mainstream mosque and one of the largest

5   mosques in Southern California, with a congregants at times numbering in the

6   thousands, including Muslims from a wide variety of national and ethnic

7   backgrounds.

8       14.    Plaintiff Yasser AbdelRahim, is a thirty-four year-old lawful

9   permanent resident of the United States, who emigrated from Egypt when he was

10  twenty-one years old.   Plaintiff AbdelRahim first attended business school in

11  Arizona, then moved to Southern California after he obtained his degree in 1999 to

12  work in business consulting. AbdelRahim is a practicing Muslim and has attended

13  religious services regularly at ICOI since about 2005.

14      15.    Defendant the Federal Bureau of Investigations (FBI) is an agency of

15  the United States government within the meaning of the Privacy Act and the

16  Federal Tort Claims Act. It maintains records on individual whom its agents have

17  investigated, including Plaintiffs and the putative class they seek to represent. The

18  FBI is sued for injunctive relief only.

19      16.    Defendant Robert Mueller is the Director of the FBI.  In that capacity

20  he is responsible for the direction and oversight of all operations of the FBI,

21  including the retention of records arising out of the investigations of FBI agents.

22  He is sued in his official capacity for injunctive relief only.

23      17.    Defendant Steven M. Martinez is the Assistant Director In Charge of

24  the FBI's Los Angeles Field office.[3]   In that capacity, he is responsible for the

25  _____

26  [3] In addition to its national headquarters and various specialized facilities

27  operations, the FBI maintains 56 field offices in major cities, nearly 400 smaller
    offices called resident agencies in cities and towns across the nation, and more than

28  (cont'd)

-4-

1   direction and oversight of all operations of the FBI in Los Angeles and Orange

2   Counties, including the retention of records arising out of the investigations of FBI

3   agents in his jurisdiction. He is sued in his official capacity for injunctive relief

4   only.

5       18.    Upon information and belief, Defendant Kevin Armstrong was, at all

6   times relevant to this action, employed by the FBI, and acting within the scope of

7   his employment, as a Special Agent assigned to the Orange County area, and a

8   handler for Craig Monteilh. Agent Armstrong met with Monteilh repeatedly and

9   on a regular basis during the time period at issue in this lawsuit. He directed Craig

10  Monteilh to indiscriminately gather information on the Muslim community in

11  Orange County, and personally supervised and directed Monteilh's surveillance

12  activities as described herein.

13      19.    Upon information and belief, Defendant Paul Allen was, at all times

14  relevant to this action, employed by the FBI, and acting within the scope of his

15  employment, as a Special Agent assigned to the Orange County area, and a handler

16  for Craig Monteilh. Agent Allen met with Monteilh repeatedly and on a regular

17  basis during the time period at issue in this lawsuit. He directed Craig Monteilh to

18  indiscriminately gather information on the Muslim community in Orange County,

19  and personally supervised and directed Monteilh's surveillance activities as

20  described herein.

21      20.    Defendant J. Stephen Tidwell, at all times relevant to this action, was

22  an employee of the FBI and acting within the scope of his employment. Defendant

23  Tidwell served as the Assistant Director in Charge of the FBI's Los Angeles Field

24  Office from August 2005 to December 2007, in which capacity he supervised

25  operations in the Central District of California. Upon information and belief,

26

27  60 international offices in U.S. embassies worldwide.

28

-5-

1   Defendant Tidwell authorized the search for an informant to go into mosques in
2   Orange County to collect information on Muslims, authorized the selection of
3   Craig Monteilh as that informant, authorized the nature and scope of the operation
4   and its targeting of Muslims, read Monteilh's notes of his activities, and authorized
5   and actively directed the actions of Agents Armstrong, Allen, Rose, Walls and
6   other agents in the handling of Monteilh at all times relevant in this action, for the
7   purpose of surveilling Plaintiffs and other putative class members because they
8   were Muslim.

9        21.    Upon information and belief, Defendant Barbara Walls was, at all
10  times relevant to this action, employed by the FBI, and acting within the scope of
11  her employment as Special Agent in Charge of the Santa Ana branch office, one of
12  ten satellite offices of the FBI's Los Angeles field office, where she was one of the
13  direct supervisors of Agents Allen, Armstrong, and Rose. Upon information and
14  belief, Defendant Walls was regularly apprised of the information Agents
15  Armstrong and Allen collected through Monteilh; directed the action of FBI agents
16  on various instances based on that information; and actively monitored, directed,
17  and authorized the actions of Agents Armstrong and Allen and other agents at all
18  times relevant in this action, for the purpose of surveilling Plaintiffs and other
19  putative class members because they were Muslim. Eventually, she ordered that
20  Agents Armstrong and Allen cease using Monteilh as an informant because she no
21  longer trusted him.

22       22.    Upon information and belief, Defendant Pat Rose was, at all times
23  relevant to this action, employed by the FBI and acting in the scope of her
24  employment as a Special Agent. Upon information and belief, Agent Rose was
25  assigned to the FBI's Santa Ana branch office, where she supervised the FBI's
26  Orange County national security investigations and was one of the direct
27  supervisors of Agents Allen and Armstrong. Upon information and belief,
28  Defendant Rose was regularly apprised of the information Agents Armstrong and

- 6 -

1   Allen collected through Monteilh; directed the action of FBI agents on various

2   occasions based on that information; and actively monitored, directed, and

3   authorized the actions of Agents Armstrong and Allen and other agents at all times

4   relevant in this action, for the purpose of surveilling Plaintiffs and other putative

5   class members because they were Muslim.   Agent Rose also sought additional

6   authorization to expand the scope of the surveillance program described herein, in

7   an effort to create a Muslim gym that the FBI would use to gather yet more

8   information about the class.

9        23.   Defendant Does 1-20 are agents of the Federal Bureau of

10  Investigation and United States Department of Justice, whose identities are not yet

11  known to Plaintiffs, who authorized, directed, and actively monitored the actions

12  alleged herein in order to engage in surveillance of the Plaintiffs and putative class

13  members because they were Muslim.

14  **FACTUAL ALLEGATIONS**

15  **FBI Focus On Islam Since 2001**

16       24.   Since September 11, 2001, the FBI has focused much of its

17  counterterrorism efforts on broad investigations in the Muslim communities of the

18  United States.  In the weeks and months following 9/11, the United States detained

19  hundreds of "suspects" across the country, the vast majority of whom were

20  Muslim.  Over the next few years, the FBI engaged in a program to conduct

21  interviews of thousands of individuals who had immigrated to the U.S. from

22  countries in which intelligence allegedly indicated al-Qaeda operated, a burden that

23  fell overwhelmingly on Muslims.[4]

24       25.   In January 2003, the FBI ordered its field supervisors to count the

25

26  [4] *Homeland Security: Justice Department's Project to Interview Aliens after*

27  *September 11, 2001*, U.S. Gen. Accounting Office, G.A.O. No. GAO-03-459
    (April 2003) *available at* http://www.gao.gov/new.items/d03459.pdf.

28

- 7 -

number of mosques and Muslims in their jurisdictions to aid in counterterrorism investigations.[5]

26.     Starting in 2002 and continuing through 2005, the FBI engaged in a program of monitoring radiation levels across the country, including at more than one hundred "Muslim sites," though officials indicated that religion was not the "only criterion."  According to one official, Muslim sites were picked because, in the past, terrorists or people close to them had tended to live in Muslim areas or attend local mosques.[6]

27.     In a 2006 briefing to reporters, the FBI official second-in-command over the National Security Branch displayed a map of the San Francisco area showing where Iranian immigrants were clustered — and where, he said, an F.B.I. squad was "hunting."[7]

**Evolution of FBI Policies on Use of Religion in Investigation**

28.     The FBI has been accused of targeting people based on their First Amendment activity before.  During the 1960s and 1970s, domestic intelligence-gathering activities by the FBI came under increasing scrutiny, culminating in the "Church Committee," a Senate Select Committee that investigated the FBI's COINTELPRO operation.

29.     In 1976, the Church Committee wrote that "The Government has

---

[5] Eric Lichtblau, *F.B.I. Tells Offices to Count Local Muslims and Mosques*, N.Y. TIMES (Jan. 28, 2003), available at http://www.nytimes.com/2003/01/28/politics/28MOSQ.html.
[6] Kevin Bohn and Jeanne Meserve, *Officials: Muslim sites subject to secret monitoring for radiation*, C.N.N. (Dec. 24, 2005), *available at* http://articles.cnn.com/2005-12-23/us/nuke.monitoring_1_radiation-levels-radioactive-material-fbi-program; Mary Beth Sheridan, *Mosques Among Sites Monitored for Radiation*, WASH. POST (Dec. 29, 2005).
[7] Scott Shane and Lowell Bergman, *F.B.I. Struggling to Reinvent Itself to Fight Terror*, N.Y. TIMES (Oct. 9, 2006), *available at* http://www.nytimes.com/2006/10/10/us/10fbi.html.

- 8 -

often undertaken the secret surveillance of citizens on the basis of their political beliefs, even when those beliefs posed no threat of violence or illegal acts on behalf of a hostile foreign power. The Government, operating primarily through secret Informants . . . has swept in vast amounts of information about the personal lives, views, and associations of American citizens. Investigations of groups deemed potentially dangerous – and even of groups suspected of associating with potentially dangerous organizations – have continued for decades, despite the fact that those groups did not engage in unlawful activity. Groups and individuals have been harassed and disrupted because of their political views and their lifestyles. Investigations have been based upon vague standards whose breadth made excessive collection inevitable."[8]

30.    After uncovering rampant abuses in the FBI's domestic intelligence programs, the Church Committee recommended a series of reforms that were ultimately adopted, including new laws to restrict domestic surveillance for national security purposes under the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.*, and guidelines issued by Attorney General Edward Levi (known as "Attorney General's Guidelines") to regulate domestic intelligence-gathering by the FBI.

31.    The Levi Guidelines restricted the FBI's domestic intelligence collection authorities to investigations of potential violations of federal law, and limited the use of specific investigative techniques, including informants.  The Guidelines allowed the FBI to conduct full domestic security investigations only on the basis of "specific and articulable facts giving reason to believe that an

---

[8] *Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities*, "Book II: Intelligence Activities and the Rights of Americans," at 5, U.S. Senate, 94th Cong., 2nd Sess. (Apr. 26, 1976), *available at http://www.aarclibrary.org/publib/church/reports/book2/html/ChurchB2_0009a.htm*.

1   individual or group is or may be engaged in activities which involve the use of

2   force or violence and which involve or will involve the violation of federal law..."[9]

3   More limited Preliminary Investigations could be authorized for 90 days based on

4   receipt of "allegations or other information that an individual or group is or may

5   be engaged in activities which involve the use of force or violence and which

6   involve or will involve the violation of federal law," but only to determine whether

7   there is a sufficient factual basis for opening a full investigation.[10]

8          32.    In 2002, Attorney General John Ashcroft revised the Guidelines for

9   General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigations,

10  respectively, significantly reducing or eliminating the requirement of a factual

11  basis to believe federal crimes would be committed before the FBI could initiate

12  investigations.[11]  Significant changes to the General Crimes guidelines included

13  expanding the duration and type of investigative techniques that could be utilized

14  in preliminary investigations and creating new authorities for the FBI to

15  proactively conduct internet and commercial database searches and attend public

16  places and events for the purpose of detecting or preventing terrorist activities, all

17  without any factual basis or allegation indicating a possible violation of federal

18  law.  Attorney General Ashcroft said terrorism prevention was the key objective of

19  these new Guidelines, arguing that "Our philosophy today is not to wait and sift

20  through the rubble following a terrorist attack. Rather, the FBI must intervene early

21

22  _____

    [9] FBI Statutory Charter: Hearings Before the Senate Committee on the Judiciary,
23  95th Cong. pt. 1, p. 22 (1978).
    [10] Id., at 21.
24  [11] Attorney General's Guidelines for General Crimes, Racketeering Enterprise and
    Terrorism Enterprise Investigations, (May 2002), available at:
25  http://www.fas.org/irp/agency/doj/fbi/generalcrimes2.pdf and, Attorney General's
    Guidelines for National Security Investigations and Foreign Intelligence
26  Collection, (Oct. 2003), available at:
27  http://www.fas.org/irp/agency/doj/fbi/nsiguidelines.pdf

28

- 10 -

ER - 190

and investigate aggressively where information exists suggesting the possibility of terrorism, so as to prevent acts of terrorism. The new guidelines advance this strategy of prevention by strengthening investigative authority at the early stage of preliminary inquiries. Also, even absent specific investigative predicates, FBI agents under the new guidelines are empowered to scour public sources for information on future terrorist threats."[12]

33.    In June 2003 the Department of Justice issued "Guidance on the Use of Race by Federal Law Enforcement Agencies," purporting to ban the use of racial or ethnic profiling.[13]  This Guidance explicitly failed to include religion as an attribute that could not be used by federal law enforcement officials in making law enforcement decisions.  In addition, the Guidance contained broad exemptions for the use of racial profiling in national security and border integrity investigations.[14]

34.    In October 2003 Attorney General Ashcroft revised the Guidelines for FBI National Security Investigations and Foreign Intelligence Collection, to authorize the "proactive collection of information concerning threats to the national security, including information on individuals, groups and organizations of possible investigative interest, and information on possible targets of international terrorist activities or other national security threats."[15]  These Guidelines authorized the FBI to conduct "threat assessments" without opening

---

[12] Remarks of Attorney General John Ashcroft, Attorney General Guidelines May 30, 2002, at:
http://www.justice.gov/archive/ag/speeches/2002/53002agpreparedremarks.htm
[13] Department of Justice Civil Rights Division, "Guidance Regarding the Use of Race by Federal Law Enforcement Authorities, (June 2003), available at:
http://www.scribd.com/doc/22092319/DOJ-Guidance-Regarding-the-Use-of-Race-by-Federal-Law-Enforcement-Agencies-June-2003.
[14] Id.
[15] Attorney General Guidelines for FBI National Security Investigations and Foreign Intelligence Collection (Oct. 2003), available at:
http://www.fas.org/irp/agency/doj/fbi/nsiguidelines.pdf

- 11 -

1    preliminary or full investigations – in other words without the required factual

2    basis to justify such investigations.[16]

3        35.    The combined effect of these Guidelines and Guidance was to

4    authorize the FBI to engage in intrusive investigations of First Amendment

5    protected activity, and specifically religious practices, without any factual basis to

6    believe any criminal violations or threat to the national security existed.

7        36.    In 2008, Attorney General Mukasey revised the guidelines further,

8    explicitly eliminating the need for any factual predicate before FBI agents are

9    allowed to conduct a new category of investigation called "assessments."  The

10   2008 revisions allow FBI agents to use an array of intrusive investigative

11   techniques during assessments, including physical surveillance, recruiting and

12   tasking informants, and pre-textual interviews by FBI agents acting in ruse.  In

13   response, the FBI revised its internal policy, publishing the FBI's *Domestic*

14   *Intelligence and Operations Guides* ("DIOG") in December 2008.[17]  The DIOG

15   only requires an "authorized purpose" to conduct an assessment, which is defined

16   broadly as "a national security, criminal or foreign intelligence collection

17   purpose."[18]  Requiring only an authorized purpose rather than a factual predicate

18   means that the authority to conduct investigations in this category is based on the

19   subjective intent of the agent, rather than any factual information regarding the

20   potential subjects of the assessment establishing suspicion of wrongdoing.

21   Moreover, the DIOG authorizes FBI headquarters and field offices to conduct

22   "Domain Management" assessments to "identify locations of concentrated ethnic

23   communities in the Field Office's domain" and to collect, analyze and map racial

24

25   ---

     [16] *Id.*, at 3.

26   [17] Federal Bureau of Investigation Domestic Investigations and Operations Guide,
     (Dec. 2008), available at: http://www.muslimadvocates.org/DIOGs_pt1.pdf

27   [18] DIOG p. 21.

28

- 12 -

and ethnic "behaviors," "cultural traditions," and "life style characteristics" in local communities.  FBI Director Robert Mueller issued a broad mandate for FBI offices to "know your domain," which meant "understanding every inch of a given community—its geography, its populations, its economy, and its vulnerabilities."[19] Domain Management assessments appear to be mandated as a matter of course, and require no specific threat or criminal predicate to justify the collection of information regarding the makeup of American communities.

37.    Upon information and belief, Defendants operated under the principles set forth in the revised Mukasey Guidelines and DIOGs even before the Attorney General formally issued them.  For instance, a 2010 report by the Department of Justice Inspector General revealed that from 2002 to 2006 the FBI engaged in a number of investigations of domestic advocacy groups based on "factually weak" or "speculative" predication.[20]  The Inspector General (IG) determined many of the investigations were opened based upon the FBI agents' mere speculation that the individuals or groups might commit some federal crime in the future.  The IG determined that most of these investigations did not violate the 2002 Attorney General's Guidelines in effect at the time because all that was required to initiate a preliminary inquiry was "information indicating the possibility of a federal crime," which illustrated "the broad scope of the FBI's authority under the Attorney General's Guidelines to open preliminary inquiries based on extremely limited information, including information about the First

---

[19] Robert Mueller, Speech to the International Association of Chiefs of Police, San Diego, CA California, Nov. 10, 2008, at: http://www.fbi.gov/news/speeches/using-intelligence-to-protect-our-communities (last visited Sept. 13, 2011).
[20] Department of Justice Inspector General Review of FBI's Investigations of Certain Advocacy Groups (Sept 2010) (hereinafter "IG Report"): http://www.justice.gov/oig/special/s1009r.pdf (last visited Sept. 13, 2011).

- 13 -

1   Amendment expressions of subjects."[21]  Moreover, the IG noted that while the

2   FBI's collection and retention of First Amendment material in these cases often

3   violated the 2002 Guidelines, it would not have violated the revised 2008

4   Guidelines: "Therefore, some of the violations of policy we found in this review

5   would not be violations if they occurred today."[22]  Additionally, a 2006 New York

6   Times report indicated that FBI Associate Executive Assistant Director Phil Mudd

7   was "pitching" a vague domestic intelligence program called "Domain

8   Management," which vaguely implied "ethnic targeting."[23]

9          38.    Upon information and belief, trainings offered by the FBI have also

10  reflected broad generalizations about Muslims supporting the view that Islam and

11  those who practice it inherently condone violence and should be regarded with

12  suspicion.  As recently as 2009, the FBI training for newly recruited agents

13  included a power-point presentation that makes gross generalizations about Islam

14  and Muslims.  The presentation included slide entitled "Islam 101" that stated

15  Islam "transforms country's culture into 7th century Arabians ways" and claimed

16  that "it is characteristic of the Arabic mind to be swayed more by words than ideas

17  and more by ideas than by facts." Of the eight books that the training listed as

18  "recommended reading," at least three of them have been widely criticized as

19  setting forth stereotypes about Muslims and Islam.  Two listed were by Robert

20  Spencer, founder of the group "Stop the Islamization of America," including his

21  book, "The Politically Incorrect Guide to Islam," which asserts on its cover

22  (reproduced in the training's slides) that "Islam teaches that Muslims must wage

23  war to impose Islamic law on non-Muslim states" and "American Muslim groups

24  
25  [21] IG Report at 87.
    [22] IG Report at 189.
26  [23] Scott Shane and Lowell Bergman, "FBI Struggling to Reinvent Itself to Fight
    Terror," NY Times (Oct. 10, 2006), available at
27  http://www.nytimes.com/2006/10/10/us/10fbi.html (last visited Sept. 13, 2011).
28  

- 14 -

ER - 194

1    are engaged in a huge cover-up of Islamic doctrine and history," and has chapters

2    titled "The Qur'an: Book of War," "Islam: Religion of War" and "Islamic Law:

3    Lie, Steal and Kill," in which it argues that Islam condones violence, criminality,

4    and terrorism.[24]

5         39.    Upon information and belief, William Gawthrop, an FBI senior

6    intelligence analyst who has presented and continues to present trainings at

7    conferences to local law enforcement, has offered trainings or training materials on

8    the "Sources and Patterns of Terrorism in Islamic Law" in which he takes selected

9    quotes from Quran and other Islamic texts out of context to teach that Islam

10   inherently mandates violent action against non-Muslims.

11   **FBI Investigation of Muslims in Orange County, California**

12        40.    Approximately 500,000 Muslims live in Southern California, more

13   than 120,000 of them in Orange County, making the area home to the second-

14   largest population of Muslims in the United States.

15        41.    The FBI has surveilled Muslims in Southern California and Orange

16   County for at least several years.

17        42.    In about late 2001 or 2002, the FBI approached at least one Muslim

18   leader asking who the Muslim leaders in the Southern California area are and for a

19   list of mosques.

20        43.    In May 2006, Defendant Rose, a supervisor of the FBI's Orange

21   County counterterrorism operations, spoke to the Pacific Club in Irvine about the

22   FBI's counterterrorism efforts.  There, she stated that "[t]here are a lot of

23

24

25   [24] Spencer Ackerman, *FBI 'Islam 101' Guide Depicted Muslims as 7th-Century

26   Simpletons*, WIRED (July 27, 2011), available at

27   http://www.wired.com/dangerroom/2011/07/fbi-islam-101-guide (last visited Sept.
     13, 2011).

28

- 15 -

ER - 195

1  individuals of interest right here in Orange County."[25]  She described recent efforts

2  the FBI had taken in the region: planting bugs and closed-circuit TV cameras,

3  examining computer use and email, and establishing units on both foreigners and

4  domestic suspects.  She indicated that the FBI frequently received calls from

5  people who wanted to tell them about situations like a Muslim neighbor who is

6  changing his license plates or someone who has an apartment with only a mattress

7  and five computers, stating, "I can't tell you how many" tips like that paid off.

8  When asked whether citizens should be worried about activist Muslim students at

9  University of California at Irvine, Rose characterized that as a "tough question,"

10  but indicated the FBI was aware of large numbers of Muslim students at UCI and

11  the University of Southern California.  "We live in Irvine.  I can't tell you how

12  many subjects' names come up, and they live right down the street from me," she

13  stated.  "I think we need to be concerned with everybody, including our next-door

14  neighbor."[26]

15      44.    In 2006 and 2007, authorities arrested reserve officers who worked at

16  the Strategic Technical Operations Center, an intelligence unit at Camp Pendleton,

17  for stealing classified intelligence documents and providing them to local law

18  enforcement.  According to reports, the theft ring had operated since 2001, and the

19  documents seized from the participants included more than 100 FBI and Defense

20  Department files, including documents establishing the existence of programs to

21  surveil Muslim communities and mosques in Southern California.[27]

22

23      ―――――――――――――

24  [25] Frank Mickadeit, *Feds warn O.C. of terror lurking 'down the street'*, THE
ORANGE COUNTY REGISTER (May 25, 2005), *available at*
25  http://www.ocregister.com/news/fbi-194882-county-orange.html (last visited Sept.
13, 2011).
26  [26] *Id.*
[27] Rick Rogers, *Records detail security failure in base file theft*, SAN DIEGO UNION-
27  TRIBUNE (May 22, 2008), *available at* http://www.signonsandiego.com/
28  (cont'd)

- 16 -

45.     Documents obtained by the ACLU of Southern California via the Freedom of Information Act show that the FBI has collected information about the membership of the Shura Council (an association of mosques in the Southern California area), as well as information about activities or events organized at or by mosques or Muslim organizations — including individuals handing out flyers for fundraising, events on political issues such as the war in Iraq or immigration reform, and a wide variety of fundraising efforts.

46.     The FBI has sought and continues to seek interviews of hundreds of people in the Southern California Muslim community, often by sending FBI agents to appear unannounced at the homes or workplaces of people to request an interview.  During these interviews, FBI agents have often questioned interviewees about religious practices that have no discernible relationship to criminal activity, such as what mosque interviewees attend, how many times a day they pray, who the imam of their mosque is, or what they think of particular religious scholars.

**Monteilh's Role in the FBI's Investigation of Muslims**

47.     In the face of substantial evidence of the FBI's particular focus on investigating Muslims, in June 2006, Los Angeles FBI Assistant Director Stephen Tidwell attended a forum for the Muslim community at the Islamic Center of Irvine ("ICOI"), where he assured an audience of about two hundred people that the FBI would enter mosques only openly to outreach to the community and would not send covert informants into mosques for the purpose of monitoring the Muslim community.[28]

---

uniontrib/20080522/news_1n22theft.html (last visited Sept 13, 2011).

[28]  At some point during the spring of 2007, Agents Armstrong and Allen told Monteilh that the Assistant Director in Charge of the FBI's Los Angeles Field Office had told the Muslim community that there would be no undercover informants placed in mosques at a meeting held only about a month or so before Monteilh had publicly "converted," on their instructions, at the ICOI mosque. (cont'd)

- 17 -

48.    At some time prior to July 2006, the FBI hired Craig Monteilh to become a paid informant for them to covertly gather information about Muslims in the Irvine area.

49.    In about July 2006, Monteilh requested a meeting with the imam of the Islamic Center of Irvine ("ICOI"). Monteilh told the imam that he was of French and Syrian descent, and that he wanted to embrace his roots by formally converting to Islam. The following Friday, Monteilh attended the *jummah* prayer (the Friday afternoon prayer that is the most important service of the week), where he went before the congregation of hundreds and made a public declaration of his Muslim faith. This declaration, known as *shahadah*, is one of the five pillars of Islam. After this, Monteilh began going to ICOI on a daily basis, often attending multiple prayers a day. About a week later, he began using the Muslim name Farouk al-Aziz.

50.    After taking *shahadah*, Monteilh attended prayers at ICOI on a daily basis. He attended prayers at mosque multiple times per day, and was often waiting for the mosque to open before dawn prayers at about 5 a.m. He also attended classes and special events. He primarily attended ICOI, but also went with some regularity to about five of the other largest mosques in Orange County.

51.    Congregants at ICOI generally welcomed Monteilh. People introduced themselves, spoke with him about his conversion and their faith, and offered to help him learn about Islam and Muslims in America. Various congregants offered help by buying him books on Islam, talked with him about the tenets of the religion, and showed him the movements of prayers. Congregants invited him to have meals or tea outside of the mosque to help welcome him to the

---

They told him that at the time Tidwell made this statement, they had already been looking for someone to send into the mosques, and that Tidwell had approved recruitment of an informant.

- 18 -

mosque's community and discuss questions he might have.

52.    After several months, Monteilh began wearing traditional Muslim robes and skull caps both at mosque and in public, in place of his "western" clothes.

53.    After Monteilh had attended ICOI for some time, Muslim community leaders began to hear concerns voiced by the congregants about Monteilh's behavior.  Monteilh engaged people in conversations in which he aggressively probed their views on religion and American foreign policy.  Soon leaders began hearing that he was asking people's opinions on *jihad* and its meaning in Islam, and that he was resisting their claims that Islam did not condone terrorism.

54.    Among the many people Monteilh met during his time as an FBI informant were Plaintiffs Fazaga, Malik, and AbdelRahim.

**Plaintiff Sheikh Yassir Fazaga**

55.    Plaintiff Sheikh Yassir Fazaga is a thirty-eight year-old U.S. citizen born in Eritrea, who has lived here since he was a teenager.  He attended high school in Orange County.  Sheikh Fazaga has an undergraduate degree in Islamic Studies from the Institute of Islamic and Arabic Sciences in Virginia and a masters degree in marriage and family counseling from the California State University of Long Beach, and has taken coursework toward a masters degree in Christian Theology at Loyola Marymount University.  From about 1998 to the present, Sheikh Fazaga has served as an imam of the Orange County Islamic Foundation (OCIF), a mosque in Mission Viejo, California.  His duties there have included directing the religious affairs of the mosque, leading prayer, and conducting educational, spiritual, and recreational activities for the entire mosque community and its youth.

56.    Sheikh Fazaga earned a national reputation for his contemporary American teaching of Islam.  He has spoken at numerous conferences, colleges, and other fora both in the United States and abroad on the topics of Islam and the

- 19 -

American Muslim. In 2007, he traveled to Romania at the invitation and expense
of the U.S. State Department to speak on terrorism, radicalism and extremism.
He has also been interviewed for print, television and radio media, including for
NBC's Today show on spirituality in America and for a New York Times article
on American imams in which he was featured.[29]

57.    Over the years, Sheikh Fazaga's mosque conducted a number of
events in conjunction with various other mosques in the area, including ICOI.
Sheikh Fazaga was, and still is, concerned about the erosion of civil rights for
people in the Muslim community, and he often took actions to advocate on behalf
of that issue.

58.    On one occasion in early 2006 he attended one such event, which
Defendant Stephen Tidwell, Assistant Director in Charge of the Los Angeles FBI
Field Office, also attended. At the event, Fazaga asked questions to Tidwell
concerning the FBI's use of informants in mosques.

59.    Shortly afterward, Sheikh Fazaga came into contact with Craig
Monteilh, because Monteilh came to attend prayers and other events at his mosque,
OCIF, starting in approximately 2006.

60.    Some time after Monteilh began attending his mosque, Sheikh Fazaga
hosted a famous Islamic speaker named Yusuf Estes at his mosque. Estes is a
former National Muslim Chaplain for the United States Bureau of Prisons, and was
a Delegate to the United Nations World Peace Conference for Religious Leaders
several years before being invited to speak at the OCIF.

61.    A number of Sheikh Fazaga's congregants, including Monteilh,
attended the lecture.

---

[29] *See* Neil MacFarquhar, *A Growing Demand for the Rare American Imam*, N.Y.
Times (June 1, 2007), available at
http://www.nytimes.com/2007/06/01/us/01imam.html (last visited Sept. 13, 2011).

62.     Several months after Monteilh first began attending events at OCIF, another member of the OCIF community formally introduced Fazaga to Monteilh.

63.     After Monteilh's role as an FBI informant became publicly known in February 2009, a number of Sheikh Fazaga's congregants expressed their dismay to him, because Monteilh had spent a considerable amount of time at the OCIF.

64.     Sheikh Fazaga had to spend considerable time counseling his congregants who were afraid that they were being targeted for FBI surveillance because of their faith. He often conducted this counseling away from the mosque and in person, rather than over the telephone, because of his congregants' fear of surveillance.

65.     Sheikh Fazaga also observed the trust within and cohesion of his congregation, and of other Muslim communities in Southern California, to be significantly damaged, and that this damage directly undermined the Islamic practice of *jama'ah,* or worship in a congregation. In part because of this, he devoted two whole sermons to addressing the fears of the congregation about surveillance, rather than addressing religious subjects.

**Plaintiff Ali Uddin Malik**

66.     Plaintiff Malik grew up in Orange County, California. When Malik was growing up, his family were strong supporters of the Republican Party. Malik started a young Republicans club at his high school. During high school, Malik aspired to work for the U.S. State Department or elsewhere in government.

67.     Plaintiff Malik attended the University of California, Irvine ("UCI") from about 2007 to 2009. While at Irvine, Malik co-founded the Olive Tree Initiative, a peace-building program through which a culturally and religiously diverse group of UCI students take joint factfinding trips to Israel and Palestine to better understand the Israel-Palestine conflict and report on their findings to the UCI community. Malik and the other founders were recognized for their work with the University of California President's Award for Outstanding Student

- 21 -

1  Leadership, UCI Chancellor's Living Our Values Award, and recognition by the

2  Orange County Human Relations Commission and the U.S. State Department.

3  68.    When Malik was about twenty years old, he developed an interest in

4  religion. His family had always attended the mosque, but he started attending

5  more regularly and trying to study Islam with more seriousness. Malik began

6  wearing traditional robes and head covering when he went to the mosque to pray.

7  He also grew a full, long beard in a traditional fashion. Because Islam encourages

8  Muslims to follow the "sunnah" or practices of the Prophet Muhammad,who had a

9  beard and required his followers to grow beards, observant Muslim men commonly

10  grow their beards as a part of their religious practice and as a form of modesty,

11  Most observant Muslim men in Orange County wear beards of some sort, and

12  many or most try to grow long beards at some point in their lives. Similarly, many

13  Muslim men wear traditional clothes to pray as part of their religious practice, as a

14  form of modesty. As such, an emulation of the practices of Muhammad is also

15  "sunnah." Malik also found that wearing his clothes and beard in this way helped

16  serve as a reminder of his faith.

17  69.    In about summer 2006, as part of his efforts to study Islam more

18  seriously, Malik attended a six-week summer course on Islam at Dar al-Mustafa, a

19  seminary in Yemen. Islam emphasizes the importance of gaining religious

20  knowledge, and encourages its adherents to seek knowledge, so much so that for

21  Muslims gaining religious knowledge is a faith practice in and of itself. Dar al-

22  Mustafa is a mainstream religious school whose leaders are internationally known

23  in the Muslim community for advocating justice, equality, and peaceful co-

24  existence between religious groups, and have been active in interfaith efforts in

25  these areas with religious leaders of other faiths. Upon information and belief, the

26  school and its leaders enjoyed a similar reputation with the United States

27  government and the FBI. At the time Malik attended the summer course, both

28  Yemen and Dar al-Mustafa were popular places for American Muslims who

- 22 -

wanted to pursue Arabic language or religious studies abroad for a variety of reasons: Southern Yemen, where Dar al-Mustafa is located, was known for its spiritual Sufi religious scholarship, for having a clear and eloquent form of the Arabic language, and for being scenic and affordable, if slightly rustic. Plaintiff Malik attended ICOI and was present when Monteilh took *shahadah* in about July 2006. Plaintiff Malik, along with many other congregants, approached Monteilh after he took *shahadah,* offering his well-wishes and assistance.

70. In about August 2006, the imam at ICOI asked Plaintiff Malik to teach Monteilh how to pray and to guide him through the basics of Islam.

71. At the imam's request, Plaintiff Malik approached Monteilh. Malik talked with Monteilh about the basics of Islam, including the basic tenets, how to pray, and the development of faith. Monteilh asked for Malik's cell phone number and email address, which Malik provided. He tried to offer Monteilh support and welcome him in the community, and talked about inviting him over to his family's house for dinner.

72. To help Monteilh learn about Islam, Plaintiff Malik gave him a very basic book on the religion. The book is commonly used to teach Sunday school classes to children, and Malik knew that his father had taught Sunday school and had used the same book.

73. Monteilh talked frequently with Malik at the mosque. He also suggested that they talk at a nearby gym, which they did in part because Monteilh worked out there. Shortly after their meeting, Monteilh began asking Malik things that made Malik uncomfortable. At one point Monteilh asked Plaintiff Malik what would happen if someone went up to the imam at ICOI and told him they wanted to blow themselves up. Plaintiff Malik replied that the imam would think this person was crazy. Monteilh persisted, and asked Plaintiff Malik if there were other imams in the area that would respond to someone who wanted to blow themselves up. Plaintiff Malik told Monteilh that there are no such imams or mosques in

- 23 -

1    Southern California as far as he knew.

2        74.    On another occasion, Monteilh asked Malik about *jihad*, citing

3    specific pages in the children's book Malik had given him that mentioned jihad.

4    When Malik answered that *jihad* meant a "struggle," and that the concept referred

5    to the spiritual struggle to purify oneself, Monteilh pressed him about whether it

6    meant physical violence, and resisted Malik's answer that it did not.

7        75.    These conversations deeply concerned Malik and made him very

8    uncomfortable around Monteilh. Malik thought that Monteilh had strange ideas

9    about Islam from movies or media, and urged him to go talk to the imam so that

10    the imam could guide him.

11        76.    When Monteilh persisted in talking with Malik about his violent

12    ideas, Malik began trying to avoid Monteilh. He would avoid answering or

13    returning Monteilh's calls, although Monteilh called repeatedly. Malik also began

14    trying to go to the gym at times Monteilh did not attend.

15        77.    Malik also noticed that Monteilh spoke with many others at the

16    mosque. For example, Malik occasionally saw Monteilh praying near meetings of

17    a youth group Malik attended in the mosque's prayer hall. Malik noticed on

18    several occasions that when Monteilh would pray near the group, he would leave

19    his belongings in the prayer hall while he went elsewhere.

20        78.    Finally, Malik stopped attending the mosque altogether because

21    Monteilh was there so often. Malik also stopped attending the mosque in Tustin

22    because he heard that Monteilh had also been seen at that mosque. Malik resumed

23    attending ICOI only after Monteilh began approaching other people and speaking

24    to him less often. Even since returning to the mosque, Malik attends less often

25    than he had before he had contact with Monteilh.

26        79.    In about spring 2007, Monteilh asked Malik about studying Islam

27    abroad. Malik suggested that Monteilh look into the seminary where Malik had

28    studied, Dar al-Mustafa, which Malik had enjoyed very much.

- 24 -

**Plaintiff Yasser AbdelRahim**

80.     Plaintiff AbdelRahim was another victim of Monteilh's dragnet surveillance of Muslims in Irvine. AbdelRahim started attending ICOI in about 2005. Shortly afterwards, he rented a room in a large house where a friend he met through the mosque lived. Over the next few months, two other mutual friends from ICOI, and AbdelRahim's brother, moved into the house as other roommates left. All five of the housemates were, like AbdelRahim, of Egyptian origin.

81.     In about July 2006, one of AbdelRahim's roommates told him about a guy who had taken *shahadah* at the mosque. The following Saturday, they saw Monteilh and introduced themselves, offering to help him learn about Islam if he had any questions. Monteilh said that he appreciated it and took their phone numbers.

82.     Shortly afterward, Monteilh called AbdelRahim and began socializing with AbdelRahim and his roommates. They talked, went out to get coffee, and soon AbdelRahim invited Monteilh to their house for *iftar* (a meal eaten during Ramadan). Monteilh began to spend time with them at their house watching TV or playing X-box. AbdelRahim and his roommates also tried to help Monteilh feel welcome by introducing him to other people in the Muslim community.

83.     Initially, Monteilh talked with AbdelRahim and his roommates about a variety of innocuous topics — not only about Islam, but about politics, world affairs, movies, and sports. At some point, however, Monteilh began asking questions about *jihad*, again with a focus on violence. AbdelRahim found this odd, and responded that Monteilh should not concern himself with that, but instead should concentrate on developing his faith, and should talk to the imam at ICOI if he had questions about the meaning of *jihad*. However, Monteilh persisted in raising the subject. AbdelRahim eventually became worried that Monteilh had asked him several times about *jihad*, particularly when he heard from several of his friends at the mosque that Monteilh had made similar inquiries

- 25 -

with them. AbdelRahim also noticed that Monteilh guided conversations to political subjects like the wars in Iraq and Afghanistan, and would say inflammatory things that seemed aimed at eliciting agreement or angry responses from others.

84.    Shortly afterward, a friend of AbdelRahim reported to him that Monteilh had asked the friend to coffee to discuss a personal issue, but then started asking particularly pointed questions about *jihad*. Upon hearing this, AbdelRahim confronted Monteilh. AbdelRahim told Monteilh that if someone was teaching him this view of *jihad*, then he needed to find another teacher.

85.    After this conversation, AbdelRahim stopped speaking with Monteilh or returning his calls. Over the next several months, AbdelRahim noticed that Monteilh was spending time with different people at the mosque, and AbdelRahim warned a few of them about his concerns regarding Monteilh.

**The FBI's "Dragnet" Approach**

86.    The interactions between Monteilh and Plaintiffs Fazaga, Malik, and AbdelRahim were part of a broader pattern of dragnet surveillance that Monteilh engaged in at the behest of his FBI handlers. Two FBI Special Agents instructed Monteilh to gather information on Muslims in general, and instructed him to adopt strategies of information-gathering and surveillance that ensured that he would obtain that information in an indiscriminate manner, such that Plaintiffs and numerous other people were surveilled solely due to their religion. They also provided Monteilh with the tools needed to conduct this indiscriminate surveillance, including sophisticated audio and video recording devices. Again, their instructions ensured that the surveillance tools would target people solely due to their religion.

87.    Monteilh's handlers at the FBI were FBI Special Agent Kevin Armstrong and FBI Special Agent Paul Allen. Agents Armstrong and Allen supervised all of Monteilh's work with the FBI. The FBI paid Monteilh for the

- 26 -

1    duration of his work for Agents Armstrong and Allen, in amounts ranging from

2    about $6,000 to over $11,000 per month.

3        88.    Agents Armstrong and Allen told Monteilh that the FBI used the

4    name "Operation Flex" for the surveillance program that used him, and used that

5    term repeatedly. Agents Armstrong and Allen told Monteilh that the name

6    referenced him, since he operated under the cover of a fitness consultant. But they

7    also told Monteilh that Operation Flex was a broader surveillance program that

8    went beyond just his work.

9        89.    The central feature of the FBI agents' instructions to Monteilh was

10   their directive that he gather information on Muslims, without any further

11   specification. Agents Armstrong and Allen did not limit Monteilh to specific

12   targets on which they wanted information. On the contrary, they repeatedly made

13   clear that they were interested simply in Muslims. To the extent they differentiated

14   within that group, they held a heightened interest in Muslims who were particularly

15   religious.

16       90.    When Agents Armstrong and Allen first sent Monteilh to meet the

17   imam at ICOI and began infiltrating the Muslim community, they gave him no

18   specific targets, but instead told him to gather as much information on as many

19   people in the Muslim community as possible. Agent Allen told Monteilh, "We

20   want to get as many files on this community as possible." Agents Armstrong and

21   Allen told Monteilh that the United States was five to ten years behind Europe in

22   the extent of Islamic presence, and that they needed to build files on as many

23   individuals as possible so that when things started to happen, they would know

24   where to go. They said they were building files in areas with the biggest

25   concentrations of Muslim Americans — New York; the Dearborn, Michigan area;

26   and the Orange County/Los Angeles area.

27       91.    In addition to information about the membership of each mosque,

28   Agents Armstrong and Allen instructed Monteilh to get the names of all board

- 27 -

ER - 207

members, imams, people who taught classes at the mosques, and other leadership figures within the mosques.

92.     Over the course of the investigation, Agents Armstrong and Allen sent Monteilh to about ten mosques to conduct surveillance and audio recording in each one.  Monteilh spent the most time at ICOI, which he attended daily, but spent significant time at other mosques, including the Orange County Islamic Foundation mosque in Mission Viejo, Durul Falah in Tustin, Omar al-Farouq mosque in Anaheim, Islamic Society of Orange County in Garden Grove, Al-Fatiha in the West Covina/Azusa area, the mosque in Lomita, and King Fahd mosque in Culver City.  For about five or six months Monteilh went at least once a week to each of these mosques, and would go to as many as four different mosques in a day to meet with and talk to people, if not to pray.

93.     Agents Armstrong and Allen initially told Monteilh he would make his first contact with the community by attending services at a mosque in Anaheim, but then instructed him to attend ICOI instead because it was closer to where he lived, so he could spend more time there.

94.     Agents Armstrong and Allen also informed Monteilh that the surveillance program was itself spread indiscriminately across the area's mosques. Electronic surveillance equipment was installed in at least eight area mosques including ICOI, and mosques in Tustin, Mission Viejo, Culver City, Lomita, West Covina, and Upland.  They told him at one point that they could get in a lot of trouble if people found out what surveillance they had in the mosques, which Monteilh understood to mean that they did not have warrants.  Nonetheless, Agent Armstrong told Monteilh that the FBI had every mosque in the area under surveillance — including both the ones he went to and the ones he didn't.

95.     Upon information and belief, Agents Allen and Armstrong caused such electronic surveillance equipment to be installed at the Mission Viejo mosque and used it to monitor conversations of Plaintiff Yassir Fazaga, including

- 28 -

1   conversations held in parts of the mosque not open to the public, including Sheikh

2   Fazaga's office.

3         96.    Apart from the electronic surveillance program, Agents Armstrong

4   and Allen also directed their surveillance at people on the basis of their religion by

5   instructing Monteilh to look for and identify to them people with certain religious

6   backgrounds or traits, such as anyone who studied *fiqh* (a strand of Islamic law

7   concerning morals and etiquette), who was an imam or sheikh; who went on *Hajj*;

8   who played a leadership role at a mosque or in the Muslim community; who

9   expressed sympathies to *mujahideen*; who was a "white" Muslim; or who went to

10  an Islamic school overseas.

11        97.    Even with respect to these categories of Muslims, Monteilh's handlers

12  did not tell him to limit the information he collected to those people. Agents

13  Armstrong and Allen would occasionally instruct Monteilh to spend more time

14  with or find out more about particular people he identified, but these were always

15  people Monteilh had identified to them during the course of the operation, not

16  people who had been targeted from the outset.

17        98.    Agents Armstrong and Allen also instructed Monteilh to focus on

18  Muslim youth by keeping an eye out for people who tended to attract young

19  Muslims. They instructed him to identify and gather information on such people.

20  For example, Monteilh told them about a popular youth group on Tuesdays at ICOI

21  run by the imam. Students from the Muslim Student Union at the University of

22  California, Irvine ("UCI") would attend. On many occasions, Monteilh recorded

23  the youth group meetings at ICOI by leaving his possessions, including the

24  recording key fob, near where the group met in the prayer hall so that all of their

25  discussions could be recorded. Monteilh did this by going into the prayer hall

26  during their meetings to pray, and then leaving behind his possessions as if he had

27  forgotten them or just chosen to leave them there while he did other things.

28  Monteilh would go to another part of the mosque or the courtyard, and return

- 29 -

1  sometime later to collect his things. Monteilh told his handlers he did this in his

2  written reports. His handlers never instructed him to stop this practice, and instead

3  repeatedly discussed with him the contents of the recordings obtained in this

4  manner.

5  **The FBI's Surveillance Strategies**

6  99.    The FBI agents instructed Monteilh to engage in a number of

7  surveillance strategies, all of which served to gather information on Muslims in an

8  indiscriminate manner.

9  100.    After Monteilh agreed to work as a confidential informant and

10  underwent some training under the supervision Agents Armstrong and Allen,

11  Agents Armstrong and Allen instructed him to make the appointment to see the

12  imam at the ICOI. Once Monteilh had taken *shahadah* and began attending both

13  ICOI and other mosques, Agents Armstrong and Allen instructed him to gather

14  information on the Muslims at the mosques.

15  101.    Agents Armstrong and Allen instructed Monteilh to obtain

16  information through various methods. They told him to take every opportunity to

17  meet people, get their contact information, meet them privately to get to know

18  them, find out their background, find out their religious and political views, and get

19  any information about them that he could to pass on to the FBI.

20  102.    As a result, over the time he spent at ICOI and other mosques

21  Monteilh did not focus on any particular group of people, such as those who may

22  have engaged in criminal activity or even those from a particular country, but

23  instead socialized widely with different groups and individuals. ICOI is a multi-

24  lingual, multi-ethnic mosque, with separate social groups that form around

25  common language or country of origin. Monteilh surveilled people from every

26  social group regardless of their ethnic origin or dominant language.

27  103.    Pursuant to his handlers' instructions, Monteilh went out of his way to

28  engage all of these different groups, even when he had no natural connection to

- 30 -

them. For example, he attended religion classes given in Arabic even when he did not speak Arabic, and questioned 17 and 18 year olds about religious doctrine and politics, when a stranger in his forties might be expected to ask such questions of adults, not youth. Similarly, Monteilh spent significant time with a group of Egyptians, a group of Pakistanis and Indians, a group from Syria and Lebanon, and with the younger, second-generation social groups (generally identified as "Muslim Students Union," or MSU, in reference to on-campus Muslim organizations). Within each group, he spoke to large numbers of people so as to probe their views on religion, politics and violence, and then report them back to his handlers at the FBI.

104. Within these groups, Monteilh tended to focus more heavily on people who were more religious; people who came to the mosque only to attend Friday prayers were less likely to be recipients of his attention.

105. Agents Armstrong and Allen also gave Monteilh a standing order to gather information on Muslims' charitable giving. They instructed him to collect any pamphlet or brochure at any mosque that concerned charitable donations, to inquire of Muslims about which charities and Islamic schools to give to, and to then pass on the names of the charities and Islamic schools to them.

106. Monteilh's handlers also instructed him to attend Muslim fundraising events, to interact with the community and gather information, to identify people who attended and who they came with, and, if there were any speakers, to record what those speakers said.

107. Agents Armstrong and Allen also asked Monteilh to collect information on the travel plans of Muslims in the community. They told him that they shared this information with the Department of Homeland Security so as to be able to monitor or search people during their travels.

108. Monteilh's handlers also instructed him to attend lectures by Muslim scholars and other guest speakers. Because Monteilh's handlers wanted to know

- 31 -

ER - 211

1  both what the lecturers said and who attended these lectures, they equipped

2  Monteilh with a video surveillance device that had a camera in a shirt button, so

3  that he could both record lectures and film attendees socializing. Monteilh also

4  collected license plate numbers from the parking lots to identify those who

5  attended.

6      109. In keeping with his handlers' orders, Monteilh also attended classes at

7  the mosque so as to obtain more information on Muslim community members. For

8  example, he attended an Arabic language class at ICOI from about December 2006

9  to March 2007. On his handlers' instructions, he obtained and provided them with

10  the lists of the individuals who attended the class. Monteilh also attended a course

11  in *fiqh*, and obtained and provided the class list to his handlers, as per their

12  instructions.

13      110. Agents Armstrong and Allen also instructed Monteilh to attend *fajr*

14  (dawn) prayers, which are held about 4 a.m., or *ishaa* (late) prayers, which are held

15  about 9:30 p.m. Agents Armstrong and Allen told him that people who attended

16  prayers very early in the morning or late at night, and especially both, were very

17  devout and therefore more suspicious. They instructed him to obtain the names

18  and the license plate numbers of individuals who attended these prayers. Agents

19  Armstrong and Allen increased his pay when he agreed to go to *fajr* prayer four

20  days a week.

21      111. Agents Armstrong and Allen also instructed Monteilh to memorize

22  certain *ayas* and *surahs* (verses and chapters from the Quran) and to ask Muslims

23  about them. They said they had picked these verses because they believed them to

24  be susceptible to a "jihadist" interpretation, so that people's reactions to them

25  would help discern who was and was not a threat. They told Monteilh that

26  discussions about these verses would elicit responses that could be used to justify

27  additional surveillance measures.

28      112. Agents Armstrong and Allen also expressed interest in any Muslims

who followed websites that the agents believed were "jihadist," including *MissionIslam.com* and *CagePrisoners.com* (a site devoted to raising awareness about the detainees at Guantanamo Bay). Agent Allen told Monteilh to encourage people he spoke with to go to these websites because they could document people's visits to the website and use that either to pressure them to become informants or to justify further surveillance on them.

113. Agents Armstrong and Allen also encouraged Monteilh to bring up in conversation certain Muslim scholars and thinkers whom they believed were extremist, so as to elicit people's views on them. The scholars they instructed him to discuss included a number of Islamic scholars who, at the time, were both widely popular and moderate, such as Sheikh Suhaib Webb and Yusef Estes.

114. Monteilh also used his cover as a fitness consultant to gather information on the Muslims with whom he interacted. During his time working on Operation Flex, Monteilh told people in the Muslim community that he worked as a fitness consultant. In about November 2006, Agent Allen instructed Monteilh to start going to the gym to work out with people he met from the Muslim community, in order to get close to them and obtain information about them. Again, Monteilh's handlers did not limit the scope of their instructions; the directive included anyone from any mosque without any specific target, for the purpose of collecting as much information as possible about Muslims in the community. Pursuant to these instructions, Monteilh worked out with Muslims in various gyms around the Orange County area and elicited a wide variety of information, including travel plans, political and religious views.

115. The goal of these conversations was to obtain compromising information that his handlers could use to pressure the Muslims with whom Monteilh interacted into providing information or becoming informants. Monteilh recorded these conversations using the equipment on his key fob or cell phone. This surveillance was so fruitful that Monteilh's handlers eventually told him they

- 33 -

1  were seeking approval to have him open a Muslim gym.

2  116.  Agents Armstrong and Allen talked repeatedly with Monteilh about

3  obtaining new informants within the Muslim community, primarily by getting

4  information on potential informants that could be used against them if they refused

5  to inform — such as immigration issues, sexual activity, business problems, or

6  crimes like drug use.  Agents Armstrong and Allen instructed Monteilh to pay

7  attention to people's problems, to talk about and record them, including marital

8  problems, business problems, and petty criminal issues.  Agents Armstrong and

9  Allen on several occasions talked about different individuals that they believed

10 might be susceptible to rumors about their sexual orientation, so that they could be

11 persuaded to become informants through the threat of such rumors being started.

12 117.  Agents Armstrong and Allen also often spoke with Monteilh about a

13 maxim that "everybody knows somebody."  They explained that if someone is

14 from Afghanistan, that meant that they would likely have some distant member of

15 their family or acquaintance who has some connection with the Taliban.  If they

16 are from Lebanon, it might be Hezbollah; if they are from Palestine, it might be

17 Hamas.  By finding out what connections they might have to these terrorist groups,

18 no matter how distant, they could threaten the individuals and pressure them to

19 provide information, or could justify additional surveillance.

20 118.  Agents Armstrong and Allen also instructed Monteilh to engage in

21 acts that would build his reputation as a devout Muslim who had access to black

22 market items.  On one occasion, Agents Armstrong and Allen instructed Monteilh

23 to provide Vicodin to a person whose father was sick in a foreign country.  On

24 another occasion, Agent Allen instructed Monteilh to provide prescription anabolic

25 steroids to another two individuals to similarly further his credibility, which he did.

26 119.  During their regular meetings with Monteilh, Agents Armstrong and

27 Allen also showed him photographs of Muslims from the community, taken from

28 many of the methods identified above (e.g. at the gym, at fajr prayer, etc.), asked

- 34 -

him to identify the people in those photographs, and then directed him to provide as much information as possible about each person, including what mosque they attended, their ethnicity or country of origin, the languages they spoke, the people they associated with, what kind of car they drove, their occupation or whether they were a student, as well as any other information Monteilh could obtain.

120.   One theme ran throughout all of these different surveillance gathering strategies:  Agents Armstrong and Allen expressed interest in gathering information only on Muslims, and they set aside any non-Muslims who were identified through surveillance Monteilh performed.  For example, on several occasions when Agents Armstrong and Allen asked Monteilh to identify individuals from photographs taken by surveillance cameras at the entrances to gyms, they presented him with photographs of individuals who were not Muslim — usually Latino — who Monteilh had spoken to or who had simply helped him lift weights.  Each time Monteilh indicated to Armstrong and Allen that the individual identified was not a Muslim, they discarded the picture.

121.   Indeed, both Agent Armstrong and Agent Allen, as well as other agents, explicitly told Monteilh that Islam was a threat to America's national security.

**The FBI's Surveillance Tools**

122.   Agents Armstrong and Allen recorded information about virtually all of the people with whom Monteilh interacted in several different ways – through audio recording, video recording, extensive review of Monteilh's handwritten notes about all aspects of his daily interactions, and a dragnet program to obtain cellphone numbers, email addresses, and information about internet usage.

123.   Upon information and belief, virtually all of Monteilh's interactions with Muslims in the mosques were recorded by audio, video, or both.  The recordings were then transcribed and reviewed by officials within the FBI.  Agent Allen told Monteilh that there was a team transcribing all of his recorded

- 35 -

ER - 215

conversations.

124.   Agents Armstrong and Allen instructed Monteilh that because of his criminal background, all information he collected would have to be recorded. After about September 2006, Armstrong and Allen gave Monteilh a cell phone and two key fobs (which resembled the remote controls for car locks) with audio recording devices in them, and which Monteilh used to record all day, every moment he worked undercover, regardless of whom he was meeting or what was discussed.

125.   People at ICOI noticed that Monteilh would often forget his keys, so that they would be delivered to the imam's office.  People joked about Monteilh frequently forgetting his keys, and for having his keys out during lectures and conversations, even if he had to get them out after he sat down.

126.   In fact, Monteilh utilized the trick of leaving his keys around the mosque to allow audio recording of conversations to take place even when he was not present.

127.   On several occasions, Monteilh also left the recording devices in locations in mosques in the area.  For example, in a large mosque in Culver City, Monteilh several times attended with a friend who changed in the office from business clothes to more traditional dress before they went into the mosque to pray. Monteilh left his keys in the office so that the key fob would record staff and board members who came in and talked, then retrieved his keys from the office when they were finished in the mosque.  Monteilh did this several times, and in several different mosques.  Agents Armstrong and Allen received the notes where Monteilh said he did this but never instructed him to stop.

128.   Monteilh's recording activity was not limited to audio.  Beginning in about February 2007, on numerous occasions Agents Armstrong and Allen outfitted Monteilh with video surveillance equipment that recorded through a camera hidden in a button in the front of his shirt, while recording audio as well.

- 36 -

1 Toward the end of his assignment, Agents Armstrong and Allen had equipped

2 Monteilh to use this video surveillance as often as several days per week.

3   129. Agents Armstrong and Allen instructed Monteilh to use the video

4 camera for various specific purposes, including to capture the internal layout of

5 mosques, to film basketball or soccer games to see who associated with whom, to

6 film guest lectures at mosques to see what was said and who attended, and to

7 record the interiors of people's houses. Monteilh's handlers at various times

8 instructed him to open particular doors in homes or mosques and film the room

9 behind.

10   130. Agents Armstrong and Allen also used Monteilh's activities to gather

11 telephone and cell phone numbers, email addresses, and other electronic

12 information for indiscriminate surveillance.

13   131. Agents Armstrong and Allen told Monteilh they wanted him to collect

14 contact information, particularly email addresses and phone numbers. At times,

15 they even gave Monteilh quotas to collect contact information for ten new Muslims

16 per day. Agents Armstrong and Allen told Monteilh that they monitored his email

17 and cell phones to obtain the telephone numbers and email addresses of people

18 with whom he corresponded. Agent Allen instructed him to give out his cell phone

19 number widely so that people would call him or give their cell numbers in return,

20 so that the FBI could then collect those numbers. Armstrong and Allen also

21 instructed him to email frequently with people, so that the FBI could collect their

22 email addresses. Agents Armstrong and Allen told Monteilh that they used the cell

23 phone numbers and email addresses of individuals who contacted him to obtain

24 information from those individuals' phone and email accounts, including the list of

25 people they contacted.

26   132. Agents Armstrong and Allen told Monteilh that they kept the numbers

27 and emails he collected in a database that could be monitored for international

28 calls, or cross-referenced against phone calls or emails to persons of interest who

- 37 -

1    were believed to be linked to terrorism. Monteilh's handlers also told him that the

2    emails could be used to determine if the person was visiting certain websites, and

3    with whom they were emailing. Monteilh joined email distribution lists for many

4    of the mosques he surveilled, and would forward messages from the mosques to

5    the FBI so they would be informed about events and bulletins, and so they would

6    have the email addresses of anybody else who received the message.

7        133. Agents Armstrong and Allen also instructed Monteilh to gather all

8    available information, including literature, on events occurring at the mosques.

9    Following these instructions, Monteilh would collect brochures on charities that

10   were distributed in the mosques, visit the mosques' libraries or book areas, collect

11   newsletters and bulletins to see what activities were going on in the mosque, and

12   collect the names of individuals who attended, as well as their cell phone numbers

13   and license plates when possible. He would record this information either

14   electronically or through a system of notes.

15       134. Agents Armstrong and Allen instructed Monteilh to compose daily

16   notes of his activities and the surveillance he had undertaken. These notes were

17   extensive — Agents Armstrong and Allen instructed Monteilh to "empty [his]

18   head" about what he had learned that day — so that Monteilh regularly spent an

19   hour or two each evening writing notes. After a while, these notes became so

20   voluminous that Armstrong and Allen instructed Monteilh to prepare separate

21   "supplemental notes" containing any sensitive or particularly valuable information.

22   These were all handwritten. Armstrong and Allen took these notes from Monteilh

23   when they met him twice a week.

24       135. At times, Monteilh reported to Agents Armstrong and Allen that when

25   he was left alone in a mosque office, he had looked in drawers for information.

26   Armstrong and Allen never instructed him not to do this.

27       136. Agents Armstrong and Allen were well aware that many of the

28   surveillance tools that they had given Monteilh were being used illegally. Agent

- 38 -

1    Armstrong once told Monteilh that while warrants were needed to conduct most

2    surveillance for criminal investigations, "National security is different. Kevin is

3    God." Agent Armstrong also told Monteilh more than once that they did not

4    always need warrants, and that even if they could not use the information in court

5    because they did not have a warrant, it was still useful to have the information. He

6    said that they could attribute the information to a confidential source if they needed

7    to.

8        137. Over the course of the fourteen months that Agents Armstrong and

9    Allen supervised Monteilh's work as an informant in the Los Angeles and Orange

10   County Muslim communities, they gathered hundreds of phone numbers and

11   thousands of email addresses of Muslims. They also obtained background

12   information on hundreds of individuals, gathered hundreds of hours of video

13   recordings that captured the interiors of mosques, homes, businesses, and the

14   associations of hundreds of Muslims. They also obtained thousands of hours of

15   audio recording of conversations — both where Monteilh was and was not present

16   — as well as recordings of public discussion groups, classes, and lectures

17   occurring in mosques and at other Muslim religious and cultural events.

18   **The FBI's Oversight, Supervision, and Use of Monteilh**

19       138. Upon information and belief, FBI Agents Armstrong and Allen, as

20   well as their superiors Director Tidwell, and Agents Walls and Rose, maintained

21   extremely close oversight and supervision of Monteilh. Moreover, because they

22   made extensive use of the results of his surveillance, they knew in great detail the

23   nature and scope of the operation, including the methods of surveillance Monteilh

24   used and the criteria used to decide his targets, and continually authorized their

25   ongoing use.

26       139. From about August 2006 to October 2007, Agents Armstrong and

27   Allen met with Monteilh about twice per week for meetings to discuss their

28   assignments for him, to give him instructions, to obtain his daily notes, and to

- 39 -

either exchange his recording devices for fresh ones or upload the recordings to a computer. These meetings were held in public places, outside the areas where the Muslim community lived. About once per month, they met with Monteilh in a room at the Anaheim Hilton Hotel, where they discussed the information he had obtained and gave him instructions in greater detail.

140. Agents Armstrong and Allen monitored and supervised Monteilh's work as an undercover informant closely. Through the daily notes they collected from him and the twice-weekly meetings, Monteilh told them about virtually everything he did and all the information he had obtained. They gave Monteilh instructions, or "tasking orders," regularly. They gave him both standing instructions on kinds of information to gather whenever possible — for example, to meet and get contact information for a certain number of Muslims per day — and also gave him specific instructions on information they wanted, often in response to information he provided – such as, for example, instructions to get inside a certain house within the week or to have lunch with a particular person two times. Agents Armstrong and Allen also gave Monteilh standing orders to call one of them every day, even on his days off, which Monteilh would do, apprising them on the call of his day's activities.

141. Agents Armstrong and Allen at various times discussed with Monteilh what happened to these notes. They said that their supervisors read the notes, that the notes were seen in "the Beltway," that they were seen by people with "a lot of authority," and that the Assistant Director in Charge of the FBI's Los Angeles field office, who at that time was Stephen Tidwell, read all of Monteilh's daily notes.

142. During the course of the investigation, Agents Armstrong and Allen discussed with Monteilh how the information he collected was actually being used. They assured him that all the information he collected was retained, and that they discarded none of it. They also told him that the information was used to build files on individuals: that every person he contacted — whose phone number he got,

- 40 -

1    who he emailed, who he identified through photographs — had an individual file

2    in which the information he gathered was retained.

3          143.  On about four different occasions, during the meetings between

4    Agents Armstrong and Allen and Monteilh at the hotel room, they showed him a

5    huge photo array on a large board consisting of the photos of around two hundred

6    Muslims from the Orange County/Los Angeles area.  Agents Armstrong and Allen

7    used different sets of photographs for each of these meetings, so that Monteilh saw

8    hundreds of photographs over the four meetings.  They instructed him to arrange

9    the photos from the most dangerous to the least based on his knowledge and

10    experience.  The entire leadership of the Islamic community were in the photos —

11    sheikhs, imams, board members, prayer leaders, leaders of civic organizations, and

12    youth groups.  The process took hours.  Agents Armstrong and Allen also asked

13    Monteilh to assist them in organizing the photos according to categories such as

14    financial, operative, and leadership; to divide photos into possible cells according

15    to mosques and ethnicity or nationality.  The first of these meetings was in about

16    March 2007, and the last was in about September 2007.

17          144.  Over the course of several conversations, Agents Armstrong and

18    Allen told Monteilh that they considered the leaders in the Muslim community —

19    board members and leadership at mosques and leaders of Muslim organizations —

20    to be potential threats, and that they regularly surveilled them and maintained more

21    detailed files of information on their background and activities.

22          145.  In about early spring of 2007, Agents Armstrong and Allen told

23    Monteilh that information he had provided was particularly valuable, and told him

24    he was "gold" in Los Angeles and in Washington.  Agent Allen said that

25    information from the operation was followed by people "at the highest levels,"

26    and that the operation was among the ten most important intelligence

27    investigations going on in the country.  In about March or April 2007, Agent Allen

28    said that he had meetings with Stephen Tidwell and one of his supervisors from

Washington, D.C., Joseph Billy, Jr., about the operation.[30]  Around the same time period, Agent Allen flew to Washington, D.C. with his supervisor, Pat Rose, in part to meet with high-level FBI officials to get approval to open a gym for Muslims that would function in part as a mosque with a prayer room.  Agent Allen told Monteilh that approval to open the gym had been granted.

146.   At around that time, Agents Armstrong and Allen told Monteilh that information from the operation would be shared with other agencies — that information obtained on people's finances or foreign assets was shared with the Treasury Department, and that information about people's immigration issues would be sent to immigration officials.

**The End of the Monteilh Operation**

147.   Agents Allen and Armstrong had instructed Monteilh to ask general questions about *jihad* from the beginning of the operation.  In early 2007, they instructed him to start asking more pointedly about *jihad* and armed conflict, then to more openly suggest his own willingness to engage in violence.  Pursuant to these instructions, in one-on-one conversations, Monteilh began asking people about violent *jihad*, expressing frustration over the oppression of Muslims around the world, pressing them for their views, and implying that he might be willing or able to take action.

148.   In about May 2007, on instructions from his handlers, Monteilh told a number of individuals that he believed it was his duty as a Muslim to take violent actions, and that he had access to weapons.  Many members of the Muslim community at ICOI then reported these statements to community leaders, including Hussam Ayloush.  Ayloush both called the FBI to report the statements and instructed the individuals who had heard the statements to report them to the Irvine

---

[30] Upon information and belief, Billy was at the time the FBI's Assistant Director in Charge of the agency's Counterterrorism Division.

- 42 -

Police Department, which they did.

149. As a community, ICOI also brought an action for a restraining order against Monteilh to bar him from the mosque. A California Superior Court granted the restraining order in June 2007.

150. After the court granted the restraining order, Monteilh continued going to other mosques for a month or two, but then disappeared from the Muslim community.

151. At around the same time – during the summer of 2007 -- Agents Armstrong and Allen told Monteilh that Defendant Barbara Walls, then the Assistant Special Agent in Charge of the FBI's Santa Ana office, had come to distrust him and did not want him working any more. They told him there was significant conflict between Agent Walls and field agents over how to handle the operation, and that there had been an audit team sent from Washington, D.C., to examine Agent Walls' handling of one of the leads from the operation. Because of this conflict and complications surrounding the restraining order, Agents Armstrong and Allen told Monteilh in about September 2007 that he would be going on hiatus from undercover work in the Orange County Muslim community.

152. During one of their final meetings with Monteilh in about October 2007, Agent Allen told Monteilh that although his role was over, Operation Flex and the FBI's operations in Orange County and Los Angeles would continue. He said that the information Monteilh had provided was a valuable foundation for the FBI's continuing work.

153. During one of the final meetings between Agents Armstrong and Allen and Monteilh, Agent Walls was also present. She warned Monteilh to stay silent about the operation.

154. In August 2008, Monteilh returned to Irvine and contacted the Irvine Police Department to voice concerns about his safety because of his role as an informant. He spoke with a detective, as well as a sergeant that he recognized as

- 43 -

someone who had once escorted him when he was undercover with his handlers. The sergeant knew very specific information about individuals Monteilh had surveilled who he had concerns about, and told Monteilh in this meeting that he worked for JTTF. He told Monteilh that several individuals he had asked him about were still under surveillance. He also specifically mentioned that surveillance was ongoing at gyms and at least two mosques.

**Monteilh's Identity Revealed**

155. On or about about February 20, 2009, a man named Ahmed Niazi was arrested in Orange County and charged in federal criminal court with immigration fraud for lying on his naturalization application.

156. Niazi had met Monteilh at ICOI and had spent a significant amount of time with him. Niazi had heard Monteilh's most direct statements about *jihad* and had reported those statements to Hussam Ayloush and to the Irvine Police Department.

157. At Niazi's bail hearing, which occurred on February 24, 2009 in federal district court in Santa Ana, California, FBI Special Agent Thomas Ropel testified that Niazi presented a threat to national security. Agent Ropel testified that he had heard numerous recordings of conversations between Niazi and a confidential informant. Agent Ropel stated that this confidential informant was the man Hussam Ayloush had reported to the FBI, and that Niazi and another individual had reported to the Irvine Police Department. Together, these statements confirmed that the informant was Craig Monteilh, and that he had recorded numerous conversations that he had while an informant.

158. Charges against Niazi were dismissed at the request of the United States Attorney's office on about September 30, 2010.

159. Agent Ropel's testimony on February 24, 2009 confirmed for the first time that Monteilh was a confidential informant for the FBI who had recorded numerous conversations.

- 44 -

ER - 224

160.   Prior to that testimony, Plaintiffs did not know and could not reasonably have known that Monteilh was working for the FBI as an informant; that the FBI and Defendants, through Monteilh, had surveilled and gathered information about them from their interactions with Monteilh; and that the FBI had subjected them to this surveillance because of their religion.  Upon information and belief, prior to February 2009, Monteilh never told anyone outside of law enforcement and his immediate family that he was working as an informant for the FBI.

161.   Subsequent to Ropel's testimony, a number of different sources have confirmed that Monteilh worked for the FBI, including Monteilh himself.

162.   In news accounts of the investigation, Monteilh himself has stated to reporters that the FBI paid him more than $170,000 over fifteen months to be an undercover informant in mosques in Orange County, that "he was instructed to infiltrate mosques throughout Orange [County] and two neighboring counties in Southern California," that he was "ordered to randomly surveil and spy on Muslims to ferret out potential terrorists," and that his handlers told him that "Islam is a threat to our national security."[31]

163.   Upon information and belief, on August 20, 2007, the district attorney in a state criminal case against Monteilh from 2003 moved to terminate his probation early.  In the proceeding, the district attorney explained the basis for the termination:

> Apparently, [Monteilh] is working with F.B.I. Agent Kevin Armstrong. He has given Agent Armstrong very, very valuable information that has proven to be essential in an F.B.I. prosecution. It was Agent Armstrong that contacted the head deputy and the head deputy instructed us to ask

---

[31] See Jerry Markon, *Tension grows between Calif. Muslims, FBI after informant infiltrates mosque*, WASH. POST (Dec. 5, 2010).

- 45 -

. for termination.[32]

A copy of the transcript is attached hereto as Attachment 1.

164.   Further confirmation comes from court documents filed in a civil action that Monteilh brought against the FBI and the City of Irvine.  In some of those documents, the City of Irvine acknowledged that while a pending criminal investigation of Monteilh was underway, members of the FBI's Orange County Joint Terrorism Task Force approached members of the Irvine police force and asked them to delay any action against Monteilh.[33]

165.   In discovery served by Monteilh in that same federal lawsuit, the City of Irvine admitted that it and its agents "were aware that [Monteilh] was an FBI informant," and that the City of Irvine "[was] informed by the FBI that [Monteilh] was an FBI informant."[34]

166.   Correspondence in connection with that lawsuit provides yet more evidence of Monteilh's work as an FBI informant.  Upon information and belief, on June 16, 2010, Associate General Counsel for the FBI, Henry R. Felix, sent a letter to Adam Krolikowsi, an attorney representing Monteilh in his civil action against the FBI, in reply to a letter Krolikowski had sent the previous day.  Felix's June 16 letter indicated that Monteilh had signed a non-disclosure agreement with the FBI on October 5, 2007.  Felix noted that Krolikowsi had sent previous letters, but stated that his most recent letter mentioned "Operation Flex" and that this was

---

[32] Transcript of Proceedings held Aug. 20, 2007, Probation Termination, *People v. Monteilh*, L.A. Sup. Ct. No. KA059040, filed in support of Motion to Set Aside Conviction, Exh. I, *Monteilh v. Federal Bureau of Investigation*, Dkt. 89-9, Case No. 10-cv-00102 JVS (RNBx) (C.D. Cal.).

[33] *See* Answer to Complaint of City of Irvine and Ronald Carr, *Monteilh v. Federal Bureau of Investigation*, Dkt. 23, Case No. 10-cv-00102 JVS (RNBx) (C.D. Cal.).

[34] *See* Motion to Set Aside Conviction, Exh. G, *Monteilh v. Federal Bureau of Investigation*, Dkt. 89-7, Case No. 10-cv-00102 JVS (RNBx) (C.D. Cal.) (exceprts of City of Irvine's responses to requests for admissions).

- 46 -

1  "the first letter in which [Krolikowski] reference[d] a particular FBI operation or

2  investigation." A copy of this letter is attached hereto as Attachment 2.[35]

3      167.  Monteilh himself confirms many of the above-described details of his

4  work as an informant, including that he worked for the FBI to infiltrate the Muslim

5  community of Southern California from about July 2006 until October 2007; that,

6  during this time, he spent about six or seven days a week posing as a Muslim

7  convert named Farouk al-Aziz; that he conducted surveillance and other

8  information-gathering on a wide variety of individuals and organizations in the

9  Muslim community, solely because they were Muslim; and that he conducted

10 surveillance of Plaintiffs as alleged below.

11 **Monteilh's Interactions with Sheikh Yassir Fazaga**

12     168.  Agents Armstrong and Allen instructed Monteilh to conduct

13 surveillance of the Orange County Islamic Foundation (OCIF) mosque in Mission

14 Viejo, California. The imam of that mosque is Plaintiff Yassir Fazaga.

15     169.  Agents Armstrong and Allen told Monteilh they believed that Plaintiff

16 Fazaga, the imam of OCIF, was a radical, for several reasons: They said that

17 Fazaga directed students on how to conduct demonstrations and encouraged them

18 to speak out. They said that when the FBI Assistant Director in Charge of the Los

19 Angeles Field Office, Stephen Tidwell, attended a meeting at an Orange County

20 mosque in about spring 2006, Fazaga openly pressed Tidwell about FBI informants

21 in mosques, and when Tidwell denied putting informants in mosques, Fazaga had

22 openly said he did not believe Tidwell. They also said that Fazaga was a person of

23 interest because he was a board member of "In Focus News," a prominent Muslim

24 newspaper that was vocal in speaking out against U.S. government actions that

25 _____

26 [35] A copy of the letter was filed by Monteilh in his damages action against the FBI.

27 *See* Motion to Set Aside Conviction, Exh. D, *Monteilh v. Federal Bureau of Investigation*, Dkt. 89-4, Case No. 10-cv-00102 JVS (RNBx) (C.D. Cal.).

28

- 47 -

ER - 227

1   negatively affected Muslims and which Agents Armstrong and Allen believed was

2   anti-American and linked to Muslim civil rights groups.[36]

3       170.  Agents Armstrong and Allen told Monteilh that OCIF was linked to

4   ICOI, a mosque they were also interested in, because the two mosques held joint

5   events and jointly organized foreign trips, including the hajj pilgrimage to Mecca.

6   They referred to OCIF as a "definite hotspot."

7       171.  Agents Armstrong and Allen also told Monteilh that OCIF was radical

8   because it had certain religious scholars as guest speakers whom they believed

9   were radical —particularly Yusef Estes, Suhaib Webb, and a local imam, Ahmad

10   Sakr.  They said that a moderate mosque would not have chosen these guest

11   speakers.

12       172.  Agents Armstrong and Allen instructed Monteilh to attend the Yusef

13   Estes lecture which Sheikh Fazaga's mosque hosted.  They equipped him with

14   hidden video equipment that he used to video record the entire lecture, the

15   literature Estes had set out, and the people who attended.

16       173.  Pursuant to Agent Armstrong and Allen's instructions, Monteilh

17

---

18   [36] Southern California *InFocus News* is the largest Muslim newspaper in

19   California, with a circulation of about 25,000 and distribution at over 350 Muslim
businesses and mosques throughout California, including every major mosque in

20   Los Angeles and Orange County.  According to its website, the paper's objective is

21   to provide honest, effective and professional reporting, with a focus on California
Muslims that both brings forth issues of concern to the California Muslim

22   communities and provides a window into the American Muslim experience for all

23   Californians.  The paper has not only covered stories on local Muslim events and
leaders, but has examined taboo topics such as domestic violence in the Muslim

24   community and written stories to bridge community divides, such as by profiling

25   families of other religions.  Like many other newspapers, *InFocus News* has at
times given news coverage or printed opinion pieces that supported or opposed

26   various policies of the United States government.  The paper has never advocated

27   violence against the United States or its citizens or done anything else that would
reasonably justify characterizing it as "anti-American."

28

- 48 -

ER - 228

1    attended OCIF a number of times to conduct surveillance, including during Sheikh

2    Fazaga's sermons.

3        174.    Agent Armstrong and Allen also equipped Monteilh with a video

4    camera hidden in a shirt button that he used to take video of the interior of OCIF.

5    Agents Armstrong and Allen instructed Monteilh to get a sense of the schematics

6    of the place — entrances, exits, rooms, bathrooms, locked doors, storage rooms, as

7    well as security measures and whether any security guards were armed.  Agent

8    Armstrong later told Monteilh that they had used the information he gathered to

9    enter the mosque.

10        175.    On the instructions of Agents Armstrong and Allen, Monteilh made

11    video recordings of an area in the back of OCIF where there were religious books

12    available for congregants to use, so that they could determine if any of the

13    literature there was extremist.

14        176.    Agents Armstrong and Allen also instructed Monteilh to make

15    contacts within Sheikh Fazaga's Mission Viejo congregation.  To comply,

16    Monteilh worked out on various different occasions with about 40 of their

17    congregants, usually in groups, obtaining the email address and cell phone number

18    of anyone he worked out with and passing that information on to his handlers.

19        177.    Agents Armstrong and Allen instructed Monteilh to gather additional

20    information on a few individuals within the congregation who seemed to have the

21    most direct access to Fazaga — to gather their email addresses, cell phone

22    numbers, and addresses, as well as basic background information such as their

23    occupation, whether they were married or had children, and what prayers they

24    attended.  Monteilh gathered this information and passed it on to Armstrong and

25    Allen.

26        178.    Agents Armstrong and Allen instructed Monteilh to monitor Fazaga at

27    the prayers he conducted, to record and report on what he said, to talk with him

28    afterwards and see who else talked to him afterwards, and to note individuals who

- 49 -

1   appeared to be close to him.   Monteilh also monitored what was said by a member

2   of the congregation who substituted for Fazaga during one of the prayers.

3        179.   In about April 2007, a member of the community introduced Monteilh

4   to Fazaga while he was recording with a hidden video camera.  Monteilh also

5   obtained Fazaga's cell phone number and email address (not through Fazaga, but

6   through others) and passed those on to Agents Armstrong and Allen, who told him

7   they used the email addresses and telephone numbers gathered to monitor

8   communications and conduct further surveillance.

9        180.   Monteilh also gave Agents Armstrong and Allen the license plate

10  numbers of cars Fazaga traveled in and the people with whom Monteilh saw him

11  associate.

12       181.   Agents Armstrong and Allen instructed Monteilh that whenever he

13  saw Fazaga at another mosque or anywhere outside OCIF, he should call them and

14  let them know immediately.  Monteilh did this at least once when he saw Fazaga at

15  another mosque.

16       182.   On one occasion, during Friday afternoon prayer at OCIF, the mosque

17  had a booth set up to collect donations for some kind of relief for Muslims abroad.

18  Pursuant to Agents Armstrong and Allen's orders to monitor donations, Monteilh

19  stood near the booth and used the hidden video camera to make video recordings

20  of people who went up to the booth to contribute money.

21       183.   After Monteilh's role as an FBI informant became publicly known in

22  February 2009, many members of the OCIF congregation were horrified to learn

23  that the man who spent so much time in their mosque was an informant.  This

24  revelation significantly undermined the trust within that community, which in turn

25  deterred members from worshipping as a congregation.

26       184.   Since he had contact with Monteilh, Fazaga has also been subjected to

27  secondary screening and searches upon return to the U.S. from various

28  international trips, being held between 45 minutes and three hours most times he

- 50 -

travels.

185.   Since discovering the FBI surveilled him and the mosque where he serves as imam, Sheikh Fazaga believes that any of his communications in the mosque and over telephones may be monitored, and indeed that he may be under surveillance at any time.   As an intern therapist as well as an imam, Fazaga provided counseling to congregants and Muslims at the mosque as part of his service to the Muslim community.   Since learning of the FBI's surveillance, he no longer counsels congregants at the mosque for fear that their conversations are monitored and therefore the personal information shared is not confidential, which has limited his capacity to provide such counseling.   The constant fear of being under surveillance, the scrutiny during travel, the effect on the sense of community at his mosque and others, and the additional difficult in providing counseling to clients have all caused Sheikh Fazaga severe and ongoing anxiety and emotional distress.

**Monteilh's Interaction with Plaintiff Ali Uddin Malik**

186.   In their early meetings with Monteilh, Agents Armstrong and Allen showed Monteilh a picture of a young man who they identified as Plaintiff Ali Malik.   They told him Malik had been a surfer kid in Newport Beach who wore dyed hair, but had travelled to Yemen to attend a religious school, and had returned to the U.S. wearing traditional Muslim dress and a full beard.

187.   Agents Armstrong and Allen told Monteilh that Malik's change in behavior in embracing religion and traditional dress was highly suspicious and for that reason they needed to investigate him.   They also told him they were suspicious of Malik because he was involved with people from the "MSU." ("MSU" stands for "Muslim Student Union," which is the name of Muslim student groups at many colleges and universities, including U.C. Irvine.)   Agent Armstrong told Monteilh that before he was assigned to be his handler, he had been assigned to investigate the MSUs and young Muslims, including Ali Malik.

- 51 -

188.   Agents Armstrong and Allen told Monteilh that the way that Malik groomed his beard indicated that he was a radical.

189.   Agents Armstrong and Allen already had information on Malik and his family before they assigned Monteilh to do anything, but they told Monteilh to get more information on one of his brothers; on another individual who Malik was close to; on Malik's associations from the Irvine mosque, and on anyone with whom Malik hung out at the gym.

190.   Agents Armstrong and Allen said that they knew Malik had been to an Islamic religious school in Yemen, and that he had been blocked from entering Saudi Arabia after he had traveled to Yemen.  They tasked Monteilh with finding out what school he had been to and why he had been denied entry into Saudi Arabia.  Upon information and belief, Armstrong and Allen already had knowledge of this information.  When re-entering the country in 2006, Malik had been interviewed at length by U.S. officials and had fully disclosed the nature of his travels, including his study at Dar al-Mustafa.  Malik also disclosed that while abroad, he had traveled to Abu Dhabi in hopes of getting a visa to Saudi Arabia for Umrah (the minor pilgrimage in Islam).  However, Malik was informed by individuals both at Dar al-Mustafa and in Abu Dhabi that he needed to apply for a visa with the Saudi embassy in the United States, which was logistically impossible to do during his trip, so that Malik did not attempt to enter Saudi Arabia or even apply for a visa during his 2006 trip.

191.   In about April 2007, Agents Armstrong and Allen began discussing the possibility of sending Monteilh abroad to study Islam and Arabic.  When Monteilh started asking about a school to go to, Malik told him that he had attended Dar al-Mustafa in Tarim, in Yemen.  Monteilh reported this information to Agents Armstrong and Allen.

192.   On several occasions, Monteilh used the key fob or cell phone recording devices provided by Agents Armstrong and Allen to record groups of

- 52 -

ER - 232

young Muslims talking in the prayer hall, particularly after *ishaa* prayer. On these occasions, Monteilh greeted people, left his things — including the recording device — near where they were talking, and then went to another part of the mosque (or a different part of the prayer hall) to pray so that the recording device would capture their conversation when he was gone. On several of these occasions, Ali Malik was one of the people in the group Monteilh recorded. Monteilh recorded these conversations when he was not present, then gave notes that detailed the people he saw there to Agents Armstrong and Allen, so they would be able to identify the voices. Agents Armstrong and Allen received notes in which Monteilh said that he had recorded these conversations without being physically present, and never told him not to do this.

193. The prayer hall of a mosque is sacred space where particular rules and expectations apply. Shoes are prohibited, one must be in a state of ablution, discussing worldly matters is discouraged, and the moral standards and codes of conduct are at their strongest. Gossiping, eavesdropping, or talebearing (*namima* - revealing anything where disclosure is resented) is forbidden. *Halaqas*, or small group meetings, are understood by attendees of the mosque to be safe environments in which to discuss theology or matters related to the practice of Islam, and that correspondingly ensure some measure of confidentiality among participants. In addition, audio and video recording without permission were barred at ICOI, and on rare occasions where an outside entity recorded an event or speaker, signs notified congregants of the recording.

194. Malik more than once told Monteilh that he heard Monteilh was going regularly to *fajr*, or early morning prayer. Malik commended Monteilh on his commitment — he said that he had gotten into the routine of attending *fajr* prayers daily when he had been studying abroad, but that, regrettably, it was easy to fall into attending prayers only when it was convenient. He stated that he wanted to get back to that kind of regimen. Agents Armstrong and Allen told Monteilh this

- 53 -

was significant information that indicated Malik was returning to extremist beliefs, which justified further surveillance.

195.   Agents Armstrong and Allen received significant information on Malik.  In addition to the surveillance described above, including recordings of all Monteilh's conversations with Malik, they several times showed Monteilh photos with people they said had seen with Malik and asked him to identify them.  The pictures sometimes had Malik in them.

196.   Since his contact with Monteilh, Malik has repeatedly been subjected to extended interviews with FBI and Customs upon re-entering the country, including one interview that lasted for several hours, resulted in him missing a connecting flight, and consequently missing a summer school class that made him lose credit for the class and required that he push his college graduation back by several months at considerable financial expense.

197.   Also as a result of the FBI's surveillance, Malik altered his religious practices. Because he understood he was targeted because of his outwardly religious appearance, adherence to Islamic ritual practice, and involvement with the mosque and Muslim Student Union at UCI, Malik trimmed his beard, does not regularly wear a skull cap any longer, and stopped attending the mosque regularly for an extended period of time.  To this day, he attends mosque less frequently than he did before having contact with Monteilh because of his fear of being monitored at mosque and the effect that this fear has on his sense of the mosque as a place of peace and spiritual refuge.   This interference with his religious practice results from Defendants' actions and has caused Malik severe and ongoing anxiety and emotional distress.

198.   Malik also believes his reputation in the community to have been damaged. He believes that because of his association with Monteilh, people have also assumed that he is a government informant and act as if they are suspicious of him.  He believes that he does not have the full trust of the Muslim community.

- 54 -

ER - 234

1   This belief that others suspect him because of Defendants' actions has caused

2   Malik severe and ongoing anxiety and emotional distress.

3       199.   Since discovering the FBI surveilled him and the mosque he attended,

4   Malik believes that any of his communications in the mosque and over telephones

5   may be monitored, and indeed that he may be under surveillance at any time.   He

6   curtails phone and email conversations with his friends and family because of his

7   belief that they may be monitored.   He also suspects that any newcomer to a

8   mosque may be an FBI informant, and has refused to be as welcoming to

9   newcomers as he believes his religion requires.   This constant fear of being under

10  surveillance because of Defendants' acts has caused Malik severe and ongoing

11  anxiety and emotional distress.

12  **Monteilh's Interaction with Yasser AbdelRahim**

13      200.   A few weeks after Monteilh took *shahadah* at ICOI, a group of young

14  men approached him at the mosque, said they were impressed that he attended

15  mosque so regularly and invited him to socialize with them at their house.  Agents

16  Armstrong and Allen told Monteilh that the men's home was already under

17  surveillance because it was shared by five young, unmarried Muslim Egyptian men

18  with different skills and backgrounds — including a computer analyst, a

19  pharmacist, an accountant, and one who handled logistics — and that for that

20  reason they believed they might be a Muslim Brotherhood cell.

21      201.   A few days after this invitation, Monteilh told Agents Armstrong and

22  Allen that one of the young men who lived at the house, Plaintiff Yasser Abdel

23  AbdelRahim, was a person who seemed to attract and have influence with young

24  Muslims.  Agents Armstrong and Allen told him they thought AbdelRahim was the

25  leader of the cell, and that he should spend time at their house, and with

26  AbdelRahim in particular, and gather as much information as he could.   Monteilh

27  did so, and gave recordings of all the conversations he had with AbdelRahim and

28  the other members of the house to Agents Armstrong and Allen, along with notes

- 55 -

about his observations.

202.   Agents Armstrong and Allen told Monteilh to get into every room in AbdelRahim's house to see what was in there, and include that information in his reports.  Later, in about February or March of 2007, Armstrong and Allen equipped Monteilh with a video camera hidden in a shirt button and instructed him to conduct video surveillance of the layout and contents of the house, which he did.

203.   Shortly after first meeting Monteilh, AbdelRahim and one of his roommates bought Monteilh some books on Islam, and later asked he what thought of them.  Some time after that, AbdelRahim agreed to meet with Monteilh to teach him various prayers.  Agents Armstrong and Allen expressed excitement at this, and asked for the first sheet of paper on which AbdelRahim had written a prayer for Monteilh to learn, telling him when they gave it back a few days later that they had lifted AbdelRahim's fingerprints from it.

204.   When Monteilh reported that AbdelRahim always led prayer in the house, Agents Armstrong and Allen said that showed leadership, and confirmed that the surveillance should focus on him.

205.   Pursuant to standing instructions from Agents Armstrong and Allen, Monteilh gathered and provided them information about AbdelRahim's travel plans, particularly when AbdelRahim was going to or from Egypt to see his family or his fiancé's family.  After one of these trips to Egypt, AbdelRahim complained that he had questioned for a long time when he re-entered the country – that he expected some delay but this had been way too long.  Agents Armstrong and Allen told Monteilh they had been responsible for that questioning.

206.   During this time, AbdelRahim played pick-up soccer with other Muslim youth.  Monteilh attended some of these games and took down the license plates of people who attended.  On more than one occasion, he made a video recording with a hidden camera Agents Armstrong and Allen provided him, in order to document who was attending and socializing with one another.

- 56 -

ER - 236

207. After Monteilh learned through conversations that AbdelRahim traveled to a particular city for his job, Agents Armstrong and Allen had a particular group of Muslims in that city surveilled and believed he went there to report or get instructions from this group. As Agents Armstrong and Allen had told Monteilh to report all travel plans, he reported AbdelRahim's travel plans on several occasions. Agents Armstrong and Allen told Monteilh that they had AbdelRahim surveilled when he traveled, based on Monteilh's information.

208. Monteilh talked to AbdelRahim about his fiancée, who lived in Detroit, and her family, and transmitted what information he learned to Agents Armstrong and Allen — including her email address.

209. On different occasions, Agents Armstrong and Allen told Monteilh that the FBI had electronic listening devices in AbdelRahim's house, as well as in AbdelRahim's car and phone. For example, one day, one of Monteilh's handlers called to tell him that a friend had driven up to AbdelRahim's house quickly in an agitated state, and asked Monteilh to go down there to find out what was going on. When Monteilh asked how he knew this, he indicated they had video outside the house. Another time, Agents Armstrong and Allen asked him about something that happened inside the house that he hadn't yet put in his notes, then told him that they knew because they had audio surveillance in the home.

210. Agents Armstrong and Allen said that AbdelRahim was donating money to a charitable organization in Egypt and that these donations had been tracked by the Treasury Department. They said that these donations were not unlawful, but that they could make them seem suspicious in order to threaten him and pressure him to provide information and become an informant.

211. On many Tuesday nights, an imam from the Garden Grove mosque gave Arabic language teachings at ICOI. AbdelRahim often attended. On several occasions, Monteilh used recording devices provided by his handlers to record these teachings and the discussions afterward by going into the prayer hall to pray

- 57 -

near the group, then leaving his things — including the recording device (disguised as a key fob or cell phone) — near to where the group was talking, and then go to another part of the mosque or a different part of the prayer hall to pray. The recording device would capture their conversation when Monteilh was not within earshot. AbdelRahim was part of the group when Monteilh recorded on several occasions.

212. On instructions from Agents Armstrong and Allen, Monteilh asked AbdelRahim questions about *jihad* and pressed him on his views about religious matters and certain religious scholars (particularly Egyptian ones) in order to get him to say something that might be incriminating or provide a way to pressure him to provide information to the FBI. AbdelRahim told Monteilh that there was more to Islam than *jihad*: that *jihad* is a personal struggle, and that to the extent that there is such thing as a fighting *jihad*, the Quran places very strict rules that prohibit harming plants or trees, infants, elderly or women, and that terrorists who say they are engaged in *jihad* are committing murder. When Monteilh brought up religious scholars Agents Armstrong and Allen had instructed him to mention, like Hassan al-Banna and Sayid Qutb, AbdelRahim said that he did not agree with them, but thought that the Egyptian government should not have executed them.

213. When Monteilh was reported to the FBI by Muslim community members, AbdelRahim was contacted by FBI agents and met with them to offer information about Monteilh and his extremist rhetoric. Upon information and belief, one of these agents was Defendant Paul Allen.

214. A few months later, AbdelRahim unexpectedly met the same FBI agents, who were waiting for him outside the office of his chiropractor. He was surprised to see them there as he had scheduled an appointment with the chiropractor just an hour or so prior. They went to a coffee shop and showed him a search warrant and told him that his storage unit was being searched by the FBI. Two days later, they met again with AbdelRahim and asked him if he knew of any

- 58 -

1    person engaged in any suspicious activity at the mosque or elsewhere. They asked

2    AbdelRahim if he minded contacting the agents if he came across any information

3    of anyone doing anything. AbdelRahim understood that they were asking him to

4    be an informant, and he refused. The FBI agents asked not to mention the offer to

5    anyone.

6        215.   Since he had contact with Monteilh, AbdelRahim has also been

7    subjected to extensive secondary questioning and searches most of the times he has

8    returned to the U.S. from trips abroad. These interrogations and the fear that he

9    will be subjected to them when he travels have caused AbdelRahim severe anxiety

10   and emotional distress.

11       216.   Since discovering the FBI surveilled him and the mosque he attended,

12   AbdelRahim believes that any of his communications in the mosque and over

13   telephones or email may be monitored, and indeed that he may be under

14   surveillance at any time. He also suspects that any newcomer to a mosque may be

15   an FBI informant, and has refused to be as welcoming to newcomers as he believes

16   his religion requires. This constant fear of being under surveillance because of

17   Defendants' acts has caused AbdelRahim severe and ongoing anxiety and

18   emotional distress.

19       217.   Since these incidents, AbdelRahim's confidence in the mosque as a

20   sanctuary has been ruined. He significantly decreased his attendance to mosque

21   services for fear of surveillance, and as such his donations to mosque institutions

22   also decreased. This interference with his religious practice has caused

23   AbdelRahim severe and ongoing anxiety and emotional distress.

24                         **CLASS ALLEGATIONS**

25       218.   Plaintiffs, as class representatives, bring claims for injunctive relief on

26   behalf of themselves and all similarly situated persons pursuant to Rule 23(a) and

27   (b)(2).

28       219.   Plaintiffs, as class representatives, bring this action on their own

- 59 -

ER - 239

behalf and on behalf of the following class:

> All individuals targeted by Defendants for surveillance or
> information-gathering through Monteilh and Operation Flex, on
> account of their religion, and about whom the FBI thereby gathered
> personally identifiable information.

220. *Numerosity.* The size of the class makes a class action both necessary and efficient. Plaintiffs estimate that the class consist of hundreds if not thousands of current and former residents of Southern California. Members of the class are ascertainable through a review of Defendants' files on Operation Flex, but so numerous that joinder is impracticable.

221. *Typicality.* The claims of the Plaintiffs are typical of the claims of the class as a whole. Each of the Plaintiffs was subjected to surveillance by Defendants during the relevant period. As a result of Defendants' practices, Defendants have discriminated against each of Plaintiffs on the basis of their religion and religious practices, in violation of law. The unlawful policies and practices that have operated to discriminate against the Plaintiffs are typical of the unlawful practices that operated to discriminate against other class members so as to unlawfully target them for surveillance because of their religion and religious practices.

222. *Common Questions of Law and Fact.* This case poses common questions of law and fact affecting the rights of all members of the class, including, but not limited to:

> a. Whether Defendants engaged in a program of conducting surveillance of mosques in Orange County, and the Plaintiffs and class members who attended those mosques;
>
> b. Whether Defendants targeted Plaintiffs and class members for surveillance through Monteilh because they were Muslims or because of their practice of Islam;
>
> c. Whether Defendants' practice of targeting Plaintiffs and class

- 60 -

members for surveillance because they were Muslim or because of their practice of Islam constitutes impermissible religious discrimination under the First Amendment;

d.  Whether Defendants' practice of targeting Plaintiffs and class members for surveillance because they were Muslim or because of their practice of Islam violates the guarantee of equal protection of the laws under the Fifth Amendment;

e.  Whether Defendants' practice of targeting Plaintiffs and class members for surveillance because they were Muslim or because of their practice of Islam places a substantial burden on the religious exercise of Plaintiffs and class members under the First Amendment;

f.  Whether Defendant FBI maintains records on Plaintiffs and class members, arising out of the investigation at issue, describing how they exercise rights guaranteed by the First Amendment;

g.  Whether the maintenance by Defendant FBI of records on Plaintiffs and class members describing how they exercise rights guaranteed by the First Amendment is pertinent to and within the scope of lawful, authorized law enforcement activity;

h.  Whether information gathered by Defendants pursuant to unlawful surveillance should be disgorged and purged from their files;

i.  Whether Defendants conspired for the purpose of depriving Plaintiffs and other class members of their rights for purposes of 42 U.S.C. § 1985;

j.  Whether and what kinds of declaratory and injunctive relief are appropriate.

223.  *Adequacy of Class Representation.*  Plaintiffs can adequately and fairly represent the interests of the class as defined above, because their individual interests are consistent with, and not antagonistic to, the interests of the class.

224.  *Adequacy of Counsel for the Class.*  Counsel for Plaintiffs possess the requisite resources and ability to prosecute this case as a class action and are

- 61 -

1    experienced civil rights attorneys who have successfully litigated other cases
2    involving similar issues.

3         225.   *Propriety of Class Action Mechanism.*  Class certification is
4    appropriate because the prosecution of separate actions against Defendants by
5    individual class members would create a risk of inconsistent or varying
6    adjudications that would establish incompatible standards of conduct for
7    Defendants and because Defendants have acted or refused to act on grounds that
8    apply generally to the class.

9                            **CLAIMS FOR RELIEF**
10                            **First Cause of Action**
11          **Violation of the First Amendment Establishment Clause**
12                   **Claim under *Bivens*; 28 U.S.C. § 1331**
13    **(Against All Defendants except the FBI and United States by all Plaintiffs.)**[37]

14         226.   Plaintiffs incorporate Paragraphs 1- 225 as if fully set forth herein.
15         227.   As set forth above, Defendants engaged in a scheme to target
16    Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the
17    religion of Islam.  This scheme discriminates against Muslims, in violation of the
18    Establishment Clause of the First Amendment to the United States Constitution.

19                           **Second Cause of Action**
20          **Violation of the First Amendment Establishment Clause**
21              **Claim under 42 U.S.C. § 1985(3); 28 U.S.C. § 1343**
22          **(Against Individual Capacity Defendants by all Plaintiffs.)**

23         228.   Plaintiffs incorporate Paragraphs 1- 227 as if fully set forth herein.
24         229.   As set forth above, Defendants engaged in a scheme to target

25    _____

26    [37] Plaintiffs' claims for damages under *Bivens* are made against those Defendants
27    named in their individual capacities, while their claims for injunctive relief under
      Section 1331 are made against Defendants named in their official capacities.
28

                              - 62 -

Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the religion of Islam and for the purpose of discriminating against Plaintiffs, as Muslims, in violation of the Establishment Clause of the First Amendment to the United States Constitution.

230.    Through their scheme, Defendants conspired, and conspired to go in disguise on the premises of another, for the purpose of depriving Plaintiffs, directly or indirectly, of the equal protection of the laws, and of equal privileges and immunities under the laws, because of their adherence to and practice of Islam. Defendants performed these acts with discriminatory animus against Muslims.

**Third Cause of Action**

**Violation of the First Amendment Free Exercise Clause**

**Claim under *Bivens*; 28 U.S.C. § 1331**

**(Against All Defendants except the FBI and United States by all Plaintiffs.)**

231.    Plaintiffs incorporate Paragraphs 1-230 as if fully set forth herein.

232.    As set forth above, Defendants engaged in a scheme to target Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the religion of Islam.  This scheme discriminates against Muslims, in violation of the Free Exercise Clause of the First Amendment to the United States Constitution.

233.    As set forth above, Defendants' surveillance placed a substantial burden on Plaintiffs' religious exercise in their practice of Islam and is justified by no legitimate government interest.

**Fourth Cause of Action**

**Violation of the First Amendment Free Exercise Clause**

**Claim under 42 U.S.C. § 1985(3); 28 U.S.C. § 1343**

**(Against Individual Capacity Defendants by all Plaintiffs.)**

234.    Plaintiffs incorporate Paragraphs 1-233 as if fully set forth herein.

235.    As set forth above, Defendants engaged in a scheme to target Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the

- 63 -

1    religion of Islam and for the purpose of discriminating against Plaintiffs, as

2    Muslims in violation of the Free Exercise Clause of the First Amendment to the

3    United States Constitution.

4        236.   As set forth above, Defendants' surveillance placed a substantial

5    burden on Plaintiffs' religious exercise in their practice of Islam and is justified by

6    no legitimate government interest.

7        237.   Defendants have conspired, and conspired to go in disguise on the

8    premises of another, for the purpose of depriving Plaintiffs, directly or indirectly,

9    of the equal protection of the laws, and of equal privileges and immunities under

10   the laws, because of their adherence to and practice of Islam.  Defendants

11   performed these acts with discriminatory animus against Muslims.

**Fifth Cause of Action**

**Violation of Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1**

**(Against All Defendants by all Plaintiffs.)**

15       238.   Plaintiffs incorporate Paragraphs 1-237 as if fully set forth herein.

16       239.   The actions of Defendants substantially burdened Plaintiffs' exercise

17   of religion, and are neither in furtherance of a compelling governmental interest

18   nor the least restrictive means of furthering any compelling governmental interest.

**Sixth Cause of Action**

**Violation of Fifth Amendment Equal Protection Clause**

**Claim under *Bivens*; 28 U.S.C. § 1331**

**(Against All Defendants except the FBI and United States by all Plaintiffs.)**

23       240.   Plaintiffs incorporate Paragraphs 1-239 as if fully set forth herein.

24       241.   As set forth above, Defendants have engaged in a scheme to target

25   Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the

26   religion of Islam.  This scheme discriminates against Muslims, in violation of the

27   Equal Protection Clause of the Fifth Amendment to the United States Constitution.

28

- 64 -

ER - 244

### Seventh Cause of Action

### Violation of the Equal Protection Clause

### Claim under 42 U.S.C. § 1985(3); 28 U.S.C. § 1343

### (Against Individual Capacity Defendants by all Plaintiffs.)

242.   Plaintiffs incorporate Paragraphs 1-241 as if fully set forth herein.

243.   As set forth above, Defendants have engaged in a scheme to target Plaintiffs for surveillance because of Plaintiffs' adherence to and practice of the religion of Islam.  This scheme discriminates against Muslims, in violation of the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

244.   Defendants have conspired, and conspired to go in disguise on the premises of another, for the purpose of depriving Plaintiffs, directly or indirectly, of the equal protection of the laws, and of equal privileges and immunities under the laws, because of their adherence to and practice of Islam.  Defendants performed these acts with discriminatory animus against Muslims.

### Eighth Cause of Action

### Violation of the Privacy Act, 5 U.S.C. § 552a(a)-(l)

### (Against Defendant FBI by all Plaintiffs.)

245.   Plaintiffs incorporate Paragraphs 1-244 as if fully set forth herein.

246.   Defendant FBI, through Monteilh, collected and maintained records describing how Plaintiffs exercised their First Amendment rights, in violation of 5 U.S.C. §552a(e)(7).  Collection and maintenance of these records is not expressly authorized by statute, not authorized by Plaintiffs, and is neither pertinent to nor within the scope of an authorized law enforcement activity.

247.   Defendant FBI's collection and maintenance of records of Plaintiffs' First Amendment activities was intentional and willful, insofar as Defendants gathered the information for the purpose of collecting and maintaining records of Plaintiffs' First Amendment activities.

248.   On or about September 6 and 12, 2011, Plaintiffs submitted letters to

- 65 -

ER - 245

the FBI requesting that the FBI disclose all records in the possession of the FBI, associated with each Plaintiff, that were "gathered through the surveillance of former FBI informant Craig Monteilh and/or Operation Flex, as well as any information derived from that information." The letters also requested that the FBI "expunge all records associated with [Plaintiffs] that describe the exercise of [their] rights under the First Amendment of the United States Constitution that were gathered through the surveillance of former FBI informant Craig Monteilh and/or Operation Flex, as well as any records derived from that information." The FBI has to date failed to provide Plaintiffs with those records or otherwise to respond to their requests.

249.   Defendant FBI has failed to disclose records as required by Section 552a(d)(1). The records requested are not exempt from disclosure pursuant to Section 552a(j-k) or any other applicable law.

**Ninth Cause of Action**

**Violation of the Fourth Amendment**

**Claim under *Bivens*; 28 U.S.C. § 1331.**

**(Against All Defendants except the FBI and United States by all Plaintiffs.)**

250.   Plaintiffs incorporate Paragraphs 1- 249 as if fully set forth herein.

251.   Defendants' actions as set forth above constitute unreasonable searches in violation of the Fourth Amendment to the United States Constitution, including but not limited to Defendants' actions in  audio recording Plaintiffs' communications without a warrant and where no party to the communication consented to the recording; video recording in homes and other places where Plaintiffs had a reasonable expectation of privacy against video recording; and entering and planting electronic listening devices in mosques without a warrant.

**Tenth Cause of Action**

**Violation of the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1810**

**(Against All Defendants by all Plaintiffs.)**

252.  Plaintiffs incorporate Paragraphs 1-251 as if fully set forth herein.

253.  Defendants, under color of law, acting through Monteilh, used electronic, mechanical, and/or other surveillance devices, without a warrant, to monitor Plaintiffs and their communications and/or activities, and to acquire information under circumstances in which Plaintiffs had a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

**Eleventh Cause of Action**

**Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.***

**(Against Defendant United States by all Plaintiffs.)**

254.  Plaintiffs incorporate Paragraphs 1-253 as if fully set forth herein.

255.  At all times relevant to the complaint, Defendants Armstrong, Allen, Rose, Tidwell and Walls, were employees of the United States, acting in the scope of their employment through their own actions and their directions to employees and agents, under circumstances that would render the United States, if a private person, liable for damages that their actions caused Plaintiffs under California law. The United States is therefore liable to Plaintiffs, as follows, pursuant to 28 U.S.C. §§ 1346(b) and 2674.

256.  The United States, if a private person, would be liable to Plaintiffs for invasion of privacy under California law.  Defendants' acts in conducting audio and video surveillance of Plaintiffs, through Monteilh and Operation Flex, in situations in which Plaintiffs' had a reasonable expectation of privacy, constitute intrusions into a private place or matter in a manner highly offensive to a reasonable person.

257.  The United States, if a private person, would be liable to Plaintiffs for violations of the California constitutional right of privacy set forth in Article 1,

- 67 -

section 1 of the California constitution.  Defendants' conduct in conducting audio and video surveillance of Plaintiffs, both through Monteilh and Operation Flex, in situations in which Plaintiffs' had a reasonable expectation of privacy, and in compiling and maintaining information on Plaintiffs based solely on their religion and religious practice, amounts to a serious invasion of their rights to privacy.

258.  The United States, if a private person, would be liable to Plaintiffs for violations of California Civil Code section 52.1.  By subjecting Plaintiffs to constant surveillance because of their religion, then publicly revealing that surveillance, Defendants have interfered, or attempted to interfere, by threats, intimidation, or coercion with the exercise or enjoyment by Plaintiffs of their rights to practice their religion and to be free from religious discrimination under the California Constitution, in violation of California Civil Code § 52.1.

259.  The United States, if a private person, would be liable to Plaintiffs for the intentional infliction of emotional distress under California law.  Defendants' acts constitute extreme and outrageous conduct, in which they engaged with the intention of causing, or a reckless disregard for the probability of causing, emotional distress in plaintiffs; which was the actual or proximate cause of severe or extreme emotional distress that Plaintiffs have suffered.

260.  Plaintiffs presented the FBI with notification of the above-alleged incidents and claims for monetary damages in claims sent to the FBI using Standard Form 95 on or about February 21, 2011.  The FBI failed to make any response to Plaintiffs' claims within six months after they were filed.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court grant the following relief:

     a.  Certify a Class under Rule 23(b)(2), as described above;

     b.  Injunctive relief on behalf of Plaintiffs and all other putative class members ordering Defendants to destroy or return any information

- 68 -

1   gathered through the unlawful surveillance program by Monteilh
2   and/or Operation Flex described above, and any information derived
3   from that unlawfully obtained information, as well as to comply with
4   their obligations under the Privacy Act, 5 U.S.C. § 552a;

5   c. Compensatory and punitive damages for violations of the laws of the
6   United States and California, in an amount to be proven at trial;

7   d. Liquidated damages in an amount to be proven at trial pursuant to 50
8   U.S.C. §§ 1810(a), 1828(a), and California Civil Code §§ 52(a),
9   52.1(b);

10   e. Reasonable attorneys' fees and costs;

11   f. Any other relief as this Court deems proper and just.

12

13   Dated: September 13, 2011          Respectfully Submitted,

14                                       ACLU FOUNDATION OF SOUTHERN
                                         CALIFORNIA
15
                                         COUNCIL ON AMERICAN-ISLAMIC
16                                       RELATIONS, CALIFORNIA

17                                       HADSELL STORMER KEENY RICHARDSON
                                         & RENICK LLP
18

19                                       By: _____
20                                           Peter Bibring
                                             Attorneys for Plaintiffs
21

22

23

24

25

26

27

28

# ATTACHMENT
# 1

Case 8:11-cv-00301-CJC-VBK Document 40-2 Filed 09/13/11 Page 23 of 29 Page ID
Case 8:10-cv-00102-JVS-RNB Document 80-9 Filed 02/15/11 Page 1 of 5 Page ID
#:1600

```
 1

 2

 3

 4

 5

 6

 7

 8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 9            COUNTY OF LOS ANGELES - WEST COVINA BRANCH

10    DEPARTMENT 8                    HON. ABRAHAM KHAN, JUDGE

11

12    THE PEOPLE OF THE STATE OF CALIFORNIA,   )
                                               )
13                        PLAINTIFF,           )
                                               )
14              VS.                            )  NO. KA059040
                                               )  PROBATION TERMINATION
15    CRAIG F. MONTEILH,                       )
                                               )
16                        DEFENDANT.           )
      _____)

17

18            WEST COVINA, CALIFORNIA; AUGUST 20, 2008

19                        2:40 P.M.

20         UPON THE ABOVE DATE, THE DEFENDANT NOT

21    BEING PRESENT IN COURT AND NOT REPRESENTED BY

22    COUNSEL; THE PEOPLE BEING REPRESENTED BY LINDA

23    CHILSTROM, DEPUTY DISTRICT ATTORNEY OF

24    LOS ANGELES COUNTY, THE FOLLOWING PROCEEDINGS

25    WERE HELD:

26         (DIANA WHITESEL, CSR #6287, OFFICIAL REPORTER.)

27

28
```

·1

CERTIFIED COPY

Attachment 1 - page 70

Case 8:1□cv-00309-CJC-VBK Document 49-24 Filed 09/13/12 Page 194 of 262 Page ID
Case 8:10-cv-00102-JVS-RNB Document 88-2 Filed 02/15/11 Page 2 of 5 Page ID
#:1601

```
 1    CASE NUMBER:                     KA059040
 2    CASE NAME:                       PEOPLE OF THE STATE OF CALIFORNIA
 3                                     VS. CRAIG MONTEILH
 4    WEST COVINA, CALIFORNIA          AUGUST 20, 2007
 5    DEPARTMENT NO. 8                 HON. ABRAHAM KHAN, JUDGE
 6    REPORTER:                        DIANA WHITESEL, CSR NO. 6287
 7    TIME:                            2:40 P.M.
 8    APPEARANCES:
 9                      (LINDA CHILSTROM, DEPUTY DISTRICT ATTORNEY
10                      OF LOS ANGELES COUNTY.)
11                                     -OOO-
12
13          THE CLERK:  PEOPLE ARE GOING TO MOVE TO MAKE A MOTION TO
14    TERMINATE PROBATION.
15          THE COURT:  CRAIG F. MONTEILH.  KA059040.
16          MS. CHILSTROM:  YOUR HONOR, I HAVE BEEN INFORMED BY
17    MR. SATO OF MY OFFICE THAT HEAD DEPUTY SCOTT CARBAUGH HAS
18    REQUESTED THAT THIS CASE -- THAT THE PROBATION IN THIS MATTER BE
19    TERMINATED.
20          THE COURT:  CAN YOU GIVE ME A REASON?
21          MS. CHILSTROM:  I DON'T KNOW A REASON.  I WAS JUST TOLD IT
22    WAS UPON THE REQUEST OF THE HEAD DEPUTY.
23          THE COURT:  I'M GOING TO CONTINUE THIS UNTIL TOMORROW
24    UNTIL YOU CAN GIVE ME A REASON.  I USUALLY DON'T TERMINATE
25    PROBATION UNLESS THERE IS SOMETHING I CAN RELY ON.
26          MS. CHILSTROM:  NOT A PROBLEM.
27                I TAKE IT, WE'RE WAITING FOR MR. LINDARS.
28                MAY I MAKE A QUICK CALL?
```

2

Attachment 1 - page 71

ER - 252

1                    (PAUSE IN PROCEEDINGS.)

2

3        MS. CHILSTROM:  YOUR HONOR, COULD THE COURT RECALL THE

4   LAST CASE?

5        THE COURT:  OKAY.  WE'RE STILL ON THE RECORD IN CRAIG F.

6   MONTEILH.

7        MS. CHILSTROM:  YOUR HONOR, I JUST SPOKE WITH MR. SATO.

8   INITIALLY I WAS JUST TOLD THAT THE HEAD DEPUTY WANTED THE

9   PROBATION TERMINATED.

10            APPARENTLY THE DEFENDANT IS WORKING WITH F.B.I. AGENT

11  KEVIN ARMSTRONG.  HE HAS GIVEN AGENT ARMSTRONG VERY, VERY

12  VALUABLE INFORMATION THAT HAS PROVEN TO BE ESSENTIAL IN AN F.B.I.

13  PROSECUTION.  IT WAS AGENT ARMSTRONG THAT CONTACTED THE HEAD

14  DEPUTY AND THE HEAD DEPUTY INSTRUCTED US TO ASK FOR TERMINATION.

15       THE COURT:  WELL, OKAY.  I KNOW THE DEFENDANT HIMSELF WAS

16  HERE IN APRIL AND HAD REQUESTED EARLY TERMINATION.  AND I BELIEVE

17  ON RECOMMENDATION OF THE DISTRICT ATTORNEY, I DENIED HIS REQUEST.

18  AND THAT WAS BACK IN APRIL.  THAT'S WHY I WANTED TO FIND OUT WHAT

19  THE REASONS WHY WERE AT THIS TIME BECAUSE IT'S ONLY BEEN FOUR

20  MONTHS AFTER.

21            BUT OTHERWISE HE'S PAID HIS FINANCIAL OBLIGATION AND

22  HE'S OTHERWISE BEEN ON PROBATION -- HOW LONG HAS HE BEEN ON?

23  IT'S KA059040.  IS THAT '03?

24       MS. CHILSTROM:  IT IS '03, YOUR HONOR.

25       THE CLERK:  YES, YOUR HONOR, SINCE MAY 5, '03.

26       THE COURT:  ALL RIGHT.  APPARENTLY HE'S HAD PROBATION

27  EXTENDED.  IT MAY HAVE BEEN BECAUSE OF A WARRANT THAT HAD BEEN

28  ISSUED WHICH IT WOULD OTHERWISE TOLL THE RUNNING OF HIS PERIOD.

3

```
 1          I'LL GRANT THE REQUEST FOR THE REASONS STATED.

 2      MS. CHILSTROM:   THANK YOU.

 3

 4          (THE PROCEEDINGS IN THE ABOVE-ENTITLED

 5          MATTER WERE ADJOURNED.)

 6

 7                         -OOO-

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

4

Attachment 1 - page 73

ER - 254

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2          FOR THE COUNTY OF LOS ANGELES - WEST COVINA BRANCH

3   DEPARTMENT 8                    HON. ABRAHAM KHAN, JUDGE

4

5   THE PEOPLE OF THE STATE OF CALIFORNIA,    )

6                    PLAINTIFF,              )

7          VS.                              )    NO. KA059040

8   CRAIG F. MONTEILH,                       )    REPORTER'S
                                            )    CERTIFICATE
9                    DEFENDANT.              )

10

11

12          I, DIANA WHITESEL, CSR NO. 6287, OFFICIAL REPORTER OF THE

13   SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF

14   LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

15   CORRECT TRANSCRIPT OF ALL OF THE ADMONITIONS TAKEN AT THE TIME OF

16   THE TAKING OF THE PLEA AND PRONOUNCEMENT OF SENTENCE IN THE

17   ABOVE-ENTITLED CAUSE; AND FURTHER THAT THE VIEWS AND

18   RECOMMENDATIONS OF THE COURT, IF ANY, ARE CONTAINED THEREIN

19   PURSUANT TO SECTION 1203.01 OF THE PENAL CODE THE ABOVE-ENTITLED

20   MATTER.

21

22

23          DATED THE DECEMBER 2, 2009

24

25

26

27   _____, CSR NO. 6287
     DIANA WHITESEL, OFFICIAL REPORTER

28

5

Attachment 1 - page 74

ER - 255

Case: 13-56867, 11/17/2014, ID: 9316414, DktEntry: 13-2, Page 198 of 262

# ATTACHMENT 2

Case 8:12-cv-06068-CJC-VBK Document 40-24, Filed 09/13/12, Page 199 of 262 Page ID
Case 8:10-cv-00102-JVS-RNB Document 8027 Filed 02/15/11 Page 1 of 1 Page ID
#:1582
JUL-20-2010 16:58 FBI OGC 202 220 9347 P.004



U.S. Department of Justice

Federal Bureau of Investigation

Washington, D. C. 20535-0001

June 16, 2010

Adam J. Krolikowski, Esq.
Woods & Krolikowski
1200 Main Street, Suite H
Irvine, CA 92614

RE:  Craig Monteilh [Confidential Communication]
     Compliance with NDA Notice Requirement

Dear Mr. Krolikowski:

This office is in receipt of your letter to Steven Kramer dated June 15, 2010. In your letter you state that Mr. Montielh has "been asked to review and sign declarations prepared by the ACLU for a lawsuit they will be filing concerning civil rights violations by the FBI within the Islamic Community during the time period of Operation Flex." I am aware that you have sent previous letters to the FBI concerning the Non-Disclosure Agreement that Mr. Monteilh signed on October 5, 2007; however, this is the first letter in which you reference a particular FBI operation or investigation. In advance of June 17, 2010, please provide us with any information that you intend to include in these declarations that is/or may be covered by the Non-Disclosure Agreement. The FBI maintains that all the obligations created under the Non-Disclosure Agreement remain in effect. Notification by Mr. Monteilh that he intends to disclose information covered by this agreement does not limit or nullify the obligations that he accepted by signing this agreement.

Sincerely,

Henry R. Felix
Associate General Counsel
Civil Litigation Unit II
Office of the General Counsel
Federal Bureau of Investigation
PA 400
935 Pennsylvania Ave., NW
Washington, D.C. 20535
Phone: 202-220-9328
Fax:    202-220-9355

TOTAL P.004

Attachment 2 - page 75

ER - 257

(and lawful permanent residents) on United States soil"— is entirely without foundation. Pls.' App. at 6.[2]

To be clear, Government Defendants recognize that the state secrets privilege is to be invoked only rarely, and that it requires a "serious, considered judgment" reflecting the "personal judgment," in this instance, of the Attorney General. *Jeppesen*, 614 F.3d at 1080. And the privilege is invoked only after application of the Administration's state secrets review policy, reflected in its September 23, 2009 memorandum. *Id.* at 1090. But nothing in the case law or Executive Branch policy provides that the privilege, having been properly invoked, is subject to the novel categorical bars that plaintiffs ask this Court to impose. While plaintiffs claim to have reviewed sixty cases on the matter, *see* Pls.' App. at 6, they do not cite a single case in support of their theory. That is because the applicability of the state secrets privilege does not turn on the nature of the claim asserted or the relief sought, or on a plaintiff's characterization of the claim. Rather, the privilege applies where the disclosure of information in litigation reasonably could be expected to harm national security. *Reynolds*, 345 U.S at 10-11; *Al-Haramain Islamic Found.*, 507 F.3d at 1196. Neither the Supreme Court nor the Ninth Circuit has ever given the slightest indication that this longstanding principle must give way in cases involving particular claims or facts.

To the extent that plaintiffs imply otherwise, the state secrets privilege has been upheld in cases involving constitutional claims. *See, e.g., Al-Haramain*, 507 F.3d at 1193; *El-Masri*, 479 F.3d at 299-300; *Ellsberg*, 709 F.2d at 52; *Halkin*, 598 F.2d at 3, 8. And plaintiffs cite no case — nor is the Government aware of any — where a court has

---

[2] The Government also takes issue with this characterization of plaintiffs' claims. As to the individual capacity defendants, plaintiffs are in fact seeking damages, and the Government has asserted privilege over the information these defendants will need to defend themselves. In addition, although plaintiffs seek the destruction or return of information that plaintiffs allege was collected, there is no dispute that the alleged confidential source in this case is no longer providing information to the FBI.

6

1    TONY WEST
     Assistant Attorney General
2    ANDRE BIROTTE, JR.
3    United States Attorney
     VINCENT M. GARVEY
4    Deputy Branch Director
5    ANTHONY J. COPPOLINO
     E-mail: tony.coppolino@usdoj.gov
6    LYNN Y. LEE (SBN #235531)
7    E-mail: lynn.lee@usdoj.gov
8    U.S. Department of Justice
     Civil Division, Federal Programs Branch
9    20 Massachusetts Avenue, N.W.
     Washington, D.C. 20001
10   Telephone: (202) 514-4782
11   Facsimile: (202) 616-8460
12   *Attorneys for the Federal Bureau of Investigation and*
     *Defendants Mueller and Martinez Sued in their*
13   *Official Capacities*

14                    UNITED STATES DISTRICT COURT
15                   CENTRAL DISTRICT OF CALIFORNIA
16                        SANTA ANA DIVISION

17   -------------------------------------------
18                                    )
     YASSIR FAZAGA, et al.            )
19                                    )
20            Plaintiffs,             )   Case No. SACV11-00301 CJC (VBKx)
                                      )   Judge Carney
21                                    )
22   v.                               )   **PUBLIC DECLARATION OF**
                                      )   **MARK F. GIULIANO**
23                                    )   **FEDERAL BUREAU OF**
24   FEDERAL BUREAU OF                )   **INVESTIGATION**
     INVESTIGATION, et al.            )
25                                    )
26            Defendants.             )
                                      )
27   -------------------------------------------
28

                                  1

I, Mark F. Giuliano, hereby declare the following:

1. I am the Assistant Director, Counterterrorism Division, Federal Bureau of Investigation (the FBI), United States Department of Justice. I am responsible for, among other things, directing the conduct of FBI counterterrorism investigations. As Assistant Director, I have official supervision and control over the files and records of the Counterterrorism Division, FBI Headquarters, Washington, D.C. In addition, I have been delegated original classification authority by the Director of the FBI. *See* Executive Order 13,526, Section 1.3(c). As a result, and pursuant to all applicable Executive Orders, I am responsible for the protection of classified national security information within the Counterterrorism Division of the FBI, including the sources and methods used by the FBI in the collection of national security information. I have been authorized by the Director of the FBI to execute declarations and affidavits in order to protect such information. The matters stated herein are based on my personal knowledge and on information furnished to me in the course of my official duties.

2. I submit this declaration in support of the Attorney General's assertion of the state secrets privilege in this case. I describe below, as best I am able to do in unclassified terms, certain information related to FBI counterterrorism investigations that is implicated by the allegations of this lawsuit and which in my judgment should be protected from disclosure to avoid significant harm to national

2

security.[1]  As an original FBI classification authority and the official charged with

general supervisory responsibilities for the FBI's counterterrorism investigations, I

have concluded that the unauthorized disclosure of the privileged information

described herein reasonably could be expected to cause significant harm to the

national security.

## SUMMARY

3.  I have reviewed the Complaint in this matter and I am aware of the

allegations it contains that the FBI, through Craig Monteilh acting as an informant

for the FBI in an investigation known as Operation Flex, infiltrated mosques in

Southern California and indiscriminately collected personal information on

hundreds and perhaps thousands of innocent Muslim Americans, including the

three named plaintiffs, Yassir Fazaga, Ali Uddin Malik and Yasser AbdelRahim,

due solely to their religion.  *See* Complaint, ¶¶ 1-3, 6, 84.  The plaintiffs

specifically allege that, after attacks of September 11, 2001, the FBI has

improperly focused its counterterrorism efforts on the Muslim community in the

United States.  *See id.* ¶¶ 24-27.  The plaintiffs also cite guidelines issued by the

Attorney General for counterterrorism investigations and assert that "the combined

effect" of these guidelines was to authorize the FBI to engage in intrusive

---

[1]    I am also separately providing a declaration solely for the Court's *ex parte, in camera* review, that discusses these matters in more detail with reference to information that cannot be disclosed on the public record.

3

1  investigation of First Amendment protected activity, and specifically religious

2  practices, without any factual basis to believe any criminal violations or threat to

3
4  national security existed. *See* Compl. ¶¶ 28-35.  Plaintiffs also allege that

5  guidelines issued by the Attorney General in 2008, as well as the FBI's *Domestic*

6  *Intelligence and Operations Guides ("DIOG")* published in December 2008,

7
8  permit investigative activity "based on extremely limited information, including

9  information about the First Amendment expression of subjects." *See* Compl.

10  ¶¶ 36-37.  Accordingly, this lawsuit puts at issue whether the FBI has undertaken

11
12  counterterrorism investigative activity of Muslim Americans and mosques in

13  Southern California, and of the three plaintiffs in particular, through the use of

14  Monteilh as an informant, which was impermissibly based solely on religion or

15
16  First Amendment-protected activities.

17      4. The Attorney General Guidelines and FBI policies cited by the plaintiffs

18  in the Complaint include a prohibition on the FBI's undertaking investigative

19
20  activity based solely on First Amendment activities.  For example, *The Attorney*

21  *General's Guidelines for FBI National Security Investigations and Foreign*

22  *Intelligence Collection*, effective October 31, 2003 (Excerpts at Tab 1) ("AG

23
24  2003"), and the Guidelines which superseded them, *The Attorney General's*

25  *Guidelines for Domestic FBI Operations* issued by the Attorney General on

26  September 29,  2008 (Excerpts at Tab 2) ("AG 2008"), state: "These guidelines do

27
28  not authorize investigating or collecting or maintaining information on United

4

States persons solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States." *See* Tab 2, AG 2008 at 13; *see also* Tab 1, AG 2003 at 7-8.

5. Likewise, the FBI's DIOG contains an extensive discussion of the FBI's policy to undertake its investigations with full adherence to the Constitutional protections and civil liberties of the American people. *See* Tab 3 (DIOG Excerpts). In particular, the DIOG prohibits investigative activity conducted for the sole purpose of monitoring the exercise of Constitutional rights or on the basis of race, ethnicity, national origin, or religion. *See* DIOG at 21-38. Under the DIOG, there must be an authorized purpose for investigative activity that could have an impact on religious practice. *Id.* at 21. The DIOG provides that an authorized purpose of FBI investigative activity must avoid actual—and the appearance of—interference with religious practice to the maximum extent possible. *Id.* at 27. The DIOG also explains, however, that this policy does not mean that religious practitioners or religious facilities are completely free from being examined as part of FBI investigative activity. If such practitioners are involved in—or such facilities are used for—activities that are the proper subject of FBI-authorized investigative or intelligence collection activities, religious affiliation does not immunize them to any degree from FBI investigative action. *Id.* Nonetheless, FBI policy states that the authorized purpose of an investigation must be properly documented and that

5

investigative activity directed at religious leaders or occurring at religious facilities

must be focused in time and manner so as not to infringe on legitimate religious

practice by any individual but especially by those who appear unconnected to the

activities under investigation. *Id.*

6. Addressing plaintiffs' allegations in this case will risk or require the

disclosure of certain sensitive information concerning counterterrorism

investigative activity in Southern California, including in particular the nature and

scope of Operation Flex. As indicated below, the FBI previously has

acknowledged that it utilized Mr. Monteilh as a confidential human source and has

disclosed some limited information concerning his actions. However, certain

specific information pertinent to the allegations about Operation Flex and

Monteilh's activities remains highly sensitive information concerning

counterterrorism matters that if disclosed reasonably could be expected to cause

significant harm to national security. As described below, this includes:

> (i) the identities of individuals who have or have not been the subject of
>
> counterterrorism investigations, including in Operation Flex, and the status
>
> and results of any such investigations;
>
> (ii) information concerning why particular individuals were subject to
>
> investigation, including in Operation Flex; and
>
> (iii) particular sources and methods used in obtaining information for
>
> counterterrorism investigations, including in Operation Flex.

6

# BACKGROUND

**A.    The Continuing Terrorist Threat Since September 11, 2001**

7.  Before describing the information that the FBI seeks to protect in this case through the Attorney General's privilege assertion, I set forth some background on the FBI's counterterrorism actions since the 9/11 attacks.  FBI Director Robert Mueller has made clear that the FBI's number one priority continues to be the prevention of terrorist attacks against the United States.[2]  As Director Mueller explained in Congressional testimony, since the 2001 terrorist attacks, al Qaeda's intent to conduct high-profile attacks inside the United States has been unwavering.  Recent investigations reveal that the group has adapted its strategy for conducting such attacks.  In the immediate aftermath of 9/11, al Qaeda's plots and plans primarily focused on using individuals from the Middle East or South Asia for such attacks.  More recent plots—beginning in August 2006 with the attempted plan to commit attacks against U.S.-bound aircraft using improvised explosive devices—suggest al Qaeda is also putting more emphasis on finding recruits or trainees from the West to play key roles for these homeland specific operations.

---

[2]    *See* Testimony of Director Mueller before the Senate Committee on Homeland Security and Governmental Affairs (Sept. 22, 2010) (available at http://www.fbi.gov/news/testimony/ nine-years-after-9-11-confronting-the-terrorist-threat-to-the.u.s (last visited on July 20, 2011).

7

8.  Al Qaeda's effort to recruit, train, and deploy operatives to attack worldwide, but specifically in the United States, was demonstrated with the arrest of Najibullah Zazi, who was plotting to attack the New York City subway system. The fact that Zazi and his associates had access to the United States and were familiar with the environment here from an operational security and targeting perspective demonstrates how al Qaeda can leverage Americans.  The potential exists for al Qaeda to use and train other Americans for additional homeland attacks.  Identifying these individuals is among the FBI's highest counterterrorism priorities.

9.  A similar example may be seen in the May 2010 failed attempt of Faisal Shazad to detonate a car bomb in Times Square, an attack for which Tehrik-e-Taliban in Pakistan (TTP) claimed responsibility.  Like al Qaeda's use of Zazi, TTP's use of Shazad—a naturalized U.S. citizen who had lived for years in the United States—to attempt to attack the homeland underscores the operational role people in the United States can play for al Qaeda and its affiliates.  Similarly, al Qaeda of the Arabian Peninsula (AQAP) demonstrated its intent to target the U.S. homeland in the failed attempt by Umar Farouk Abdulmutallab to bomb Northwest Flight 253 to Chicago on December 25, 2009.  Much like the other attacks, AQAP was able to identify a willing recruit who was committed to attacking the United States and whose background did not raise traditional security scrutiny.

10.  The threat of homegrown violent extremists—those who have lived

primarily inside the United States and may commit acts of violence in furtherance
of the objectives of a foreign terrorist organization—also remains a particular
concern.  Such individuals may be inspired by the global jihadist movement to
commit violent acts inside the United States but do not necessarily receive direct
guidance from terrorist groups overseas.  A good example of this type of
homegrown threat occurred in the Los Angeles area.  On September 11, 2005, a
group of armed men planned to enter a military recruiting center on a busy street in
Santa Monica and kill everyone inside.  Their plan was to then go underground for
a month and re-emerge on Yom Kippur.  They plotted to open fire on families
gathered outside a temple in West Los Angeles, preparing to celebrate the holy
day.  The members of this homegrown cell planned these attacks in a jail cell in
Folsom Prison.  They had no official connection to al Qaeda, but they had adopted
its cause.  They had raised the money, recruited the participants, chosen the targets,
obtained the weapons, and set the date.  These terrorists were poised to strike, but
they made a key mistake by first committing a series of gas station robberies to
raise money to finance their attacks.  Police in Torrance, California, arrested two of
the men for robbery and, when their apartment was searched, documents were
discovered that listed the addresses of military recruiting stations and local
synagogues.  The Torrance police then contacted the Los Angeles Joint Terrorism
Task Force (JTTF).  From that point, hundreds of investigators worked at an FBI
command post to identify other members of the cell.  Ultimately, the FBI, working

9

through the JTTF, was able to disrupt this particular home grown attack.  But the

threat of such attacks persists, and the FBI continues to devote extensive effort to

detecting and preventing other such attacks.

**B.**   **The FBI's Use of Monteilh as Confidential Source**

11.   In 2009, the FBI acknowledged that it utilized Monteilh as a

confidential human source during a criminal proceeding in this district involving

Ahmadullah Niazi.[3]  From 2006-2007, Monteilh reported on a group of

counterterrorism investigations that was given the name Operation Flex.  Operation

Flex focused on fewer than 25 individuals and was directed at detecting and

preventing possible terrorist attacks.  The goal of Operation Flex was to determine

whether particular individuals were involved in the recruitment and training of

individuals in the United States or overseas for possible terrorist activity.

12. The FBI has previously disclosed some of the actions Mr. Monteilh

undertook as a confidential informant for the FBI and some of the information he

collected for the FBI.  Specifically, during the *Niazi* criminal case noted above, the

---

[3]      In the criminal case *United States v. Ahmadullah Niazi,* U.S.D.C., C.D.
Cal., No. SACR 09-28-AN, FBI Special Agent Thomas Ropel testified at a
detention hearing in that case that an FBI informant who had provided information
concerning Mr. Niazi was the same person Mr. Niazi had reported to the FBI as a
possible terrorist.  Although SA Ropel did not identify Mr. Monteilh by name, Mr.
Niazi knew that Monteilh was the person he had reported to the FBI as a possible
terrorist. (The *Niazi* indictment in that criminal case was later dismissed by the
United States without prejudice.)

FBI disclosed to the defendant in that case the content of some of the audio and

video recordings containing conversations between Mr. Monteilh and the

defendant and others.  The FBI also acknowledged in the *Niazi* case that Mr.

Monteilh provided handwritten notes to the FBI, and it produced certain notes

provided by Mr. Monteilh concerning Mr. Niazi.  The FBI is presently assessing

whether additional audio, video, or notes can be disclosed without risking

disclosure of the privileged information described below and significant harm to

national security interests in protecting counterterrorism investigations.

13. However, as set forth below, the FBI must protect certain specific

information concerning counterterrorism investigative matters related to the

allegations of this case, including Operation Flex in which Monteilh was involved.

In particular, the FBI cannot publicly disclose the identities of specific subjects of

counterterrorism investigations (some of which remain open), the identities of

those who have not been subject to investigation, the precise number of Operation

Flex subjects, the reasons particular individuals were subject to investigation, or

particular sources and methods of investigation used in counterterrorism cases.

14. Monteilh has provided numerous statements to the media discussing his

purported activities on behalf of the FBI.  He has also filed his own lawsuit against

the FBI and agents in their personal capacity in which he makes allegations related

to his work as an FBI source. *See Monteilh v. FBI*, et al., U.S.D.C., C.D. Cal.,

Civil Action No. 10-102.  The FBI has not confirmed or denied any of Monteilh's

11

public allegations concerning his work for the FBI, and his allegations do not constitute a disclosure or confirmation by the FBI of any information concerning his activities as an informant.

## INFORMATION SUBJECT TO STATE SECRETS PRIVILEGE AND HARM TO NATIONAL SECURITY FROM DISCLOSURE

15.  The categories of information that the FBI seeks to protect in this case through the Attorney General's privilege assertion are described below.  Upon my personal consideration, I have determined that disclosure of information in these categories reasonably could be expected to cause significant harm to national security:

(1)  *Subject Identification*: Information that could tend to confirm or deny whether a particular individual was or was not the subject of an FBI counterterrorism investigation, including in Operation Flex.

(2)  *Reasons for Counterterrorism Investigations and Results*: Information that could tend to reveal the initial reasons (*i.e.* predicate) for an FBI counterterrorism investigation of a particular person (including in Operation Flex), any information obtained during the course of such an investigation, and the status and results of the investigation.  This category includes information obtained from the U.S. Intelligence Community related to the reasons for an investigation.

(3)    *Sources and Methods:* Information that could tend to reveal

whether particular sources and methods were used in a

counterterrorism investigation of a particular subject, including in

Operation Flex.  This category includes previously undisclosed

information related to whether court-ordered searches or surveillance,

confidential human sources, and other investigative sources and

methods, were used in a counterterrorism investigation of a particular

person, the reasons such methods were used, the status of the use of

such sources and methods, and any results derived from such

methods.[4]

**I.    Subject Identification and Reasons for Investigation**

16.  The FBI seeks to protect through the Attorney General's privilege

assertion information that would confirm or deny whether particular individuals

were the subjects of FBI counterterrorism investigations, and the predicate for,

information obtained in, and the status and results of any counterterrorism

investigations action of particular persons.  I describe below in unclassified terms

why the disclosure of such information reasonably could be expected to cause

---

[4]     This description of the broad categories of information subject to the
Attorney General's claim of privilege is not meant to foreclose the possibility that
other information related to FBI counterterrorism investigations including
Operation Flex may be identified in later proceedings as subject to privilege.

13

significant harm to national security.   I address first the process for approval and

oversight of FBI counterterrorism investigations under then-applicable Attorney

General Guidelines.

A. **Counterterrorism Guidelines Applicable to Operation Flex**

17.  At the time the investigations at issue in this case were opened, the

October 31, 2003 Attorney General Guidelines for FBI National Security

Investigations and Foreign Intelligence Collection (NSIG) were in effect.  The

NSIG authorized three levels of investigative activity: threat assessments,

preliminary investigations and full investigations.

18.  The 2003 AG Guidelines authorized the FBI to undertake threat

assessments to proactively draw on available sources of information to identify

terrorist threats and activities through non-intrusive investigative techniques,

including obtaining publicly available information, accessing information available

within the FBI and Department of Justice, requesting information from other

government entities, using online resources, interviewing previously established

assets, and conducting non-pretextual interviews of members of the public and

private entities.  The authority to undertake threat assessments could be used in

cases in which information or an allegation concerning possible terrorist activity or

other national security threats by an individual, group, or organization were

received by the FBI and the matter could be checked promptly through the

relatively non-intrusive means described above.

14

19. A Preliminary Investigation could be initiated under the 2003 guidelines to determine whether a full investigation was appropriate based upon "information or an allegation" indicating a threat to the national security, for example, that an individual is or may be an international terrorist or an agent of a foreign power; an individual, group or organization is or may be engaging, or has or may have engaged, in activities constituting a threat to the national security (or related preparatory or support activities) for or on behalf of a foreign power; or an individual, group or organization is, or may be, the target of a recruitment or infiltration effort by an international terrorist, foreign power, or agent of a foreign power under circumstances related to a threat to the national security.  Most Preliminary Investigations could be approved by either the Special Agent in Charge (SAC) of the field office or, as authorized by the Special Agent in Charge, by an Assistant Special Agent in Charge (ASAC) or squad supervisor with responsibility for national security investigations.  A field office was required under the 2003 guidelines to notify FBI Headquarters of the initiation of the investigation and to identify the grounds for the investigation.  FBI Headquarters, in turn, was required to provide notice of the initiation of the investigation to the Department of Justice's Office of Intelligence Policy and Review (OIPR).[5]  All

---

[5]   The Office of Intelligence Policy and Review became part of the National Security Division (NSD) in the Department of Justice and has been renamed the (cont'd)

15

lawful investigative techniques could be used in a Preliminary Investigation except for mail opening, physical search, or electronic surveillance requiring judicial order or warrant.

20. A Preliminary Investigation was to be completed within six months of the date of initiation, but if warranted by facts or information obtained in the course of the investigation, senior field office managers could authorize a six-month extension. An extension of a Preliminary Investigation beyond the initial one-year period required FBI Headquarters approval and could be granted in six-month increments. FBI Headquarters was required to notify OIPR of any extensions by FBI Headquarters beyond the initial one-year period.

21. A Full Investigation was authorized under the same circumstances as a Preliminary Investigation except that instead of "information or an allegation" of a threat to the national security the NSIG required that "specific and articulable facts" gave reason to believe that a threat to the national security may exist. Most Full Investigations could be approved by either the SAC of the field office or, as authorized by the SAC, by an ASAC. The notice requirements for the initiation of a Full Investigation were the same as for the initiation of a Preliminary Investigation. All lawful investigative techniques could be used in a Full Investigation. The FBI was required under the 2003 guidelines to notify OIPR and

Office of Intelligence.

16

the Criminal Division at the end of each year a full investigation continued and to

provide OIPR and the Criminal Division with a summary of the investigation.

22.  All of the investigations of Operation Flex subjects were opened with

supervisory authority and subject to internal FBI and DOJ oversight.

**B.     Harm to National Security from Disclosure of Counterterrorism Investigation Subjects and Reasons for Investigation**

23.  Disclosure of the identity of subjects of counterterrorism investigations

could reasonably be expected to result in significant harm to national security.

First, disclosure of the subjects of open counterterrorism investigations would

obviously alert those subjects to the fact of the FBI's current interest in them.

Such knowledge would cause significant harm to FBI counterterrorism

investigations, as subjects could attempt to flee, destroy evidence or take steps to

alter their conduct so as to avoid detection of their future activities by law

enforcement.  In these circumstances, law enforcement and intelligence officers

would be significantly hindered in gathering further intelligence on their activities

or determine their whereabouts.  In addition, knowledge that they were under

investigation might enable subjects to anticipate the activities of law enforcement

and intelligence officers, perhaps conducting counter-surveillance activities that

could place Federal agents at greater risk. Such knowledge would also alert

associates of the subjects to the fact that the FBI is likely aware of their

associations with the subject, causing them to take similar steps to avoid scrutiny.

17

Disclosing the identities of counterterrorism subjects also could enable subjects to ascertain the identities of confidential informants or other sources of intelligence, putting those sources at risk.

24.  Disclosure that an individual is *not* a subject of a national security investigation also reasonably could be expected to cause significant harm to national security.  Individuals or terrorist groups could manipulate the system to discover whether they or their members are subject to investigation.  Disclosure that some persons are not subject to investigation, while the status of others is not confirmed, would inherently reveal that concerns remains as to particular persons.  Also, if individuals desire to commit terrorist acts, notification that they are not under investigation would inform them that they can move without detection.  Indeed, confirmation that an individual is not under investigation could provide an incentive to those so inclined to commit a terrorist act before becoming subject to investigative interest.

25.  Similarly, even where an investigation has been closed, disclosing that an individual formerly was the subject of a counterterrorism investigation reasonably could be expected to cause significant harm to national security.  Disclosure that an individual had been, but is no longer, under investigation might induce that subject to evaluate previous conduct and interactions to determine what information the Government may have obtained about them.  As noted, to the extent that the individual's terrorism-related intentions were not previously

18

detected and the individual later decided to undertake terrorist activity, knowing

one was no longer the subject of investigative interest might embolden that person

to operate confident that there is not a threat of detection.  In addition, the fact that

investigations are closed typically does not indicate that the subjects have been

"cleared" of wrongdoing.  Closed cases are often reopened based on new

information.

26.  Even if individuals are entirely law-abiding, disclosure that they were

once, but no longer are, the subjects of counterterrorism investigations would

provide valuable intelligence to suspected terrorists and terrorist organizations

regarding the intelligence and suspicions the FBI has regarding them.  Indeed, even

if the FBI has closed an investigation on one subject, it may have open

investigations on the associates of that subject who are engaged in or still

suspected of ties to terrorist activity.  Disclosing that investigations on certain

persons are closed where the FBI has not found a current nexus to terrorism could

still alert their associates of the FBI interests in *them*, which could lead these

associates to destroy evidence or alter their conduct so as to avoid detection of

their future activities by law enforcement.

27.  In addition, disclosure that a person had been a subject of a closed

counterterrorism investigation would also provide an important insight into the

FBI's investigative sources and methods.  The FBI may open a counterterrorism

investigation based on an individual's association with a subject of another open

19

counterterrorism investigation, when the association is close enough to indicate a

threat to the national security.  If the subjects of FBI investigations were disclosed,

individuals closely associated with that subject would be on notice that they may

be subjects of investigations, and thus take steps to avoid detection.

28. Even if a person believes that he or she might have been under

investigation based on unconfirmed public speculation or other information,

confirmation of that fact by the Government in litigation would remove all doubt

and would not only confirm who was or was not subject to investigation, but would

tend to reveal why the Government had a particular interest or concern with certain

individuals.  This would inherently reveal the focus (or lack thereof) of

investigative action.

29.  Similarly, disclosure of the substance of a counterterrorism

investigation—whether the initial predicate, information gained during the

investigation, status, and results—would reveal a range of sensitive

counterterrorism investigative information, even if the investigation does not

identify any nexus to terrorism.  There is, first, the obvious harm of revealing to

subjects who may in fact be bent on terrorist activity what the FBI knows or does

not know about their plans and the threat they pose to national security.  Even if a

person is not intent on committing terrorist acts, the reasons they came under

suspicion may involve sensitive intelligence information about them, their

associates, or a particular threat, the disclosure of which could harm other pending

ER - 278

1   or future investigations.  More generally, disclosure of the reasons for an

2   investigation could indicate what kind of information is sufficient to trigger an

3   inquiry by the FBI, thus providing insights to those intent on terrorism on how to

4   avoid detection.  Finally, as discussed further below, disclosure of the reasons for

5   an investigation may reveal sensitive sources and methods related to how the FBI

6   may obtain information on a person.

7

8

9   **II.     FBI Investigative Sources, Methods, Techniques in Operation Flex**

10      30.  The FBI also seeks to protect through the Attorney General's privilege

11   assertion information that would tend to describe, reveal, confirm or deny the

12   existence or use of FBI investigative sources, methods, or techniques of

13   counterterrorism investigations that were utilized in Operation Flex against

14   particular subjects.  This category includes previously undisclosed information

15   related to whether court-ordered searches or surveillance, confidential human

16   sources, and other investigative sources and methods, were used in a

17   counterterrorism investigation of a particular person, the reasons such methods

18   were used, the status of the use of such sources and methods, and any results

19   derived from such methods

20      31.  The disclosure of the information in this category reasonably could be

21   expected to cause significant harm to the national security.  The disclosure of

22   sources and methods used in a particular investigation would reveal not only the

23   identities of particular subjects but the steps taken by the FBI in counterterrorism

24

25

26

27

28

21

investigations.  FBI sources and methods for investigating potential terrorist threats

are of the utmost significance, because the FBI's top priority is to detect and

prevent terrorist attacks.  The disclosure of sources and methods, such as

confidential human sources, the existence of surveillance, and the use of other

techniques, would provide a roadmap to adversaries as to how the FBI goes about

this vital task.  For these reasons, disclosure of the sources and methods used by

the FBI in a particular counterterrorism investigation, including in Operation Flex,

reasonably could be expected to cause significant harm to national security.

22

ER - 280

## CONCLUSION

32.  For the reasons set forth above, based on my personal consideration of the matter, I have determined that disclosure of the information in the three categories described above reasonably could be expected to cause significant harm to national security.  I refer the Court to my classified declaration, submitted solely for *in camera, ex parte* review, for further details concerning the information subject to the Attorney General's privilege assertion.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 7/25/11

Mark F. Giuliano
Assistant Director
Counterterrorism Division
Federal Bureau of Investigation
United States Department of Justice

23

ER - 281

TONY WEST
Assistant Attorney General
ANDRE BIROTTE, JR.
United States Attorney
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
E-mail: tony.coppolino@usdoj.gov
LYNN Y. LEE (SBN #235531)
E-mail: lynn.lee@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Telephone:  202-514-4782
Facsimile:  202-616-8460
*Attorneys for the Federal Bureau of Investigation and
Defendants Mueller and Martinez Sued in their
Official Capacities*

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

| | |
|---|---|
| YASSIR FAZAGA *et al.*, | ) CASE:  SA11-CV-00301 CJC (VBKx) |
|     Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL BUREAU OF | ) |
|    INVESTIGATION *et al.*, | ) |
| | ) |
|    Defendants. | ) |

**DECLARATION OF ERIC H. HOLDER**
**ATTORNEY GENERAL OF THE UNITED STATES**

I, Eric H. Holder, hereby state and declare as follows:

1.    I am the Attorney General of the United States and head of the United States Department of Justice ("DOJ"), an Executive Department of the United States. *See* 28 U.S.C.§§ 501, 503, 509.  The purpose of this declaration is to assert, at the request of the Director of the Federal Bureau of Investigation ("FBI"), and in my capacity as Attorney General and head of DOJ, a formal claim of the state secrets privilege in order to protect the national security interests of the

United States.  The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, and on my evaluation of that information.

2.     In the course of my official duties, I have been informed that the plaintiffs in this action—three Muslim residents of southern California—have filed a class action against the FBI, FBI Director Robert Mueller and Steven M. Martinez, Assistant Director in Charge of the FBI's Los Angeles Field Office, in their official capacities, and several FBI employees in their individual capacities, claiming alleged violations of the Free Exercise Clause and Establishment Clause of the First Amendment, the Religious Freedom Restoration Act, the equal protection principles of the Fifth Amendment, the Privacy Act, the Fourth Amendment, and the Foreign Intelligence Surveillance Act, and for conspiracy to violate the plaintiffs' civil rights pursuant to 42 U.S.C. § 1985(3).  I understand that the plaintiffs allege that the defendants, through the use of a paid confidential informant, engaged in an impermissible investigation to collect personal information indiscriminately on the plaintiffs and others based solely on their religion in violation of their rights under the Constitution and statutory law.

3.     I have read and carefully considered the public and classified declarations of Mark Giuliano ("Giuliano Declaration"), Assistant Director of the FBI's Counterterrorism Division.  After careful and actual personal consideration of the matter, I have concluded that disclosure of the three categories of information described below and in more detail in the classified Giuliano Declaration could reasonably be expected to cause significant harm to the national security, and I therefore formally assert the state secrets privilege over this information.  The classified Giuliano Declaration, which is available for the Court's *ex parte, in camera* review, describes in classified detail the information over which I am asserting the state secrets privilege.  As Attorney General, I possess original classification authority under § 1.3 of Executive Order ("E.O.")

13526, dated December 29, 2009. *See* 75 Fed. Reg. 707. The classified Giuliano Declaration is properly classified under § 1.2 of E.O. 13526 because public disclosure of the information contained in that declaration also could reasonably be expected to cause significant harm to national security.

4.     In unclassified terms, my privilege assertion encompasses information in the following categories:

(i)     *Subject Identification*: Information that could tend to confirm or deny whether a particular individual was or was not the subject of an FBI counterterrorism investigation, including in Operation Flex.

(ii)     *Reasons For Counterterrorism Investigations and Results*: Information that could tend to reveal the initial reasons (*i.e.*, predicate) for an FBI counterterrorism investigation of a particular person (including in Operation Flex), any information obtained during the course of such an investigation, and the status and results of the investigation. This category includes any information obtained from the U.S. Intelligence Community related to the reasons for an investigation.

(iii)     *Sources and Methods*: Information that could tend to reveal whether particular sources and methods were used in a counterterrorism investigation of a particular subject, including in Operation Flex. This category includes previously undisclosed information related to whether court-ordered searches or surveillance, confidential human sources, and other investigative sources and methods were used in a counterterrorism investigation of a particular person, the reasons such methods were used, the status of the use of such sources and methods, and any results derived from such methods.

5.     As indicated above and explained further below, I have determined that disclosure of information falling into the foregoing categories could reasonably be expected to cause significant harm to national security.

6.     First, I concur with the FBI's determination that the disclosure of the identities of subjects of counterterrorism investigations, including in Operation

-3-

Flex, reasonably could be expected to cause significant harm to national security. As the FBI has explained, such disclosures would alert those subjects to the FBI's interest in them and cause them to attempt to flee, destroy evidence, or alter their conduct so as to avoid detection of their future activities, which would seriously impede law enforcement and intelligence officers' ability to determine their whereabouts or gain further intelligence on their activities. In addition, as the FBI has explained, knowledge that they were under investigation could enable subjects to anticipate the actions of law enforcement and intelligence officers, possibly leading to counter-surveillance that could place federal agents at higher risk, and to ascertain the identities of confidential informants or other intelligence sources, placing those sources at risk. Such knowledge, as the FBI has further explained, could also alert associates of the subjects to the fact that the FBI is likely aware of their associations with the subjects and cause them to take similar steps to avoid scrutiny.

7.     Second, I agree with the FBI that disclosure that an individual is not a subject of a national security investigation could likewise reasonably be expected to cause significant harm to national security. As the FBI has explained, disclosure that some persons are not subject to investigation, while the status of others is left unconfirmed, would inherently reveal that FBI concerns remain as to particular persons. Allowing such disclosures, as the FBI indicates, would enable individuals and terrorist groups alike to manipulate the system to discover whether they or their members are subject to investigation. Further, as the FBI has pointed out, individuals who desire to commit terrorist acts could be motivated to do so upon discovering that they are not being monitored.

8.     In addition, I agree with the FBI's judgment that where an investigation of a subject has been closed, disclosure that an individual was formerly the subject of a counterterrorism investigation could also reasonably be expected to cause significant harm to national security. Again, I agree with the

-4-

FBI that, to the extent that an individual had terrorist intentions that were not previously detected, the knowledge that he or she is no longer the subject of investigative interest could embolden him or her to carry out those intentions. Moreover, as the FBI indicates, the fact that investigations are closed does not mean that the subjects have necessarily been cleared of wrongdoing, as closed cases are often reopened based on new information. As the FBI has also explained, even if the former subjects are law-abiding, the disclosure that they had been investigated could still provide valuable information to terrorists and terrorist organizations about the FBI's intelligence and concerns, particularly where the former subjects have associates whom the FBI may still be investigating based on suspected ties to terrorist activity. As the FBI has further explained, disclosure of the FBI's interest in the closed subject could alert such associates to the FBI's interest in them and lead them to destroy evidence or alter their conduct so as to avoid detection of their future activities.

9.      Third, I agree with the FBI's judgment that disclosure of the reasons for and substance of a counterterrorism investigation—whether the initial predicate for opening an investigation, information gained during the investigation, or the status or results of the investigation—could also reasonably be expected to cause significant harm to national security. As the FBI has determined, such disclosures would reveal to subjects who are involved in or planning to undertake terrorist activities what the FBI knows or does not know about their plans and the threat they pose to national security. Even if the subjects have no terrorist intentions, as the FBI has explained, disclosure of the reasons they came under investigation may reveal sensitive intelligence information about them, their associates, or a particular threat that would harm other investigations. More generally, as the FBI has also explained, disclosure of the reasons for an investigation could provide insights to persons intent on committing terrorist

-5-

attacks as to what type of information is sufficient to trigger an inquiry by the FBI, and what sources and methods the FBI employs to obtain information on a person.

10.     Finally, I agree with the FBI that the disclosure of certain information that would tend to describe, reveal, confirm or deny the existence or use of FBI investigative sources and methods, or techniques used in the counterterrorism investigations at issue in this case could likewise be reasonably expected to cause significant harm to national security.  This aspect of my privilege assertion would include information that would tend to reveal whether court-ordered searches or surveillance, confidential human sources, and other investigative sources and methods were used in a counterterrorism investigation of a particular person, the reasons for and the status of the use of such sources and methods, and any results derived from such methods.  The disclosure of such information, as the FBI has explained, could reveal not only the identities of particular subjects but also the steps taken by the FBI in counterterrorism matters.  I agree with the FBI's assessment that such information would effectively provide a road map to adversaries on how the FBI goes about detecting and preventing terrorist attacks.

11.     Any further elaboration concerning the foregoing matters on the public record would reveal information that could cause the very harms my assertion of the state secrets privilege is intended to prevent.  The classified Giuliano Declaration, submitted for *ex parte, in camera* review, provides a more detailed explanation of the information over which I am asserting the privilege and the harms to national security that would result from  disclosure of that information.

12.     On September 23, 2009, I announced a new Executive Branch policy governing the assertion and defense of the state secrets privilege in litigation.  Under this policy, the Department of Justice will defend an assertion of the state secrets privilege in litigation, and seek dismissal of a claim on that basis, only when "necessary to protect against the risk of significant harm to national

security." *See* Exhibit 1 (State Secrets Policy) ¶ 1(A).  The policy provides further that an application of a privilege assertion must be narrowly tailored and that dismissal be sought pursuant to the privilege assertion only when necessary to prevent significant harm to national security. *Id.* ¶ 1(B).  Moreover, "[t]he Department will not defend an invocation of the privilege in order to: (i) conceal violations of the law, inefficiency, or administrative error; (ii) prevent embarrassment to a person, organization, or agency of the United States government; (iii) restrain competition; or (iv) prevent or delay the release of information the release of which would not reasonably be expected to cause significant harm to national security." *Id.* ¶ 1(C).  The policy also established detailed procedures for review of a proposed assertion of the state secrets privilege in a particular case. *Id.* ¶ 2.  Those procedures require submissions by the relevant government departments or agencies specifying "(i) the nature of the information that must be protected from unauthorized disclosure; (ii) the significant harm to national security that disclosure can reasonably be expected to cause; [and] (iii) the reason why unauthorized disclosure is reasonably likely to cause such harm." *Id.* ¶ 2(A).  Based on my personal consideration of the matter, I have determined that the requirements for an assertion and defense of the state secrets privilege have been met in this case in accord with the September 2009 State Secrets Policy.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of July, 2011, in Washington, D.C.

ERIC H. HOLDER
Attorney General of the United States

-7-

# EXHIBIT 1 TO DECLARATION OF
# ATTORNEY GENERAL ERIC H. HOLDER



# Office of the Attorney General
## Washington, D. C. 20530

September 23, 2009

MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES
MEMORANDUM FOR THE HEADS OF DEPARTMENT COMPONENTS

FROM:   THE ATTORNEY GENERAL

SUBJECT:   Policies and Procedures Governing Invocation of the State Secrets Privilege

I am issuing today new Department of Justice policies and administrative procedures that will provide greater accountability and reliability in the invocation of the state secrets privilege in litigation. The Department is adopting these policies and procedures to strengthen public confidence that the U.S. Government will invoke the privilege in court only when genuine and significant harm to national defense or foreign relations is at stake and only to the extent necessary to safeguard those interests. The policies and procedures set forth in this Memorandum are effective as of October 1, 2009, and the Department shall apply them in all cases in which a government department or agency thereafter seeks to invoke the state secrets privilege in litigation.

1. **Standards for Determination**

   **A. Legal Standard.** The Department will defend an assertion of the state secrets privilege ("privilege") in litigation when a government department or agency seeking to assert the privilege makes a sufficient showing that assertion of the privilege is necessary to protect information the unauthorized disclosure of which reasonably could be expected to cause significant harm to the national defense or foreign relations ("national security") of the United States. With respect to classified information, the Department will defend invocation of the privilege to protect information properly classified pursuant to Executive Order 12958, as amended, or any successor order, at any level of classification, so long as the unauthorized disclosure of such information reasonably could be expected to cause significant harm to the national security of the United States. With respect to information that is nonpublic but not classified, the Department will also defend invocation of the privilege so long as the disclosure of such information reasonably could be expected to cause significant harm to the national security of the United States.

   **B. Narrow Tailoring.** The Department's policy is that the privilege should be invoked only to the extent necessary to protect against the risk of significant harm to national security. The Department will seek to dismiss a litigant's claim or case on the basis of the state secrets privilege only when doing so is necessary to protect against the risk of significant harm to national security.

Memorandum for Heads of Executive Departments and Agencies          Page 2
Memorandum for the Heads of Department Components
Subject:  State Secrets Privilege

        **C.  Limitations.**  The Department will not defend an invocation of the privilege in order to: (i) conceal violations of the law, inefficiency, or administrative error; (ii) prevent embarrassment to a person, organization, or agency of the United States government; (iii) restrain competition; or (iv) prevent or delay the release of information the release of which would not reasonably be expected to cause significant harm to national security.

## 2.  Initial Procedures for Invocation of the Privilege

        **A.  Evidentiary Support.**  A government department or agency seeking invocation of the privilege in litigation must submit to the Division in the Department with responsibility for the litigation in question[1] a detailed declaration based on personal knowledge that specifies in detail: (i) the nature of the information that must be protected from unauthorized disclosure; (ii) the significant harm to national security that disclosure can reasonably be expected to cause; (iii) the reason why unauthorized disclosure is reasonably likely to cause such harm; and (iv) any other information relevant to the decision whether the privilege should be invoked in litigation.

        **B.  Recommendation from the Assistant Attorney General.**  The Assistant Attorney General for the Division responsible for the matter shall formally recommend in writing whether or not the Department should defend the assertion of the privilege in litigation.  In order to make a formal recommendation to defend the assertion of the privilege, the Assistant Attorney General must conclude, based on a personal evaluation of the evidence submitted by the department or agency seeking invocation of the privilege, that the standards set forth in Section 1(a) of this Memorandum are satisfied.  The recommendation of the Assistant Attorney General shall be made in a timely manner to ensure that the State Secrets Review Committee has adequate time to give meaningful consideration to the recommendation.

## 3.  State Secrets Review Committee

        **A.  Review Committee.**  A State Secrets Review Committee consisting of senior Department of Justice officials designated by the Attorney General will evaluate the

---

[1] The question whether to invoke the privilege typically arises in civil litigation.  Requests for invocation of the privilege in those cases shall be addressed to the Civil Division.  The question whether to invoke the privilege also may arise in cases handled by the Environment and Natural Resources Division (ENRD), and requests for invocation of the privilege shall be addressed to ENRD in those instances.  It is also possible that a court may require the Government to satisfy the standards for invoking the privilege in criminal proceedings.  *See United States v. Araf*, 533 F.3d 72, 78-80 (2d Cir. 2008); *but see United States v. Rosen*, 557 F.3d 192, 198 (4th Cir. 2009).  In such instances, requests to submit filings to satisfy that standard shall be directed to the National Security Division.

Memorandum for Heads of Executive Departments and Agencies                Page 3
Memorandum for the Heads of Department Components
Subject:  State Secrets Privilege

Assistant Attorney General's recommendation to determine whether invocation of the privilege in litigation is warranted.

**B.  Consultation.**  The Review Committee will consult as necessary and appropriate with the department or agency seeking invocation of the privilege in litigation and with the Office of the Director of National Intelligence.  The Review Committee must engage in such consultation prior to making any recommendation against defending the invocation of the privilege in litigation.

**C.  Recommendation by the Review Committee.**  The Review Committee shall make a recommendation to the Deputy Attorney General, who shall in turn make a recommendation to the Attorney General.[2]  The recommendations shall be made in a timely manner to ensure that the Attorney General has adequate time to give meaningful consideration to such recommendations.

## 4.  Attorney General Approval

**A.  Attorney General Approval.**  The Department will not defend an assertion of the privilege in litigation without the personal approval of the Attorney General (or, in the absence or recusal of the Attorney General, the Deputy Attorney General or the Acting Attorney General).

**B.  Notification to Agency or Department Head.**  In the event that the Attorney General does not approve invocation of the privilege in litigation with respect to some or all of the information a requesting department or agency seeks to protect, the Department will provide prompt notice to the head of the requesting department or agency.

**C.  Referral to Agency or Department Inspector General.**  If the Attorney General concludes that it would be proper to defend invocation of the privilege in a case, and that invocation of the privilege would preclude adjudication of particular claims, but that the case raises credible allegations of government wrongdoing, the Department will refer those allegations to the Inspector General of the appropriate department or agency for further investigation, and will provide prompt notice of the referral to the head of the appropriate department or agency.

---

[2]  In civil cases, the review committee's recommendation should be made through the Associate Attorney General to the Deputy Attorney General, who shall in turn make a recommendation to the Attorney General.

Memorandum for Heads of Executive Departments and Agencies                    Page 4
Memorandum for the Heads of Department Components
Subject:  State Secrets Privilege

## 5. Reporting to Congress

The Department will provide periodic reports to appropriate oversight committees of Congress with respect to all cases in which the Department invokes the privilege on behalf of departments or agencies in litigation, explaining the basis for invoking the privilege.

## 6. Classification Authority

The department or agency with classification authority over information potentially subject to an invocation of the privilege at all times retains its classification authority under Executive Order 12958, as amended, or any successor order.

## 7. No Substantive or Procedural Rights Created

This policy statement is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 237 of 262

(VBKx),APPEAL,CLOSED,DISCOVERY,RELATED-G

# UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA
## (Southern Division - Santa Ana)
## CIVIL DOCKET FOR CASE #: 8:11-cv-00301-CJC-VBK

| | |
|---|---|
| Yassir Fazaga et al v. Federal Bureau of Investigation et al | Date Filed: 02/22/2011 |
| Assigned to: Judge Cormac J. Carney | Date Terminated: 01/29/2013 |
| Referred to: Magistrate Judge Victor B. Kenton | Jury Demand: Plaintiff |
| Related Case: 8:07-cv-01088-CJC-AN | Nature of Suit: 440 Civil Rights: Other |
| Case in other court: 9th CCA, 12-56867 | Jurisdiction: U.S. Government Defendant |
|                     9th CCA, 12-56874 | |
| Cause: 28:1343 Violation of Civil Rights | |

**Plaintiff**

**Yassir Fazaga**           represented by    **Ahilan T Arulanantham**
ACLU Foundation of Southern California
1313 West Eighth Street
Los Angeles, CA 90017
213-977-5211
Fax: 213-977-5297
Email: aarulanantham@aclu-sc.org
*ATTORNEY TO BE NOTICED*

**Ameena Mirza Qazi**
Council on American Islamic Relations -
Greater Los Angeles
2180 West Cresent Avenue Suite F
Anaheim, CA 92801
714-776-1847
Email: aqazi@cair.com
*ATTORNEY TO BE NOTICED*

**Dan Stormer**
Hadsell Stormer Richardson and Renick
LLP
128 North Fair Oaks Avenue
Pasadena, CA 91103
626-585-9600
Fax: 626-577-7079
Email: dstormer@hadsellstormer.com
*ATTORNEY TO BE NOTICED*

**Jennifer L Pasquarella**
ACLU Foundation of Southern California
1313 West Eighth Street
Los Angeles, CA 90017
213-977-9500

**ER - 295**

Fax: 213-977-5297
Email: jpasquarella@aclu-sc.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Piovia-Scott**
Hadsell Stormer & Renick LLP
128 North Fair Oaks Avenue
Pasadena, CA 91103
626-585-9600
Fax: 626 577 7079
Email: jps@hadsellstormer.com
*ATTORNEY TO BE NOTICED*

**Peter Bibring**
ACLU Foundation of Southern California
1313 West Eight Street
Los Angeles, CA 90017
213-977-9500
Fax: 213-977-5297
Email: pbibring@aclu-sc.org
*ATTORNEY TO BE NOTICED*

**Reem Salahi**
Email: reem@hadsellstormer.com
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
Advancing Justice - Asian Law Caucus
55 Columbus Ave.
San Francisco, CA 94610
415-848-7711
Fax: 415-896-1702
Email: yamans@advancingjustice-alc.org
*TERMINATED: 11/12/2013*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ali Uddin Malik**　　　　　represented by　**Ahilan T Arulanantham**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ameena Mirza Qazi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dan Stormer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer L Pasquarella**

ER - 296

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Piovia-Scott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter Bibring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Reem Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*TERMINATED: 11/12/2013*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Yasser Abdelrahim**      represented by    **Ahilan T Arulanantham**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ameena Mirza Qazi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dan Stormer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer L Pasquarella**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Piovia-Scott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter Bibring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Reem Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

ER - 297

**Yaman Salahi**
(See above for address)
*TERMINATED: 11/12/2013*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Federal Bureau of Investigation**     represented by    **Anthony Joseph Coppolino**
US Department of Justice
Federal Programs Branch
20 Massachusetts Avenue NW
Room 6102 883
Washington, DC 20001
202-514-4782
Email: tony.coppolino@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn Y Lee**
US Department of Justice
Civil Division
P O Box 883
Washington, DC 20044
202-305-0531
Fax: 202-616-8470
Email: lynn.lee@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Robert Mueller**
*Director of the Federal Bureau of*
*Investigation, in his official capacity*    represented by    **Anthony Joseph Coppolino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Steven M Martinez**
*Assistant Director in Charge, Federal*
*Bureau of Investigation's Los Angeles*
*Division, in his official capacity*    represented by    **Anthony Joseph Coppolino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

ER - 298

**J Stephen Tidwell**       represented by   **Annie L Owens**
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
202-663-6471
Fax: 202-663-6363
Email: annie.owens@wilmerhale.com
*TERMINATED: 10/01/2013*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian R Michael**
Wilmer Cutler Pickering Hale & Dorr LLP
350 South Grand Avenue Suite 2100
Los Angeles, CA 90071
213-443-5300
Fax: 213-443-5400
Email: brian.michael@fox.com
*TERMINATED: 08/17/2012*

**Carl J Nichols**
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
202-663-6226
Fax: 202-663-6363
Email: carl.nichols@wilmerhale.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Howard M Shapiro**
Wilmer Cutler Pickering Hale and Dorr
LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
202-663-6606
Fax: 202-663-6363
Email: howard.shapiro@wilmerhale.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katie Moran**
Wilmer Cutler Pickering Hale and Dorr
LLP
350 South Grand Avenue Suite 2100
Los Angeles, CA 90071
213-443-5300
Fax: 213-443-5400
Email: katie.moran@wilmerhale.com
*ATTORNEY TO BE NOTICED*

ER - 299

**Peiyin Patty Li**
Wilmer Cutler Pickering Hale and Dorr
LLP
350 South Grand Avenue Suite 2100
Los Angeles, CA 90071
213-443-5328
Fax: 213-443-5400
Email: patty.li@wilmerhale.com
*TERMINATED: 06/03/2013*

**Defendant**

**Barbara Walls**      represented by   **Annie L Owens**
(See above for address)
*TERMINATED: 10/01/2013*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian R Michael**
(See above for address)
*TERMINATED: 08/17/2012*

**Carl J Nichols**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Howard M Shapiro**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katie Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peiyin Patty Li**
(See above for address)
*TERMINATED: 06/03/2013*

**Defendant**

**Pat Rose**      represented by   **Alexander H Cote**
Scheper Kim & Harris LLP
601 West Fifth Street 12th Floor
Los Angeles, CA 90071-2025
213-613-4655
Fax: 213-613-4656
Email: acote@scheperkim.com
*ATTORNEY TO BE NOTICED*

**Amos Alexander Lowder**
Scheper Kim and Harris LLP

**ER - 300**

601 West 5th Street 12th Floor
Los Angeles, CA 90071
213-613-4655
Fax: 213-613-4656
Email: alowder@scheperkim.com
*ATTORNEY TO BE NOTICED*

**Angela M Machala**
Scheper Kim & Harris LLP
One Bunker Hill
601 West Fifth Street
12th Floor
Los Angeles, CA 90071-2025
213-613-4655
Fax: 213-613-4656
Email: amachala@scheperkim.com
*ATTORNEY TO BE NOTICED*

**David C Scheper**
Scheper Kim & Harris LLP
601 West Fifth Street 12th Floor
Los Angeles, CA 90071-2025
213-613-4655
Fax: 213-613-4656
Email: dscheper@scheperkim.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kevin Armstrong**                  represented by  **Alexander H Cote**
Scheper Kim and Harris LLP
601 West Fifth Street 12th Floor
Los Angeles, CA 90071-2025
213-613-4655
Fax: 213-613-4656
Email: acote@scheperkim.com
*ATTORNEY TO BE NOTICED*

**Angela M Machala**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David C Scheper**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Paul Allen**                       represented by  **Angela M Machala**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David C Scheper**

ER - 301

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DOES**
*1-20*

**Defendant**

**United States of America**     represented by     **Anthony Joseph Coppolino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen E Handler**
US Department of Justice
Civil Division Torts Branch
Benjamin Franklin Station
Post Office Box 888
Washington, DC 20044
202-616-4279
Email: stephen.handler@usdoj.gov
*ATTORNEY TO BE NOTICED*

**W. Scooter Slade**
U S Department of Justice
Litigation Security Group
Two Constitution Square
145 N Street, N E
Washington, DC 20530
202-514-9016
Fax: 202-307-2066
Email: scooter.slade@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/22/2011 | 1 | COMPLAINT against Defendants Paul Allen, Kevin Armstrong, Federal Bureau of Investigation, Steven M Martinez, Robert Mueller, Pat Rose, J Stephen Tidwell and Barbara Walls. Case assigned to Judge Josephine Staton Tucker for all further proceedings. Discovery referred to Magistrate Judge Victor B. Kenton.(Filing fee $ 350 Paid). Jury Demanded. Filed by Plaintiffs Ali Uddin Malik, Yasser Abdelrahim and Yassir Fazaga.(lwag) (Entered: 02/24/2011) |
| 02/22/2011 | | 60 DAY Summons Issued re Complaint - (Discovery), Complaint - (Discovery) 1 as to Defendants Paul Allen, Kevin Armstrong, Federal Bureau of Investigation, Steven M Martinez, Robert Mueller, Pat Rose, J Stephen Tidwell and Barbara Walls. (lwag) (Entered: 02/24/2011) |
| 02/22/2011 | 2 | NOTICE of Interested Parties filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga and Ali Uddin Malik. (lwag) (Entered: 02/24/2011) |

ER - 302

| 02/22/2011 | 3 | NOTICE of Related Case(s) filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga and Ali Uddin Malik. Related Case(s): 8:07-cv-01088-CJC(ANx). (lwag) (Entered: 02/24/2011) |
|---|---|---|
| 02/24/2011 | 4 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 08-05 -Related Case- filed. Related Case No: SACV07-01088 CJC (ANx). Case transferred from Judge Josephine Staton Tucker to Judge Cormac J. Carney for all further proceedings. The case number will now reflect the initials of the transferee Judge SACV11-00301 CJC (VBKx). Signed by Judge Cormac J. Carney. (dro) (Entered: 02/28/2011) |
| 03/09/2011 | 5 | NOTICE of Appearance filed by attorney Anthony Joseph Coppolino on behalf of Defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller (Coppolino, Anthony) (Entered: 03/09/2011) |
| 03/09/2011 | 6 | NOTICE of Appearance filed by attorney Lynn Y Lee on behalf of Defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller (Lee, Lynn) (Entered: 03/09/2011) |
| 03/31/2011 | 7 | NOTICE of Related Case(s) filed by defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller. Related Case(s): 10-102 (Lee, Lynn) (Entered: 03/31/2011) |
| 04/05/2011 | 8 | RESPONSE filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malikto Notice of Related Case(s) 7 (Attachments: # 1 Exhibit)(Bibring, Peter) (Entered: 04/05/2011) |
| 04/06/2011 | 9 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 08-05 (Related Case) filed. Transfer of case declined by Judge James V. Selna, for the reasons set forth on this order. Related Case No. SACV10-00102 JVS (RNBx) (ade) (Entered: 04/06/2011) |
| 04/11/2011 | 10 | STIPULATION for Order To Defer Class Certification Proceedings filed by plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Proposed Order Re: Stipulation to Defer Class Certification Proceedings)(Bibring, Peter) (Entered: 04/11/2011) |
| 04/11/2011 | 11 | STIPULATION for Extension of Time to File Answer to June 7, 2011 re Complaint - (Discovery), Complaint - (Discovery) 1 filed by plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Proposed Order re: Stipulation to Extend Time for Initial Response to Complaint)(Bibring, Peter) (Entered: 04/11/2011) |
| 04/20/2011 | 12 | ORDER by Judge Cormac J. Carney, re Stipulation to Defer Class Certification Proceedings 10 : Court hereby ORDERS that Plaintiffs are relieved from the requirement set forth in Local Rule 23-3 that a motion for class certification be filed within 90 days after service of a pleading purporting to commence a class action. (See document for further details.) (rla) (Entered: 04/21/2011) |
| 04/20/2011 | 13 | ORDER by Judge Cormac J. Carney granting Stipulation to Extend Time to Answer 11 : Court hereby ORDERS that: (i) the date on which the Official Capacity Defendants must respond to the Complaint shall be extended to June 7, 2011; and that (ii) the date on which Defendant Stephen Tidwell must respond to the Complaint shall also be extended to June 7, 2011. (rla) (Entered: 04/21/2011) |
| 05/27/2011 | 14 | Joint STIPULATION for Extension of Time to File Answer to July 22, 2011 filed by defendants J Stephen Tidwell, Barbara Walls. (Attachments: # 1 Proposed Order re Extension of Time to Answer or Otherwise Respond to Complaint and Briefing |

ER - 303

| | | Schedule)(Michael, Brian) (Entered: 05/27/2011) |
|---|---|---|
| 05/27/2011 | 15 | NOTICE of Appearance filed by attorney Peiyin Patty Li on behalf of Defendants J Stephen Tidwell, Barbara Walls (Li, Peiyin) (Entered: 05/27/2011) |
| 05/31/2011 | 16 | ORDER granting Stipulation to Extend Time to Answer (More than 30 days) 14 , defendant Paul Allen answer due 7/22/2011; Kevin Armstrong answer due 7/22/2011; Federal Bureau of Investigation answer due 7/22/2011; Steven M Martinez answer due 7/22/2011; Robert Mueller answer due 7/22/2011; Pat Rose answer due 7/22/2011; J Stephen Tidwell answer due 7/22/2011; Barbara Walls answer due 7/22/2011 by Judge Cormac J. Carney (twdb) (Entered: 06/01/2011) |
| 06/08/2011 | 17 | PROOF OF SERVICE Executed by Plaintiff Ali Uddin Malik, Yasser Abdelrahim, Yassir Fazaga, upon Defendant Federal Bureau of Investigation served on 3/3/2011, answer due 7/22/2011; Steven M Martinez served on 3/3/2011, answer due 7/22/2011; Robert Mueller served on 3/3/2011, answer due 7/22/2011. Service of the Summons and Complaint were executed upon the United States Attorneys Office by delivering a copy to Pat Myles. Executed upon the Attorney Generals Office of the United States by delivering a copy to illegible. Service was executed in compliance with Federal Rules of Civil Procedure. Due diligence declaration NOT attached. Registered or certified mail return receipt attached. Original Summons NOT returned. (Attachments: # 1 Exhibit POS Atty General, # 2 Exhibit POS Govt. Defendants)(Bibring, Peter) (Entered: 06/08/2011) |
| 06/08/2011 | 18 | WAIVER OF SERVICE Returned Executed filed by plaintiff Ali Uddin Malik, Yasser Abdelrahim, Yassir Fazaga. upon J Stephen Tidwell waiver sent by Plaintiff on 3/3/2011, answer due 7/22/2011. Waiver of Service signed by J. Stephen Tidwell. (Bibring, Peter) (Entered: 06/08/2011) |
| 06/08/2011 | 19 | PROOF OF SERVICE Executed by Plaintiff Ali Uddin Malik, Yasser Abdelrahim, Yassir Fazaga, upon Plaintiff Paul Allen served on 4/8/2011, answer due 7/22/2011; Kevin Armstrong served on 4/8/2011, answer due 7/22/2011; Pat Rose served on 4/8/2011, answer due 7/22/2011; Barbara Walls served on 4/8/2011, answer due 7/22/2011. Service of the Summons and Complaint were executed upon Kimberly Harberson, Clerk authorized to accept service in compliance with Federal Rules of Civil Procedure by personal service. Original Summons NOT returned. (Bibring, Peter) (Entered: 06/08/2011) |
| 06/09/2011 | 20 | APPLICATION for attorney Howard M. Shapiro to Appear Pro Hac Vice (PHV FEE PAID.) filed by Defendant J Stephen Tidwell, Barbara Walls. Lodged Proposed Order. (Attachments: # 1 Proposed Order)(nbo) (Entered: 06/09/2011) |
| 06/09/2011 | 21 | APPLICATION for attorney Annie L. Owens to Appear Pro Hac Vice (PHV FEE PAID) filed by Defendants J Stephen Tidwell, Barbara Walls. (nbo) (Entered: 06/09/2011) |
| 06/09/2011 | 22 | APPLICATION for attorney Carl J. Nichols to Appear Pro Hac Vice (PHV FEE PAID) filed by Defendants J Stephen Tidwell, Barbara Walls. Lodged Proposed Order. (Attachments: # 1 Proposed Order)(nbo) (Entered: 06/09/2011) |
| 07/19/2011 | 23 | Joint STIPULATION for Extension of Time to File Answer filed by Defendant J Stephen Tidwell, Barbara Walls. (Attachments: # 1 Proposed Order RE: Extension of Time for Defendants to Answer or Otherwise Respond to Complaint and Request for Extension of Page Limits)(Michael, Brian) (Entered: 07/19/2011) |

ER - 304

| | | |
|---|---|---|
| 07/19/2011 | 24 | NOTICE of Change of Attorney Information for attorney Alexander H Cote counsel for Defendant Pat Rose. Adding Alexander H. Cote as attorney as counsel of record for Defendants Pat Rose, Kevin Armstrong and Paul Allen for the reason indicated in the G-06 Notice. Filed by Defendant Pat Rose, Kevin Armstrong, Paul Allen (Cote, Alexander) (Entered: 07/19/2011) |
| 07/19/2011 | 25 | NOTICE of Change of Attorney Information for attorney Amos Alexander Lowder counsel for Defendant Pat Rose. Adding Amos A. Lowder as attorney as counsel of record for Defendants Pat Rose, Kevin Armstrong and Paul Allen for the reason indicated in the G-06 Notice. Filed by Defendants Pat Rose, Kevin Armstrong and Paul Allen (Lowder, Amos) (Entered: 07/19/2011) |
| 07/20/2011 | 26 | ORDER granting Stipulation to Extend Time to Answer or Otherwise Respond to Complaint 23 by Judge Cormac J. Carney: (1) U.S. Department of Justice, on behalf of FBI and Robert Mueller and Steven M. Martinez, deadline to file its contemplated motion to dismiss shall be extended until 7/26/11; the time for J. Stephen Tidwell, Barbara Walls, Pat Rose, Kevin Armstrong, and Paul Allen to file their motions to dismiss shall be extended until 8/2/11 at 5:00 p.m. PDT; the time for Plaintiffs to file opposition briefs to all Defendants' motions shall be extended until 10/7/11; and the time for all Defendants to file their reply briefs shall be extended until 10/21/11; (2) That the date for a hearing on all Defendants' motions to dismiss shall be 11/7/11 at 1:30 p.m.; (3) That the time for Plaintiffs to amend their Complaint pursuant to Fed.R.Civ.P 15(a)(1)(B) as to all Defendants shall be 21 days from the date the individual-capacity Defendants file their motions to dismiss; and (4) That the parties' briefs in support of or in opposition to Defendants' motions to dismiss shall not exceed 35 pages. (rla) (Entered: 07/21/2011) |
| 07/22/2011 | 27 | ORDER by Judge Cormac J. Carney: granting 20 Application to Appear Pro Hac Vice by Attorney Howard M. Shapiro on behalf of J. Stephen Tidwell and Barbara Wells, designating Brian R. Michael as local counsel. (lt) (Entered: 07/25/2011) |
| 07/22/2011 | 28 | ORDER by Judge Cormac J. Carney: granting 21 Application to Appear Pro Hac Vice by Attorney Annie L. Owens on behalf of J. Stephen Tidwell and Barbara Wells, designating Brian R. Michael as local counsel. (lt) (Entered: 07/25/2011) |
| 07/22/2011 | 29 | ORDER by Judge Cormac J. Carney: granting 22 Application to Appear Pro Hac Vice by Attorney CArl J. Nichols on behalf of J. Stephen Tidwell and Barbara Wells, designating Brian R. Michael as local counsel. (lt) (Entered: 07/25/2011) |
| 07/25/2011 | 30 | Joint STIPULATION for Extension of Time to File Answer filed by Defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller. (Attachments: # 1 Declaration Declaration of Anthony J. Coppolino, U.S. Department of Justice, # 2 Proposed Order)(Coppolino, Anthony) (Entered: 07/25/2011) |
| 07/26/2011 | 31 | ORDER RE: EXTENSION OF TIME FOR DEFENDANTS TO ANSWER OR OTHERWISE RESPOND TOCOMPLAINT; REVISION TO BRIEFING AND HEARING SCHEDULE by Judge Cormac J. Carney: This Court hereby ORDERS as follows: (1) The time for DOJ to file its motion to dismiss shall be extended until August 1, 2011; the time for the individual-capacity defendants to file their motions to dismiss shall be extended until August 9, 2011; the time for plaintiffs to file opposition briefs to all defendants motions shall be extended until October 14, 2011; and the time for all defendants to file their reply briefs shall be extended until October 28, 2011. (see document for details) (mu) (Entered: 07/27/2011) |

ER - 305

| 08/01/2011 | 32 | NOTICE OF MOTION AND MOTION to Dismiss Case *and for Summary Judgment* filed by Defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller. Motion set for hearing on 11/14/2011 at 01:30 PM before Judge Cormac J. Carney. (Attachments: # 1 Declaration Christopher N. Morin, FBI, # 2 Appendix Statement of Material Facts, # 3 Declaration Attorney General Eric H. Holder) (Coppolino, Anthony) (Entered: 08/01/2011) |
| --- | --- | --- |
| 08/01/2011 | 33 | DECLARATION of Mark F. Giuliano, Federal Bureau of Investigation in Support of MOTION to Dismiss Case *and for Summary Judgment* 32 filed by Defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller. (Coppolino, Anthony) (Entered: 08/01/2011) |
| 08/01/2011 | 34 | EXHIBIT 1-3 to MOTION to Dismiss Case *and for Summary Judgment* 32 *Exhibits to Public Declaration of Mark F. Giuliano, Federal Bureau of Investigation* filed by Defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller. (Coppolino, Anthony) (Entered: 08/01/2011) |
| 08/01/2011 | 35 | NOTICE OF LODGING filed *Notice of Lodging of Classified In Camera, Ex Parte Declaration of Mark F. Giuliano, Federal Bureau of Investigation* re MOTION to Dismiss Case *and for Summary Judgment* 32 (Coppolino, Anthony) (Entered: 08/01/2011) |
| 08/01/2011 | 36 | NOTICE OF LODGING filed *Notice of Lodging of Classified In Camera, Ex Parte Supplemental Memorandum by Government Defendants* re MOTION to Dismiss Case *and for Summary Judgment* 32 (Coppolino, Anthony) (Entered: 08/01/2011) |
| 08/03/2011 | 37 | NOTICE of Appearance filed by attorney David C Scheper on behalf of Defendants Paul Allen, Kevin Armstrong, Pat Rose (Scheper, David) (Entered: 08/03/2011) |
| 08/03/2011 | 38 | NOTICE of Appearance filed by attorney Angela Machala on behalf of Defendants Paul Allen, Kevin Armstrong, Pat Rose (Machala, Angela) (Entered: 08/03/2011) |
| 08/04/2011 | 39 | EX PARTE APPLICATION for Order for Staying Review of Defendants' Ex Parte In Camera Submissions filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Proposed Order)(Bibring, Peter) (Entered: 08/04/2011) |
| 08/09/2011 | 40 | NOTICE of Appearance filed by attorney Katie Moran on behalf of Defendants J Stephen Tidwell, Barbara Walls (Moran, Katie) (Entered: 08/09/2011) |
| 08/09/2011 | 41 | NOTICE OF MOTION AND MOTION to Dismiss Plaintiffs' Class Action Complaint *; Notice of Joinder in Motions to Dismiss by (1) Defendants FBI, Robert Mueller, and Steven Martinez and (2) Defendants Stephen Tidwell and Barbara Walls* filed by defendants Paul Allen, Kevin Armstrong, Pat Rose. Motion set for hearing on 11/14/2011 at 01:30 PM before Judge Cormac J. Carney. (Scheper, David) (Entered: 08/09/2011) |
| 08/09/2011 | 42 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendants J Stephen Tidwell, Barbara Walls. Motion set for hearing on 11/14/2011 at 01:30 PM before Judge Cormac J. Carney. (Li, Peiyin) (Entered: 08/09/2011) |
| 08/10/2011 | 43 | OPPOSITION to EX PARTE APPLICATION for Order for Staying Review of Defendants' Ex Parte In Camera Submissions 39 filed by Defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller. (Attachments: # 1 Exhibit 1)(Lee, Lynn) (Entered: 08/10/2011) |

ER - 306

| 08/10/2011 | 44 | JOINDER in EX PARTE APPLICATION for Order for Staying Review of Defendants' Ex Parte In Camera Submissions 39 *JOINDER TO GOVERNMENT DEFENDANTS' RESPONSE TO PLAINTIFFS' EX PARTE APPLICATION* filed by Defendant Pat Rose. (Cote, Alexander) (Entered: 08/10/2011) |
|---|---|---|
| 08/11/2011 | 45 | NOTICE OF ERRATA filed by Defendants Paul Allen, Kevin Armstrong, Pat Rose. correcting MOTION to Dismiss Plaintiffs' Class Action Complaint *; Notice of Joinder in Motions to Dismiss by (1) Defendants FBI, Robert Mueller, and Steven Martinez and (2) Defendants Stephen Tidwell and Barbara Walls* MOTION to Dismiss Plaintiffs' Class Action Complaint *; Notice of Joinder in Motions to Dismiss by (1) Defendants FBI, Robert Mueller, and Steven Martinez and (2) Defendants Stephen Tidwell and Barbara Walls* 41 (Attachments: # 1 Exhibit 1 - CORRECTED Motion to Dismiss) (Machala, Angela) (Entered: 08/11/2011) |
| 08/11/2011 | 46 | MINUTES (IN CHAMBERS): ORDER by Judge Cormac J. Carney: DENYING 39 Ex Parte Application: Plaintiffs' ex parte application is DENIED. The Court needs to consider the Government's classified submissions in order to conduct a "searching judicial review" of the basis for and merits of the Government's assertion of the state secrets privilege. (rla) (Entered: 08/11/2011) |
| 08/29/2011 | 47 | Joint STIPULATION for Extension of Time to Amend Complaint - (Discovery), Complaint - (Discovery) 1 filed by Plaintiff Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Proposed Order)(Bibring, Peter) (Entered: 08/29/2011) |
| 08/29/2011 | 48 | ORDER by Judge Cormac J. Carney, granting Stipulation for Extension of Time to Amend 47 . Plaintiffs First Amended Complaint shall be due on September 13, 2011; See order for more information. (twdb) (Entered: 08/30/2011) |
| 09/13/2011 | 49 | FIRST AMENDED COMPLAINT against defendants Paul Allen, Kevin Armstrong, Federal Bureau of Investigation, Steven M Martinez, Robert Mueller, Pat Rose, J Stephen Tidwell, Barbara Walls, Does 1-10; amending Complaint - (Discovery) 1 ; filed by plaintiffs Ali Uddin Malik, Yasser Abdelrahim, Yassir Fazaga (Attachments: # 1 PART 2, # 2 PART 3)(rla) (Additional attachment(s) added on 9/15/2011: # 3 SUMMONS ISSUED) (rla). (Entered: 09/14/2011) |
| 09/14/2011 | | 60 DAY Summons Issued re First Amended Complaint, 49 as to defendant(s) United States of America. (rla) (Entered: 09/15/2011) |
| 09/21/2011 | 50 | NOTICE OF SERVICE filed by plaintiff Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik, re Amended Complaint, 49 served on 9/13/2011. (Bibring, Peter) (Entered: 09/21/2011) |
| 09/30/2011 | 51 | Joint STIPULATION for Extension of Time to File Response to First Amended Complaint filed by Defendant Federal Bureau of Investigation, Steven M Martinez, Robert Mueller. (Attachments: # 1 Proposed Order)(Coppolino, Anthony) (Entered: 09/30/2011) |
| 10/03/2011 | 52 | ORDER by Judge Cormac J. Carney, granting Stipulation for Extension of Time to File Response/Reply 51 . (twdb) (Entered: 10/05/2011) |
| 10/07/2011 | 53 | PROOF OF SERVICE Executed by Plaintiff Ali Uddin Malik, Yasser Abdelrahim, Yassir Fazaga, upon Defendant United States of America served on 9/15/2011, answer due 11/14/2011. Service of the Summons and Complaint were executed upon the United States Attorneys Office by delivering a copy to Pat Myles. Executed upon the Attorney Generals Office of the United States by delivering a copy to Unknown. |

ER - 307

| | | |
|---|---|---|
| | | Executed upon the officer agency or corporation by delivering a copy to Unknown. Service was executed in compliance with Federal Rules of Civil Procedure. Due diligence declaration NOT attached. Registered or certified mail return receipt attached. Original Summons NOT returned. (Attachments: # 1 Exhibit Receipt for Mail to AG)(Bibring, Peter) (Entered: 10/07/2011) |
| 11/03/2011 | 54 | NOTICE of Appearance filed by attorney Stephen E Handler on behalf of Defendant United States of America (Handler, Stephen) (Entered: 11/03/2011) |
| 11/04/2011 | 55 | NOTICE OF MOTION AND MOTION to Dismiss Case *Amended Complaint and for Summary Judgment* filed by Government Defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller, United States of America. Motion set for hearing on 1/30/2012 at 01:30 PM before Judge Cormac J. Carney. (Attachments: # 1 Declaration Christopher N. Morin, Federal Bureau of Investigation, # 2 Appendix Statement of Undisputed Facts)(Coppolino, Anthony) (Entered: 11/04/2011) |
| 11/04/2011 | 56 | NOTICE OF LODGING filed *of Classified Supplemental Declaration of Mark F. Giuliano, Federal Bureau of Investigation for In Camera, Ex Parte Review* re MOTION to Dismiss Case *Amended Complaint and for Summary Judgment* 55 (Coppolino, Anthony) (Entered: 11/04/2011) |
| 11/11/2011 | 57 | NOTICE OF MOTION AND MOTION to Dismiss Case *First Amended Class Action Complaint and Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez, and (2) Defendants Stephen Tidwell and Barbara Walls* filed by Defendants Paul Allen, Kevin Armstrong, Pat Rose. Motion set for hearing on 1/30/2012 at 01:30 PM before Judge Cormac J. Carney. (Scheper, David) (Entered: 11/11/2011) |
| 11/11/2011 | 58 | NOTICE OF MOTION AND MOTION to Dismiss Case *First Amended Complaint* filed by Defendants J Stephen Tidwell, Barbara Walls. Motion set for hearing on 1/30/2012 at 01:30 PM before Judge Cormac J. Carney. (Li, Peiyin) (Entered: 11/11/2011) |
| 11/15/2011 | 59 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: MOTION to Dismiss Case 57 . The following error(s) was found: Local Rule 7.1-1 No Certification of Interested Parties and or no copies. In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (db) (Entered: 11/15/2011) |
| 11/15/2011 | 60 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: MOTION to Dismiss Case *First Amended Complaint* 58 . The following error(s) was found: Local Rule 7.1-1 No Certification of Interested Parties and or no copies. In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (db) (Entered: 11/15/2011) |
| 12/15/2011 | 61 | STIPULATION for Order to Allow Parties to Combine Opposition or Reply Briefs on Motions to Dismiss filed by plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Proposed Order Allowing Parties to Combine Oppositions Or Reply Briefs on Motions to Dismiss)(Bibring, Peter) (Entered: 12/15/2011) |

ER - 308

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 251 of 262

| 12/16/2011 | 62 | ORDER by Judge Cormac J. Carney, ALLOWING PARTIES TO COMBINE OPPOSITION OR REPLY BRIEFS ON MOTIONS TO DISMISS re Stipulation 61 : In filing their oppositions to Defendants' dispositive motions challenging their First Amended Complaint (Dkt. Nos. 55, 57, and 58), Plaintiffs may combine any or all of their opposition briefs, or re-allocate pages between briefs, so long as the total number of pages of all opposition briefs filed does not exceed the total of 125 pages allowed in the Court's orders of July 20, 2011 (Dkt. No. 26) and October 3, 2011 (Dkt. No. 48). (See document for further details.) (rla) (Entered: 12/19/2011) |
|---|---|---|
| 12/23/2011 | 63 | In Opposition re: MOTION to Dismiss Case *First Amended Class Action Complaint and Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez, and (2) Defendants Stephen Tidwell and Ba MOTION to Dismiss Case First Amended Class Action Complaint and Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez, and (2) Defendants Stephen Tidwell and Ba* 57 , *MOTION to Dismiss Case First Amended Complaint* 58 *filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Attachment A - Claims Chart)(Bibring, Peter) (Entered: 12/23/2011)* |
| 12/23/2011 | 64 | MEMORANDUM in Opposition to MOTION to Dismiss Case *Amended Complaint and for Summary Judgment* 55 filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Statement of Genuine Issues)(Arulanantham, Ahilan) (Entered: 12/23/2011) |
| 12/23/2011 | 65 | DECLARATION of Ahilan Arulanantham In Opposition to MOTION to Dismiss Case *First Amended Class Action Complaint and Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez, and (2) Defendants Stephen Tidwell and Ba MOTION to Dismiss Case First Amended Class Action Complaint and Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez, and (2) Defendants Stephen Tidwell and Ba* 57 , *MOTION to Dismiss Case First Amended Complaint* 58 , *MOTION to Dismiss Case Amended Complaint and for Summary Judgment* 55 *filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Exhibit #1 - #3)(Arulanantham, Ahilan) (Entered: 12/23/2011)* |
| 12/23/2011 | 66 | DECLARATION of Craig Monteilh In Opposition to MOTION to Dismiss Case *First Amended Class Action Complaint and Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez, and (2) Defendants Stephen Tidwell and Ba MOTION to Dismiss Case First Amended Class Action Complaint and Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez, and (2) Defendants Stephen Tidwell and Ba* 57 , *MOTION to Dismiss Case First Amended Complaint* 58 , *MOTION to Dismiss Case Amended Complaint and for Summary Judgment* 55 *filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Arulanantham, Ahilan) (Entered: 12/23/2011)* |
| 01/06/2012 | 67 | Joint STIPULATION for Extension of Time to File Reply as to MEMORANDUM in Opposition to Motion 64 , Objection/Opposition (Motion related), Objection/Opposition (Motion related), Objection/Opposition (Motion related) 63 filed by defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller. |

ER - 309

| | | |
|---|---|---|
| | | (Attachments: # 1 Proposed Order)(Lee, Lynn) (Entered: 01/06/2012) |
| 01/10/2012 | 68 | ORDER by Judge Cormac J. Carney, Extending Stipulation for Extension of Time to File Response/Reply 67 . It Is Ordered that Defendants respective replies to plaintiffs oppositions shall be due on January 20, 2012; A hearing on pending dispositive motions shall be held on February 10, 2012 at 10:00 a.m. ( Motion set for hearing on 2/10/2012 at 10:00 AM before Judge Cormac J. Carney.) (twdb) (Entered: 01/10/2012) |
| 01/20/2012 | 69 | REPLY support MOTION to Dismiss Case *Amended Complaint and for Summary Judgment* 55 *Government Defendants' Reply in Support of Motion to Dismiss Amended Compaint and for Summary Judgment* filed by Defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller, United States of America. (Coppolino, Anthony) (Entered: 01/20/2012) |
| 01/20/2012 | 70 | REPLY In Support Of MOTION to Dismiss Case *First Amended Class Action Complaint and Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez, and (2) Defendants Stephen Tidwell and Ba* MOTION to Dismiss Case *First Amended Class Action Complaint and Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez, and (2) Defendants Stephen Tidwell and Ba* 57 filed by Defendants Paul Allen, Kevin Armstrong, Pat Rose. (Attachments: # 1 Attachment: 11/3/11 Opinion in *Mirmehdi v. United States*)(Scheper, David) (Entered: 01/20/2012) |
| 01/20/2012 | 71 | REPLY IN SUPPORT OF MOTION to Dismiss Case *First Amended Complaint* 58 filed by Defendants J Stephen Tidwell, Barbara Walls. (Li, Peiyin) (Entered: 01/20/2012) |
| 02/02/2012 | 72 | MINUTE ORDER IN CHAMBERS REFERRAL OF MATTER FOR SETTLEMENT CONFERENCE by Magistrate Judge David T Bristow: At the request of the parties, this matter has been referred to the Honorable David T. Bristow, United States Magistrate Judge for purposes of settlement proceedings. The Honorable Victor B. Kenton shall remain as the Magistrate Judge assigned to this matter in all other respects. The parties are advised that Judge Bristow has agreed to act as the settlement officer in this matter. Counsel are directed to contact Judge Bristows Court Room Deputy, Deb Taylor at (951) 328-4466 for purposes of scheduling a settlement conference. (am) (Entered: 02/03/2012) |
| 02/03/2012 | 73 | NOTICE OF SUPPLEMENTAL AUTHORITY OF INDIVIDUAL-CAPACITY DEFENDANTS J. STEPHEN TIDWELL AND BARBARA WALLS IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT filed by defendants J Stephen Tidwell, Barbara Walls. (Attachments: # 1 Exhibit A)(Michael, Brian) (Entered: 02/03/2012) |
| 02/06/2012 | 74 | Joint STIPULATION to Continue Motions Hearing from February 10, 2012 to April 20, 2012 filed by Government Defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller. (Attachments: # 1 Proposed Order)(Coppolino, Anthony) (Entered: 02/06/2012) |
| 02/06/2012 | 76 | ORDER RE SETTLEMENT CONFERENCE by Magistrate Judge David T Bristow.( Settlement Conference set for 3/29/2012 at 09:30 AM before Magistrate Judge David T Bristow.) (mrgo) (Entered: 02/07/2012) |

**ER - 310**

Case: 12-56867, 11/17/2014, ID: 9316414, DktEntry: 31-2, Page 253 of 262

| 02/07/2012 | 75 | ORDER by Judge Cormac J. Carney, CONTINUING HEARING DATE re Stipulation to Continue 74 : Court ORDERS that the hearing on the pending dispositive motions filed by all Defendants shall be continued to April 20, 2012 at 10 a.m. (rla) (Entered: 02/07/2012) |
| --- | --- | --- |
| 03/13/2012 | 77 | CERTIFICATE of Interested Parties filed by Defendants J Stephen Tidwell, Barbara Walls, identifying J Stephen Tidwell; Hudson Specialty Insurance Company; Barbara Walls. (Michael, Brian) (Entered: 03/13/2012) |
| 03/27/2012 | 78 | STIPULATION to Waive (Excuse) Attendance at Settlement Conference filed by Defendants Paul Allen, Kevin Armstrong, Pat Rose. (Attachments: # 1 Proposed Order)(Scheper, David) (Entered: 03/27/2012) |
| 03/27/2012 | 79 | ORDER STIPULATION TO EXCUSE ATTENDANCE AT SETTLEMENT CONFERENCE by Magistrate Judge David T Bristow: Having reviewed the stipulation and request by the parties to excuse the presence of Defendants Pat Rose, Kevin Armstrong, Paul Allen, J. Stephen Tidwell and Barbara Walls and Plaintiffs Ali Uddin Malik and Yasser AbdelRahim, and good cause appearing, the Court hereby EXCUSES Defendants Rose, Armstrong, Allen, Tidwell and Walls and Plaintiffs Malik and AbdelRahim from attendance at the March 29, 2012 Settlement Conference. 78 (am) (Entered: 03/27/2012) |
| 03/29/2012 | 80 | MINUTES OF SETTLEMENT CONFERENCE held before Magistrate Judge David T Bristow: Following consultation with the Court, and after significant discussionsbetween the Court and counsel, the parties were unable to agree upon settlement terms. The parties indicated that they would continue to discuss settlement terms, and would also provide tentative dates to the Court for a possible second settlement conference.Court Recorder: RS-4 03-29-12. (ad) (Entered: 04/04/2012) |
| 04/12/2012 | 81 | STIPULATION to Continue Hearing on MTD from 04/20/2012 to 06/13/2012 filed by Plaintiff Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Proposed Order to Continue Hearing on MTD)(Bibring, Peter) (Entered: 04/12/2012) |
| 04/13/2012 | | SCHEDULING NOTICE IN CHAMBERS by Magistrate Judge David T Bristow Second Settlement Conference set for 5/16/2012 09:30 AM before Magistrate Judge David T Bristow. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dts) TEXT ONLY ENTRY (Entered: 04/13/2012) |
| 04/13/2012 | 82 | ORDER RE CONTINUING APRIL 20, 2012 HEARING by Judge Cormac J. Carney, re Stipulation 81 : Court hereby ORDERS that the hearing on the pending dispositive motions filed by all Defendants shall be continued to June 13, 2012, at 10 a.m. (rla) (Entered: 04/13/2012) |
| 04/30/2012 | | SCHEDULING NOTICE IN CHAMBERS by Magistrate Judge David T Bristow Telephone Status Conference set for 5/3/2012 09:30 AM before Magistrate Judge David T Bristow. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dts) TEXT ONLY ENTRY (Entered: 04/30/2012) |
| 05/03/2012 | 83 | MINUTES OF TELEPHONIC STATUS CONFERENCE RE SETTLEMENT CONFERENCE held before Magistrate Judge David T Bristow: The Court and counsel discussed the status of settlement, as well as preparations for the upcoming settlement conference.Court Recorder: RS-4 03-29-12. (ad) (Entered: 05/04/2012) |

| 05/14/2012 | | SCHEDULING NOTICE IN CHAMBERS by Magistrate Judge David T Bristow previously scheduled for 5/16/12 9:30 a.m. has been rescheduled. Settlement Conference set for 5/16/2012 09:15 AM before Magistrate Judge David T Bristow. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dts) TEXT ONLY ENTRY (Entered: 05/14/2012) |
|---|---|---|
| 05/16/2012 | 85 | MINUTES OF Settlement Conference held before Magistrate Judge David T Bristow:Following consultation with the Court, and after significant discussions between the Court and counsel, the parties were unable to agree upon settlement terms. The parties indicated that they would continue to discuss settlement terms, and would like to have a third settlement conference. The Court set a third settlement conference for May 31, 2012, at 10:00 a.m. without further notice. The Court encouraged counsel to continue to work towards a settlement, and offered to assist in any manner necessary, including engaging with the parties telephonically regarding settlement.Court Recorder: RS-4 03-32-12. (am) (Entered: 05/22/2012) |
| 05/17/2012 | 84 | NOTICE filed by defendants J Stephen Tidwell, Barbara Walls. *NOTICE OF SUPPLEMENTAL AUTHORITY OF INDIVIDUAL-CAPACITY DEFENDANTS IN SUPPORT OF MOTIONS TO DISMISS FIRST AMENDED COMPLAINT* (Attachments: # 1 Exhibit A)(Michael, Brian) (Entered: 05/17/2012) |
| 05/31/2012 | | SCHEDULING NOTICE IN CHAMBERS by Magistrate Judge David T Bristow Third Settlement Conference previously scheduled for 5/31/12 9:30 a.m. has been rescheduled. Third Settlement Conference set for 6/14/2012 09:30 AM before Magistrate Judge David T Bristow. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dts) TEXT ONLY ENTRY (Entered: 05/31/2012) |
| 05/31/2012 | 86 | Joint STIPULATION to Continue Hearing on MTD from June 13, 2012 to July 19, 2012 filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Proposed Order)(Bibring, Peter) (Entered: 05/31/2012) |
| 06/04/2012 | 87 | ORDER by Judge Cormac J. Carney, granting Stipulation to Continue 86 . The hearings re Motion originally scheduled have been rescheduled re 55 .( Motion set for hearing on 7/19/2012 at 10:00 AM before Judge Cormac J. Carney.) (twdb) (Entered: 06/04/2012) |
| 06/11/2012 | | SCHEDULING NOTICE IN CHAMBERS by Magistrate Judge David T Bristow Telephone Conference set for 6/12/2012 03:00 PM before Magistrate Judge David T Bristow. Please dial the telephone number below during the reservation date and time: Call-in Number:213.894.0800, Please follow the prompts and enter the codes below: Meeting ID:1114#User Password:3333#THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dts) TEXT ONLY ENTRY (Entered: 06/11/2012) |
| 06/12/2012 | 88 | MINUTES OF TELEPHONIC STATUS CONFERENCE RE SETTLEMENT CONFERENCE held before Magistrate Judge David T Bristow: The case was called for a telephonic status conference. Attorneys Peter Bibring, Ahilan T. Arulanantham, Laura Moran, and Reem Salahi appeared on behalf of plaintiffs. Assistant United States Attorneys Anthony Joseph Coppolino and Lynn Y. Lee appeared on behalf of defendants United States of America, Federal Bureau of Investigation, Robert Mueller, and Steven M. Martinez. Assistant United States Attorney Stephen E. Handler appeared on behalf of the United States of America. Attorneys Brian R. Michael, Carl J. Nichols, Peiyin Patty Li, and Katie Moran appeared on behalf of defendants J. Stephen Tidwell and Barbara Walls. Attorney Alexander H. Cote appeared on behalf of |

| | | defendants Pat Rose, Kevin Armstrong, and Paul Allen. Also present were Federal Bureau of Investigation Attorneys Ted Schwartz and Kim Schwartz. Following discussion with counsel, the Court granted the request to continue the settlement conference that was previously scheduled for June 14, 2012 to June 19, 2012, at 9:00 a.m.Court Recorder: RS-4 06-12-12. (am) (Entered: 06/13/2012) |
|---|---|---|
| 06/18/2012 | | SCHEDULING NOTICE of Settlement Conference by Magistrate Judge David T Bristow previously scheduled for 06/19/2012 at 9:00 a.m. has been rescheduled. Settlement Conference set for 6/28/2012 at 9:00 a.m. before Magistrate Judge David T Bristow. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dsb) TEXT ONLY ENTRY (Entered: 06/18/2012) |
| 06/26/2012 | 89 | NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT filed by defendants J Stephen Tidwell, Barbara Walls. (Attachments: # 1 Exhibit A)(Michael, Brian) (Entered: 06/26/2012) |
| 06/28/2012 | 92 | MINUTES OF Settlement Conference held before Magistrate Judge David T Bristow: A third settlement conference was held as previously scheduled. Attorneys Peter Bibring, Ahilan T. Arulanantham, Laura Moran and Reem Salahi, appeared on behalf of plaintiffs. Assistant United States Attorney Anthony Joseph Coppolino appeared on behalf defendants United States of America, Federal Bureau of Investigation, Robert Mueller, and Steven M. Martinez. Also present was Federal Bureau of Investigation Attorneys Ted Schwartz. Following consultation with the Court, and after significant discussions between the Court and counsel, the parties were unable to agree upon settlement terms. The parties indicated that they would continue to discuss settlement terms, and the Court set a telephonic status conference for Friday, July 6, 2012. The Court encouraged counsel to confer with their clients and continue to work towards a settlement, and offered to assist in any manner necessary, including engaging with the parties telephonically regarding settlement. However, the Court also indicated that the parties had until July 6, 2012, to agree to settle the matter or the Court would conclude the Courts settlement process.Court Recorder: RS-4 06-28-12. (am) (Entered: 07/03/2012) |
| 06/29/2012 | 90 | NOTICE of Change of Attorney Information for attorney Dan Stormer counsel for Plaintiff Yassir Fazaga. Changing firm name to Hadsell Stormer Richardson & Renick LLP. Filed by plaintiff Yassir Fazaga, et al. (Stormer, Dan) (Entered: 06/29/2012) |
| 07/02/2012 | 91 | SCHEDULING NOTICE IN CHAMBERS by Magistrate Judge David T Bristow Telephone Conference set for 7/6/2012 09:30 AM before Magistrate Judge David T Bristow. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dts) TEXT ONLY ENTRY (Entered: 07/02/2012) |
| 07/06/2012 | 93 | NOTICE filed by DEFENDANTS Paul Allen, Kevin Armstrong, Pat Rose. *NOTICE OF SUPPLEMENTAL AUTHORITY OF INDIVIDUAL-CAPACITY DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT* (Attachments: # 1 Exhibit)(Machala, Angela) (Entered: 07/06/2012) |
| 07/06/2012 | 94 | IN CHAMBERS MINUTE ORDER CONTINUING HEARING ON DEFENDANTS MOTIONS TO DISMISS FIRST AMENDED COMPLAINT 55 , 57 , 58 by Judge Cormac J. Carney: The Court hereby CONTINUES the hearing on Defendants motions to dismiss firstamended complaint from July 19, 2012 at 10:00 a.m. to August 3, 2012 at 9:00 a.m. (mu) (Entered: 07/06/2012) |

| 07/06/2012 | 96 | MINUTES OF TELEPHONIC STATUS CONFERENCE RE SETTLEMENT CONFERENCE held before Magistrate Judge David T Bristow: The Court directed counsel to confer with their clients regarding the prospect of settling the action prior to the scheduled motion to dismiss on July 19, 2012.Court Recorder: RS-4 07-06-12. (ad) (Entered: 07/10/2012) |
|---|---|---|
| 07/10/2012 | 95 | Joint STIPULATION to Continue Hearing on MTD from August 3, 2012 to August 14, 2012 filed by Plaintiff Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Proposed Order)(Bibring, Peter) (Entered: 07/10/2012) |
| 07/11/2012 | 97 | ORDER RE CONTINUING AUGUST 3, 2012 HEARING by Judge Cormac J. Carney: NOTE CHANGES HAVE BEEN MADE TO THIS DOCUMENT: Having reviewed the stipulation and request by the parties to reschedule the hearing date on all Defendants motions to dismiss Plaintiffs First Amended Complaint 95 , the Court hereby ORDERS that the hearing on the pending dispositive motions filed by all Defendants shall be continued to August 14, 2012, at 9:00 a.m. (mu) (Entered: 07/11/2012) |
| 07/30/2012 | 98 | NOTICE United States Correction to Memorandum in Support of Motion to Dismiss Amended Complaint and for Summary Judgment filed by Defendant United States of America. (Handler, Stephen) (Entered: 07/30/2012) |
| 08/03/2012 | 99 | ORDER RE TRANSFER PURSUANT TO Local Rule 83-1.3.1 and General Order 08.05 -Related Case-, declining transfer filed. Related Case No: SACV07-01088 CJC (ANx). Transfer is DECLINED by Magistrate Judge Arthur Nakazato for the following reasons: Judge Bristow has already spent a substantial amount of time becoming familiar with the underlying facts, and it would be a waste of judicial resources to transfer the case to me at this juncture. Signed by Magistrate Judge Arthur Nakazato. (dro) (Entered: 08/03/2012) |
| 08/07/2012 | 100 | SUPPLEMENT *AL AUTHORITY IN OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS MOTIONS TO DISMISS* filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Bibring, Peter) (Entered: 08/07/2012) |
| 08/14/2012 | 101 | ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS BASED ON THE STATE SECRETS PRIVILEGE by Judge Cormac J. Carney: (See document for details.) Accordingly, all of Plaintiffs causes of action against Defendants, aside from their FISA claim, are DISMISSED. (rla) (Entered: 08/14/2012) |
| 08/14/2012 | 102 | ORDER by Judge Cormac J. Carney, GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' FISA CLAIM: (See document for details.) For the foregoing reasons, with respect to Plaintiffs' FISA Section 1810 claim, the Government's motion to dismiss is GRANTED and the Agent Defendants' motions to dismiss are DENIED. (rla) (Entered: 08/14/2012) |
| 08/14/2012 | 103 | MINUTES OF Motion Hearing held before Judge Cormac J. Carney: Motion hearing held. RE: motions filed 11/4/11; 11/11/11; 11/11/11. Court confers with counsel and hears oral argument. Defendantsmotions to dismiss are taken under submission. Court Reporter: Maria Dellaneve. (twdb) (Entered: 08/15/2012) |
| 08/17/2012 | 104 | NOTICE of Withdrawal of Appearance of Brian R. Michael filed by Defendants J Stephen Tidwell, Barbara Walls. (Li, Peiyin) (Entered: 08/17/2012) |
| 08/24/2012 | 105 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Notice (Other) 104 . The following error(s) was found: Incorrect event selected. The correct event is: Change of Attorney Information (G-06). Note: Wrong event does not |

| | | |
|---|---|---|
| | | provide relief or change sought. In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (lt) (Entered: 08/24/2012) |
| 08/27/2012 | 106 | STIPULATION for Extension of Time to File Answer to October 27, 2012 re Amended Complaint, 49 filed by Defendants Kevin Armstrong. (Attachments: # 1 Proposed Order)(Cote, Alexander) (Entered: 08/27/2012) |
| 08/29/2012 | 107 | ORDER by Judge Cormac J. Carney, re Stipulation to Extend Time for Individual-Capacity Defendants to Answer the Tenth Cause of Action of the First amended Complaint 106 : Court ORDERS that the time for Defendants J. Stephen Tidwell, Barbara Walls, Pat Rose, Kevin Armstrong, and Paul Allen to answer the Tenth Cause of Action of the First Amended Complaint shall be extended until October 27, 2012. (rla) (Entered: 08/29/2012) |
| 08/29/2012 | 108 | SCHEDULING NOTICE IN CHAMBERS by Magistrate Judge David T Bristow Telephone Conference set for 8/31/2012 10:00 AM before Magistrate Judge David T Bristow. Please follow the prompts and enter the codes below.Meeting ID:7002#User Password4115#THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dts) TEXT ONLY ENTRY (Entered: 08/29/2012) |
| 08/31/2012 | 109 | MINUTES OF TELEPHONIC STATUS CONFERENCE RE SETTLEMENT CONFERENCE held before Magistrate Judge David T Bristow: Following discussion with counsel, the Court set a further settlement conference for October 4, 2012, at 9:00am. Counsel for the individual capacity defendants and the defendants themselves are not required to be present, although they may attend. The parties indicated that they will each separately contact the Court prior to October 4, 2012 to discuss settlement issues.Court Recorder: RS-4 08-31-12. (ad) (Entered: 08/31/2012) |
| 10/04/2012 | 110 | MINUTES OF CONTINUED SETTLEMENT CONFERENCE held before Magistrate Judge David T Bristow: At approximately 6:00 p.m., the parties concluded settlement discussions without reaching a settlement agreement. However, the parties did agree that the proposed settlement framework could lead to a settlement in this matter. It was anticipated that Counsel for Plaintiffs will contact Counsel for the Defendants within one week of todays date to discuss the potential terms of settlement. As discussed with the parties the Court will make itself available should either side wish to continue discussions on the four areas with Counsel in this matter.Court Recorder: RS-4 10-04-12. (am) (Entered: 10/11/2012) |
| 10/12/2012 | 111 | NOTICE filed by Individual-Capacity Defendants J Stephen Tidwell, Barbara Walls. *Notice of Appeal* (Moran, Katie) (Entered: 10/12/2012) |
| 10/12/2012 | 112 | NOTICE OF APPEAL to the 9th CCA filed by Individual-Capacity Defendants J Stephen Tidwell, Barbara Walls. Appeal of Order, 102 (Appeal fee FEE NOT PAID.) (Moran, Katie) (Entered: 10/12/2012) |
| 10/12/2012 | 113 | REPRESENTATION STATEMENT re Notice of Appeal to 9th Circuit Court of Appeals 112 . (Moran, Katie) (Entered: 10/12/2012) |
| 10/12/2012 | 114 | NOTICE filed by Individual-Capacity Defendants J Stephen Tidwell, Barbara Walls. *NOTICE OF ERRATA* (Moran, Katie) (Entered: 10/12/2012) |

| 10/12/2012 | 115 | NOTICE OF APPEAL to the 9th CCA filed by Defendants Paul Allen, Kevin Armstrong, Pat Rose. Appeal of Order, 102 (Appeal fee of $455 receipt number 0973-11094403 paid.) (Attachments: # 1 Supplement)(Machala, Angela) (Entered: 10/12/2012) |
|---|---|---|
| 10/12/2012 | 116 | APPEAL FEE PAID: re Notice of Appeal to 9th Circuit Court of Appeals 112 as to Defendants J Stephen Tidwell, Barbara Walls; Receipt Number: SA006182 in the amount of $455. (car) (Entered: 10/16/2012) |
| 10/16/2012 | 118 | NOTIFICATION by Circuit Court of Appellate Docket Number 12-56867, 9th CCA regarding Notice of Appeal to 9th Circuit Court of Appeals 112 as to Defendants J Stephen Tidwell, Barbara Walls. (car) (Entered: 10/17/2012) |
| 10/16/2012 | 119 | NOTIFICATION by Circuit Court of Appellate Docket Number 12-56874 9th CCA regarding Notice of Appeal to 9th Circuit Court of Appeals 115 as to Defendants Paul Allen, Kevin Armstrong, Pat Rose. (dmap) (Entered: 10/17/2012) |
| 10/17/2012 | 117 | SCHEDULING NOTICE by Judge Cormac J. Carney. Status Conference set for 11/5/2012 at 3:00 PM before Judge Cormac J. Carney. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(mu) TEXT ONLY ENTRY (Entered: 10/17/2012) |
| 10/29/2012 | 120 | TRANSCRIPT ORDER as to Defendants Paul Allen, Kevin Armstrong, Pat Rose Court Reporter. Court will contact Melissa Vasquez at mvasquez@scheperkim,com with any questions regarding this order. Transcript portion requested: Other: Motion to Dismiss (8/14/12). Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Lowder, Amos) (Entered: 10/29/2012) |
| 11/01/2012 | 121 | NOTICE OF MOTION AND MOTION for Entry of Judgment pursuant to Rule 54(b) *Partial* filed by Plaintiff Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. Motion set for hearing on 12/10/2012 at 01:30 PM before Judge Cormac J. Carney. (Attachments: # 1 Memorandum, # 2 Proposed Order)(Bibring, Peter) (Entered: 11/01/2012) |
| 11/01/2012 | 122 | Joint STIPULATION to Stay Case pending Appeal by Individual Defendants filed by Plaintiff Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Attachments: # 1 Proposed Order)(Bibring, Peter) (Entered: 11/01/2012) |
| 11/02/2012 | 123 | ORDER by Judge Cormac J. Carney, STAY OF FISA CLAIMS AND DATE OF STATUS CONFERENCE AND HEARING FOR PLAINTIFFS' MOTION FOR PARTIAL FINAL JUDGMENT, re Stipulation 122 : (NOTE: CHANGES MADE BY THE COURT): Court ORDERS that the FISA claims against the Individual Capacity Defendants be immediately stayed pending resolution of the appeal; that the Court will hear and subsequently rule on Plaintiffs' pending Motion for Issuance of Partial Final Judgment on Tuesday, December 11, 2012 at 4:30 p.m.; and that the November 5, 2012 status conference be continued until Tuesday, December 11, 2012 at 4:30 p.m. (rla) (Entered: 11/02/2012) |
| 11/15/2012 | 124 | MEMORANDUM in Opposition to MOTION for Entry of Judgment pursuant to Rule 54(b) *Partial* MOTION for Entry of Judgment pursuant to Rule 54(b) *Partial* 121 *Government Defendants' Opposition to Plaintiffs' Motion for Issuance of Partial Final Judgment Pursuant to F.R.C.P. 54(b)* filed by Defendants Federal Bureau of Investigation, Steven M Martinez, Robert Mueller, United States of America. (Coppolino, Anthony) (Entered: 11/15/2012) |

ER - 316

| 11/27/2012 | 125 | REPLY in support of MOTION for Entry of Judgment pursuant to Rule 54(b) *Partial* MOTION for Entry of Judgment pursuant to Rule 54(b) *Partial* 121 filed by Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. (Arulanantham, Ahilan) (Entered: 11/27/2012) |
|---|---|---|
| 11/29/2012 | 126 | TRANSCRIPT for proceedings held on AUGUST 14, 2012. Court Reporter/Electronic Court Recorder: MARIA DELLANEVE, phone number 714-564-9259. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 12/20/2012. Redacted Transcript Deadline set for 12/30/2012. Release of Transcript Restriction set for 2/27/2013. (Dellaneve, Maria) (Entered: 11/29/2012) |
| 11/29/2012 | 127 | NOTICE OF FILING TRANSCRIPT filed for proceedings AUGUST 14, 2012 re Transcript 126 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Dellaneve, Maria) TEXT ONLY ENTRY (Entered: 11/29/2012) |
| 12/03/2012 | 128 | ORDER by Judge Cormac J. Carney: GRANTING PLAINTIFFS' MOTION FOR ISSUANCE OF PARTIAL FINAL JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 54(b) 121 : (See document for details.) For the foregoing reasons, The Court GRANTS Plaintiffs' motion for issuance of partial final judgment. The Court will sign and enter Plaintiffs' proposed order concurrently herewith. (rla) (Entered: 12/05/2012) |
| 12/03/2012 | 129 | PARTIAL FINAL JUDGMENT by Judge Cormac J. Carney, in favor of Federal Bureau of Investigation, United States of America, Barbara Walls, J Stephen Tidwell, Kevin Armstrong, Pat Rose, Paul Allen, Robert Mueller, Steven M Martinez. Related to: Order Granting Motion for Issuance of Partial Final Judgment pursuant to Rule 54(b, 128 . (rla) (Entered: 12/05/2012) |
| 01/03/2013 | 130 | NOTICE OF APPEAL to the 9th CCA filed by Plaintiff Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. Appeal of Judgment, 129 (Appeal fee of $455 receipt number 0973-11463653 paid.) (Bibring, Peter) (Entered: 01/03/2013) |
| 01/29/2013 | 131 | NOTICE of Change of Attorney Information for attorney Peter Bibring counsel for Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. Adding Yaman Salahi as attorney as counsel of record for Yassir Fazaga; Ali Uddin Malik; Yasser AbdelRahim for the reason indicated in the G-06 Notice. Filed by Plaintiff Fazaga; Malik; AbdelRahim (Bibring, Peter) (Entered: 01/29/2013) |
| 01/29/2013 | 132 | MINUTE ORDER IN CHAMBERS by Judge Cormac J. Carney: Case should have been closed on entry dated November 2, 2012 123 . Make JS-6.(Made JS-6. Case Terminated.) (rla) (Entered: 01/29/2013) |
| 02/04/2013 | 133 | TRANSCRIPT ORDER as to Plaintiff Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik Court Reporter. Court will contact Christian Lebano at clebano@aclu-sc.org with any questions regarding this order. Transcript portion requested: Other: 8/14/2012 MTD Hearing. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Bibring, Peter) (Entered: 02/04/2013) |
| 04/04/2013 | 134 | SCHEDULING NOTICE IN CHAMBERS by Magistrate Judge David T. Bristow Telephone Conference set for 4/5/2013, 10:00 AM before Magistrate Judge David T. Bristow. Please dial 213.894.0800, Please follow the prompts and enter the codes, |

ER - 317

| | | |
|---|---|---|
| | | Meeting ID:7002#, User Password:6674#Note: To mute the Hold Music, the first participant in the conference should enter *99 after entering the meeting and hearing the music. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dts) TEXT ONLY ENTRY (Entered: 04/04/2013) |
| 04/05/2013 | 135 | MINUTES OF Telephone Conference held before Magistrate Judge David T. Bristow: A telephonic status conference regarding settlement was held as previously scheduled. Attorneys Ahilan T. Arulanantham and Peter Bibring appeared on behalf of plaintiffs. Assistant United States Attorneys Anthony Joseph Coppolino and Lynn Y.Lee appeared on behalf of the United States of America, Federal Bureau of Investigation, Robert Mueller, and Steven M. Martinez. Assistant United States Attorney Stephen F. Handler appeared on behalf of the United States of America.Attorney Annie L. Owens appeared on behalf of J. Stephen Tidwell and Barbara Walls. Attorney Alexander H. Cote appeared on behalf Pat Rose and Kevin Armstrong. The Court and counsel discussed the status on the case. Counsel indicated that further discussions with the Court would be beneficial, prior to scheduling any further settlement conference. Accordingly, defense counsel will contact the Court telephonically no later than April 30, 2013, and the Court will thereafter contact plaintiffs counsel regarding the settlement status. Thereafter, the Court will calendar a further settlement conference if it deems it appropriate.Court Recorder: RS-4 04-05-13. (am) (Entered: 04/11/2013) |
| 06/03/2013 | 136 | NOTICE of Withdrawal of Appearance of P. Patty Li filed by Defendants J Stephen Tidwell, Barbara Walls. (Moran, Katie) (Entered: 06/03/2013) |
| 10/01/2013 | 137 | Notice of Appearance or Withdrawal of Counsel: for attorney Annie L Owens counsel for Defendants J Stephen Tidwell, Barbara Walls. Annie L. Owens is no longer attorney of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Defendants Stephen Tidwell and Barbara Walls. (Owens, Annie) (Entered: 10/01/2013) |
| 11/04/2013 | 138 | SCHEDULING NOTICE IN CHAMBERS by Magistrate Judge David T. Bristow Telephone Settlement Conference set for 11/7/2013 10:00 AM before Magistrate Judge David T. Bristow. Call-in Number:213.894.0800, Please follow the prompts and enter the codes Meeting ID:1112#, User Password:7312#, THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dts) TEXT ONLY ENTRY (Entered: 11/04/2013) |
| 11/07/2013 | 139 | MINUTES OF TELEPHONIC STATUS CONFERENCE RE SETTLEMENT held before Magistrate Judge David T. Bristow: The Court and counsel discussed the status on the case. The Court directed counsel to confer and contact the Court with an updated status on Friday, November 8, 2013, at 11:30am. Court Recorder: RS-4 04-05-13. (ad) (Entered: 11/08/2013) |
| 11/12/2013 | 140 | Notice of Appearance or Withdrawal of Counsel: for attorney Peter Bibring counsel for Plaintiffs Yasser Abdelrahim, Yassir Fazaga, Ali Uddin Malik. Yaman Salahi is no longer attorney of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Plaintiffs Peter Bibring. (Bibring, Peter) (Entered: 11/12/2013) |
| 11/13/2013 | 141 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Notice (Other) 136 . The following error(s) was found: Incorrect event selected. The correct event is: Notices/Notice o Appearance or Withdrawal of Counsel (G-123). Note: Wrong event does not provide relief or changes sought. In response to this notice |

ER - 318

| | | |
|---|---|---|
| | | the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (lt) (Entered: 11/13/2013) |
| 12/16/2013 | 142 | SCHEDULING NOTICE IN CHAMBERS by Magistrate Judge David T. Bristow Telephone Conference set for 12/19/2013 11:00 AM before Magistrate Judge David T. Bristow. Call-in Number:213.894.0800, Please follow the prompts and enter the codes.Meeting ID:1116#, User Password:5612#, THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dts) TEXT ONLY ENTRY (Entered: 12/16/2013) |
| 12/19/2013 | 143 | MINUTES OF TELEPHONIC STATUS CONFERENCE RE SETTLEMENT held before Magistrate Judge David T. Bristow: The Court and counsel discussed the status on the case. The Court directed the government to provide a final statement, in light of plaintiffs previously-stated position regarding such, and to have a further telephonic conference with the plaintiffs regarding the same. Following the telephonic conference the Court and counsel shall confer regarding settlement status, and, accordingly, the Court set a further telephonic conference for January 7, 2014, at 11:00am. Court Recorder: RS-4 12-19-13. (ad) (Entered: 12/30/2013) |
| 01/02/2014 | 144 | Telephone Conference set for 1/7/2014 11:00 AM before Magistrate Judge David T. Bristow. The call in number is 213-894-0800, please follow the prompts and enter the codes meeting id: 7002# and user password: 4524# THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dts) TEXT ONLY ENTRY (Entered: 01/02/2014) |
| 01/07/2014 | 145 | MINUTES OF Telephonic Status Conference held before Magistrate Judge David T. Bristow: The Court and counsel discussed the status on the case. The Court ordered plaintiffs counsel to respond, in writing, to the governments most recent draft with red-line revisions within one week prior to determining that a settlement would not be possible. The Court set a further telephonic conference for January 17, 2014, at 11:00 a.m.Court Recorder: RS-3 01-07-14. (mrgo) (Entered: 01/10/2014) |
| 01/15/2014 | 146 | SCHEDULING NOTICE IN CHAMBERS by Magistrate Judge David T. Bristow Telephone Conference set for 1/17/2014 11:00 AM before Magistrate Judge David T. Bristow. Call in number is 213-894-0800, Meeting ID:1112#, and User Password:6154#:THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dts) TEXT ONLY ENTRY (Entered: 01/15/2014) |
| 01/17/2014 | 147 | MINUTES OF Telephonic Status Conference held before Magistrate Judge David T. Bristow: Plaintiffs counsel informed the Court that they have been unable to agree with defense counsel on acceptable languagefor a proposed written statement regarding the settlement of the case, and that such a statement was a requirement of any proposed settlement. Accordingly, plaintiffscounsel believed any further settlement discussions regarding a global settlement would be futile. Defense counsel thereafter again inquired as to whether plaintiffs believed a settlement with only the individual plaintiffs was a possibility. Following further discussion, the Court thereafter directed counsel to confer as to whether a settlement between the plaintiffs and the individual defendants would be possible. The Court set a further telephonic conference for February 5, 2014, at 11:00 a.m.Court Recorder: RS-4 01-17-14. (dts) (Entered: 01/29/2014) |

ER - 319

| | | |
|---|---|---|
| 02/05/2014 | 148 | MINUTES OF TELEPHONIC STATUS CONFERENCE RE SETTLEMENT held before Magistrate Judge David T. Bristow: Upon inquiry by the Court, the parties confirmed that they were unable to agree upon terms for a possible partial settlement of this action involving only the individual plaintiffs. Accordingly, the Court confirmed that settlement discussions had been exhausted, as it appeared that negotiations had reached an intractable impasse. The Court noted that the settlement discussions in this case had been extraordinary, and that they had encompassed nearly two years. Notwithstanding the absence of a settlement agreement, the Court advised the parties of its willingness to conduct further settlement negotiations in the future if the parties believed such efforts were warranted by any factual or procedural developments. The Clerk shall serve a copy of this Order on the Ninth Circuit Court of Appeals settlement coordinator, Claudia Lynn Bernard. Court Recorder: RS-4 02-05-14. (ad) (Entered: 02/19/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/14/2014 15:02:02 | | | |
| **PACER Login:** | af0060:2502760:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 8:11-cv-00301-CJC-VBK End date: 11/14/2014 |
| **Billable Pages:** | 22 | **Cost:** | 2.20 |

ER - 320