Nos. 12-56867, 12-56874, 13-55017

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

YASSIR FAZAGA, et al.,

Plaintiffs-Appellants,

v.

FEDERAL BUREAU OF INVESTIGATION, et al.,

Defendants-Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

FEDERAL APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD
_____

BENJAMIN C. MIZER
  *Acting Assistant Attorney General*

STEPHANIE YONEKURA
  *Acting United States Attorney*

DOUGLAS N. LETTER
MARK B. STERN
DANIEL TENNY
  *(202) 514-1838*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*

# INDEX

**Page**

Plaintiffs' Opposition to Individual Capacity Defendants'
Motion to Dismiss (Dkt. 63) (excerpt) ..................................................... SER 1

Mem. in Support of Gov't Mot. to Dismiss (Dkt. 55) (excerpt) ............. SER 10

Declaration of Christopher N. Morin (Dkt. 55-1) ................................... SER 18

Attachments to Public Declaration of Mark F. Giuliano (Dkt. 34)

    Attorney General's Guidelines for
    Domestic FBI Operations (excerpt) .............................................. SER 25

    Domestic Investigations and Operations Guide (excerpt) .............. SER 30

1  Peter Bibring (SBN 223981)
2    *pbibring@aclu-sc.org*
   Ahilan T. Arulanantham (SBN 237841)
3    *aarulanantham@aclu-sc.org*
4  Jennifer L. Pasquarella (SBN 263241)
   Mohammad Tajsar (SBN 280152)
5  Laura Moran  (bar admission pending)
6  ACLU FOUNDATION OF SOUTHERN CALIFORNIA
   1313 West Eighth Street
7  Los Angeles, California  90017
   Telephone: (213) 977-9500
8  Facsimile: (213) 977-5297
9
10 Attorneys for Plaintiffs
11 (Additional Counsel listed on next page)
12
13                 **UNITED STATES DISTRICT COURT**
14                **CENTRAL DISTRICT OF CALIFORNIA**
15
16

| | |
|---|---|
| 17  YASSIR FAZAGA, *et al.*, | CASE NO.: SA CV 11-00301 CJC (VBKx) |
| 18                     Plaintiffs, | |
| 19       v. | **PLAINTIFFS' COMBINED OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| 20  FEDERAL BUREAU OF INVESTIGATION *et al.*, | |
| 21 | |
| 22                     Defendants. | |
| 23 | Date:         January 30, 2012 |
| 24 | Time:         1:30 p.m. |
| 25 | Judge:        Hon. Cormac J. Carney |

26
27
28

c. <u>The Ban on Religious Discrimination is Clearly Established</u>

There can be no argument that the First Amendment's prohibition on facial religious discrimination is not clearly established.  Supreme Court cases dating back sixty years to *Fowler* and *Niemotko* establish that government actors may not intentionally discriminate against a religious group because of its religion — period.  The Supreme Court has announced this principle in denouncing religious discrimination in contexts as diverse as the issuance of permits, *Niemotko*, enforcement of criminal laws, *Fowler*, and selective prosecution, *United States v. Armstrong*, 517 U.S. 456, 464, (1996) (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)), and has repeated throughout its cases the mantra that classifications on the basis of religion are subject to strict scrutiny.  *See, e.g.*, *Smith*, 494 U.S. at 886 n.3.

The fact that the Supreme Court has never squarely held that intentional religious discrimination is also forbidden in undercover law enforcement investigations does not entitle Defendants to qualified immunity, where their explicit targeting based on religion is so egregious. "To be established clearly, . . . there is no need that the very action in question have previously been held unlawful.  The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that '[t]he easiest cases don't even arise.' But even as to action less than an outrage, "officials can still be on notice that their conduct violates established law . . . in novel factual circumstances." *Safford Unif. Sch. Dist. v. Redding*, 129 S. Ct. 2633, 2643 (2009) (citing *K.H. v. Morgan,* 914 F.2d 846, 851 (7th Cir. 1990)).

2. ***The Complaint Alleges Facial Discrimination Against Muslims***

Defendants AAR make a half-hearted argument that it is not clearly established that facial religious discrimination is unlawful in the context of an undercover investigation where there is "no allegation that the investigation was

requirement.  *See infra*, Part II.C (addressing "substantial burden" under RFRA).

40

1   pursued for the purpose of discrimination rather than a neutral, investigative

2   reason." AAR Br. 24.  Defendants AAR are wrong on the law, *see supra*, but also

3   the facts: the complaint is replete with allegations that the discrimination was facial

4   and, therefore, intentional.

5       As set forth in the summary of facts *supra*, Plaintiffs' lengthy complaint

6   alleges the details an investigation that explicitly and intentionally discriminated

7   against Muslims because of their religion.  Indeed, the central and explicit purpose

8   of Defendants' undercover operation was to conduct surveillance and gather

9   information on Muslims in Orange County.  *See, e.g.*, FAC ¶¶ 88, 89 (agents did

10  not limit informant to specific targets, but "repeatedly made clear that they were

11  interested simply in Muslims"); ¶ 162 ("Islam is a threat to our national security.").

12  To the extent they differentiated between targets, they told him to focus on

13  Muslims who appeared more devout (for example, as demonstrated by a

14  willingness to attend late evening or early morning prayers) because they were

15  "more suspicious." FAC ¶ 110; *see also id.* ¶¶ 89, 96, 104.

16      The complaint also alleges that Defendants consistently gave instructions

17  that made religion the primary criterion for suspicion by focusing explicitly on

18  Muslims and the Muslim community, including through daily quotas on the

19  number of Muslims he should get contact information from, FAC ¶ 131, and

20  through spying on lectures, classes or any other events held at mosques, FAC

21  ¶¶ 108, 109, 133.  They discarded information inadvertently gathered on non-

22  Muslims.  FAC ¶ 120.  Overall, the complaint alleges with great specificity that

23  Defendants were indiscriminate: they instructed the informant to unearth about as

24  much information about as many Muslims as possible through as many methods as

25  possible, without specific targets.  *See, e.g.*, FAC ¶¶ 101, 102, 103.

26      These allegations are not mere "labels and conclusions" or "formulaic

27  recitation of the elements of a cause of action," *cf. Iqbal*, 129 S. Ct. at 1949, but

28  rather detailed facts about what Defendants did, what Defendants said, and how the

41

1   investigation proceeded.  While *Iqbal* requires only facts that "allow the court to

2   draw the reasonable inference" that Defendants intentionally discriminated against

3   Muslims, *see id*, here no inference is necessary, because the complaint alleges that

4   Defendants explicitly told the informant to discriminate against Muslims, and that

5   he followed these instructions in numerous ways.

6           Importantly, while a plaintiff alleging a *neutral* policy is actually

7   discriminatory must plead facts from which a court can infer that it was adopted

8   "not for a neutral, investigative reason but for the purpose of discriminating on

9   account of … religion." *Iqbal*, 129 S. Ct. at 1949, for the *facial* discrimination at

10  issue here, it does not matter whether Defendants intended to harm Plaintiffs.  As

11  the Supreme Court has recognized, "the absence of a malevolent motive does not

12  convert a facially discriminatory policy into a neutral policy with a discriminatory

13  effect.  Whether [a practice] involves disparate treatment through explicit facial

14  discrimination does not depend on why the [actor] discriminates but rather on the

15  explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace and*

16  *Agr. Implement Workers of America, UAW v. Johnson Controls, Inc.*, 499 U.S.

17  187, 199 (1991); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S.

18  263, 269, 271-72 (1993) (while noting that "[d]iscriminatory purpose . . . implies

19  more than intent as volition or intent as awareness of consequences," rejecting

20  argument that "animus" requirement of 42 U.S.C. 1985 "can be met only by

21  maliciously motivated, as opposed to assertedly benign (though objectively

22  invidious), discrimination").  Thus, it does not matter whether Defendants were

23  motivated by a desire to prevent terrorism.  The goal of preventing terrorism,

24  though laudable in the abstract, is neither incompatible with nor justification for

25  the singling out of Muslims in a counterterrorism investigation.

26               a.  The Complaint Suggests No Legitimate Basis to Investigate

27                   the Three Individual Plaintiffs

28  Defendants AAR argue that even if the FBI's entire Operation was premised

42

1    on discriminatory goals, the FBI did not discriminate against these particular

2    Plaintiffs because they had "at least *some* basis, apart from religious

3    discrimination, for investigating *these Plaintiffs*." AAR Br. 2 (emphasis in orig.).

4    This is wrong both legally and factually.

5         First, facial distinctions drawn on the basis of constitutionally suspect

6    classifications receive strict scrutiny, even if the suspect classification is only one

7    factor considered.  In *Gratz*, the Court struck down a state university's admissions

8    scheme where the race of applicants was only one of many factors considered.  The

9    Court applied strict scrutiny to the use of race as any part of the admissions

10   decision, even though it was not the sole or even primary factor, reasoning that "all

11   racial classifications reviewable under the Equal Protection Clause must be strictly

12   scrutinized," such that a plaintiff "has the right to demand that any governmental

13   actor subject to the Constitution justify any racial classification subjecting that

14   person to unequal treatment under the strictest of judicial scrutiny." 539 U.S. at

15   270.  Facial classifications on the basis of religion are treated no differently.

16   *Smith*, 494 U.S. at 886 n.3 ("Just as we subject to the most exacting scrutiny laws

17   that make classifications based on race, or on the content of speech, so too we

18   strictly scrutinize governmental classifications based on religion.").

19        Even if this case did not involve an explicit, facial classification, the

20   Supreme Court has repeatedly held, in varying contexts, that if discrimination on a

21   forbidden basis was a "substantial" or "motivating" factor for Defendants' decision

22   targeting them, the burden shifts to Defendants to demonstrate that Plaintiffs would

23   have been targeted even without consideration of religion.  *See, e.g.*, *Mt. Healthy*

24   *City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (First

25   Amendment retaliation); *Village of Arlington Heights v. Metropolitan Housing*

26   *Development Corp.*, 429 U.S. 252, 271 (1977) (racial discrimination under the

27   Equal Protection Clause).  Even on this lower standard, for purposes of a motion to

28   dismiss, Plaintiffs need not prove all the facts required to prevail at trial on this

43

burden-shifting analysis, but only those facts sufficient to render it plausible that they were subject to religious discrimination.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002); *Twombly*, 550 U.S. at 569 (reaffirming *Swierkiewicz* under the pleading standard later adopted in *Iqbal*).  Thus, this Court could only dismiss the claim if the facts of the complaint render it implausible that plaintiffs were treated differently on the basis of religion.  Given that the entire premise of Defendants' operation was to target Muslims, that cannot be the case.

Second, Defendants point to no factual allegations that actually provide a legitimate basis to target Plaintiffs: Defendants AAR argue that the complaint acknowledges that they targeted Fazaga because they suspected he was a "radical," but the complaint alleges their reasons for that conclusion are either insubstantial or themselves based on religious discrimination — that he encouraged students to speak out and helped teach them about political demonstrations, FAC ¶ 169; that he served on the board of the largest Muslim newspaper in California which, like most papers, has occasionally printed pieces that opposed various policies of the United States government (but which is and has never advocated violence or done anything that would reasonably justify characterizing it as "anti-American"), FAC ¶ 169 & n.36; and that his mosque invited scholars to speak who Defendants believed were radical, but were in fact "widely popular and moderate," FAC ¶ 60, 113, 170.  Moreover, Defendants AAR simply ignore that Sheikh Fazaga has a national reputation as a moderate and contemporary teacher of Islam, and that he traveled to Europe at the invitation and expense of the U.S. State Department to speak on radicalism.  *See* FAC ¶ 56.

Similarly, Defendants AAR argue that they were justified in targeting AbdelRahim because they believed he was part of a Muslim Brotherhood cell, but the complaint clearly alleges they believed so simply because he lived in a house "shared by five young, unmarried Muslim Egyptian men with different skills and backgrounds — including a computer analyst, a pharmacist, an accountant, and

1  one who handled logistics." FAC ¶ 200.  Defendants' conclusion that five Muslims

2  living together must be terrorist cell is an example of religious discrimination, not

3  an alternative explanation.[28]

4      Defendants supposed basis for targeting Malik again underscores their

5  discriminatory motives: the complaint alleges that Defendants targeted Malik

6  because he went from dressing as a "surfer kid" to wearing traditional clothes and

7  growing his beard, and "his behavior in embracing religion and traditional dress

8  was highly suspicious," and he was friendly with people from Muslim student

9  groups.  FAC ¶ 186, 187.  This is simply an example of Defendants' focus on more

10 religious Muslims: Malik behaved this way because he developed an interest in

11 religion, and Islam encourages Muslims to grow beards and wear traditional

12 clothes as a way of following the practices of the Prophet Muhammad.[29] FAC ¶ 68.

13 _____

14 [28] Defendants AAR argue that the allegation that FBI agents searched
   AbdelRahim's storage unit shows that they had probable cause.  This is untrue.

15 First, the mere allegation that two agents showed AbdelRahim a warrant does not
   mean Plaintiffs concede that the warrant was supported by probable cause; second,

16 the search occurred months after community members reported Monteilh and his

17 investigation concluded — even if they had probable cause to search
   AbdelRahim's storage unit a few months, it would not mean they had a legitimate

18 basis to target him for surveillance more than a year before.

19 [29] Defendants also cite as a basis for investigating him that Malik studied a six-

20 week summer program at a religious school in Yemen and was "blocked" from
   entering Saudi Arabia.  This provides no basis for investigation: Malik was not

21 "blocked" from entering Saudi Arabia; he had hoped to go on a pilgrimage there
   while abroad, but never tried to enter after realizing he could not get the requisite

22 visas — a fact that Armstrong and Allen already knew.  FAC ¶ 190.  Defendants

23 also knew that Malik attended a school, Dar al-Mustafa , which is a mainstream
   religious school whose leaders are internationally known in the Muslim

24 community and to the FBI for advocating justice, equality, and peaceful co-

25 existence between religious groups. FAC ¶¶ 69, 190.  Malik attended this school at
   a time when both Yemen and Dar al-Mustafa were popular places for American

26 Muslims who wanted to pursue Arabic language or religious studies abroad

27 because of its spiritual Sufi religious scholarship, its clear and eloquent form of the
   Arabic language, and for being scenic and affordable, if slightly rustic.  FAC ¶69.

28

45

1  Defendants also ignore that Malik co-founded an interfaith peace-building program

2  around the Israel-Palestine conflict, for which he received awards and recognition

3  from the University of California, the Orange County Human Rights Commission,

4  and the U.S. State Department.  FAC ¶ 67.  Finally, Defendants distort the

5  complaint by suggesting that what was suspicious was that Malik changed his

6  dress when he was not "particularly religious," an unfounded conclusion they

7  squeeze from the fact that Malik once indicated to Monteilh that he had gotten out

8  of the habit of attending dawn prayers, but wanted to start again (a statement that

9  Armstrong and Allen interpreted as indicating Malik was returning to extremist

10 beliefs).  FAC ¶ 194.

### 3.  *Defendants' Facial Discrimination Fails Strict Scrutiny*

12      The First Amendment requires strict scrutiny of the kind of facial,

13 intentional religious discrimination evident from the complaint — such actions are

14 prohibited unless "justified by a compelling government interest" and "closely

15 fitted to further that interest." *Larson*, 456 U.S. at 247; *see also Lukumi*, 508 U.S.

16 at 546 (non-neutral government action subject to "the most rigorous of scrutiny"

17 such that they must be "narrowly tailored in pursuit of" "interests of the highest

18 order").  Defendants AAR argue that Defendants had a compelling interest,

19 because their investigation was related to terrorism and "[i]t is obvious and

20 unarguable that no governmental interest is more compelling than the security of

21 the Nation," AAR Br. 23 (citing *Haig v. Agee*, 453 U.S. 280, 307 (1981)), and

22 suggest that the complaint does not allege that the investigation was not "narrowly

23 tailored" to the government's interest in preventing terrorism.  *Id.* at 23-24.

24      While the "security of this nation" may be compelling in the abstract, under

25 strict scrutiny, "ambiguous proof will not suffice," *Brown v Ent. Merch. Ass'n*, 131

26 S. Ct. 2729, 2739 (2011), and "[m]ere speculation of harm does not constitute  a

27 compelling state interest," *Consol. Edison Co. v. Public Service Commission of*

28 *New York*, 447 U.S. 530, 543 (1980); *see also, e.g.*, *Bernal v. Fainter*, 467 U.S.

46

Case 12-56867 02/17/2015 ID: 9461356 DktEntry: 47-2 Page 41 of 41

1  216, 227-28 (1984) ("Without a factual underpinning, the State's asserted interest

2  lack s the weight we have required of interests properly denominated as

3  compelling."). Nothing in the complaint suggests Defendants had any factual

4  basis to believe there was any threat to the security of the nation before the

5  investigation was launched, nor did any prosecution arise from the investigation

6  other than a single charge of naturalization fraud, which was subsequently

7  dismissed by the government. FAC ¶¶ 155-158.

8      More importantly, even were the government interests at stake compelling,

9  the dragnet surveillance of all Muslims — without other basis to believe them

10 involved in criminal or terrorist activity — cannot be said to be "closely fitted to

11 further" the government's interest in preventing terrorism. *Larson*, 456 U.S. at

12 247; *see also Lukumi*, 508 U.S. at 546; *see also United States v. Montero-*

13 *Camargo*, 208 F.3d 1122, 1134 -1135 (9th Cir. 2000) (rejecting use of race as

14 factor in law enforcement stops).[30] Plaintiffs have clearly pled facts sufficient to

15 establish that Defendants' actions were not narrowly tailored.

16     **B.    The Complaint Establishes that the Supervisory Defendants Are**

17            **Liable For Intentional Discrimination and Unlawful Searches**

18     Defendants Rose, Walls and Tidwell each argue that while the allegations

19

---

20 [30] Defendants AAR's suggestion that the investigation is narrowly tailored to fight

21 terrorism because use of an informant does not violate the Fourth Amendment defies logic — religious discrimination is barred by the First Amendment, whether or not the investigative techniques used also violate the Fourth Amendment. *Cf.*

22 *Whren v. United States*, 517 U.S. 806, 813 (1996) (noting that "of course the

23 Constitution prohibits selective enforcement of the law based on considerations such as race" but that "the constitutional basis for objecting to intentionally

24 discriminatory application of laws is the Equal Protection Clause, not the Fourth

25 Amendment"); *Farm Labor Org. Comm. v. Ohio State Hwy. Patrol*, 308 F.3d 523,

26 533 (6th Cir. 2002) ("[A]n officer's discriminatory motivations for pursuing a course of action can give rise to an Equal Protection claim, even where there are

27 sufficient objective indicia of suspicion to justify the officer's actions under the

28 Fourth Amendment.").

---

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

TONY WEST
Assistant Attorney General
ANDRE BIROTTE JR.
United States Attorney
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
E-mail: tony.coppolino@usdoj.gov
LYNN Y. LEE (SBN #235531)
E-mail: lynn.lee@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Telephone: 202-514-4782
*Attorneys for the Federal Bureau of*
*Investigation and Defendants Mueller*
*and Martinez Sued in their Official Capacities*

STEPHEN E. HANDLER
Senior Trial Counsel
E-mail: stephen.handler@usdoj.gov
U.S. Department of Justice, Civil Division, Torts Branch
1331 Pennsylvania Avenue N.W., Rm 8070N
Washington, D.C. 20530
Telephone: (202) 616-4279
*Attorney for the United States*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

| | |
|---|---|
| YASSIR FAZAGA *et al.*, | CASE: SA11-CV-00301 CJC (VBKx) |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT AND FOR SUMMARY JUDGMENT** |
| v. | |
| FEDERAL BUREAU OF INVESTIGATION, *et al.*, | DATE: January 30, 2012<br>TIME: 1:30 p.m.<br>JUDGE: Hon. Cormac J. Carney |
| Defendants. | |

## **INTRODUCTION**

On September 13, 2011, plaintiffs filed a First Amended Complaint (FAC) in this action. *See* Dkt. 49. Defendants Federal Bureau of Investigation (FBI), Robert Mueller, Director of the FBI, and Steven Martinez, Assistant Director of the FBI's Los Angeles Field Office, sued in their official capacities, renew their motion to dismiss and for summary judgment, joined by Defendant United States with respect to new claims raised in the FAC under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*

This action puts at issue whether the FBI engaged in impermissible counterterrorism investigative activity in Southern California. Plaintiffs are three residents of Southern California who allege that, through an investigation dubbed "Operation Flex," the FBI utilized a paid informant (Craig Monteilh) to "indiscriminately collect personal information on hundreds and perhaps thousands of innocent Muslim Americans in Southern California . . . simply because the targets were Muslim." *See* FAC ¶¶ 1-3, 86, 89. Plaintiffs also assert that Operation Flex was part of the FBI's effort, after the terrorist attacks of September 11, 2001, to focus counterterrorism investigations on Muslim communities in the United States under applicable policies issued after 9/11. *See id.* ¶¶ 24, 32-37.

Plaintiffs seek damages against several current and former FBI agents and officials in their individual capacities, *see id.* ¶¶ 18-22; Claims 1-7, 9-10; injunctive relief against the FBI and official capacity defendants in the form of the disclosure or destruction of the investigative information, *see id.* ¶¶ 15-17, Prayer for Relief ¶ b; and damages against the United States of America pursuant to the FTCA, *see* FAC ¶¶ 254-260, Prayer for Relief ¶¶ c-d. Plaintiffs also seek certification of a class of "[a]ll individuals targeted by Defendants for surveillance or information-gathering through Monteilh and Operation Flex, on account of their religion, and about whom the FBI thereby gathered personally identifiable information." *Id.* ¶ 219; *see also id.* ¶¶ 220-225.

1    The FBI has made clear that counterterrorism investigations may not be

2  based solely on religion or First Amendment protected activities; indeed, the very

3  policies plaintiffs again cite in their Amended Complaint set forth these FBI

4  policies.  It should be apparent, however, that moving beyond these important

5  general principles to the details of a specific investigation in order to rebut

6  plaintiffs' claims would risk or require the disclosure of sensitive investigative

7  information.

8    While the FBI has previously acknowledged that Monteilh was a

9  confidential source, a range of details concerning Operation Flex, for which

10  Monteilh provided information, remains properly protected counterterrorism

11  investigative information.  This includes, principally, evidence detailing the nature

12  and scope of Operation Flex — precisely what that investigation entailed and why

13  it was undertaken, the identity of particular subjects, and the reasons they were

14  investigated.  This evidence is by no means at the margins of this lawsuit.  The

15  purpose of the plaintiffs' claims is to ascertain what Operation Flex entailed and to

16  litigate its alleged unlawfulness.  Accordingly, as set forth in more detail below,

17  the Government renews its response to these allegations by seeking to protect

18  certain evidence that cannot be disclosed in the interests of national security but

19  without seeking dismissal of all claims on that basis.

20    First, the Attorney General's state secrets privilege assertion of August 1,

21  2011, identifies and seeks to protect certain investigative information implicated by

22  the allegations in this case – (i) the identities of particular subjects of

23  counterterrorism investigations, including in Operation Flex; (ii) the reasons those

24  investigations occurred; and (iii) particular sources and methods utilized by the

25  FBI in the investigations – because the privilege is "necessary to protect against the

26  risk of significant harm to national security."  *See* Declaration of Eric H. Holder

27

28                                                                2

1    ("Holder Decl.") ¶¶ 3-4, 12 (Dkt. 32-3, filed August 1, 2011).  The basis for the

2    Attorney General's privilege assertion is set forth to the extent possible on the

3    public record in the Attorney General's unclassified declaration, as well as in an

4    unclassified declaration of Mark Giuliano, Assistant Director of the FBI's

5    Counterterrorism Division (Dkt. 33, filed August 1, 2011).  Details concerning

6    why this information is properly protected from disclosure are set forth in the

7    classified declaration of Mr. Giuliano submitted on August 1, 2011, for the Court's

8    *ex parte, in camera* review.  *See* Notice of Lodging at Dkt. 35.[1]  In accord with a

9    policy announced on September 23, 2009, the Attorney General's privilege

10   assertion in this case is "necessary to protect against the risk of significant harm to

11   national security."  *See* Holder Decl. ¶ 12 and Exhibit 1 thereto (State Secrets

12   Policy).

13        Importantly, however, the Attorney General's privilege assertion is limited

14   in nature, and the Government's request for dismissal is narrowly tailored.  The

15   Government does not seek dismissal of all claims at the outset based on the

16   privilege assertion, nor to bar disclosure of all information concerning Operation

17   Flex or Monteilh's activities.  The Government's motion relies first on

18   considerations apart from state secrets that require dismissal of plaintiffs' claims.

19   The Government's motion then seeks to distinguish between claims for which

---

[1] Mr. Giuliano has executed a supplemental classified declaration that
updates the status of certain investigations discussed in his prior classified
declaration.  *See* Notice of Filing Supplemental Classified Declaration filed
herewith. Through these classified *ex parte, in camera* submissions, the
Government seeks to inform the Court at the outset of this case as to the sensitive,
privileged facts that the Government believes must be protected from disclosure
and excluded from the case.  The Government does not consent to the disclosure of
the information described in the classified Giuliano declarations to plaintiffs or
their counsel.

3

1    privileged evidence would be required and claims that may not require such

2    evidence.  Where litigation of a claim would risk or require the disclosure of

3    privileged information, and the claim is not otherwise dismissed on non-privilege

4    grounds, the need to protect properly privileged information would require

5    dismissal of that claim.

6          With respect to non-privilege grounds for dismissal, the United States seeks

7    dismissal of the newly raised FTCA claims for failure to state a claim upon which

8    relief can be granted, for the reasons detailed below.  In addition, the FBI and

9    official capacity defendants first seek dismissal or, in the alternative, summary

10   judgment on the grounds that the relief sought by plaintiffs against these

11   defendants — the disclosure and expungement of alleged records — is not

12   authorized or available under the Privacy Act or other law.  Because this is the only

13   relief plaintiffs seek for all of their claims against these defendants, the Court

14   should dismiss the entire Amended Complaint as to the FBI and Defendants

15   Mueller and Martinez on this ground.  In addition, plaintiffs' claims against the

16   FBI, official capacity defendants, and the United States brought pursuant to

17   Section 1810 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C.

18   § 1810, should be dismissed because sovereign immunity bars this cause of action

19   as to the United States and Government officials sued in their official capacities.

20         Absent dismissal on the non-privilege grounds advanced herein, the FBI and

21   official capacity defendants do not seek to dismiss plaintiffs' Fourth Amendment

22   and FISA claims based on the state secrets privilege.  At least at this stage of the

23   proceedings, sufficient non-privileged evidence may be available to litigate these

24   claims should they otherwise survive motions to dismiss on non-privilege grounds.

25   The FBI has previously disclosed in a separate criminal proceeding that Monteilh

26   collected audio and video information for the FBI, and some of that audio and

27

28                                          4

1    video information was produced in that prior case. *See* Public Declaration of

2    Mark. F. Giuliano ("Pub. Giuliano Decl.") ¶ 12 (Dkt. 33). The FBI has been

3    reviewing additional audio and video collected by Monteilh for possible disclosure

4    in connection with further proceedings on the issue of whether the FBI instructed

5    or permitted Monteilh to leave recording devices unattended in order to collect

6    non-consenting communications. *See id.* The FBI expects that the majority of the

7    audio and video will be available in connection with further proceedings. Thus,

8    while it remains possible that the need to protect properly privileged national

9    security information might still foreclose litigation of these claims, at present the

10   FBI and official capacity defendants do not seek to dismiss these claims based on

11   the privilege assertion.

12         In contrast, however, litigating plaintiffs' allegations of an indiscriminate

13   investigation based solely on religion would risk or require the disclosure of

14   properly privileged information and, unless these claims are dismissed on non-

15   privilege grounds, the Government seeks their dismissal as to all defendants at the

16   outset based on the state secrets privilege. While presented under various statutory

17   and constitutional theories, plaintiffs' discrimination claims raise one issue:

18   whether the FBI, through its agents, impermissibly investigated and collected

19   information on plaintiffs (and other putative class members) based solely on their

20   religion. *See* FAC, Causes of Action 1 to 7, at 62-65; *see also id*. Cause of Action

21   11 at 67-68 (FTCA). These claims put at issue core privileged information

22   concerning the scope and purpose of Operation Flex. Because plaintiffs allege that

23   the FBI indiscriminately collected information based solely on religion, any

24   rebuttal of this claim would risk or require disclosure of whom and what the FBI

25   was investigating under Operation Flex and why. This is precisely the kind of

26   sensitive investigative information that cannot be disclosed without risking

27

28                                          5

1    significant harm to national security.

2          The Court should first consider the impact of the state secrets privilege

3    assertion on claims brought against the individual capacity defendants.  These

4    individuals have threshold legal defenses under the *Bivens* and qualified immunity

5    doctrines.  Moreover, because litigation of plaintiffs' religious discrimination

6    claims against the individual capacity defendants will inherently put at issue and

7    risk the disclosure of privileged information, these claims should be dismissed at

8    the outset as to the individual capacity defendants.  *Mohammed v. Jeppesen*

9    *Dataplan, Inc.,* 614 F.3d 1070, 1080-81 (9th Cir. 2010) (state secrets privilege may

10   be asserted at the pleading stage rather than waiting for an evidentiary dispute).

11   Similarly, because privileged information will also be inherently at risk of

12   disclosure in any litigation of the religious discrimination claims against the FBI,

13   official capacity defendants, and the United States, dismissal of these claims as to

14   these defendants based on the privilege assertion would also be appropriate at this

15   stage.  To the extent the Court wishes to evaluate further the impact of the privilege

16   assertion on claims against the Government, it should at least dismiss plaintiffs'

17   religious discrimination claims against the individual capacity defendants, in light

18   of their unique threshold legal defenses, and require plaintiffs to demonstrate in

19   proceedings under Fed. R. Civ. P. 16 and 26 what discovery it intends to seek

20   against the Government Defendants concerning these claims.

21          Proceeding in the foregoing manner, the Government seeks to advise the

22   Court at the outset of the underlying national security information that lies at the

23   heart of this case and must be protected, while narrowly tailoring its request for

24   dismissal by presenting non-privilege defenses first, seeking dismissal of some but

25   not all claims on privilege grounds, and focusing on the impact of the privilege on

26   the threshold defenses of the individual capacity defendants, before addressing

27

28                                                6

1  whether any remaining claims against the Government Defendants should also be

2  dismissed on privilege grounds.

3  **BACKGROUND**

4  **I.    Plaintiffs' Allegations**

5           Plaintiffs allege that the FBI, through the use of Craig Monteilh as a

6  confidential informant, indiscriminately collected information on thousands of

7  Muslims, including hundreds of phone numbers, thousands of email addresses,

8  hundreds of hours of video, and thousands of hours of audio.  *See* FAC ¶ 2.

9  Plaintiffs allege that, as part of Operation Flex, Monteilh was instructed to infiltrate

10 ten mosques in southern California, *see id.* ¶¶ 92, 94, in order to gather information

11 on Muslims due solely to their religion.  *Id.* ¶ 3; *see also id.* ¶¶ 86, 89-91, 99.  The

12 three named plaintiffs — Yassir Fazaga, Ali Uddin Malik, and Yasser AbdelRahim

13 — allege that Monteilh's interactions with them were part of this alleged "dragnet"

14 surveillance.  *Id.* ¶ 86.  These plaintiffs also make specific allegations concerning

15 the FBI's alleged investigative interest in them.  For example, plaintiffs allege that

16 the FBI instructed Monteilh to conduct surveillance at Orange County Islamic

17 Foundation, where plaintiff Fazaga was imam, on the ground that the FBI believed

18 Fazaga was radical.  *See id.* ¶¶ 168-69; *see also id*. ¶¶ 170-82.  Plaintiffs also allege

19 that the FBI told Monteilh that it was suspicious of plaintiff Malik because he had

20 gone to a religious school in Yemen and was allegedly involved in the Muslim

21 Student Union.  *See id.* ¶¶ 186-87; *see also id.* ¶¶ 188-92; 194-95.  Plaintiffs also

22 allege that the FBI told Monteilh that plaintiff AbdelRahim's home was under

23 surveillance, and that the FBI believed AbdelRahim was the leader of a terrorist

24 cell.  *See id.* ¶¶ 200-01; *see also id*. ¶¶ 202-14.  The Amended Complaint sets forth

25 alleged instructions provided to Monteilh, *see id.* ¶¶ 89-119; 129-35, and asserts in

26 particular that the FBI acquiesced in Monteilh leaving audio devices unattended to

27

28                                              7

TONY WEST
Assistant Attorney General
ANDRE BIROTTE, JR.
United States Attorney
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
E-mail: tony.coppolino@usdoj.gov
LYNN Y. LEE (SBN #235531)
E-mail: lynn.lee@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Telephone: 202-514-4782
Facsimile: 202-616-8460
*Attorneys for the Federal Bureau of Investigation and
Defendants Mueller and Martinez Sued in their
Official Capacities*

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

| | |
|---|---|
| YASSIR FAZAGA *et al.*, | ) CASE: SA11-CV-00301 CJC (VBKx) |
| Plaintiffs | ) |
| v. | ) DATE: January 30, 2012 |
| | ) TIME: 1:30 pm |
| FEDERAL BUREAU OF | ) JUDGE: Hon. Cormac J. Carney |
| INVESTIGATION *et al.* | ) |
| Defendants. | ) |

**DECLARATION OF CHRISTOPHER N. MORIN**

I, Christopher N. Morin, declare as follows:

1. I am currently the Unit Chief of the FOIA/Privacy Act ("FOIPA")
Litigation Support Unit ("LSU"), Record/Information Dissemination Section
("RIDS"), Records Management Division ("RMD"), formerly located at Federal
Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C., and
currently relocated to Winchester, Virginia. I have been employed by the Federal
Bureau of Investigation ("FBI") since March 14, 2010. Prior to joining the FBI,

1  from December 7, 2007, to February 19, 2010, I was the Acting Assistant Judge

2  Advocate General of the United States Navy for Civil Law.  In that capacity, I had

3  direct oversight of Freedom of Information Act ("FOIA") policy, procedures,

4  appeals, and litigation for the Navy.  From November 13, 1984 to December 6,

5  2007, I served as a Navy Judge Advocate at various commands and worked on

6  record processing matters.  I am also an attorney who has been licensed to

7  practice law in the State of Ohio since 1984.

8       2. In my official capacity as the Unit Chief of the FOIPA LSU, I supervise

9  ten Legal Administrative Specialists ("LASs") whose collective mission is to

10  support the FBI Office of the General Counsel ("OGC") FOIA Litigation Unit

11  ("FLU") in all FOIA litigation and other legal units within OGC with regard to

12  Privacy Act litigation.  The LSU is responsible for justifying the search, review,

13  classification, and processing of records for release in response to FOIA/PA

14  requests, and for drafting declarations in support of RIDS responses to FOIA and

15  Privacy Act requests.  The statements contained in this declaration are based upon

16  my personal knowledge, upon information provided to me in my official capacity,

17  and upon conclusions and determinations reached and made in accordance

18  therewith.

19       3. In the course of my official duties, I have become aware that Yassir

20  Fazaga, Ali Uddin Malik, and Yasser AbdelRahim (collectively, "plaintiffs") have

21  filed a lawsuit alleging that the FBI, through a paid confidential informant named

22  Craig Monteilh, infiltrated several mosques in southern California and

23  indiscriminately collected information on plaintiffs and "hundreds if not

24  thousands" of other Muslims solely on the basis of their religion and in violation

25  of their constitutional and statutory rights.  Based on my review of the First

26  Amended Complaint ("FAC"), I understand that plaintiffs claim in part that the

27

28

-2-

FBI collected and maintained records describing the exercise of their First

Amendment rights in violation of the Privacy Act, 5 U.S.C. § 552a(e)(7). FAC

¶¶ 246-247. I further understand that plaintiffs have alleged that, on or about

September 6 and 12, 2011, they submitted letters to the FBI requesting disclosure

of all records in the possession of the FBI, associated with each Plaintiff, that were

"gathered through the surveillance of former FBI informant Craig Monteilh and/or

Operation Flex, as well as any information derived from that information," and

expungement of all such records that describe the exercise of plaintiffs' First

Amendment rights. Moreover, Plaintiffs allege, as of the filing of the FAC, that

the FBI had "failed to provide Plaintiffs with those records or otherwise to respond

to their requests." FAC ¶ 248. I further understand that plaintiffs seek, among

other relief, the destruction or return of "any information gathered through the

unlawful surveillance program by Monteilh and/or Operation Flex … and any

information derived from that unlawfully obtained information." *Id.* at 68-69

(Prayer for Relief, ¶ b).

4. This declaration is submitted in support of the FBI's motion to dismiss

and for summary judgment with respect to plaintiffs' Privacy Act claim. The

purpose of this declaration is to address (1) the status of plaintiffs' Privacy Act

access requests and (2) why the information plaintiffs seek to expunge, to the

extent that it exists, is exempt from such destruction by application of the Privacy

Act. In providing this declaration, I am relying on my review of information

provided to me in my official capacity, including files relating to the reporting of

Monteilh, Operation Flex, and other information related to the investigative

activity potentially at issue in this case.

5. Attached hereto as Exhibit "A" are true and correct copies of the Privacy

Act requests submitted by plaintiffs Fazaga, Malik, and AbdelRahim, which have

been redacted to omit personally identifying information.

-3-

6.  In accordance with DOJ regulations, 28 C.F.R. § 16.41(d), on September

22, 2011, RIDS sent form letters to plaintiffs Fazaga, Malik, and AbdelRahim,

asking each of them to provide additional information required by FBI regulation

to process their requests.  On October 13, 2011, RIDS received the requested

information from plaintiff Fazaga, which it acknowledged in a letter dated October

19.  On October 18, RIDS received the requested information from plaintiff Malik,

which it acknowledged in a letter dated October 19.  On October 21, RIDS

received the requested information from plaintiff AbdelRahim, which it

acknowledged in a letter dated October 24.  RIDS' acknowledgment letters were

intended solely to notify plaintiffs that it had received the additional information

which it had requested earlier.  Such acknowledgment should not be construed as

confirmation that the documents sought in plaintiffs' Privacy Act requests exist.

Attached hereto as Exhibit B are true and correct copies of these letters that have

been redacted to omit personally identifying information.

7.  RIDS is currently processing plaintiffs' access requests.  In the event that

any of these requests is denied, plaintiffs may file an administrative appeal with

the FBI pursuant to 28 C.F.R. § 16.45.  To date, plaintiffs' requests have not been

denied and plaintiffs have not filed any appeal.

8.  In light of the classified nature of these records, I cannot fully discuss on

the public record all of the details concerning the collection of information by

Monteilh or Operation Flex.  I am able to attest to the fact that the records

maintained by the FBI concerning Monteilh's source work and Operation Flex

constitute investigatory material compiled for law enforcement and criminal

investigation purposes.  I am advised that Operation Flex was the name given by

the FBI to a group of counterterrorism investigations on which Monteilh was

reporting.  No statement in this declaration should be construed as admitting or

-4-

1    suggesting that the FBI has any records responsive to plaintiff's access requests, or

2    any unlawfully obtained records concerning Monteilh or Operation Flex.

3        9.  The information gathered by Monteilh and concerning Operation Flex is

4    located in the FBI's Central Records System ("CRS") and the Electronic

5    Surveillance ("ELSUR") indices.  Pursuant to 5 U.S.C. §§ 552a(j) and (k) and 28

6    C.F.R. § 16.96, both the FBI's CRS and ELSUR indices have been expressly

7    exempted from subsection (d) of the Privacy Act, which addresses the federal

8    government's obligations to provide individuals access to records concerning

9    them and to amend any portion of such records which is not accurate, relevant,

10   timely, or complete.  The exemption applies to records that are maintained by "any

11   agency or component thereof which performs as its principal function any activity

12   pertaining to the enforcement of criminal laws" and consist of "information

13   compiled for the purpose of a criminal investigation, including reports of

14   informants and investigators, and associated with an identifiable individual," as

15   well as other "investigatory material compiled for law enforcement purposes."  5

16   U.S.C. §§ 552a(j)(2)(B), (k)(2).  As noted above, the records concerning

17   information collected by Monteilh and for Operation Flex in the CRS and ELSUR

18   indices constitute investigatory material compiled for law enforcement and

19   criminal investigation purposes.

20       10.  As explained in the FBI's regulations, the CRS has been exempted from

21   the Privacy Act's access requirements because compliance with these

22   requirements "could compromise sensitive information classified in the interest of

23   national security, interfere with the overall law enforcement process by revealing a

24   pending sensitive investigation, possibly identify a confidential source or disclose

25   information which would constitute an unwarranted invasion of another

26   individual's personal privacy, reveal a sensitive investigative technique, or

27   constitute a potential danger to the health or safety to law enforcement personnel."

28

-5-

28 C.F.R. § 16.96(b)(2)(i).  The CRS has been exempted from the Privacy Act's amendment provision because "requir[ing] the FBI to amend information thought to be incorrect, irrelevant or untimely, because of the nature of the information collected and the essential length of time it is maintained, would create an impossible administrative and investigative burden by forcing the agency to continuously retrograde its investigations attempting to resolve questions of accuracy[.]"  28 C.F.R. § 16.96(b)(2)(iii).

11.  Similarly, the ELSUR indices have been exempted because "access to records in this system would compromise ongoing investigations, reveal investigatory techniques and confidential informants, and invade the privacy of private citizens who provide information in connection with a particular investigation."  28 C.F.R. §§ 16.96(d)(2).

12.  Even if the records sought by plaintiffs, to the extent they exist, were not exempt by statute and regulation from the Privacy Act's amendment provisions, the destruction of any such records could significantly impair the FBI's ability to conduct ongoing or future investigations.  The FBI maintains and preserves its investigative records – subject to strict records retention schedules agreed to in conjunction with the National Archives and Records Administration ("NARA") – for several reasons.

13.  First, when the FBI receives new information that may relate to an ongoing or prior investigation, it examines and seeks to verify that information in the context of information it has already received.  Thus, if the FBI's existing records regarding Monteilh and Operation Flex were destroyed, and further information relating to the investigative matter at issue were later brought to the FBI's attention, the investigating agent would not have the complete context in which to evaluate the newly received information and properly assess the matter.

-6-

1     14. Second, the maintenance of investigative records permits the FBI to

2  assess the reliability of sources of information it receives over time. The

3  premature destruction of files would severely hinder the FBI's ability to evaluate

4  the accuracy and credibility of information received from the same source over the

5  course of several years or even decades.

6     15. Finally, the FBI maintains investigative records for historic and

7  accountability purposes. The premature destruction of records relating to

8  investigative activities, in addition to being in violation of the NARA-imposed

9  record retention and destruction schedules, would significantly impede any future

10  inquiry into how the FBI responded to information it received.

11     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

12  foregoing is true and correct.

13

14     Executed this 4th day of November, 2011.

15

16                   CHRISTOPHER N. MORIN
                       Unit Chief

17                   FOIPA Litigation Support Unit
                       Record/Information Dissemination Section

18                   Records Management Division
                       Federal Bureau of Investigation

19                   Winchester, Virginia

20

21

22

23

24

25

26

27

28

-7-

# THE ATTORNEY GENERAL'S GUIDELINES FOR DOMESTIC FBI OPERATIONS

## I. GENERAL AUTHORITIES AND PRINCIPLES

### A. SCOPE

These Guidelines apply to investigative activities conducted by the FBI within the United States or outside the territories of all countries. They do not apply to investigative activities of the FBI in foreign countries, which are governed by the Attorney General's Guidelines for Extraterritorial FBI Operations.

### B. GENERAL AUTHORITIES

1.  The FBI is authorized to conduct investigations to detect, obtain information about, and prevent and protect against federal crimes and threats to the national security and to collect foreign intelligence, as provided in Part II of these Guidelines.

2.  The FBI is authorized to provide investigative assistance to other federal agencies, state, local, or tribal agencies, and foreign agencies as provided in Part III of these Guidelines.

3.  The FBI is authorized to conduct intelligence analysis and planning as provided in Part IV of these Guidelines.

4.  The FBI is authorized to retain and share information obtained pursuant to these Guidelines as provided in Part VI of these Guidelines.

### C. USE OF AUTHORITIES AND METHODS

#### 1. Protection of the United States and Its People

The FBI shall fully utilize the authorities provided and the methods authorized by these Guidelines to protect the United States and its people from crimes in violation of federal law and threats to the national security, and to further the foreign intelligence objectives of the United States.

#### 2. Choice of Methods

a.  The conduct of investigations and other activities authorized by these Guidelines may present choices between the use of different investigative methods that are each operationally sound and effective, but that are more or less intrusive, considering such factors as the effect on the privacy and civil liberties of individuals and potential damage to reputation. The least intrusive method feasible is to be used in such situations. It is recognized,

12

however, that the choice of methods is a matter of judgment. The FBI shall not hesitate to use any lawful method consistent with these Guidelines, even if intrusive, where the degree of intrusiveness is warranted in light of the seriousness of a criminal or national security threat or the strength of the information indicating its existence, or in light of the importance of foreign intelligence sought to the United States' interests. This point is to be particularly observed in investigations relating to terrorism.

b. United States persons shall be dealt with openly and consensually to the extent practicable when collecting foreign intelligence that does not concern criminal activities or threats to the national security.

## 3. Respect for Legal Rights

All activities under these Guidelines must have a valid purpose consistent with these Guidelines, and must be carried out in conformity with the Constitution and all applicable statutes, executive orders, Department of Justice regulations and policies, and Attorney General guidelines. These Guidelines do not authorize investigating or collecting or maintaining information on United States persons solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States. These Guidelines also do not authorize any conduct prohibited by the Guidance Regarding the Use of Race by Federal Law Enforcement Agencies.

## 4. Undisclosed Participation in Organizations

Undisclosed participation in organizations in activities under these Guidelines shall be conducted in accordance with FBI policy approved by the Attorney General.

## 5. Maintenance of Records under the Privacy Act

The Privacy Act restricts the maintenance of records relating to certain activities of individuals who are United States persons, with exceptions for circumstances in which the collection of such information is pertinent to and within the scope of an authorized law enforcement activity or is otherwise authorized by statute. 5 U.S.C. 552a(e)(7). Activities authorized by these Guidelines are authorized law enforcement activities or activities for which there is otherwise statutory authority for purposes of the Privacy Act. These Guidelines, however, do not provide an exhaustive enumeration of authorized FBI law enforcement activities or FBI activities for which there is otherwise statutory authority, and no restriction is implied with respect to such activities carried out by the FBI pursuant to other

13

authorities. Further questions about the application of the Privacy Act to authorized activities of the FBI should be addressed to the FBI Office of the General Counsel, the FBI Privacy and Civil Liberties Unit, or the Department of Justice Office of Privacy and Civil Liberties.

## D. NATURE AND APPLICATION OF THE GUIDELINES

### 1. Repealers

These Guidelines supersede the following guidelines, which are hereby repealed:

a. The Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigations (May 30, 2002) and all predecessor guidelines thereto.

b. The Attorney General's Guidelines for FBI National Security Investigations and Foreign Intelligence Collection (October 31, 2003) and all predecessor guidelines thereto.

c. The Attorney General's Supplemental Guidelines for Collection, Retention, and Dissemination of Foreign Intelligence (November 29, 2006).

d. The Attorney General Procedure for Reporting and Use of Information Concerning Violations of Law and Authorization for Participation in Otherwise Illegal Activity in FBI Foreign Intelligence, Counterintelligence or International Terrorism Intelligence Investigations (August 8, 1988).

e. The Attorney General's Guidelines for Reporting on Civil Disorders and Demonstrations Involving a Federal Interest (April 5, 1976).

### 2. Status as Internal Guidance

These Guidelines are set forth solely for the purpose of internal Department of Justice guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable by law by any party in any matter, civil or criminal, nor do they place any limitation on otherwise lawful investigative and litigative prerogatives of the Department of Justice.

### 3. Departures from the Guidelines

Departures from these Guidelines must be approved by the Director of the FBI, by the Deputy Director of the FBI, or by an Executive Assistant Director designated

14

by the Director. If a departure is necessary without such prior approval because of the immediacy or gravity of a threat to the safety of persons or property or to the national security, the Director, the Deputy Director, or a designated Executive Assistant Director shall be notified as soon thereafter as practicable. The FBI shall provide timely written notice of departures from these Guidelines to the Criminal Division and the National Security Division, and those divisions shall notify the Attorney General and the Deputy Attorney General. Notwithstanding this paragraph, all activities in all circumstances must be carried out in a manner consistent with the Constitution and laws of the United States.

**4.     Other Activities Not Limited**

These Guidelines apply to FBI activities as provided herein and do not limit other authorized activities of the FBI, such as the FBI's responsibilities to conduct background checks and inquiries concerning applicants and employees under federal personnel security programs, the FBI's maintenance and operation of national criminal records systems and preparation of national crime statistics, and the forensic assistance and administration functions of the FBI Laboratory.

15

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 07-08-2009 BY UC 60322 LP/STP/SZ

UNCLASSIFIED

FOR OFFICIAL USE ONLY

# Domestic Investigations and Operations Guide



## Federal Bureau of Investigation (FBI)

## December 16, 2008

This is a privileged document that cannot be released in whole or in part to persons or agencies outside the Federal Bureau of Investigation, nor can it be republished in whole or in part in any written form not containing this statement, including general use pamphlets, without the approval of the Director of the Federal Bureau of Investigation.

UNCLASSIFIED

FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

# 4.  (U) Privacy and Civil Liberties, and Least Intrusive Methods

### 4.1.    (U) Civil Liberties and Privacy

A. (U) **Overview**

(U) The FBI is responsible for protecting the American public, not only from crime and terrorism, but also from incursions into their constitutional rights. Accordingly, all AGG-Dom investigative activities must be carried out with full adherence to the Constitution, federal laws and the principles of civil liberty and privacy.

(U) The FBI has a long-established commitment to protecting the civil liberties of Americans as it investigates threats to national security and public safety. As discussed below, compliance with the FBI's comprehensive infrastructure of legal limitations, oversight and self-regulation effectively ensures that this commitment is honored. Because our ability to achieve our mission requires that we have the trust and confidence of the American public, and because that trust and confidence can be significantly shaken by our failure to respect the limits of our power, special care must be taken by all employees to comply with these limitations.

B. (U) **Purpose of Investigative Activity**

(U) One of the most important safeguards in the AGG-Dom—one that is intended to ensure that FBI employees respect the constitutional rights of Americans—is the threshold requirement that all investigative activity be conducted for an authorized purpose. Under the AGG-Dom that authorized purpose must be an authorized national security, criminal, or foreign intelligence collection purpose.

(U) Simply stating such a purpose is not sufficient, however, to ensure compliance with this safeguard. It is critical that the authorized purpose not be, or appear to be, arbitrary or contrived; that it be well-founded and well-documented; and that the information sought and the investigative method used to obtain it be focused in scope, time, and manner to achieve the underlying purpose. Furthermore, there are constitutional provisions that set limits on what that purpose may be. It may not be solely to monitor the exercise of rights that are protected by the Constitution, and, equally important, the authorized purpose may not be based solely on race, ethnicity, national origin or religion.

(U) It is important to understand how the "authorized purpose" requirement and these constitutional limitations relate to one another. For example, individuals or groups who communicate with each other or with members of the public in any form in pursuit of social or political causes—such as opposing war or foreign policy, protesting government actions, promoting certain religious beliefs—have a fundamental constitutional right to do so. No investigative activity may be conducted for the sole purpose of monitoring the exercise of these rights. If, however, there exists a well-founded basis to conduct investigative activity for one of the authorized purposes listed above—and that basis is not solely the race, ethnicity, national origin or religion of the participants—FBI employees may assess or investigate these activities, subject to other limitations in the AGG-Dom and the DIOG. In this situation, the investigative activity would not be based solely on Constitutionally-protected conduct or on race, ethnicity, nationality or religion. Finally, although investigative activity would be authorized in this situation, it is important that it be conducted in a manner

21
UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

that does not materially interfere with the ability of the individuals or groups to engage in the exercise of Constitutionally-protected rights.

C. (U) **Oversight and Self-Regulation**

(U) Provisions of the AGG-Dom, other AGG, and oversight from DOJ components are designed to ensure the activities of the FBI are lawful, appropriate and ethical as well as effective in protecting the civil liberties and privacy of individuals in the United States. DOJ and the FBI's Inspection Division, OIC, and OGC, along with every FBI employee, share responsibility for ensuring that the FBI meets these goals.

(U) In the criminal investigation arena, oversight of FBI activities has traditionally come from prosecutors and district courts. Because many national security investigations do not result in prosecutions, other oversight mechanisms are necessary. Various features of the AGG-Dom facilitate the DOJ NSD oversight functions in the national security and foreign intelligence collection areas. Relevant requirements and provisions include: (i) required notification by the FBI to the DOJ NSD concerning a full investigation that involves foreign intelligence collection, a full investigation of a United States person in relation to a threat to the national security; or a national security investigation involving a "sensitive investigative matter;" (ii) an annual report by the FBI to the DOJ NSD concerning the FBI's foreign intelligence collection program, including information reflecting the scope and nature of foreign intelligence collection activities in each FBI Field Office; (iii) access by the DOJ NSD to information obtained by the FBI through national security or foreign intelligence activities; and (iv) general authority for the Assistant Attorney General for National Security to obtain reports from the FBI concerning these activities. (AGG-Dom, Intro.4.C)

(U) The DOJ NSD's Oversight Section and the FBI's OGC are responsible for conducting regular reviews of all aspects of FBI national security and foreign intelligence activities. These reviews, conducted at FBI Field Offices and FBIHQ Divisions, broadly examine such activities for compliance with the AGG-Dom and other applicable requirements.

(U) Further examples of oversight mechanisms include the involvement of both FBI and prosecutorial personnel in the review of undercover operations involving sensitive circumstances; notice requirements for investigations involving sensitive investigative matters; and notice and oversight provisions for enterprise investigations, which involve a broad examination of groups implicated in criminal and national security threats. These requirements and procedures help to ensure that the rule of law is respected in the FBI's activities and that public confidence is maintained in these activities. (AGG-Dom, Intro.4.C)

(U) In addition to the above-mentioned oversight entities DOJ has in place, the FBI is subject to a regime of oversight, legal limitations, and self-regulation designed to ensure strict adherence to civil liberties. This regime is comprehensive and has many facets, including the following:

1. (U) The Foreign Intelligence Surveillance Act of 1978, as amended, and Title III of the Omnibus and Streets Act of 1968. These laws establish the processes for obtaining judicial approval of: electronic surveillance and physical searches for the purposes of collecting foreign intelligence and electronic surveillance for the purpose of collecting evidence of crimes.

UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

2. (U) The Whistleblower Protection Acts of 1989 and 1998: These laws protect whistleblowers from retaliation.

3. (U) The Freedom of Information Act of 1966: The law provides the public with access to FBI documents not covered by a specific statutory exemption.

4. (U) The Privacy Act of 1974: The purpose of the Privacy Act is to balance the government's need to maintain information about United States citizens and legal permanent resident aliens with the rights of those individuals to be protected against unwarranted invasions of their privacy stemming from the government's collection, use, maintenance, and dissemination of that information. The Privacy Act forbids the FBI and other federal agencies from collecting information about how individuals exercise their First Amendment rights, unless that collection is expressly authorized by statute or by the individual, or is pertinent to and within the scope of an authorized law enforcement activity (5 U.S.C. § 552a[e][7]). Except for collection of <u>foreign intelligence</u>, activities authorized by the AGG-Dom are authorized law enforcement activities or activities for which there is otherwise statutory authority for purposes of the Privacy Act. Foreign intelligence collection is not an authorized law enforcement activity.

(U) Congressional Oversight is conducted by various committees of the United States Congress, but primarily by the Judiciary and Intelligence Committees. These committees exercise regular, vigorous oversight into all aspects of the FBI's operations. To this end, the National Security Act of 1947 requires the FBI to keep the intelligence committees (for the Senate and House of Representatives) fully and currently informed of substantial intelligence activities. This oversight has significantly increased in breadth and intensity since the 1970's, and it provides important additional assurance that the FBI conducts its investigations according to the law and the Constitution.

(U) The FBI's counterintelligence and counterterrorism operations are subject to significant self-regulation and oversight beyond that conducted by Congress. The Intelligence Oversight Board (IOB), comprised of members from the President's Intelligence Advisory Board (PIAB), also conducts oversight of the FBI. Among its other responsibilities, the IOB reviews violations of The Constitution, national security law, E.O. or Presidential Decision Directive (PDD) by the FBI and the other intelligence agencies, and issues reports thereon to the President and the Attorney General.

(U) Internal FBI safeguards include: (i) the OGC's <u>Privacy and Civil Liberties Unit</u> (PCLU), which reviews plans of any record system proposed within the FBI for compliance with the Privacy Act and related privacy protection requirements and policies; (ii) the criminal and national security undercover operations review committees, comprised of senior DOJ and FBI officials, which review all proposed undercover operations that involve sensitive circumstances; (iii) the Sensitive Operations Review Committee (SORC), comprised of

b5

(iv) all FBI employees have an obligation to report violations of the DIOG to their supervisor, other management officials, or appropriate authorities; and (v) the FBI requirement for training of new FBI employees and periodic training for all FBI employees

23
UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

to maintain currency on the latest guidelines, changes to laws and regulations, and judicial decisions related to constitutional rights and liberties.

(U) The AGG-Dom and DIOG set forth the standards and requirements under which an investigative activity may be initiated and are designed to provide FBI employees with a framework that maintains the proper balance between the public's need for effective law enforcement and protection of the national security and the protection of civil liberties and privacy. Among the provisions that specifically serve to protect civil liberties and privacy are the following: (i) the prohibition against initiating investigations based solely on the exercise of First Amendment rights or other constitutionally protected activity; (ii) the requirement that FBI employees use the least intrusive method reasonable under the circumstances to achieve their investigative goals; and (iii) the prohibition against engaging in ethnic and racial profiling. Further, in the context of collecting foreign intelligence, the FBI is further required to operate openly and consensually with United States persons, to the extent practicable.

## 4.2. (U) Protection of First Amendment Rights

(U) A fundamental principle of the Attorney General's guidelines for FBI investigations and operations since the first guidelines were issued in 1976 has been that investigative activity may not be based solely on the exercise of rights guaranteed by the First Amendment to the United States Constitution. This principle carries through to the present day in the AGG-Dom. There is a corollary to this principle in the Privacy Act of 1974, 5 U.S.C. § 552a, which prohibits the retention of information describing how a person exercises rights under the First Amendment, unless there is a valid law enforcement purpose.

(U) The First Amendment states:

> *(U) Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people to peaceably assemble, and to petition the Government for redress of grievances.*

(U) Although the amendment appears literally to apply only to Congress, the Supreme Court made it clear long ago that it also applies to activities of the Executive Branch, including law enforcement agencies. Therefore, for FBI purposes, it would be helpful to read the introduction to the first sentence as: "The FBI shall take no action respecting . . ." In addition, the word "abridging" must be understood. "Abridging," as used here, means "diminishing." Thus, it is not necessary for a law enforcement action to destroy or totally undermine the exercise of First Amendment rights for it to be unconstitutional; significantly diminishing or lessening the ability of individuals to exercise these rights without an authorized investigative purpose is sufficient.

(U) This is not to say that any diminishment of First Amendment rights is unconstitutional. The Supreme Court has never held that the exercise of these rights is absolute. In fact, the Court has set forth realistic interpretations of what level and kind of government activity actually violates a First Amendment right. For example, taken to an extreme, one could argue that the mere possibility of an FBI agent being present at an open forum (or an on-line presence) would diminish the right of free speech by, for example, an anti-war protestor because he/she would be afraid to speak freely. The Supreme Court, however, has never found an "abridgement" of First Amendment rights based on such a subjective fear. Rather, it requires an action that, from an

24

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

objective perspective, truly diminishes the speaker's message or his/her ability to deliver it (e.g., pulling the plug on the sound system). For another example, requiring protestors to use a certain parade route may diminish, in a practical sense, delivery of their message. The Court has made it clear, however, that for legitimate reasons (e.g., public safety), the government may impose reasonable limitations in terms of time, place and manner to the exercise of such rights—as long as the ability to deliver the message remains.

(U) While the language of the First Amendment prohibits action that would abridge the enumerated rights, the implementation of that prohibition in the AGG-Dom reflects the Supreme Court's opinions on the constitutionality of law enforcement action that may impact the exercise of First Amendment rights. As stated above, the AGG-Dom prohibits investigative activity for the sole purpose of monitoring the exercise of First Amendment rights. The import of the distinction between this language and the actual text of the First Amendment language is two-fold: (i) the line drawn by the AGG-Dom prohibits even "monitoring" the exercise of First Amendment rights (far short of abridging those rights) as the sole purpose of FBI activity; and (ii) the requirement of an authorized purpose for all investigative activity provides additional protection for the exercise of Constitutionally protected rights.

(U) The AGG-Dom classifies investigative activity that involves a religious or political organization (or an individual prominent in such an organization) or a member of the news media as a "sensitive investigative matter." That designation recognizes the sensitivity of conduct that traditionally involves the exercise of First Amendment rights—i.e., groups who associate for political or religious purposes, and the press. The requirements for opening and pursuing a "sensitive investigative matter" are set forth in Section 10 of this policy document. It should be clear, however, from the discussion below just how pervasive the exercise of First Amendment rights is in American life and that not all protected First Amendment activity will fall within the definition of a "sensitive investigative matter." Therefore, it is essential that FBI employees recognize when investigative activity may have an impact on the exercise of these fundamental rights and be especially sure that any such investigative activity has a valid law enforcement or national security purpose, even if it is not a "sensitive investigative matter" as defined in the AGG-Dom and the DIOG.

(U) Finally, it is important to note that United States persons (and organizations comprised of United States persons) do not forfeit their First Amendment rights simply because they also engage in criminal activity or in conduct that threatens national security. For example, an organization suspected of engaging in acts of domestic terrorism may also pursue legitimate political goals and may also engage in lawful means to achieve those goals. The pursuit of these goals through constitutionally-protected conduct does not insulate them from legitimate investigative focus for unlawful activities—but the goals and the pursuit of their goals through lawful means remain protected from unconstitutional infringement.

(U) When allegations of First Amendment violations are brought to a court of law, it is usually in the form of a civil suit in which a plaintiff has to prove some actual or potential harm. Presbyterian Church v. United States, 870 F.2d 518 (9th Cir. 1989). In a criminal trial, a defendant may seek either or both of two remedies as part of a claim that his or her First Amendment rights were violated: suppression of evidence gathered in the alleged First Amendment violation, a claim typically analyzed under the "reasonableness" clause of the Fourth Amendment, and dismissal of the indictment on the basis of "outrageous government conduct" in violation of the Due Process Clause of the Fifth Amendment.

25
UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

(U) The scope of each of the primary First Amendment rights and their impact on FBI investigative activity are discussed below. The First Amendment's "establishment clause,"—the prohibition against the government establishing or sponsoring a specific religion—has little application to the FBI and, therefore, is not discussed here.

A. (U) Free Speech

(U) The exercise of free speech includes far more than simply speaking on a controversial topic in the town square. It includes such activities as carrying placards in a parade, sending letters to a newspaper editor, posting a web site on the Internet, wearing a tee-shirt with a political message, placing a bumper sticker critical of the President on one's car, and publishing books or articles. The common thread in these examples is conveying a public message or an idea through words or deeds. Law enforcement activity that diminishes a person's ability to communicate in any of these ways may interfere with his or her freedom of speech—and thus may not be undertaken by the FBI solely for that purpose.

(U) The line between constitutionally protected speech and advocacy of violence or of conduct that may lead to violence or other unlawful activity must be understood. In Brandenburg v. Ohio, 395 U.S. 444 (1969), the Supreme Court established a two-part test to determine whether such speech is constitutionally protected: the government may not prohibit advocacy of force or violence except when such advocacy (i) is intended to incite imminent lawless action, and (ii) is likely to do so. Therefore, even heated rhetoric or offensive provocation that could conceivably lead to a violent response in the future is usually protected. Suppose, for example, a politically active group advocates on its web site taking unspecified "action" against persons or entities it views as the enemy, who thereafter suffer property damage and/or personal injury. Under the Brandenburg two-part test, the missing specificity and imminence in the message may provide it constitutional protection. For that reason, law enforcement may take no action that, in effect, blocks the message or punishes its sponsors.

(U) Despite the high standard for prohibiting free speech or punishing those who engage in it, the law does not preclude FBI employees from observing and collecting any of the forms of protected speech and considering its content—as long as those activities are done for a valid law enforcement or national security purpose and conducted in a manner that does not unduly infringe upon the ability of the speaker to deliver his or her message. To be an authorized purpose, it must be one that is authorized by the AGG-Dom—i.e., to further an FBI assessment, predicated investigation, or other authorized function such as providing assistance to other agencies. Furthermore, by following the "Standards for Initiating or Approving an Assessment or Predicated Investigation" as contained in the DIOG, the FBI will ensure that there is a rational relationship between that authorized purpose and the protected speech such that a reasonable person with knowledge of the circumstances could understand why the information is being collected.

(U) Returning to the example posed above, because the group's advocacy of action could be directly related by circumstance to property damage suffered by one of the group's known targets, collecting the speech—although lawfully protected—can lawfully occur. Similarly, listening to the public talks by a religious leader, who is suspected of raising funds for a terrorist organization, may yield clues as to his motivation, plan of action, and/or hidden messages to his followers. FBI employees should not, therefore, avoid collecting First

26
UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide

Amendment protected speech if it is relevant to an authorized AGG-Dom purpose—as long as they do so in a manner that does not inhibit the delivery of the message or the ability of the audience to hear it, and so long as the method of collection is the least intrusive means feasible to gather the relevant information.

(U) In summary, during the course of lawful investigative activities, the FBI may lawfully collect, retain, and consider the content of constitutionally protected speech, so long as: (i) the collection is logically related to an authorized investigative purpose; (ii) the collection does not actually infringe on the ability of the speaker to deliver his or her message; and (iii) the method of collection is the least intrusive alternative feasible.

B. (U) **Exercise of Religion**

(U) Like the other First Amendment freedoms, the "free exercise of religion" clause is broader than commonly believed. First, it covers any form of worship of a deity—even forms that are commonly understood to be cults or fringe sects, as well as the right not to worship any deity. Second, protected religious exercise also extends to dress or food that is required by religious edict, attendance at a facility used for religious practice (no matter how unlikely it appears to be intended for that purpose), observance of the Sabbath, raising money for evangelical or missionary purposes, and proselytizing. Even in controlled environments like prisons, religious exercise must be permitted—subject to reasonable restrictions as to time, place, and manner. Another feature of this First Amendment right is that it is a matter of heightened sensitivity to some Americans—especially to devout followers. For this reason, it is a matter that is more likely to provoke an adverse reaction if the right is violated—regardless of which religion is involved. Therefore, when essential investigative activity may impact this right, it must be conducted in a manner that avoids the actual—and the appearance of—interference with religious practice to the maximum extent possible.

(U) While there must be an authorized purpose for any investigative activity that could have an impact on religious practice, this does not mean religious practitioners or religious facilities are completely free from being examined as part of an assessment or predicated investigation. If such practitioners are involved in—or such facilities are used for—activities that are the proper subject of FBI-authorized investigative or intelligence collection activities, their religious affiliation does not "immunize" them to any degree from these efforts. It is paramount, however, that the authorized purpose of such efforts be properly documented. It is also important that investigative activity directed at religious leaders or at conduct occurring within religious facilities be focused in time and manner so as not to infringe on legitimate religious practice by any individual but especially by those who appear unconnected to the activities under investigation.

(U) Furthermore, FBI employees may take appropriate cognizance of the role religion may play in the membership or motivation of a criminal or terrorism enterprise. If, for example, affiliation with a certain religious institution or a specific religious sect is a known requirement for inclusion in a violent organization that is the subject of an investigation, then whether a person of interest is a member of that institution or sect is a rational and permissible consideration. Similarly, if investigative experience and reliable intelligence reveal that members of a terrorist or criminal organization are known to commonly possess or exhibit a combination of religion-based characteristics or practices (e.g., group leaders state that acts of terrorism are based in religious doctrine), it is rational and lawful to consider

27

UNCLASSIFIED-FOR OFFICIAL USE ONLY

UNCLASSIFIED - FOR OFFICIAL USE ONLY
**Domestic Investigations and Operations Guide**

such a combination in gathering intelligence about the group—even if any one of these, by itself, would constitute an impermissible consideration. By contrast, solely because prior subjects of an investigation of a particular group were members of a certain religion and they claimed a religious motivation for their acts of crime or terrorism, other members' mere affiliation with that religion, by itself, is not a basis to assess or investigate—absent a known and direct connection to the threat under assessment or investigation. Finally, the absence of a particular religious affiliation can be used by analysts and investigators to eliminate certain individuals from further investigative consideration in those scenarios where religious affiliation is relevant.

## C. (U) Freedom of the Press

(U) Contrary to what many believe, this well-known First Amendment right is not owned by the news media; it is a right of the American people. The drafters of the Constitution believed that a free press was essential to preserving democracy. Although the news media typically seeks to enforce this right, freedom of the press should not be viewed as a contest between law enforcement or national security, on the one hand, and the interests of news media, on the other.

(U) Freedom of the press includes such matters as reasonable access to news-making events, the making of documentaries, and the posting of "blogs." The news gathering function is the aspect of freedom of the press most likely to intersect with law enforcement and national security investigative activities. Within that category, the interest of the news media in protecting confidential sources and the interest of agencies like the FBI in gaining access to these sources who may have evidence of a crime or national security intelligence often clash. The seminal case in this area is Branzburg v. Hayes, 408 U.S. 665 (1977), in which the Supreme Court held that freedom of the press does not entitle a news reporter to refuse to divulge the identity of his source to a federal grand jury. The Court reasoned that, as long as the purpose of law enforcement is not harassment or vindictiveness against the press, any harm to the news gathering function of the press (by revealing source identity) is outweighed by the need of the grand jury to gather evidence of crime.

(U) Partially in response to Branzburg, the Attorney General has issued regulations that govern the issuance of subpoenas for reporter's testimony and telephone toll records, the arrest of a reporter for a crime related to news gathering, and the interview of a reporter as a suspect in a crime arising from the news gathering process. In addition, an investigation of a member of the news media in his official capacity, the use of a reporter as a source, and posing as a member of the news media are all sensitive circumstances in the AGG-Dom and other applicable AG guidelines.

(U) These regulations are not intended to insulate reporters and other news media from FBI assessments or predicated investigations. They are intended to ensure that investigative activity that seeks information from or otherwise involves members of the news media: is appropriately authorized; is necessary for an important law enforcement or national security objective; is the least intrusive means to obtain the information or achieve the goals; and does not unduly infringe upon the news gathering aspect of the constitutional right to freedom of the press.

28
UNCLASSIFIED-FOR OFFICIAL USE ONLY

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2015, I electronically filed the foregoing supplemental excerpts of record with the Clerk of the Court by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

 s/ Daniel Tenny
Daniel Tenny