Consolidated Case Nos.: 12-56867, 12-56874, 13-55017
U.S.D.C. Case No. 8:11-cv-00301-CJC-VBK

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

YASSIR FAZAGA, et al.

Plaintiff/Appellants/Cross-Appellees,

v.

FBI, et al.,

Defendants/Appellees/Cross-Appellants.
_____

On Appeal From The United States District Court
For The Central District of California
_____

**CROSS-APPELLANTS PAT ROSE, PAUL ALLEN AND KEVIN
ARMSTRONG'S SUPPLEMENTAL EXCERPTS OF RECORD**
_____

**VOLUME 1 OF 1, SER 1-285**

DAVID C. SCHEPER (SBN 120174)
ALEXANDER H. COTE (SBN 211558)
ANGELA M. MACHALA (SBN 224496)
AMOS A. LOWDER (SBN 269362)
SCHEPER KIM & HARRIS LLP
601 WEST FIFTH STREET, 12TH FLOOR
LOS ANGELES, CALIFORNIA 90071-2025
TELEPHONE: (213) 613-4655
FACSIMILE: (213) 613-4656
*Attorneys for Pat Rose, Paul Allen and Kevin
Armstrong*

## INDEX OF SUPPLEMENTAL EXCERPTS OF RECORD

| FILING DATE | DOCUMENT DESCRIPTION | TRIAL EXHIBIT NO. OR DOCKET NO. | SER NO. |
|---|---|---|---|
| 10/12/12 | Notice of Appeal of Defendants Pat Rose, Kevin Armstrong and Paul Allen | 115 | 1-2 |
| 1/20/12 | Reply Memorandum of Points and Authorities in Support of Motion to Dismiss by Defendants Pat Rose, Kevin Armstrong and Paul Allen | 70 | 3-32 |
| 12/23/11 | Plaintiffs' Combined Opposition to Individual Capacity Defendants' Motion to Dismiss First Amended Complaint | 63 | 33-124 |
| 11/11/11 | Notice of Motion and Motion of Individual Capacity Defendants J. Stephen Tidwell and Barbara Walls to Dismiss First Amended Complaint | 58 | 125-167 |
| 11/11/11 | Notice of Motion and Motion by Defendants Pat Rose, Kevin Armstrong and Paul Allen to Dismiss Plaintiffs' First Amended Class Action Complaint; Notice of Joinder in Motions to Dismiss by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller, and Steven Martinez and (2) Defendants Stephen Tidwell And Barbara Walls | 57 | 168-214 |
| 11/4/11 | Notice of Motion and Motion to Dismiss Amended Complaint and for Summary Judgment | 55 | 215-285 |

Dated:  April 29, 2015      Respectfully submitted,

By:   /s/David C. Scheper
      DAVID C. SCHEPER
      ALEXANDER H. COTE
      ANGELA M. MACHALA
      AMOS A. LOWDER

      Attorneys for Appellants
      PAT ROSE, PAUL ALLEN
      AND KEVIN ARMSTRONG

1  **SCHEPER KIM & HARRIS LLP**
   DAVID C. SCHEPER (State Bar No. 120174)
2  dscheper@scheperkim.com
   ALEXANDER H. COTE (State Bar No. 211558)
3  acote@scheperkim.com
   ANGELA M. MACHALA (State Bar No. 224496)
4  amachala@scheperkim.com
   601 West Fifth Street, 12th Floor
5  Los Angeles, CA  90071-2025
   Telephone: (213) 613-4655
6  Facsimile:  (213) 613-4656

7  **Attorneys for Defendants**
   **Pat Rose, Kevin Armstrong and Paul**
8  **Allen**

9                    **UNITED STATES DISTRICT COURT**

10        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12  YASSIR FAZAGA, ALI UDDIN          | Case No. SACV 8:11-00301-CJC(VBKx)
    MALIK, YASSER ABDELRAHIM,         |
13                                    | **NOTICE OF APPEAL OF**
                                      | **DEFENDANTS PAT ROSE, KEVIN**
14                Plaintiffs,         | **ARMSTRONG AND PAUL ALLEN**

15         v.

16  FEDERAL BUREAU OF
    INVESTIGATION; ROBERT
17  MUELLER, DIRECTOR OF THE
    FEDERAL BUREAU OF
18  INVESTIGATION, in his official
    capacity; STEVEN M. MARTINEZ,
19  ASSISTANT DIRECTOR IN
    CHARGE, FEDERAL BUREAU OF
20  INVESTIGATION'S LOS ANGELES
    DIVISION, in his official capacity; J.
21  STEPHEN TIDWELL; BARBARA
    WALLS; PAT ROSE; KEVIN
22  ARMSTRONG; PAUL ALLEN,

23                Defendants.

24

25

26

27

28

Notice is hereby given that Defendants Pat Rose, Kevin Armstrong and Paul Allen in the above-named case, hereby appeal to the United States Court of Appeals for the Ninth Circuit from the Orders denying Defendants' Motion To Dismiss Plaintiffs' FISA Claim entered on the 14th day of August, 2012.  According to *Mitchell v. Forsyth,* 472 U.S. 511 (1985), the Court's denial of qualified immunity to Defendants Rose, Armstrong and Allen on the FISA claim is an "appealable 'final decision' within the meaning of 28 U.S.C. § 1291." *Id*. at 530.

Pursuant to Ninth Circuit Rule 3-2(b), a Representation Statement is attached hereto.


DATED: October 12, 2012          Respectfully submitted,

                                 SCHEPER KIM & HARRIS LLP
                                 DAVID C. SCHEPER
                                 ALEXANDER H. COTE
                                 ANGELA M. MACHALA



                                 By: /s/ Angela M. Machala
                                     Angela M. Machala
                                     Attorneys for Defendants Pat Rose, Kevin
                                     Armstrong and Paul Allen

1

**SCHEPER KIM & HARRIS LLP**
DAVID C. SCHEPER (State Bar No. 120174)
dscheper@scheperkim.com
ALEXANDER H. COTE (State Bar No. 211558)
acote@scheperkim.com
ANGELA M. MACHALA (State Bar No. 224496)
amachala@scheperkim.com
601 West Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
Telephone:  (213) 613-4655
Facsimile:   (213) 613-4656

**Attorneys for Defendants**
**Pat Rose, Kevin Armstrong and Paul**
**Allen**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| YASSIR FAZAGA, ALI UDDIN MALIK, YASSER ABDELRAHIM, <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL BUREAU OF INVESTIGATION; ROBERT MUELLER, DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION, in his official capacity; STEVEN M. MARTINEZ, ASSISTANT DIRECTOR IN CHARGE, FEDERAL BUREAU OF INVESTIGATION'S LOS ANGELES DIVISION, in his official capacity; J. STEPHEN TIDWELL; BARBARA WALLS; PAT ROSE; KEVIN ARMSTRONG; PAUL ALLEN, <br><br> Defendants. | CASE: SACV 11-00301-CJC(VBKx) <br><br> **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN** <br><br> **Date:**  February 10, 2012 <br> **Time:**  10:00 A.M. <br> **Court:** Hon. Cormac J. Carney |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................1

II. PLAINTIFFS' CLAIMS FAIL UNDER QUALIFIED IMMUNITY .............2

    A. Qualified Immunity Bars The First Amendment Claims .......................2

        1. The Lemon and Sherbert Tests Apply Here .................................2

        2. Plaintiffs Fail to Allege a Violation of the Lemon Test ..............6

        3. Plaintiffs Fail to Allege a Violation of the Sherbert Test............7

        4. Plaintiffs' Legal Theories Are Not "Beyond Debate".................8

    B. Qualified Immunity Bars The Fourth Amendment Claims ...................9

        1. Conversations Conducted in Monteilh's Presence ....................9

        2. Recording of Audio Communications.......................................10

        3. Video Surveillance..................................................................13

        4. Surveillance Devices in Mosques and Homes...........................14

    C. Plaintiffs' Equal Protection Claims Fail ............................................15

III. PLAINTIFFS ARE NOT ENTITLED TO A BIVENS REMEDY ...............16

    A. Plaintiffs' Claims Present a New Context for Bivens..........................16

    B. Privacy Act Displaces Plaintiffs' *Bivens* Claim ..................................20

IV. PLAINTIFFS' SECTION 1985(3) CLAIM FAILS.......................................22

V. PLAINTIFFS' ALLEGATIONS OF SUPERVISORY LIABILITY FAIL .......................................................................................23

VI. CONCLUSION ......................................................................................24

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Access Fund v. United States Dep't of Agric.,*
499 F.3d 1036 (9th Cir. 2007)..................................................................5

*American Family Association, Inc. v. City and County of San Francisco,*
277 F.3d 1114 (9th Cir. 2002)..........................................................3, 4, 5

*Arar v. Ashcroft,*
585 F.3d 559 (2d Cir. 2009) ............................................................16, 17

*Ashcroft v. al-Kidd,*
131 S. Ct. 2074 (2011) ..............................................................passim

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) ........................................................14, 18, 22

*Berry v. Hollander,*
925 F.2d 311 (9th Cir. 1991) ...............................................................18

*Bond v. United States,*
529 U.S. 334 (2000) ............................................................................10

*Card v. City of Everett,*
520 F.3d 1009 (9th Cir. 2008) ...............................................................5

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
508 U.S. 520 (1993) ..............................................................................4

*Davis v. Passman,*
442 U.S. 228 (1979) ............................................................................17

*Devereaux v. Perez,*
218 F.3d 1045 (9th Cir. 2000) ...............................................................7

*Downie v. City of Middleburg Heights,*
301 F.3d 688 (6th Cir 2002)..........................................................19, 21

*Fitzgerald v. Penthouse Int'l,*
776 F.2d 1236 (4th Cir. 1985) .............................................................15

*Girard v. 94th St. & Fifth Ave. Corp.,*
530 F.2d 66 (2d Cir. N.Y. 1976) .........................................................22

*Intri-Plex Techs., Inc. v. Crest Group, Inc.,*
499 F.3d 1048 (9th Cir. 2007)..............................................................24

*Katz v. United States,*
389 U.S. 347 (1967) ....................................................................10, 13

*Larson v. Valente,*
   456 U.S. 228 (1982) ............................................................. 5

*Libas Ltd. v. Carillo,*
   329 F.3d 1128 (9th Cir. 2003) ............................................ 20

*Lumpkin v. Brown,*
   109 F.3d 1498 (9th Cir. 1997) .............................................. 3

*Mirmehdi v. United States,*
   662 F.3d 1073 (9th Cir. Nov. 3, 2011) .......................... passim

*Mockaitis v. Harcleroad,*
   104 F.3d 1522 (9th Cir. 1997) ........................................... 11

*Moss v. United States Secret Serv.,*
   750 F. Supp. 2d 1197 (D. Or. 2010) ................................. 24

*Navajo Nation v. U.S. Forrest Service,*
   535 F.3d 1058 (9th Cir. 2008) ......................................... 7, 8

*O'Connor v. Ortega,*
   480 U.S. 709 (1987) ........................................................... 11

*Orin v. Barclay,*
   272 F.3d 1207 (9th Cir. 2001) ........................................... 15

*Presbyterian Church v. United States,*
   870 F.2d 518 (9th Cir. 1989) ............................................... 6

*Smith v. Maryland,*
   442 U.S. 735 (1979) ........................................................... 10

*Trujillo v. City of Ontario,*
   428 F. Supp. 2d 1094 (C.D. Cal. 2006) ............................ 11

*United States v. Aguilar,*
   883 F.2d 662 (9th Cir. 1989) ........................................... 5, 9

*United States v. Brathwaite,*
   458 F.3d 376 (5th Cir. 2006) ............................................. 13

*United States v. Davis,*
   326 F.3d 361 (2nd Cir. 2003) ............................................ 13

*United States v. Gering,*
   716 F.2d 615 (9th Cir. 1983) ........................................... 4, 6

*United States v. Mayer,*
   503 F.3d at 740 (9th Cir. 2007) ........................................ 10

*United States v. Nerber,*
   222 F.3d 597 (9th Cir. 2000) ....................................... 10, 12

*United States v. Taketa,*
    923 F.2d at 665 (9th Cir. 1991) ...................................................... 11, 12

*United States v. White,*
    401 U.S. 745 (1971) ................................................................................ 9

*Vasquez v. L.A. County,*
    487 F.3d 1246 (9th Cir. 2007) ............................................................... 3

*Vernon v. City of Los Angeles,*
    27 F.3d 1385 (9th Cir. 1994) ........................................................ passim

*Whren v. United States,*
    517 U.S. 806 (1996) ..................................................................... 1, 9, 10

*Wilkie v. Robbins,*
    551 U.S. 537 (2007) ................................................................ 16, 17, 19

*Wilson v. Libby,*
    535 F.3d 697 (D.C. Cir. 2008) ............................................................ 21

*Yendes v. McCulloch,*
    2010 U.S. Dist. LEXIS 86443 (Aug. 23, 2010) ................................. 12

## **Federal Statutes**

5 U.S.C. § 522a(e)(7) .................................................................................. 20

5 U.S.C. § 552a(g)(1)(D) ............................................................................ 22

88 Stat. 1896 ............................................................................................... 20

Fed. R. Civ. Proc. 12(d) ............................................................................. 24

Pub. L. No. 93-579, § 2(a)(4) ..................................................................... 20

Pub. L. No. 93-579, § 2(a)(5) ..................................................................... 20

## **Treatises**

John E. Nowak et al., Handbook on Constitutional Law (1978) ................ 15

# I.    INTRODUCTION

Plaintiffs contend that FBI Agents cannot "use religion as a factor in deciding whom to surveil," even as part of a post-9/11 counterterrorism investigation. (*See, e.g.,* Docket No. 63 ("Opp.") at 2:11-12.) But no case has ever recognized a right to be free from an investigation motivated in any way by religion. Even assuming that religion was "a factor" in their 2006-2007 decision to gather information on Plaintiffs, Agents Pat Rose, Kevin Armstrong and Paul Allen (the "Agent Defendants") had no reason to believe that they had violated Plaintiffs' constitutional rights. Accordingly, the Agent Defendants are immune from Plaintiffs' claims for money damages.

Qualified immunity protects all federal officers except "the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) ("*al-Kidd*"). The Agent Defendants deserve neither label, not the least because the Ninth Circuit held almost twenty years ago that a religiously motivated investigation does *not* necessarily offend the First Amendment. *See Vernon v. City of Los Angeles,* 27 F.3d 1385 (9th Cir. 1994) ("*Vernon*"). Similarly, for decades the Supreme Court has rejected "Fourth Amendment challenges based on the actual motivations of individual officers." *Whren v. United States,* 517 U.S. 806, 813 (1996). These holdings squarely defeat Plaintiffs' First and Fourth Amendment arguments for prohibiting religiously-motivated investigations.

In the face of these authorities, Plaintiffs' quest to enlarge the scope of the First and Fourth Amendments is a nonstarter with respect to the Agent Defendants. That is true even if Plaintiffs convince this Court, in 2012, to prohibit the use of religion as a factor in a counterterrorism investigation, because that right was not "beyond debate" in 2006. *al-Kidd* at 2083. While the Plaintiffs are free to litigate, with the United States government, the question of whether religion can play any factor in an investigation, the Agent Defendants nonetheless "deserve[] qualified immunity even assuming—contrafactually—that [their conduct] violated the"

1    Constitution. *Id.* at 2085. Accordingly, the Agent Defendants respectfully request

2    that each of Plaintiffs' causes of action against them be dismissed.

3    **II.    PLAINTIFFS' CLAIMS FAIL UNDER QUALIFIED IMMUNITY**

4         To overcome qualified immunity, Plaintiffs bear the burden of pleading facts

5    showing "that the right was 'clearly established' at the time of the challenged

6    conduct." *al-Kidd* at 2080. Plaintiffs allege they have a right to be free from any

7    investigation that "used religion as a factor in deciding whom to surveil . . . even if

8    they employ religion as only one factor (rather than the sole factor)." (Opp. at 2:10-

9    17; *see also* Docket No. 64 at 21:15-18 ("Plaintiffs' theory does not require that they

10   prove that religion is the 'sole' reason for their having been targeted for intrusive

11   surveillance, but rather only that religion was 'a' reason that they were targeted").)

12        To be clearly established, "existing precedent must have placed the statutory

13   or constitutional question beyond debate." *al-Kidd* at 2083 (internal cites and quotes

14   omitted). "[C]onduct violates clearly established law when, at the time of the

15   challenged conduct, the contours of a right are sufficiently clear that every

16   reasonable official would have understood that what he is doing violates that right."

17   *Id.* The Supreme Court has consistently advised courts "not to define clearly

18   established law at a high level of generality." *Id.* at 2084 (general rule that "an

19   unreasonable search or seizure violates the Fourth Amendment is of little help in

20   determining whether the violative nature of particular conduct is clearly

21   established."). "When properly applied, [qualified immunity] protects all but the

22   plainly incompetent or those who knowingly violate the law." *Id.* (quote omitted).

23        **A.    <u>Qualified Immunity Bars The First Amendment Claims</u>**

24             ***1.    The Lemon and Sherbert Tests Apply Here***

25        As a threshold matter, Plaintiffs dispute the proper framework to apply to

26   their First Amendment claims. Plaintiffs contend that, "[u]nder long-established

27   precedent, facial discrimination against a given religious group is subject to strict

28   scrutiny under either [the Free Exercise or Establishment] clause." (Opp. at 29:22-

2

24.) However, Plaintiffs disregard controlling Ninth Circuit authority (namely *Vernon*) requiring that a challenge to a religiously motivated investigation satisfy the *Lemon* and *Sherbert* tests typically applied to First Amendment claims.

While *Vernon* was discussed in the Agent Defendants' motion, it is worth reviewing the facts of that case in particular detail here in light of Plaintiffs' arguments in the Opposition.  In *Vernon*, the City of Los Angeles investigated Los Angeles Assistant Chief of Police Robert Vernon after City Council members expressed concern that his religious views could "improperly affect[] the operations of the LAPD." *Vernon* at 1389-90. Members of the City Council leaked a letter to the press regarding the potential investigation and made public statements identifying Vernon's religious beliefs as the impetus for the investigation.[1] *Id.* For his part, Vernon responded publicly "that investigating me because of my beliefs is against the law. It's against my rights as an individual." *Id.* The investigation found no wrongdoing, and no action was taken against Vernon. *Id.* After the investigation concluded, Vernon filed a Section 1983 claim alleging that the investigation violated his "rights under the Free Exercise and Establishment Clauses of the First Amendment, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment." *Id.* Particularly, Vernon objected to "an investigation into the potentially improper impact of his religious beliefs upon his job as Assistant Chief of Police." *Id.* at 1396. The district court granted summary judgment to the investigating officers, and Vernon appealed to the Ninth Circuit. *Id.* at 1390-91.

The Ninth Circuit affirmed the district court's application of the *Lemon* and

---

[1] The Ninth Circuit has repeatedly characterized *Vernon* as a First Amendment challenge to a religiously motivated investigation. *See, e.g., Vasquez v. L.A. County*, 487 F.3d 1246, 1256 (9th Cir. 2007); *American Family Association, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1121-22 (9th Cir. 2002); *Lumpkin v. Brown*, 109 F.3d 1498, 1502 (9th Cir. 1997).

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

SER 10

1   *Sherbert* tests to Vernon's First Amendment claims. With respect to Vernon's Free

2   Exercise claims, the Ninth Circuit held that "[u]nder *Sherbert*, the plaintiff must first

3   establish that the government has placed a substantial burden on his or her free

4   exercise of religion." *Vernon* at 1393; *see also United States v. Gering*, 716 F.2d

5   615, 619 (9th Cir. 1983) (holding that a government investigation did not violate the

6   Free Exercise Clause where appellant failed to show a burden on his free exercise

7   rights). With respect to Vernon's Establishment Clause claims, the Ninth Circuit

8   applied *Lemon* and concluded that the City's investigation "clearly had a valid

9   secular purpose," that "the investigation [could not] be construed to send as its

10  *primary* message the disapproval of Vernon's religious beliefs," and that the

11  investigation posed no risk of excessive entanglement, and therefore affirmed

12  summary judgment against Vernon. *Vernon* at 1396-1401.

13      Plaintiffs' claim is virtually indistinguishable from Vernon's claim. Both

14  cases involve an investigation into wrongdoing by the plaintiff, based at least in part

15  on the targets' religious beliefs. In both cases, nothing ultimately came of the

16  investigation. In both cases, plaintiffs claimed that the investigation infringed the

17  Free Exercise and Establishment clauses of the Constitution. Yet, although the

18  *Vernon* court applied the *Lemon* and *Sherbert* tests to the investigation there,

19  Plaintiffs demand a different test here.

20      First, with respect to the application of *Sherbert* to their Free Exercise claim,

21  Plaintiffs contend that "the Supreme Court in *Smith* sharply narrowed applicability

22  of the 'substantial burden test'" and that the proper test is found in *Church of*

23  *Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993). (Opp. at 35:15-36:12.)

24  However, the Ninth Circuit has repeatedly rejected these arguments. In *Vernon*, the

25  plaintiff also argued that *Smith,* not *Sherbert,* provided the relevant test, but the

26  Ninth Circuit rejected this argument "because this Circuit has held that the *Smith*

27  analysis is ***inapplicable*** to Free Exercise claims such as the plaintiff's." *Vernon* at

28  1393 n. 1 (emphasis added). Similarly, in *American Family*, plaintiffs argued that

---

4

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

**SER 11**

1  under *Lukumi* "they are not required to demonstrate a 'substantial burden' on their

2  religion." 277 F.3d at 1124. The Ninth Circuit flatly rejected that argument, stating

3  that "[p]laintiffs overlook a critical distinction, however: in this case, there is no

4  actual 'law' at issue." *Id.* The court added that post-*Smith* the Ninth Circuit

5  continued "to apply the *Sherbert* substantial burden test to government conduct that

6  did not involve an actual regulation or criminal law." *Id.* After citing *Vernon*

7  favorably, the Ninth Circuit concluded that "there does not appear to be ***any case in***

8  ***this circuit*** applying *Smith* or *Lukumi* to some non-regulatory or non-compulsory

9  governmental action – in other words to something other than an actual *law*." *Id.*

10  (emphasis added). The distinction drawn in *Vernon* and clarified in *American*

11  *Family* – that allegedly discriminatory *laws* are treated differently than

12  discriminatory *conduct* – applies with equal force here.

13       Second, with respect to the application of *Lemon* to their Establishment

14  Clause claim, Plaintiffs assert that their claim merits strict scrutiny under *Larson v.*

15  *Valente,* 456 U.S. 228 (1982). (Opp. at 33:1-34:13.) Yet, *Larson* is distinguishable

16  for the same reason as *Lukumi* and *Smith:* it did not address *government conduct*

17  generally, but rather a statute that imposed burdens on religious contributions.

18  *Larson*, 456 U.S. at 231. More importantly – especially in light of Plaintiffs' burden

19  to identify a constitutional right that is beyond debate in order to overcome qualified

20  immunity – *Vernon* is also consistent with the law in this Circuit that departures

21  from the *Lemon* test are the exception, not the rule. *Access Fund v. United States*

22  *Dep't of Agric.*, 499 F.3d 1036, 1042 (9th Cir. 2007) (*Lemon* is the general

23  constitutional framework in all but a few narrow exceptions); *see also Card v. City*

24  *of Everett*, 520 F.3d 1009, 1013, 1015 (9th Cir. 2008) (same).

25       Finally, *Vernon* post-dates *Larson* (and *Smith* and *Lukumi),* and has never

26  been overruled or called into question. To the contrary, the Ninth Circuit has

27  repeatedly rejected First Amendment challenges to investigative conduct directed at

28  religion. *United States v. Aguilar,* 883 F.2d 662 (9th Cir. 1989) (First Amendment

5

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

**SER 12**

1  did not prohibit undercover investigation targeting members of a particular religious

2  congregation); *Presbyterian Church v. United States*, 870 F.2d 518, 527 (9th Cir.

3  1989) (undercover investigation did not violate church's rights under the Free

4  Exercise Clause); *United States v. Gering*, 716 F.2d 615 (9th Cir. 1983) (approving

5  investigative method directed at a minister). In light of these controlling authorities,

6  the Court should decline Plaintiffs' invitation to depart from the standard *Lemon* and

7  *Sherbert* tests applied by the Ninth Circuit in *Vernon*.

8        **2.**     ***Plaintiffs Fail to Allege a Violation of the Lemon Test***

9        As *Vernon* makes clear, Plaintiffs must allege a violation of the three-part

10  *Lemon* test to state an Establishment Clause claim. In just a single sentence,

11  Plaintiffs offer a half-hearted attempt to satisfy *Lemon*. (Opp. at 34:14-35:13.) First,

12  Plaintiffs essentially admit that the government had the secular purpose of

13  investigating terrorism. (Opp. at 34:15-35:4). Although Plaintiffs take exception to

14  the alleged scope of the investigation, its actual purpose is not in dispute.

15        Second, Plaintiffs claim that investigating Muslims conveys a message of

16  disapproval, which is irreconcilable with *Vernon*'s conclusion that an investigation,

17  even if motivated by religion, does not offend the Constitution if the primary

18  purpose is the investigation of impermissible conduct by the target. *Vernon* at 1398-

19  98. In *Vernon*, the investigation concerned "whether [Vernon's] *religious views*

20  were having an impermissible effect on his on-duty police department

21  performance." *Id.* at 1388 (emphasis added). The Ninth Circuit took note of several

22  documents that explicitly identified Vernon's religious views as the impetus for the

23  challenged investigation. *Id.* at 1389-90, 1397-99. Notably, the court found that, in

24  spite of the public nature of the investigation, its primary message was not the

25  disapproval of Vernon's religious beliefs: "[n]otwithstanding the fact that one may

26  infer possible city disapproval of Vernon's religious beliefs from the direction of the

27  investigation, this cannot objectively be construed as the primary focus or effect of

28  the investigation." *Id.* at 1399. Here, Plaintiffs admit that the investigation had a

6

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

**SER 13**

1  valid secular purpose – counterterrorism – and therefore the same conclusion

2  applies.

3     Third, Plaintiffs allege there was administrative entanglement based on the

4  duration and type of the investigation conducted. (Opp. at 35:10-13.) However,

5  Plaintiffs make absolutely no effort to discuss any of the three factors of the

6  administrative entanglement inquiry. *See Vernon*, 27 F.3d at 1399. This omission by

7  Plaintiffs weighs heavily in favor of the Agent Defendants because when "the

8  existence of a right or the degree of protection it warrants in a particular context is

9  subject to a balancing test, the right can rarely be considered clearly established at

10 least in the absence of closely corresponding factual and legal precedent."

11 *Devereaux v. Perez*, 218 F.3d 1045, 1055 (9th Cir. 2000). Since the investigation in

12 *Vernon* satisfied the third prong of the *Lemon* test, and Plaintiffs have not cited a

13 single factually similar case to the contrary, Plaintiffs have failed to allege a

14 violation of the *Lemon* test.

15        **3.**  ***Plaintiffs Fail to Allege a Violation of the Sherbert Test***

16    With respect to their Free Exercise claim, Plaintiffs purport to satisfy

17 *Sherbert's* "substantial burden" test by alleging that the FBI "'discourage[d]'

18 mosque attendance and religious practice." (Opp. at 56:9-58:4.) However, under

19 *Vernon*, Plaintiffs' alleged burdens are nothing more than subjective chilling effects

20 that are not constitutionally cognizable. *See Vernon*, 27 F.3d at 1395; *see also*

21 *Navajo Nation v. U.S. Forrest Service*, 535 F.3d 1058, 1070 (9th Cir. 2008) (holding

22 that free exercise of religion can only be burdened when "individuals are forced to

23 choose between following the tenets of their religion and receiving a governmental

24 benefit (*Sherbert)*[,] or coerced to act contrary to religious beliefs by the threat of

25 civil or criminal sanctions (*Yoder*)."). Plaintiffs fail to cite any authority in support

26 of their argument that "discrimination itself" constitutes a burden on the free

27

28

1  exercise of religion.[2] (Opp. at 57:7-21.) Plaintiffs' claim that the FBI "made

2  surveillance a condition of religious practice" is also unsupported by any authority

3  and is inconsistent with *Vernon* and *Navajo Nation*. (*id.* at 56:25-57:6.) Finally,

4  Plaintiffs' alleged decisions to decrease mosque attendance and to alter their dress,

5  grooming and donations, (*id.* at 57:22-58:4), were not brought about by any threat of

6  civil or criminal sanctions, and therefore do not satisfy the test articulated in *Navajo*

7  *Nation*.[3]

8  ### 4.    *Plaintiffs' Legal Theories Are Not "Beyond Debate"*

9  Plaintiffs offer no basis to distinguish the instant case from *Vernon*. Instead,

10  they base their legal theories on a patchwork of isolated statements from a wide

11  range of discrimination cases that have nothing to do with religiously motivated

12  investigations.[4] This piecemeal approach could not inform the Agent Defendants of

13  _____

14  [2] None of Plaintiffs' proffered authorities even address the First Amendment. (Opp.
15  at 57:7-21 (*citing Saenz* (right to travel), *City of Jacksonville* (race based
      preferences), *Allen* (IRS tax guidelines).)

16  [3] Because RFRA protects the same religious freedoms embodied by the Free
17  Exercise Clause, the analysis of both claims is the same. *Navajo Nation,* 535 F.3d at
18  1070. Accordingly, Plaintiffs' RFRA clams fail for the same reasons as their Free
      Exercise claims.

19  [4] Of the approximately 37 cases cited by Plaintiffs in support of their First
20  Amendment claims, not one grapples with these issues as directly and explicitly as
21  *Vernon*. Plaintiffs repeatedly cite to cases involving; 1) race and gender based
      affirmative action: (*Gratz*; *Hayden*; *Adarand*); 2) First Amendment Free Speech:
22  (*Brown v. Ent. Merch. Ass'n*; *Consol. Edison Co.*; *Mt. Healthy City School Dist. Bd.
      Of Educ.*); 3) city ordinances: (*McCreary*; *Lukumi*; *Larson*; *McDaniel*; *Braunfeld*;
23  *Fowler; Niemotko*; *Vision Church*; *Tenafly Eruv Ass'n, Inc.*); 4) zoning and
24  construction decisions: (*Lyng*; *Village of Arlington Heights*); 5) state statutes:
      (*Smith*; *Bernal*; *Yoder*; *Wirzburger*); 6) federal laws and regulations: (*Gillette*; *Gary
25  S.*; *Hartmann*); 7) taxes: (*Hernandez*; *Jimmy Swaggart Ministries*; *Sklar*); 8)
26  prisoner rights: (*Cooper*; *Vinning-El*; *Rouser*); or 9) otherwise having nothing to do
      with an investigation: (*Safford Unif. Sch. Dist.*; *Johnson Controls, Inc.*; *Armstrong*;
27  *Cnty of Allegheny*; *Alpha Delta Chi-Delta Chapter*). These cases are of little to no
28  (footnote continued)

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

1  "the contours of a right" in a way that is "sufficiently clear," so as to place the
2  constitutional question "beyond debate." *al-Kidd* at 2083. A decision here that
3  Plaintiffs had an absolute right to be free from a religiously motivated investigation
4  would break new ground in First Amendment jurisprudence.[5] Therefore, the Agent
5  Defendants are immune to Plaintiffs' damages claims under the First Amendment.

6       **B.**    **Qualified Immunity Bars The Fourth Amendment Claims**

7          ***1.***    ***Conversations Conducted in Monteilh's Presence***

8       An audio recording, made with the consent of one of the participants in the
9  conversation, is not a search under the Fourth Amendment. *See, e.g., United States*
10  *v. White*, 401 U.S. 745, 749 (1971); *Aguilar,* 883 F.2d at 699. Plaintiffs attempt to
11  avoid this "invited informer doctrine" by arguing that the audio recordings were
12  made in "bad faith," *i.e.*, for the purpose of violating their First Amendment rights.
13  (Opp. at 71-72). However, motives are irrelevant to the Fourth Amendment analysis.
14  *al-Kidd* at 2080 ("the Fourth Amendment regulates conduct rather than thoughts.").
15  The Supreme Court has "almost uniformly rejected invitations to probe subjective
16  intent." *al-Kidd* at 2081; *see also Whren v. United States,* 517 U.S. 806, 812 (1996)
17  ("Not only have we never held, outside the context of inventory search or
18  administrative inspection [], that an officer's motive invalidates objectively
19  justifiable behavior under the Fourth Amendment; but we have repeatedly held and
20  asserted the contrary.").

21       Plaintiffs' citations to *Mayer* and *Aguilar* are not to the contrary. The "good
22  faith" requirement articulated in *Aguilar* and *Mayer* is not a Fourth Amendment

23  _____

24  utility in determining the constitutionality of a law enforcement investigation
25  concerned with national security. (*See* Opp. at 29-47.)

26  [5] In their opposition, Plaintiffs take the position that religion cannot be any factor in
a decision to gather information; even if Plaintiffs had alleged that religion was the
27  *sole* criteria, *Vernon* controls and defeats even that claim.

28

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

SER 16

1  limitation, but a Fifth Amendment limitation on investigations. *See United States v.*

2  *Mayer,* 503 F.3d at 740, 751 (9th Cir. 2007) ("Good faith has been an implicit

3  requirement for investigations under the Fifth Amendment."); *Cf.*, *Whren*, 517 U.S.

4  at 813 ("the constitutional basis for objecting to intentionally discriminatory

5  application of laws is the Equal Protection Clause, not the Fourth Amendment").

6  Plaintiffs' allegations of "bad faith" are irrelevant to their Fourth Amendment

7  claims.

8                    **2.    *Recording of Audio Communications***

9         Plaintiffs Malik and AbdelRahim argue that they have a valid Fourth

10  Amendment claim based on alleged audio recordings made by Monteilh, but outside

11  his presence, during *halaqas* and other intimate religious discussion groups in the

12  mosque. (Opp. at 67-68.) However, not one of the numerous cases cited by Plaintiffs

13  comes close to clearly establishing an expectation of privacy in such a setting. The

14  expectation of privacy that one has while in the presence of others in a mosque

15  prayer hall that is open to the public is undoubtedly different than the expectation of

16  privacy one has while alone in a hotel room (*Nerber*) or public phone booth (*Katz*),

17  or the expectation of privacy one has while in one's office (*Taketa* and *O'Connor*)

18  or while undressing in a locker room that is inaccessible to the public (*Trujillo*).

19         Unlike the cases cited by Plaintiffs, Malik and AbdelRahim do not allege that

20  they took steps to prevent disclosure to other inhabitants of the prayer hall – *i.e.*,

21  they cannot show that by their conduct they "'[sought] to preserve [something] as

22  private.'" *Bond v. United States*, 529 U.S. 334, 338 (2000) (quoting *Smith v.*

23  *Maryland*, 442 U.S. 735, 740 (1979)). *Cf. United States v. Nerber*, 222 F.3d 597,

24  603 (9th Cir. 2000) (finding a subjective expectation of privacy in a hotel room

25  when a person closed the door, drew the blinds, and exercised dominion in the

26  room); *Bond*, 529 U.S. at 338 (placing an object in an opaque bag and placing the

27  bag above one's seat while on a bus was sufficient to establish a subjective

28  expectation of privacy); *Katz v. United States*, 389 U.S. 347, 352 (1967) (one who

10

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

SER 17

1  occupies a phone booth, shuts the door behind him, and pays the toll is "entitled to
2  assume that the words he utters into the mouthpiece will not be broadcast to the
3  world"); *United States v. Taketa*, 923 F.2d at 665, 677 (9th Cir. 1991) (finding it
4  "noteworthy" that defendant's office was not open to the public and that he was
5  videotaped at a time when other people would not normally be present); *O'Connor
6  v. Ortega*, 480 U.S. 709, 724 (1987) (plaintiff had a reasonable expectation of
7  privacy in his office where undisputed evidence showed that he did not share his
8  desk or file cabinets with any other employees and that he kept personal items in his
9  office); *Trujillo v. City of Ontario*, 428 F. Supp. 2d 1094, 1102 (C.D. Cal. 2006)
10 (plaintiffs "took measures that significantly limited the number of people who could
11 observe their private activities" while in a locker room).

12        Instead of alleging that they took steps to preserve their privacy, Plaintiffs
13 assert that there was a religious "custom" of privacy in the location where they were
14 allegedly recorded. (*See* Opp. at 69.) However, the one case cited in support of this
15 position, *Mockaitis v. Harcleroad*, 104 F.3d 1522, 1533 (9th Cir. 1997), involved
16 the audio recording of a confession by an inmate to a Catholic priest. As discussed
17 at length in that case, the priest in question had a reasonable expectation of privacy
18 given the fact "the history of the nation has shown a uniform respect for the
19 character of sacramental confession as inviolable by government agents interested in
20 securing evidence of crime from the lips of criminal." *Id.* at 1532-33 (describing the
21 "inviolability of religious confession to the clergy" as "the law of the land"). From
22 the point of view of an FBI Agent in 2006, the expectation of privacy during a one-
23 on-one communication between a priest and a confessor is radically different than
24 the expectation held by participants in public conversations held in small groups in
25 an open prayer hall. Plaintiffs also rely heavily on the allegation that there was an
26 "explicit rule" against audio and video recording in the mosque. (Opp. at 69.)
27 However, Plaintiffs do not cite any cases in which such a rule was, on its own,
28 sufficient to establish a reasonable expectation of privacy or that such a rule could

11

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

SER 18

1    bar an otherwise legal recording.

2         In addition, most of the cases relied on by Plaintiffs (*Nerber*, *Taketa*, *Trujillo*,

3    and *Bernhard*) involve the reasonable expectation to be free from hidden *video* – not

4    *audio* – surveillance. However, as Plaintiffs themselves point out later in their brief

5    (*see* Opp. at 70-71), video surveillance is "one of the most intrusive investigative

6    mechanisms available to law enforcement," and is treated quite differently than

7    audio surveillance. *Nerber*, 222 F.3d at 603 (internal citations omitted); *Taketa*, 923

8    F.2d at 677 (recognizing the "exceptional intrusiveness of video surveillance" and

9    stating "Our holding is limited to warrantless video surveillance for law

10   enforcement purposes"). Accordingly, Plaintiffs' reliance on video surveillance

11   cases is misplaced.

12        Plaintiffs cite just one case involving warrantless audio surveillance, *Yendes

13   v. McCulloch*, 2010 U.S. Dist. LEXIS 86443 (Aug. 23, 2010), and argue that this

14   case alone shows that the law "clearly establishes" that the Fourth Amendment did

15   not permit warrantless audio surveillance here. (*See* Opp. at 66.) *Yendes* is easily

16   distinguishable, on two grounds. First, if *Yendes* establishes any principle of law, it

17   does so too late to have provided the Agent Defendants with notice, "at the time of

18   the challenged conduct," that their conduct was prohibited. *al-Kidd* at 2083. (*See*

19   FAC ¶ 48 (FBI used Monteilh between July 2006 and October 2007).) Second,

20   *Yendes* concluded that those plaintiffs' expectation of privacy was reasonable

21   because plaintiffs had a "formal arrangement" with a motel for their exclusive use of

22   a conference room. *Yendes*, 2010 U.S. Dist. LEXIS 86443 at *19. Here, Plaintiffs

23   can claim no similar arrangement in the open prayer hall of the mosque. Moreover,

24   the court in *Yendes* held as a matter of law that the plaintiffs had no legitimate

25   expectation of privacy when audio surveillance took place *while the conference

26   room was open to the public*. *Id*. at *21-22. Plaintiffs do not allege that the prayer

27

28

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

**SER 19**

1  hall was closed to the public during the religious discussion groups.[6] Accordingly, if

2  the alleged recording in the prayer hall of the mosque by unattended devices

3  violated the Fourth Amendment, that violation was not "beyond debate" at the time.[7]

4  ### 3.    *Video Surveillance*

5  Plaintiffs contend that the invited informer doctrine is inapplicable to video

6  surveillance conducted by Monteilh in AbdelRahim's home. (Opp. at 70.) In support

7  of this proposition, Plaintiffs point to *dicta* in *Nerber*, where the court expressed

8  "*suspicion*" that an "informant's presence and consent is insufficient to justify the

9  warrantless *installation* of a hidden video camera in a suspect's home." (Opp. at

10  70:19-21 (quoting *Nerber* 222 F.3d at 604 n.5) (emphasis added).) However, the

11  Ninth Circuit's "suspicion" in *dicta* about how the law might develop in the future

12  does not place the Constitutional question "beyond debate." *al-Kidd* at 2083.

13  Moreover, Plaintiffs do not allege that anyone *installed* video equipment in

14  AbdelRahim's home. Rather, Plaintiffs allege that Monteilh had the video camera

15  hidden "in a shirt button." (*See, e.g.,* FAC ¶¶ 108 128-129, 174, 202.)

16  Plaintiffs also argue that private homes are "subject to the most stringent

17  Fourth Amendment protection." (Opp. at 70.) However, homes are not treated

18  differently under the invited informer doctrine. *See United States v. Brathwaite*, 458

19  F.3d 376, 380-81 (5th Cir. 2006) (no expectation to be free from video surveillance

20  once defendant invited the informant into his home); *United States v. Davis*, 326

21  F.3d 361, 366 (2nd Cir. 2003) (same); *Cf.*, *Katz*, 389 U.S. at 351. Here, AbdelRahim

22  consented to Monteilh's presence when he invited Monteilh into his home, and his

23  misplaced confidence in Monteilh precludes a Fourth Amendment claim for such

24  _____

25  [6] Even if *Yendes* supported Plaintiffs' contention here, a single district court case
cannot place a constitutional question "beyond debate." *al-Kidd* at 2083.

26
27  [7] Because Plaintiffs did not have a reasonable expectation of privacy in the
circumstances alleged, Plaintiffs' FISA claim also fails. *See* Motion at 34-35.

28

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN
**SER 20**

1 video surveillance. But in any event, Plaintiffs' theory that the Fourth Amendment

2 prohibits video recording in the home by an invited informer was not beyond debate

3 at the time it allegedly occurred.

### 4.    *Surveillance Devices in Mosques and Homes*

5    As noted in the Motion, Plaintiffs' allegation that Agents Allen and

6 Armstrong "caused" electronic surveillance equipment to be installed at mosques,

7 including the Mission Viejo mosque, and used it to monitor conversations held in

8 "parts of the mosque not open to the public, including Sheikh Fazaga's office," is

9 just the sort of conclusory allegation that should not survive a motion to dismiss

10 under *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("*Iqbal*"). (FAC ¶ 95.) The

11 utter lack of any details – how many devices were planted? in which mosques? who

12 discovered them? where were they installed? how long were they operative? – is

13 telling, and renders these assertions implausible. Moreover, the authorities cited by

14 Plaintiffs on this point are inapposite. (Opp. at 66-67.)[8]

15    Plaintiffs' allegation that Agents Armstrong and Allen told Monteilh that the

16 FBI had electronic listening devices in AbdelRahim's home, car, and phone is

17 similarly lacking in specificity and plausibility. Moreover, Plaintiffs fail to allege

18 any specific personal involvement by Agents Armstrong, Allen and Rose in

19 installing such alleged devices. These conclusory statements therefore fail to allege

20 any facts from which the Court could "draw the reasonable inference that the

21 defendant is liable for the misconduct alleged." *Iqbal* at 1949.

22    Finally, as noted in the Motion, litigation of Plaintiffs' vague allegations of

23 listening devices installed in unnamed mosques and in Abdelrahim's home, car and

---

25 [8] *See* Opp. at 66-67 (*citing Moss* (denying 12(b)(6) where plaintiffs' complaint

26 included detailed factual allegations that "provide[d] context" for the events and alleged direct personal conduct by defendants) and *Mora* (summary judgment on

27 Fourth Amendment claim involving an unreasonable vehicle stop and arrest).

1   phone will be foreclosed if the Court upholds the state secrets privilege. *See* Motion

2   at 33. As the government has made plain, all "sources and methods" of the

3   investigation (except for conduct by Monteilh) are privileged. (Docket No. 55 at

4   43:3-8.) If the Court agrees, Plaintiffs will necessarily be precluded from litigating

5   the allegation that unidentified officers installed unidentified devices in unidentified

6   places.  Although Plaintiffs argue that the individual defendants may not assert the

7   privilege for themselves (Opp. at 67), Defendants *are* entitled to identify claims that

8   cannot be litigated as a result of the privilege.  *See Fitzgerald v. Penthouse Int'l*, 776

9   F.2d 1236, 1239 n.4 (4th Cir. 1985) (rejecting the argument that private parties

10  cannot argue the effect of the government's assertion of the state secrets privilege).

11  Because Plaintiffs' claims could not be litigated if these methods are privileged, the

12  claim must be dismissed.[9]

13      **C.      Plaintiffs' Equal Protection Claims Fail**

14          Defendants moved to dismiss Plaintiffs' Seventh Cause of Action for

15  violation of the Fifth Amendment's Equal Protection Clause because "[i]t is

16  generally unnecessary to analyze laws which burden the exercise of First

17  Amendment rights by a class of persons under the equal protection guarantee,

18  because the substantive guarantees of the Amendment serve as the strongest

19  protection against the limitation of these rights." *Orin v. Barclay*, 272 F.3d 1207,

20  1213 (9th Cir. 2001) (*citing* John E. Nowak et al., Handbook on Constitutional Law

21  (1978)). Plaintiffs do not dispute this fundamental point, and instead concede that

22  the viability of their Equal Protection claim stands or falls with the First

23  _____

24  [9] In an effort to avoid the dismissal of their claims, Plaintiffs argue in opposition to
    the government's motion that their case "likely will not require information about

25  whether or how any particular sources and methods – other than Monteilh himself
    and the surveillance he assisted in conducting – were employed." (Docket No. 64 at

26  40.) This is flatly inconsistent with Plaintiffs' efforts to recover money damages

27  from the Agent Defendants for the conduct unrelated to Monteilh described above.

28

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

1   Amendment claims. (Opp. at 64:14-16 ("Because Plaintiffs have stated a claim for

2   religious discrimination under the First Amendment . . they have also stated an

3   Equal Protection claim"). Accordingly, to the extent the Court dismisses Plaintiffs'

4   First Amendment claims against the Agent Defendants, the Seventh Cause of Action

5   should also be dismissed.

6   ## III.   PLAINTIFFS ARE NOT ENTITLED TO A BIVENS REMEDY

7           In opposition to Defendants' motion to dismiss their *Bivens* claims, Plaintiffs

8   argue (1) that their complaint does not invoke *Bivens* in a "new context" and (2) that

9   the Privacy Act does not provide them with an adequate alternative remedy to

10  *Bivens*. (Opp. at 8-17.) For the reasons that follow, both arguments fail.

11          ### A.   <u>Plaintiffs' Claims Present a New Context for Bivens</u>

12          In arguing that their claims do not present a "new context," Plaintiffs

13  overlook *Mirmehdi v. United States*, 662 F.3d 1073 (9th Cir. Nov. 3, 2011)

14  (decision attached hereto), a controlling authority directly on point, issued after

15  Defendants moved to dismiss but before Plaintiffs opposed. *Mirmehdi* considered

16  whether a suit brought by "illegal immigrants to recover for unlawful detention

17  during deportation proceedings" presented a "new context" for *Bivens*. *Mirmehdi* at

18  7. The court cautioned that this question could not be answered "at a high level of

19  generality [because that] would invite claims in every sphere of legitimate

20  governmental action touching, however tangentially, on a constitutionally protected

21  interest." *Id.* (*citing Wilkie v. Robbins*, 551 U.S. 537, 561 (2007)("*Wilkie*")).

22  Accordingly, the court adopted the following definition of "context": "a potentially

23  recurring scenario that has similar legal and factual components." *Id.* (*citing Arar v.

24  Ashcroft*, 585 F.3d 559, 571 (2d Cir. 2009)("*Arar*")).

25          With this definition in mind, the Ninth Circuit found that "deportation

26  proceedings" are "unique from other situations where an unlawful detention may

27  arise," in part because an alien's rights are not coextensive with those offered to

28  citizens. *Id.* Thus, the Ninth Circuit took into account not just the constitutional

16

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

**SER 23**

1    claim (*i.e.*, unlawful detention), but also the reason for the detention (a pending

2    immigration proceeding) and the legal status of the Plaintiffs (illegal aliens) in

3    defining the relevant context. This level of specificity followed *Arar*, an *en banc*

4    decision of the Second Circuit. There, the court faced a *Bivens* challenge to the

5    government's "extraordinary rendition" program. *Arar* at 569. *Arar* found

6    extraordinary rendition to be a new context for *Bivens*, because it is a "distinct

7    phenomenon in international law," particularly in light of the allegation of

8    "complicity or cooperation of United States government officials in the delivery of a

9    non-citizen to a foreign country for torture." *Arar* at 572. In finding a "new

10   context," the Second Circuit took into account not just the constitutional right

11   allegedly violated, but also the specific actions of the defendant officers and the

12   international ramifications of the claim. *Id.* Neither case defined the relevant context

13   solely by reference to the alleged constitutional violation or similar "high level of

14   generality."

15       Here, Plaintiffs seek monetary relief from federal officers who "targeted them

16   for investigation because of their religion." (Opp. at 8:23-25.) Plaintiffs contend that

17   this is not a "new context" in light of *Davis v. Passman,* 442 U.S. 228 (1979)*,* which

18   purportedly applied *Bivens* to all types of "unconstitutional discrimination by federal

19   officials." (Opp. at 9:1.) But "unconstitutional discrimination" is too "high [a] level

20   of generality" to define a "context" for purposes of *Bivens* – it describes no

21   "potentially recurring scenario that has similar legal and factual components."

22   *Mirmehdi* at 7. Instead, the context in *Davis* was gender based "employment

23   discrimination in violation of the Due Process Clause," not discrimination generally,

24   as courts have repeatedly recognized. *Mirmehdi* at 6 (*citing Arar* at 559); *see also*

25   *Wilkie* at 549-550 (describing *Davis* in same terms).

26       Indeed, Plaintiffs' reading of *Davis* cannot be squared with *Iqbal,* where the

27   Supreme Court cast serious doubt on a "religious discrimination" *Bivens* claim. In

28   *Iqbal*, the plaintiff alleged that he had been detained "on account of his race,

17

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

SER 24

1   religion, or national origin, in contravention of the First and Fifth Amendments to

2   the Constitution," but the Court noted its reluctance to extend *Bivens* to "any new

3   context," and concluded:

4        That reluctance might well have disposed of respondent's First

5        Amendment claim of ***religious discrimination***. For while we have

6        allowed a *Bivens* action to redress a violation of the equal protection

7        component of the Due Process Clause of the Fifth Amendment, ***see***

8        ***Davis v. Passman***, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846

9        (1979), ***we have not found an implied damages remedy under the***

10       ***Free Exercise Clause.*** Indeed, we have declined to extend Bivens to a

11       claim sounding in the First Amendment.

12  129 S. Ct. at 1948 (emphasis added). *Iqbal* clearly regarded a "religious

13  discrimination" claim as a new context, squarely rejecting Plaintiffs' theory that

14  religious discrimination claims arise "directly under *Davis.*" (Opp. at 9:4-5.)

15       Plaintiffs attempt to rescue their *Bivens* claim by arguing that prior cases

16  extended *Bivens* to "religious discrimination" unrelated to investigations[10] or to

17  _____

18  [10] Contrary to Plaintiffs' contention, ***none*** of their proffered authorities extended

19  *Bivens* to religious discrimination after conducting the "new context" analysis
    required by the Supreme Court. Accordingly, these cases are of no utility

20  whatsoever. *See, e.g., Berry v. Hollander*, 925 F.2d 311, 314 n.3, 316 (9th Cir.

21  1991), *see also Mirmehdi* at 5 n. 2 (same). *See* Opp. at 9:7-10:12 (*citing Koelzer*

22  (predated *Bush v. Lucas* and did not engage in the required analysis), *Ibrahim*
    (reversed dismissal of the *Bivens* claim on personal jurisdiction grounds but never

23  opined on the merits of the *Bivens* claim), *Mayfield* and *Resnick* (ruled on the merits

24  of the constitutional claim without considering whether *Bivens* should be extended),
    *Wong* (did not "review the district court's decision to infer a *Bivens* remedy"

25  because the court lacked jurisdiction), *Scott* (assumed "*without deciding*, that a

26  private cause of action may be implied directly under the Constitution for violations
    of the First Amendment" (emphasis added)) and *Padilla* (concerned a denial of

27  access to religious items and the Koran, not allegations of religious discrimination).)

28  (footnote continued)

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

1    "misconduct by law enforcement officers" unrelated to religious discrimination.

2    (*See* Opp. at 9:10-10:20.) But this patchwork approach is entirely inconsistent with

3    the controlling law. The context that matters here is a religiously motivated

4    investigation – that is the only "potentially recurring scenario that has similar legal

5    and factual components" for which Plaintiffs seek damages. *Mirmehdi* at 7.

6    Religious discrimination that has nothing to do with an investigation raises different

7    factual and legal components than the claim asserted here, and the mere fact that

8    two cases assert a violation of the same amendment does not mean they present the

9    same context. *See e.g. Wilkie,* 551 U.S. at 550 (finding a claim for unlawful search

10   and due process violations raised a new context, notwithstanding *Bivens* itself – an

11   unlawful search case –  and *Davis* – a due process case). The Court must look to the

12   facts, not just Plaintiffs' legal theory, when evaluating context. *Mirmehdi* at 7.

13           Likewise, "misconduct by law enforcement" is an amorphous generalization,

14   not a "recurring scenario" with "similar legal and factual components." *Id.* The

15   broad range of cases cited by Plaintiffs – covering "misconduct" as varied as

16   unwarranted searches, searches accompanied by media, wrongful arrest and

17   excessive force – share no "similar legal and factual components" at all with the

18   instant case, apart from the fact that the defendants in each were law enforcement

19   agents. (*See* Opp. at 10:13-20, n. 7.) If every assertion of "misconduct by law

20   enforcement" stated a claim under *Bivens*, the landscape of *Bivens* jurisprudence

21   would look quite different today: *Iqbal*, *Mirmehdi*, *Arar, Downie v. City of*

22   *Middleburg Heights*, 301 F.3d 688 (6th Cir 2002) (Free Speech retaliation by

---

24   Plaintiffs' claim that courts have recognized *Bivens* claims in the context of racial
     or national origin discrimination is likewise unsupported. *See* Opp. at 9 n. 6 (*citing*

25   *Nurse* (Court did not consider the viability of the *Bivens* action because the *Bivens*

26   defendants had not yet been served or moved to dismiss); *Castaneda* (plaintiff
     alleged he "was invidiously denied medical care due to his immigration status" –

27   placing the case squarely within the prisoner abuse context of *Carlson*).)

28

---

19

1  customs agents) and *Libas Ltd. v. Carillo*, 329 F.3d 1128, 1130 (9th Cir. 2003)

2  (arbitrary action by customs agents), to name but a few cases, all involve

3  "misconduct by law enforcement," but in each case, the claim raised a new context.

4    **B.**   **Privacy Act Displaces Plaintiffs' *Bivens* Claim**

5     Because Plaintiffs' complaint raises a new context, "we now must apply the

6  Supreme Court's test from *Wilkie* . . . whether there is any alternative, existing

7  process for protecting the plaintiffs interests." *Mirmehdi* at 8 (quotes omitted)). "If

8  there is such an alternative remedy, our inquiry stops." *Id.*[11]

9     Plaintiffs dispute that the Privacy Act (the "Act"), 5 U.S.C. § 522a(e)(7),

10  provides them with an alternative remedy here, for three reasons. First, Plaintiffs

11  assert that their claim involves the collection of information because of religion, not

12  the collection of information about religious practices. (Opp. at 15:15-16:3.) This is

13  mere semantics. Congress enacted the Privacy Act in part to recognize that the

14  "right to privacy is a personal and fundamental right protected by the Constitution"

15  and that regulating the federal government's "collection, maintenance, use, and

16  dissemination of information" regarding individuals was necessary and proper "to

17  protect the privacy of [such] individuals." Privacy Act of 1974, Pub. L. No. 93-579,

18  § 2(a)(4) and (5), 88 Stat. 1896. Congress fashioned the Act to remedy precisely the

19  injury alleged here: that a federal agency would collect information about religious

20  practices. According to Plaintiffs, Monteilh's surveillance was objectionable

21  *because* it collected information about Plaintiffs' practice of religion. Therefore, the

22  government's alleged collection of such information clearly falls within the Act's

23  prohibitions.

24     Second, Plaintiffs claim that the Act "does not purport to provide remedies for

25  

26  [11] As they did in their motion to dismiss, the Agent Defendants join Defendants
Tidwell and Walls' argument that (1) RFRA and FISA provide Plaintiffs with an
27  alternative remedy and that (2) "special factors" preclude *Bivens* relief here.

28  

20
REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

**SER 27**

1   law enforcement who act for constitutionally forbidden reasons [because] if it did, it

2   would preclude *Bivens* remedies for law enforcement actions in retaliation for

3   protected speech." (Opp. at 16:2-5.) Plaintiffs are incorrect: the Act clearly *does* bar

4   *Bivens* claims for Free Speech retaliation, *if* the alleged retaliation consists of

5   activities proscribed by the Act. In *Downie*, 301 F.3d at 690-91, a former informant

6   sued federal officers who allegedly retaliated against the informant for criticizing an

7   ongoing investigation, and in *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008), the

8   Wilsons sued federal officers who retaliated against plaintiffs for criticizing the

9   Bush Administration. Both cases asserted First Amendment claims under *Bivens*,

10  and in both cases the court found plaintiffs had an adequate remedy under the Act.

11      Third and finally, Plaintiffs complain that the Act does not provide for

12  damages against the individual agents. The same argument was raised – and rejected

13  – in both *Mirmehdi* and *Wilson*. In *Mirmehdi*, the Ninth Circuit was "unpersuaded

14  by the Mirmehdis' assertions they are nonetheless entitled to a *Bivens* remedy

15  because neither the immigration system nor habeas provides monetary

16  compensation for unlawful detention." *Mirmehdi* at 9. "Even where Congress has

17  given plaintiffs no damages remedy for a constitutional violation, the Court has

18  declined to create a right of action under *Bivens* when doing so would be plainly

19  inconsistent with Congress' authority in th[e] field." *Id.* Likewise, in *Wilson*,

20  plaintiffs complained that they were denied an adequate remedy because they could

21  not recover damages from three of the federal officers responsible for their injury.

22  *Wilson*, 535 F.3d at 707. The Court of Appeals flatly rejected this argument, noting

23  that "[t]he failure of the Act to provide complete relief to the Wilsons, however,

24  does not undermine its status as a 'comprehensive scheme' that stops us from

25  providing additional remedies under *Bivens* [because] the availability of *Bivens*

26  remedies does not turn on the completeness of the available statutory relief." *Id.*

27      Plaintiffs' complaint that the Act's "remedies do not serve *Bivens*' twin

28  purposes of deterring individual officers and providing a meaningful remedy" is

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

**SER 28**

1  entirely beside the point. (Opp. at 16:7-9.) These "twin purposes" do not

2  automatically entitle Plaintiffs to a *Bivens* suit in the face of Congressional action.

3  *Mirmehdi* at 6 ("Such a cause of action 'is not an automatic entitlement no matter

4  what other means there may be to vindicate a protected interest'"). But more to the

5  point, Plaintiffs' reading of the Act is incorrect: the Act authorizes damages suits

6  against agencies who violate § 522a(e)(7), including a minimum $1000 award plus

7  attorneys' fees if the conduct was willful or intentional. *See* 5 U.S.C. §

8  552a(g)(1)(D). Although Plaintiffs plainly *are* entitled to monetary relief for some

9  violations of the Act, Congress need not grant a remedy for *every* constitutional

10 wrong in order to supplant the *Bivens* remedy. That Congress has acted is enough to

11 defeat an implied right of action for damages under *Bivens*. Accordingly, Plaintiffs'

12 motion to dismiss the *Bivens* claims should be granted.[12]

13 **IV.  PLAINTIFFS' SECTION 1985(3) CLAIM FAILS**

14       Relying largely on a handful of district court decisions,  Plaintiffs argue that

15 this Court should rule that the intracorporate conspiracy doctrine does not extend to

16 civil rights claims under § 1985. (Opp. at 59-60.) However, it is irrefutable that the

17 overwhelming majority of courts – including the Second, Fourth, Fifth, Sixth,

18 Seventh, Eighth, and Eleventh Circuits, as well as numerous district courts within

19 the Ninth Circuit – to consider this issue have held that the doctrine bars § 1985(3)

20 actions when the purported conspiracy consists of employees of the same

21 government or corporate body, acting in the course and scope of their employment.

22 *See* cases cited in Motion at 7-8; *see also Girard v. 94th St. & Fifth Ave. Corp.*, 530

23 F.2d 66, 71 (2d Cir. N.Y. 1976) (doctrine barred § 1985(3) claim where "plaintiff's

24 allegations of multiple acts by the [defendants] are not alleged to be other than the

25

26 [12] As noted in the Agent Defendants' Motion, *Bivens* also requires an allegation of
unlawful purpose. (Motion at Part V.B (*citing Iqbal* at 1948-49).) Plaintiffs offer no
27 response to this argument, which alone is grounds for dismissing the *Bivens* claims.

28

22
REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

**SER 29**

Case: 12-56867  04/29/2015  ID: 9519711  DktEntry: 61-2  Page: 33 of 289

1 implementation of a single policy by a single policymaking body"). Because the

2 FAC alleges concerted action by employees of a single entity (the FBI), Plaintiffs'

3 claims fail under this doctrine.

4       Second, Plaintiffs argue that because the FAC alleges that the Agent

5 Defendants targeted them for surveillance because of their religion, they satisfy §

6 1985(3)'s requirement that Plaintiffs allege purposeful violation of their rights.

7 (Opp. at 61-63.) Plaintiffs miss the point, however: they allege that the Agent

8 Defendants intended to deprive Plaintiffs of their "right" to be free from religiously

9 motivated investigations, but Plaintiffs cite no authorities recognizing such a right in

10 the context of § 1985(3).[13] Because Plaintiffs fail to allege a purposeful violation of

11 their rights that is cognizable under section 1985(3), these claims fail. Moreover, the

12 lack of any case law on point shows that Plaintiffs' legal theory was not "beyond

13 debate" at the time that the Agent Defendants' alleged conduct violated Plaintiffs'

14 rights under section 1985(3). Qualified immunity therefore bars these claims.

15 **V.    PLAINTIFFS' ALLEGATIONS OF SUPERVISORY LIABILITY FAIL**

16       Plaintiffs argue that the FAC's allegations about Agent Rose's individual

17 actions – that she was the "direct supervisor" to Allen and Armstrong, she "actively

18 monitored, directed, and authorized" their actions, and she "maintained extremely

19 close oversight and supervision of Monteilh" – are sufficient to render her

20 personally liable for violating Plaintiffs' constitutional rights. (Opp. at 50-55.)

21

22 _____

[13] *See* Opp. at 62 (*citing Griffin* (right to interstate travel); *Fobbs* (racial

23 discrimination); *Thomas* (racial discrimination); *Bowen* (Americans with

Disabilities Act and Rehabilitation Act); *Word of Faith Fellowship* (conspiracy by

24 social workers to threaten and harass plaintiffs and their children in order to

25 discourage them from practicing their religion constituted cognizable injuries under

§ 1985(3)); *Maynard* (retaliation for plaintiff's disclosure of irregularities in hiring

26 process); *Johnson* (racially segregated inmates); *Scott* (conspiracy to violate civil

27 rights by attempts to involuntarily "deprogram" plaintiff).

28

1   However, the court should disregard such conclusory allegations as insufficient

2   under *Iqbal*. *See, e.g., Moss v. United States Secret Serv.*, 750 F. Supp. 2d 1197,

3   1229-30 (D. Or. 2010) (dismissing First Amendment discrimination claim against

4   supervisory police officers where plaintiffs alleged such officers "personally

5   directed and approved of" activities that resulted in the alleged discrimination but

6   did not allege "any factual content regarding when, how, or from where" the

7   defendants acted).[14] While Plaintiffs emphasize their allegation that Agent Rose

8   sought to create a Muslim gym that the FBI could use to gather information, they

9   fail to allege that the gym was ever opened or how that effort violated their

10  constitutional rights. Plaintiffs also repeatedly point to their allegation that Rose

11  read Monteilh's daily notes. However, Plaintiffs fail to identify any case law

12  suggesting that such an activity by a supervisor is sufficient on its own to establish

13  personal liability for constitutional violations. Finally, Plaintiffs assert that their

14  allegations are not conclusory, as proved by the various Monteilh declarations filed

15  concurrently with their Opposition. (Opp. at 50.) Declarations are beyond the scope

16  of a Rule 12(b)(6) motion and should not be considered. *See Intri-Plex Techs., Inc.*

17  *v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007); *see also* Fed. R. Civ.

18  Proc. 12(d).

19  **VI.   CONCLUSION**

20       The Agent Defendants do not dispute that Plaintiffs raise an important legal

---

22  [14] While the court in *Moss* denied the supervisory officers' motion to dismiss the

23  plaintiffs' Fourth Amendment claims for excessive force, the allegations in that case
    – that the supervisory officers improperly trained their underlings and that the

24  underlings' use of excessive force occurred under the supervisory officers' personal
    direction, *see Moss*, 750 F.Supp.2d at 1237-40 – go farther than the allegations here,

25  as Plaintiffs do not allege that Rose personally directed anyone to engage in

26  activities that could plausibly constitute an unlawful search. In any event, Agent
    Rose is entitled to qualified immunity on the Fourth Amendment claims for the

27  reasons set forth in Part II.B.

28

24
REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

SER 31

1    question, *i.e.* the degree to which religion may be a factor in motivating a law

2    enforcement investigation. Nor do the Agent Defendants seek to deny Plaintiffs an

3    opportunity to litigate that question against the government. And ultimately,

4    Plaintiffs may convince this Court or a reviewing court of their view that religion

5    may never be a factor in an investigation. But such a ruling in this case would be the

6    first ever issued in the nation. Accordingly, Plaintiffs' constitutional theory is not

7    well established and is an extension of *Bivens* to a new context, and therefore they

8    cannot recover damages from the Agent Defendants. Accordingly, the motion

9    should be granted, and all causes of action against the Agent Defendants dismissed.

10   DATED: January 20, 2012            Respectfully submitted,

11

12                                      SCHEPER KIM & HARRIS LLP
                                        DAVID C. SCHEPER
13                                      ALEXANDER H. COTE
                                        ANGELA M. MACHALA

14
                                        By:   /s/
15                                      _____
                                             David C. Scheper
16                                           Attorneys for Defendants Pat Rose, Kevin
                                             Armstrong and Paul Allen
17

18

19

20

21

22

23

24

25

26

27

28

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PAT ROSE, KEVIN ARMSTRONG AND PAUL ALLEN

Peter Bibring (SBN 223981)
 pbibring@aclu-sc.org
Ahilan T. Arulanantham (SBN 237841)
 aarulanantham@aclu-sc.org
Jennifer L. Pasquarella (SBN 263241)
Mohammad Tajsar (SBN 280152)
Laura Moran  (bar admission pending)
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California  90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

Attorneys for Plaintiffs

(Additional Counsel listed on next page)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YASSIR FAZAGA, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>FEDERAL BUREAU OF INVESTIGATION *et al.*,<br><br>                    Defendants. | CASE NO.: SA CV 11-00301 CJC (VBKx)<br><br>**PLAINTIFFS' COMBINED OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:          January 30, 2012<br>Time:          1:30 p.m.<br>Judge:        Hon. Cormac J. Carney |

Additional Plaintiffs' Attorneys:


Ameena Mirza Qazi (SBN 250404)
  *aqazi@cair.com*
COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA
2180 W. Crescent Avenue, Suite F
Anaheim, California  92801
Telephone: (714) 776-1847
Facsimile: (714) 776-8340


Dan Stormer (SBN 101967)
  *dstormer@hadsellstormer.com*
Joshua Piovia-Scott (SBN 222364)
  *jps@hskrr.com*
Reem Salahi (SBN 259711)
  *reem@hskrr.com*
HADSELL STORMER KEENY RICHARDSON & RENICK, LLP
128 N. Fair Oaks Avenue, Suite 204
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079

# TABLE OF CONTENTS

INTRODUCTION............................................................................1

FACTS......................................................................................2

ARGUMENT.................................................................................5

I.     THE CONSTITUTION PROVIDES A DAMAGES REMEDY FOR RELIGIOUS DISCRIMINATION AND UNLAWFUL SURVEILLANCE UNDER *BIVENS*............................................. 6

    A.    This Case Does Not Present an Extension of *Bivens*...................8

        1. Claims Alleging Discrimination by Law Enforcement Officers Lie at the Core of *Bivens*..................................... 8

        2. 'National Security' Does Not Make This a New Context......... 11

    B.    Even If This Case Is an Extension, a *Bivens* Remedy Is Available................................................................... 13

        1. No Statutory Scheme Indicates Congress's Intent to Displace *Bivens* Remedies............................................. 13

           a.  Privacy Act............................................................15

           b.  RFRA...................................................................17

           c.  FISA....................................................................19

        2. No Special Factors Justify Precluding a *Bivens* Remedy.......... 19

           a.  National Security.....................................................21

           b.  State Secrets..........................................................26

II.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY...........................................................................28

    A.    Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' First Amendment Claims.................................29

i

1.  Under Clearly Established Law, Facial Discrimination
    on the Basis of Religion Triggers Strict Scrutiny...................31

    a.  Establishment Clause.................................................33

    b.  Free Exercise Clause................................................ 35

    c.  The Ban on Religious Discrimination Is Clearly
        Established......................................................................40

2.  The Complaint Alleges Facial Discrimination Against
    Muslims. ...................................................................... 40

    a.  The Complaint Suggests No Legitimate Basis to
        Investigate the Three Individual Plaintiffs.....................42

3.  Defendants' Facial Discrimination Fails Strict Scrutiny...........46

B.  The Complaint Establishes that the Supervisory Defendants
    Are Liable For Intentional Discrimination and Unlawful
    Searches.......................................................................... 47

    1.  The Supervisors Are Liable For Intentional Discrimination.......48

    2.  The Supervisors Are Liable For Unlawful Searches..............53

C.  Defendants Are Not Entitled To Qualified Immunity on
    Plaintiffs' RFRA Claims......................................................55

D.  Defendants Are Not Entitled to Qualified Immunity on
    Plaintiffs' Claim under 42 U.S.C. 1985(3)........................... 58

    1.  Application of the Antitrust "Intracorporate
        Conspiracy" Doctrine To § 1985 Claims Would Be
        Wholly Inappropriate...................................................58

    2.  Plaintiffs' Adequately Allege a Conspiracy Under
        § 1985.................................................................... 60

E.  Defendants Are Not Entitled To Qualified Immunity on
    Plaintiffs' Equal Protection Claims..................................... 63

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

F.    Defendants Are Not Entitled To Qualified Immunity on............. 64
Plaintiffs' Fourth Amendment and FISA Claims

1. Warrantless Audio Recording Outside Informant's
Presence..................................................................65

2. Video Recording by the Informant...............................70

3. Conversations to Which the Informant Was a Party.............. 71

4. Plaintiffs State a Plausible Claim For Violation of
the Foreign Intelligence Surveillance Act.........................72

CONCLUSION...............................................................73

iii

**SER 37**

# TABLE OF AUTHORITIES

Page(s)

CASES

*ACLU v. National Sec. Agency,*
   493 F.3d 644 (6th Cir. 2007) ................................................................. 72

*Adarand Constructors, Inc. v. Pena,*
   515 U.S. 200 (1995) ................................................................... 30, 50

*Al-Kidd v. Ashcroft,*
   580 F.3d 949 (9th Cir. 2009) ............................................................ passim

*Allegheny v. ACLU,*
   492 U.S. 573 (1989) ................................................................... 33, 35

*Allen v. Wright,*
   468 U.S. 737 (1984) .......................................................................... 57

*Alpha Delta Chi-Delta Chapter v. Reed,*
   648 F.3d 790 (9th Cir. 2011) .............................................................. 40

*Am. Comm. Ass'n, C.I.O. v. Douds,*
   339 U.S. 382 (1950) ................................................................... 56, 57

*Am. Family Ass'n v. City and County of San Francisco,*
   277 F.3d 1114 (9th Cir. 2002) ........................................................... 37

*Anderson v. Creighton,*
   483 U.S. 635 (1987) .......................................................................... 10

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) .................................................................. passim

*Ass'n of Christian Sch. Intern. v. Stearns,*
   362 Fed. Appx. 6406 (9th Circ. 2010) .............................................. 63

*Azar v. Conley,*
   456 F.2d 1382 (6th Cir. 1972) ........................................................... 61

*Ball v. Massanari,*
   254 F.3d 817 (9th Cir. 2001) ............................................................. 63

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007) .................................................................... 5, 44, 60

*Bernal v. Fainter*,
  467 U.S. 216 (1984) .................................................................... 46

*Berry v. Hollander*,
  925 F.2d 311 (9th Cir. 1991) ...................................................... 14

*Bivens v. Six Unknown Fed. Narcotics Agents*,
  403 U.S. 388 (1971) .................................................................... passim

*Black v. United States*,
  62 F.3d 1115 (8th Cir. 1995) ...................................................... 26

*Bond v. United States*,
  529 U.S. 334 (2000) .................................................................... 65, 68

*Boumediene v. Bush*,
  553 U.S. 723 (2008) .................................................................... 22

*Bowen v. Rubin*,
  2002 U.S. Dist. LEXIS 25283 (E.D.N.Y. May 17, 2002) ........... 61, 62

*Braunfeld v. Brown*,
  366 U.S. 599 (1961) .................................................................... 35, 38

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) .................................................................... 42, 59, 61, 62

*Brown v Ent. Merch. Ass'n*,
  131 S. Ct. 2729 (2011) ............................................................... 46

*c.f. Wirzburger v. Galvin*,
  412 F.3d 271 (1st Cir. 2005) ...................................................... 39

*Carlson v. Green*,
  446 U.S. 14 (1980) ...................................................................... 6, 16, 19

*Castaneda v. United States*,
  546 F.3d 682 (9th Cir. 2008) ...................................................... 9

*Catholic League for Religious and Civil Rights v. City and County of San Francisco*,
  624 F.3d 1043 (9th Cir. 2010) .................................................... 34

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 39**

*Chappell v. Wallace*,
  462 U.S. 296 (1983) ................................................................. 23

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ................................................................. 18

*Colorado Christian Univ. v. Weaver*
  534 F.3d 1245 (10th Cir. 2008) ............................................... 63

*Community House, Inc. v. City of Boise*,
  623 F.3d 945 (9th Cir. 2010) ................................................... 29

*Consol. Edison Co. v. Public Service Commission of New York*,
  447 U.S. 530 (1980) ................................................................. 46

*Cooper v. Pate*,
  378 U.S. 546 (1964) ................................................................. 38

*Correctional Servs. Corp. v Malesko*,
  534 U.S. 61 (2001) ................................................. 8, 13, 16, 20

*Davis v. Passman*,
  442 U.S. 228,229 (1979) ................................................. passim

*Dellums v. Powell*,
  566 F.2d 167 (D.C. Cir. 1977) ................................................ 11

*Denney v. Drug Enforcement Admin.*,
  508 F.Supp.2d 815 (E.D. Cal. 2007) ...................................... 11

*Deorle v. Rutherford*,
  272 F.3d 1272 (9th Cir. 2001) ................................................. 29

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988) ................................................................. 23

*Devereaux v. Abbey*,
  263 F.3d 1070 (9th Cir. 2001) (en banc) ................................. 29

*Diem v. City and County of San Francisco*,
  686 F.Supp. 806 (N.D. Cal. 1988.) .......................................... 60

*DiMartini v. Ferrin*
  889 F.2d 922, *amended on pet. for rehearing en banc*, 906 F.2d 465 (9th
  Cir. 1990) ................................................................................ 10

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 40**

*Downie v. Middleburg Heights*,
    301 F.3d 688 (6th Cir. 2002) ................................................................ 16

*Edgerly v. City and County of San Francisco*,
    599 F.3d 946 (9th Cir. 2010) ............................................................... 53

*Employment Division v. Smith*,
    494 U.S. 872 (1990) ................................................................... passim

*Erickson v. United States*,
    976 F.2d 1299 (9th Cir. 1992) ............................................................ 11

*Everson v. Board of Ed.*,
    330 U.S. 1 (1947) .............................................................................. 33

*Farm Labor Org. Comm. v. Ohio State Hwy. Patrol*,
    308 F.3d 523 (6th Cir. 2002) ............................................................. 47

*FDIC v. Meyer*,
    510 U.S. 471 (1994) .......................................................................... 20

*Fobbs v. Holy Cross Health Sys. Corp.*,
    29 F.3d 1439 (9th Cir. 1994) ............................................................. 62

*Fowler v. Rhode Island*,
    345 U.S. 67 (1953) ............................................................... 37, 38, 40

*Freeman v. Arpaio*,
    125 F.3d 732 (9th Cir. 1997) ............................................................. 63

*Gary S. v. Manchester School Dist.*,
    374 F.3d 15 (1st Cir. 2004) ............................................................... 39

*Gibson v. United States*,
    781 F.2d 1334 (9th Cir. 1986) ............................................... 11, 19, 25

*Gillette v. United States*,
    401 U.S. 437 (1971) .......................................................................... 35

*Gratz v. Bollinger*,
    539 U.S. 244 (2003) .............................................................. 2, 30, 43

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971) ............................................................................ 62

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*Groh v. Ramirez*,
  540 U.S. 551 (2004) ...................................................................... 10

*Hafer v. Melo*,
  502 U.S. 21 (1991) ........................................................................ 55

*Haig v. Agee*,
  453 U.S. 280 (1981) ................................................................. 22, 46

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ................................................................. 22, 27

*Handschu v. Special Services Div.*,
  349 F.Supp. 766 (S.D.N.Y. 1972) ................................................. 72

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ...................................................................... 28

*Harris v. Roderick*,
  126 F.3d 1189 (9th Cir. 1997) ...................................................... 10

*Hartman v. Moore*,
  547 U.S. 250 (2006) ...................................................................... 11

*Hartmann v. Stone*,
  68 F.3d 973 (6th Cir.1995) ...................................................... 18, 39

*Hayden v. County of Nassau*,
  180 F.3d 42 (2nd Cir. 1999) .................................................... 32, 50

*Hernandez v. C.I.R.*,
  490 U.S. 680 (1989) ...................................................................... 34

*Holder v. Humanitarian Law Project*,
  130 S. Ct. 2705 (2010) .................................................................. 22

*Home Bldg. & Loan Ass'n v. Blaisdell*,
  290 U.S. 398 (1934) ...................................................................... 22

*Hutton v. Law Offices of Collins & Lamore*,
  668 F.Supp.2d 1251 (S.D. Cal. 2009) ............................................. 6

*Ibrahim v. Dep't of Homeland Sec.*,
  538 F.3d 1250 (9th Cir. 2008) ............................................... 8, 9, 12

viii

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*In re John Doe Trader*,
   894 F.2d 240 (7th Cir. 2003) ................................................................ 69

*Internat'l Union, United Auto., Aerospace and Agr. Implement Workers of*
   *America, UAW v. Johnson Controls, Inc.*,
   499 U.S. 187 (1991) ............................................................ 42, 61

*Jama v. I.N.S.*,
   343 F.Supp.2d 338 (D.N.J. 2004) ............................................ 55, 56

*Jimmy Swaggart Ministries v. Bd. of Eqal. of Cal.*,
   493 U.S. 378 (1990) ................................................................ 36

*Johnson v. California*,
   207 F.3d 650 (9th Cir. 2000) .................................................. 62

*Kee v. City of Rowlett*,
   247 F.3d 206 (5th Cir. 2001) .................................................. 69

*Keen v. Noble*,
   2007 WL 2789561 (E.D. Cal. Sept. 20, 2007) ........................ 56

*Kreisner v. City of San Diego*,
   1 F.3d 775 (9th Cir. 1993) ...................................................... 34

*Kwai Fun Wong v. United States*,
   373 F.3d 952 (9th Cir. 2004) .................................................. 10

*Kyllo v. United States*,
   533 US 27 (2001) .................................................................... 67

*Labadie v. United States*,
   2011 WL 1376235 (W.D. Wa. Apr. 12, 2011) ........................ 11

*Lacey v. Maricopa Cnty.*,
   2011 WL 2276198 (9th Cir. 2011) .......................................... 53

*Larson v. Valente*,
   456 U.S. 228 (1982) ........................................................passim

*Lee v. Gregory*,
   363 F.3d 931 (9th Cir. 2004) .................................................. 10

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971) .................................................... 29, 33, 34

ix

*Lepp v. Gonzales*,
    2005 WL 1867723 (N.D. Cal. Aug. 2, 2005) ................................... 56

*Little v. Barreme*,
    2 Cranch (6 U.S.) 170 (1804) ........................................................ 12

*Locke v. Davey*,
    540 U.S. 712 (2004) ........................................................................ 33

*Lonegan v. Hasty*,
    436 F. Supp. 2d 419 (E.D.N.Y. 2006) ............................................ 65

*Lyall v. City of Los Angeles*,
    2011 WL 61626 (C.D. Cal. Jan. 6, 2011) ....................................... 69

*Lyng v. Northwest Indian Cemetery Protective Assn.*,
    485 U.S. 439 (1988) ........................................................................ 32

*Marbury v. Madison*,
    1 Cranch (5 U.S.) 137 (1803) .................................................... 2, 21

*Mayfield v. Gonzales*,
    2005 WL 1801679 (D. Or. July 28, 2005) ................................. 9, 12

*Maynard v. City of San Jose*,
    37 F.3d 1396 (9th Cir. 1994) ......................................................... 62

*McCreary County v. ACLU*,
    545 U.S. 844 (2005) ................................................................. 31, 35

*McDaniel v. Paty*,
    435 U.S. 618 (1978) ........................................................................ 38

*Mendocino Envtl. Ctr. v. Mendocino Cnty*,
    14 F.3d 457 (9th Cir. 1994) ........................................................... 11

*Miller v. Johnson*,
    515 U.S. 900 (1995) ........................................................................ 63

*Miller v. Reed*,
    176 F.3d 1202 (9th Cir. 1999) ....................................................... 37

*Mirmehdi v. United States*,
    __ F.3d __, 2011 WL 5222884 (9th Cir. Nov. 3, 2011) ........... 23, 24

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 44**

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) ................................................................. passim

*Mockaitis v. Harcleroad,*
    104 F.3d 1522 (9th Cir. 1997) ........................................................ 69

*Mora v. Arpaio,*
    2011 WL 1562443 (D.Ariz. Apr. 25, 2011) .............................. 53, 67

*Moss v. Secret Service,*
    572 F.3d 962 (9th Cir. 2009) ......................................................... 11

*Moss v. U.S. Secret Service,*
    750 F.Supp.2d 1197 (D.Or. 2010) ............................................ 54, 66

*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,*
    429 U.S. 274 (1977) ..................................................................... 43

*Murdock v. Pennsylvania,*
    319 U.S. 105 (1943) ..................................................................... 33

*Native American Council of Tribes v. Solem,*
    691 F.2d 382 (8th Cir. 1982) ......................................................... 64

*Navajo Nation v. U.S. Forest Service,*
    535 F.3d 1058 (9th Cir. 2008) ....................................................... 56

*Niemotko v. Maryland,*
    340 U.S 268 (1951) ........................................................... 37, 38, 40

*NLRB v. Hanna Boys Ctr.,*
    940 F.2d 1295 (9th Cir. 1991) ....................................................... 37

*Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of
    Jacksonville,*
    508 U.S. 656 (1993) ............................................................... 15, 57

*Nunez v. Duncan,*
    591 F.3d 1217 (9th Cir. 2010) ....................................................... 53

*Nurre v. Whitehead,*
    580 F.3d 1087 (9th Cir. 2009) ....................................................... 34

*Nurse v. United States,*
    226 F.3d 996 (9th Cir. 2000) ..................................................... 9, 25

xi

*O.H. v. Oakland Unified School Dist.*
   2000 WL 33376299 (N.D. Cal. 2000)................................................59, 60

*O'Connor v. Ortega,*
   480 U.S. 709 (1987) ........................................................................ 69

*Orin v. Barclay,*
   272 F.3d 1207 (9th Cir. 2001).......................................................... 64

*Padilla v. Yoo,*
   633 F.Supp.2d. 1005 (N.D. Cal. 2009)........................................passim

*Paton v. La Prade,*
   524 F.2d 862 (3d Cir. 1975) ............................................................ 11

*Pearson v. Callahan,*
   555 U.S. 223 (2009) ........................................................................ 28

*Peter v. Wedl,*
   155 F.3d 992 (8th Cir. 1998)............................................................ 63

*Portman v. County of Santa Clara,*
   995 F.2d 898 (9th Cir. 1993)............................................................ 59

*Rashdan v. Geissberger,*
   2011 WL 197957 (N.D. Cal. Jan. 11, 2011) ................................59, 60

*Rebel Van Lines v. City of Compton,*
   663 F.Supp. 786 (C.D. Cal. 1987).................................................... 60

*Resnick v. Adams,*
   348 F.3d 763 (9th Cir. 2003)............................................................ 10

*Rouser v. White,*
   630 F.Supp.2d 1165 (E.D. Cal. 2009) .............................................. 34

*Saenz v. Roe,*
   526 U.S. 489 (1999) ........................................................................ 57

*Safford Unif. Sch. Dist. v. Redding,*
   129 S. Ct. 2633 (2009) .................................................................... 40

*Saucier v. Katz,*
   533 U.S. 194 (2001) ........................................................................ 28

SER 46

*Schweiker v. Chilicky*,
    487 U.S. 412 (1988) ..................................................................... 14, 20

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000) ................................................................ 61

*Scott v. Rosenberg*,
    702 F.2d 1263,1266 (9th Cir. 1983) ......................................................... 10

*Scott v. Ross*,
    140 F.3d 1275 (9th Cir. 1998) ............................................................ 58, 62

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ..................................................................... 36, 38

*Sklar v. C.I.R.*,
    549 F.3d 1252 (9th Cir. 2008) ................................................................ 34

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ................................................................ 53

*Sutton v. Providence St. Joseph Medical Ctr*,
    192 F.3d 826 (9th Cir.1999) ................................................................. 55

*Sweet v. Sec'y, Dept. of Corr.*
    467 F.3d 1311 (11th Cir. 2006) .............................................................. 63

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ......................................................................... 44

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
    309 F.3d 144 (3rd Cir. 2002) ................................................................ 39

*Thomas v. Independence Township.*,
    463 F.3d 285 (3rd Cir. 2006) ................................................................ 62

*Thomas v. Review Bd. of Indiana Employment Sec. Div.*,
    450 U.S. 707 (1981) ......................................................................... 36

*Trevino v. Gates*,
    99 F.3d 911 (9th Cir. 1996) ................................................................. 29

*Trujillo v. City of Ontario*,
    428 F.Supp.2d 1094 (C.D. Cal. 2006) ..................................................... 68, 71

xiii

*United States ex rel. Moore v. Koelzer*,
    457 F.2d 892 (3rd Cir. 1972) ................................................................. 9

*United States v. Aguilar*,
    883 F.2d 662 (9th Cir. 1989) ............................................................... 71

*United States v. Armstrong*,
    517 U.S. 456 (1996) ................................................................... 40, 63

*United States v. Gonzalez*,
    328 F.3d 543 (9th Cir. 2003) ............................................................... 69

*United States v. Heckenkamp*,
    482 F.3d 1142 (9th Cir. 2007) ............................................................ 65

*United States v. Koyomejian*,
    970 F.2d 536 (9th Cir. 1992) .......................................................... 71, 72

*United States v. Little*,
    753 F.2d 1420 (9th Cir. 1984) ............................................................ 69

*United States v. Martinez-Fuerte*,
    428 U.S. 543 (1976) ........................................................................ 71

*United States v. Mayer*,
    503 F.3d 740 (9th Cir. 2007) .......................................................... 71, 72

 *United States v. McIntyre*,
    582 F.2d 1221 (9th Cir. 1978) ............................................................ 66

*United States v. Mesa-Rincon*,
    911 F.2d 1433 (10th Cir. 1990) .......................................................... 71

*United States v. Montero-Camargo*,
    208 F.3d 1122, 1134 -1135 (9th Cir. 2000)…………………………..………47

*United States v. Nerber*,
    222 F.3d 597 (9th Cir. 2000) ..................................................... 68, 70, 71

*United States v. Stanley*,
    483 U.S. 669 (1987) ................................................................. 14, 20, 23

*United States v. Taketa*,
    923 F.2d 665 (9th Cir. 1991) ..................................................... 66, 68, 69

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 48**

*United States v. Torres*,
   751 F.2d 875 (7th Cir. 1984) ........................................................ 71

*Van Orden v. Perry*,
   545 U.S. 677 (2005) .................................................................... 33

*Vance v. Rumsfeld*,
   694 F.Supp.2d 957 (N.D. Ill. 2010) ............................................. 25

*Vernon v. City of Los Angeles*,
   27 F.3d 1385 (9th Cir. 1994) ................................... 34, 36, 37, 56, 57

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977) .................................................................... 43

*Vinning-El v. Evans*,
   657 F.3d 591 (7th Cir. 2011) ....................................................... 39

*Vision Church v. Village of Long Grove*,
   468 F.3d 975 (7th Cir. 2006) ....................................................... 39

*W. Radio Servs. Co. v. U.S. Forest Service*,
   578 F.3d 1116 (9th Cir. 2009) ............................................... 14, 20

*Wallace v. Jaffree*,
   472 U.S. 38 (1985) ...................................................................... 33

*Walz v. Tax Comm'n*,
   397 U.S. 664 (1970) ................................................................ 33, 36

*Washington v. Duty Free Shoppers*,
   696 F.Supp. 1323 (N.D. Cal. 1988) ............................................. 60

*Weinberger v. Wiesenfeld*,
   420 U.S. 636 (1975) ...................................................................... 9

*Whren v. United States*,
   517 U.S. 806 (1996) .................................................................... 47

*Widmar v. Vincent*,
   454 U.S. 263 (1981) .................................................................... 33

*Wilkie v. Robbins*,
   551 U.S. 537 (2007) ........................................................... passim

xv

*Wilson v. Layne*,
   526 U.S. 603 (1999) ........................................................................... 10

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) ...................................................... 17, 24

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ...................................................................... 32, 36

*Word of Faith Fellowship, Inc. v. Rutherford County Dep't Social Services*,
   329 F. Supp. 2d 675 (W.D.N.C. 2004) ............................................... 63

*Yendes v. McCulloch*,
   2010 WL 3339505 (S.D. Cal. Aug. 23, 2010) ............................... 66, 68

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ........................................................................... 23


**STATUTES**

5 U.S.C. 552a(e)(7) ................................................................................ 15

8 U.S.C. 1324 ........................................................................................ 71

18 U.S.C. 2510 *et seq* ............................................................................ 66

42 U.S.C. 1983 ...................................................................................... 55

42 U.S.C. 1985 ................................................................................. 42, 58

42 U.S.C. 2000bb-2(1), 2000bb-1(c) .................................................... 55

42 U.S.C. 2000bb-4 ............................................................................... 18

42 U.S.C. 2000bb(a)(4) .................................................................... 18, 19

42 U.S.C. § 2000bb–1(a), (b) ................................................................ 17

50 U.S.C. 1801(f)(4) ............................................................................. 72

50 U.S.C. 1809(a) .................................................................................. 73

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1

**OTHER AUTHORITIES**

2

Federal Rule of Civil Procedure 8(a)(2) ........................................................ 5

3

Hon. Marsha S. Berzon, *Securing Fragile Foundations: Affirmative*

4

*Constitutional Adjudication In Federal Courts,* 84 N.Y.U. L. Rev. 681,
683-84 (2009) ............................................................................................ 20

5

6

S. Rep. No. 103-111, *reprinted in* 1993 U.S.C.C.A.N. 1892 ................................ 18

7

Sir William Blackstone, 3 COMMENTARIES ON THE LAWS OF ENGLAND 109
(Worcester: Isiah Thomas 1790) .............................................................. 20

8

9

Spencer Ackerman, *Attorney General: FBI Hurt Terror Fight With 'Violent*
*Muslim' Training* ....................................................................................... 4

10

11

Spencer Ackerman and Noah Shachtman, *Video: FBI Trainer Says Forget*
*'Irrelevant' al-Qaida, Target Islam* .......................................................... 4

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 51**

# **INTRODUCTION**

Plaintiffs have pled with remarkable specificity — borne of detailed statements from an informant who worked for the government — that Defendants engaged in a program of intentional religious discrimination by singling out Plaintiffs for intrusive surveillance because of their religion.  Plaintiffs have also pled, with equal specificity, that Defendants used surveillance tactics that plainly violate existing Fourth Amendment law — including most obviously the warrantless use of recording devices to tape conversations to which the informant was not a party.  Plaintiffs assert that these egregious tactics violate no fewer than five different federal statutes and four constitutional provisions.[1]

Yet, remarkably, according to Defendants not a single one of these statutes or constitutional provisions gives the Court authority even to address whether their egregious conduct was unlawful.  Defendants' responses, taken together, evoke images of a game of Three-card Monte — each and every federal statute or constitutional provision provides no cause of action against these defendants, addresses some slightly different harm, or provides no remedy in this particular context.  The resulting whirl deflects attention from the obvious violations, until at the end, no means for the Court to address the legality of this egregious conduct is left on the table.[2]  In Defendants' view, despite the deep commitments to religious liberty and privacy enshrined in our laws, neither Congress nor the Framers of the Constitution intended for the federal government to be held accountable for adopting a program to intrusively surveil law-abiding American citizens because of their religion; and even if they did, they intended to allow the government to foreclose any legal challenge to such conduct simply by labeling it secret.

Defendants' view is not the law.  As Chief Justice Marshall recognized,

---

[1] As clarification, Plaintiffs have submitted a Claims Chart, identifying each claim, the relief sought, and the general defenses raised, as Attachment A to this brief.
[2] For a visual depiction of this sleight of hand, *see* http://youtu.be/o2kO_5cNF5k.

1

1   "The very essence of civil liberty certainly consists in the right of every individual

2   to claim the protection of the laws, whenever he receives an injury." *Marbury v.*

3   *Madison*, 1 Cranch (5 U.S.) 137, 163 (1803) (quoted in *Bivens v. Six Unknown*

4   *Fed. Narcotics Agents*, 403 U.S. 388, 397 (1971)).  And as Plaintiffs set forth in

5   detail, Defendants' analysis of each statute and constitutional provision is as

6   unsupportable as the result is unacceptable.

7          Most important, Defendants misunderstand Plaintiffs' discrimination claims

8   by arguing that Plaintiffs' allegations do not plausibly show discriminatory intent,

9   or that litigating them will require revealing secret motives to show that

10  Defendants were not motivated "solely" by religion.  But Plaintiffs' complaint

11  alleges that Defendants explicitly used religion as a factor in deciding whom to

12  surveil by instructing their informant to target *Muslims* for surveillance.  A

13  government action that expressly classifies persons on the basis of a suspect

14  classification constitutes facial discrimination.  Such facial classifications – even if

15  they employ religion as only one factor (rather than the sole factor) — are

16  impermissible unless they satisfy strict scrutiny.  *See Gratz v. Bollinger*, 539 U.S.

17  244, 270 (2003) (holding use of race as one factor in college admissions

18  unconstitutional); *Emp't Div. v. Smith*, 494 U.S. 872, 886 n.3 (1990) ("Just as we

19  subject to the most exacting scrutiny laws that make classifications based on race,

20  or on the content of speech, so too we strictly scrutinize governmental

21  classifications based on religion.").  And when government uses facial

22  classifications, there is no further need to infer discriminatory intent, nor to

23  examine whether the classification was adopted out of disdain for the suspect class.

24         Defendants have engaged in precisely this kind of facial discrimination

25  against Plaintiffs.  Federal law and our Constitution forbid it.

26                              **FACTS**

27         Plaintiffs' 69-page First Amended Complaint ("FAC" or "complaint") paints

28  down to the fine details a picture of an investigation that explicitly and

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

intentionally discriminated against Muslims because of their religion: FBI officers ran an undercover operation, the central and explicit purpose of which was to conduct surveillance and gather information on Muslims in Orange County. *See, e.g.*, FAC ¶¶ 88, 89 (agents did not limit informant to specific targets, but "repeatedly made clear that they were interested simply in Muslims"), ¶ 90 (gave informant no specific targets but "told him to gather as much information on as many people in the Muslim community as possible"), ¶ 100. Defendants told their informant, "We want to get as many files on [the Muslim] community as possible." FAC ¶ 90. They told him that "the United States was five to ten years behind Europe in the extent of Islamic presence, and that they needed to build files on as many individuals as possible so that when things started to happen, they would know where to go." FAC ¶ 90. They told him that "Islam is a threat to our national security." FAC ¶¶ 121, 162. They told him to focus on Muslims who appeared more devout (for example, as demonstrated by a willingness to attend late evening or early morning prayers) because they were "more suspicious." FAC ¶ 110; *see also id.* ¶¶ 89, 96, 104. They instructed him to get the names of any leadership figures within mosques, and told him that they considered the leaders in the Muslim community — board members and leadership of mosques and leaders of Muslim organizations — to be potential threats. FAC ¶¶ 91, 96, 144.

The complaint alleges that Defendants consistently gave instructions that made religion the primary criterion for suspicion by focusing explicitly on Muslims and the Muslim community: they gave the informant daily quotas on the number of Muslims he should get contact information from, FAC ¶ 131; told him to work out at the gym with members of the Muslim community in order to get close to them and obtain information, FAC ¶ 114; gave him a standing order to report on Muslims' charitable giving, travel plans, or fundraising activities, FAC ¶¶ 105, 106, 107, as well as any lectures, classes or any other events held at mosques, FAC ¶¶ 108, 109, 133. And while they discarded information

1   inadvertently gathered on non-Muslims, FAC ¶ 120, within the targeted group of

2   Muslims they were indiscriminate: they instructed the informant to unearth as

3   much information about as many Muslims as possible through as many methods as

4   possible, without specific targets.  FAC ¶¶ 101, 102, 103.

5        Although more detailed allegations would not be necessary to establish the

6   plausibility of Plaintiffs' discrimination claims, the FAC also contains information

7   about the government's internal policies and training that provide yet further

8   support to these claims — describing how, over the last several years, the Attorney

9   General's Guidelines and FBI internal policies have moved towards policies and

10  practices that explicitly focus on Muslims and Islam, *see, e.g.*, FAC ¶¶ 24-37, and

11  how the FBI has trained its agents that Islam inherently mandates violent action

12  against non-Muslims.  The FBI even recommended to its agents readings that

13  instructed that "Islam teaches that Muslims must wage war to impose Islamic law

14  on non-Muslim states" and "American Muslim groups are engaged in a huge

15  cover-up of Islamic doctrine and history," FAC ¶¶ 38, 39.[3]

16       With respect to the privacy and search allegations, the FAC alleges that

17  Defendants told the informant they did not need warrants for national security

18  investigations, FAC ¶ 136, and engaged in several types of clearly unlawful

19  warrantless surveillance.  Defendants' instructed the informant to take secret video

20  of the interior of mosques, including any security, and used the information to

21  enter mosques.  FAC ¶ 174.  Defendants secretly planted electronic surveillance in

22  mosques, including in Plaintiff Fazaga's office, FAC ¶ 95.  Defendants also

23  _____

24  [3] The FBI's discriminatory trainings were widely exposed just days after Plaintiffs
    filed their FAC, and have since been roundly condemned.  *See* Spencer Ackerman,

25  *Attorney General: FBI Hurt Terror Fight With 'Violent Muslim' Training*, Wired
    (Nov. 8, 2011), available at *http://www.wired.com/dangerroom/2011/11/holder-*

26  *fbi-islamophobia*; Spencer Ackerman and Noah Shachtman, *Video: FBI Trainer*

27  *Says Forget 'Irrelevant' al-Qaida, Target Islam*, Wired (Sept. 20, 2011), available
    at *http://www.wired.com/ dangerroom/2011/09/fbi-islam-qaida-irrelevant.*

28

4

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 55**

allowed the informant to use recording devices to capture private conversations at the mosque when he was not present, FAC ¶¶ 98, 126, 192, 211; to obtain warrantless video surveillance of mosques (including private areas) and even the inside of Plaintiff AbdelRahim's home, FAC, at ¶¶ 106, 108, 129, 172-73, 182, 192, 202; and to record every conversation the informant had with members of the Muslim community in his daily contact over more than a year, amassing personal information on hundreds if not thousands of Muslims.  FAC ¶ 2.

## **ARGUMENT**

Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted).  "To survive a motion to dismiss," this plain statement of facts "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  In *Twombly* and *Iqbal*, the Supreme Court identified a two-part approach in order to ensure that the allegations of a complaint give rise to more than a "sheer possibility" of wrongdoing. *Iqbal,* 129 S. Ct. at 1949–50.

First, a court reviews the complaint for any "bare assertions" of liability that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, as such assertions are "conclusory and not entitled to be assumed true." *Id.*  Next, the court examines the remaining factual allegations, and, in doing so, "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950.  To do so, the allegations must "nudge[]" a plaintiff's claims "across the line from conceivable to plausible," by "allow[ing] the court to draw the reasonable inference" that Defendants may be liable. *Id.* at 1951, 1949.  Even under *Iqbal*, Rule 8 does not require "detailed factual allegations," but requires only "more than an unadorned, the-defendant-

1    unlawfully-harmed-me accusation." *Id.* at 1949.  *See Padilla v. Yoo*, 633

2    F.Supp.2d. 1005, 1018-19 (N.D. Cal. 2009) ("The issue is not whether a plaintiff

3    will ultimately prevail but whether the claimant is entitled to offer evidence to

4    support the claims. . . . [T]o survive a motion to dismiss, a plaintiff's burden is

5    limited to setting forth factual allegations sufficient to raise the right to relief above

6    the speculative level. . . . That is, a plaintiff must allege facts that, taken as true, are

7    suggestive of illegal conduct.").

8         When a court considers a motion to dismiss, it must construe all allegations

9    of the complaint in the plaintiff's favor. *Hutton v. Law Offices of Collins &*

10   *Lamore*, 668 F.Supp.2d 1251, 1254 (S.D. Cal. 2009).

11   **I.    THE CONSTITUTION PROVIDES A DAMAGES REMEDY FOR**

12   **RELIGIOUS DISCRIMINATION AND UNLAWFUL**

13   **SURVEILLANCE UNDER *BIVENS***

14        In *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), the

15   Supreme Court held that an individual alleging a Fourth Amendment violation by

16   federal officers could sue those officers for damages directly under the

17   Constitution.  The Court has subsequently held that *Bivens* allows damages

18   remedies for discrimination in violation of the Fifth Amendment's Due Process

19   Clause, *Davis v. Passman*, 442 U.S. 228, 229 (1979), and violations of the Eighth

20   Amendment, *Carlson v. Green*, 446 U.S. 14, 25 (1980).  Under *Bivens*, the

21   Supreme Court and Ninth Circuit have repeatedly addressed damages claims

22   arising out law enforcement conduct, including discrimination and First

23   Amendment retaliation.

24        The Individual Capacity Defendants argue that this case should be different

25   — that even if they engaged in facial religious discrimination by targeting Muslims

26   in violation of the First Amendment and Equal Protection Clause, and even if they

27   repeatedly violated the Fourth Amendment with unlawful surveillance, this Court

28   should nonetheless dismiss Plaintiffs' constitutional claims without reaching the

merits for two reasons.  Both are meritless.[4]

First, Defendants argue that Congress has provided remedies in three federal statutes — the Religious Freedom and Restoration Act (RFRA), the Foreign Intelligence Surveillance Act (FISA) and the Privacy Act — that preclude a damages remedy for constitutional violations.  But Defendants' argument rests on a misunderstanding of Plaintiffs' discrimination claims — Plaintiffs claim that Defendants expressly used religion as a basis to target them for surveillance.  This harm is not addressed by RFRA (which addresses burdens placed on religious practice by neutral laws, not facial discrimination), the Privacy Act (which provides limited remedies for the maintenance of records of First Amendment activity, but does not limit the retention of records gathered under a policy that discriminates on the basis of religion), and certainly not by FISA, which addresses only discrete Fourth Amendment-related harms concerning electronic surveillance.

Second, Defendants TW argue that no damages are available for any constitutional violation, no matter how egregious, as long as the government officer who caused it was acting in the name of "national security."  Contrary to Defendants' assertions, the Supreme Court has *never* held national security to be a special factor to consider in withholding a *Bivens* remedy.  And in the one *Bivens* case to address national security, *Mitchell v. Forsyth*, 472 U.S. 511 (1985), the Court rejected the argument that "national security" justified absolute immunity from damages actions under *Bivens*, reasoning that "[t]he danger that high federal officials will disregard constitutional rights in their zeal to protect the national security is sufficiently real to counsel against affording such officials an absolute

---

[4] For clarity and brevity, Plaintiffs refer to Defendants FBI, United States, Mueller, and Martinez (the latter two of whom are sued in their official capacities) as the "Government."   Plaintiffs refer to Defendants Tidwell and Walls as "TW," and to Armstrong, Allen and Rose as "AAR," and to Defendants TW and AAR collectively as "Individual Capacity Defendants."

7

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

immunity." *Id.* at 523. The Ninth Circuit and district courts within it have addressed *Bivens* claims under the First Amendment in cases involving national security. *See Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1253-54, 1259 (9th Cir. 2008); *Padilla*, 633 F.Supp.2d at 1019. The lower court cases on which Defendants rely involve matters of foreign policy or military activity expressly delegated to the Executive by the Constitution; they do not control this case, which challenges the investigation of civilian American citizens and residents by a domestic law enforcement agency on U.S. soil.

Most important, to deny a *Bivens* remedy here the Court would have to conclude either that discrimination on the basis of religion is the only constitutionally forbidden discrimination for which a damages remedy is unavailable, or that "national security" concerns grant unfettered immunity to the FBI in an investigation of Americans in Orange County. Governing law forecloses both of these unsavory results.

## A.    This Case Does Not Present An Extension Of *Bivens*

A court considering whether a *Bivens* remedy should proceed must first determine whether the case presents a "new context" or "new category of defendants." *Corr. Servs. Corp. v Malesko*, 534 U.S. 61, 68 (2001). The present case is not an extension of *Bivens*; it involves the type of unconstitutional law enforcement conduct that lies at the heart of *Bivens* jurisprudence.

### 1.   *Claims Alleging Discrimination By Law Enforcement Officers Lie at the Core of* Bivens

The basic facts of Plaintiffs' claims — the FBI targeted them for investigation because of their religion and unlawfully surveilled them — put this case in the heartland of *Bivens* actions by raising claims of discrimination and challenging unlawful conduct by law enforcement during an investigation.

Courts have routinely allowed *Bivens* claims alleging discrimination, including on the basis of religion. *Davis* held that *Bivens* allows damages claims

8

by plaintiffs alleging unconstitutional discrimination by federal officials under the equal protection component of the Fifth Amendment.[5] 442 U.S. at 229. As set forth in detail below, courts have generally recognized that classification on the basis of religion violates equal protection. *See infra* Part II.E. Plaintiffs' claim for religious discrimination therefore can be brought directly under *Davis*.[6] Indeed, the *Davis* Court contemplated its holding would encompass religious discrimination. It explicitly followed *U. S. ex rel. Moore v. Koelzer*, 457 F.2d 892 (3rd Cir. 1972), which held a plaintiff could bring claims under *Bivens* that FBI agents procured false testimony because of his race and religion. *See Davis*, 442 U.S. at 244 n.22.

Moreover, courts have consistently adjudicated *Bivens* claims asserting religious discrimination and violations of the Free Exercise Clause. Both the Ninth Circuit and district courts within it have addressed *Bivens* claims for religious discrimination and Free Exercise violations, including in cases that raise national security concerns. *See Ibrahim*, 538 F.3d at 1254 n.4 (addressing *Bivens* claim of religious discrimination in detention by police and federal airport authorities); *Padilla*, 633 F.Supp.2d at 1019 (allowing *Bivens* remedy for, *inter alia*, First Amendment religion claims against alleged architect of the policies that led to plaintiff's detention as "enemy combatant"); *Mayfield v. Gonzales*, 2005 WL 1801679, at *1 & n.1, *9-10 (D. Or. July 28, 2005) (addressing *Bivens* claim

_____

[5] The analysis for claims of discrimination against federal officials under the Fifth Amendment's Due Process Clause is "precisely the same" as that for discrimination claims against state officials under the Equal Protection Clause. *Weinberger v. Wiesenfeld* 420 U.S. 636, 638 n.2 (1975).

[6] The Ninth Circuit allowed *Bivens* actions challenging discrimination on the basis of race, *see Nurse v. United States*, 226 F.3d 996, 999-1000 (9th Cir. 2000) (reversing dismissal of *Bivens* action against U.S. Customs agents who plaintiff alleged detained, arrested and searched her solely on the basis of her race without reasonable suspicion or probable cause), and national origin, *see Castaneda v. United States*, 546 F.3d 682, 688 n.6 (9th Cir. 2008), *reversed on other grounds sub nom. Hui v. Castaneda*, 130 S.Ct. 1845 (2010).

9

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

against FBI agents that arrested plaintiff on suspicion he participated in the Madrid train bombings, allegedly "based upon his Muslim religion"); *see also Kwai Fun Wong v. United States*, 373 F.3d 952, 959, 961 (9th Cir. 2004) (addressing *Bivens* claim of religious discrimination, though reserving question whether immigration laws created comprehensive remedial scheme that precludes *Bivens* remedy); *Resnick v. Adams*, 348 F.3d 763, 765 (9th Cir. 2003) (addressing federal prisoner's *Bivens* claim that obstacles to obtaining kosher food violated First Amendment); *Scott v. Rosenberg*, 702 F.2d 1263,1266 (9th Cir. 1983) (assuming that church president could file damages action against FCC officers alleging violation of Free Exercise Clause arising out of FCC investigation into television and radio programs). In light of these cases, Defendants' argument that a claim for religious discrimination requires an "extension" of *Bivens* is meritless.

In addition, courts have consistently found *Bivens* applicable in the factual context of misconduct by law enforcement officers during an investigation, ever since *Bivens* itself recognized a damages remedy to address claims of an unconstitutional search and detention by "*Six Unknown Federal Narcotics Agents*," *see Bivens*, 403 U.S. at 389.  Courts have allowed *Bivens* remedies for a range of constitutional violations by law enforcement, including a variety of claims under the Fourth Amendment,[7] as well as violations of the Fifth Amendment's Due Process Clause,[8] and the First Amendment's speech protections.[9]  Courts have long

---

[7] *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (execution of facially unreasonable warrant); *Wilson v. Layne*, 526 U.S. 603, 608 (1999) (unreasonable search due to presence of media); *Anderson v. Creighton*, 483 U.S. 635, 637 (1987) (warrantless search of home); *Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004) (wrongful arrest); *Harris v. Roderick*, 126 F.3d 1189, 1205 (9th Cir. 1997) (excessive force and conspiracy to blame plaintiff for shootout).

[8] *See, e.g.*, *DiMartini v. Ferrin* 889 F.2d 922, *amended on pet. for rehearing en banc*, 906 F.2d 465, 466 (9th Cir. 1990) (*Bivens* due process claim against FBI agent plaintiff claimed caused him to be fired from his job with a private employer because agent believed plaintiff had not cooperated with investigation).

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1  allowed *Bivens* actions charging that law enforcement acted based on illegal

2  motives, including discrimination, *supra*, and retaliation in violation of the First

3  Amendment. *See Gibson v. United States*, 781 F.2d 1334, 1342 (9th Cir. 1986)

4  (holding plaintiff could bring *Bivens* claim under First Amendment against FBI

5  agents who allegedly sought to discourage her political activities by wiretapping

6  her telephone, passing defamatory information to her employers, and seeking to

7  entrap her in contraband drug transactions); *see also Hartman v. Moore*, 547 U.S.

8  250, 256 (2006) (stating First Amendment retaliation claim proper "on the

9  authority of *Bivens*").[10]

10  ## 2. *'National Security' Does Not Make This a New Context*

11  Defendants argue that this case is transformed to a new context by national

12  security, asserting that "no court has inferred a damages cause of action under the

13  Fourth or Fifth Amendment to remedy alleged injuries" in a similar context, but

14  that assertion cannot be reconciled with *Mitchell*. Leaving aside that Defendants

---

16  [9] *Dellums v. Powell*, 566 F.2d 167, 194-95 (D.C. Cir. 1977) (permitting First
Amendment *Bivens* claim alleging federal officers prevented plaintiffs from
17  engaging in war protest); *Paton v. La Prade,* 524 F.2d 862, 870 (3d Cir. 1975)
(providing *Bivens* relief to plaintiffs on First Amendment claims that FBI agents
18  conducted unlawful surveillance of plaintiffs' lawful political correspondence).
19  [10] Following *Gibson*, the Ninth Circuit has repeatedly entertained *Bivens*
challenges to law enforcement investigations as retaliation for protected First
20  Amendment speech. *See, e.g.*, *Moss v. Secret Service*, 572 F.3d 962, 967 n.4 (9th
Cir. 2009) (*Bivens* claim by protestors that secret service relocated demonstration
21  because protestors were critical of the president, in violation of their First
22  Amendment rights); *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 14 F.3d 457, 461-
64 (9th Cir. 1994) (*Bivens* claims against FBI officers for chilling plaintiffs' First
23  Amendment free speech rights by unlawfully arresting them, releasing false
24  accusations about their responsibility for a bombing of the plaintiffs' own car, and
interrogating their associates); *Erickson v. United States*, 976 F.2d 1299, 1301 (9th
25  Cir. 1992); *Labadie v. United States*, 2011 WL 1376235, 3 (W.D. Wa. Apr. 12,
26  2011); *Denney v. Drug Enforcement Admin.*, 508 F.Supp.2d 815, 835 (E.D. Cal.
2007) (*Bivens* claim DEA investigated plaintiff in retaliation for his advocacy of
27  medical marijuana).

28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 62**

1    have not defined the contours of the "national security" category of potential

2    *Bivens* case and explained why this case fits within it, *see* Pl. Opp. to Gov't MTD

3    41 n.24, *Mitchell* allowed a *Bivens* action  to proceed where the plaintiff sought

4    damages for being subject to warrantless phone wiretaps during investigation of a

5    group plotting to blow up parts of federal buildings and kidnap then-National

6    Security Advisor Henry Kissinger.  472 U.S. at 513.  In *Mitchell*, the Court

7    explicitly rejected the notion that officials acting in the interests of "national

8    security" should enjoy absolute immunity from *Bivens* claims, reasoning that "[t]he

9    danger that high federal officials will disregard constitutional rights in their zeal to

10   protect the national security is sufficiently real to counsel against affording such

11   officials an absolute immunity." *Id.* at 523.  While *Mitchell* framed the issue as one

12   of absolute immunity, rather than an inquiry under the *Bivens* special factors, the

13   Court rejected the same argument that Defendants offer here: that plaintiffs should

14   be categorically barred from bringing damages actions against law enforcement in

15   national security investigations.[11]

16       More recently, a California district court in *Padilla v. Yoo* explicitly held

17   that *Bivens* claims under the First, Fourth and Fifth Amendments could proceed to

18   challenge the treatment of an American detained as an enemy combatant.  633

19   F.Supp.2d at 1019-30.  Other courts, including the Ninth Circuit, have assumed

20   that *Bivens* creates a cause of action to address claims of religious discrimination in

21   response to government action in the name of national security.  *See Ibrahim*, 538

22   F.3d at 1259 (allowing *Bivens* claim of religious discrimination to proceed against

23   Transportation Security Intelligence Service officer); *Mayfield*, 2005 WL 1801679,

24

25   [11] Neither national security nor interference with foreign affairs deterred the

26   Supreme Court more than 200 years ago from allowing a damages action against
     the commander of an American warship who seized cargo on the President's

27   orders blockading French ports, where those orders exceeded congressional

28   authorization. *Little v. Barreme*, 2 Cranch (6 U.S.) 170 (1804).

at *1 & n.1, *9-10 (addressing *Bivens* claim that FBI agents arrested plaintiff in connection with Madrid train bombings because he was Muslim).

### B. Even If This Case Is an Extension, a *Bivens* Remedy Is Available

Even were the Court to conclude that this case does raise a new context for *Bivens* actions, it should still recognize a damages remedy for the constitutional violations alleged here. A court considering whether a *Bivens* remedy is appropriate in a new context asks first "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). If the court concludes that "[i]t would be hard to infer that Congress expected the Judiciary to stay its *Bivens* hand, but equally hard to extract any clear lesson that *Bivens* ought to spawn a new claim," step two of the analysis directs the court to "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done," "paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation," *Id.* at 554, 550. Courts have undertaken this analysis in light of *Bivens'* two primary purposes. As Chief Justice Rehnquist wrote in *Malesko*, "*Bivens* from its inception has been based …on the deterrence of individual officers who commit unconstitutional acts." 534 U.S. at 71. *Bivens* also "provide[s] a cause of action for a plaintiff who lack[s] any alternative remedy for harms caused by an individual officer's unconstitutional conduct." *Id.* at 70 (emphasis omitted). Only where "such circumstances are not present" has the Court "consistently rejected invitations to extend *Bivens*." *Id.*

#### 1. *No Statutory Scheme Indicates Congress's Intent to Displace* **Bivens** *Remedies*

Although several statutes address harms tangentially related to those at issue here, no statutory scheme indicates Congress's intent to displace the *Bivens* remedies that Plaintiffs seek. As *Wilkie* made clear, the existence of statutory

13

1   schemes figures into the *Bivens* analysis in two ways.  First, at step one of the
2   *Bivens* analysis, the Court examines whether there is a statutory scheme
3   sufficiently comprehensive that, from its enactment, a court can "infer that
4   Congress expected the Judiciary to stay its *Bivens* hand." *Wilkie*, 551 U.S. at 554;
5   *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988) (*Bivens* action  not warranted
6   "[w]hen the design of a Government program suggests that Congress has provided
7   what it considers adequate remedial mechanisms for constitutional violations"); *W.*
8   *Radio Servs. Co. v. U.S. Forest Service*, 578 F.3d 1116, 1122 (9th Cir. 2009)
9   (Administrative Procedure Act, which "expressly declares itself to be a
10  comprehensive remedial scheme," precluded *Bivens* challenge to unfavorable
11  agency actions).  At the first stage, courts should decline to recognize a *Bivens*
12  remedy only where "Congress' failure to provide money damages, or other
13  significant relief, has not been inadvertent." *Berry v. Hollander*, 925 F.2d 311, 314
14  (9th Cir. 1991) (quotations omitted).  In *Wilkie*, even where the plaintiff had "an
15  administrative, and ultimately a judicial, process for vindicating virtually all of his
16  complaints," 551 U.S. at 553, the Court held that because the available remedies
17  were "a patchwork, an assemblage of state and federal, administrative and judicial
18  benches applying regulations, statutes, and common law rules," *id.* at 554, "[i]t
19  would be hard to infer that Congress expected the Judiciary to stay its *Bivens*
20  hand," *id.*, and the Court should proceed to the second step of the analysis.
21      Second, when the Court "weighs reasons for and against the creation of a
22  new cause of action, the way common law judges have always done," at step two
23  of the *Bivens* analysis, the existence of alternative remedies again arises and
24  (contrary to Defendants' assertion, *see* TW Br. 19) the absence of a statutory
25  remedy weighs *in favor* of allowing a constitutional one.[12]  In *Wilkie*, although the

---

[12] Defendants on this point cite *Stanley*, in which the Court held that the absence of
remedies for the plaintiff was irrelevant to its particular determination in that case
that "the unique disciplinary structure of the Military Establishment and Congress'
(*cont'd*)

14

1    Court noted that the plaintiff "had ready at hand a wide variety of administrative

2    and judicial remedies to redress his injuries," 551 U.S. at 562; *see also id.* at 555,

3    the "inadequacy of discrete, incident-by-incident remedies" in addressing the

4    plaintiff's complaints about "the course of dealing as a whole" ultimately weighed

5    in favor of creating a remedy. *See id.* at 554 ("Here, the competing arguments boil

6    down to one on a side: from [plaintiff], the inadequacy of discrete, incident-by-

7    incident remedies; and from the Government and its employees, the difficulty of

8    defining" a workable standard for the cause of action).

9                            a.  Privacy Act

10          Defendants argue that the Privacy Act precludes Plaintiffs' First and Fifth

11   Amendment claims, because, they assert, Congress fashioned the statute to remedy

12   "precisely the injury" Plaintiffs allege: that a federal agency "maintain no record

13   describing how any individual exercises rights guaranteed by the First

14   Amendment." 5 U.S.C. 552a(e)(7).

15          Defendants simply misunderstand the injury Plaintiffs allege in their

16   Constitutional claims.  Plaintiffs' primary constitutional claims are that the FBI

17   "gathered the information [about Plaintiffs] simply *because* the targets were

18   Muslim."  FAC ¶ 3. (emphasis added).  The constitutional injury is discrimination

19   — not just that their religious activities were burdened because they were

20   monitored, but that all of their activities – both religious and non-religious — were

21   subjected to investigation because of their religion.  *Cf. Northeastern Fla. Chapter*

22   *of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666

23   (1993) ("The 'injury in fact' in an equal protection case ... is the denial of equal

24   ─────────────────────────────────────────────

     activity in the field," and the "explicit constitutional authorization for *Congress*" to

25   regulate the Military, nonetheless precluded a *Bivens* remedy.  483 U.S. at 683,

26   682-83 (emphasis in original).  *Wilkie* makes clear, however, that as a general

     matter the absence of a full remedy (even where a partial one exists) weighs in

27   favor of creating one.  *Wilkie*, 551 U.S. at 554 (weighing "inadequacy" of remedies

28   in favor of recognizing remedy).

─────────────────────────────────────────────

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 66**

1   treatment . . . "). Section (e)(7) of the Privacy Act restricts federal officials from

2   maintaining records of religious activity, but it does not purport to provide

3   remedies for law enforcement who act for constitutionally forbidden reasons.  If it

4   did, it would preclude *Bivens* remedies for law enforcement actions in retaliation

5   for protected speech, a *Bivens* action the Ninth Circuit has repeatedly recognized.

6   *See supra* Part I.B.1.a.[13]

7        Even if the Privacy Act did address the harms of which plaintiffs complain,

8   its remedies do not serve *Bivens*' twin purposes of deterring individual officers and

9   providing a meaningful remedy.  *See Malesko*, 534 U.S. at 70, 71.  Like the

10  Federal Tort Claims Act (FTCA), it provides a remedy only against the agency, not

11  against the federal officer responsible for the violation.  In *Carlson*, the Court

12  relied in part on this very reason to conclude that the FTCA does not create a

13  sufficient deterrent to justify denial of a *Bivens* remedy.  *See Carlson*, 446 U.S. at

14  21; *Padilla*, 633 F.Supp.2d at 1021.  *Carlson*'s reasoning applies with equal force

15  here, particularly given the Government's arguments that the FBI's records are

16  entirely exempt from the Privacy Act and that Section (e)(7) provides no

17  enforceable remedy at all.  *Compare Malesko*, 534 U.S. at 70, and *Carlson*, 446

18  U.S. at 22, *with* Gov't Br. 15-16.

19       Defendants point to two cases that find the Privacy Act a basis to refuse a

20  *Bivens* remedy, but both are distinguishable because they involve very different

21  harms (both related to the disclosure of information) which are specifically

22  regulated by the Privacy Act. *Downie v. Middleburg Heights*, 301 F.3d 688 (6th

23  Cir. 2002), held a *Bivens* remedy was unavailable because the Privacy Act

24

25  [13] In keeping with this theory, while Plaintiffs bring a claim under Section (e)(7) of

26  the Privacy Act seeking expungement of records which describe their religious

     activities, they also make a separate and distinct claim under the Constitution for

27  expungement of records that the government gathered simply because they were

28  Muslim.  *See* Plfs. Opp. to Gov't Defs., Part I.B.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1   provided a damages remedy for the precise wrongs alleged, and the plaintiff

2   needed only to sue under the statute, rather than the Constitution.  *See id.* at 696,

3   696-97.  In *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008), the court held that the

4   Privacy Act generally regulated the precise injury of which plaintiffs complained

5   (disclosure of information), but intentionally omitted a damages action against the

6   particular defendants Wilson had sued, exhibiting Congressional intent to preclude

7   a damages remedy.  Even accepting the logic of *Wilson* (which is not binding and

8   is strongly questioned by the dissent), it does not bar a *Bivens* remedy here.  Unlike

9   *Wilson*, plaintiffs' constitutional claim is not for "improper [collection] of

10   information subject to the Privacy Act's protections," *id.* at 707, but rather for

11   collection of information based on a discriminatory purpose.

12       Because the Privacy Act neither provides any meaningful remedy for

13   religious discrimination by law enforcement nor evinces any intent by Congress to

14   preclude one, it does not bar a *Bivens* remedy.

15               b.  RFRA

16       Defendants TW argue that the enactment of RFRA indicates "Congress's

17   intent that it, rather than the judiciary, should decide whether to create a damages

18   remedy" for the claims Plaintiffs present.  TW Br. 18.  Defendants' argument is

19   plainly meritless given the clear text and purpose of RFRA.  Indeed, Defendants

20   cite no case holding that RFRA precludes any kind of *Bivens* action, let alone a

21   discrimination action, and this Court should not be the first to adopt that rule.[14]

22       First, Congress made its intent in enacting RFRA clear and explicit: to

23   *expand* the remedies available for plaintiffs by overruling *Emp't Div. v. Smith*, 494

24

25   [14] RFRA provides that "[g]overnment shall not substantially burden a person's
26   exercise of religion even if the burden results from a rule of general applicability,"
     unless the government demonstrates a "compelling governmental interest" and
27   uses the "least restrictive means" of furthering that interest.  42 U.S.C. § 2000bb–
     1(a), (b).  *See infra*, Part I.B.1.b.
28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

U.S. 872 (1990), which "virtually eliminated the requirements that the government justify burdens on religious exercise imposed by laws neutral toward religion," 42 U.S.C. 2000bb(a)(4), and "to restore the compelling interest test as set forth" in pre-*Smith* cases." *Id.* § 2000bb(b). The Senate report explains further that "the purpose of this act is only to overturn the Supreme Court's decision in *Smith*," and, "[t]o be absolutely clear, the act does not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with the Supreme Court's free exercise jurisprudence under the compelling governmental interest test prior to *Smith*." S. Rep. No. 103-111, pt. V(f), at 12 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1902. The report noted this to quell concerns that the act could have "unintended consequences and unsettle other areas of the law." *Id.*

Similarly, RFRA contains a provision entitled "Establishment Clause unaffected," which states that "Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the 'Establishment Clause')." 42 U.S.C. 2000bb-4. It establishes beyond dispute that RFRA did not extinguish a *Bivens* remedy for Establishment Clause violations.

Finally, RFRA does not provide a remedy for most of the unlawful conduct Plaintiffs' allege. As set forth in detail *infra*, Part II.A, the core of Plaintiffs' complaint is not burden by neutral law or conduct, but intentional discrimination through facial classification on the basis of religion, which RFRA does not address. Indeed, the Supreme Court has never analyzed such facial classifications under the "substantial burden" test, but always instead under strict scrutiny. As the Supreme Court has concluded, Congress in passing RFRA simply was not concerned with intentional discrimination. *See City of Boerne v. Flores*, 521 U.S. 507, 530-31 (1997); *cf.* 42 U.S.C. 2000bb(a)(4); *id.* § 2000bb(a)(4) (RFRA restores protection for "burdens on religious exercise imposed by laws neutral toward religion"); *see also Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir.1995).

Case: 12-56867   04/29/2015   ID: 9519714   DktEntry: 66-2   Page: 73 of 289

### c.  FISA

Defendants TW suggest that FISA provides sufficient evidence of Congress' intent to preclude *Bivens* claims under the Fourth Amendment. But because FISA's cause of action is not limited to national security cases, Defendants must explain why courts have addressed *Bivens* claims for electronic surveillance regularly in the past thirty years. *See, e.g.*, *Mitchell*, 472 U.S. at 513; *Gibson*, 781 F.2d at 1342. Unsurprisingly, then, Defendants point to no case holding that FISA precludes a *Bivens* remedy, and this Court should not be the first to do so.

*          *          *

None of the statutory schemes to which Defendants point either set forth an "elaborate remedial scheme" comprehensive enough to demonstrate that "Congress expected the Judiciary to stay its *Bivens* hand," *Wilkie*, 551 U.S. at 554, or provide an alternative remedy for religious discrimination that constitutes a "special factor counseling hesitation." *Id.*

### 2.  *No Special Factors Justify Precluding a Bivens Remedy*

If the Court agrees that no statute evinces Congress's intent to preclude a *Bivens* remedy, it must then "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done," "paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Wilkie*, 551 U.S. at 554, 550.[15]

Defendants vastly overstate the reluctance of courts to allow *Bivens* remedies.  While the Supreme Court has extended *Bivens* twice, to claims of discrimination under the Due Process Clause in *Davis* and cruel and unusual punishment under the Eighth Amendment in *Carlson*, the Court has relied on only two "special factors" to deny a *Bivens* remedy (other than the congressional

---

[15] Contrary to the suggestion of Defendants TW, the mere existence of a special factor does not mean no *Bivens* remedy is available, TW Br. 14, as the Supreme Court's balancing analysis in *Wilkie* shows.  551 U.S. at 555.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

preclusion that the *Wilkie* Court recast as step one of the *Bivens* analysis)[16] —
intrusion on "'the unique disciplinary structure of the Military Establishment and
Congress' activity in the field'" pursuant to an "explicit Constitutional
authorization for *Congress*" to regulate the military, *United States v. Stanley*, 483
U.S. 669, 683, 682-83 (1987) (quoting *Chappell v. Wallace*, 462 U.S. 296, 304
(1983) and citing U.S. Const. Art. I, § 8, cl. 14); and "difficulty in defining a
workable cause of action," *Wilkie*, 551 U.S. at 555. Neither factor is present here.

While the Court has at various times declined to extend *Bivens* to defendants
other than individual federal officers, *see, e.g.*, *FDIC v. Meyer*, 510 U.S. 471, 473
(1994) (holding federal agency could not be named as a defendant in a *Bivens*
action); *Malesko*, 534 U.S. at 71-74 (holding *Bivens* did not provide constitutional
damages action against private prison corporation), those holdings obviously say
little if anything about the applicability of *Bivens* to individual federal law
enforcement officers, who were also the defendants in *Bivens* itself.

It also bears noting that, contrary to Defendants' suggestion, the rule that
courts should hesitate to infer a private action from a statute (when Congress failed
to do so), is not applicable to the Constitution, where the founders would not have
included causes of action among the document's broad statements of principles,
but nonetheless clearly intended the rights conferred to be enforced by the
judiciary. *See* Hon. Marsha S. Berzon, *Securing Fragile Foundations: Affirmative
Constitutional Adjudication In Federal Courts,* 84 N.Y.U. L. Rev. 681, 683-84
(2009) ("[S]tatutory causes of action (particularly so-called implied causes of
action) and direct, affirmative constitutional claims are largely distinct and are not
usefully analyzed as though they were the same."); Sir William Blackstone, 3
COMMENTARIES ON THE LAWS OF ENGLAND 109 (Worcester: Isiah Thomas 1790)

---

[16] *See, e.g.*, *W. Radio Servs.*, 578 F.3d at 1123 (citing *Schweiker* and other cases
involving comprehensive remedial schemes in *Wilkie* step-one analysis).

1   ("[I]t is a settled and invariable principle in the laws of England, that every right,

2   when withheld, must have a remedy, and every injury its proper redress.").

3        Fundamentally, *Bivens* preserves the Constitution's careful balance of power

4   by establishing a means for courts to enforce the individual rights (and limitations

5   on government power) the Constitution already sets forth.  As *Davis* reasoned,

6   "unless such rights are to become merely precatory, the class of those litigants who

7   allege that their own constitutional rights have been violated, and who at the same

8   time have no effective means other than the judiciary to enforce these rights, must

9   be able to invoke the existing jurisdiction of the courts for the protection of their

10  justiciable constitutional rights." *Davis*, 442 U.S. at 242; *see also Marbury v.*

11  *Madison*, 1 Cranch (5 U.S.) 137, 163 (1803) ("The very essence of civil liberty

12  certainly consists in the right of every individual to claim the protection of the

13  laws, whenever he receives an injury.") (quoted in *Bivens*, 403 U.S. at 397).

14       Defendants point to only two "special factors" that they argue justify

15  denying Plaintiffs a remedy for their constitutional injuries — national security

16  issues and the assertion of state secrets privilege.  TW Br. 14.  Neither suffices.

17                    a.  <u>National Security</u>

18       Defendants TW argues that "national security" is a special factor that

19  justifies denial of a *Bivens* remedy because the case "probes into the predicates,

20  subjects, and methods of an FBI counterterrorism investigation."  TW Br. 16. *See*

21  TW Br. 14-16.  This argument is based on several distortions of the law.

22       First, Defendants ignore the only *Bivens* action involving national security at

23  the Supreme Court.  *See supra* Part I.A.2 (discussing *Mitchell v. Forsyth*).  Indeed,

24  *Mitchell* held that qualified immunity would provide adequate protection from

25  frivolous lawsuits in a case involving national security, and that "[w]here an

26  official could be expected to know that his conduct would violate statutory or

27  constitutional rights, he *should* be made to hesitate. This is as true in matters of

28  national security as in other fields of governmental action." *Id.* (emphasis in

21

*Mitchell*).  Although *Mitchell* framed the issue as absolute immunity from suits for damages, rather than the absence of a damages remedy, its rationale forecloses Defendants' argument here.

Even apart from *Mitchell*, Defendants' bold assertion that "[t]he Supreme Court consistently has held that *Bivens* should not be extended in cases involving 'determinations relating to national security'" is flatly incorrect.  *Id*.  The Supreme Court has *never* so held, and recent cases give little indication it would do so.  The cases Defendants cite that mention "national security" are not *Bivens* cases.[17]  Indeed, in one case on which they rely, *Boumediene v. Bush*, 553 U.S. 723 (2008), notwithstanding the Court's observation (quoted by Defendants) that judges do not "begin the day with briefings" on "serious threats to our Nation," the Court *rejected* the argument that courts should defer to the political branches.  The Court found that "Security subsists, too, in fidelity to freedom's first principles," *id.* at 797, and held that the Constitution required judicial oversight of enemy combatant detention through habeas corpus.  In many other contexts, too, the Court has rejected the notion that issues of national security bar judicial scrutiny.  *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality) ("Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake.");  *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934) ("[E]ven the war

---

[17] *See Haig v. Agee*, 453 U.S. 280 (1981) (addressing, on claim for declaratory and injunctive relief only, whether Passport Act conferred on Secretary of State the authority to revoke a passport upon determining that passport hold's foreign activities damaging to national security); *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2727 (2010) (adjudicating whether statute prohibiting provision of "material support or resources" to groups designated as foreign terrorist organizations was unconstitutionally vague or impermissibly burdened speech and association); TW Br. 1, 15 (citing *Haig* and *HLP*).

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 73**

1    power does not remove constitutional limitations safeguarding essential

2    liberties."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

3         Defendants cite to *Stanley* and *Chappell* as if those cases addressed "national

4    security" as a special factor, but they did not.  Those cases declined to extend

5    *Bivens* to claims arising from military service because the Constitution expressly

6    commits authority over military matters to Congress, and because alternate

7    remedies exist within the military system.  *See Stanley*, 483 U.S. at 681-82

8    (declining to make *Bivens* available for incidents arising out of military service

9    because of "explicit constitutional authorization for Congress 'to make Rules for

10   the [military]'" and "the insistence . . . with which the Constitution confers

11   authority over the Army, Navy, and militia upon the political branches" (quoting

12   U.S. Const. art. I, § 8, cl. 14)); *Chappell*, 462 U.S. at 300-04 (declining *Bivens*

13   remedy in military context, relying on "the unique disciplinary structure of the

14   military establishment and Congress' activity in the field").  Nothing in these

15   opinions justifies withholding a *Bivens* remedy based on a generalized invocation

16   of "national security," or that Americans give up their constitutional rights when

17   FBI agents claim to be acting in the name of "counterterrorism."

18        Finally, three circuit cases mention "national security" in discussing special

19   factors under *Bivens*, but all of them arise in very different factual circumstances

20   and reflect a concern with "national security" primarily as related to interference

21   with foreign affairs.[18]  In *Mirmehdi v. United States*, __ F.3d __, 2011 WL

22   5222884 (9th Cir. Nov. 3, 2011), the Ninth Circuit held that four unlawfully

23   _____

24   [18] Defendants also cite *Beattie v. Boeing Co.*, in which the Tenth Circuit refused to
     allow a *Bivens* challenge to Boeing's revocation of an employee's security

25   clearance, on not on generalized grounds of "national security," but because the
     Supreme Court had explicitly held (in another context) the grant of security

26   clearances to be committed by law to the discretion of the Executive Branch and

27   beyond review.  43 F.3d 559, 564-65 (10th Cir. 1994) (relying on *Dep't of Navy v.
     Egan*, 484 U.S. 518 (1988)).

28

1    present non-citizen plaintiffs could not bring a *Bivens* action to challenge their

2    allegedly wrongful detention pending removal proceedings under the Immigration

3    and Nationality Act ("INA").  But *Mirmehdi* based its holding in major part on the

4    context of removal proceedings and its conclusion (under the first step of *Wilkie*)

5    that the INA and habeas remedies constituted a "substantial, comprehensive, and

6    intricate remedial scheme" that indicated Congressional intent to foreclose

7    damages remedies.  *See id.* at *4 (quotation omitted).  The court mentioned

8    "national security" only briefly, noting that immigration issues "have the natural

9    tendency to affect diplomacy, foreign policy, and the security of the nation" that

10   further "counsel[ed] hesitation." *Id*.  This passing reference emphasizes

11   "diplomacy and foreign policy," more than "national security," and in any event

12   cannot be read to foreclose *Bivens* remedies for domestic surveillance given

13   *Mitchell* and various other challenges to law enforcement action.

14         In *Wilson v. Libby*, a panel of the D.C. Circuit (over a vigorous dissent)

15   declined to recognize a *Bivens* remedy for claims by a CIA agent that officials

16   from the Vice President's office had leaked her identity as a CIA officer,

17   effectively ending her career.  As in *Mirmehdi*, the court relied chiefly on its

18   conclusion that a statute (the Privacy Act) provided a "comprehensive scheme"

19   that precluded "additional remedies under *Bivens*." 535 F.3d at 707.  The court

20   further noted the difficulty inherent in "inquiry into . . . the job risks and

21   responsibilities of covert CIA agents," and that such intrusion into "matters of

22   national security and sensitive intelligence information" provided "further support"

23   for its refusal to allow a *Bivens* remedy.  *Id.* at 710.  Here, unlike in *Wilson*, there is

24   no comprehensive remedial scheme, and Plaintiffs' have not pled claims that

25   directly involve the inner workings of the CIA.

26         Defendants also point to *Arar*, in which the Second Circuit (over vigorous

27   dissents) used the term "national security" in discussions of *Bivens* special factors.

28   Again, however, the court referred to the foreign policy aspects of a challenge to

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 75**

the treatment of a foreign citizen abroad by cooperating foreign governments, none of which are applicable here. *See Arar*, 585 F.3d at 575-76 (citing President's plenary "international relations" power, judicial incompetence in foreign policy, and unique context concerning treatment of "foreign subjects abroad" by "military and foreign policy officials" in light of "[t]he special needs of foreign affairs."). None of these concerns apply to a claim of religious discrimination by a law enforcement agency investigating Americans on American soil — a context in which courts regularly inquire into the discriminatory motives of law enforcement investigations. *See e.g.*, *Mitchell*, *Gibson*, *Nurse, supra* Part I.A.1.[19]

In sum, none of the authority on which Defendants rely suggests that generalized concerns for "national security" should preclude *Bivens* remedies for American citizens and residents harmed by federal officials on American soil, and indeed, *Mitchell* strongly counsels against such a conclusion. District courts have found *Bivens* remedies available in cases involving American civilians harmed in the name of national security, even when the harm occurred at the hands of the military abroad. *See Padilla*, 633 F.Supp.2d at 1019 (American citizen subjected to prolonged detention as enemy combatant); *Vance v. Rumsfeld*, 694 F.Supp.2d 957, 975 (N.D. Ill. 2010) (American citizens detained under harsh conditions by the military while working as contractors in Iraq could bring *Bivens* action).

---

[19] Framing the *Arar* court's analysis was its conclusion that the plaintiff was challenging the "'policy' of extraordinary rendition," 585 F.3d at 575. Defendants suggest that this action similarly challenges counterterrorism policies. TW Br. 16. But this is not true — Plaintiffs claims arise solely from the one investigation, Operation Flex, alleged to have occurred Orange County. Plaintiffs do point to various FBI policies and training showing an increasing tolerance of racial and religious profiling, *see* FAC ¶¶ 24-37, but do not in challenge these policies or bring claims against their drafters, but include them only to demonstrate a climate supports the plausibility of allegations of religious discrimination in this particular operation. *Cf. also Iqbal* (challenging detention policies); *Padilla* (claim against architect of policy allowing plaintiff to be detained as an "enemy combatant").

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1                      b.  <u>State Secrets</u>

2        Defendants TW also offer "state secrets" as a separate factor counseling

3 hesitation, arguing that because they could not defend themselves without risking

4 disclosure of information the government has asserted is a state secret, no remedy

5 should be recognized.  TW Br. 16.  Aside from the fact that the state secrets

6 privilege should not apply in this case, *see* Plfs. Opp. to Gov't Defs., Part III, no

7 court has counted the assertion of state secrets as a special factor, for good reason:

8 this argument is simply the *Reynolds* privilege analysis, dressed as a *Bivens* special

9 factor.  The court should address the argument under the framework set forth in

10 *Reynolds*.  *See Black v. United States*, 62 F.3d 1115, 1118 (8th Cir. 1995)

11 (addressing state secrets privilege in *Bivens* case under state secrets analysis, not as

12 *Bivens* special factor).[20]

13        Indeed, if anything, the state secrets privilege provides a reason to allow a

14 remedy under *Bivens*.  To the extent that Defendants raise the specter that litigation

15 could potentially lead to public disclosure of information that might pose some

16 threat to law enforcement safety or "national security," the Court should address

17 that evidence as it arises through state secrets privilege, and utilize protective

18 orders, *in camera* hearings, and other mechanisms to protect any relevant but

19 secret information, rather than dismissing the action at the outset because of the

20 mere *possibility* that the case may touch on national security.  *See* Plfs. Opp. to

21 Gov't Defs., Part IV.B (addressing state secrets and established procedures

22 allowing courts to address classified materials in litigation).  Such an approach

23 would give the Court much more fine-grained control over the balance between the

24

---

25 [20] *Arar* is not to the contrary.  Although *Arar* referred in passing to the fact that the
26 government had asserted the state secrets privilege in conducting its *Bivens*
analysis, the court focused on the foreign policy implications of recognizing a
27 cause of action, and did not suggest that the fact that the government had invoked
the privilege was itself a special factor counseling hesitation.
28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 77**

1    need for secrecy and its duty to enforce core constitutional rights.  Both law and

2    history establish that courts can and should scrutinize assertions of the need for

3    secrecy and deference to the executive with skepticism.  *See, e.g.*, *Hamdi*, 542 U.S.

4    at 535 (plurality) ("[W]e necessarily reject the Government's assertion that

5    separation of powers principles mandate a heavily circumscribed role for the

6    courts" in establishing procedures for designating enemy combatants).

7         Finally, the Supreme Court has already recognized that concerns that are

8    adequately addressed by other doctrines and privileges should not be weighed as

9    "special factors."  In *Davis*, the Court recognized that the plaintiff's "suit against a

10   Congressman for putatively unconstitutional actions taken in the course of his

11   official conduct does raise special concerns counseling hesitation" under *Bivens*,

12   but held that "these concerns are coextensive with the protections afforded by the

13   Speech or Debate Clause," 442 U.S. at 246, which "shields federal legislators with

14   absolute immunity," *id*. at 236 n.11.  Thus, the Court rejected it as a special factor.

15   Similarly, here, this Court can fully address issues of sensitive "national security"

16   information through the state secrets privilege.  That fact counsels *against* allowing

17   Defendants to treat national security and any accompanying need for secrecy as a

18   "special factor."

19                    *              *              *

20        Even if this Court determines this case presents a new context for *Bivens*, the

21   reasons set forth above weigh strongly in favor of recognizing a *Bivens* remedy:

22   binding authority already recognizes *Bivens* actions for unlawful discrimination,

23   including First Amendment retaliation; many courts have already addressed

24   religious discrimination claims under *Bivens* or § 1983, making such a claim

25   familiar and workable, rather than novel; a damages remedy for religious

26   discrimination would provide needed deterrence and a remedy in keeping with the

27   purposes of *Bivens*; no other statutory scheme provides a remedy for religious

28   discrimination; and the FBI should not be permitted to avoid judicial scrutiny

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 78**

1    under *Bivens* merely because it claims to be acting in the name of national security.

2    The Court should hold that Plaintiffs can seek damages for their religious

3    discrimination and Fourth Amendment claims.

4    **II.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

5          Defendants advance a separate argument (against both the statutory and the

6    constitutional claims) that they should escape liability under the qualified

7    immunity doctrine.  Although "[d]amages actions against high officials are . . . an

8    important means of vindicating constitutional guarantees," *Harlow v. Fitzgerald*,

9    457 U.S. 800, 809 (1982) , a government official defendant may obtain qualified

10   immunity if: (1) taken in the light most favorable to plaintiff, the official's conduct

11   did not "violate a constitutional right;" or (2) "[t]he contours of the right [were not]

12   sufficiently clear that a reasonable official would understand that what he is doing

13   violates that right."  *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).  Courts have

14   discretion either to first determine whether the conduct at issue violated a federal

15   right or to proceed directly to the question whether the defendant violated clearly

16   established law.  *Pearson v. Callahan*, 555 U.S. 223 (2009).[21]

17         The Ninth Circuit has repeatedly held that there need not be a case directly

18   _____

19   [21] Defendants mistakenly argue that, even if they have intentionally violated a
     statutory or constitutional norm, they should be entitled to qualified immunity if
20   the law is not clearly established as to procedural aspects of the claim, such as
     whether § 1985 provides a right of action for unconstitutional religious
21   discrimination, TW Br. 23 n.12, or whether FISA allows a damages remedy
     against officials, AAR Br. 34-35.  But it would not serve the purposes of qualified
22   immunity to protect an official who knowingly violated the law simply because it
     was not clear whether the victim of such conduct would have a cause of action or
23   remedy.  As the Court explained in *Harlow*, "Where an official could be expected
     to know that certain conduct would violate statutory or constitutional rights, he
24   should be made to hesitate; and a person who suffers injury caused by such
     conduct may have a cause of action."  457 U.S. 800, 819 (1982); *see also Saucier*,
25   533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right
     is clearly established is whether it would be clear to a reasonable officer that *his*
26   *conduct was unlawful* in the situation he confronted.") (emphasis added).

27

28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1  on point for law to be "clearly established."  *See, e.g.*, *Deorle v. Rutherford*, 272

2  F.3d 1272, 1286 (9th Cir. 2001).  Federal law can be clearly established by general

3  constitutional principles that provide "fair warning" that conduct is

4  unconstitutional.  *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) (en

5  banc).  "In the absence of binding precedent, courts should look to available

6  decisions of other circuits and district courts to ascertain whether the law is clearly

7  established."  *Community House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir.

8  2010); *see also Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. 1996).

9  **A.      Defendants Are Not Entitled To Qualified Immunity on Plaintiffs'**

10 **First Amendment Claims**

11        The Complaint sets forth detailed allegations of intentional discrimination:

12 an investigation designed to target Muslims, because of their religion, out of FBI

13 agents' belief that "Islam is a threat to national security." Unsurprisingly, this stark

14 facial discrimination on the basis of religion clearly violates core First Amendment

15 principles.  Defendants' arguments to the contrary fail for three reasons.

16        First, Defendants AAR apply the wrong legal framework for the First

17 Amendment.  They apply the *Lemon* test to evaluate Plaintiffs' Establishment

18 Clause claim, but that analysis is "intended to apply to laws affording a uniform

19 benefit to *all* religions, and not to provisions . . . that discriminate *among*

20 religions." *Larson v. Valente*, 456 U.S. 228, 252 (1982).  Similarly, they apply the

21 "substantial burden" test for the Free Exercise claim, even though that test applies

22 to *facially neutral* government conduct.  Under long-established precedent, facial

23 discrimination against a given religious group is subjected to strict scrutiny under

24 either Clause.  *Smith*, 494 U.S. at 886 n.3.  Defendants' treatment of Islam as itself

25 suspicious and the resulting dragnet surveillance of an entire religious group

26 cannot survive strict scrutiny.

27        Second, Defendants fundamentally mistake the nature of Plaintiffs'

28 discrimination claims, and therefore draw a mistaken parallel between the religious

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 80**

discrimination claim in *Iqbal* and the claim here.  Defendants miss an enormous difference between *Iqbal* and the present case: the plaintiffs in *Iqbal* asked the Court to *infer* discriminatory intent from the disparate impact on Muslims created by the investigation into the 9/11 hijackings.  Here, in contrast, Plaintiffs plead ample nonconclusory facts that provide *direct evidence* that Defendants explicitly used religion as a factor deciding who to target.  Defendants gave Monteilh instructions to target people on the basis of their religion; they repeatedly told him to target Muslims and the Muslim community, to target more devout Muslims because they were more suspicious, and that targeting Muslims was necessary because "Islam is a threat to national security."  Such explicit use of religion needs no inference of intent; it is direct evidence of discrimination. *Cf. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213 (1995) ("[T]his case concerns only classifications based explicitly on race, and presents none of the additional difficulties posed by laws that, although facially race neutral, result in racially disproportionate impact and are motivated by a racially discriminatory purpose.").

Defendants point to factual allegations that they argue show legitimate reasons to target the three Plaintiffs in this action, but they are wrong both factually and legally.  Factually, the allegations to which they point are actually prime examples of religious discrimination – they show Defendants using religious activity as a basis for suspicion.  Legally, the purportedly legitimate reasons are irrelevant, because Plaintiffs need not allege facts that show that religious discrimination was the *sole* basis for the government's actions.  Rather, *any* use of religion as a facial classification is subject to strict scrutiny, *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003), and plaintiffs on a motion to dismiss need plead only sufficient facts to "nudge[] [their] claims of invidious discrimination across the line from conceivable to plausible." *Iqbal*, 129 S.Ct. at 1950-51.

Finally, Defendants Tidwell, Walls and Rose again draw unsupportable parallels to the Supreme Court's analysis in *Iqbal* to argue that the complaint does

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 81**

1   not show that they, as supervisors of the operation, acted with the requisite

2   discriminatory intent.  But unlike *Iqbal*, in which the Court held plaintiffs had not

3   alleged facts that showed that the Attorney General and Director of the FBI were

4   motivated by discrimination against Muslims when they set policies on the

5   detention of suspects in the September 11 investigations, Tidwell, Walls and Rose

6   are not heads of agencies, but instead are relatively low-level supervisors who were

7   directly involved in the operation.[22] And unlike in *Iqbal*, their involvement is not

8   alleged to be merely in setting policy — the complaint alleges that they were

9   involved in the ongoing oversight of a months-long, highly sensitive and (within

10  the FBI) high-profile investigation.  The complaint alleges, for example, that

11  Tidwell approved the action in advance and read all the informant's daily notes,

12  that Walls monitored the operation and was involved enough to be audited for her

13  handling of leads from the case, and that Rose (the supervisor of counterterrorism

14  in the Orange County branch office) sought to expand the investigation and flew to

15  D.C. for that purpose.  On these facts, it is easily plausible that these supervisors

16  also knew the instructions being given to the informant and understood that the

17  "central feature" of the operation was that it targeted Muslims.

18          1.   ***Under Clearly Established Law, Facial Discrimination on the***

19               ***Basis of Religion Triggers Strict Scrutiny***

20          The Supreme Court has repeatedly held that one of the First Amendment's

21  central purposes is to guarantee government neutrality by barring governments

22  from favoring or disfavoring particular religions.  *See, e.g.*, *McCreary Cnty. v.*

---

[22] Indeed, in *Iqbal*, the Court distinguished its analysis of the supervisory liability of the Attorney General and FBI director from that for lower level supervisors.  *See Iqbal*, 129 S. Ct. at 1952 ( "Though respondent alleges that various other defendants, who are not before us, may have labeled him a person 'of high interest' for impermissible reasons, his only factual allegation against petitioners accuses them of adopting a policy approving restrictive conditions of confinement for post-September-11 detainees until they were cleared by the FBI." (quotations omitted)).

31

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 82**

*ACLU*, 545 U.S. 844, 860 (2005).  This principle of neutrality is contained within both the Establishment Clause and the Free Exercise Clause.  While the law governing facially neutral laws that have a disparate impact on particular religions is more complex, the law governing facial discrimination is clear: any facial classification is unconstitutional unless it can survive strict scrutiny.

> *Iqbal* establishes that "the plaintiff must plead and prove that the defendant acted with discriminatory purpose" to establish a claim of intentional religious discrimination, *Iqbal*, 129 S.Ct. at 1948.  But there are several ways to plead such discriminatory purpose.  As one court has described it:

> > A plaintiff could point to a law or policy that expressly classifies persons on the basis of [a suspect classification]. . . . Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. . . . A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus.

*Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2nd Cir. 1999).  In *Iqbal*, the plaintiffs advanced the third theory — that a facially neutral policy was motivated by discrimination and had a discriminatory effect.  Here, Plaintiffs plead facts establishing the first: that Defendants had an express policy of surveilling Muslims on the basis of their religion.  Once a plaintiff shows that a government official has made a facially discriminatory classification on the basis of religion, that intentional discrimination action is subject to strict scrutiny under either the Establishment Clause or the Free Exercise Clause.[23]

---

[23] As *Lukumi* recognized, facial religious discrimination is "not often at issue" in the cases addressed by the Court.  508 U.S. at 533.  Indeed, most of the Court's Free Exercise cases have not involved religious discrimination at all, but the burdens placed on religious exercise by neutral laws that plaintiffs did not suggest were discriminatorily motivated, s*ee, e.g.*, *Smith*, *supra*; *Lyng v. Northwest Indian Cemetery Protective Ass'n*,485 U.S. 439, 450 (1988); *Wisconsin v. Yoder*,406 U.S.

*(cont'd)*

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 83**

a. Establishment Clause

The Establishment Clause clearly forbids the type of explicit discrimination on the basis of religion at issue in this case. "In the course of adjudicating specific cases, [the Supreme Court] has come to understand the Establishment Clause to mean that government . . . *may not discriminate among persons on the basis of their religious beliefs and practices . . . .*" *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 590-91 (1989) (emphasis added); *see also Larson*, 456 U.S. at 244 ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.")

Defendants AAR devote several pages to application of the familiar, three-prong test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), *see* AAR Brief at 24-28, but the Supreme Court has clearly stated that the *Lemon* test simply does not apply to facial discrimination against a particular religion. "[T]he [*Lemon*] 'tests' are intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions . . . that discriminate *among* religions." *Larson*, 456 U.S. at 252 (emphasis in original). Such "denominational preferences . . . must be invalidated unless [they are] justified by a compelling governmental interest, and . . . closely

_____

205 (1972); *Murdock v. Pennsylvania*, 319 U.S. 105 (1943). Similarly, most of the Court's Establishment Clause cases do not involve religious discrimination, but rather funding provisions (that are either neutral or address religion generally) that involve "play in the joints" between Establishment and Free Exercise clauses, *Locke v. Davey*, 540 U.S. 712, 718 (2004); *see also Widmar v. Vincent*, 454 U.S. 263 (1981); *Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970); *Everson v. Board of Ed.*, 330 U.S. 1 (1947); or religious display and similar cases that balance recognition of "the strong role played by religion and religious traditions throughout our Nation's history" with the principle that government may not endorse any religion or religion generally, *Van Orden v. Perry*, 545 U.S. 677, 683 (2005). Of the few cases that do address religious discrimination, most involve claims that facially neutral policies were motivated by discriminatory animus, *see Lukumi*, *supra*; or applied in a discriminatory manner, or cases that addressed facial preferences for religion generally, rather than between religions, *see, e.g.*, *Wallace v. Jaffree*, 472 U.S. 38 (1985).

**SER 84**

fitted to further that interest." *Id.* at 246-47; *see also Sklar v. C.I.R.*, 549 F.3d 1252, 1256 n.3 (9th Cir. 2008) ("*Larson* [] established an analytical framework to assess the constitutionality of statutes granting denominational preferences. To survive an Establishment Clause challenge under *Larson*, a statute which grants a denominational preference must be justified by a "compelling governmental interest" to which it is "closely fitted"); *Rouser v. White*, 630 F.Supp.2d 1165, 195 (E.D. Cal. 2009) ("Under *Larson*, when a plaintiff shows that a law or other state action grants a denominational preference among religions, the court must "treat the law as suspect and . . . apply strict scrutiny in adjudging its constitutionality."). Courts should employ the three-part *Lemon* test only if a government practice does not "facially differentiate[] among religions." *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989). Because Defendants explicitly targeted Muslims on the basis of their religion, strict scrutiny applies.[24]

Moreover, even if the *Lemon* test did apply, the allegations more than satisfy it. First, while fighting terrorism may be a valid secular purpose, the dragnet

---

[24] None of the cases on which Defendants rely for application of the *Lemon* test involved the allegations of facial discrimination against a particular religious group that are presented here. Rather, in each case, the government acted in pursuit of anti-establishment interests that were neutral between religions. *See Nurre v. Whitehead*, 580 F.3d 1087, 1089 (9th Cir. 2009) (holding school officials' refusal to allow school band to play religious-themed songs in graduation program did not violate Establishment Clause); *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1397 (9th Cir. 1994) (investigation into whether assistant police chief's on-duty conduct violated the Establishment Clause did not target religion); *Kreisner v. City of San Diego*, 1 F.3d 775, 779 (9th Cir. 1993) (city did not violate Establishment Clause by allowing private group to put on overtly religious holiday display in park's public forum through permit available on first-come, first-serve basis). While the Ninth Circuit employed *Lemon* in one case that arguably involves discrimination against a religious group, *see Catholic League for Religious and Civil Rights v. City and County of San Francisco*, 624 F.3d 1043, 1047 (9th Cir. 2010) (addressing denunciation of Catholic church's stance on same sex adoption), the plaintiffs appear not to have disputed the test, as none of the fragmented opinions in that case mention *Larson* or address whether it commands a different test.

---

34

1   investigation of all members of a religious group (absent any indication of criminal

2   or terrorist activity) that is alleged here does not clearly advance such a secular

3   purpose and raises the specter of that it is a "sham," *see McCreary Cnty*, 545 U.S.

4   at 864; *see also, id.* at 859 ("the secular purpose requirement alone may rarely be

5   determinative"); second, the investigation's sweeping target of all Muslims on the

6   basis of their religion conveys the message of disapproval of the religion violates

7   the Establishment Clause's prohibition on "making adherence to a religion relevant

8   in any way to a person's standing in the political community," *Cnty. of Allegheny*,

9   492 U.S. at 594, which the agents' statements that "Islam is a threat to national

10   security" simply confirms; and the Ninth Circuit has continually noted that

11   "comprehensive, discriminating, and continuing surveillance of religion" of the

12   type entailed in this operation that spanned years constitutes the kind of

13   entanglement forbidden by *Lemon*'s third prong.  *See Vernon*, 27 F.3d at 1399.

14                         b. <u>Free Exercise Clause</u>

15         Similarly, allegations of facial religious discrimination trigger strict scrutiny

16   under the Free Exercise Clause.  Indeed, *Iqbal* itself relied on *Lukumi*, in which the

17   Court held that the Free Exercise Clause requires that government action that is not

18   "neutral and of general applicability . . . must be justified by a compelling

19   governmental interest and must be narrowly tailored to advance that interest." 508

20   U.S. at 532; *see also Smith*, 494 U.S. at 886 n.3 ("Just as we subject to the most

21   exacting scrutiny laws that make classifications based on race, or on the content of

22   speech, so too we strictly scrutinize governmental classifications based on

23   religion."); *Braunfeld v. Brown*, 366 U.S. 599, 607 (1961) ("If the purpose or effect

24   of a law . . . is to discriminate invidiously between religions, that law is

25   constitutionally invalid even though the burden [on the observance of religion]

26   may be characterized as being only indirect."); *accord Gillette v. United States*,

27   401 U.S. 437, 462 (1971).  Were there any doubt, *Lukumi* held that the inquiry into

28   "neutrality" under the Free Exercise Clause can follow the equal protection

1  analysis of discriminatory intent.  *See id.* at 540-41 ("[n]eutrality in its application

2  requires an equal protection mode of analysis) (quoting *Walz v. Tax Comm'n of*

3  *New York City*, 397 U.S 664, 696 (1970) (Harlan, J., concurring)).[25]

4      Defendants AAR again apply the wrong analysis by engaging in the

5  "substantial burden" test for Free Exercise claims.  That test was originally crafted

6  in *Sherbert v. Verner*, 374 U.S. 398 (1963) and held that "[a] regulation neutral on

7  its face may, in its application, nonetheless offend the constitutional requirement

8  for governmental neutrality if it unduly burdens the free exercise of religion."

9  *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 717 (1981);

10  *accord Jimmy Swaggart Ministries v. Bd. of Eqal. of Cal.*, 493 U.S. 378, 384

11  (1990); *Wisconsin v. Yoder*, 406 U.S. 205, 219 (1972).  But the Supreme Court in

12  *Smith* sharply narrowed applicability of the "substantial burden" test to two

13  situations: first, circumstances (applicable to unemployment compensation and

14  perhaps little else) "where the State has in place a system of individual

15  exemptions" such that "it may not refuse to extend that system to cases of

16  'religious hardship' without compelling reason," 494 U.S. at 884; and second,

17  "hybrid" claims, where the government intrusion implicated not just the Free

18  Exercise Clause but another constitutional right as well. *Id.* at 881-82.[26]

19  _____

20  [25] While Justices Scalia and Thomas did not join this section of the *Lukumi* opinion
   out of concern for the difficulty in determining of a "the singular 'motive' of a
21  collective legislative body" *Lukumi*, 508 U.S. at 558 (Scalia, J., concurring), no
   such concern prevents examination of executive officers' motives, as is confirmed
22  by Justices Scalia and Thomas joining the *Iqbal* opinion that cites this standard.
   [26] While the Ninth Circuit in *Vernon* applied the "substantial burden" test in a
23  challenge to a government conduct that was not "regulatory, proscriptive, or
   compulsory in nature," 27 F.3d 1385, 1394 (9th Cir. 1994), that case did not
24  involve the facial discrimination against a particular religion that is clearly alleged
   here.  *See id.* at 1398 (noting that investigation aimed whether specific person's on-
25  duty conduct violated the Establishment Clause).  Additionally, while the Court
   rejected Vernon's argument that his claims should be analyzed as a non-neutral
26  law under *Smith*, see *id.* at 1393 n.1, it did so on the ground the Ninth Circuit had

27

28                                                                    *(cont'd)*

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 87**

1       But the "substantial burden" test has never applied to facial, intentional

2  discrimination.  Where the Supreme Court has confronted explicit, facial

3  discrimination against a particular religious sect, it has applied strict scrutiny.  In

4  *Fowler v. Rhode Island*, 345 U.S. 67 (1953), the Court held that discriminatory

5  application of an ordinance barring public preaching in parks to Jehovah's

6  Witnesses, when the same law was not enforced against Catholics or Protestants,

7  violated the Free Exercise Clause.  Because the evidence "plainly show[ed] that a

8  religious service of Jehovah's Witnesses is treated differently than a religious

9  service of other sects.  That amounts to the state preferring some religious groups

10  over this one." *See id.* at 69.  In *Niemotko v. Maryland*, 340 U.S 268, 272 (1951),

11  the court held that denial of a permit to Jehovah's Witnesses based on religious

12  discrimination constituted an unconstitutional prior restraint; *see also Fowler*, 345

13  U.S. at 69 ("[In *Niemotko*,] a public park, open to all religious groups, was denied

14  Jehovah's Witnesses because of the dislike which the local officials had of these

15  people and their views.  That was a discrimination which we held to be barred by

---

17  earlier held *Smith* inapplicable to non-criminal cases.  *See id.*  (citing *NLRB v.*

18  *Hanna Boys Ctr.*, 940 F.2d 1295, 1305 (9th Cir. 1991)).  But the Ninth Circuit has
since rejected the rule on which the *Vernon* court relied.  *See Miller v. Reed*, 176

19  F.3d 1202, 1207 (9th Cir. 1999) (characterizing *Hanna Boys* as dicta and holding

20  "*Smith* is not limited to challenges to criminally prohibited conduct").

       The Ninth Circuit in *Am. Family Ass'n v. City and County of San Francisco*,

21  277 F.3d 1114, 1124 (9th Cir. 2002), relied on *Vernon* to apply the "substantial

22  burden" test to a Free Exercise challenge to a letter and two resolutions by San
Francisco's Board of Supervisors denouncing anti-gay rhetoric and television

23  announcements sponsored, in part, by religious groups, that did not discriminate

24  against any particular religion.  The court in *Am. Family Ass'n* declined to bypass
the "substantial burden" test for the resolutions on grounds that courts had not

25  applied *Lukumi* to a case addressing a "non-regulatory or non-compulsory

26  government action." But the present case can be distinguished in that certainly
presents government action beyond mere issuance of a resolution, and the Supreme

27  Court's subsequent citation to *Lukumi* in *Iqbal* makes clear that *Lukumi* governs in

28  cases addressing religious discrimination by law enforcement.

the First and Fourteenth Amendments."). In *McDaniel v. Paty*, 435 U.S. 618, 626 (1978), the Court held that a statute barring ministers from holding public office violated the Free Exercise Clause, reasoning that "[i]f the Tennessee disqualification provision were viewed as depriving the clergy of a civil right solely because of their religious beliefs, *our inquiry would be at an end*. The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such." (emphasis added). And in *Cooper v. Pate*, 378 U.S. 546, 546 (1964) (*per curiam*), the Court held that a prisoner's allegations that he was denied privileges enjoyed by other prisoners solely because of his religious beliefs stated a First Amendment claim.

No Supreme Court case in decades has addressed the kind of explicit discrimination against a particular religion as the Court perceived in *Niemotko* and *Fowler*. *See Lukumi*, 508 U.S. at 533 (noting that principles barring facial discrimination are "not often at issue in [the Court's] Free Exercise Clause cases"). However, the Court has repeatedly stated that facial classifications based on religion are subject to strict scrutiny, often on the basis of these early cases. *See, e.g.*, *Smith*, 494 U.S. at 886 n.3 ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, or on the content of speech, so too we strictly scrutinize governmental classifications based on religion." (citing *McDaniel*)); *id.* at 877 (government may not "impose special disabilities on the basis of religious views or religious status" (citing *McDaniel* and *Fowler*)); *Braunfeld* , 366 U.S. at 607 ("If the purpose or effect of a law . . . is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden [on the observance of religion] may be characterized as being only indirect."); *Sherbert*, 374 U.S. at 402 (citing *Fowler* for proposition that under Free Exercise Clause, government may not "penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities").

Federal appellate courts have also recognized that strict scrutiny, not the

38

1   "substantial burden" test, applies in cases that involve facial or intentional

2   discrimination against a particular religious group.  *See Vinning-El v. Evans*, 657

3   F.3d 591, 593 (7th Cir. 2011) ("*Smith* does not apply to such a policy

4   [discriminating against those who hold particular religious beliefs]; it did not

5   change the norm forbidding materially different treatment of different religious

6   faiths."); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 170 (3rd

7   Cir. 2002) ("Under *Smith* and *Lukumi*, however, there is no substantial burden

8   requirement when government discriminates against religious conduct.");

9   *Hartmann v. Stone*, 68 F.3d 973, 979 & n.3 (6th Cir. 1995) (holding substantial

10  burden test applicable to "situations in which a neutral and generally applicable

11  regulation imposes an indirect, albeit substantial, burden on the practice of

12  religion," and applying strict scrutiny where regulation is not neutral and generally

13  applicable); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 996 (7th Cir.

14  2006) (describing Free Exercise analysis as applying strict scrutiny to any law that

15  is not neutral and generally applicable); *c.f. Wirzburger v. Galvin*, 412 F.3d 271,

16  281 & n.4 (1st Cir. 2005) (holding challenged statute would not be subject to strict

17  scrutiny in part because it did not "discriminate on the basis of religious belief or

18  status"); *Gary S. v. Manchester School Dist.*, 374 F.3d 15, 18 (1st Cir. 2004)

19  (holding substantial burden test "limited . . . to the unemployment compensation

20  field"); *see also Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 804 (9th

21  Cir. 2011) (reversing grant of summary judgment for defendants where there was

22  evidence plaintiffs had been "treated differently because of their religious status").

23      Accordingly, under the Free Exercise Clause, as with the Establishment

24  Clause, Plaintiffs must show that the FBI's actions were not neutral, in that they

25  intentionally discriminate on the basis of religion, and that they were not justified

26  by a compelling interest.[27]

27

28  [27] Even if the plaintiffs required to show a "substantial burden," they satisfy that

*(cont'd)*

39

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

### c. The Ban on Religious Discrimination is Clearly Established

There can be no argument that the First Amendment's prohibition on facial religious discrimination is not clearly established.  Supreme Court cases dating back sixty years to *Fowler* and *Niemotko* establish that government actors may not intentionally discriminate against a religious group because of its religion — period.  The Supreme Court has announced this principle in denouncing religious discrimination in contexts as diverse as the issuance of permits, *Niemotko*, enforcement of criminal laws, *Fowler*, and selective prosecution, *United States v. Armstrong*, 517 U.S. 456, 464, (1996) (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)), and has repeated throughout its cases the mantra that classifications on the basis of religion are subject to strict scrutiny.  *See, e.g.*, *Smith*, 494 U.S. at 886 n.3.

The fact that the Supreme Court has never squarely held that intentional religious discrimination is also forbidden in undercover law enforcement investigations does not entitle Defendants to qualified immunity, where their explicit targeting based on religion is so egregious. "To be established clearly, . . . there is no need that the very action in question have previously been held unlawful.  The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that '[t]he easiest cases don't even arise.' But even as to action less than an outrage, "officials can still be on notice that their conduct violates established law . . . in novel factual circumstances." *Safford Unif. Sch. Dist. v. Redding*, 129 S. Ct. 2633, 2643 (2009) (citing *K.H. v. Morgan,* 914 F.2d 846, 851 (7th Cir. 1990)).

### 2. *The Complaint Alleges Facial Discrimination Against Muslims*

Defendants AAR make a half-hearted argument that it is not clearly established that facial religious discrimination is unlawful in the context of an undercover investigation where there is "no allegation that the investigation was

requirement.  *See infra*, Part II.C (addressing "substantial burden" under RFRA).

40

pursued for the purpose of discrimination rather than a neutral, investigative reason." AAR Br. 24. Defendants AAR are wrong on the law, *see supra*, but also the facts: the complaint is replete with allegations that the discrimination was facial and, therefore, intentional.

As set forth in the summary of facts *supra*, Plaintiffs' lengthy complaint alleges the details an investigation that explicitly and intentionally discriminated against Muslims because of their religion. Indeed, the central and explicit purpose of Defendants' undercover operation was to conduct surveillance and gather information on Muslims in Orange County. *See, e.g.*, FAC ¶¶ 88, 89 (agents did not limit informant to specific targets, but "repeatedly made clear that they were interested simply in Muslims"); ¶ 162 ("Islam is a threat to our national security."). To the extent they differentiated between targets, they told him to focus on Muslims who appeared more devout (for example, as demonstrated by a willingness to attend late evening or early morning prayers) because they were "more suspicious." FAC ¶ 110; *see also id.* ¶¶ 89, 96, 104.

The complaint also alleges that Defendants consistently gave instructions that made religion the primary criterion for suspicion by focusing explicitly on Muslims and the Muslim community, including through daily quotas on the number of Muslims he should get contact information from, FAC ¶ 131, and through spying on lectures, classes or any other events held at mosques, FAC ¶¶ 108, 109, 133. They discarded information inadvertently gathered on non-Muslims. FAC ¶ 120. Overall, the complaint alleges with great specificity that Defendants were indiscriminate: they instructed the informant to unearth about as much information about as many Muslims as possible through as many methods as possible, without specific targets. *See, e.g.*, FAC ¶¶ 101, 102, 103.

These allegations are not mere "labels and conclusions" or "formulaic recitation of the elements of a cause of action," *cf. Iqbal*, 129 S. Ct. at 1949, but rather detailed facts about what Defendants did, what Defendants said, and how the

41

investigation proceeded.  While *Iqbal* requires only facts that "allow the court to draw the reasonable inference" that Defendants intentionally discriminated against Muslims, *see id*, here no inference is necessary, because the complaint alleges that Defendants explicitly told the informant to discriminate against Muslims, and that he followed these instructions in numerous ways.

Importantly, while a plaintiff alleging a *neutral* policy is actually discriminatory must plead facts from which a court can infer that it was adopted "not for a neutral, investigative reason but for the purpose of discriminating on account of … religion." *Iqbal*, 129 S. Ct. at 1949, for the *facial* discrimination at issue here, it does not matter whether Defendants intended to harm Plaintiffs.  As the Supreme Court has recognized, "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect.  Whether [a practice] involves disparate treatment through explicit facial discrimination does not depend on why the [actor] discriminates but rather on the explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace and Agr. Implement Workers of America, UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269, 271-72 (1993) (while noting that "[d]iscriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences," rejecting argument that "animus" requirement of 42 U.S.C. 1985 "can be met only by maliciously motivated, as opposed to assertedly benign (though objectively invidious), discrimination").  Thus, it does not matter whether Defendants were motivated by a desire to prevent terrorism.  The goal of preventing terrorism, though laudable in the abstract, is neither incompatible with nor justification for the singling out of Muslims in a counterterrorism investigation.

a. The Complaint Suggests No Legitimate Basis to Investigate the Three Individual Plaintiffs

Defendants AAR argue that even if the FBI's entire Operation was premised

42

on discriminatory goals, the FBI did not discriminate against these particular Plaintiffs because they had "at least *some* basis, apart from religious discrimination, for investigating *these Plaintiffs*." AAR Br. 2 (emphasis in orig.). This is wrong both legally and factually.

First, facial distinctions drawn on the basis of constitutionally suspect classifications receive strict scrutiny, even if the suspect classification is only one factor considered.  In *Gratz*, the Court struck down a state university's admissions scheme where the race of applicants was only one of many factors considered.  The Court applied strict scrutiny to the use of race as any part of the admissions decision, even though it was not the sole or even primary factor, reasoning that "all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized," such that a plaintiff "has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest of judicial scrutiny." 539 U.S. at 270.  Facial classifications on the basis of religion are treated no differently. *Smith*, 494 U.S. at 886 n.3 ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, or on the content of speech, so too we strictly scrutinize governmental classifications based on religion.").

Even if this case did not involve an explicit, facial classification, the Supreme Court has repeatedly held, in varying contexts, that if discrimination on a forbidden basis was a "substantial" or "motivating" factor for Defendants' decision targeting them, the burden shifts to Defendants to demonstrate that Plaintiffs would have been targeted even without consideration of religion.  *See, e.g.*, *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (First Amendment retaliation); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 271 (1977) (racial discrimination under the Equal Protection Clause).  Even on this lower standard, for purposes of a motion to dismiss, Plaintiffs need not prove all the facts required to prevail at trial on this

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 94**

burden-shifting analysis, but only those facts sufficient to render it plausible that they were subject to religious discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002); *Twombly*, 550 U.S. at 569 (reaffirming *Swierkiewicz* under the pleading standard later adopted in *Iqbal*). Thus, this Court could only dismiss the claim if the facts of the complaint render it implausible that plaintiffs were treated differently on the basis of religion. Given that the entire premise of Defendants' operation was to target Muslims, that cannot be the case.

Second, Defendants point to no factual allegations that actually provide a legitimate basis to target Plaintiffs: Defendants AAR argue that the complaint acknowledges that they targeted Fazaga because they suspected he was a "radical," but the complaint alleges their reasons for that conclusion are either insubstantial or themselves based on religious discrimination — that he encouraged students to speak out and helped teach them about political demonstrations, FAC ¶ 169; that he served on the board of the largest Muslim newspaper in California which, like most papers, has occasionally printed pieces that opposed various policies of the United States government (but which is and has never advocated violence or done anything that would reasonably justify characterizing it as "anti-American"), FAC ¶ 169 & n.36; and that his mosque invited scholars to speak who Defendants believed were radical, but were in fact "widely popular and moderate," FAC ¶ 60, 113, 170. Moreover, Defendants AAR simply ignore that Sheikh Fazaga has a national reputation as a moderate and contemporary teacher of Islam, and that he traveled to Europe at the invitation and expense of the U.S. State Department to speak on radicalism. *See* FAC ¶ 56.

Similarly, Defendants AAR argue that they were justified in targeting AbdelRahim because they believed he was part of a Muslim Brotherhood cell, but the complaint clearly alleges they believed so simply because he lived in a house "shared by five young, unmarried Muslim Egyptian men with different skills and backgrounds — including a computer analyst, a pharmacist, an accountant, and

44

1  one who handled logistics." FAC ¶ 200.  Defendants' conclusion that five Muslims

2  living together must be terrorist cell is an example of religious discrimination, not

3  an alternative explanation.[28]

4          Defendants supposed basis for targeting Malik again underscores their

5  discriminatory motives: the complaint alleges that Defendants targeted Malik

6  because he went from dressing as a "surfer kid" to wearing traditional clothes and

7  growing his beard, and "his behavior in embracing religion and traditional dress

8  was highly suspicious," and he was friendly with people from Muslim student

9  groups.  FAC ¶ 186, 187.  This is simply an example of Defendants' focus on more

10 religious Muslims: Malik behaved this way because he developed an interest in

11 religion, and Islam encourages Muslims to grow beards and wear traditional

12 clothes as a way of following the practices of the Prophet Muhammad.[29] FAC ¶ 68.

13 ─────────────

14 [28] Defendants AAR argue that the allegation that FBI agents searched
    AbdelRahim's storage unit shows that they had probable cause.  This is untrue.

15 First, the mere allegation that two agents showed AbdelRahim a warrant does not
    mean Plaintiffs concede that the warrant was supported by probable cause; second,

16 the search occurred months after community members reported Monteilh and his
    investigation concluded — even if they had probable cause to search

17 AbdelRahim's storage unit a few months, it would not mean they had a legitimate

18 basis to target him for surveillance more than a year before.

19 [29] Defendants also cite as a basis for investigating him that Malik studied a six-
    week summer program at a religious school in Yemen and was "blocked" from

20 entering Saudi Arabia.  This provides no basis for investigation: Malik was not
    "blocked" from entering Saudi Arabia; he had hoped to go on a pilgrimage there

21 while abroad, but never tried to enter after realizing he could not get the requisite

22 visas — a fact that Armstrong and Allen already knew.  FAC ¶ 190.  Defendants
    also knew that Malik attended a school, Dar al-Mustafa , which is a mainstream

23 religious school whose leaders are internationally known in the Muslim

24 community and to the FBI for advocating justice, equality, and peaceful co-
    existence between religious groups. FAC¶¶ 69, 190.  Malik attended this school at

25 a time when both Yemen and Dar al-Mustafa were popular places for American

26 Muslims who wanted to pursue Arabic language or religious studies abroad

27 because of its spiritual Sufi religious scholarship, its clear and eloquent form of the
    Arabic language, and for being scenic and affordable, if slightly rustic.  FAC ¶69.

28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1   Defendants also ignore that Malik co-founded an interfaith peace-building program

2   around the Israel-Palestine conflict, for which he received awards and recognition

3   from the University of California, the Orange County Human Rights Commission,

4   and the U.S. State Department.  FAC ¶ 67.  Finally, Defendants distort the

5   complaint by suggesting that what was suspicious was that Malik changed his

6   dress when he was not "particularly religious," an unfounded conclusion they

7   squeeze from the fact that Malik once indicated to Monteilh that he had gotten out

8   of the habit of attending dawn prayers, but wanted to start again (a statement that

9   Armstrong and Allen interpreted as indicating Malik was returning to extremist

10  beliefs).  FAC ¶ 194.

### 3.   *Defendants' Facial Discrimination Fails Strict Scrutiny*

12          The First Amendment requires strict scrutiny of the kind of facial,

13  intentional religious discrimination evident from the complaint — such actions are

14  prohibited unless "justified by a compelling government interest" and "closely

15  fitted to further that interest." *Larson*, 456 U.S. at 247; *see also Lukumi*, 508 U.S.

16  at 546 (non-neutral government action subject to "the most rigorous of scrutiny"

17  such that they must be "narrowly tailored in pursuit of" "interests of the highest

18  order").  Defendants AAR argue that Defendants had a compelling interest,

19  because their investigation was related to terrorism and "[i]t is obvious and

20  unarguable that no governmental interest is more compelling than the security of

21  the Nation," AAR Br. 23 (citing *Haig v. Agee*, 453 U.S. 280, 307 (1981)), and

22  suggest that the complaint does not allege that the investigation was not "narrowly

23  tailored" to the government's interest in preventing terrorism.  *Id.* at 23-24.

24          While the "security of this nation" may be compelling in the abstract, under

25  strict scrutiny, "ambiguous proof will not suffice," *Brown v Ent. Merch. Ass'n*, 131

26  S. Ct. 2729, 2739 (2011), and "[m]ere speculation of harm does not constitute  a

27  compelling state interest," *Consol. Edison Co. v. Public Service Commission of*

28  *New York*, 447 U.S. 530, 543 (1980); *see also, e.g.*, *Bernal v. Fainter*, 467 U.S.

---

46

1    216, 227-28 (1984) ("Without a factual underpinning, the State's asserted interest

2    lack s the weight we have required of interests properly denominated as

3    compelling.").  Nothing in the complaint suggests Defendants had any factual

4    basis to believe there was any threat to the security of the nation before the

5    investigation was launched, nor did any prosecution arise from the investigation

6    other than a single charge of naturalization fraud, which was subsequently

7    dismissed by the government.  FAC ¶¶ 155-158.

8           More importantly, even were the government interests at stake compelling,

9    the dragnet surveillance of all Muslims — without other basis to believe them

10   involved in criminal or terrorist activity — cannot be said to be "closely fitted to

11   further" the government's interest in preventing terrorism.  *Larson*, 456 U.S. at

12   247; *see also Lukumi*, 508 U.S. at 546; *see also United States v. Montero-*

13   *Camargo*, 208 F.3d 1122, 1134 -1135 (9th Cir. 2000) (rejecting use of race as

14   factor in law enforcement stops).[30]  Plaintiffs have clearly pled facts sufficient to

15   establish that Defendants' actions were not narrowly tailored.

16   **B.     The Complaint Establishes that the Supervisory Defendants Are**

17   **        Liable For Intentional Discrimination and Unlawful Searches**

18   Defendants Rose, Walls and Tidwell each argue that while the allegations

19   _____

20   [30] Defendants AAR's suggestion that the investigation is narrowly tailored to fight
     terrorism because use of an informant does not violate the Fourth Amendment

21   defies logic — religious discrimination is barred by the First Amendment, whether
     or not the investigative techniques used also violate the Fourth Amendment.  *Cf.*

22   *Whren v. United States*, 517 U.S. 806, 813 (1996) (noting that "of course the
     Constitution prohibits selective enforcement of the law based on considerations

23   such as race" but that "the constitutional basis for objecting to intentionally
     discriminatory application of laws is the Equal Protection Clause, not the Fourth

24   Amendment"); *Farm Labor Org. Comm. v. Ohio State Hwy. Patrol*, 308 F.3d 523,

25   533 (6th Cir. 2002) ("[A]n officer's discriminatory motivations for pursuing a
     course of action can give rise to an Equal Protection claim, even where there are

26   sufficient objective indicia of suspicion to justify the officer's actions under the

27   Fourth Amendment.").

28

47

1   may demonstrate that the other individual defendants (Armstrong and Allen)

2   violated intentionally discriminated against Muslims and engaged in unlawful

3   searches, they do not show that Rose, Walls, and Tidwell, as supervisors, should be

4   held liable for these violations, because the complaint does not "allow[] the court

5   to draw the reasonable inference" that these supervisors had the requisite intent to

6   be liable for religious discrimination or unlawful searches.  TW Br. 27-29; AAR

7   Br. 18-20.  This argument ignores the detailed allegations establishing the

8   supervisors' personal role in the operation that caused Plaintiffs' injuries.

9           While supervisors may not be held liable under a *respondeat superior*

10  theory, "direct, personal participation is not necessary to establish liability for a

11  constitutional violation." *Al-Kidd v. Ashcroft*, 580 F.3d 949, 965 (9th Cir. 2009),

12  *rev'd on other grounds*, 131 S. Ct. 2074 (2011).  Under *Bivens*, "[s]upervisors can

13  be held liable for the actions of their subordinates (1) for setting in motion a series

14  of acts by others, or knowingly refusing to terminate a series of acts by others,

15  which they knew or reasonably should have known would cause others to inflict

16  constitutional injury; (2) for culpable action or inaction in training, supervision, or

17  control of subordinates; (3) for acquiescence in the constitutional deprivation by

18  subordinates; or (4) for conduct that shows a reckless or callous indifference to the

19  rights of others." *Id.* (quotations omitted).

20          1.  ***The Supervisors Are Liable For Intentional Discrimination***

21          For a claim of intentional discrimination, a plaintiff must plead and prove

22  that the supervising defendant possessed the requisite intent by acting with

23  discriminatory purpose.  *Iqbal*, 129 S. Ct. at 1948.  Defendants' rest their argument

24  primarily on *Iqbal*, arguing that Plaintiffs' allegations about the involvement of

25  Rose, Walls, and Tidwell mirror the allegations in *Iqbal* against Attorney General

26  Ashcroft and FBI director Mueller, which the Court held insufficient to state a

27  claim of religious discrimination.  In *Iqbal*, the plaintiff claimed he had been held

28  in restrictive conditions because of his religion.  He alleged that "the [FBI], under

the direction [Mueller], arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11," and that Mueller and Ashcroft approved a policy of holding detainees in highly restrictive conditions until they were cleared by the FBI. The Court gave two reasons this failed to provide a basis to infer discriminatory intent on the part of Mueller and Ashcroft.

First, the Court reasoned that given that the September 11 hijackers and the organization to which they belonged, Al Qaeda, were overwhelmingly Arab Muslims, "it should come as no surprise" that those detained in connection with the incident were also overwhelmingly Arab and Muslim, and that the allegations that the investigation had a disparate effect on Arab Muslims did not plausibly suggest that the effect was due to discriminatory intent. *See id.* at 1951-52. Second, the *Iqbal* court reasoned that Plaintiff had not alleged that Ashcroft and Mueller had participated in the decision of how to classify his detention, only that they had approved the policies pursuant to which that classification took place. And the Court held that even if the officials who had made that decision had done so for "impermissible reasons," the allegations that Ashcroft and Mueller had approved a policy of housing detainees in restrictive conditions until cleared did not give rise to the inference they did so for the purpose of discriminating against Muslims. *Iqbal*, 129 S. Ct. at 1952.

Plaintiffs' religious discrimination claim differs fundamentally from the one discussed in *Iqbal* in at least one critical respect: Plaintiffs do not ask this Court to *infer* discriminatory intent from disparate impact. Rather, they provide allegations that, if proven, would provide *direct evidence* that the FBI intentionally discriminated: FBI agents explicitly instructed their informant over and over to target Muslims and only Muslims, to pay special attention to more devout Muslims, and to do so because "Islam is a threat to national security." *See* Facts, *supra*. There is no question from the factual allegations that Armstrong and Allen ran an investigation that, on its face, discriminated on the basis of religion. This

49

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 100**

1    case would be comparable to *Iqbal* only if the plaintiff there had alleged that an

2    agent working in Mr. Ashcroft's office stated that the plan Ashcroft approved

3    explicitly called for targeting Muslims for harsh treatment while in detention.

4         That fundamental factual difference narrows greatly the Court's supervisory

5    liability analysis. The only question the Court need answer is whether the

6    complaint pleads facts sufficient to render it "plausible" that Tidwell, Walls, and

7    Rose knew of and approved the "central feature" of the operation — that it

8    explicitly and intentionally focused on Muslims. That is intentional

9    discrimination, *Adarand*, 515 U.S. at 213; *Hayden*, 180 F.3d at 48, and

10   Tidwell, Walls and Rose are liable if they approved, acquiesced in, or knowingly

11   refused to terminate such a facially discriminatory program by their subordinates.

12   *Al-Kidd*, 580 F.3d at 965.

13        The complaint alleges far more about the roles of Rose, Walls and Tidwell

14   than what plaintiffs in *Iqbal* pled about Mueller and Ashcroft. The complaint

15   alleges that Tidwell, Walls, and Rose "actively monitored, directed, and authorized

16   the actions of Agents Armstrong and Allen and other agents at all times relevant in

17   this action, for the purpose of surveilling Plaintiffs and other putative class

18   members because they were Muslim," and "maintained extremely close oversight

19   and supervision of Monteilh." *See* FAC ¶¶ 20-22. Defendants suggest that these

20   allegations are conclusory, but in fact they are based on evidence that Plaintiffs

21   possess. *See generally* Monteilh Decs. (filed concurrently herewith).

22        The complaint also provides ample supporting allegations to render these

23   conclusions plausible. First, the complaint alleges a major undercover

24   counterterrorism investigation that stretched over more than a year and which

25   resulted in the payment of tens or hundreds of thousands of dollars to a convicted

26   felon sent into a Muslim community to pose as a convert. FAC ¶¶ 87, 90, 137,

27   162, 167. The cost, duration, and sensitivity of the operation would alone render

28   "plausible" that the immediate supervisors would review and approve the

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 101**

instructions given the informant.  The complaint also alleges that the lead agents stated that the informant was "gold" in Los Angeles and Washington, that information from the operation was followed by people "at the highest levels," and that the operation was among the ten most important intelligence investigations going on in the country.  FAC ¶ 145.  The FAC alleges that the informant recorded all his conversations, which were subsequently transcribed, and provided detailed daily notes of his activities that contained "virtually everything he did and all the information he had obtained." FAC ¶¶ 123, 124, 140. Not only is it plausible that supervisors would review these notes to monitor the operation, but the complaint alleges that Defendants did, in fact, read those notes.  FAC ¶¶ 21, 22, 141.

Second, the complaint alleges specific instances of direct involvement in the operation by Tidwell, Walls and Rose that go far beyond the mere setting of policy alleged in *Iqbal*:  Defendant Tidwell approved the operation in advance and the recruitment of an informant, FAC ¶ 47 & n.28.  Armstrong and Allen also told the informant that Tidwell, specifically, read all his daily notes. FAC ¶ 141.

Defendant Walls was a "direct supervisor" of the agents involved, and as such read the informant's daily notes.  FAC ¶¶ 21, 141.  She was involved enough that an audit team was at one point sent to examine her handling of the investigation.  FAC ¶ 151.  By summer 2007, there was conflict between Walls and field agents over how to handle the operation.  Walls had come to distrust Monteilh and did not want him working for them.  *Id.* Eventually, Walls ordered that Agents Armstrong and Allen cease using Monteilh as an informant because she no longer trusted him.  FAC ¶ 21.  After Armstrong and Allen told Monteilh he would be going on hiatus, although Operation Flex would continue, Agent Walls attended one of the final meetings between Monteilh and Armstrong and Allen and warned Monteilh to stay silent about the operation.  FAC ¶¶ 152, 153.

Defendant Rose was also a "direct supervisor" of the agents involved, and as such read the informant's daily notes.  FAC ¶¶ 20, 141.  Rose also sought

SER 102

authorization to expand the scope of the surveillance program, in an effort to create a Muslim gym that the FBI would use to gather yet more information about the class.  FAC ¶ 22.  Agent Allen flew to Washington, D.C. with Rose, to meet with high-level FBI officials to get approval to open a gym for Muslims that would function in part as a mosque with a prayer room.  Agent Allen told Monteilh that approval to open the gym had been granted.  FAC ¶ 145.

Third, there are significant structural differences between the positions of Tidwell, Walls and Rose here and Mueller and Ashcroft in *Iqbal*.  Rather than being the heads of agencies allegedly involved only in setting policy, they were the supervisors directly over the operation in question: Rose supervised counter-terrorism operations in the FBI's Santa Ana Branch office, Walls supervised the FBI's Santa Ana branch office, and Tidwell headed the Los Angeles field office.  FAC ¶¶ 20-22. As the complaint alleges, the L.A. field office is a small part of the FBI, one of the 56 field offices that the agency maintains in addition to its national headquarters, specialized facilities, and more than 400 smaller "resident agencies" and 60 international offices.  FAC ¶ 17 n.3.  The Santa Ana branch office is one of ten satellite branch offices in the Los Angeles Field Office.  FAC ¶ 21.  The fact that they were much closer in the chain of command to the prolonged discrimination renders plausible the allegations they were directly involved.

Finally, Plaintiffs' claim that supervisors approved an operation with a facially discriminatory focus cannot be itself implausible in light of allegations that the FBI has, over the last several years, moved towards policies and practices that explicitly focus on Muslims and Islam,[31] *see, e.g.*, FAC ¶¶ 24-37, and training that equates Islam with terrorism, FAC ¶¶ 38, 39; *supra,* n.3.

---

[31] Defendants TW say the FAC alleges that Defendants adhered to policies that bar religious profiling. TW Br. 25. This is an unsupportable distortion. The FAC clearly describes FBI policy changes eroding requirements for investigations' factual predicate and allowing use of race and religion.  *See* FAC ¶¶ 24-39.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

2. ***The Supervisors Are Liable For Unlawful Searches***

Defendants their arguments on supervisory liability in the context of the Plaintiffs' Fourth Amendment claims. TW Br. 27-29; AAR Br. 18-20. Defendants arguments are even weaker with respect to this claim.

Nothing in *Iqbal* changes the intent required to find supervisors liable for a constitutional violation, which as that court recognizes, turns on the constitutional violation at issue. *Iqbal*, 129 S. Ct. at 1948; *Starr v. Baca*, 652 F.3d 1202, 1206-07 (9th Cir. 2011). Because an officer's subjective intent is irrelevant for a Fourth Amendment analysis, *Nunez v. Duncan*, 591 F.3d 1217, 1228 (9th Cir. 2010), the test set forth in *Al-Kidd* governs without any additional intent requirement.

Defendants TW nonetheless argue that the complaint does not show a "sufficient causal connection exists" to show the supervisors' liability. TW Br. 27. But they rely on cases that refused to hold supervisors liable only where plaintiffs were unable to allege *any* knowledge of or personal involvement in constitutional violations. *Edgerly v. City and Cnty. of San Francisco*, 599 F.3d 946, 961 (9th Cir. 2010) (supervisor not aware of challenged arrest and not responsible for police that governs challenged conduct); *Lacey v. Maricopa Cnty.*, 2011 WL 2276198, at *13 (9th Cir. 2011) (supervisor unaware of faulty nature of challenged subpoenas and not involved in ordering challenged raids).

Here, the detailed allegations with respect to Tidwell, Walls, and Rose on the religious discrimination claim make it equally possible for the court "to draw the reasonable inference" that those Defendants knew of and approved ongoing Fourth Amendment violations. Indeed, the complaint alleges specifically that in the informant's daily notes (which Tidwell, Walls and Rose read), he specifically wrote down that he recorded conversations where he was not present, and searched through the drawers at mosque offices where he found himself alone there. *Id.* ¶¶ 192, 135. Courts have refused to dismiss claims against supervisors on far less specific allegations than these. *See Mora v. Arpaio*, 2011 WL 1562443, at *8

53

1   (D.Ariz. Apr. 25, 2011) (allowing pleadings that merely alleged "supervisory

2   authority" and "the ultimate responsibility for and decision-making authority over

3   all" challenged conduct); *Moss v. U.S. Secret Service*, 750 F.Supp.2d 1197, 1238-

4   40 (D.Or. 2010) (mere allegations of "final decision-making authority,"

5   authorization of the unconstitutional conduct, and inappropriately trained and

6   supervised their subordinates sufficient to state plausible claim of supervisory

7   liability).

8                          *               *               *

9          On these facts, this Court cannot conclude that that it is not "plausible" that

10  Tidwell, Walls, and Rose knew of and approved the "central feature" of the

11  operation — its focus on Muslims — or the unlawful searches the operation

12  entailed.  To conclude that Tidwell, Walls, and Rose lacked intent to allow this

13  facially discriminatory operation would mean that these FBI supervisors allowed

14  "one of the ten most important investigations in the country" to go on under their

15  watch for more than a year, an investigation that garnered the attention of

16  management in Washington, D.C. and that involved the sensitive matters of

17  placing a criminal convict into mosques to pose as a convert and recording

18  conversations on hundreds if not thousands of people — all without knowing the

19  "central feature" of the informant's orders, or ever reviewing to see whether the

20  agents had obtained warrants.  It would mean Tidwell, Walls, and Rose lacked this

21  knowledge about the basic focus of the operation on Muslims despite Tidwell

22  approving in advance the recruitment of an informant to be placed in mosques,

23  despite Tidwell and other supervisors reading Monteilh's daily reports and

24  monitoring the operation closely; despite Rose flying to Washington to expand the

25  operation; despite Walls being involved enough that she was audited for her

26  handling of leads, monitoring closely enough that she came to distrust Monteilh

27  and eventually ordered the operation to close, and meeting with Monteilh

28  personally to order him to remain silent about the operation.  In stark contrast to

---

54

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

*Iqbal*, it is this alternative that is implausible.

### C. Defendants Are Not Entitled To Qualified Immunity on Plaintiffs' RFRA Claims

Defendants argue that they are entitled to qualified immunity from the RFRA claims for three reasons, but their arguments are meritless.

Defendants TW argument that RFRA does not provide suits for damages against government individuals in their individual capacities, TW Br. 31-32, runs contrary to the statutory text and the holdings of most courts to address the question. RFRA permits "a person whose religious exercise has been burdened" to "assert that violation as a claim or defense in a judicial proceeding" and to "obtain appropriate relief against a government, "and defines government as "a branch, department, agency, instrumentality, and official (or other person acting under color of law)." 42 U.S.C. 2000bb-2(1), 2000bb-1(c). As several courts have recognized, the phrase "person acting under color of law" tracks the language of 42 U.S.C. 1983, which provides liability for officials in their individual capacities. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). "When a legislature borrows an already established individual phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of that phrase." *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 834-35 (9th Cir.1999). Moreover, providing a damages remedy is consistent with RFRA's remedial purpose. *See Jama v. I.N.S.*, 343 F.Supp.2d 338, 374-75 (D.N.J. 2004) ("[A] conclusion that RFRA does not allow for suits for money damages would seem to be at odds with the general Congressional purpose that animates the statute. Congress enacted RFRA because it wanted to re-invigorate protection of free exercise rights after the Supreme Court in *Smith* diluted the standard used to evaluate claimed violations of those rights…It seems unlikely that Congress would *restrict the kind of remedies* available to plaintiffs who challenge free exercise violations in the same statute it passed to

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 106**

1    *elevate the kind of scrutiny* to which such challenges would be entitled.").  Finally,

2    while Defendants cite one district court opinion from another circuit in support of

3    their view, most district courts to address the question have held that RFRA allows

4    damages against officers in their individual capacities.  *See Jama*, 343 F.Supp.2d at

5    374-75; *Padilla*, 633 F.Supp.2d at 1039 (following *Jama* to hold that "RFRA

6    allows for individual capacity suits for money damages against federal officers");

7    *Keen v. Noble*, 2007 WL 2789561, at *9 (E.D. Cal. Sept. 20, 2007); *Lepp v.

8    Gonzales*, 2005 WL 1867723, at *8 (N.D. Cal. Aug. 2, 2005) (following *Jama*).

9          Defendants also argue that their conduct did not impose a "substantial

10   burden" because, it did not force Plaintiffs "to choose between following the tenets

11   of their religion and receiving a governmental benefit" or coerce them "to act

12   contrary to their religion under the threat of civil or criminal sanctions." *Navajo

13   Nation v. U.S. Forest Service*, 535 F.3d 1058, 1070 (9th Cir. 2008).

14         As the Supreme Court has recognized, "[u]nder some circumstances, indirect

15   'discouragements' undoubtedly have the same coercive effect upon the exercise of

16   First Amendment rights as imprisonment, fines, injunctions or taxes. A

17   requirement that adherents of particular religious faiths or political parties wear

18   identifying arm-bands, for example, is obviously of this nature." *Am. Comm.

19   Ass'n, C.I.O. v. Douds*, 339 U.S. 382 (1950).[32]  By conducting surveillance on

20   anyone who attends mosques, engages in certain religious practices, or identifies as

21   a Muslim, the FBI imposed just such a "discouragement" to mosque attendance

22   and religious practice.  While alleging a "subjective chilling effect" may not be

23   sufficient to constitute a substantial burden under *Vernon*, 27 F.3d at 1394,

24   plaintiffs here allege more than a mere chilling effect.

25         First, by subjecting Muslims to surveillance at mosques, the FBI effectively

26   ───────────────────

27   [32] Because RFRA expressly adopted and restored federal court rulings on the
     "substantial burden" inquiry prior to *Smith*, those cases properly govern a RFRA

28   analysis.  *See Navajo Nation*, 535. F.3d at 1069.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 107**

1    made surveillance a *condition* of religious practice.  A Muslim who wanted to

2    practice at his or her chosen mosque would face the choice of refraining from

3    religious practice or submitting to government surveillance.  Under an

4    investigation that targets all Muslims, investigation is effectively compulsory for

5    those who choose to exercise their religion.  *Cf. Vernon*, 27 F.3d at 1394.  This

6    burden is objective, not subjective.

7        Second, plaintiffs do not allege only a chilling effect from some neutral

8    government action (such as the improper religious influence in employment in

9    *Vernon*) — they allege that the chill arises from explicit religious discrimination.

10   In other constitutional contexts, such discrimination constitutes injury in itself

11   sufficient for standing.  *See, e.g.*, *Saenz v. Roe*, 526 U.S. 489, 505 (1999) (noting

12   that where right "to be treated equally" is at stake, "discriminatory classification is

13   itself a penalty"); *Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am.*,

14   508 U.S. at 666 ("The 'injury in fact' in an equal protection case . . . is the denial

15   of equal treatment resulting from the imposition of [a] barrier, not the ultimate

16   ability to obtain the benefit."); *Allen v. Wright*, 468 U.S. 737, 755 (1984) ("There

17   can be no doubt that [stigmatic injury caused by discrimination] is one of the most

18   serious consequences of discriminatory government action and is sufficient in

19   some circumstances to support standing.").  As the Supreme Court recognized in

20   *Douds*, being subject to such explicit religious discrimination, even where the

21   result is a harmless as wearing an armbands, is itself a burden on religious practice.

22       Finally, Plaintiffs experienced burdens on their religious activity.  Because

23   of Monteilh's intrusive questioning, Malik tried to avoid him to the point of

24   staying away from the mosque.  FAC ¶¶ 197-199.  Both Malik and AbdelRahim

25   have altered their religious practice rather than risk continued surveillance, by

26   decreasing their attendance at mosque and altering religiously motivated dress and

27   grooming (Malik) and religiously prescribed donations (AbdelRahim).  FAC

28   ¶¶ 197, 217.  After Monteilh's status as an informant was revealed, Fazaga spent

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1    time that he would have spent in religious ministry addressing his congregants'

2    fears about attending and participating in the mosque's services and activities.

3    FAC ¶ 185.  Even under Defendants' cramped view of what constitutes a burden

4    on free exercise, these allegations suffice.

5          **D.    Defendants Are Not Entitled to Qualified Immunity on Plaintiffs'**

6          **Claim under 42 U.S.C. 1985(3)**

7          Plaintiffs' lengthy and detailed allegations that Defendants targeted them for

8    surveillance solely on the basis of their religion easily state a claim that defendants

9    "conspire[d] . . . for the purpose of depriving, either directly or indirectly, any

10   person or class of persons of the equal protection of the laws, or of equal privileges

11   and immunities under the laws."  42 U.S.C. 1985(3).  To state a claim § 1985(3),

12   Plaintiffs must allege four elements: (1) a conspiracy (2) for the purpose of

13   depriving, either directly or indirectly, Plaintiffs of the equal protection of the laws

14   and (3) an act in furtherance of the conspiracy (4) that causes injury to plaintiffs.

15   *Scott v. Ross*, 140 F.3d 1275 (9th Cir. 1998).

16         Defendants argue that plaintiffs have not adequately alleged a meeting of the

17   minds to violate Plaintiffs' constitutional rights, for two different reasons.

18   Defendants TW assert this is so because the factual allegations are insufficient,

19   TW Br. 20-21, while AAR argues that a conspiracy among government officials

20   from the same agency does not violate § 1985.  Neither is correct.

21         1.   *Application of the Antitrust "Intracorporate Conspiracy"*

22         *Doctrine To § 1985 Claims Would Be Wholly Inappropriate*

23         Defendants argue that this Court should apply, in the § 1985(3) context, the

24   "intracorporate conspiracy" doctrine that courts have developed in antitrust law.

25   Under that doctrine, employees of a single entity, acting within the scope of

26   employment, generally cannot be held culpable for conspiring with each other to

27   violate antitrust law.  AAR Br. 7-9.  However, the Ninth Circuit has held that the

28   applicability of intracorporate conspiracy doctrine to other types of conspiracies

---

58

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 109**

1   (other than antitrust) depends upon the type of activity the statute at issue is

2   designed to prohibit.  In *Webster v. Omnitrition Intern., Inc.*, the Ninth Circuit held

3   the intracorporate conspiracy doctrine should not apply to conspiracies under

4   RICO, because while "a conspiracy 'in restraint of trade' between [a subsidiary

5   and its parent] poses no threat to the goals of antitrust law-protecting

6   competition . . . [,] intracorporate conspiracies do threaten RICO's goals of

7   preventing the infiltration of legitimate businesses by racketeers and separating

8   racketeers from their profits" 79 F.3d 776, 787 (9th Cir. 1996) (*quoting Ashland*

9   *Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989)).

10          While the Ninth Circuit has not explicitly addressed whether the

11   intracorporate conspiracy doctrine extends to civil rights claims under §1985, *see*

12   *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 910 (9th Cir. 1993) (noting circuit

13   split and reserving question), *Webster*'s logic clearly compels the conclusion that it

14   does not apply here.  Section 1985, known as the Ku Klux Klan Act of 1871, was

15   designed to "prevent[] . . . deprivations which shall attack the equality of rights of

16   American citizens."  *Bray*, 506 U.S. at 268.  Unlike antitrust law, which prohibits

17   anticompetitive conduct by corporate entities, "the conspiracy in a § 1985(3) claim

18   is focused on the discriminatory conduct of the individuals involved" and therefore

19   remains actionable "regardless of whether the defendants were acting as

20   individuals or in the course and scope of their employment." *Rashdan v.*

21   *Geissberger*, 2011 WL 197957, at *7 (N.D. Cal. Jan. 11, 2011).  Indeed, applying

22   the doctrine to § 1985 would have the effect of putting discriminatory law

23   enforcement conspiracies outside the reach of § 1985 — a goal that Congress

24   cannot possibly have intended in 1866, when it passed the statute in the wake of

25   massive civil rights violations by state actors. *See O.H. v. Oakland Unified Sch.*

26   *Dist.*, 2000 WL 33376299, at *8 (N.D. Cal. Apr. 17, 2000) (recognizing that

27   application of intracorporate conspiracy doctrine to § 1985 "would immunize

28   official policies of discrimination from scrutiny").  District courts have recognized

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 110**

1   this distinction and rejected application of the intracorporate conspiracy doctrine to

2   § 1985 conspiracies.[33]  This Court should do likewise.

3         2.  ***Plaintiffs' Adequately Allege A Conspiracy Under § 1985***

4         Defendants TW argue that Plaintiffs' complaint lacks the factual specificity

5   to establish that they entered an agreement to violate Plaintiffs' constitutional

6   rights.  TW Br. 21.  This assertion verges on the absurd.  As discussed with respect

7   to supervisory liability, *supra* Part II.B.1, Plaintiffs allege that Tidwell and Walls

8   approved, oversaw, and supervised an investigation whose "central feature" was

9   that it targeted Muslims on the basis of religion.  And as set forth above, *see id.*,

10  Plaintiffs have pled detailed, nonconclusory facts about the nature and importance

11  of the investigation, these supervisors' specific roles and actions, and the climate at

12  the FBI that easily satisfy the requirement that Plaintiff plead facts "plausibly

13  suggesting . . . agreement." *Twombly*, 550 U.S. at 557; *see also Scott*, 140 F.3d at

14  1284 ("A conspiracy can be inferred from conduct and need not be proven by

15  evidence of an express agreement." (quotation omitted)).  Indeed, it is hard to

16  know what facts a plaintiff could plead to satisfy the standard that Defendants

17  suggest governs – a standard far beyond what § 1985 requires.

18        Defendants AAR contend that Plaintiffs do not adequately plead that

19  Defendants acted "for the purpose of depriving, either directly or indirectly,

20  

---

21  [33] *See Rashdan*, 2011 WL 197957; *Washington v. Duty Free Shoppers*, 696
22  F.Supp. 1323, 1326 (N.D. Cal. 1988) ("In the area of civil rights, a real danger
    exists from the collaboration among agents of a single business to discriminate.
23  There is no reason to believe that discrimination by an individual business is less
    harmful than discrimination by multiple businesses, or that discrimination by a
24  single business deserves to be protected because it confers any benefit on
25  society."); *O.H. v. Oakland Unified School Dist.* 2000 WL 33376299 at 8 (N.D.
    Cal. 2000) (recognizing that application of intracorporate conspiracy doctrine to
26  § 1985 "would immunize official policies of discrimination from scrutiny"); *Rebel
    Van Lines v. City of Compton*, 663 F.Supp. 786, 792-793 (C.D. Cal. 1987); *Diem v.
27  City and County of San Francisco*, 686 F.Supp. 806, 810 (N.D. Cal. 1988).

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1   Plaintiffs of the equal protection of the laws." *Carpenters*, 463 U.S. at 828-29;

2   AAR Br. 9-12. However, as described above, Plaintiffs have alleged that

3   Defendants employed a facial classification on the basis of religion. *See supra*

4   II.A.2. Thus, Plaintiffs allege "that some racial, or perhaps otherwise class-based,

5   invidiously discriminatory animus [lay] behind the conspirators' action." *Bray v.*

6   *Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993). *Bray* stated that

7   the "discriminatory animus" required for a § 1985(3) claim need not be malicious.

8   *Id*. at 269-70 (stating that the "assertedly benign (though objectively invidious),

9   discrimination against women" would be actionable because it "focuses upon

10  women by reason of their sex"). *See also Johnson Controls*, 499 U.S. at 199;

11  *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) (citing *Bray* and

12  concluding that "an 'animus' requirement can be met not just by acts that are

13  maliciously motivated, but also by acts arising out of assertedly benign or even

14  affectionate (though objectively harmful) impulses.").

15          Courts have repeatedly applied this analysis to allow § 1985(3) claims to

16  proceed beyond the pleadings stage where plaintiffs have alleged that defendants

17  were motivated by plaintiffs' membership in a protected class. *See, e.g.*, *Bowen v.*

18  *Rubin*, 2002 U.S. Dist. LEXIS 25283, at *8 (E.D.N.Y. May 17, 2002) (holding that

19  plaintiffs "sufficiently alleged the required animus by alleging that they were

20  targeted for the very reason of their group characteristic"); *see also Azar v. Conley*,

21  456 F.2d 1382, 1386 (6th Cir. 1972) (specific intent need not be alleged in

22  connection with § 1985(3) claims). Plaintiffs' allegation that Defendants targeted

23  them for surveillance solely because of their religion is sufficient to establish the

24  required animus for Plaintiffs' § 1985(3) claim.

25          Plaintiffs' allegation that Defendants targeted them for surveillance because

26  of their religion is also sufficient to establish that Defendants intended to interfere

27  with a legal right — namely, Plaintiffs' right to be free from religious

28  discrimination. Defendants AAR seem to misunderstand this, and place great

61

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 112**

weigh on their argument that the complaint alleges "no deliberate disruption of their religious activities to dissuade members from attending services." AAR Br. 11. But the Supreme Court and the Ninth Circuit have repeatedly held that allegations of intentional discrimination constitute allegations of interference with a protected right sufficient to survive a motion to dismiss.[34] *See, e.g.*, *Griffin v. Breckenridge*, 403 U.S. 88, 90-91 (1971) (holding § 1985(3) claim sufficiently pled where African-American plaintiffs alleged that defendants engaged in a conspiracy to prevent them "from seeking the equal protection of the laws" on the basis of race); *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1450 (9th Cir. 1994), *overruled on other grounds as stated in Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001) (African-American's allegations that employer deprived him of equal protection by discriminating against him on the basis of race satisfied both the animus requirement and the denial of "his right to be free from improper racial discrimination"). Recent decisions in other circuits have also concluded that such allegations are sufficient to survive dismissal. *See, e.g.*, *Thomas v. Independence Township.*, 463 F.3d 285 (3rd Cir. 2006); *Bowen*, 2002 U.S. Dist. LEXIS 25283 at*8; *Word of Faith Fellowship, Inc. v. Rutherford Cnty. Dep't Social Services*, 329 F. Supp. 2d 675, 689-90 (W.D. N.C. 2004).

Defendants cite at length the Supreme Court's decision in *Bray*, which notes that "the 'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it."

---

[34] *See also, e.g.*, *Maynard v. City of San Jose*, 37 F.3d 1396 (9th Cir. 1994) (allowing § 1985 claim to proceed to trial where plaintiff alleged he was intentionally discriminated against on the basis of race); *Johnson v. State of California*, 207 F.3d 650, 655 (9th Cir. 2000) (reversing dismissal of § 1985(3) claim where plaintiff alleged policy of racial segregation of prisoners); *Scott v. Ross*, 140 F.3d 1275, 1284 (9th Cir. 1998) (affirming jury verdict for plaintiff on § 1985 claim that he was targeted because of his religious affiliation).

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 113**

1  506 U.S. at 275-76. But the FAC easily passes this test, as it alleges in great detail

2  that Defendants intentionally discriminated against them by targeting them for

3  investigation and surveillance solely because of their religion, as discussed above.

4  *See supra* Part II.A (discussing intentional discrimination under First Amendment).

5         **E.    Defendants are Not Entitled To Qualified Immunity on Plaintiffs'**

6              **Equal Protection Claims**

7        Courts have repeatedly recognized that classification on the basis of religion

8  violates equal protection. *Armstrong*, 517 U.S. at 464 (holding that government

9  may not base decision to prosecute on "an unjustifiable standard such as race,

10  religion, or other arbitrary classification"); *Miller v. Johnson*, 515 U.S. 900, 911

11  (1995) (at the "heart" of equal protection "lies the simple command that the

12  Government must treat citizens as individuals, not as simply components of a

13  racial, religious, sexual or national class.") (quotations omitted)); *Ball v.*

14  *Massanari*, 254 F.3d 817, 823 (9th Cir. 2001) (under Equal Protection Clause,

15  where government "employs a suspect class (such as race, religion, or national

16  origin) . . . , then courts must apply strict scrutiny"); *Freeman v. Arpaio*, 125 F.3d

17  732, 737 (9th Cir. 1997) ("The Constitution's equal protection guarantee ensures

18  that [government] officials cannot discriminate against particular religions."),

19  *overruled on other grounds as recognized in Shakur v. Schriro*, 514 F.3d 878,

20  884-85 (9th Circ. 2008); *Ass'n of Christian Sch. Intern. v. Stearns*, 362 Fed. Appx.

21  640, 646 (9th Circ. 2010) (unpub.) (under Equal Protection Clause, courts "apply

22  strict scrutiny when distinctions are made on the basis of a suspect class, like

23  religion"); *Colorado Christian Univ. v. Weaver* , 534 F.3d 1245, 1257 (10th Cir.

24  2008) ("The [Supreme] Court has called neutral treatment of religions 'the clearest

25  command of the Establishment Clause.' Such discrimination is forbidden by the

26  Free Exercise Clause as well. The Court has suggested that the Equal Protection

27  Clause's requirement is parallel."); *Sweet v. Sec'y, Dept. of Corrections* 467 F.3d

28  1311, 1319 (11th Cir. 2006); *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998)

1   (holding that facial classification on the basis of religion violated Equal

2   Protection); *Native American Council of Tribes v. Solem*, 691 F.2d 382, 384 (8th

3   Cir. 1982) (holding that complaint made out a "violation of equal protection by

4   means of religious discrimination").

5          Defendants AAR argue that the claim should be dismissed because courts

6   have recognized that "[i]t is generally unnecessary to analyze laws which burden

7   the exercise of First Amendment rights by a class of persons under the equal

8   protection guarantee, because the substantive guarantees of the [First] Amendment

9   serve as the strongest protection against the limitation of these rights." *Orin v.*

10  *Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001).  But it does not follow that

11  plaintiffs' Equal Protection claim must be dismissed.  Rather, as the *Orin* court

12  concluded, a plaintiff's Equal Protection claim is "subsumed by, and co-extensive

13  with, his First Amendment claim." *Id.*; *see supra, Part II.A* (First Amendment

14  claims also require strict scrutiny).  Because Plaintiffs have stated a claim for

15  religious discrimination under the First Amendment, *see supra*, Part II.A, they

16  have also stated an Equal Protection claim.

17      **F.    Defendants Are Not Entitled To Qualified Immunity on Plaintiffs'**

18             **Fourth Amendment and FISA Claims**

19         The complaint sets forth detailed allegations that Defendants planted

20  electronic listening devices in one Plaintiff's home and another's office, that their

21  informant left recording devices to capture intimate religious discussion at the

22  mosque, that the informant routinely took video in mosques and in private homes,

23  and that the informant acted pursuant to broad instructions to gather as much

24  information on Muslims as possible.  All of this took place without warrants,

25  because, as defendant Armstrong told the informant, while warrants might be

26  required for criminal cases, "National security is different.  Kevin [Armstrong] is

27  God." FAC ¶ 136.  Defendants nonetheless argue that none of these activities

28  violated clearly established Fourth Amendment law.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1   Defendants are wrong.  Established law clearly holds that the FBI cannot go

2   around dropping listening devices in places of worship or private homes without a

3   warrant or suspicion of illegal activity, cannot videotape the interiors of a person's

4   home without consent or a warrant, and cannot engage in a fishing expedition

5   targeting an entire religious group without a proper law enforcement purpose.

6        The Fourth Amendment protects against unreasonable searches and seizures.

7   In the absence of a warrant, a court must assess whether any particular action by

8   the government invades an individual's reasonable expectation of privacy by

9   considering both whether the individual exhibited an actual expectation of privacy,

10   and whether the individual's expectation is one society "is prepared to recognize as

11   reasonable." *Bond v. United States*, 529 U.S. 334, 338 (2000).  Courts have been

12   hesitant to create bright line rules governing expectations of privacy in any

13   particular places – rather, a careful Fourth Amendment analysis must take into

14   account the specific circumstances of the communications at issue.  *United States*

15   *v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007); *see also Lonegan v. Hasty*,

16   436 F. Supp. 2d 419, 434 (E.D.N.Y. 2006) ("the question of whether society is

17   prepared to accept as reasonable plaintiffs' expectation of privacy . . . requires an

18   analysis that considers not only where the conversations occurred, but, also, the

19   nature of the conversations, the specific circumstances in which they occurred, and

20   the relationships of the participants.").

21        1.   ***Warrantless Audio Recording Outside Informant's Presence***

22        The most obvious Fourth Amendment (and FISA) violation alleged in the

23   FAC arises from the informant's warrantless recording of conversations to which

24   he was *not* a party.  Although Defendants argue that the informants' surveillance

25   was reasonable under the invited informer doctrine, the FAC alleges Defendants

26   conducted audio surveillance of Plaintiffs *outside the presence of the informant* in

27   at least three ways: (1) by installing warrantless audio surveillance in Fazaga's

28   office, FAC ¶ 95; (2) by installing warrantless audio surveillance in AbdelRahim's

---

65

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

home, FAC ¶ 209; and (3) through the informant leaving recording devices around the mosque, outside his presence, to record intimate religious discussions to which he was not a party, FAC ¶¶ 127, 137, 192, 211.  The law clearly establishes that the Fourth Amendment does not permit audio surveillance of communications without consent or a warrant.  *Yendes v. McCulloch*, 2010 WL 3339505, at *7 (S.D. Cal. Aug. 23, 2010); 18 U.S.C. 2510 *et seq*.

_Fazaga's Office:_  Defendants do not contest that under clearly established law Fazaga had a reasonable expectation of privacy against audio recording his office, nor could they.  *See United States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991); *United States v. McIntyre*, 582 F.2d 1221, 1223-24 (9th Cir. 1978).  Instead, they argue that the allegation is "conclusory" and falls short of plausible under *Iqbal*.  This contention is absurd.  First, the allegation that "Agents Allen and Armstrong caused . . . electronic surveillance equipment to be installed at the Mission Viejo mosque and used it to monitor conversations of Plaintiff Yassir Fazaga, including conversations held in parts of the mosque not open to the public, including Sheikh Fazaga's office," FAC ¶ 95, is not conclusory, as it contains specific factual allegations and is not merely a "formulaic recitation of the elements of a constitutional discrimination claim." *Iqbal*, 129 S.Ct. at 1951.  Second, even if it could somehow be described as conclusory, it is plausible in light of other, detailed allegations: that Agents Allen and Armstrong had developed a specific interest in Fazaga (based, as set forth *supra*, Part II.A.2, on innocuous and protected First Amendment activity) and had instructed the informant to gather more information on him, FAC ¶¶ 168-180; that they told the informant that electronic surveillance equipment had been installed at Fazaga's Mission Viejo mosque, in a way that "could get [them] in a lot of trouble," which he understood to mean that they did not have warrants, FAC ¶ 94; and that they told him they did not need warrants for national security investigations, FAC ¶ 136.  Courts have refused to dismiss claims on far less specific allegations.  *See, e.g., Moss*, 750

66

1    F.Supp. 2d at 1236-1240; *Mora*, 2011 WL 1562443, at * 8.

2        *AbdelRahim's Home:*  The complaint alleges that Defendants Armstrong and

3    Allen told the informant that "the FBI had electronic listening devices in

4    AbdelRahim's house, as well as in AbdelRahim's car and phone," and cites a

5    particular instance in which they told him they had knowledge of something that

6    happened in the house because they had audio surveillance in it.  FAC ¶ 209.  It is

7    clearly established that warrantless surveillance of homes violates the Fourth

8    Amendment. *See Kyllo v. United States*, 533 US 27, 31 (2001) ("With few

9    exceptions, the question whether a warrantless search of a home is reasonable and

10   hence constitutional must be answered no.").  Defendants TW argue that Plaintiffs

11   fail to allege who is responsible and whose conversations were recorded.  TW Br.

12   27 n.14.  The allegations that Armstrong and Allen had instructed Monteilh to

13   gather extensive information on AbdelRahim and had knowledge about the

14   surveillance, *see* FAC ¶ 200-213, easily render plausible the claim that Defendants

15   were responsible for the surveillance and recorded AbdelRahim's conversations.

16       Defendants AAR also argue that this portion of the claim should be

17   dismissed on state secrets grounds as it would expose "sources and methods."

18   AAR Br. 33-34 n.7.  But the individual defendants cannot assert the state secrets

19   privilege — only the government can, and it has chosen not to do so with respect to

20   the Fourth Amendment claims.  *See* Plfs. Opp. to Gov't Defs., Part IV.C.3.

21       *Surveillance In Mosques Outside the Informant's Presence:* The FAC

22   alleges instances in which the informant left recording devices in the mosque so as

23   to record communications during *halaqas*, or intimate religious discussion groups,

24   while he went elsewhere, and that he specifically recorded conversations of

25   Plaintiffs Malik and AbdelRahim in this manner.  *See* FAC ¶¶ 127, 137, 192, 211.

26   The invited informant doctrine does not apply to situations where no informant is

27   present, and warrantless audio recording in circumstances where an individual

28   enjoys a reasonable expectation of privacy violates clearly established Fourth

                                        67
PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

1    Amendment law.  *United States v. Nerber*, 222 F.3d 597, 604-05 (9th Cir. 2000).

2           Defendants argue that no reasonable expectation of privacy exists in

3    recordings made at mosques because Plaintiffs do not allege that these spaces were

4    closed to the public.  TW Br. 26, 28-31; AAR Br. 29-31.  But even if Plaintiffs

5    knew their communications could be heard by other participants in the *halaqa*,

6    they retained a reasonable expectation of privacy against having them audio

7    recorded. "What a person seeks to preserve as private, even in an area accessible to

8    the public, may be constitutionally protected." *Katz*, 389 U.S. at 351-52 (finding

9    reasonable expectation of privacy in public phone booth).  Similarly, even where

10   the public nature of a space involves some degree of exposure, people may still

11   retain reasonable expectations of privacy against more serious intrusions.  *See*

12   *Bond*, 529 U.S. at 338-39 (holding that although passenger on public bus "clearly

13   expects that his bag [placed in overhead bin] may be handled," he nonetheless had

14   reasonable expectation of privacy against agents "feel[ing] the bag in an

15   exploratory manner").  Courts have repeatedly recognized that even where people

16   expect to be seen and heard by a limited number of others, they retain a reasonable

17   expectation of privacy against audio or video recording.  As the Ninth Circuit has

18   recognized, "[p]rivacy does not require solitude. . . . [a]ccess of others does not

19   defeat [people's] expectation of privacy." *Taketa*, 923 F.2d at 673;  *Nerber*, 222

20   F.3d at 604 ("Even if one cannot expect total privacy . . . , [a] diminished privacy

21   interest does not eliminate society's expectation to be protected from" severe

22   intrusion); *Trujillo v. City of Ontario*, 428 F.Supp.2d 1094, 1105 & n.6 (C.D. Cal.

23   2006) (holding police officers retained reasonable expectation of privacy against

24   videotaping in station locker room, even though they could be seen by other

25   officers), *aff'd sub nom. Bernhard v. City of Ontario*, 270 Fed.Appx. 518, 519 n.1

26   (9th Cir. 2008) (unpublished) ("That Plaintiffs expected to undress in front of their

27   colleagues does not mean that they expected to undress for the camera."); *Yendes*,

28   2010 WL 3339505, at *6 (fact that plaintiffs met with other people while

1    defendants recorded them in conference room without a warrant "not fatal" to

2    Fourth Amendment claim, "as '[p]rivacy does not require solitude'" (quoting

3    *Taketa*)). Certainly, from the allegations of the complaint, it is clear that the prayer

4    groups were not "so open to . . . the public that no expectation of privacy is

5    reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987).

6         Defendants TW rely on cases where no expectation of privacy was found

7    due to the purely commercial nature of the locations involved. *See Lyall v. City of*

8    *Los Angeles*, 2011 WL 61626, *4-7 (C.D. Cal. Jan. 6, 2011); *United States v.*

9    *Gonzalez*, 328 F.3d 543, 547 (9th Cir. 2003); *United States v. Little*, 753 F.2d

10   1420, 1436 (9th Cir. 1984); *In re John Doe Trader*, 894 F.2d 240, 243-45 (7th Cir.

11   2003) (relying on both "noisy and frantic" environment of trading floor presence

12   and of agents in and near the recorded conversations). These cases are

13   inapplicable to the noncommercial sanctuary a mosque provides.

14        Here, the allegations show that Plaintiffs had a reasonable expectation of

15   privacy that the *halaqa* would not be recorded. Mosque prayer halls are not

16   ordinary public spaces, as various rules and customs apply, including a religious

17   prohibition on eavesdropping or tale-bearing, and an explicit rule against audio and

18   video recording. FAC ¶ 193. The *halaqa* where Defendants recorded Plaintiffs are

19   intended to be safe environments for religious discussion that are afforded "some

20   measure of confidentiality." *Id.* Defendant TW argues that these customs must be

21   ones that "*society* is prepared to recognize as reasonable," TW Br. 30 (quoting

22   *Katz*, 389 U.S. at 361 (emphasis in brief)), but the Ninth Circuit has recognized

23   that expectations of privacy arising out of religious custom are based on "the

24   nation's history of respect for religion in general."[35] *Mockaitis v. Harcleroad*, 104

25

26   [35] Defendants AAR rely on *Kee v. City of Rowlett*, 247 F.3d 206 (5th Cir. 2001), in

27   which the Fifth Circuit held no reasonable expectation of privacy had been shown
     at a gravesite where local police had planted a hidden microphone. But there,

28   plaintiffs "adduced no evidence regarding the context of the communications that

                                                                        *(cont'd)*

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 120**

1    F.3d 1522, 1533 (9th Cir. 1997) (holding that plaintiff had objectively reasonable

2    expectation of privacy in communications made during confession), *overruled on*

3    *other grounds as recognized by United States v. Antoine*, 318 F.3d 919, 923 (9th

4    Cir. 2003) (recognizing overruling on RFRA claim).

5         At the motion to dismiss stage, under *Iqbal*, Plaintiffs need only plead facts

6    sufficient to "nudge [their claims] across the line from conceivable to plausible."

7    *Iqbal*, 129 S.Ct. at 1951.  Plaintiffs' allegations more than suffice to make

8    plausible their claims of a reasonable expectation of privacy in the prayer hall.

9         2.  ***Video Recording by the Informant***

10        In addition to the installation of listening devices, the FAC alleges serious

11   violations of the Fourth Amendment arising out of warrantless video surveillance:

12   in particular, that the informant took warrantless video recording inside Plaintiff

13   AbdelRahim's home, FAC ¶ 202.  Defendants argue that the presence of an

14   informant renders this a reasonable search.  TW Br. 28-29, AAR Br. 32.

15        However, in *Nerber*, the Ninth Circuit expressly disclaimed the blanket rule

16   that "video surveillance is justifiable whenever an informant is present," holding

17   that the presence of informants justified video surveillance only because

18   "defendants' privacy expectations were already substantially diminished."  222

19   F.3d at 604 n.5.  Indeed, the Court specifically noted, "[W]e suspect an informant's

20   presence and consent is insufficient to justify the warrantless installation of a

21   hidden video camera in a suspect's home."  *Id.  Nerber*'s position is grounded in

22   the view, clearly established in the Ninth Circuit, that video surveillance is "one of

23   the most intrusive investigative mechanisms available to law enforcement."  *Id.* at

24

25   they now seek to characterize as private," and the facts indicated that

26   "representatives of the media and . . . third parties were in close proximity to the
     grave site."  *Id.* at 213.  Here, plaintiffs' allegations of the rules and customs of the

27   prayer hall and the *halaqa* easily render plausible that they had a reasonable

28   expectation of privacy.

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

SER 121

603; *see also United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir. 1992)

(Kozinski, J., concurring); *United States v. Mesa-Rincon*, 911 F.2d 1433, 1442

(10th Cir. 1990); *United States v. Torres*, 751 F.2d 875, 885 (7th Cir. 1984)

("Television surveillance is identical in its indiscriminate character to wiretapping

and bugging.  It is even more invasive of privacy, just as a strip search is more

invasive than a pat-down search . . . ."); *Trujillo*, 428 F.Supp.2d at 1107.

*Nerber* held that individuals lacked an expectation of privacy against video

recording by informants when they visited a hotel room "solely to conduct a

business transaction at the invitation of the occupants, with whom they were only

minimally acquainted."  222 F.3d at 604.  In contrast to this "substantially

diminished" expectation of privacy, *id.* at 604 n.5, private homes like

AbdelRahim's are subject to "the most stringent Fourth Amendment protection,"

*United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976), and Defendants' video

surveillance there violated the Fourth Amendment.

### 3.  *Conversations to Which the Informant Was a Party*

The complaint also alleges a Fourth Amendment violation arising from that

Defendants' use of the informant to gather "thousands of hours of audio recording

of conversations . . . as well as recordings of religious lectures, discussion groups,

classes, and other Muslim religious and cultural events occurring in mosques."

FAC ¶ 2.  Defendants argue that the vast majority of this recording was permissible

without a warrant under the "invited informer" doctrine.  *See* TW Br. 28-30;

AAR Br. 29-32.  But the Ninth Circuit has been clear that for the invited informer

doctrine to apply, the "the government's investigation must be conducted in good

faith; i.e., not for the purpose of abridging first amendment freedoms." *United

States v. Aguilar*, 883 F.2d. 662, 705 (9th Cir. 1989), *superseded on other grounds

by* 8 U.S.C. 1324; *see also United States v. Mayer*, 503 F.3d 740, 751 (9th Cir.

2007) ("Good faith has been an implicit requirement for investigations under the

Fifth Amendment and searches under the Fourth Amendment.").  Under this good

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 122**

1   faith requirement, law enforcement must not investigate individuals for the purpose

2   of violating First Amendment rights, and must do so with a legitimate law

3   enforcement purpose. *Mayer*, 503 F.3d at 752. The allegations in the FAC paint a

4   detailed portrait of a dragnet surveillance operation undertaken by Defendants' to

5   survey the entire Muslim community in Southern California. *See supra* Part II.A.

6   Based on the allegations, the Court could conclude that the requisite good faith was

7   absent here, given that the investigation was motivated by the perception, stated by

8   Defendants Allen and Armstrong, that "Islam is a threat to national security." FAC

9   ¶¶ 121, 162. This is a classic example of a police operation conducted in bad faith

10  that would preclude the applicability of the invited informant doctrine. *See also*

11  *Handschu v. Special Services Div.*, 349 F.Supp. 766, 770 (S.D.N.Y. 1972) (no

12  legitimate law enforcement purpose in infiltration of anti-war group).

13            4.  ***Plaintiffs State A Plausible Claim For Violation Of The Foreign***

14                ***Intelligence Surveillance Act***

15          Defendants argue that Plaintiffs lack standing on their FISA claim because

16  the statute provides relief only for plaintiffs subject to "electronic surveillance"

17  employed "under circumstances in which a person has a reasonable expectation of

18  privacy and a warrant would be required for law enforcement purposes." 50

19  U.S.C. 1801(f)(4); *see also Koyomejian*, 946 F.2d at 1453-54 (holding that FISA's

20  protections cover video surveillance). For the reasons discussed in connection

21  with the Fourth Amendment claims, *see supra* Part II.F.1-3, the complaint pleads

22  detailed facts that render plausible the allegations that Plaintiffs were monitored

23  without a warrant in circumstances where they had a reasonable expectation of

24  privacy. *See ACLU v. National Sec. Agency*, 493 F.3d 644, 657 n.16 (6th Cir.

25  2007) (noting FISA's "aggrieved person" status coextensive with Fourth

26  Amendment) (Batchelder, J.).

27          Defendants TW also misread § 1809's *mens rea* for liability, arguing that it

28  requires "intent to violate the law." *See* TW Br. 34. The complaint sets forth

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

SER 123

1    ample facts to render plausible that Defendants' intentionally authorized and

2    engaged in constitutional violations.  But Defendants' reading of the law is wrong

3    — it is unsupported by the statute's text, which renders liable any person who

4    "intentionally engages in electronic surveillance under color of law except as

5    authorized by [statute]" or "intentionally discloses or uses information obtained . . .

6    by electronic surveillance, knowing or having reason to know that the information

7    was obtained through electronic surveillance not authorized by [statute]." 50

8    U.S.C. 1809(a).  Plaintiffs are aware of no case to apply such an intent

9    requirement, and Defendants cite none.

10                                   **CONCLUSION**

11         For the foregoing reasons, Plaintiffs respectfully request that this Court deny

12   the Individual Capacity Defendants' motions to dismiss.

13                                              Respectfully submitted,

14   Dated:  December 23, 2011             ACLU FOUNDATION OF SOUTHERN
15                                              CALIFORNIA

16                                          COUNCIL ON AMERICAN-ISLAMIC
                                                RELATIONS, CALIFORNIA
17
18                                          HADSELL STORMER KEENY
                                                RICHARDSON & RENICK, LLP
19
                                            By: s/ Peter Bibring
20                                                Peter Bibring

21                                              Attorneys for Plaintiffs

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO INDIVIDUAL CAPACITY DEFENDANTS' MTNS. TO DISMISS

**SER 124**

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Brian R. Michael (SBN: 240560)
brian.michael@wilmerhale.com
P. Patty Li (SBN: 266937)
Patty.li@wilmerhale.com
katie Moran (SBN: 272041)
Katie.moran@wilmerhale.com
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071
Telephone:  (213) 443-5300
Facsimile:  (213) 443-5400

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Howard M. Shapiro (admitted *pro hac vice*)
howard.shapiro@wilmerhale.com
Carl J. Nichols (admitted *pro hac vice*)
carl.nichols@wilmerhale.com
Annie Owens (admitted *pro hac vice*)
annie.owens@wilmerhale.com
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

Attorneys for Defendants J. Stephen Tidwell
and Barbara Walls

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| YASSIR FAZAGA *et al.*, | Case No. SA CV 11-00301-CJC (VBKx) |
| Plaintiffs, | **NOTICE OF MOTION AND MOTION OF INDIVIDUAL-CAPACITY DEFENDANTS J. STEPHEN TIDWELL AND BARBARA WALLS TO DISMISS FIRST AMENDED COMPLAINT** |
| v. | |
| FEDERAL BUREAU OF INVESTIGATION *et al.*, | |
| Defendants. | Date:  January 30, 2012 |
| | Time:  1:30 p.m. |
| | Judge:  Hon. Cormac J. Carney |
| | Crtrm:  Courtroom 9B |

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071

PLEASE TAKE NOTICE that individual-capacity defendants J. Stephen Tidwell and Barbara Walls ("Defendants") will bring the following Motion to Dismiss the First Amended Complaint before the Honorable Cormac J. Carney, United States District Judge, in his courtroom, U.S. Courthouse, 411 West Fourth Street, Santa Ana, California, on January 30, 2012 at 1:30 p.m., or at such time as the Court may direct that matter be heard.

Defendants move to dismiss Counts 1-7, 9, and 10 against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The grounds for this motion are based on the accompanying memorandum of law, any argument offered at a hearing on this motion, and the files and records of this case.

Pursuant to Local Rule 7-3, the parties conferred in connection with the relief sought in this motion on November 1, 2011. Plaintiffs oppose this motion.

DATED: November 11, 2011

Respectfully submitted,

WILMER CUTLER PICKERING
   HALE AND DORR LLP

By: /s/ Brian R. Michael

> Brian R. Michael
> P. Patty Li
> Katie Moran
> 350 South Grand Avenue, Suite 2100
> Los Angeles, CA 90071
> Telephone: (213) 443-5300
> Facsimile: (213) 443-5400
>
> Howard M. Shapiro
> Carl J. Nichols
> Annie L. Owens
> 1875 Pennsylvania Avenue, N.W.
> Washington, D.C. 20006
> Telephone: (202) 663-6000
> Facsimile: (202) 663-6363
>
> *Attorneys for Defendants J. Stephen Tidwell and Barbara Walls*

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071

WILMER CUTLER PICKERING
   HALE AND DORR LLP
Brian R. Michael (SBN: 240560)
brian.michael@wilmerhale.com
P. Patty Li (SBN: 266937)
patty.li@wilmerhale.com
Katie Moran (SBN: 272041)
katie.moran@wilmerhale.com
350 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

WILMER CUTLER PICKERING
   HALE AND DORR LLP
Howard M. Shapiro (admitted *pro hac vice*)
howard.shapiro@wilmerhale.com
Carl J. Nichols (admitted *pro hac vice*)
carl.nichols@wilmerhale.com
Annie L. Owens (admitted *pro hac vice*)
annie.owens@wilmerhale.com
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Attorneys for Defendants J. Stephen Tidwell
and Barbara Walls

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| YASSIR FAZAGA *et al.*, | No. SA CV 11-00301-CJC (VBKx) |
| Plaintiffs, | **MEMORANDUM OF LAW IN SUPPORT OF MOTION OF INDIVIDUAL-CAPACITY DEFENDANTS J. STEPHEN TIDWELL AND BARBARA WALLS TO DISMISS FIRST AMENDED COMPLAINT** |
| v. | |
| FEDERAL BUREAU OF INVESTIGATION *et al.*, | |
| Defendants. | |
| | Date: January 30, 2012 |
| | Time: 1:30 p.m. |
| | Judge: Hon. Cormac J. Carney |
| | Crtrm: Courtroom 9B |

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
Case No. SA CV 11-00301-CIC (VBKx)

**SER 127**

*Sidebar (vertical text):* Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION ............................................................................... 1

BACKGROUND ................................................................................. 4

    A.    Allegations Regarding "Operation Flex" ................................ 5

    B.    Allegations Regarding Defendants Tidwell And Walls ............................ 8

ARGUMENT .................................................................................. 9

I.    THE GOVERNMENT'S ASSERTION OF THE STATE-SECRETS PRIVILEGE MANDATES DISMISSAL OF COUNTS 1-7 ............................... 9

II.    THIS COURT SHOULD DECLINE TO EXTEND *BIVENS* ........................... 12

    A.    No Court Has Extended *Bivens* To This Context ................................ 12

    B.    The Creation Of A *Bivens* Cause Of Action Is Inappropriate Here........ 14

        1.    National Security Issues And Assertion Of State-Secrets Privilege Are Special Factors Precluding A *Bivens* Remedy........ 14

        2.    Existing Remedial Statutory Schemes Preclude The Creation Of A *Bivens* Remedy ........................................ 16

III.    PLAINTIFFS FAIL TO STATE VALID FIRST AND FIFTH AMENDMENT CLAIMS UNDER 42 U.S.C. § 1985(3) ................................ 20

IV.    TIDWELL AND WALLS ARE ENTITLED TO QUALIFIED IMMUNITY ON ALL OF PLAINTIFFS' CLAIMS..................................... 22

    A.    Qualified Immunity Bars The First And Fifth Amendment Claims........ 23

    B.    Qualified Immunity Bars Plaintiffs' Fourth Amendment Claim............. 26

        1.    Plaintiffs Fail To Allege That Tidwell Or Walls Was Personally Involved In The Purported Searches, Or That A Sufficient Causal Connection Between Their Conduct And The Alleged Violation Otherwise Existed................................... 27

        2.    Plaintiffs Fail To Allege A Reasonable Expectation Of Privacy In The Circumstances Of The Alleged Searches ............ 28

    C.    Qualified Immunity Bars Plaintiffs' RFRA Claim ........................ 31

        1.    RFRA Does Not Permit Suits For Damages Against Individual-Capacity Defendants ...................................... 31

        2.    Plaintiffs Have Not Alleged A "Substantial Burden" On Free Exercise........................................................ 32

    D.    Qualified Immunity Bars Plaintiffs' FISA Claim................................. 33

CONCLUSION................................................................................ 35

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

**TABLE OF AUTHORITIES**

**CASES**

Page(s)

*ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007) ........................................................ 34

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) ........................................ 20

*Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190 (9th Cir. 2007) ........... 10

*Amnesty International v. Clapper*, 638 F.3d 118 (2d Cir. 2011) ................................. 18

*Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) ...........................................*passim*

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) .......... 3, 22, 23, 26, 32

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ............................*passim*

*Beattie v. Boeing Co.*, 43 F.3d 559 (10th Cir. 1994) .................................................. 15

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955,
     167 L. Ed. 2d 929 (2007) ...........................................................................20, 21, 25

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
     403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) .............................*passim*

*Black v. United States*, 62 F.3d 1115 (8th Cir. 1995) ............................................... 16

*Boumediene v. Bush*, 553 U.S. 723, 128 S. Ct. 2229, 171 L. Ed. 2d 41 (2008) ........... 15

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 113 S. Ct. 753,
     122 L. Ed. 2d 34 (1993) ...........................................................................23

*Bush v. Lucas*, 462 U.S. 367, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983) .............*passim*

*Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980) ............. 13, 20

*Chappell v. Wallace*, 462 U.S. 296, 103 S. Ct. 2362, 76 L. Ed. 2d 586 (1983) ....... 13, 15

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520,
     113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993) .................................................. 10, 24

*Community House, Inc. v. City of Boise*, 623 F.3d 945 (9th Cir. 2010)...................... 22

*Correctional Services Corp. v. Malesko*, 534 U.S. 61, 122 S. Ct. 515,
     151 L. Ed. 2d 456 (2001)..........................................................................12, 13, 19

*Davis v. Passman*, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979)............. 13, 20

*Downie v. City of Middleburg Heights*, 301 F.3d 688 (6th Cir. 2002)........................ 20

*Edgerly v. City & County of San Francisco*, 599 F.3d 946 (9th Cir. 2010)......... 4, 27, 29

*El-Masri v. United States*, 479 F.3d 296 (4th Cir. 2007) ..................................... 10, 11

**Wilmer Cutler Pickering Hale and Dorr LLP**
**350 South Grand Avenue, Suite 2100**
**Los Angeles, California 90071**

*FDIC v. Meyer*, 510 U.S. 471, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994) ...................13

*Fitzgerald v. Penthouse International, Ltd.*, 776 F.2d 1236 (4th Cir. 1985) .................12

*General Dynamics Corp. v. United States*, 131 S. Ct. 1900, 179 L. Ed. 2d 957 (2011)......................................................................................................10, 12

*Griffin v. Breckenridge*, 403 U.S. 88, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971) ......21, 23

*Haig v. Agee*, 453 U.S. 280, 101 S. Ct. 2766, 69 L. Ed. 2d 640 (1981)...................1, 15

*Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)............22

*Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966)............30

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 177 L. Ed. 2d 355 (2010)......................................................................................................15

*Holly v. Scott*, 434 F.3d 287 (4th Cir. 2006) ................................................................13

*Hunter v. Bryant*, 502 U.S. 224, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) ...........3, 22

*In re John Doe Trader Number One*, 894 F.2d 240 (7th Cir. 1990) ..........................30

*In re NSA Telecommunications Records Litigation*, 564 F. Supp. 2d 1109 (N.D. Cal. 2008).............................................................................................34

*In re NSA Telecommunications Records Litigation*, 595 F. Supp. 2d 1077 (N.D. Cal. 2009).............................................................................................34

*Jean-Pierre v. Bureau of Prisons*, 2010 WL 3852338 (W.D. Pa. July 30, 2010)....31, 32

*Karim-Panahi v. Los Angeles Police Department*, 839 F.2d 621 (9th Cir. 1988) .........21

*Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998)........................................................10

*Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 576 (1967)...................30

*Keen v. Noble,* 2007 WL 2789561 (E.D. Cal. Sept. 20, 2007)......................................32

*Kentucky v. Graham*, 473 U.S. 159, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) .........32

*Kwai Fun Wong v. United States*, 373 F.3d 952 (9th Cir. 2004)..................................27

*Lacey v. Maricopa County*, 2011 WL 2276198 (9th Cir. June 9, 2011) ......................27

*Lebron v. Rumsfeld*, 764 F. Supp. 2d 787 (D.S.C. 2011) ......................................11, 33

*Leer v. Murphy*, 844 F.2d 628 (9th Cir. 1988) ..............................................................27

*Lepp v. Gonzales*, 2005 WL 1867723 (N.D. Cal. Aug. 2, 2005) ................................32

*Lincoln v. Vigil*, 508 U.S. 182, 113 S. Ct. 2024, 124 L. Ed. 2d 101 (1993) ...........1, 15

*Lyall v. City of Los Angeles*, 2011 WL 61626 (C.D. Cal. Jan. 6, 2011) ...............28, 29

**Wilmer Cutler Pickering Hale and Dorr LLP**
**350 South Grand Avenue, Suite 2100**
**Los Angeles, California 90071**

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
Case No. SA CV 11-00301-CJC (VBKx)

**SER 130**

*Mirmehdi v. United States*, 2011 WL 5222884 (9th Cir. Nov. 3, 2011) ...............*passim*

*Mitchell v. Forsyth*, 472 U.S. 511, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985) .............. 22

*Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070 (9th Cir. 2010) ................*passim*

*Navajo Nation v. United States Forest Service*, 535 F.3d 1058
     (9th Cir. 2008) .................................................................................. 32, 33, 34

*Oliver v. United States*, 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 214, (1984) ....... 4, 30

*Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) .......... 22

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989) ............ 26

*Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978) .................... 26

*Safford Unified School District No. 1 v. Redding*, 129 S. Ct. 2633, 174 L. Ed. 2d
     354 (2009)............................................................................................ 22

*Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) ................ 26

*Schweiker v. Chilicky*, 487 U.S. 412, 108 S. Ct. 2460, 101 L. Ed. 370 (1988) ........ 13, 19

*Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992).......................................... 21

*Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979)............... 30

*United Brotherhood of Carpenters & Joiners of America v. Scott*, 463 U.S. 825,
     103 S. Ct. 3352, 77 L. Ed. 2d 1049 (1983) ........................................... 20

*United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989)............................................... 28

*United States v. Duggan*, 743 F.2d 59 (2d Cir. 1984) ................................................. 18

*United States v. Forrester*, 512 F.3d 500 (9th Cir. 2007) ........................................... 31

*United States v. Gonzalez*, 328 F.3d 543 (9th Cir. 2003) ............................................ 29

*United States v. Hinton*, 222  F.3d 664 (9th Cir. 2000)................................................ 31

*United States v. Little*, 753 F.2d 1420 (9th Cir. 1984) ............................................... 29

*United States v. Mayer*, 503 F.3d 740 (9th Cir. 2007) ....................................... 4, 28, 29

*United States v. Nerber*, 222 F.3d 597 (9th Cir. 2000)............................................... 28

*United States v. Reynolds, Inc.*, 345 U.S. 1, 73 S. Ct. 528, 97 L. Ed. 2d 727
     (1953)..................................................................................................... 10

*United States v. Stanley*, 483 U.S. 669, 107 S. Ct. 3054, 97 L. Ed. 2d 550
     (1987)............................................................................................ 13, 15, 19

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).................................................. 18

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

*United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539
    (9th Cir. 1989) ............................................................. 20, 21

*Washington v. Davis*, 426 U.S. 229, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976) ........ 11, 24

*Webb v. County of Trinity*, 734 F. Supp. 2d 1018 (E.D. Cal. 2010) ............................ 23

*Western Radio Services Co. v. United States Forest Service*, 578 F.3d 1116
    (9th Cir. 2009) ............................................................. 14

*Wilkie v. Robbins*, 551 U.S. 537, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007) ........ 13, 18

*Wilson v. Layne*, 526 U.S. 603, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) .................. 32

*Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) ........................................ 15, 17, 19, 20

*Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110
    (9th Cir. 2000) ............................................................. 32

## STATUTES AND LEGISLATIVE MATERIALS

42 U.S.C.
    § 1985(3) ................................................................. 20, 21, 22, 23
    §§ 2000bb—2000bb-4 ....................................................... 16
    § 2000bb-1 ............................................................... 11, 17, 31, 32, 33
    § 2000bb-2 ............................................................... 31

50 U.S.C.
    § 552a ................................................................... 16, 17
    §§ 1801, *et seq.* ....................................................... 16
    § 1801 ................................................................... 34
    § 1809 ................................................................... 34
    § 1810 ................................................................... 18, 33

H.R. Rep. No. 95-1283 (1978) ............................................... 34

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

Defendants J. Stephen Tidwell and Barbara Walls respectfully submit this Memorandum in Support of their Motion to Dismiss the First Amended Complaint.

## INTRODUCTION

Plaintiffs ask this Court to create unprecedented and unjustified remedies against two Federal Bureau of Investigation ("FBI") supervisors based on their alleged knowledge and supervision of a counterterrorism investigation undertaken following the terrorist attacks of September 11, 2001. Courts, however, consistently have rejected efforts to impose liability on government officials in similar circumstances, and for good reason: Determinations regarding sensitive national security matters have long been considered an area in which courts should hesitate to tread. *See Arar v. Ashcroft*, 585 F.3d 559, 575 (2d Cir. 2009) (en banc) (affirming dismissal of action against government officials because determinations relating to national security "fall within 'an area of [exclusive] executive action in which courts have long been hesitant to intrude' absent congressional authorization" (quoting *Lincoln v. Vigil*, 508 U.S. 182, 192, 113 S. Ct. 2024, 2031, 124 L. Ed. 2d 101, 112 (1993))); *Haig v. Agee*, 453 U.S. 280, 292, 101 S. Ct. 2766, 2774, 69 L. Ed. 2d 640, 652 (1981) ("Matters intimately related to … national security are rarely proper subjects for judicial intervention."). Such cases also often risk the disclosure of critical national security and counterterrorism information. *See Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1088-89 (9th Cir. 2010). And the specter of potential damages liability risks chilling the effective conduct of national security and counterterrorism activities. *See Arar*, 585 F.3d at 574.

This case presents precisely these concerns, and Plaintiffs' First Amended Complaint ("Compl.") must be dismissed as to Defendants Tidwell and Walls for four separate and independent reasons. *First*, the government's assertion of the state-secrets privilege requires dismissal of Counts 1-7. Each of those claims is predicated upon, and would require the adjudication of, Plaintiffs' contention that Defendants Tidwell and Walls were aware of and approved unlawful investigative activities and

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1    electronic surveillance based *solely* on Plaintiffs' religion.  To defend themselves fully

2    and effectively, Tidwell and Walls would seek to show that they had non-

3    discriminatory, national-security-related reasons for investigating specific individuals,

4    and that the investigative methods used were narrowly tailored to achieve specific,

5    legitimate counterterrorism goals.  But that is the very same information over which the

6    government has asserted the state-secrets privilege.  *See* Gov't Br. 2, 6-7, 43-52;[1] *infra*

7    Part I.  Because the privilege renders this information unavailable to Tidwell and Walls

8    for their defense, these causes of action against them must be dismissed.  *Jeppesen*, 614

9    F.3d at 1082-83 (assertion of state-secrets privilege requires dismissal when it precludes

10   defendant from adequately raising and supporting available defenses).

11           Second, as to Counts 1, 3, 6, and 9, this Court should decline Plaintiffs'

12   invitation to create an unprecedented *Bivens* damages remedy against FBI officials

13   arising from an informant's allegedly discriminatory activities conducted during a

14   counterterrorism investigation.  It is well established that courts should refrain from

15   creating damages remedies when "special factors counsel[] hesitation in the absence

16   of affirmative action by Congress," *Bivens v. Six Unknown Named Agents of Fed.*

17   *Bureau of Narcotics*, 403 U.S. 388, 396, 91 S. Ct. 1999, 2005, 29 L. Ed. 2d 619, 626

18   (1971), and special factors strongly counsel against extending *Bivens* in this context.

19   Courts have long recognized that national security concerns constitute just such a

20   special factor, *see, e.g.*, *Arar*, 585 F.3d at 575, and the government's assertion of the

21   state-secrets privilege makes plain that this case implicates substantial national

22   security issues.  Further, three comprehensive statutory schemes under which

23   Plaintiffs have also brought claims—the Privacy Act, the Religious Freedom

24   Restoration Act ("RFRA"), and the Foreign Intelligence Surveillance Act ("FISA")—

25   strongly evince Congress' desire not to allow judicially created causes of action for

26   the alleged constitutional torts.  That is true even where (as here) Plaintiffs cannot

27

28   _____

[1] "Gov't Br." refers to the government's memorandum in support of its motion to
dismiss the First Amended Complaint.

prevail on their statutory claims: The question is not whether complete relief is available, but whether Congress has already spoken as to who should decide if a cause of action should exist. *See Bush v. Lucas*, 462 U.S. 367, 380, 103 S. Ct. 2404, 2412, 76 L. Ed. 2d 648, 659 (1983).

*Third*, as to Counts 2, 4, and 7, even though they have had the opportunity to amend their initial complaint, Plaintiffs fail to allege facts plausibly showing the existence of a conspiracy to violate Plaintiffs' civil rights, much less that Tidwell or Walls—both of whom are alleged to have acted solely in a supervisory capacity—personally acted with the purpose of depriving Plaintiffs of equal protection, or were motivated by class-based animus.

*Finally*, Tidwell and Walls are entitled to qualified immunity on all claims against them. Qualified immunity shields government officers from suits for damages based on their exercise of discretionary duties, and courts must "resolv[e] [such] immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589, 595 (1991). Officers are entitled to such immunity unless Plaintiffs can show *both* that their conduct violated a statutory or constitutional right *and* that the right was so clearly established at the time that "*every* 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149, 1159 (2011) (emphasis added). Here, Tidwell and Walls are entitled to qualified immunity and dismissal of all claims asserted against them because:

- Plaintiffs' First and Fifth Amendment claims (Counts 1-4, 6-7) fail plausibly to allege, as they must, that Tidwell and Walls "acted with discriminatory purpose." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868, 882-83 (2009). At most, Plaintiffs allege that Tidwell and Walls are liable for the actions of the informant and their subordinates, but it is long established that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Id*. It therefore follows that it was not clearly established at the time that Tidwell and Walls could be held liable in these circumstances.

- Plaintiffs' Fourth Amendment claim (Count 9) fails plausibly to allege that either Tidwell or Walls was "personally involved" in an unlawful search or that a "'sufficient causal connection exists'" between a search and their alleged

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

conduct. *Edgerly v. City & Cnty. of S.F.*, 599 F.3d 946, 961 (9th Cir. 2010). Plaintiffs also fail to allege that an unlawful search occurred. Other than one speculative allegation, the alleged recordings were conducted in places where Plaintiffs had no reasonable expectation of privacy, such as mosques open to the public or homes into which Plaintiffs allege the informant had been invited. The Fourth Amendment does not protect subjective expectations arising from self-imposed restrictions on activity that purportedly existed at mosques, *Oliver v. U.S.*, 466 U.S. 170, 171, 104 S. Ct. 1735, 1738, 80 L. Ed. 214 (1984), and undercover operations in which the agent is an "invited informer" are not "searches" under the Fourth Amendment, *see U.S. v. Mayer*, 503 F.3d 740, 750 (9th Cir. 2007). It therefore also follows that it was not clearly established at the time that Tidwell and Walls could be held liable in such circumstances.

- Plaintiffs' RFRA claim (Count 5) must be dismissed both because RFRA does not create a damages cause of action against individual defendants and because Plaintiffs have not adequately pleaded that Tidwell or Walls placed a "substantial burden" on their religion. Liability under such circumstances thus necessarily could not have been clearly established at the time.

- Plaintiffs' FISA claim (Count 10) fails to allege that Plaintiffs are "aggrieved persons" with standing to sue—defined as persons with a reasonable expectation of privacy—because they do not plausibly allege that they had such an expectation. Therefore, it also could not have been clearly established at the time that Tidwell and Walls could be held liable in such circumstances.

For these reasons, discussed more fully below, Plaintiffs' claims against Defendants Tidwell and Walls must be dismissed.

## BACKGROUND

Plaintiffs Yassir Fazaga, Ali Uddin Malik, and Yasser AbdelRahim allege in their First Amended Complaint that, since September 11, 2001, the FBI has "focused much of its counterterrorism efforts on broad investigations in the Muslim communities of the United States." Compl. ¶ 24.[2] Their allegations arise from an investigation known as "Operation Flex." *Id.* ¶ 88; *see also* Gov't Br. 1-2, 7. According to Plaintiffs, "at some time prior to July 2006," the FBI employed an informant to "infiltrate[]" several Southern California mosques and covertly "gather information" about the Muslim community. Compl. ¶¶ 1, 2, 48.

Plaintiffs allege that "[o]ver the course of fourteen months" the FBI directed the informant to "indiscriminately collect personal information on hundreds and perhaps

_____

[2] Defendants do not admit the veracity or relevance of these facts, which are restated as alleged in the First Amended Complaint solely for the purpose of this motion.

thousands of innocent Muslim Americans in Southern California." *Id.* ¶ 2. Plaintiffs claim in a conclusory manner that this investigation "did not result in even a single conviction related to counterterrorism … because the FBI did not gather the information based on suspicion of criminal activity," but instead did so "simply because the targets were Muslim." *Id.* ¶ 3. Plaintiffs contend that in carrying out this investigation, "Defendants operated under the principles set forth in" the Attorney General's Guidelines for FBI National Security Investigations and Foreign Intelligence Collection (later named the Guidelines for Domestic FBI Operations) ("2008 AG Guidelines") and the FBI's Domestic Intelligence and Operations Guides ("DIOG")—which expressly prohibit investigative activity solely on the basis of religion. *Id.* ¶¶ 32-34, 36-37; *see also* Gov't Br. 8-9.[3] Nonetheless, Plaintiffs claim these policies authorized the FBI to "engage in intrusive investigations of First Amendment protected activity, and specifically religious practices, without any factual basis to believe any criminal violations or threat to the national security existed." Compl. ¶ 35.

## A. Allegations Regarding "Operation Flex"

Plaintiffs allege that Defendants Kevin Armstrong and Paul Allen were FBI special agents assigned to the Orange County area who acted as the informant's handlers. *Id.* ¶¶ 18-19. According to Plaintiffs, "[a]t some time prior to July 2006," Armstrong and Allen recruited the informant, and thereafter directed him to pose as a Muslim convert and use various techniques to conduct surveillance of, and gather intelligence on, congregants of several Southern California mosques. *Id.* ¶¶ 2, 48-51, 99-137. Plaintiffs claim that, during this operation, the informant gathered covertly

---

[3] These binding guidelines require that investigative activity be undertaken only for a "valid purpose" and provide that they "do not authorize investigating or collecting or maintaining information on United States persons solely for the purpose of monitoring activities protected by the First Amendment." Gov't Br. 9; *see also* Giuliano Decl., Dkt. No. 33, ¶ 4, Tab 2 at 13. Similarly, the DIOG requires that "investigative activity [be] conducted" for "an authorized purpose" and provides that such purpose may not be solely to monitor the "exercise of other rights secured by the Constitution." Indeed, FBI investigative activity may not be based solely on "race, ethnicity, national origin or religion." Gov't Br. 9; *see also* Giuliano Decl. ¶ 5, Tab 3 at 21.

"hundreds of phone numbers, thousands of email addresses, hundreds of hours of video recordings that captured the interiors of mosques, homes, businesses, and the associations of hundreds of Muslims, thousands of hours of audio recording of conversations … and other Muslim religious and cultural events occurring in mosques," as well as addresses, license plate numbers, brochures, newsletters and bulletins, and lists of attendees at various lectures, courses, and prayer sessions. *Id.* ¶¶ 2, 91, 104-06, 119, 126-29, 131, 137, 172-73. Plaintiffs allege that they met the informant while he was acting in this covert capacity.[4] *Id.* ¶ 54.

Despite Plaintiffs' claim that the investigation improperly targeted them "solely due to their religion," *id.* ¶¶ 86, 167, "for the purpose of discriminating against Plaintiffs as Muslims," *id.* ¶ 229, and "because of Plaintiffs' adherence to and practice of the religion of Islam," *id.* ¶ 232, 235, 237, 241, 243-44, they *also* allege that the operation was intended to gather information regarding individuals who may have connections to terrorist organizations, such as the Taliban, Hezbollah, and Hamas, and that agents Allen and Armstrong told the informant that "everyone knows somebody." *Id.* ¶ 117. The agents also allegedly directed the informant to gather information regarding matters associated with counterterrorism, including: (a) individuals who may be sympathetic to and/or interested in "mujahideen," violent "jihadist" activities, and religious extremism or radicalism (*id.* ¶¶ 96, 111-13, 143, 169, 171, 187); (b) Arabic speakers and foreign nationals from Egypt, Pakistan, India, Syria, and Lebanon (*id.* ¶ 103); (c) individuals' views on politics and violence (*id.* ¶¶ 103, 113); (d) charitable giving, fundraising, and financial information (*id.* ¶¶ 105-06, 133, 146, 182, 210); (e) individuals' planned and actual travel to Yemen, Saudi Arabia, and Egypt (*id.* ¶¶ 107, 114, 184, 205, 207); (f) telephone, international call, and email information associated with "persons of interest who were believed to be linked to

---

[4] Plaintiffs allege that until February 2009, they did not know, and "could not reasonably have known," that the informant was working for the FBI, or that they had been surveilled. *Id.* ¶ 160. Plaintiffs allegedly altered their religious practices only after the informant ceased his activities. *Id.* ¶¶ 64-65, 183-85, 197-99, 216-17.

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1    terrorism" (*id*. ¶ 132); and (g) a suspected cell of the Muslim Brotherhood led by

2    Plaintiff AbdelRahim (*id*. ¶¶ 200-01).

3    Plaintiffs allege that as part of these efforts, Allen and Armstrong provided the

4    informant with, and directed him to use, recording devices. *Id*. ¶ 122. According to

5    Plaintiffs, "[a]fter about September 2006," the agents gave the informant "a cell phone

6    and two key fobs" containing audio-recording devices that he allegedly used to record

7    "every moment he worked undercover, regardless of whom he was meeting or what

8    was discussed." *Id*. ¶ 124. Plaintiffs further claim that, on unspecified occasions, the

9    informant allegedly left recording devices unattended in mosques to record

10   conversations that took place while he was not present, *id*. ¶¶ 124-27, although the

11   only parties identified as having been recorded in this manner are Plaintiffs Malik and

12   AbdelRahim.[5] *Id*. ¶¶ 192, 211. With regard to Plaintiff Fazaga, the First Amended

13   Complaint conclusorily alleges "[u]pon information and belief," that Allen and

14   Armstrong "caused … electronic surveillance equipment to be installed" in Fazaga's

15   mosque and monitored his conversations "in parts of the mosque not open to the

16   public," including "Fazaga's office." *Id*. ¶ 95.[6]

17   Plaintiffs also allege that, "[b]eginning in about February 2007," agents

18   outfitted the informant with a "shirt button" camera that he used "as often as several

19   days per week" to capture video and audio recordings of the "internal layout of

20   mosques, to film basketball or soccer games …, to film guest lectures at mosques …,

21   and to record the interiors of people's houses." *Id*. ¶¶ 128-29. For example,

22   according to Plaintiffs, the informant was directed to record a lecture at Fazaga's

23

24   [5] Plaintiffs do not allege that any Defendant directed the informant to record
     conversations in this manner. Rather, they claim only that agents Armstrong and
25   Allen received notes in which the informant stated he had done so, and that the agents
     "never told him not to do this." *Id*. ¶ 192.
26   [6] Plaintiffs also allege in vague and conclusory terms, without more, that "[e]lectronic
     surveillance equipment was installed in at least eight [Southern California] mosques"
27   by the FBI, *id*. ¶ 94, and that "the FBI had electronic listening devices in
     AbdelRahim's house … car and phone," as well as video surveillance outside his
28   house. *Id*. ¶ 209. Plaintiffs do not allege which if any individual-capacity Defendants
     participated in this purported activity, much less whose conversations were captured.

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1    mosque, as well as interior areas and a donation booth within it, none of which are

2    alleged to be non-public areas.  *Id*. ¶¶ 172-75.  Plaintiffs also claim that the

3    informant—after being invited in—was directed to record the interior of

4    AbdelRahim's house, which was "shared by five young, unmarried Muslim Egyptian

5    men with different skills and backgrounds—including a computer analyst, a

6    pharmacist, an accountant, and one who handled logistics," whom the FBI suspected

7    of being a Muslim Brotherhood cell led by AbdelRahim.  *Id*. ¶¶ 200-01.

8    Plaintiffs also allege that the informant successfully gathered information

9    deemed relevant to counterterrorism efforts.  Specifically, Plaintiffs claim that: (a) the

10   FBI deemed his information as "particularly valuable" and that it had "proven to be

11   essential" to a federal prosecution; (b) the "information … was followed by people 'at

12   the highest levels'"; (c) "the operation was among the ten most important intelligence

13   investigations going on in the country"; and (d) information regarding individuals'

14   finances, foreign assets, and immigration issues "would be shared with other

15   agencies."  *Id*. ¶¶ 144-46, 163.

16   **B.    Allegations Regarding Defendants Tidwell And Walls**

17   In a mere nine of its 260 paragraphs, the First Amended Complaint offers only

18   generalized, conclusory assertions "upon information and belief" regarding

19   Defendants Tidwell and Walls, arising solely from their supervisory roles.  *See id*.

20   ¶¶ 20-21, 47, 138, 141, 145, 151, 153, 169.  Plaintiffs allege that from August 2005

21   until December 2007, Tidwell served as the FBI Assistant Director in Charge of the

22   Los Angeles Field Office with supervisory authority over all operations in the Central

23   District of California, and that during an unspecified time period, Walls was the FBI

24   Special Agent in Charge of the Santa Ana branch office, "where she was one of the

25   direct supervisors of Agents Allen, Armstrong, and Rose."  *Id*. ¶¶ 20-21.  Plaintiffs

26   allege "[u]pon information and belief" that Tidwell "authorized the search for" and

27   "the selection of" the informant, "authorized the nature and scope of the operation and

28   its targeting of Muslims," read the informant's "notes of his activities," and

"authorized and actively directed the actions of" Armstrong, Allen, Rose, Walls, and other agents in the handling of the informant, "for the purpose of surveilling Plaintiffs and other[s] … because they were Muslim." *Id.* ¶¶ 20, 141. Likewise, Plaintiffs claim "[u]pon information and belief" that Walls "was regularly apprised of the information Agents Armstrong and Allen collected through" the informant, "directed the action of [the] agents on various instances based on that information," and "actively monitored, directed, and authorized the actions of Agents Armstrong and Allen and other agents … for the purpose of surveilling Plaintiffs and other[s] … because they were Muslim." *Id.* ¶ 21.

Similarly, Plaintiffs claim that Tidwell and Walls, along with agents Armstrong, Allen, and supervisor Pat Rose, "maintained extremely close oversight and supervision of" the informant, and "because they made extensive use of the results of his surveillance, they knew in great detail the nature and scope of the operation, including the methods of surveillance used and the criteria used to decide his targets, and continually authorized their ongoing use." *Id.* ¶ 138. Plaintiffs also allege that Walls "[e]ventually" ordered Armstrong and Allen to cease using the informant because "she no longer trusted him"; that there was "significant conflict" between Walls and the agents regarding how to handle the operation; that an audit team was examining Walls's "handling of one of the leads from the operation"; and that Walls was present at one of the final meetings with the informant, during which she instructed him "to stay silent about the operation." *Id.* ¶¶ 21, 151, 153. Plaintiffs make no other specific allegations regarding Tidwell's or Walls's knowledge of or involvement in, much less authorization of, the informant's activities.

## ARGUMENT

## I. THE GOVERNMENT'S ASSERTION OF THE STATE-SECRETS PRIVILEGE MANDATES DISMISSAL OF COUNTS 1-7

The government has asserted the state-secrets privilege over certain key investigative information, and Counts 1-7 against Tidwell and Walls must be

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

dismissed in light of that assertion.[7]  *See* Gov't Br. Part II.  It is well established that the state-secrets privilege "permits the government to bar the disclosure of information if 'there is a reasonable danger' that disclosure will 'expose … matters which, in the interest of national security, should not be divulged.'"  *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007) (quoting *U.S. v. Reynolds, Inc.*, 345 U.S. 1, 10, 73 S. Ct. 528, 534, 97 L. Ed. 2d 727, 727 (1953)).[8]  When the government invokes the state-secrets privilege, "the evidence is completely removed from the case," *Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998), and "is absolutely privileged, irrespective of the plaintiffs' countervailing need for it," *Jeppesen*, 614 F.3d at 1082.  If the removal of privileged information precludes a defendant from adequately raising and supporting available defenses, the action must be dismissed.  *See id.* at 1083; *Kasza*, 133 F.3d at 1166; *see also Gen. Dynamics Corp. v. U.S.*, 131 S. Ct. 1900, 1907, 179 L. Ed. 2d 957, 965 (2011) (where state-secrets assertion precludes litigation, "traditional course is to leave the parties where they stood when they knocked on the courthouse door").

Here, the Attorney General's invocation of the state-secrets privilege deprives Tidwell and Walls of information crucial to their ability to defend against Counts 1-7, making the full and fair litigation of those claims impossible.  Each of those counts is predicated on, and would require the adjudication of, Plaintiffs' allegations that Tidwell and Walls approved and supervised unlawful investigative activities and electronic surveillance based solely on Plaintiffs' religion.  Indeed, to prevail on their claims, Plaintiffs "must plead and prove that [Tidwell and Walls] acted with discriminatory purpose."  *Iqbal*, 129 S. Ct. at 1948; *see Church of Lukumi Babalu Aye, Inc. v. City of*

---

[7] Although the government has not argued that its state-secrets assertion mandates immediate dismissal of the Fourth Amendment and FISA claims (Counts 9 and 10), Gov't Br. 4-5, Defendants Tidwell and Walls reserve the right to seek dismissal of these claims on such grounds following a review of the evidence the government intends to produce.

[8] The government may, as here, invoke the privilege "at the pleading stage, rather than waiting for an evidentiary dispute to arise during discovery or trial."  *Jeppesen*, 614 F.3d at 1081; *see El-Masri v. U.S.*, 479 F.3d 296, 308 (4th Cir. 2007) (state-secrets assertion and dismissal of case proper at pleading stage).

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1   *Hialeah*, 508 U.S. 520, 540-41, 113 S. Ct. 2217, 2230-31, 124 L. Ed. 2d 472, 494-95

2   (1993) (First Amendment); *Washington v. Davis*, 426 U.S. 229, 240, 96 S. Ct. 2040,

3   2048, 48 L. Ed. 2d 597, 607-08 (1976) (Fifth Amendment).  In their defense, Tidwell

4   and Walls would seek to show that they had non-discriminatory, national-security and

5   law-enforcement-related reasons for investigating specific individuals, and that the

6   methods they used were narrowly tailored to achieve an important government interest

7   in combating terrorism.  But the state-secrets assertion precludes them from mounting

8   such defenses because the privilege removes from the case precisely the information

9   needed to make those showings:  (1) "[s]ubject [i]dentification" information,

10  including evidence tending to confirm or deny that a particular person was the subject

11  of an FBI counterterrorism investigation; (2) the "[r]easons for [c]ounterterrorism

12  [i]nvestigation and [r]esults," including evidence that "could tend to reveal the

13  predicate for an FBI counterterrorism investigation"; and (3) the "[s]ources and

14  [m]ethods" used in the counterterrorism investigation at issue here.[9]  *See* Gov't Br.

15  27-28.  Accordingly, the Attorney General's assertion of the state-secrets privilege

16  precludes Tidwell and Walls from defending fully and adequately against Plaintiffs'

17  claims.  *See El-Masri v. U.S.*, 479 F.3d 296, 309-10 (4th Cir. 2007).

18      For similar reasons, Counts 1-7 must be dismissed because they are so

19  intertwined with state secrets that "there is no feasible way to litigate [their] liability

20  without creating an unjustifiable risk of divulging state secrets."  *Jeppesen*, 614 F.3d

21  at 1087; *see El-Masri*, 479 F.3d at 312.  Tidwell's and Walls's alleged roles in the

22  counterterrorism investigation and the propriety of their actions cannot be isolated

23  from the privileged aspects of this case related to the investigation and its targets,

24  predicates, sources, and methods.  Where the "facts underlying plaintiffs' claims are

25  so infused with … secrets," the case must be dismissed because "any plausible effort

---

26  [9] Likewise, with respect to the RFRA claim (Count 5), the state-secrets assertion
    deprives Tidwell and Walls of the ability to fully litigate a key defense:  that the
27  investigation was "in furtherance of a compelling governmental interest"—or, indeed,
    that it was in furtherance of any governmental interest at all.  42 U.S.C. § 2000bb-
28  1(b)(1); *see Lebron v. Rumsfeld*, 764 F. Supp. 2d 787, 804 (D.S.C. 2011).

… to defend against them would create an unjustifiable risk of revealing state secrets, even if plaintiffs could make a prima facie case on one or more claims with nonprivileged evidence." *Jeppesen*, 614 F.3d at 1088. Particularly where, as here, the witnesses likely to be called at trial have personal knowledge of the state secrets relevant to the claims, "the parties would have every incentive to probe dangerously close to the state secrets themselves. In these circumstances, state secrets could be compromised even without direct disclosure by a witness." *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1243 (4th Cir. 1985); *see Gen. Dynamics*, 131 S. Ct. at 1907 (dismissal required where "[e]very document request or question to a witness would risk further disclosure, since both sides have an incentive to probe up to the boundaries of state secrets").

## II.  THIS COURT SHOULD DECLINE TO EXTEND *BIVENS*

Plaintiffs urge this Court to create an unprecedented *Bivens* damages remedy against FBI officials arising from an informant's allegedly discriminatory activities conducted during a counterterrorism investigation undertaken in the wake of September 11, 2001. No court has recognized a *Bivens* damages remedy in this context, and there is good reason to decline Plaintiffs' invitation to do so now:  (1) this case implicates substantial national security issues, and courts have long held that national security concerns constitute a special factor counseling against the creation of a *Bivens* damages remedy, *see Arar*, 585 F.3d at 575; and (2) the Privacy Act, RFRA, and FISA are existing alternative remedial schemes that strongly evince Congress' desire *not* to allow judicially created causes of action for the alleged constitutional torts, *see Bush*, 462 U.S. at 373 (power to infer *Bivens* remedy "is to be exercised in the light of relevant policy determinations made by the Congress").

### A.  No Court Has Extended *Bivens* To This Context

In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66, 122 S. Ct. 515,

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

519, 151 L. Ed. 2d 456, 462 (2001); *see Bivens*, 403 U.S. 388 (recognizing Fourth Amendment cause of action for unlawful search of residence). Because "[a] *Bivens* cause of action is implied without any express congressional authority whatsoever," *Holly v. Scott*, 434 F.3d 287, 289 (4th Cir. 2006), however, it is "disfavored," *Iqbal*, 129 S. Ct. at 1948, and courts have made clear that "[s]uch a cause of action 'is not an automatic entitlement *no matter what other means there may be* to vindicate a protected interest.'" *Mirmehdi v. United State*s, 2011 WL 5222884, at *2 (9th Cir. 2011) (emphasis added) (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550, 127 S. Ct. 2588, 2597, 168 L. Ed. 2d 389, 401 (2007)).

Accordingly, since *Bivens*, the Supreme Court has "extended its holding only twice," *Malesko*, 534 U.S. at 70, to circumstances not implicated here, *see Davis v. Passman*, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979) (employment discrimination in violation of Fifth Amendment); *Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980) (Eighth Amendment violation by prison officials). And for the last thirty-one years, the Court has "consistently refused to extend *Bivens* liability to *any* new context or new category of defendants." *Malesko*, 534 U.S. at 68 (emphasis added) (Eighth Amendment violation by prison officials working for federal contractor); *see also Wilkie*, 551 U.S. 537 (extortion by federal officers in violation of Fifth Amendment); *FDIC v. Meyer*, 510 U.S. 471, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994) (deprivation of property in violation of Fifth Amendment); *Schweiker v. Chilicky*, 487 U.S. 412, 108 S. Ct. 2460, 101 L. Ed. 370 (1988) (denial of Social Security disability benefits in violation of Fifth Amendment); *U.S. v. Stanley*, 483 U.S. 669, 107 S. Ct. 3054, 97 L. Ed. 2d 550 (1987) (injuries incident to military service); *Bush*, 462 U.S. 367 (defamation and retaliatory demotion of federal employee in violation of First Amendment); *Chappell v. Wallace*, 462 U.S. 296, 103 S. Ct. 2362, 76 L. Ed. 2d 586 (1983) (racial discrimination by military superiors).

In determining whether a particular case presents a new "context," the Ninth Circuit recently reaffirmed that the inquiry does not focus on the constitutional right at

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1    issue; rather, the term "context" "reflect[s] a potentially recurring scenario that has

2    similar legal and factual components." *Mirmehdi*, 2011 WL 5222884, at *3 (quoting

3    *Arar*, 585 F.3d at 572); *see W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116,

4    1119 (9th Cir. 2009) (relevant "context" can be "factual" or "legal").  No court has

5    extended *Bivens* to the context at issue in this case—to provide a remedy for alleged

6    religious discrimination or an allegedly unlawful search arising from an informant's

7    surveillance conducted during a counterterrorism investigation.  *Cf. Mirmehdi*, 2011

8    WL 5222884, at *3 (considering "relevant 'environment of fact and law' in which to

9    'decide whether to recognize a *Bivens* remedy'").  Indeed, the Supreme Court has

10   altogether "declined to extend *Bivens* to a claim sounding in the First Amendment,"

11   *Iqbal*, 129 S. Ct. at 1948, and no court has inferred a damages cause of action under

12   the Fourth or Fifth Amendment to remedy alleged injuries in a factual and legal

13   context analogous to this case.  *Cf. Arar*, 585 F.3d at 572.

**B.     The Creation Of A *Bivens* Cause Of Action Is Inappropriate Here**

14             Courts should not extend *Bivens* to new contexts where "there is 'any

15   alternative, existing process for protecting' the plaintiffs' interests," or, even if there is

16   not, there are special "'factors counseling hesitation' before devising such an implied

17   right of action."  *Mirmehdi*, 2011 WL 5222884, at *3 (quoting *W. Radio*, 578 F.3d at

18   1120).  The judicial creation of a *Bivens* cause of action in this unprecedented context

19   is inappropriate for both reasons.

**1.     National Security Issues And Assertion Of State-Secrets Privilege Are Special Factors Precluding A *Bivens* Remedy**

20

21

22

23             Whether special factors counsel hesitation in the absence of congressional

24   action "is [a] remarkably low" standard, and courts should refuse to recognize a

25   *Bivens* remedy "whenever thoughtful discretion would pause even to consider."  *Arar*,

26   585 F.3d at 574.  Special factors "d[o] not concern the merits of the particular remedy

27   that [i]s sought.  Rather, they relate to the question of who should decide whether such

28   a remedy should be provided … [and] whether there are reasons for allowing

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1   Congress to prescribe the scope of relief that is made available." *Bush*, 462 U.S. at 380.

2       The Supreme Court consistently has held that *Bivens* should not be extended in

3   cases involving "determinations relating to national security" because such issues "fall

4   within 'an area of [exclusive] executive action in which courts have long been hesitant

5   to intrude' absent congressional authorization." *Arar*, 585 F.3d at 575 (quoting

6   *Lincoln*, 508 U.S. at 192); *see Haig*, 453 U.S. at 292 ("Matters intimately related to …

7   national security are rarely proper subjects for judicial intervention.").  Given the

8   expertise of the executive and legislative branches in "litigation implicat[ing] sensitive

9   and weighty interests of national security," the judgment of the political branches "is

10  entitled to deference." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2727,

11  177 L. Ed. 2d 355, 386 (2010); *see Boumediene v. Bush*, 553 U.S. 723, 797, 128 S. Ct.

12  2229, 2276-77, 171 L. Ed. 2d 41, 96-97 (2008) ("neither the Members of this Court

13  nor most federal judges begin the day with briefings that may describe new and

14  serious threats to our Nation and its people").  Courts have thus repeatedly declined to

15  extend *Bivens* to such suits because they "unavoidably influence[] government policy,

16  probe[] government secrets, invade[] government interests, enmesh[] government

17  lawyers, and thereby elicit[] government funds for settlement." *Arar*, 585 F.3d at 574;

18  *see Mirmehdi*, 2011 WL 5222884, at *4 (*Bivens* remedy inappropriate in immigration

19  context for same reasons); *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008);

20  *Beattie v. Boeing Co.*, 43 F.3d 559, 563 (10th Cir. 1994); *see also Stanley*, 483 U.S. at

21  682-84 (*Bivens* remedy inappropriate because "mere process of arriving at correct

22  conclusions would disrupt the military regime"); *Chappell*, 462 U.S. at 301 (no *Bivens*

23  remedy where military and national security issues implicated).

24      This case necessarily probes into the predicates, subjects, and methods of an

25  FBI counterterrorism investigation.  Plaintiffs ask the Court to assess whether the

26  purposes and goals of the investigation were necessary and appropriate; who the

27  specific targets and subjects of the investigation were and how and why they were

28  identified; and whether the specific techniques were appropriately tailored to achieve

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1   the purposes and goals of the investigation.  Indeed, the First Amended Complaint

2   makes clear that in addition to seeking compensation for alleged constitutional

3   injuries, Plaintiffs are challenging the executive branch's counterterrorism-related

4   investigatory policies.  *See, e.g.*, Compl. ¶¶ 24-27, 28-37.  But those are precisely the

5   kinds of claims that are inappropriate for resolution through a judicially created

6   damages remedy that second guesses the judgments of executive branch officials

7   involved in counterterrorism activities.  *See Arar*, 585 F.3d at 574 ("Our federal system

8   of checks and balances provides means to consider allegedly unconstitutional executive

9   policy, … a private action … against individual policymakers is not one of them.").

10      Moreover, as discussed *supra* Part I, to defend against Plaintiffs' First and Fifth

11  Amendment claims, Defendants would need to show, among other things, that they had

12  non-discriminatory national-security or law-enforcement reasons for allegedly

13  investigating specific individuals and that the methods they used were narrowly tailored

14  to achieve important government interests.  But as the government's assertion of the

15  state-secrets privilege demonstrates, Defendants cannot do so without risking the

16  disclosure of sensitive national-security and counterterrorism information.  The state-

17  secrets assertion thus underscores the need for hesitation before creating a new *Bivens*

18  remedy that could expose such sensitive information.  *See Arar*, 585 F.3d  at 575-76

19  (state-secrets assertion additional factor in declining to create *Bivens* remedy); *Black v.*

20  *U.S.*, 62 F.3d 1115, 1118 (8th Cir. 1995) (claim dismissed where "protected information

21  precludes [plaintiff] from establishing a prima facie *Bivens* claim and … continued

22  litigation carries with it the risk that privileged information might be disclosed").

23          **2.    Existing Remedial Statutory Schemes Preclude The Creation**
24          **Of A *Bivens* Remedy**

25      In addition, several federal statutory schemes—including the Privacy Act, 5

26  U.S.C. § 552a; RFRA, 42 U.S.C. §§ 2000bb–2000bb-4; and FISA, 50 U.S.C. §§ 1801,

27  *et seq.*—already exist to remedy the harm that Plaintiffs allege, precluding the judicial

28  creation of an additional remedy.  *See Mirmehdi*, 2011 WL 5222884, at *3 (no *Bivens*

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1  remedy where "there is 'any alternative, existing process for protecting' the plaintiffs'

2  interests").

3      Plaintiffs' constitutional claims (Counts 1, 3, 6, 9) are variations on a theme:

4  Plaintiffs allege discriminatory, illegal surveillance designed to collect and maintain

5  information related to their First Amendment activity. The Privacy Act, however, sets

6  out extensive requirements regulating "the collection, maintenance, use, and

7  dissemination of information about individuals by federal agencies." *See Wilson*, 535

8  F.3d at 707 (internal quotation marks omitted). In particular, the Act expressly forbids

9  the maintenance of any "record describing how any individual exercises rights

10 guaranteed by the First Amendment unless expressly authorized by statute or by the

11 individual about whom the record is maintained or unless pertinent to and within the

12 scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). The Act

13 authorizes damages actions against the government for failure to comply with its

14 provisions, *id.* § 552a(g), and Plaintiffs assert such a claim in Count 8.

15     Plaintiffs' First and Fifth Amendment *Bivens* claims (Counts 1, 3, 6) allege that

16 the FBI targeted Plaintiffs because of their religion and burdened their free exercise.

17 But Congress has already legislated extensively in this area through RFRA, which

18 prohibits the "government" from "substantially burden[ing] a person's exercise of

19 religion," unless the burden is shown to be "in furtherance of a compelling

20 governmental interest" and "the least restrictive means of furthering that compelling

21 governmental interest." *Id.* § 2000bb-1(a), (b). RFRA includes a cause of action

22 pursuant to which a person may assert an alleged violation "in a judicial proceeding

23 and obtain appropriate relief against a government." *Id.* § 2000bb-1(c). Plaintiffs

24 have asserted a RFRA claim against all Defendants in Count 5.

25     Finally, Plaintiffs' Fourth Amendment *Bivens* claim (Count 9) alleges that

26 Plaintiffs' rights were violated by "unreasonable searches … including … audio

27 recording Plaintiffs' communications without a warrant …; video recording in homes

28 and other places …; and entering and planting electronic listening devices … without

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1    a warrant." Compl. ¶ 251. Again, however, Congress has legislated heavily in this

2    field through FISA, which prescribes "procedures under which federal officials …

3    obtain authorization to conduct electronic surveillance for foreign intelligence

4    purposes." *Amnesty Int'l v. Clapper*, 638 F.3d 118, 122 (2d Cir. 2011). FISA

5    comprehensively regulates "surveillance for the purpose of gathering foreign

6    intelligence information, which is defined to include 'information that relates to, and if

7    concerning a United States person is necessary to, the ability of the United States to

8    protect against … international terrorism.'" *U.S. v. Stewart*, 590 F.3d 93, 126 (2d Cir.

9    2009). Indeed, "Congress passed FISA to settle what it believed to be the unresolved

10   question of the applicability of the Fourth Amendment warrant requirement to

11   electronic surveillance for foreign intelligence purposes, *and to 'remove any doubt as*

12   *to the lawfulness of such surveillance*.'" *U.S. v. Duggan*, 743 F.2d 59, 73 (2d Cir.

13   1984) (emphasis added). FISA also creates a damages remedy for "aggrieved

14   person[s] subjected to illegal electronic surveillance" where "the defendant

15   intentionally engaged in that illegal electronic surveillance, or intentionally used or

16   disclosed the information derived therein with knowledge of, or reason to know of, the

17   illegal manner in which it was collected." 50 U.S.C. § 1810. Plaintiffs have asserted

18   such a claim in Count 10.

19          At a minimum, these statutes counsel against the creation of a *Bivens* remedy in

20   this context because they reflect Congress' intent that it, rather than the judiciary,

21   should decide whether to create a damages remedy in these circumstances. *See*

22   *Wilkie*, 551 U.S. at 550 ("even in the absence of an alternative, a *Bivens* remedy is a

23   subject of judgment," and in making that judgment, courts must "pay[] particular heed

24   … to any special factors counseling hesitation before authorizing a new kind of

25   federal litigation"); *Mirmehdi*, 2011 WL 5222884, at *4 (existing statutory causes of

26   action special factors counseling against creation of *Bivens* remedy in addition to

27   constituting alternative, existing process). The relevant inquiry is whether Congress,

28   by legislating in the area, has spoken as to who should determine whether a cause of

1    action exists. *See Bush*, 462 U.S. at 380.  If Congress has provided a remedy for a

2    particular harm, judicial supplementation of the remedy through an implied *Bivens*

3    action is unwarranted. *Malesko*, 534 U.S. at 69.  If, on the other hand, Congress has

4    legislated in a particular area and declined to provide a damages remedy, courts

5    should infer that Congress believes such a remedy to be inappropriate. *See, e.g.*, *Bush*,

6    462 U.S. 367; *Chilicky*, 487 U.S. 412.  A court therefore should not create a *Bivens*

7    remedy merely because existing statutory remedies do not provide a particular

8    plaintiff complete relief. *See, e.g.*, *Stanley*, 483 U.S. at 683 ("[I]t is irrelevant to a

9    'special factors' analysis whether the laws currently on the books afford [a plaintiff]

10   an 'adequate' federal remedy for his injuries."); *Chilicky*, 487 U.S. at 421-22 (absence

11   of statutory relief does not imply that courts should award damages); *Malesko*, 534

12   U.S. at 69 (remedy should not "be implied simply for want of any other means for

13   challenging a constitutional deprivation"); *Mirmehdi*, 2011 WL 5222884, at *4 ("'[s]o

14   long as Congress' failure to provide money damages … has not been inadvertent,

15   courts should defer to its judgment'").

16          To be sure, the Privacy Act does not authorize a damages remedy against

17   *individuals* like Tidwell and Walls, but it does create such a cause of action against the

18   government, and in light of the comprehensive nature of the statutory scheme,

19   Congress' decision not to permit damages against individuals precludes the judicial

20   creation of such a remedy.  *See Chilicky*, 487 U.S. at 423; *Wilson*, 535 F.3d 707-08.

21   Similarly, even if RFRA or FISA does not allow for damages claims against

22   government officers in their individual capacities or does not provide these Plaintiffs

23   complete relief, *see infra* Part IV, inferring a *Bivens* cause of action would likewise be

24   inappropriate.  In such a situation, the relevant inquiry "is not what remedy the court

25   should provide for a wrong that would otherwise go unaddressed," but whether a

26   statutory scheme "should be augmented by the creation of a new remedy," a question

27   that "cannot be answered simply by noting that existing remedies do not provide

28   complete relief for the plaintiff."  *Bush*, 462 U.S. at 388; *see id*. at 373 (no *Bivens*

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

action, even assuming "a federal right has been violated and Congress has provided a less than complete remedy for the wrong"); *Wilson*, 535 F.3d at 711 (statute precludes *Bivens* remedy even when it provides no remedy). Courts have held that the Privacy Act is a special factor counseling against *Bivens* claims in circumstances similar to this case, *see id*. at 706-11; *Downie v. City of Middleburg Heights*, 301 F.3d 688, 697 (6th Cir. 2002), and RFRA and FISA should be treated similarly.[10]

## III.  PLAINTIFFS FAIL TO STATE VALID FIRST AND FIFTH AMENDMENT CLAIMS UNDER 42 U.S.C. § 1985(3)

Plaintiffs also assert First and Fifth Amendment claims under 42 U.S.C. § 1985(3) (Counts 2, 4, 7), but those claims fail as a matter of law. To state such a claim, Plaintiffs both must adequately allege a constitutional violation—which they do not, *see infra* Part IV—and *also* must allege: "(1) the existence of a conspiracy to deprive the plaintiff of the equal protection of the laws; (2) an act in furtherance of the conspiracy[;] and (3) a resulting injury." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1141 (9th Cir. 2000); *see United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 828-29, 103 S. Ct. 3352, 3354, 3356-57, 77 L. Ed. 2d 1049, 1054-55 (1983).

The existence of a conspiracy requires an agreement among co-conspirators, and for the purposes of Section 1985(3) Plaintiffs must allege that Defendants had "an agreement or meeting of the minds to violate constitutional rights." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989) (en banc) (internal quotation marks omitted). But alleging such an agreement in conclusory terms is insufficient; instead, Plaintiffs must allege facts plausibly suggesting a "further circumstance pointing toward a meeting of the minds." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929, 941 (2007).

---

[10] Plaintiffs also assert a Federal Tort Claims Act claim against the government (Count 11) for the same alleged acts underlying their *Bivens* (and statutory) claims. Although such a claim alone is not a special factor, *see Carlson*, 446 U.S. at 19-23, the creation of a *Bivens* remedy here is particularly inappropriate where Plaintiffs have several available statutory causes of action. *Cf. Davis*, 442 U.S. at 247 (inferring *Bivens* remedy where it was a judicially created damages remedy "or nothing").

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

Moreover, Plaintiffs "must demonstrate a deprivation of [equal protection] motivated by 'some … invidiously discriminatory animus behind the conspirators' action.'" *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798, 29 L. Ed. 2d 338, 348 (1971)).

On even the most lenient reading of the First Amended Complaint, and despite Plaintiffs' attempt to bolster their initial complaint, Plaintiffs have failed properly to allege the existence of a conspiracy. The First Amended Complaint lacks any factual, non-conclusory allegation that anyone, let alone Tidwell or Walls, came to a "meeting of the minds" with anyone else to violate Plaintiffs' constitutional rights. *See United Steelworkers*, 865 F.2d at 1540. Although Plaintiffs do attempt to recite the elements of Section 1985(3) in Counts 2, 4, and 7, it has long been established that "[a] mere allegation of conspiracy without factual specificity is insufficient." *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988). Moreover, under *Twombly*, Plaintiffs must allege additional facts that make plausible the existence of an agreement. *See* 550 U.S. at 557 (a "naked assertion of conspiracy … gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitle[ment] to relief'").

Indeed, far from alleging the necessary elements of a Section 1985(3) claim with "factual specificity," the First Amended Complaint alleges in vague and general terms that Tidwell "authorized" various aspects of the investigation and "actively directed" the actions of "Agents Armstrong, Allen, Rose, Walls, and other agents," and that Walls "monitored, directed, and authorized the actions of" Armstrong, Allen, and other agents, both "for the purpose of surveilling Plaintiffs and other[s] … because they were Muslim." Compl. ¶¶ 20-21. Such conclusory assertions simply are not "entitled to the assumption of truth." *Iqbal*, 129 S. Ct. at 1951.[11] As the Supreme Court has made clear, "[t]hreadbare recitals of the elements of a cause of action,

---

[11] For the reasons discussed in the memorandum in support of the other individual-capacity defendants' motion to dismiss, Plaintiffs' Section 1985(3) claims also fails under the intracorporate conspiracy doctrine.

supported by mere conclusory statements, do not suffice." *Id*. at 1949.

## IV. TIDWELL AND WALLS ARE ENTITLED TO QUALIFIED IMMUNITY ON ALL OF PLAINTIFFS' CLAIMS

Even if the government's assertion of the state-secrets privilege did not require dismissal of Counts 1-7; even if the Court were to recognize a *Bivens* cause of action for some of Plaintiffs' claims; and even if the Court were to hold that Plaintiffs had adequately alleged the existence of a conspiracy under Section 1985(3), dismissal of all claims against Defendants Tidwell and Walls would still be required because they are entitled to qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 131 S. Ct. at 2080 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396, 410 (1982)). For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 2083. Qualified immunity permits government officials "to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 2085.

Qualified immunity is "*an immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526-27, 105 S. Ct. 2806, 2815-16, 86 L. Ed. 2d 411, 425 (1985). Accordingly, the Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation," *Hunter*, 502 U.S. at 227; *see Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir. 2010), and frequently has upheld the early dismissal of claims on such grounds. *See, e.g.*, *al-Kidd*, 131 S. Ct. at 2083-85; *Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S. Ct. 2633, 2643-44, 174 L. Ed. 2d 354, 365-66 (2009); *Pearson v. Callahan*, 555 U.S. 223, 243-45, 129 S. Ct. 808, 822, 172 L. Ed. 2d 565, 580-81 (2009).

Notwithstanding Plaintiffs' amendment of their initial complaint, Tidwell and

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

Walls remain entitled to qualified immunity on all claims asserted against them (Counts 1-7, 9, and 10) for two related reasons.  First, Plaintiffs fail to state any claim that Tidwell or Walls engaged in conduct that violated their rights.  Second, even if Plaintiffs had plausibly alleged such claims, they do not allege violations of clearly established rights such that it would have been clear at the time to "every reasonable official" that the alleged conduct was unlawful.  *al-Kidd*, 131 S. Ct. at 2083.

### A.    Qualified Immunity Bars The First And Fifth Amendment Claims

Tidwell and Walls are entitled to qualified immunity on Plaintiffs' First and Fifth Amendment claims (Counts 1-4, 6, and 7), which allege that "Defendants [have] engaged in a scheme to target Plaintiffs for surveillance because of [their] adherence to and practice of the religion of Islam."  Compl. ¶¶ 227, 229, 232, 235, 241, 243.  Government officials cannot be held liable for constitutional claims on a *respondeat superior* theory, and the First Amended Complaint lacks any well-pleaded factual allegations "that allow[] the court to draw the reasonable inference that [Tidwell and Walls are] liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.  Because the First Amended Complaint does not allege a constitutional violation, it follows that it was not clearly established at the time that Tidwell and Walls could be held liable in these circumstances.[12]

Courts have long recognized that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," and that such defendants "may not be held liable for the

---

[12] Qualified immunity is also appropriate with respect to the Section 1985(3) claims alleged in Counts 2, 4, and 7 because it is not clearly established—and was certainly not in 2006 and 2007—that this provision applies to conspiracies other than those motivated by racial animus.  The Ninth Circuit has not determined whether a religious group may be a protected class for purposes of Section 1985(3).  *See Webb v. Cnty. of Trinity*, 734 F. Supp. 2d 1018, 1033 n.8 (E.D. Cal. 2010).  Indeed, the Supreme Court has acknowledged that this issue remains open, noting that it has "addressed and upheld a claim under § 1985(3)" only once, "and that case involved race discrimination."  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269, 113 S. Ct. 753, 759, 122 L. Ed. 2d 34, 46 (1993) (citing *Griffin*, 403 U.S. 88).  Therefore, even if Plaintiffs had plausibly alleged a conspiracy, qualified immunity requires dismissal of the Section 1985(3) claims given the unsettled nature of the law.

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1  unconstitutional conduct of their subordinates." *Id.* at 1948.  Plaintiffs, however, seek

2  compensatory, liquidated, and punitive damages against Tidwell and Walls for the

3  alleged actions of the informant and their subordinates.  Such *respondeat superior*

4  liability is plainly foreclosed by binding precedent.  *See id.*

5        In addition, where, as here, "the claim is invidious discrimination in

6  contravention of the First and Fifth Amendments," the Supreme Court has made clear

7  "that the plaintiff must plead and prove that the defendant acted with discriminatory

8  purpose." *Id.*; *see Lukumi Babalu Aye*, 508 U.S. at 540-41 (First Amendment);

9  *Washington v. Davis*, 426 U.S. at 240 (Fifth Amendment).  "[P]urposeful

10  discrimination requires more than 'intent as volition or intent as awareness of

11  consequences.'" *Iqbal*, 129 S. Ct. at 1948.  It requires "a decisionmaker's undertaking

12  a course of action because of, not merely in spite of … adverse effects upon an

13  identifiable group." *Id.* (internal quotation marks omitted).  Applying that standard in

14  *Iqbal*, the Supreme Court made clear that qualified immunity barred claims of

15  "invidious discrimination in contravention of the First and Fifth Amendments" where

16  defendants only allegedly supervised the implementation of federal counterterrorism

17  policies that discriminated against Muslims.  *Id.* at 1944, 1948.

18        As in *Iqbal*, the First Amended Complaint does not plausibly allege that

19  Tidwell or Walls "adopted and implemented the … policies at issue not for a neutral,

20  investigative reason but for the purpose of discriminating on account of" Plaintiffs'

21  religion. *Id.* at 1948-49.  As discussed above, Plaintiffs' description of Tidwell's and

22  Walls' authorization and supervision of an investigation conducted pursuant to FBI

23  counterterrorism policies (Compl. ¶¶ 20-21) cannot "plausibly suggest an entitlement

24  to relief." *See Iqbal*, 129 S. Ct. at 1951 (allegations that Attorney General was

25  "principal architect" of "invidious policy" and FBI Director was "instrumental" in

26  executing it insufficient).

27        In amending their initial complaint, Plaintiffs have merely added more generic

28  allegations regarding Tidwell's and Walls's supervision of the investigation.  For

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

example, Plaintiffs now allege that Tidwell "authorized the nature and scope of the operation and its targeting of Muslims," and "actively" directed the agents "for the purpose of surveilling Plaintiffs and other[s] … because they were Muslim." Compl. ¶ 20. But these are precisely the kinds of "labels and conclusions" and "formulaic recitation of the elements of a cause of action" that the Supreme Court held insufficient in *Twombly*, 550 U.S. at 555. And the only new allegation regarding Walls's role is that "she was one of the direct supervisors of" the agents conducting the investigation at issue. *Id*. Plaintiffs have simply failed to provide *any specific factual averments* in support of their claims regarding Tidwell's and Walls' alleged conduct, and their new assertions are just more "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal* 129 S. Ct. at 1949. Such allegations "do not suffice," nor are they "entitled to the assumption of truth." *Id*. at 1950; *see id*. at 1949 (Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"); *Twombly*, 550 U.S. at 555.

Moreover, any allegation that Tidwell and Walls purposefully discriminated against Plaintiffs on the basis of religion would be implausible in light of Plaintiffs' other allegations. After all, Plaintiffs allege that Defendants "operated under the principles set forth" in the Attorney General's Guidelines and the DIOG, which explicitly *prohibited* investigative activity based solely on religion and First Amendment activities. *See* Compl. ¶ 37. Similarly, the First Amended Complaint contains numerous allegations that the investigation was related to counterterrorism efforts. *See supra* Background, Part A. Such allegations offer precisely the kind of "obvious alternative explanation" that this Court should credit as more plausible than Plaintiffs' general and conclusory allegations of "purposeful, invidious discrimination" on the part of Tidwell or Walls. *Iqbal*, 129 S. Ct. at 1951. Indeed, as the Supreme Court recognized in *Iqbal*,

> [i]t should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the [September 11] attacks would produce a disparate, incidental impact on

Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims. *Id.*

Because Plaintiffs fail to allege a violation of the First and Fifth Amendments, it could not have been clearly established at the time that Tidwell's and Walls's alleged conduct violated Plaintiffs' rights. *See Presbyterian Church (U.S.A.) v. U.S.*, 870 F.2d 518, 527 (9th Cir. 1989) (undercover electronic surveillance of church services did not violate clearly established First Amendment rights); *see also al-Kidd*, 131 S. Ct. at 2084 ("We have repeatedly told courts … not to define clearly established law at a high level of generality." (citation omitted)); *Saucier v. Katz*, 533 U.S. 194, 206, 121 S. Ct. 2151, 2158-59, 150 L. Ed. 2d 272, 284 (2001) (right clearly established if "'[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right'"), *overruled on other grounds by Pearson*, 555 U.S. 223.

**B.      Qualified Immunity Bars Plaintiffs' Fourth Amendment Claim**

For similar reasons, qualified immunity bars Plaintiffs' Fourth Amendment claim against Tidwell and Walls (Count 9), which alleges that the informant, at the FBI's direction, conducted unlawful video and audio recording of Plaintiffs in mosques, in homes, and at sporting events.  As an initial matter, Plaintiffs again seek improperly to hold Tidwell and Walls accountable for the conduct of the informant and their subordinates, while failing to allege that either Tidwell or Walls had any personal involvement in or directed the allegedly unlawful searches.[13]  Moreover, covert surveillance of a religious community does not, without more, violate Fourth Amendment rights, *see Presbyterian Church*, 870 F.2d at 527, and the First Amended Complaint lacks any specific allegations that the informant's conduct occurred in circumstances in which Plaintiffs had a reasonable expectation of privacy.  Because

---

[13] Defendants address only the Fourth Amendment claims specific to Plaintiffs, and not those alleged with respect to unnamed individuals, as Fourth Amendment rights "are personal rights" that may not be asserted vicariously.  *Rakas v. Illinois*, 439 U.S. 128, 138, 99 S. Ct. 421, 427-28, 58 L. Ed. 2d 387, 397-98 (1978).

the facts pleaded lack the requisite specificity and do not constitute a violation, it necessarily follows that it could not have been clearly established at the time that Tidwell's and Walls's alleged conduct violated the Fourth Amendment.[14]

### 1. Plaintiffs Fail To Allege That Tidwell Or Walls Was Personally Involved In The Purported Searches, Or That A Sufficient Causal Connection Between Their Conduct And The Alleged Violation Otherwise Existed

Plaintiffs can state a Fourth Amendment claim against supervisors such as Tidwell or Walls only by plausibly alleging that they were "personally involved" in the allegedly unlawful search or that a "'sufficient causal connection exists'" between their alleged conduct and the violation. *Edgerly*, 599 F.3d at 961; *Lacey v. Maricopa Cnty.*, 2011 WL 2276198, at *13 (9th Cir. June 9, 2011) (same); *see also Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (when evaluating constitutional deprivations, "[t]he inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant"). To satisfy this requirement, Plaintiffs must allege, at a minimum, that Tidwell and Walls "'set[] in motion a series of acts by others which [they knew] or reasonably should [have known] would cause others to inflict the constitutional injury.'" *Kwai Fun Wong v. U.S.*, 373 F.3d 952, 966 (9th Cir. 2004).

Plaintiffs fail to satisfy these requirements. They do not allege that Tidwell or Walls was "personally involved" in the purported searches, nor do they offer any facts—much less specific ones—showing that "a sufficient causal connection exists" between their actions and the alleged Fourth Amendment violations, such as personally directing the agents or the informant to engage in activities that could plausibly constitute an unlawful search. At most, Plaintiffs allege in general terms that Tidwell and Walls oversaw the overall investigation. But such generalized

---

[14] Plaintiffs also assert vague claims that the FBI installed electronic surveillance equipment in mosques, in AbdelRahim's house, car, and phone, and outside his home, *see* Compl. ¶¶ 94-95, 209, but fail to allege who participated in this purported activity and whose conversations were captured. The Court should reject such nonspecific claims that wholly lack factual support. *See Iqbal*, 129 S. Ct. at 1949.

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

allegations are insufficient to state a Fourth Amendment Claim. *See Lyall v. City of L.A.*, 2011 WL 61626, at *13 (C.D. Cal. 2011) ("[A]bsent evidence of culpable inaction that caused or set in motion the alleged constitutional violations … Plaintiffs cannot establish supervisory liability."). And because Plaintiffs have failed to allege that Tidwell or Walls had the requisite personal involvement, it certainly follows that it was not clearly established at the time that they could be held liable for an alleged Fourth Amendment violation based on the conduct alleged.

### 2. Plaintiffs Fail To Allege A Reasonable Expectation Of Privacy In The Circumstances Of The Alleged Searches

Even if Plaintiffs had adequately alleged the personal involvement of Tidwell and Walls in the purported searches to invoke the Fourth Amendment, Plaintiffs must also plausibly allege that the alleged conduct infringed on a legitimate privacy right. *See U.S. v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000). But Plaintiffs do not offer any specific allegations that any of the alleged recordings infringed on a reasonable expectation of privacy. To the extent that Plaintiffs have attempted to amend their initial complaint to offer such allegations, they have added nothing more than a single conclusory claim pertaining only to Plaintiff Fazaga, coupled with generalized claims regarding self-imposed rules and subjective expectations regarding mosques, none of which gives rise to a Fourth Amendment claim.

Plaintiffs allege that the informant was directed by the case agents to conduct recordings in Plaintiff AbdelRahim's home, but they also allege that the informant did so only *after having been invited in. See* Compl. ¶¶ 200-01. Operations in which the agent is a so-called "invited informer" are not "searches" under the Fourth Amendment. *Mayer*, 503 F.3d at 750 (citing *U.S. v. Aguilar*, 883 F.2d 662, 701 (9th Cir. 1989)). Indeed, "[t]he Supreme Court [has] unmistakably declared that persons have no expectation of privacy or confidentiality in their conversations and relations with other persons, no matter how secretive the setting." *Aguilar*, 883 F.2d at 703. Therefore, pursuant to the "invited informer" doctrine, such claims are insufficient

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

because AbdelRahim lacked any expectation of privacy with regard to the informant's alleged recording in his home as a matter of law. *See Mayer*, 503 F.3d at 751 ("no probable cause [is] required under the invited informer doctrine").

In addition, Plaintiffs allege that the informant was directed to conduct recordings in mosques, at lectures, and at sporting events; however, they do not allege (except for one vague claim regarding Fazaga, discussed below) that these places were closed to the public when the recordings occurred. Accordingly, Plaintiffs have not sufficiently alleged that they had a reasonable expectation of privacy in those conversations. *See Lyall*, 2011 WL 61626, at *5 (no reasonable expectation of privacy at warehouse that "was not used for residential purposes," was used to host a public event, and over which plaintiffs possessed no possessory interest); *U.S. v. Gonzalez*, 328 F.3d 543, 547-48 (9th Cir. 2003) (video surveillance of mail room did not violate Fourth Amendment because no reasonable expectation of privacy in room whose doors remain open throughout business day and that receives "heavy foot traffic during business hours"); *U.S. v. Little,* 753 F.2d 1420, 1435-36 (9th Cir. 1984) (no reasonable expectation of privacy in reception area when public may enter freely).

Plaintiffs do allege, based upon "information and belief," that agents Allen and Armstrong "caused … electronic surveillance equipment to be installed" at Fazaga's mosque and monitored his conversations in non-public areas of the mosque, including his office. *See* Compl. ¶ 95. This barebones claim, added only after Defendants sought dismissal of the initial complaint, is the *first and only* allegation that any individual-capacity Defendant participated in monitoring of a Plaintiff's conversations in a non-public area (or into which the informant had not been invited). But this is precisely the type of generalized allegation that is insufficient under *Iqbal*. 129 S. Ct. at 1949-50. In any event, it does not plausibly allege the personal involvement of Defendants Tidwell and Walls, as it must. *See Edgerly*, 599 F.3d at 961.

Plaintiffs have also amended their initial complaint to allege that they relied on purported rules and subjective expectations regarding appropriate conduct within a

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
Case No. SA CV 11-00301-CJC (VBKx)

-29-

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1    mosque and that the alleged violation of those rules violated their expectation of

2    privacy.  *See* Compl. ¶ 193.  But the Supreme Court has made clear that the alleged

3    violation of an individual's subjective expectation of privacy is insufficient to state a

4    Fourth Amendment claim—rather, the expectation also must "be one that *society* is

5    prepared to recognize as 'reasonable.'"  *See Katz v. U.S.*, 389 U.S. 347, 361, 88 S. Ct.

6    507, 516, 19 L. Ed. 576 (1967) (Harlan, J., concurring) (emphasis added); *see also*

7    *Oliver v. U.S.*, 466 U.S. 170, 171, 104 S. Ct. 1735, 1737-38, 80 L. Ed. 214, (1984)

8    ("The Amendment does not protect the merely subjective expectation of privacy, but

9    only those expectation[s] that society is prepared to recognize as reasonable.").

10   Indeed, courts have refused to recognize a reasonable expectation of privacy in similar

11   situations, notwithstanding rules against recording devices and other security

12   measures.  *See, e.g.*, *In re John Doe Trader No. One*, 894 F.2d 240, 243 (7th Cir.

13   1990) (no reasonable expectation of privacy in conversations on exchange trading

14   floor although subject to security, membership required to enter, and rule against

15   recording devices).  In such places, as with the invited informer scenario, "[t]he risk of

16   being overheard by an eavesdropper or betrayed by an informer or deceived as to the

17   identity of one with whom one deals is probably inherent in the conditions of human

18   society."  *Id.* (citing *Hoffa v. U.S.*, 385 U.S. 293, 303, 87 S. Ct. 408, 414, 17 L. Ed. 2d

19   374 (1966)).  Thus, if Plaintiffs "really did believe" that mosque rules protected them

20   from their conversations being recorded, this "belief was naïve rather than

21   reasonable."  *See id.* at 244.

22        Likewise, Plaintiffs' allegations that the informant gathered license plate

23   numbers, addresses, telephone numbers, email addresses, and attendee lists are

24   insufficient to state a Fourth Amendment claim.  The First Amended Complaint does

25   not allege any facts showing the informant gathered this information from non-public

26   sources or otherwise using unlawful means.  And to the extent others provided this

27   information to the informant, "a person has no legitimate expectation of privacy in

28   information he voluntarily turns over to third parties."  *Smith v. Maryland*, 442 U.S.

1   735, 743-44, 99 S. Ct. 2577, 2582, 61 L. Ed. 2d 220, 229 (1979) (telephone numbers);

2   *see also U.S. v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2007) (to/from addresses of

3   email messages); *U.S. v. Hinton*, 222 F.3d 664, 675 (9th Cir. 2000) (address affixed to

4   envelope).

5       Because Plaintiffs have not alleged with the requisite specificity that any of the

6   alleged surveillance occurred in circumstances in which they had a reasonable

7   expectation of privacy, they have therefore also failed plausibly to allege that such

8   surveillance at the time was clearly established to violate the Fourth Amendment.

9   **C.    Qualified Immunity Bars Plaintiffs' RFRA Claim**

10      Defendants Tidwell and Walls are also entitled to qualified immunity on

11  Plaintiffs' RFRA claim (Count 5) because RFRA does not provide a damages cause of

12  action against individuals and, even if it did, Plaintiffs fail to allege that Tidwell's or

13  Walls's actions have placed a substantial burden on Plaintiffs' free exercise of

14  religion.  Moreover, Plaintiffs' RFRA claim presents precisely the kind of balancing

15  of interests for which qualified immunity is particularly appropriate.

16      **1.    RFRA Does Not Permit Suits For Damages Against Individual-Capacity Defendants**

17

18      As a threshold matter, RFRA permits "a person whose religious exercise has

19  been burdened" to "assert that violation as a claim or defense in a judicial proceeding"

20  and to "obtain appropriate relief against a government."  42 U.S.C. § 2000bb-1(c).

21  The individual-capacity defendants like Tidwell and Walls are not "government[s],"

22  however, and therefore this provision does not authorize damages suits against them.

23  *See Jean-Pierre v. BOP*, 2010 WL 3852338, at *6 n.4 (W.D. Pa. July 30, 2010).

24  RFRA's definition of "government," considered in context, reaffirms this reading.

25  The statute defines "government" to include "a branch, department, agency,

26  instrumentality, and official (or other person acting under color of law) of the United

27  States, a State, or subdivision of a State."  42 U.S.C. § 2000bb-2(1).  The term

28  "official" is most naturally read to authorize official-capacity suits, which, consistent

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

1    with the text, would seek "relief against [the] government." *Id.* § 2000bb-1(c); *see*

2    *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 3104-05, 87 L. Ed. 2d 114,

3    121 (1985) (official-capacity suits "'generally represent only another way of pleading

4    an action against an entity of which an officer is an agent'").

5         Even if this Court were to hold that RFRA permits damages actions against

6    government officials in their individual capacities, this principle is far from clearly

7    established today, and certainly was not at the time of the investigation in this case.

8    Indeed, at least one court recently has concluded that RFRA *does not* "support damage

9    claims against government officials in their individual capacity." *Jean-Pierre*, 2010

10   WL 3852338, at *6 n.4. And although other courts have permitted such actions, those

11   decisions did not engage in a textual analysis of RFRA, and in any event were district

12   court decisions that would be insufficient to create a clearly established right. *See al-

13   Kidd*, 131 S. Ct. at 2084 (district court decision "is not 'controlling authority' in any

14   jurisdiction, much less in the entire United States," as "controlling authority" requires

15   "a robust 'consensus of cases of persuasive authority'" (quoting *Wilson v. Layne*, 526

16   U.S. 603, 617, 119 S. Ct. 1692, 1700, 143 L. Ed. 2d 818, 832 (1999)); *see, e.g.*, *Lepp

17   v. Gonzales*, 2005 WL 1867723, at *8 (N.D. Cal. Aug. 2, 2005); *Keen v. Noble*, 2007

18   WL 2789561, at *9 (E.D. Cal. Sept. 20, 2007).

19         **2.    Plaintiffs Have Not Alleged A "Substantial Burden" On Free
20                 Exercise**

21         Plaintiffs also fail to allege, as they must, facts sufficient to plead that Tidwell's

22   or Walls's activities placed a "substantial burden" on Plaintiffs' exercise of religion.

23   To state a claim under RFRA, Plaintiffs must allege a substantial interference with the

24   right of free exercise. *See Worldwide Church of God v. Phila. Church of God, Inc.*,

25   227 F.3d 1110, 1120 (9th Cir. 2000). A "substantial burden" on free exercise exists

26   only when the government "has coerced the Plaintiffs to act contrary to their religious

27   beliefs under threat of sanctions, or condition a governmental benefit upon conduct

28   that would violate the Plaintiffs' religious beliefs." *Navajo Nation*, 535 F.3d at 1063.

Plaintiffs, however, do not make a plausible claim that Defendants Tidwell or Walls did either; rather, they complain that the alleged surveillance ultimately had a chilling effect on mosque attendance.[15] But an "action that decreases the spirituality, the fervor, or the satisfaction with which a believer practices his religion is not what Congress has labeled a 'substantial burden' … on the free exercise of religion." *Id.* The allegations in the First Amended Complaint cannot be plausibly read to suggest coercion of any kind or the conditioning of any governmental benefit.[16]

For the same reasons, Tidwell and Walls could not have been expected reasonably to believe at the time that the alleged conduct violated RFRA. Qualified immunity protects government officials who do not have fair warning about the legality of their actions, and therefore courts have made clear that the "'sophisticated balancing of interests'" inherent in RFRA "is the very type of discretionary decision making that prevents a finding of 'clearly established' federal law on the issue." *Lebron v. Rumsfeld*, 764 F. Supp. 2d 787, 805 (D.S.C. 2011) (granting qualified immunity on RFRA claim). Indeed, qualified immunity is particularly appropriate in this case because RFRA *permits* a substantial burden on religion where the government can demonstrate that its actions were "in furtherance of a compelling state interest" and it used "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(2).

### D. Qualified Immunity Bars Plaintiffs' FISA Claim

Finally, qualified immunity bars Plaintiffs' FISA claim under 50 U.S.C. § 1810

---

[15] Plaintiffs allege that they did not know of the informant's activities until *after* the surveillance ended, and only then did Malik and AbdelRahim claim to have decreased their mosque attendance. Compl. ¶¶ 78, 217. They do not allege that their religious exercise was substantially burdened by the informant's activities while ongoing, and any subsequent change in their mosque attendance is motivated only by speculative, after-the-fact concerns, not the informant's alleged conduct. Fazaga also alleges that the informant caused damage to the "trust within and cohesion of his congregation," which "directly undermined the Islamic practice of *jama'ah*, or worship in a congregation." *Id.* ¶ 65. These claims do not go to Fazaga's religious exercise.

[16] Because "substantial burden" refers to constitutional Free Exercise standards, *see Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008) (en banc), the First Amended Complaint has also failed to state a claim for violation of the Free Exercise Clause (Counts 3 and 4).

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071

(Count 10). As an initial matter, Plaintiffs fail to allege facts demonstrating that they are "aggrieved person[s]" who may bring such a claim. Section 1810 of FISA authorizes suits only by an "aggrieved person," which is defined as "the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." 50 U.S.C. § 1801(k). "Electronic surveillance," in turn, is defined as the use of an electronic device "for monitoring to acquire information … under circumstances in which a person has *a reasonable expectation of privacy*." *Id.* § 1801(f)(4) (emphasis added). As discussed *supra* Part IV.B.2, however, Plaintiffs had no reasonable expectation of privacy in the circumstances alleged here, and for that same reason they have failed to allege that they were aggrieved by electronic surveillance. *See ACLU v. NSA*, 493 F.3d 644, 683 (6th Cir. 2007) ("[A]ggrieved person is intended to be coextensive with, but no broader than, those persons who have standing to raise claims under the Fourth Amendment with respect to electronic surveillance.") (citation omitted); *In re NSA Telecomms. Records Litig.*, 595 F. Supp. 2d 1077, 1084 (N.D. Cal. 2009) (requiring "particularized and specific" allegations to state a claim under Section 1810).

Plaintiffs' FISA claim also fails because the First Amended Complaint lacks allegations that Defendants Tidwell or Walls acted with the requisite intent. Under 50 U.S.C. § 1809—the "violation of which forms the basis for liability under section 1810," *In re NSA Telecomms. Records Litig.*, 564 F. Supp. 2d 1109, 1125 (N.D. Cal. 2008)—liability attaches only if a defendant has "'*intentionally* engag[ed] in electronic surveillance under color of law except as authorized by statute,'" *id.* (emphasis added); *see also* H.R. Rep. No. 95-1283, at 97 (1978) (statute should be interpreted as requiring "intentional violation of an order or one of the specified provisions, not just intentional conduct"). But Plaintiffs fail to allege sufficiently that either Tidwell or Walls personally conducted or authorized any specific surveillance activity with the intent to violate the law, and this claim must fail on that ground as well.

For the same reasons—particularly in light of the dearth of judicial guidance in this area, *see NSA Telecomms. Records Litig.*, 564 F. Supp. 2d at 1137 (noting "lack of precedents under section 1810")—it was not clearly established at the time that Tidwell and Walls could be held liable under FISA in the circumstances alleged.

## CONCLUSION

For the foregoing reasons, Defendants Tidwell and Walls's Motion to Dismiss should be granted in its entirety.

Dated:  November 11, 2011

Respectfully submitted,

WILMER CUTLER PICKERING
   HALE AND DORR LLP

By:    /s/ Brian R. Michael

Brian R. Michael
P. Patty Li
Katie Moran
350 South Grand Avenue
Suite 2100
Los Angeles, CA 90071
Telephone:  (213) 443-5300
Facsimile:  (213) 443-5400

Howard M. Shapiro
Carl J. Nichols
Annie L. Owens
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

*Attorneys for Defendants*
*J. Stephen Tidwell and*
*Barbara Walls*

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
Case No. SA CV 11-00301-CJC (VBKx)

1  **SCHEPER KIM & HARRIS LLP**
   DAVID C. SCHEPER (State Bar No. 120174)
2  dscheper@scheperkim.com
   ALEXANDER H. COTE (State Bar No. 211558)
3  acote@scheperkim.com
   ANGELA M. MACHALA (State Bar No. 224496)
4  amachala@scheperkim.com
   601 West Fifth Street, 12th Floor
5  Los Angeles, CA 90071-2025
   Telephone: (213) 613-4655
6  Facsimile:  (213) 613-4656

7  **Attorneys for Defendants**
   **Pat Rose, Kevin Armstrong and Paul**
8  **Allen**

9
                    **UNITED STATES DISTRICT COURT**
10
           **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
11

12
   YASSIR FAZAGA, ALI UDDIN              CASE NO.
13 MALIK, YASSER ABDELRAHIM,
                                         SACV 11-00301-JST(VBKx)
14              Plaintiffs,

15        v.                             **NOTICE OF MOTION AND**
                                         **MOTION BY DEFENDANTS PAT**
16 FEDERAL BUREAU OF                     **ROSE, KEVIN ARMSTRONG AND**
   INVESTIGATION; ROBERT                 **PAUL ALLEN TO DISMISS**
17 MUELLER, DIRECTOR OF THE              **PLAINTIFFS' FIRST AMENDED**
   FEDERAL BUREAU OF                     **CLASS ACTION COMPLAINT;**
18 INVESTIGATION, in his official        **NOTICE OF JOINDER IN**
   capacity; STEVEN M. MARTINEZ,         **MOTIONS TO DISMISS BY (1)**
19 ASSISTANT DIRECTOR IN                 **DEFENDANTS UNITED STATES**
   CHARGE, FEDERAL BUREAU OF             **OF AMERICA, FEDERAL**
20 INVESTIGATION'S LOS ANGELES           **BUREAU OF INVESTIGATION,**
   DIVISION, in his official capacity; J. **ROBERT MUELLER, AND**
21 STEPHEN TIDWELL; BARBARA              **STEVEN MARTINEZ AND (2)**
   WALLS; PAT ROSE; KEVIN                **DEFENDANTS STEPHEN**
22 ARMSTRONG; PAUL ALLEN,                **TIDWELL AND BARBARA WALLS**

23              Defendants.             **Date:**  January 30, 2012
                                         **Time:**  1:30 PM
24                                       **Judge:** Hon. Cormac J. Carney

25

26

27

28

                                                              **SER 168**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on January 30, 2012, at 1:30 PM, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Cormac J. Carney, located at 411 West Fourth Street, Room 1053, Santa Ana, CA 92701, defendants Pat Rose, Kevin Armstrong and Paul Allen (collectively the "Agent Defendants") will, and hereby do, move the Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), for an order dismissing each and every cause of action in Plaintiffs' First Amended Class Action Complaint.

The Agent Defendants move on the ground that Plaintiffs have failed to state a claim as to any cause of action against the Agent Defendants, because:

(1) Plaintiffs have failed to allege an entitlement to *Bivens* relief, an improper government purpose, a message of disapproval of religion or improper entanglement with respect to their First Cause of Action and because the Agent Defendants are entitled to qualified immunity for this cause of action;

(2) Plaintiffs have failed to allege a conspiracy formed for an unconstitutional purpose, an improper government purpose, a message of disapproval of religion or improper entanglement with respect to their Second Cause of Action and because the Agent Defendants are entitled to qualified immunity for this cause of action;

(3) Plaintiffs have failed to allege an entitlement to *Bivens* relief, an improper purpose, a burden on their free exercise of religion, that the complained of conduct was not narrowly tailored and that the conduct was not justified by a compelling government interest with respect to their Third Cause of Action and because the Agent Defendants are entitled to qualified immunity for this cause of action;

(4) Plaintiffs have failed to allege a conspiracy formed for an unconstitutional purpose, a burden on their free exercise of religion, that the complained of

conduct was not narrowly tailored and that the conduct was not justified by a compelling government interest with respect to their Fourth Cause of Action and because the Agent Defendants are entitled to qualified immunity for this cause of action;

(5) Plaintiffs have failed to allege a burden on their free exercise of religion, that the complained of conduct was not narrowly tailored and that the conduct was not justified by a compelling government interest with respect to their Fifth Cause of Action and because the Agent Defendants are entitled to qualified immunity for this cause of action;

(6) Plaintiffs have failed to allege a violation of the First Amendment with respect to their Sixth Cause of Action and because the Agent Defendants are entitled to qualified immunity for this cause of action;

(7) Plaintiffs have failed to allege a conspiracy formed for an unconstitutional purpose, a violation of the First Amendment with respect to their Seventh Cause of Action and because the Agent Defendants are entitled to qualified immunity for this cause of action;

(8) Plaintiffs have failed to allege a reasonable expectation of privacy with respect to their Ninth Cause of Action and because the Agent Defendants are entitled to qualified immunity for this cause of action; and

(9) Plaintiffs have failed to allege the existence of a clearly established right with respect for their Tenth Cause of Action and because the Agent Defendants are entitled to qualified immunity to this cause of action.

This motion is based on the accompanying Memorandum of Points and Authorities, and all pleadings and papers on file with the Court in this action.

PLEASE TAKE FURTHER NOTICE that the Agent Defendants hereby join in the motions to dismiss filed by (1) Defendants United States of America, Federal Bureau of Investigation, Robert Mueller and Steven Martinez (Docket No. 55) and (2) Defendants Stephen Tidwell and Barbara Walls because the arguments raised

1 | therein apply with equal force to the Agent Defendants.

2 | **Statement of Local Rule 7-3 Compliance**

3 | Counsel for all parties conferred on this motion on November 1, 2011.

4 | DATED: Nobvember 11, 2011     SCHEPER KIM & HARRIS LLP

5 | DAVID C. SCHEPER

       ALEXANDER H. COTE

6 | ANGELA M. MACHALA

7

8

9 | By:     /s/

10 | David C. Scheper

      Attorneys for Defendants Pat Rose, Kevin

11 | Armstrong and Paul Allen

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................... 1

II.     FACTUAL BACKGROUND ....................................................................... 2

        A.      The FBI Had Specific Neutral Reasons For Investigating
                Plaintiffs .......................................................................................... 2

        B.      Investigative Techniques Allegedly Employed By the FBI ................. 5

        C.      Plaintiffs Learned Of Monteilh's Actions After The Fact .................. 6

III.    LEGAL STANDARD UNDER *IQBAL* ....................................................... 6

IV.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION
        1985(3) ......................................................................................................... 6

        A.      Plaintiffs Fail To Allege A Conspiracy Under Section 1985(3) ........... 6

        B.      Plaintiffs Failed To Allege An Unlawful Purpose ............................. 9

                1.      Failure To Allege Purpose Of Interfering With Religion ........... 10

                2.      Failure to Allege Purposeful Discrimination .............................. 11

                3.      Inability to Prove Purposeful Disruption or Discrimination ...... 12

V.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER *BIVENS* ..................... 13

        A.      Plaintiffs' *Bivens* Claims Are Precluded By The Privacy Act ............. 13

        B.      Plaintiffs Fail To Allege An Unlawful Purpose ................................. 17

VI.     THE AGENT DEFENDANTS ARE ENTITLED TO QUALIFIED
        IMMUNITY ................................................................................................. 18

        A.      Legal Standard For Evaluating Qualified Immunity ........................... 18

        B.      Defendant Rose Is Entitled To Qualified Immunity Under *Iqbal* ....... 18

        C.      Qualified Immunity Bars The Free Exercise And RFRA Claims ........ 20

                1.      Plaintiffs Allege No Burden On Their Free Exercise Of
                        Religion ...................................................................................... 20

                2.      The Investigation Advanced A Compelling Government
                        Interest ........................................................................................ 22

                3.      The Agent Defendants Are Entitled To Qualified
                        Immunity ..................................................................................... 24

        D.      Qualified Immunity Bars The Establishment Clause Claims ............. 24

                1.      Plaintiffs Fail To Allege Improper Purpose .............................. 25

**SER 172**

| | | 2. | Plaintiffs Fail To Allege the Sending of A Message | 26 |
| | | 3. | Plaintiffs Failed To Plead Excessive Entanglement | 27 |
| | | 4. | The Agent Defendants Are Entitled To Qualified Immunity | 27 |
| | E. | | Qualified Immunity Bars The Equal Protection Claims | 28 |
| | F. | | Qualified Immunity Bars The Unlawful Search Claims | 28 |
| | | 1. | Recording Of Audio Communications | 29 |
| | | 2. | Video Surveillance | 31 |
| | | 3. | Surveillance Devices In Mosques | 32 |
| | G. | | Qualified Immunity Bars The FISA Claim | 34 |
| VII. | CONCLUSION | | | 35 |

- ii -

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Action v. Gannon*,
    450 F.2d 1227 (8th Cir. 1971)................................................................10

*Adams v. Johnson*,
    355 F.3d 1179 (9th Cir. 2004)..............................................................14

*Ashcroft v. al-Kidd*,
    131 S. Ct. 2074 (2011)........................................................................18

*Berry v. Hollander*,
    925 F.2d 311 (9th Cir. 1991)................................................................14

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971).........................................................2, 13, 15, 20

*Blunt v. County of Sacramento*,
    No. 2:04-cv-1743, 2006 U.S. Dist. LEXIS 11099
    (E.D. Cal. Mar. 2, 2006)......................................................................8

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993)........................................................................9, 10

*Bush v. Lucas*,
    462 U.S. 367 (1983)...........................................................................14

*Cammack v. Waihee*,
    932 F.2d 765 (9th Cir. 1991)................................................................27

*Chambliss v. Foote*,
    562 F.2d 1015 (5th Cir. 1977),
    *aff'g*, 421 F. Supp. 12 (E.D. La. 1976)..............................................8

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)......................................................................23, 24

*Cooper v. FAA*,
    596 F.3d 538 (9th Cir. 2010)................................................................15

*County of Allegheny v. ACLU*,
    492 U.S. 573 (1989)...........................................................................26

*Crowe v. County of San Diego*,
    608 F.3d 406 (9th Cir. 2010)..................................................................7

*Denney v. City of Albany*,
    247 F.3d 1172 (11th Cir. 2001)..............................................................8

*Devereaux v. Perez*,
    218 F.3d 1045 (9th Cir. 2000)..............................................................27

*Dickerson v. Alachua County Comm'n,*
200 F.3d 761 (11th Cir. 2000)..........................................................7

*Doe v. Chao,*
540 U.S. 614 (2004) ......................................................................15

*Downie v. City of Middleburg Heights,*
301 F.3d 688 (6th Cir. 2002)..........................................................15

*Fonda v. Gray,*
707 F.2d 435 (9th Cir. 1983) ...........................................................7

*Gooden v. Howard County,*
954 F.2d 960 (4th Cir. 1992) ...........................................................9

*Haig v. Agee,*
453 U.S. 280 (U.S. 1981) ...............................................................23

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) ......................................................................18

*Hobson v. Wilson,*
737 F.2d 1 (D.C. Cir. 1984) .....................................................10, 11

*Hoefer v. Fluor Daniel, Inc.,*
92 F. Supp. 2d 1055 (C.D. Cal. 2000)...........................................7, 8

*Hoffa v. United States,*
385 U.S. 293 (1966) ......................................................................30

*Illinois v. Gates,*
462 U.S. 213 (1983) ......................................................................12

*In re Nat'l Sec. Agency Telecomms. Records Litig.,*
564 F. Supp. 2d 1109 (N.D. Cal. 2008) .....................................34, 35

*Kasza v. Browner,*
133 F.3d 1159 (9th Cir. 1998.).................................................13, 34

*Katz v. United States,*
389 U.S. 347 (1967) ..................................................................30, 31

*Kee v. City of Rowlett* Texas,
247 F.3d 206 (5th Cir. 2001).....................................................30, 31

*Kotarski v. Cooper,*
866 F.2d 311 (9th Cir. 1989) .........................................................14

*Kreisner v. City of San Diego,*
1 F.3d 775 (9th Cir. 1993)..............................................................25

*Laird v. Tatum,*
408 U.S. 1 (1972) .........................................................................22

**SER 175**

*Lemon v. Kurtzman,*
   403 U.S. 602 (1971) ....................................................................... 25

*Libas Ltd. v. Carillo,*
   329 F.3d 1128 (9th Cir. 2003) ......................................................... 14

*Lynch v. Donnelly,*
   465 U.S. 668 (1984) ....................................................................... 25

*Mitchell v. Forsyth,*
   472 U.S. 511 (1985) ....................................................................... 19

*Mory v. City of Chula Vista,*
   No. 07CV0462, 2008 U.S. Dist. LEXIS 9911 (S.D. Cal. Feb. 11, 2008) ......... 8

*Nelson Radio & Supply Co. v. Motorola, Inc.,*
   200 F.2d 911 (5th Cir. 1952) .......................................................... 7

*Navajo Nation v. U.S. Forest Service,*
   535 F.3d 1058 (9th Cir. 2008) ............................................... 21, 23, 24

*Nurre v. Whitehead,*
   580 F.3d 1087 (9th Cir. 2009) ............................................... 25, 26, 27

*Orin v. Barclay,*
   272 F.3d 1207 (9th Cir. 2001) ......................................................... 28

*Pearson v. Callahan,*
   555 U.S. 223 (2009) ....................................................................... 18

*Pers. Admin'r of Mass. v. Feeney,*
   442 U.S. 256 (1979) ....................................................................... 17

*Portman v. County of Santa Clara,*
   995 F.2d 898 (9th Cir. 1993) .......................................................... 8

*Presbyterian Church v. United States,*
   870 F.2d 518 (9th Cir. 1989) ......................................................... 30

*Rabkin v. Dean,*
   856 F. Supp. 543 (N.D. Cal. 1994) ................................................. 8

*Rakas v. Illinois,*
   439 U.S. 128 (1978) ................................................................. 29, 33

*Runs After v. United States,*
   766 F.2d 347 (8th Cir. 1985) .......................................................... 8

*Schmitz v. Mars, Inc.,*
   261 F. Supp. 2d 1226 (D. Or. 2003) ............................................... 8

*Schweiker v. Chilicky,*
   487 U.S. 412 (1988) ....................................................................... 14

**SER 176**

*Smith v. Maryland,*
442 U.S. 735 (1978) ........................................................................29

*United Bhd. of Carpenters & Joiners, Local 610 v. Scott,*
463 U.S. 825 (1983) ..........................................................................7

*United States v. Aguilar,*
883 F.2d 662 (9th Cir. 1988)..............................................24, 30, 31

*United States v. Brathwaite,*
458 F.3d 376 (5th Cir. 2006) ...........................................................32

*United States v. Davis,*
326 F.3d 361 (2nd Cir. 2003) ..........................................................32

*United States v. Gering,*
716 F.2d 615 (9th Cir. 1983) ...........................................................21

*United States v. Lee,*
359 F.3d 194 (3rd Cir. 2004) ...........................................................32

*United States v. Nerber,*
222 F.3d 597 (9th Cir. 2000) .......................................................29, 32

*United States v. Parks,*
285 F.3d 1133 (9th Cir. 2000) .........................................................12

*United States v. Taketa,*
923 F.2d 665 (9th Cir. 1991)...............................................29, 31, 32

*United States v. White,*
401 U.S. 745 (1971) ........................................................................29

*Vernon v. City of Los Angeles,*
27 F.3d 1385 (9th Cir. 1994)...........................................21, 22, 26, 27

*Warth v. Seldin,*
422 U.S. 490 (1975) ..........................................................................3

*Western Radio Servs. Co. v. U.S. Forest Serv.,*
578 F.3d 1116 (9th Cir. 2009),
*cert. denied* 130 S. Ct. 2402 (2010) ....................................13, 14, 17

*Wilkie v. Robbins,*
551 U.S. 537 (2007) ...........................................................13, 14

*Wilson v. Libby,*
535 F.3d 697 (D.C. Cir. 2008),
*cert. denied* 129 S.Ct. 2825 (2009) .....................................15, 16, 17

*Woldeab v. 7-Eleven, Inc.,*
No. 03-0615, 2006 U.S. Dist. LEXIS 82191 (S.D. Cal. Nov 8, 2006) ...........8

*Wolde-Giorgis v. Dillard,*
No. 06-0289, 2006 U.S. Dist. LEXIS 71356 (D. Ariz. Sept. 22, 2006) ..........9

*Wright v. Ill. Dept. of Children & Family Servs.*,
   40 F.3d 1492 (7th Cir. 1994).............................................................8

## FEDERAL STATUTES

42 U.S.C. § 1985(3)..............................................................2, 7, 20

5 U.S.C. § 552a(a)(3)...................................................................15

5 U.S.C. § 552a(e)(7)...................................................................15

5 U.S.C. § 552a(g)(1)(D)..........................................................15, 16

5 U.S.C. § 552a(g)(4)...................................................................15

50 U.S.C. § 1801(f).....................................................................34

50 U.S.C. § 1809.........................................................................34

50. U.S.C. § 1810.......................................................................34

U.S. Const. Amend I.....................................................................24

U.S. Const. Amend. IV..................................................................29

## FEDERAL REGULATIONS

39 C.F.R. § 233.3(c)(1)..................................................................21

## TREATISES

John E. Nowak *et al.*, Handbook on Constitutional Law (1978) ...............28

**SER 178**

## I.     INTRODUCTION

In their First Amended Complaint ("FAC"), Plaintiffs allege in the most conclusory manner that current and former FBI Agents Pat Rose, Kevin Armstrong, and Paul Allen (the "Agent Defendants") directed confidential informant Craig Monteilh to "infiltrate" mosques throughout Southern California as part of a "dragnet" investigation of *all* Muslims "simply because the targets were Muslim" and "without further specification." But the FAC undercuts these allegations by asserting that the FBI had articulated specific and neutral reasons for investigating *these Plaintiffs.* By Plaintiffs' own account, the FBI told Monteilh that it began investigating Plaintiffs because: (a) Plaintiff Fazaga was a "radical"; (b) Plaintiff Malik traveled to Yemen for religious schooling, underwent a dramatic change in behavior and dress, and was denied entry to Saudi Arabia; and (c) Plaintiff AbdelRahim was suspected of being the charismatic leader of a Muslim Brotherhood cell. Plaintiffs do not allege that these specific neutral reasons were pretextual or were not sincerely believed by the Agent Defendants, and thus Plaintiffs' claim of religious discrimination fails.

Even if Plaintiffs had sufficiently *alleged* a discriminatory intent, they will be unable to adduce *evidence* in support of that allegation if the Court sustains the government's assertion of the state secrets privilege. Plaintiffs would be unable to prove their allegations of discriminatory purpose, and the Agent Defendants will be unable to refute them, without access to the potentially privileged evidence. Accordingly, the Agent Defendants join in the government's argument that the religious discrimination claims against the Agent Defendants (the First through Seventh Causes of Action) must be dismissed if the Court sustains the government's assertion of the state secrets privilege.

Each of Plaintiffs' claims fail for additional reasons. *First,* Plaintiffs' Second, Fourth and Seventh causes of action allege a conspiracy among all defendants to violate Plaintiffs' First Amendment and Equal Protection rights, pursuant to 42

U.S.C. § 1985(3). However, as a matter of law, the Agent Defendants cannot conspire with the FBI or other FBI agents under the intracorporate conspiracy doctrine. Moreover, Plaintiffs fail to allege that the Agent Defendants acted with the specific purpose of violating the Plaintiffs' constitutional rights.

*Second,* Plaintiffs' First, Third and Sixth causes of action allege a violation of their First and Fifth Amendment rights pursuant to *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). However, these claims must be dismissed because (a) the Privacy Act is a comprehensive remedial scheme that supplants a *Bivens* remedy for the types of constitutional injuries alleged here, and (b) Plaintiffs have failed to allege that any of the Agent Defendants acted with the specific purpose of discriminating against Plaintiffs.

*Third,* the Agent Defendants are entitled to qualified immunity on all claims, as the constitutional and statutory rights they supposedly violated were not "clearly established" at the time of the alleged violations. Moreover, Defendant Rose is separately entitled to qualified immunity on all claims because Plaintiffs seek to hold her liable under an impermissible *respondeat superior* theory.

For the foregoing reasons, and for the reasons stated in the motions to dismiss filed by (1) Defendants United States of America, Federal Bureau of Investigation ("FBI"), Robert Mueller and Steven Martinez (Docket No. 55) and (2) Defendants Stephen Tidwell and Barbara Walls – each of which the Agent Defendants expressly join – Plaintiffs' FAC should be dismissed.

## II.    FACTUAL BACKGROUND

The factual allegations are capably summarized in the government's motion to dismiss, and need not be repeated at length here. (Docket No. 55 at 7-9.) Instead, the Agent Defendants briefly address the facts relevant to this motion.

### A.    The FBI Had Specific Neutral Reasons For Investigating Plaintiffs

Plaintiffs allege in a conclusory fashion that the FBI targeted Muslims in Orange and Los Angeles counties "because of their religion and religious practice"

and gathered information about them "simply because the targets were Muslim." (FAC ¶¶ 3, 6.) Plaintiffs also describe the FBI's investigation as a "dragnet" and allege that the "central feature of the FBI agents' instructions to Monteilh was their directive that he gather information on Muslims, without any further specification." (*Id.* at ¶¶ 3, 89.) To the extent there was any "further specification" at all, Plaintiffs contend, Agents Armstrong and Allen instructed Monteilh to collect information on "Muslims who were particularly religious." (*Id.*)

However, the Court must consider whether Plaintiffs have alleged that the Agent Defendants violated *these particular Plaintiffs'* rights, not the abstract rights of absent third parties. Plaintiffs generally have no standing to seek a remedy for injuries purportedly (or possibly) suffered by others. *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). Here, Plaintiffs allege facts demonstrating that the FBI had at least *some* basis, apart from religious discrimination, for investigating *these Plaintiffs*.

Plaintiff Fazaga is an imam of the Orange County Islamic Foundation ("OCIF"), a mosque in Mission Viejo which Monteilh purportedly surveilled. (FAC ¶¶ 12, 55, 168.) According to the FAC, Agents Armstrong and Allen told Monteilh at the outset that they suspected Fazaga might be a "radical" for a number of reasons, including the fact he directed students to conduct demonstrations and served as a board member of a prominent Muslim newspaper that spoke out against certain U.S. government policies and actions. (*Id.* at ¶¶ 169-171.)

Plaintiff Malik attended religious services at the Islamic Center of Irvine ("ICOI"). (FAC ¶¶ 13, 69.) Much as they allegedly did with Fazaga, Agents Armstrong and Allen purportedly identified Malik as a "radical" due to his conduct. (FAC ¶¶ 186-188.) In particular, Agents Armstrong and Allen allegedly told Monteilh that the FBI became interested in Malik because he "had been a surfer kid in Newport Beach who wore dyed hair, but had travelled to Yemen to attend a

1   religious school, and had returned to the U.S. wearing traditional Muslim dress and

2   a full beard." (*Id.* at ¶ 186.) Malik admits he traveled to Yemen and also that his

3   dress and appearance changed dramatically during this time period. (*Id.* at ¶¶ 68-69.)

4   According to Plaintiffs, "Agents Armstrong and Allen told Monteilh *that Malik's*

5   *change in behavior* in embracing religion and traditional dress was highly

6   suspicious and for that reason they needed to investigate him." (*Id.* at ¶ 187

7   (emphasis added).) It was Malik's dramatic change in behavior, not his religious

8   practices themselves, that prompted the FBI to investigate Malik. (*Id.*) Indeed, the

9   FAC does not allege that Malik was particularly religious – to the contrary, it states

10  that Malik had fallen "into attending prayers only when it was convenient." (*Id.* at ¶

11  194.) Most significantly, the FAC acknowledges that the FBI told Monteilh that it

12  had started investigating Malik *before* recruiting Monteilh, and had become

13  interested in him because of his association with other individuals and groups

14  already under investigation. (*Id.* at ¶ 189) Moreover, Agents Allen and Armstrong

15  allegedly told Monteilh that the FBI's interest in Malik was further piqued when he

16  was blocked from entering Saudi Arabia after traveling to Yemen. (*Id.* at ¶ 190.)

17       Plaintiff AbdelRahim also attended religious services at ICOI. (FAC ¶¶ 14,

18  80.) AbdelRahim alleges that his home was under surveillance by the FBI before it

19  recruited Monteilh because the FBI feared he was part of (and perhaps the leader of)

20  a Muslim Brotherhood cell. (*Id.* at ¶¶ 200-201.) Plaintiffs also allege that the FBI

21  obtained a warrant to search AbdelRahim's storage unit – an admission that the FBI

22  had *at least* probable cause to believe that contraband or evidence of a crime would

23  be found in that particular place. (*Id.* at ¶ 214.)

24       Admittedly, the FAC couches some of the foregoing justifications for

25  investigating Plaintiffs as statements made by Agents Armstrong and Allen to

26  Monteilh. However, while Plaintiffs appear to dispute the accuracy of some of the

27  FBI's information, they do not allege that these investigative reasons were

28  pretextual or that Agents Allen and Armstrong did not *honestly believe* the

**SER 182**

1  information to be true. The facts alleged above, coupled with Plaintiffs' failure to

2  deny their truth or the Agent Defendants' honest belief in them, undercut the

3  contention that the FBI was motivated solely by religion.

4  **B.    Investigative Techniques Allegedly Employed By the FBI**

5  Plaintiffs' Ninth Cause of Action asserts that Monteilh, without a warrant,

6  (i) recorded conversations where no party consented, (ii) video recorded in homes

7  and other places where Plaintiffs had a reasonable expectation of privacy and

8  (iii) installed electronic listening devices in mosques. (FAC ¶ 251.)

9  With respect to audio recording of conversations, Plaintiffs allege that

10  Monteilh attended and recorded prayer services led by Fazaga and lectures hosted

11  by Fazaga. (*Id.* at ¶¶ 172-173, 178.) This is the sole allegation that Fazaga was

12  recorded by Monteilh. Likewise, AbdelRahim attended Arabic language teachings at

13  ICOI, which Monteilh also attended and recorded. (*Id.* at ¶ 211.) Plaintiffs also

14  allege that Monteilh recorded "conversations he had with AbdelRahim and the other

15  members of [AbdelRahim's] house." (*Id.* at ¶ 201.) Monteilh purportedly recorded

16  Malik "talking in the prayer hall, particularly after *ishaa* prayer." (*Id.* at ¶ 192.)

17  Monteilh also recorded conversations where Malik expressed a desire to pray more

18  regularly. (*Id.* at ¶¶ 194-195.) Plaintiffs also allege that Monteilh possessed a

19  recording device in the form of a key fob or cell phone, that Monteilh left it

20  unattended and recording in various locations throughout the mosque, and that

21  Malik was recorded using these methods. (*See, e.g., id.* at ¶ 192.)

22  With respect to video recording, Plaintiffs allege that Monteilh recorded

23  individuals donating "for some kind of relief for Muslims abroad." (*Id.* at ¶ 182.)

24  Monteilh allegedly also videoed other aspects of OCIF, including "security

25  measures," entrances and exits and a library available for congregants to use. (*Id.* at

26  ¶¶ 174-175.) The FAC does not allege that any of these events or locations were

27  closed to the public. Plaintiffs also allege that Monteilh recorded the interior of

28  AbdelRahim's home, after AbdelRahim invited Monteilh inside, and casual soccer

1    games that AbdelRahim played. (*Id.* at ¶¶ 202, 206.)

2       Finally, Plaintiffs allege that the FBI planted "listening devices" in mosques,

3   and that Agents Allen and Armstrong "caused such electronic surveillance

4   equipment to be installed at the Mission Viejo mosque." (*Id*. at ¶¶ 95, 251.)

5   However, the FAC fails to identify any "listening devices," when they were

6   installed, how Plaintiffs learned of them, who discovered the devices, where in the

7   mosque they were installed, or any other facts to corroborate this allegation.

8       **C.**      **Plaintiffs Learned Of Monteilh's Actions After The Fact**

9       Plaintiffs allege they were ignorant of Monteilh's role as confidential

10   informant during the time he was allegedly working with the FBI. (*See, e.g.,* FAC ¶¶

11   1, 5.) Monteilh's surveillance activities allegedly ended in October 2007, but

12   Plaintiffs claim they did not discover his role until February 24, 2009. (*Id.* at ¶¶ 152,

13   159.) Plaintiffs contend that they "did not know and could not reasonably have

14   known that Monteilh was working for the FBI as an informant" prior to this date.

15   (*Id.* at ¶ 160.) This action followed on February 22, 2011.

16   **III.**    **LEGAL STANDARD UNDER *IQBAL***

17       "To survive a motion to dismiss, a complaint must contain sufficient factual

18   matter, accepted as true, to state a claim to relief that is plausible on its face."

19   *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotes omitted). "A claim has facial

20   plausibility when the plaintiff pleads factual content that allows the court to draw

21   the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

22   Plaintiffs must offer "more than a sheer possibility that a defendant has acted

23   unlawfully." *Id.* To the extent the FAC "pleads facts that are merely consistent with

24   a defendant's liability, it stops short of the line between possibility and plausibility

25   of entitlement to relief." *Id.* (quotations omitted).

26   **IV.**    **PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 1985(3)**

27      **A.**      **Plaintiffs Fail To Allege A Conspiracy Under Section 1985(3)**

28       Plaintiffs' Second, Fourth, and Seventh Causes of Action allege that the

**SER 184**

individual capacity defendants conspired among themselves to violate Plaintiffs' First Amendment and Equal Protection rights, in violation of 42 U.S.C. § 1985(3). (FAC ¶¶ 230, 237, 244.) In order to successfully plead a cause of action pursuant to Section 1985(3), Plaintiffs must allege, in a non-conclusory fashion, four elements: (1) a conspiracy (2) for the purpose of depriving Plaintiffs of the equal protection of the laws or of equal privileges and immunities, and (3) an act in furtherance of the conspiracy (4) that causes injury to the Plaintiffs. *See United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 828-829 (1983). Plaintiffs fail the first element because they do not allege (except in the most conclusory language) that the Agent Defendants reached an agreement or "meeting of the minds" to violate Plaintiffs' constitutional rights. *See, e.g., Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010). The lack of any factual, non-conclusory allegation that any defendant entered into such an agreement is fatal to the Section 1985(3) claims.

In addition, Plaintiffs fail the first element of a Section 1985(3) claim because an entity cannot conspire with its own employees or agents. *See Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1057 (C.D. Cal. 2000). "'It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself anymore than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.'" *Hoefer*, 92 F. Supp. 2d at 1057 (quoting *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir. 1952)); *see also Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983). The Second, Fourth, Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits have extended this "intracorporate conspiracy doctrine" to Section 1985(3) claims, finding that the doctrine's logic applies equally in both contexts. *See Dickerson v. Alachua County Comm'n*, 200 F.3d 761, 768-69 (11th Cir. 2000) (listing Circuits); *Hoefer*, 92 F. Supp. 2d at 1059 (same); *Blunt v. County of Sacramento*, No. 2:04-cv-1743, 2006 U.S. Dist. LEXIS 11099 at *36 (E.D. Cal. Mar. 2, 2006) (noting only the First and Third Circuits ruling contrary to the clear majority).

1    Accordingly, where members of the same corporation or governmental body

2  allegedly conspired with each other while acting in the course and scope of their

3  employment, federal courts have held that the intracorporate conspiracy doctrine

4  bars a Section 1985(3) claim. *See, e.g., Denney v. City of Albany*, 247 F.3d 1172,

5  1190-91 (11th Cir. 2001) (rejecting alleged conspiracy among city employees);

6  *Wright v. Ill. Dept. of Children & Family Servs.,* 40 F.3d 1492, 1508 (7th Cir. 1994)

7  (same for employees of department of children & family services); *Runs After v.

8  United States*, 766 F.2d 347, 354 (8th Cir. 1985) (same for Tribal Council);

9  *Chambliss v. Foote*, 562 F.2d 1015 (5th Cir. 1977), *aff'g*, 421 F. Supp. 12, 15 (E.D.

10  La. 1976) (same for employees of public university).

11    While the Ninth Circuit has not yet decided whether the intracorporate

12  conspiracy doctrine applies to Section 1985 claims, *see Portman v. County of Santa

13  Clara*, 995 F.2d 898, 910 (9th Cir. 1993), the vast majority of California district

14  courts to consider the issue have held that the doctrine does apply. *See, e.g.,

15  Woldeab v. 7-Eleven, Inc*., No. 03-0615, 2006 U.S. Dist. LEXIS 82191, *9 (S.D.

16  Cal. Nov 8, 2006) ("the modern and majority rule is that the [intracorporate

17  conspiracy doctrine] does bar" a 1985(3) claim); *Hoefer*, 92 F. Supp. 2d at 1059; *see

18  also Rabkin v. Dean,* 856 F. Supp. 543, 551 (N.D. Cal. 1994); *Blunt,* 2006 U.S. Dist.

19  LEXIS at *36; *Mory v. City of Chula Vista*, No. 07CV0462, 2008 U.S. Dist. LEXIS

20  9911, *19 (S.D. Cal. Feb. 11, 2008). Ninth Circuit district courts outside of

21  California have also applied the doctrine to Section 1985(3) claims. *See, e.g.,

22  Schmitz v. Mars, Inc*., 261 F. Supp. 2d 1226, 1235 (D. Or. 2003) ("This Court finds

23  most persuasive the analysis of the *Hoefer* court and the majority of circuit courts

24  that have held the [] doctrine applies to § 1985 actions."); *Wolde-Giorgis v. Dillard*,

25  No. 06-0289, 2006 U.S. Dist. LEXIS 71356 (D. Ariz. Sept. 22, 2006).

26    Here, all of the conspirators identified by Plaintiffs are part of a single

27  government entity, the FBI. (FAC ¶¶ 15-22.) Plaintiffs allege that the individual

28  capacity defendants conspired to investigate Plaintiffs because of their practice of

1 Islam, actions taken during the performance of their official (not personal) duties.
2 Because these defendants were all effectively acting as the FBI itself when they
3 entered into their alleged illicit agreement, they could not have engaged in a
4 conspiracy as a matter of law, and Plaintiffs' Section 1985(3) claims fail.

5 **B.** **Plaintiffs Failed To Allege An Unlawful Purpose**

6 A Section 1985(3) conspiracy "for the purpose of depriving … any person or
7 class of persons of the equal protection of the laws, or of equal privileges and
8 immunities under the laws," requires an intent to deprive persons of a protected
9 right. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 274 (1993). As the
10 Supreme Court noted in *Bray*, a

11 conspiracy is not "for the purpose" of denying equal protection simply
12 because it has an effect upon a protected right. The right must be
13 "*aimed at*"; its impairment must be a conscious objective of the
14 enterprise…. [T]he "intent to deprive of a right" requirement demands
15 that the defendant do more than merely be aware of a deprivation of
16 right that he causes, and more than merely accept it; he must act at least
17 in part for the very purpose of producing it.

18 *Id.* at 275-76 (citation omitted) (emphasis in original). Plaintiffs alleging an
19 unlawful conspiracy must plead specific facts in a nonconclusory fashion to survive
20 a motion to dismiss. *See Gooden v. Howard County*, 954 F.2d 960, 969-70 (4th Cir.
21 1992). Simply copying the statute's language to the complaint is inadequate. *Id.*

22 The case law is replete with Section 1985(3) claims that fail this standard. For
23 example, in *Bray*, the Supreme Court reversed an injunction prohibiting
24 demonstrations at abortion clinics, holding, *inter alia*, that the abortion clinics had
25 not demonstrated that the constitutionally protected right alleged to have been
26 violated by the protestors (the right to travel interstate) was a "conscious objective
27 of the enterprise" as opposed to a right merely incidentally affected. *Bray*, 506 U.S.
28 at 275. The Court explained that "Petitioners oppose abortion, and it is irrelevant to

1    their opposition whether the abortion is performed after interstate travel." *Id.* at 276.

2    The Court also noted that "a conspiracy to rob an interstate traveler would not, of

3    itself, violate [18 U.S.C.] § 241 [the criminal counterpart to 1985(3)]. But if the

4    *predominant purpose* of the conspiracy is to impede or prevent the exercise of the

5    right of interstate travel, or to oppress a person because of his exercise of that right,

6    then . . . the conspiracy becomes a proper object of [Section 241]." *Id.* at 275

7    (internal quotation marks omitted) (emphasis added).

8                    **1.      Failure To Allege Purpose Of Interfering With Religion**

9              Courts analyzing Section 1985(3) claims have found conscious interference

10   with the plaintiff's religious liberties when the defendant's conduct was intended to

11   disrupt services. For example, in *Action v. Gannon,* 450 F.2d 1227 (8th Cir. 1971),

12   members of a predominantly white Catholic parish sued the Black Liberation Front

13   and an interracial organization to enjoin those groups from disrupting religious

14   services. The defendants allegedly entered the church during services, formed a line

15   in front of the communion rail, blocked the area where services were to be held

16   (resulting in cancellation of the services), and otherwise actively disrupted the

17   congregants' rights of freedom of assembly and worship. *Id.* at 1229-30. The Eighth

18   Circuit held that this purported scheme was cognizable under Section 1985(3), as

19   the purpose of the conspiracy was to interfere with the plaintiffs' First Amendment

20   rights of freedom of assembly and worship. *Id.* Likewise, in *Hobson v. Wilson*, 737

21   F.2d 1 (D.C. Cir. 1984), the purpose of the alleged conspiracy was to disrupt and

22   impede plaintiffs' efforts to associate with others to express opposition to the

23   Vietnam War and other government actions. *Hobson,* 737 F.2d at 9. To accomplish

24   that goal, the FBI allegedly distributed false press releases tarnishing the reputation

25   of one of the members of the targeted group and encouraged sources to "stimulate

26   dissension" in the group. *Id.* at 12. These deliberate efforts to disrupt the exercise of

27   First Amendment rights were actionable under Section 1985(3).

28             In contrast to the plaintiffs in *Action* and *Hobson*, here Plaintiffs allege no

1  similar purposeful violation of their First Amendment rights. They allege no
2  deliberate disruption of their religious activities or other actions to dissuade
3  members from attending services. Indeed, the allegedly violative conduct was *covert*
4  – meaning that Plaintiffs *were not supposed to find out about it*. (*See e.g.* FAC ¶ 160
5  ("Plaintiffs did not know and could not reasonably have known that Monteilh was
6  working for the FBI as an informant").) A covert investigation cannot be intended to
7  dissuade the investigative target from attending services because, by definition, the
8  target does not know about the investigation. To the extent Plaintiffs' rights of
9  freedom of assembly and worship were allegedly affected, this occurred only *after*
10 Monteilh ceased being an informant and his previous activities were revealed.
11 Plaintiffs' alleged injury was thus *incidental* to the alleged conspiracy to conduct
12 surveillance, not its purpose, as in *Action* and *Hobson*. If it had been the Agent
13 Defendants' conscious objective to deprive Plaintiffs of their rights, then the scheme
14 would undoubtedly have been an overt plan to impede gatherings of Muslims at
15 mosques or to otherwise inhibit their religion, rather than a covert investigation
16 about which Plaintiffs were deliberately kept ignorant. Thus, Plaintiffs have not
17 sufficiently alleged that the Agent Defendants acted with the purpose of depriving
18 Plaintiffs of their First or Fifth Amendment rights.

19           ## 2.    *Failure to Allege Purposeful Discrimination*

20           Presumably, Plaintiffs will argue that they have alleged a purposeful violation
21 of their rights because the Agent Defendants intentionally discriminated against
22 them on the basis of religion. But this argument also fails, because Plaintiffs allege
23 in the FAC that the FBI began investigating them for neutral reasons. Specifically,
24 they allege that Agents Armstrong and Allen told Monteilh that the FBI feared that
25 Plaintiff Fazaga was a "radical." (FAC ¶¶ 168-171.) They also allege that Plaintiff
26 Malik traveled to Yemen for religious schooling and underwent a dramatic change
27 in behavior and dress. (*Id.* at ¶¶ 68-69, 186-187.) Plaintiffs further allege that Agents
28 Allen and Armstrong told Monteilh to investigate Malik because "*Malik's change in*

*behavior* in embracing religion and traditional dress was highly suspicious." (*Id.* at ¶ 187 (emphasis added).) That is, the FBI was concerned with Malik's change in behavior, not his religious practice *per se*. Agents Allen and Armstrong also allegedly told Monteilh that Malik had been denied entry into Saudi Arabia. (*Id.* at ¶ 190.) Similarly, Plaintiffs allege that the government obtained a search warrant of Plaintiff AbdelRahim's storage unit – necessarily admitting that the government had *at least* probable cause to believe the storage unit contained contraband or evidence of a crime. (*Id.* at ¶ 214.); *see Illinois v. Gates*, 462 U.S. 213, 238 (1983) (stating that a magistrate must find that probable cause exists before issuing a warrant); *see also United States v. Parks*, 285 F.3d 1133, 1142 (9th Cir. 2000) (same). Moreover, Plaintiffs allege that the FBI told Monteilh of their concern that AbdelRahim might be part of – or perhaps the leader of – a terrorist cell. (*Id.* at ¶¶ 200-201.) Plaintiffs nowhere allege that any of these concerns were pretextual or not sincerely held by any defendant, let alone the Agent Defendants.[1]

### 3. Inability to Prove Purposeful Disruption or Discrimination

Even if Plaintiffs had sufficiently *alleged* an intent to disrupt Plaintiffs' religious practice or a discriminatory purpose, the government's assertion of the state secrets privilege could preclude *evidence* supporting that allegation. If the Court upholds the government's assertion of the privilege, this will foreclose inquiry into the "reasons for counterterrorism investigation and results," including information about "the predicate for an FBI counterterrorism investigation of a particular person," like each Plaintiff. (Docket No. 55 at 43:8-12.) With the question of *why* the government investigated these particular Plaintiffs off the table, Plaintiffs

---

[1] In their First Amended Complaint, Plaintiffs allege that, upon re-entering the U.S. in 2006, Malik informed some unidentified U.S. officials that he actually did *not* attempt to enter Saudi Arabia during his travels. However, Plaintiffs fail to allege how or why the Agent Defendants would have come to know this information.

1  cannot prevail on their claim that the government intended to disrupt religion or

2  intended to discriminate on the basis of religion. Similarly, the Agent Defendants

3  will be unable to defend themselves from this charge. Accordingly, dismissal is

4  appropriate. *See Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998.)

5  **V.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER *BIVENS***

6  **A.      Plaintiffs' *Bivens* Claims Are Precluded By The Privacy Act**

7          Plaintiffs' First, Third and Sixth Causes of Action seek monetary damages for

8  violations of the Free Exercise, Establishment and Equal Protection Clauses directly

9  under the First and Fifth Amendments to the United States Constitution pursuant to

10 *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388

11 (1971). (FAC ¶¶ 227, 232, 241.) However, the Supreme Court has never recognized

12 a *Bivens* action for violations of the Free Exercise, Establishment or Equal

13 Protection Clauses. *See, e.g., Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (noting

14 that the Supreme Court has recognized *Bivens* claims in just three contexts:

15 unreasonable searches in violation of the Fourth Amendment, employment

16 discrimination in violation of the Due Process Clause, and prisoner abuse under the

17 Eighth Amendment). Accordingly, Plaintiffs have no "automatic entitlement" to a

18 judicially devised cause of action for money damages under *Bivens. Id.*

19         "In *Wilkie*, the Court distilled its 35-year history of *Bivens* jurisprudence into

20 a two-step analysis for determining congressional intent as to the appropriateness of

21 a *Bivens* remedy." *Western Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116,

22 1120 (9th Cir. 2009). "First, the Court determines whether there is 'any alternative,

23 existing process for protecting' the plaintiff's interests." *Id.* "Such an alternative

24 remedy would raise the inference that Congress 'expected the Judiciary to stay its

25 *Bivens* hand' and 'refrain from providing a new and freestanding remedy in

26

27

28

1    damages.'" *Id.* (*citing Wilkie,* 551 U.S. at 550, 554).[2]

2        The Supreme Court has repeatedly found that Congressional action has

3    foreclosed the creation of a *Bivens* remedy for the same types of constitutional

4    injuries alleged here. *See, e.g., Bush v. Lucas*, 462 U.S. 367, 388 (1983) (claim

5    precluded by an "elaborate remedial system" – culminating with the Civil Service

6    Reform Act – for dealing with federal employee claims of First Amendment

7    discrimination); *Schweiker v. Chilicky*, 487 U.S. 412, 421 (1988) (Social Security

8    Act precluded Fifth Amendment due process claim). The Ninth Circuit has

9    identified several statutory schemes that preclude *Bivens* claims, including claims

10   arising under the Fifth and First Amendments. *See, e.g., Kotarski v. Cooper*, 866

11   F.2d 311, 312 (9th Cir. 1989) (following *Bush*); *Western Radio*, 578 F.3d at 1117

12   (Administrative Procedures Act bars First and Fifth Amendment claims); *Adams v.*

13   *Johnson*, 355 F.3d 1179 (9th Cir. 2004) (Internal Revenue Code bars First and Fifth

14   Amendment claims); *Libas Ltd. v. Carillo*, 329 F.3d 1128, 1130 (9th Cir. 2003)

15   (customs laws bar claims presumably brought under Fifth Amendment); *Berry v.*

16   *Hollander*, 925 F.2d 311, 314 (9th Cir. 1991) (Veterans Administration regulations

17   bar First and Fifth Amendment regulations).

18       In 1974, Congress enacted the Privacy Act in order to set forth "detailed

19   instructions" governing the government's "collection, maintenance, use, and

20   dissemination of information" about individuals in agency records. *Doe v. Chao*,

21   540 U.S. 614, 618 (2004); *see also* 5 U.S.C. § 552a(a)(3). Of particular relevance

22   here, the Privacy Act explicitly requires federal agencies to "maintain no record

23   describing how any individual exercises rights guaranteed by the First Amendment"

24

25   _____

26   [2] The second step involves determining "whether there are nevertheless 'factors
     counseling hesitation' before devising such an implied right of action." *Id.* at 1120.

27   The Agent Defendants join in Defendants Walls and Tidwell's and Defendants
     United States of America, FBI, Mueller and Martinez's analysis of this second step.

28

SER 192

unless certain exceptions apply. 5 U.S.C. § 552a(e)(7). The term "maintain" as used in subsection (e)(7) includes "collect." *Id.* § 552a(a)(3). Thus, the Privacy Act limits the government's ability to collect information on a citizen's religious activity.

Congress also crafted a carefully calibrated set of judicial remedies for violations of the Privacy Act, including violations of the constitutional provisions of subsection (e)(7). A citizen aggrieved by a violation of the Privacy Act may bring a civil suit against the agency, and obtain a minimum $1000 in damages, plus attorneys' fees in all cases where the agency's conduct was willful or intentional. 5 U.S.C. § 552a(g)(1)(D), (g)(4); *see generally Cooper v. FAA*, 596 F.3d 538, 543 (9th Cir. 2010) (describing remedies available under the Privacy Act).

Courts have recognized that the Privacy Act is a comprehensive remedial scheme that supplants *Bivens* claims. In *Downie v. City of Middleburg Heights*, 301 F.3d 688 (6th Cir. 2002), a former informant sued federal officers who allegedly disseminated false information about him in violation of the First Amendment, because he criticized an ongoing investigation. The Sixth Circuit refused to imply a *Bivens* remedy under the First Amendment "because the Privacy Act is a comprehensive legislative scheme that provides a meaningful remedy for the kind of wrong" informant alleged. *Id.* at 696. Because each of the informants' constitutional claims arose out of the "the creation, maintenance, and dissemination of false records," dismissal of the *Bivens* claim was warranted. *Id.*

More recently, in *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008), *cert. denied* 129 S. Ct. 2825 (2009), Valerie Wilson and Joseph Wilson sued, among others, Vice President Richard Cheney, for disclosing Valerie Wilson's status as a covert agent for the CIA. "The Wilsons' *Bivens* claims were based on alleged violations of their Fifth Amendment rights to equal protection of the laws, of Joseph Wilson's First Amendment right to freedom of speech, and of Valerie Wilson's Fifth Amendment rights to privacy and property." *Id.* at 703. As in *Downie*, the *Wilson* court held that the Privacy Act was a "'comprehensive scheme' that stops us from providing

1    additional remedies under *Bivens*." *Id.* at 707. Even though the Wilsons "pled in

2    terms of privacy, property, due process, or the First Amendment," the Court

3    concluded that they sought damages "from the improper disclosure of information

4    covered by the Privacy Act," and therefore dismissed the *Bivens* claim. *Id.*

5         Plaintiffs' *Bivens* claims here allege harm from the improper "collection" of a

6    "record describing how any individual exercises rights guaranteed by the First

7    Amendment" – conduct which is expressly prohibited by the Privacy Act.

8    Throughout the complaint, Plaintiffs allege that the FBI "gathered the information

9    [about Plaintiffs] simply because the targets were Muslim." (*See, e.g.,* FAC ¶ 3.)

10   Indeed, the First, Third and Sixth Causes of Action under *Bivens* each seek relief for

11   a supposed "scheme to target Plaintiffs for surveillance because of Plaintiffs'

12   adherence to and practice of the religion of Islam." (*Id.* at ¶¶ 227, 232, 241.)

13        Congress fashioned the Privacy Act to remedy precisely the injury alleged

14   here: that a federal agency would collect information on how Plaintiffs "exercise

15   rights guaranteed by the First Amendment." 5 U.S.C. § 552a(e)(7). Indeed, Plaintiffs

16   cannot dispute that their complaint falls within the ambit of the Privacy Act, in light

17   of their Eighth Cause of Action, which asserts a violation of the very subsection

18   (e)(7) of the Privacy Act that precludes their *Bivens* claims. Specifically, the Eighth

19   Cause of Action alleges that the FBI "collected and maintained records describing

20   how Plaintiffs exercise their rights to free speech and free exercise of religion

21   guaranteed by the First Amendment." (FAC ¶ 246.) As Plaintiffs admit in their

22   Eighth Cause of Action, the Privacy Act provides them with a remedy for the

23   constitutional violation alleged in the FAC.

24        Admittedly, the Privacy Act limits Plaintiffs to recovery of damages from the

25   United States, and not from the Agent Defendants individually. But this does not

26   save Plaintiffs' *Bivens* claims. When "the design of a Government program suggests

27   that Congress has provided what it considers adequate remedial mechanisms for

28   constitutional violations that may occur in the course of its administration, we have

**SER 194**

1    not created additional *Bivens* remedies." *Western Radio,* 578 F.3d at 1120 (citations

2    omitted). Indeed, the plaintiffs in *Wilson* argued that "the Privacy Act should not be

3    found comprehensive and preclusive of Bivens remedies here because three

4    defendants [including Vice President Cheney] in this case are exempted from its

5    terms." *Wilson,* 535 F.3d at 707. However, the D.C. Circuit rejected this argument,

6    noting that "[t]he failure of the Privacy Act to provide complete relief to the

7    Wilsons, however, does not undermine its status as a 'comprehensive scheme' that

8    stops us from providing additional remedies under *Bivens*." *Id.* Congress need not

9    grant a remedy for every constitutional wrong in order to supplant the *Bivens*

10   remedy: that Congress has acted is enough to defeat an implied right of action for

11   damages under *Bivens*. Accordingly, the Agent Defendants' motion to dismiss the

12   First, Third and Sixth Causes of Action should be granted.

13             **B.       Plaintiffs Fail To Allege An Unlawful Purpose**

14             Much like Section 1985(3), a discrimination claim under *Bivens* requires that

15   Plaintiffs allege an intentional violation of Plaintiffs' rights. *Iqbal*, 129 S. Ct. at

16   1948-49 (2009). The Court noted that "[w]here the claim is invidious discrimination

17   in contravention of the First and Fifth Amendments, our decisions make clear that

18   the plaintiff must plead and prove that the defendant acted with discriminatory

19   purpose." *Id.* at 1948. This purpose is "more than 'intent as volition or intent as

20   awareness of consequences.'" *Id.* (*quoting Pers. Admin'r of Mass. v. Feeney*, 442

21   U.S. 256, 279 (1979).) "It instead involves a decisionmaker's undertaking a course

22   of action because of, not merely in spite of, the action's adverse effects upon an

23   identifiable group." *Id.* (alterations omitted). In other words, Plaintiffs must show

24   that the policy at issue was adopted "not for a neutral, investigative reason but for

25   the purpose of discriminating on account of … religion." *Id.* at 1949. This intent

26   must be supported by factual allegations, not mere conclusions. *Iqbal*, 129 S. Ct. at

27   1949 ("pleading that offers labels and conclusions or a formulaic recitation of the

28   elements of a cause of action will not do.")

As described above, Plaintiffs fail to allege that any Defendant acted with the requisite purpose to establish Plaintiffs' First and Fifth claims. (*See* Parts IV.B.1 and B.2, *supra*.) Moreover, even if Plaintiffs adequately *allege* a discriminatory purpose, they will be unable to obtain *evidence* on that point if the Court sustains the government's assertion of the state secrets privilege. (*See* Part IV.B.3, *supra*.)

## VI. THE AGENT DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

### A. Legal Standard For Evaluating Qualified Immunity

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate any clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 2083. The Court is free to address the two inquiries of qualified immunity in any order. *Pearson*, 555 U.S. at 236.

### B. Defendant Rose Is Entitled To Qualified Immunity Under *Iqbal*

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), courts have evaluated the sufficiency of the allegations of the defendant's personal involvement in the deprivation of the right at the second stage of the qualified immunity analysis.

SER 196

1  "Government officials may not be held liable for the unconstitutional conduct of

2  their subordinates under a theory of *respondeat superior*." *Iqbal*, 129 S. Ct. at 1948.

3  Because vicarious liability is inapplicable to a federal constitutional tort suit, a

4  plaintiff must plead that each Government official, through the official's own

5  individual actions, has violated the Constitution. *Id.*

6        Plaintiffs allege that Defendant Rose was the Special Agent in charge of the

7  entire Santa Ana branch office and who supervised Agents Armstrong and Allen

8  during the time period in question. (FAC ¶ 22.) However, out of 260 paragraphs in

9  the FAC, only four refer to Defendant Rose. Of those four paragraphs, only two

10  have anything to do with the allegations at the core of this case. First, Plaintiffs

11  allege that "Defendant Rose was regularly apprised of the information Agents

12  Armstrong and Allen collected through Monteilh; directed the action of FBI agents

13  on various occasions based on that information; and actively monitored, directed,

14  and authorized the actions of Agents Armstrong and Allen at all times relevant in

15  this action." (FAC ¶ 22.) Second, Plaintiffs allege that that Defendant "Rose

16  maintained extremely close oversight and supervision of Monteilh [and] knew in

17  great detail the nature and scope of the operation, including the methods of

18  surveillance Monteilh used and the criteria used to decide his targets, and

19  continually authorized their ongoing use." (FAC ¶ 138.) These are allegations of

20  *respondeat superior*, nothing more.[3]

21        Moreover, these allegations lack factual detail and are nothing more than the

22  sort of conclusions the Supreme Court rejected in *Iqbal*, where the respondent

23  alleged that the petitioners "knew of, condoned, and willfully and maliciously

24

25  ─────────────────

26  [3] Plaintiffs also allege that Defendant Rose gave a speech at the Irvine Pacific Club,
and also planned to open a "Muslim gym" so that the FBI could monitor Muslims
27  while they exercised. (FAC ¶¶ 22, 43, 145.) The FAC does not seek any relief for
these supposed actions by Rose, so these allegations are irrelevant.

28

SER 197

agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national original and for no legitimate penological interest.'" *Iqbal*, 129 S. Ct. at 1951. The Supreme Court held that these allegations were not entitled to the assumption of truth because they were a mere "'formulaic recitation of the elements' of a constitutional discrimination claim." *Id*. at 1951. "As such, the allegations [were] conclusory and not entitled to be assumed true." *Id*. Plaintiffs' complaint similarly fails to plead sufficient facts to state a claim against Defendant Rose.

## C.    Qualified Immunity Bars The Free Exercise And RFRA Claims

Plaintiffs' First, Second, Third, Fourth, Fifth, Sixth and Seventh Causes of Action, alleged under *Bivens* and 42 U.S.C. § 1985(3) for First and Fifth Amendment violations, are barred by the intracorporate conspiracy doctrine, precluded by the Privacy Act, must be dismissed for failure to adequately plead a specific intent or purpose to violate the Plaintiffs' rights, and must be dismissed if the state secrets privilege forecloses inquiry into the government's specific intent. (*See* Parts IV and V, *supra*.) However, even if the Court reaches the merits of Plaintiffs' constitutional and statutory violations, qualified immunity nevertheless shields the Agent Defendants from personal liability.

### 1.    *Plaintiffs Allege No Burden On Their Free Exercise Of Religion*

Plaintiffs' Third and Fourth Causes of Action allege a violation of the Free Exercise Clause of the First Amendment, while the Fifth Cause of Action alleges a violation of the Religious Freedom Restoration Act ("RFRA").[4] To prevail, Plaintiffs must allege that the Agent Defendants have burdened their free exercise of

---

[4] RFRA protects the same religious freedoms embodied by the Free Exercise Clause*,* and therefore these causes of action are addressed collectively. *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1070 (9th Cir. 2008).

religion. *See Vernon v. City of Los Angeles*, 27 F.3d 1385, 1393 (9th Cir. 1994). The free exercise of religion can be burdened *only* when "individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*)[,] or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." *Navajo Nation*, 535 F.3d at 1070. For example, in *Navajo Nation*, plaintiffs alleged that the government's use of recycled wastewater on a sacred mountain imposed a substantial burden on their exercise of religion in violation of RFRA.[5] *Id.* at 1062-63. The Ninth Circuit found that the use of the recycled wastewater did not constitute a substantial burden because the plaintiffs were not forced "to choose between following the tenets of their religion and receiving a governmental benefit" and were not coerced "to act contrary to their religion under the threat of civil or criminal sanctions." *Id.* at 1070.

A government investigation does not impose a burden on the free exercise of religion unless it coerces the target of the investigation to do (or not do) something. For instance, in *Gering*, an ordained minister challenged the government's use of a mail cover (*see* 39 C.F.R. § 233.3(c)(1)) to investigate the contributors to a sponsorship program. *United States v. Gering*, 716 F.2d 615, 618 (9th Cir. 1983). The minister argued that the mail cover amounted to a *per se* violation of his religious rights under the First Amendment, because "the mere potential for abridgement of religious freedom should invalidate the mail cover." *Id.* at 619. The Ninth Circuit rejected this argument, holding that the mere potential for abridgement of First Amendment rights without some showing that "the mail covers were improperly used and burdened his free exercise or associational rights" was insufficient to show a violation. *Id.* at 620.

_____

[5] The Ninth Circuit explained that there is no distinction between "burden" or "substantial burden," as the United States Supreme Court has used the terms interchangeably. *Navajo Nation*, 535 F.3d at 1075 n.17.

SER 199

Similarly, in *Vernon*, a retired Assistant Chief of the Los Angeles Police Department claimed that a government investigation "retarded him in the exercise of his religious beliefs, including worship, consultation with his pastor, participation in Christian fellowship, and giving public testimony to his faith without severe consequences." *Vernon*, 27 F.3d at 1390. The district court found that plaintiff Vernon failed to establish a substantial burden on his free exercise, finding it "inadequate for a plaintiff merely to allege that government action subjectively 'chills' his religious behavior, especially where the government action is neither regulatory, proscriptive, or compulsory in nature." *Id.* at 1394 (quoting district court's order). On appeal, the Ninth Circuit affirmed, characterizing Vernon's claims as "mere subjective chilling effects with neither 'a claim of specific present objective harm nor a threat of specific future harm.'" *Id.* at 1395 (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)). The Court noted that such "chilling effects" are not constitutionally cognizable. *Id.* at 1395.

Here, Plaintiffs have alleged no actions by the Agent Defendants that burden their free exercise of religion. At most, Plaintiffs allege some reluctance to engage in religious practices well after Monteilh's role in the investigation ended. (*See* FAC ¶¶ 64-65, 78, 183, 185, 196-197.) However, Plaintiffs fail to allege any action on the part of the Agent Defendants, through the use of the informant or otherwise, that forced them to choose between following the tenets of their religion and receiving a governmental benefit, or that coerced them to act contrary to their religious beliefs by the threat of civil or criminal sanctions. Plaintiffs allege nothing more than "mere subjective chilling effects," which are insufficient as a matter of law to burden religion. Without such a burden, the Plaintiffs cannot state a cause of action for violation of the Free Exercise Clause or RFRA.

## 2. *The Investigation Advanced A Compelling Government Interest*

Even if Plaintiffs had alleged a cognizable burden on their religious rights, the

mere existence of that burden is not enough to violate the Free Exercise Clause or RFRA. Neither the Free Exercise Clause nor RFRA prohibit the government from burdening the free exercise of religion if the action is "justified by a compelling government interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993); *Navajo Nation*, 535 F.3d at 1068. It appears that Plaintiffs contend that because the investigation was motivated by naked discrimination, the government could have had no legitimate purpose.

Yet Plaintiffs allege in the FAC that the FBI began investigating them for neutral, investigative reasons, namely because the FBI (a) believed that Plaintiff Fazaga espoused "radical" beliefs ; (b) believed that Plaintiff Malik traveled to Yemen for religious schooling, thereafter underwent a dramatic change in behavior and dress, and was unable to enter Saudi Arabia; and (c) believed that Plaintiff AbdelRahim was the charismatic leader of a terrorist cell. (*See* Part IV.B.2, *supra*.) Thus, despite the claim that the investigation targeted Plaintiffs solely because of their religion, the FAC actually alleges that the FBI's concern was investigating potential terrorism. As a result, any burden on the Plaintiffs' religious beliefs was justified by a compelling government interest, because "[i]t is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (internal citations omitted).

Even if Plaintiffs had sufficiently *alleged* discriminatory purpose, the government's assertion of the state secrets privilege could preclude *evidence* supporting that claim. If the Court upholds the government's assertion of the privilege, it will take the question of *why* the government investigated these particular Plaintiffs off the table. (*See* Part IV.B.3, *supra*.) Accordingly, the Free Exercise and RFRA claims should be dismissed.

Moreover, Plaintiffs fail to allege that the use of Monteilh as a confidential informant in the alleged investigation was not narrowly tailored, or the least restrictive means, to further the government's interest in preventing terrorism. The

1    Free Exercise Clause requires that government action be narrowly tailored to further

2    a compelling government interest, *Lukumi*, 508 U.S. at 531-32, while RFRA

3    requires that the government employ the least restrictive means to further a

4    compelling government interest. *Navajo Nation*, 535 F.3d at 1068. The Fourth

5    Amendment determines the limits of government investigations, and, as explained in

6    greater detail below, Plaintiffs fail to allege facts demonstrating that the Agent

7    Defendants' use of Monteilh violated the protections of Fourth Amendment.

8    Standing alone, the First Amendment does not "prohibit law enforcement officials

9    from using an indispensable method of criminal investigation appropriate in any

10   other circumstance." *United States v. Aguilar*, 883 F.2d 662, 705 (9th Cir. 1988).

11   Because the use of a confidential informant is permitted by the Fourth Amendment,

12   Plaintiffs have failed to allege that the investigation was not narrowly tailored, nor

13   the least restrictive means, to further the government's interest in investigating

14   potential threats to national security.

### 3.   The Agent Defendants Are Entitled To Qualified Immunity

16   For the foregoing reasons, Plaintiffs have failed to allege a violation of the

17   Free Exercise Clause or RFRA, which ends the qualified immunity analysis. For the

18   same reasons, any violation of Plaintiffs' rights was not "clearly established" at the

19   time of the alleged violation. The authorities cited above reveal that it is at best an

20   open question whether an undercover or covert criminal investigation can burden

21   free exercise rights, especially where the investigation fails to condition any benefit

22   or sanction on the exercise of those rights and where there is no allegation that the

23   investigation was pursued for the purpose of discrimination rather than for "a

24   neutral, investigative reason." *Iqbal*, 129 S. Ct. at 1494.

### D.   Qualified Immunity Bars The Establishment Clause Claims

26   Plaintiffs' First and Second Causes of Action allege a violation of the

27   Establishment Clause of the First Amendment, which prohibits any law "respecting

28   an establishment of religion." U.S. CONST. AMEND I. The FAC does not allege that

1    Defendants Allen or Armstrong had any authority over the broader FBI

2    investigation of Southern California mosques. Therefore, Plaintiffs' Establishment

3    Clause claims against Allen and Armstrong are limited to the handling of Monteilh.

4         The United States Supreme Court has interpreted the Establishment Clause to

5    forbid not only the preference but also the hostility towards any religion. *Nurre v.*

6    *Whitehead*, 580 F.3d 1087, 1095-96 (9th Cir. 2009). The Ninth Circuit applies the

7    traditional test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) to determine

8    whether the government's actions have offended the Establishment Clause. *Id.* at

9    1095-96. In order to state a claim under the Establishment Clause, Plaintiffs must

10   allege that Government (1) did not have a secular purpose for its conduct, (2) that its

11   principal or primary effect was the advancement or inhibition of religion, and (3)

12   that it fostered an excessive governmental entanglement with religion. *Id.*

13              **1.    *Plaintiffs Fail To Allege Improper Purpose***

14        The first prong of the *Lemon* test requires Plaintiffs to allege that "the

15   government's actual purpose is to endorse or disapprove of religion." *Kreisner v.*

16   *City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993) (*quoting Lynch v. Donnelly*, 465

17   U.S. 668, 673 (1984) (O'Connor, J., concurring).) Government action will survive

18   the purpose prong unless the "government acts with the ostensible and predominant

19   purpose of inhibiting religion." *Nurre*, 580 F.3d at 1096 (internal quotations and

20   citations omitted). "A reviewing court must be reluctant to attribute unconstitutional

21   motives to government actors in the face of a plausible secular purpose." *Kreisner*, 1

22   F.3d at 782 (internal quotations and citations omitted).

23        Plaintiffs fail to allege that the Agent Defendants used Monteilh with the

24   purpose of inhibiting religion or even to discriminate among religions. First, the

25   FAC admits that the investigation was covert, which is utterly inconsistent with an

26   intent to inhibit religion. (*See* Part IV.B.1, *supra*.) Second, the FAC alleges that

27   there were neutral, investigative reasons for the FBI's investigation of these

28   particular Plaintiffs. (*See* Part IV.B.2, *supra*.) Third, even if Plaintiffs adequately

*allege* a discriminatory purpose or an intent to inhibit religion, they will be unable to obtain *evidence* on that point if the Court sustains the government's assertion of the state secrets privilege. (*See* Part IV.B.3, *supra*.)

### 2. Plaintiffs Fail To Allege the Sending of A Message

The second prong of the *Lemon* test requires Plaintiffs to plead that government action "could be construed as sending primarily a message of… disapproval of religion." *Vernon*, 27 F.3d at 1398 (*citing County of Allegheny v. ACLU*, 492 U.S. 573, 592-93 (1989)). Government action has the primary effect of disapproving of religion if it is likely to be perceived by nonadherents of the controlling denominations as a disapproval of their religious choices. *Nurre*, 580 F.3d at 1096. However, "[t]his is an objective test, asking whether a reasonable observer who is 'informed and familiar with the history of the government practice at issue,' would perceive the action as having a non-secular effect." *Id.* (internal citations and quotations omitted). "[T]he key consideration in this second prong analysis is whether the government action 'primarily' disapproves of religious beliefs." *Vernon,* 27 F.3d at 1398.

Just because it is *possible* to infer disapproval of religion from government action does not mean the second prong of the *Lemon* test is satisfied. In *Vernon*, the plaintiff challenged an investigation to determine "whether his religious views were having an impermissible effect on his on-duty police department performance." *Vernon*, 27 F.3d at 1388. The court rejected Vernon's challenge to the investigation, even though Vernon's religious beliefs were the subject of the investigation. The court found that, because the primary purpose of the investigation was "any possible impermissible or illegal" conduct, disapproval of religion could not be "objectively construed as the primary focus or effect of the investigation." *Id.* at 1398-99.

Here, Plaintiffs fail to allege that the Agent Defendants' actions could be construed as sending a message of disapproval of Islam. To the contrary, Plaintiffs admit that the investigation was covert and unknown to them while it was ongoing.

(*See* Part IV.B.1, *supra*.) Because the government's admitted purpose was to *conceal* the investigation from Plaintiffs – and from any other potential targets of the investigation – disapproval of religion could not be objectively construed as the primary focus or effect of the investigation. Defendants cannot "send a message" of disapproval through action that neither Plaintiffs nor anyone else knew about.

### 3.  Plaintiffs Failed To Plead Excessive Entanglement

The third and final prong of the *Lemon* test requires a showing that the government action "foster[s] excessive entanglement with religion." *Lemon*, 403 U.S. at 613. Not all entanglements violate the Establishment Clause: only those "that demonstrate that a government program has the impermissible effect of evidencing hostility toward religion" are prohibited. *Nurre*, 580 F.3d at 1097. "The entanglement prong seeks to minimize the interference of religious authorities with secular affairs and secular authorities in religious affairs." *Cammack v. Waihee*, 932 F.2d 765, 780 (9th Cir. 1991). Here, Plaintiffs fail to allege any interference with religious affairs, nor can they, when the covert nature of the investigation necessarily precludes any entanglement. (*See* Part IV.B.1, *supra*.)

### 4.  The Agent Defendants Are Entitled To Qualified Immunity

For the foregoing reasons, Plaintiffs have failed to allege a violation of the Establishment Clause, which ends the qualified immunity analysis. For the same reasons, any violation of Plaintiffs' rights was not "clearly established" at the time of the alleged violation. This is particularly true here, because when "the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered clearly established at least in the absence of closely corresponding factual and legal precedent." *Devereaux v. Perez*, 218 F.3d 1045, 1055 (9th Cir. 2000) (internal citations and quotations omitted). The authorities cited above reveal that it is, at best, an open question whether a covert criminal investigation whose admitted purpose is investigating terrorists can send a message of disapproval of religion. Accordingly, Plaintiffs fail to allege that the

1  Agent Defendants knowingly violated Plaintiffs' rights.

2  **E.  Qualified Immunity Bars The Equal Protection Claims**

3  Plaintiffs' Equal Protection claims are subsumed by, and are co-extensive

4  with, Plaintiffs' First Amendment claims, as "[i]t is generally unnecessary to

5  analyze laws which burden the exercise of First Amendment rights by a class of

6  persons under the equal protection guarantee, because the substantive guarantees of

7  the Amendment serve as the strongest protection against the limitation of these

8  rights." *Orin v. Barclay*, 272 F.3d 1207, 1213 (9th Cir. 2001) (*citing* John E. Nowak

9  *et al.*, Handbook on Constitutional Law (1978)).

10  In *Orin*, a protestor was told by a community college official that he could

11  conduct an anti-abortion protest on campus only if he refrained from, among other

12  things, couching his protest in overtly religious terms. *Id.* at 1211. After his

13  subsequent arrest at the protest, Plaintiff sued the college official, a police officer,

14  and others under 42 U.S.C. §§ 1983 and 1985(3) for, *inter alia*, violation of the

15  Equal Protection Clause and his First Amendment free exercise rights. *Id.* The Ninth

16  Circuit, noting that Plaintiff's Equal Protection claim appeared to be "no more than

17  a First Amendment claim dressed in equal protection clothing," held it subsumed by,

18  and co-extensive with, his First Amendment claim, and thus analyzed Plaintiff's free

19  exercise claims directly rather than as a component of his Equal Protection claim.

20  *Id.* Here, Plaintiffs' Equal Protection claims are likewise subsumed by their First

21  Amendment claims. Thus, the Agent Defendants are entitled to qualified immunity

22  on Plaintiffs' Equal Protection claims for the same reasons argued above.

23  **F.  Qualified Immunity Bars The Unlawful Search Claims**

24  Plaintiffs' Ninth Cause of Action asserts that the Agent Defendants violated

25  their rights under the Fourth Amendment in three ways: (i) by recording their

26  communications without a warrant; (ii) by conducting video surveillance; and

27  (iii) by planting listening devices in mosques without a warrant. (FAC ¶ 251.) In

28  order to overcome the Agent Defendants' assertion of qualified immunity, Plaintiffs

must show these actions violated established rights under the Fourth Amendment.

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. AMEND. IV. "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (internal citations omitted). The protections of the Fourth Amendment only apply if an individual can demonstrate that the government action invaded upon his legitimate expectation of privacy. *Smith v. Maryland*, 442 U.S. 735, 740-41 (1978); *see also United States v. Taketa*, 923 F.2d 665, 670-671 (9th Cir. 1991). Government action will not offend the Fourth Amendment unless: (1) the individual has exhibited a subjective expectation of privacy and (2) the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable. *Smith*, 442 U.S. at 740-41; *see also United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000). Plaintiffs can establish a subjective expectation of privacy if they allege that they sought to preserve something as private. *Smith*, 442 U.S. at 740-41. Whether or not an expectation of privacy is objectively reasonable is a question of law. *Nerber*, 222 F.3d at 599.

### 1. Recording Of Audio Communications

Plaintiffs allege that Monteilh made audio recordings of conversations where none of the participating parties consented. (FAC ¶ 251.) Plaintiffs claim that Monteilh allegedly left his recording devices unattended in the prayer hall while Malik and AbdelRahim were present.[6] (FAC ¶¶ 192, 211.) The FAC does not allege that the FBI obtained any *unattended* recordings of Plaintiff Fazaga with Monteilh's recording devices. As a result, only Malik and AbdelRahim may assert that

---

[6] The Fourth Amendment does not prohibit recordings made by Monteilh when he was present because Monteilh necessarily consented to the recording. *United States v. White*, 401 U.S. 745, 749 (1971). Consensual recordings are not even considered a search, because they do not intrude upon a legitimate expectation of privacy. *United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1988).

SER 207

Montheil's unattended audio recordings violated their Fourth Amendment rights.

Activities that take place within a religious institution are not afforded a greater expectation of privacy than normally provided by the Fourth Amendment. *Aguilar,* 883 F.2d at 696-703; *see also Presbyterian Church v. United States*, 870 F.2d 518, 527 (9th Cir. 1989). Because "the Fourth Amendment protects people, not places," an individual cannot invoke the protections of the Fourth Amendment simply due to his location. *Katz v. United States*, 389 U.S. 347, 351 (1967).

"A subjective expectation of privacy in oral communications may, but does not necessarily, turn on the physical characteristics of the place or property in which the speech takes place." *Kee v. City of Rowlett* Texas, 247 F.3d 206, 213 (5th Cir. 2001). Moreover, the Fourth Amendment does not protect information that an individual "knowingly exposes to the public, even in his own home or office." *Katz*, 389 U.S. at 351. Even the inadvertent disclosure of information is not protected by the Fourth Amendment, as the risk of being overheard by an eavesdropper is a risk we assume whenever we speak. *Hoffa v. United States*, 385 U.S. 293, 303 (1966); *see also Aguilar,* 883 F.2d at 702-03. With regard to oral communications, the dispositive considerations for constitutional protection are whether an individual subjectively expected his conversations to be private and whether the individual "took normal precautions to maintain privacy." *Kee*, 247 F.3d at 213.

In *Kee*, the plaintiffs claimed that the city and several government agents violated the Fourth Amendment and 18 U.S.C. § 2511 (the Federal Wire Tap Act) when the government agents recorded the plaintiffs' conversations at an outdoor grave site memorial service. 247 F.3d at 209-10. The district court granted summary judgment in favor of the defendants on the grounds that the plaintiffs failed to demonstrate a "subjective expectation of privacy in their conversations and prayers at the grave site," and that the defendants were entitled to qualified immunity. *Id.* at 210. On appeal, the Fifth Circuit affirmed, holding that the plaintiffs failed "to demonstrate that an issue of material fact [existed] as to whether their expectation of

privacy was violated." *Id.* at 217. The Fifth Circuit noted that the plaintiffs did not offer any evidence that they sought "to protect their conversations from 'uninvited ears,'" nor did they "assert that their oral statements were communicated free from the possibility of eavesdroppers who might have been in close proximity." *Id.* at 216. Additionally, the plaintiffs did not provide any evidence that they took affirmative steps to preserve their privacy. *Id.*

Plaintiffs have similarly failed to allege a subjective expectation of privacy in their communications in the prayer hall. While Plaintiffs allege that the ICOI barred audio and video recordings without permission, and that signs notified congregants when an outside entity recorded an event (FAC ¶ 193), these facts are irrelevant to the analysis of whether Malik and AbdelRahim sought to preserve their communications in the prayer hall as private by taking steps to prevent disclosure to the other inhabitants of the prayer hall. As noted above, activities held in a religious institution are not afforded a greater expectation of privacy than normally provided by the Fourth Amendment, and that an individual cannot invoke the protections of the Fourth Amendment simply due to his location. *See Aguilar,* 883 F.2d at 696-703; *Katz*, 389 U.S. at 351. Malik and AbdelRahim conducted the alleged conversations in an area seemingly open to the public, and populated by Monteilh and other unidentified third parties. (FAC ¶¶ 192, 211.) They thus bore the risk of being overheard, and therefore lacked a reasonable expectation of privacy.

### 2.   *Video Surveillance*

Plaintiffs allege that, on several occasions, Monteilh carried a covert video recording device with him. (FAC ¶¶ 108, 128-129, 172, 179, 202 and 206.) However, only Fazaga and AbdelRahim can assert a claim with regard to the alleged video surveillance, because Plaintiffs did not allege that Malik was the subject of any of the recordings. (*Id.*)

Video surveillance is not *per se* impermissible under the Fourth Amendment. *United States v. Taketa*, 923 F.2d 665 (9th Cir. 1991). For example, individuals do

Case 12-56867, 04/29/2015, ID: 9519741, DktEntry: 61-2, Page 213 of 289

1   not have a reasonable expectation to be free from video surveillance in public

2   places. *Id.* Similarly, individuals do not have a reasonable expectation to be free

3   from video surveillance while in the presence of a government informant, because

4   the information shared with, or visible to, the government agent is not protected by

5   the Fourth Amendment. *See Nerber*, 222 F.3d at 604 ("defendants bore the risk that

6   their activities with the informants were being surveilled" using a video camera)*;

7   see also United States v. Brathwaite*, 458 F.3d 376, 380-81 (5th Cir. 2006)

8   (defendant "forfeited his privacy interest in those activities that were exposed to the

9   CI".); *United States v. Lee*, 359 F.3d 194, 201-02 (3rd Cir. 2004) ("just as Lee gave

10  up any expectation of privacy in things he allowed [the informant] to hear, Lee also

11  gave up any expectation of privacy in the things he allowed [the informant] to see");

12  *see also United States v. Davis*, 326 F.3d 361, 366 (2nd Cir. 2003) ("Once Davis

13  invited [the informant] into his residence, Davis forfeited his privacy interest in

14  those activities that were exposed to [the informant].").

15          Plaintiffs' Fourth Amendment claim related to the alleged video recordings

16  fails because Plaintiffs have not alleged that they had a legitimate expectation of

17  privacy in any of activities allegedly captured on the recordings. Instead, each of the

18  alleged recordings were taken with a device that Monteilh supposedly had installed

19  in his shirt button, and all video footage was recorded in his presence. (FAC ¶¶ 108,

20  128-129, 172, 179, 202 and 206.) Recordings made when the informant is present,

21  of activities made accessible to him by Plaintiffs, are not protected by the Fourth

22  Amendment. Furthermore, two of the alleged recordings occurred in public places,

23  the mosque and a soccer field, where individuals do not have a reasonable

24  expectation to be free from video surveillance. (*Id.* at ¶¶ 172, 206.) Accordingly,

25  Plaintiffs' Fourth Amendment claim, with respect to the video recordings, fails.

26          **3.      *Surveillance Devices In Mosques***

27          Plaintiffs allege that the FBI planted "listening devices" and "surveillance

28  equipment" in mosques, but only allege that these "listening devices" (apart from

1    the device used by Monteilh, discussed above) recorded Plaintiff Fazaga's

2    conversations. (FAC ¶ 95.) Thus, only Fazaga may assert that the purported

3    listening devices violated his Fourth Amendment rights. *See Rakas*, 439 U.S. at 133-

4    34. Regardless, this claim fails to meet the plausibility standard set forth in *Iqbal*.

5    While Plaintiffs allege that "Agents Allen and Armstrong caused such electronic

6    surveillance equipment to be installed in the Mission Viejo Mosque" (FAC ¶ 95),

7    Plaintiffs fail to allege any facts to support this conclusory allegation. For example,

8    Plaintiffs fail to allege how they learned of these supposed devices, when the

9    device(s) were installed, who (if anyone) discovered the devices, or where within

10   the mosque they were installed. Such naked assertions "devoid of further factual

11   enhancement" will not survive a motion to dismiss. *Iqbal*, *supra,* 129 S. Ct. at 1949.

12        Moreover, if the Court upholds the government's assertion of the state secrets

13   privilege, litigation of this claim should be foreclosed, as the privilege covers

14   evidence regarding the existence, use and justification of listening devices in

15   mosques – apart from those devices allegedly used by Monteilh. (Docket No. 55 at

16   43:3-8 (stating that "previously undisclosed information related to ... sources and

17   methods used in a counterterrorism investigation of a particular person" is protected

18   by the state secrets doctrine).) Without access to this classified information,

19   Plaintiffs cannot prove – and the Agent Defendants cannot refute – the allegation

20   that the government planted "listening devices" in mosques. Accordingly, dismissal

21   is proper. *See Kasza*, 133 F.3d at 1166.[7]

22   _____

23   [7] In its motion to dismiss, the government did not move to dismiss the Fourth

24   Amendment claims, because it concedes that the audio and video recordings
     *collected by Monteilh* were publicly disclosed in a separate criminal proceeding.

25   (Docket No. 55 at 4:20-5:11.) However, Plaintiffs' complaint also asserts that
     government agents *other than Monteilh* planted "listening devices" in mosques.

26   (FAC ¶¶ 95, 251.) Plaintiffs also allege that agents *other than Monteilh* placed

27   electronic listening devices in Plaintiff AbdelRahim's home, car and cell phone and

28   video cameras outside his home. (*Id.* at ¶ 209.)  Allegations concerning conduct by
     (footnote continued)

**SER 211**

### G.   Qualified Immunity Bars The FISA Claim

Plaintiffs' Tenth Cause of Action alleges that the Agent Defendants violated Section 1810 of the Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801-71, for warrantless electronic surveillance. (*See* FAC ¶ 253.) Specifically, Plaintiffs allege that the Agent Defendants, acting through Monteilh, used electronic, mechanical, and/or other surveillance devices, without a warrant, to monitor Plaintiffs and their communications and to acquire information under circumstances in which Plaintiffs had a reasonable expectation of privacy and a warrant was required for law enforcement purposes. (*Id.*)

The Agent Defendants did not violate clearly established law of which a reasonable person would have known, and thus are entitled to qualified immunity on this claim. First, FISA provides a private right of action only to an "aggrieved person," someone who was the target of electronic surveillance under circumstances in which he or she had a reasonable expectation of privacy. *See* 50 U.S.C. §§ 1801(f), 1809, 1810. As discussed above, Plaintiffs had no reasonable expectation of privacy in the circumstances alleged. (*See* Part VI.F., *supra*.)

Second, since FISA Section 1810 was enacted more than thirty years ago, only two published decisions have addressed it, both in the same case. *See In re Nat'l Sec. Agency Telecomms. Records Litig*., 564 F. Supp. 2d 1109 (N.D. Cal. 2008) and 700 F. Supp. 2d 1182 (N.D. Cal. 2010). Neither case established that the type of warrantless surveillance alleged here creates civil liability under Section 1810 for governmental officials sued in their individual capacity, as the Agent Defendants are sued here. Indeed, in one of those decisions the court held that a Section 1810 claim for warrantless electronic surveillance claim may only be alleged against government officials in their *official*, as opposed to personal,

---

agents *other than Monteilh* are necessarily the "sources and methods" that are protected by government's privilege.

capacity. *See In re Nat'l Sec. Agency Telecomms. Records Litig.*, 700 F. Supp. 2d 1182, 1202-03 (N.D. Cal. 2010). The court there reasoned that the nature of the wrongdoing by governmental actors alleged in FISA cases "is official rather than individual or personal," as it is only "officers and employees acting in their official capacities that would engage in surveillance of the type contemplated by FISA." *Id.* at 1192-93, 1203. Accordingly, because no case has ever established that the Agent Defendants' alleged conduct violated Section 1810 of FISA, they are entitled to qualified immunity on this cause of action.

## VII. CONCLUSION

While Plaintiffs' FAC is replete with broad allegations of a discriminatory investigation by the FBI of Muslims in Southern California, Plaintiffs fail sufficiently to allege that the Agent Defendants violated these particular Plaintiffs' rights. Moreover, even if Plaintiffs had sufficiently alleged a violation of their rights, the Agent Defendants are entitled to qualified immunity as any such violation was not "clearly established" at the time. For this reason, and for the reasons set forth above and in the motions to dismiss filed by the Government Defendants and Defendants Tidwell and Walls, the Agent Defendants' motion to dismiss Plaintiffs' FAC should be granted.

DATED: November 11, 2011          Respectfully submitted,

SCHEPER KIM & HARRIS LLP
DAVID C. SCHEPER
ALEXANDER H. COTE
ANGELA M. MACHALA

By:    /s/
        David C. Scheper
        Attorneys for Defendants Pat Rose, Kevin
        Armstrong and Paul Allen

SER 213

1

## <u>JOINDER</u>

2      Defendants Rose, Armstrong and Allen hereby join in the motions to dismiss

3 filed by (1) Defendants United States of America, Federal Bureau of Investigation,

4 Robert Mueller and Steven Martinez (Docket No. 55) and (2) Defendants Stephen

5 Tidwell and Barbara Walls, because the arguments raised therein apply with equal

6 force to Agents Rose, Armstrong and Allen.

7 DATED: November 11, 2011      Respectfully submitted,

8

9      SCHEPER KIM & HARRIS LLP
       DAVID C. SCHEPER

10     ALEXANDER H. COTE
       ANGELA M. MACHALA

11

12

13      By:      /s/

14            David C. Scheper
              Attorneys for Defendants Pat Rose, Kevin

15            Armstrong and Paul Allen

16

17

18

19

20

21

22

23

24

25

26

27

28

**SER 214**

1  TONY WEST
   Assistant Attorney General
2  ANDRE BIROTTE JR.
   United States Attorney
3  VINCENT M. GARVEY
   Deputy Branch Director
4  ANTHONY J. COPPOLINO
   E-mail: tony.coppolino@usdoj.gov
5  LYNN Y. LEE (SBN #235531)
   E-mail: lynn.lee@usdoj.gov
6  U.S. Department of Justice
   Civil Division, Federal Programs Branch
7  20 Massachusetts Avenue, N.W.
   Washington, D.C. 20001
8  Telephone: 202-514-4782
   *Attorneys for the Federal Bureau of*
9  *Investigation and Defendants Mueller*
   *and Martinez Sued in their Official Capacities*
10
   STEPHEN E. HANDLER
11 Senior Trial Counsel
   E-mail: stephen.handler@usdoj.gov
12 U.S. Department of Justice, Civil Division, Torts Branch
   1331 Pennsylvania Avenue N.W., Rm 8070N
13 Washington, D.C. 20530
   Telephone: (202) 616-4279
14 *Attorney for the United States*

15              IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
16                      SANTA ANA DIVISION

17 _____
                                    )
18 YASSIR FAZAGA *et al.*,          ) CASE:  SA11-CV-00301 CJC (VBKx)
                                    )
19       Plaintiffs,                ) **NOTICE OF MOTION AND**
                                    ) **MOTION TO DISMISS**
   v.                               ) **AMENDED COMPLAINT AND**
20                                  ) **FOR SUMMARY JUDGMENT**
                                    )
21 FEDERAL BUREAU OF                )
   INVESTIGATION *et al.*,          ) DATE:   January 30, 2012
22                                  ) TIME:    1:30 p.m.
         Defendants.                ) JUDGE:  Hon. Cormac J. Carney
23 _____ )

24       PLEASE TAKE NOTICE that Defendants Federal Bureau of Investigation

25 ("FBI"), Robert Mueller, Director of the FBI sued in his official capacity, and

26 Steven Martinez, Assistant Director in Charge of the FBI Los Angeles Field office,

27 sued in his official capacity, and Defendant United States of America, will bring

28 the following Motion to Dismiss and for Summary Judgment before the Honorable

Cormac J. Carney, United States District Judge, in his courtroom, U.S. Courthouse, 411 West Fourth Street, Santa Ana, California, on January 30, 2012 at 1:30 p.m., or at such time as the Court may direct that matter be heard.

Defendants FBI, Mueller and Martinez sued in their official capacities, and Defendant United States of America hereby move to dismiss the claims against them pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure. The grounds for this motion are as follows:

(1) All of plaintiffs' claims against the FBI and official capacity defendants should be dismissed on the ground that the relief sought against these defendants in the form of the disclosure or expungement of records is not available under applicable law.

(a) Plaintiffs fail to state a claim upon which relief can be granted against Defendant FBI under the Privacy Act, 5 U.S.C. § 552a(a)-(l), including under Section 552a(e)(7), Section 552a(d)(1), and Section 552a(g)(1)(B) of the Act, 5 U.S.C. §§ 552a(e)(7),(d)(1), (g)(1)(B).

(b) Plaintiffs have failed to exhaust administrative remedies for their claim under Section 552a(d)(1) of the Privacy Act, 5 U.S.C. § 552a(d)(1).

(c) Plaintiffs cannot obtain the expungement relief they seek because it is not authorized by the Privacy Act.

(d) Plaintiffs cannot obtain the expungement or disclosure relief they seek by operation of statutory exemptions under the Privacy Act.

(e) The expungement and disclosure relief plaintiffs seek is otherwise foreclosed by law as to all claims against the FBI and/or official capacities defendants.

(2) Plaintiffs' Tenth Cause of Action (Foreign Intelligence Surveillance Act) fails to state a claim upon which relief can be granted against Defendants FBI, Mueller and Martinez sued in their official capacities, and against Defendant

2

**SER 216**

United States, and the Court lacks jurisdiction to review this claim against these

Defendants, on the ground that the Congress has not waived sovereign immunity to

permit claims against the United States and its agencies and officials sued in their

official capacities under Section 110 of the Foreign Intelligence Surveillance Act

("FISA"), 50 U.S.C. § 1810 (hereafter "Section 1810").  In addition, plaintiffs also

fail to state a claim upon which relief can be granted under FISA Section 1810

against Defendants FBI, Mueller and Martinez sued in their official capacities on

the ground that this provision does not authorize the relief sought by the plaintiffs.

(3) Plaintiffs' Eleventh Cause of Action brought against defendant United

States should be dismissed for failure to state a claim upon which relief can be

granted.

(4) In the alternative, to the extent plaintiffs' claims are not dismissed on

other grounds, Defendants FBI, Mueller and Martinez sued in their official

capacities, and the United States also move to dismiss plaintiffs' First, Second,

Third, Fourth, Fifth, Sixth, Seventh, Eighth and Eleventh Causes of Action on the

ground that litigation of these claims would risk or require the disclosure of certain

evidence properly protected by the Attorney General's assertion of the state secrets

privilege.

In addition to this Notice of Motion and Motion, the grounds for this motion

are set forth further in the accompanying Memorandum of Points and Authorities;

the statement of material facts filed herewith by the FBI and official capacity

defendants; and the declarations cited therein, including the Declaration of

Christopher N. Morin of the Federal Bureau of Investigation filed herewith; the

Declaration of Attorney General Eric H. Holder filed on August 1, 2011 (Dkt. 32-

3); the Public Declaration of Mark F. Giuliano of the Federal Bureau of

Investigation filed on August 1, 2011 (Dkt. 33); the Classified Declaration of Mark

F. Giuliano of the Federal Bureau of Investigation lodged for *in camera, ex parte*

3

SER 217

1  review on August 1, 2011 (*see* Notice of Lodging at Dkt. 35); the classified

2  Supplemental Declaration of Mark F. Giuliano lodged for the Court's *in camera,*

3  *ex parte* review on November 4, 2011 (*see* Government Defendants' Notice of

4  Lodging filed herewith); and the *In Camera, Ex Parte* Classified Supplemental

5  Memorandum in Support Of Motion to Dismiss and For Summary Judgment

6  lodged by the FBI and official capacity defendants on August 1, 2011 (*see* Notice

7  of Lodging at Dkt. 36).

8  Pursuant to Local Rule 7-3, the parties have conferred in connection with the

9  relief sought in this motion.  Plaintiffs oppose this motion.

10 Date: November 4, 2011          Respectfully submitted,

11                                 TONY WEST
                                   Assistant Attorney General
12
                                   ANDRE BIROTTE, JR
13                                 United States Attorney

14
                                   VINCENT M. GARVEY
15                                 Deputy Branch Director

16
                                    */s/ Anthony J. Coppolino*
17                                 ANTHONY J. COPPOLINO
                                   E-mail: tony.coppolino@usdoj.gov
18
                                    */s/ Lynn Y. Lee*
19                                 LYNN Y. LEE (SBN # 235531)
                                   E-mail: lynn.lee@usdoj.gov
20
                                   U.S. Department of Justice
21                                 Civil Division, Federal Programs Branch
                                   20 Massachusetts Avenue, N.W.
22                                 Washington, D.C.  20001
                                   Telephone: 202-514-4782
23                                 Facsimile:  202-616-8460

24                                 *Attorneys for the Federal Bureau of Investigation*
                                   *and Defendants Mueller and Martinez Sued in*
25                                 *their Official Capacities*

26

27

28

4

1

2                       */s/ Stephen E. Handler*
STEPHEN E. HANDLER

3             Senior Trial Counsel
E-mail: stephen.handler@usdoj.gov

4             U.S. Department of Justice
Civil Division, Torts Branch

5             1331 Pennsylvania Avenue N.W.  Room 8070N
Washington, D.C. 20530

6             Telephone: (202) 616-4279

7             *Attorney for the United States*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

TONY WEST
Assistant Attorney General
ANDRE BIROTTE JR.
United States Attorney
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
E-mail: tony.coppolino@usdoj.gov
LYNN Y. LEE (SBN #235531)
E-mail: lynn.lee@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Telephone: 202-514-4782
*Attorneys for the Federal Bureau of*
*Investigation and Defendants Mueller*
*and Martinez Sued in their Official Capacities*

STEPHEN E. HANDLER
Senior Trial Counsel
E-mail: stephen.handler@usdoj.gov
U.S. Department of Justice, Civil Division, Torts Branch
1331 Pennsylvania Avenue N.W., Rm 8070N
Washington, D.C. 20530
Telephone: (202) 616-4279
*Attorney for the United States*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

| | |
|---|---|
| YASSIR FAZAGA *et al.*, | CASE: SA11-CV-00301 CJC (VBKx) |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT AND FOR SUMMARY JUDGMENT** |
| v. | |
| FEDERAL BUREAU OF INVESTIGATION, *et al.*, | DATE: January 30, 2012 |
| Defendants. | TIME: 1:30 p.m. |
| | JUDGE: Hon. Cormac J. Carney |

**SER 220**

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    I.      Plaintiffs' Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    II.    FBI Post 9/11 Counterterrorism Concerns and Policies. . . . . . . . . . . . . . . .  8

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

    I.      PLAINTIFFS' AMENDED COMPLAINT SHOULD BE DISMISSED ON NON-
          PRIVILEGE GROUNDS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

        A.    Plaintiffs' Claims Against the FBI and Official Capacity Defendants
            Should be Dismissed Because the Relief Sought Against these

            Defendants is Not Available Under Applicable Law.. . . . . . . . . . . . . .  11

            1.    Plaintiffs Fail to State a Claim Upon Which Relief May Be
                  Granted Under the Privacy Act. . . . . . . . . . . . . . . . . . . . . . . . .  11

                  a.    Plaintiffs Have Not Exhausted Their Administrative

                        Remedies For a (g)(1)(B) Action.. . . . . . . . . . . . . . . . . . . .  13

                  b.    Plaintiffs Cannot Obtain Their Requested Relief Under

                        the Privacy Act.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

            2.    FBI Investigative Records Are Exempt from the Access and
                  Amendment Provisions of the Privacy Act and Are Therefore

                  Not Subject to Disclosure or Expungement.. . . . . . . . . . . . . .  16

            3.    Because Plaintiffs Are Foreclosed From Obtaining Expungement
                  Under the Privacy Act, They Cannot Obtain Expungement

                  for Any of Their Causes of Action.. . . . . . . . . . . . . . . . . . . . .  19

            4.    Even if the Privacy Act Did Not Preempt a General Expungement
                  Remedy, Plaintiffs Have Pled No Harm that Would Entitle

                  Them to Such Relief Here... . . . . . . . . . . . . . . . . . . . . . . . . . .  21

        B.    Plaintiffs' Tenth Cause of Action Brought Under Section 1810 of the
            Foreign Intelligence Surveillance Act Should Be Dismissed on

            Sovereign Immunity Grounds.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

        C.    The Amended Complaint Fails to State Claims Against the United States
            Under the Federal Tort Claims Act.. . . . . . . . . . . . . . . . . . . . . . . . . . .  26

            1.    Because California Law Permits Law Enforcement Officers to
                  Conduct Consensual Monitoring, the Alleged Surveillance

                  is Not Actionable.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

            2.    The Amended Complaint Fails to State Claims for Relief Under
                  California Civil Code Section 52.1.. . . . . . . . . . . . . . . . . . . . .  31

3.      Plaintiffs' Claims for Intentional Infliction of Emotional Distress Should Be Dismissed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

II.     THE STATE SECRETS PRIVILEGE PROPERLY PROTECTS CERTAIN INFORMATION IMPLICATED BY PLAINTIFFS' ALLEGATIONS... . . . . . 37

     A.     The State Secrets Privilege Bars the Use of Privileged Information in Litigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

          1.     Procedural Requirements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

          2.     The Court's Independent Evaluation of the Claim of Privilege.. 39

          3.     Impact of Privilege Assertion.. . . . . . . . . . . . . . . . . . . . . . . . . 40

          4.     Attorney General's Policy.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

     B.     The Court Should Exclude Information Subject to the Privilege Assertion from Further Proceedings in this Case.. . . . . . . . . . . . . . . . . 43

     C.     The Exclusion of Properly Privileged Information Requires the Dismissal of the Claims Based on Allegations of Discrimination Based on Religion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

## TABLE OF AUTHORITIES

### CASES

*Al-Haramain Islamic Found. v. Bush*,
    507 F.3d 1190 (9th Cir. 2007). ................................................................... *passim*

*Andrade v. United States*,
    116 F. Supp. 2d 778 (W.D. Tex. 2000)................................................................. 28

*Arar v. Ashcroft*,
    585 F.3d 559 (2d Cir. 2009)................................................................. 46, 47

*Asmar v. U.S. Dep't. of Treasury*,
    680 F. Supp. 248 (E.D. Mich. 1987)................................................................. 25

*Austin B. v. Escondido Union Sch. Dist.*,
    149 Cal. App. 4th 860 (Cal. Ct. App. 2007). ................................................................. 31

*Balser v. Dep't of Justice, Office of U.S. Trustee*,
    327 F.3d 903 (9th Cir. 2003). ................................................................. 26

*Bassiouni v. FBI*,
    436 F.3d 712 (7th Cir. 2006). ................................................................. 18

*Beijing Tong Ren Tang (USA) Corp. v. TRT USA Corp.*,
    No. C-09-0082, 2010 WL 98957 (N.D. Cal. Jan. 5, 2010)................................................................. 34

*Berkovitz by Berkovitz v. United States*,
    486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988)................................................................. 51

*Broaddrick v. Exec. Office of the President*,
    139 F. Supp. 2d 55 (D.D.C. 2001). ................................................................. 13

*Bush v. Lucas*,
    462 U.S. 367, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983)................................................................. 46

*Cell Assocs., Inc. v. NIH*,
    579 F.2d 1155 (9th Cir. 1978). ................................................................. 15

*Christensen v. Superior Court*,
    54 Cal. 3d 868, 2 Cal. Rptr. 2d 79 (1991)................................................................. 33

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)................................................................. 47

*City of Milwaukee v. Illinois,*
    451 U.S. 304, 101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981). .................................................. 20

*Comm. in Solidarity with the People of El Salvador v. Sessions,*
    738 F. Supp. 544 (D.D.C. 1990), *aff'd,* 929 F.2d 742 (D.C. Cir. 1991). .............................. 15

*Ctr. for Nat'l Sec. Studies v. Dep't of Justice,*
    331 F.3d 918 (D.C. Cir. 2003). .................................................................................. 21

*Dalrymple v. United States,*
    No. 03-20588, 2005 WL 2456213 (S.D. Fla. May 6, 2005). .......................................... 28

*Dep't of Energy v. Ohio,*
    503 U.S. 607, 112 S. Ct. 1627, 118 L. Ed. 2d 255 (1992). .......................................... 24

*Dichter-Mad Family Partners, LLP v. United States,*
    707 F. Supp. 2d 1016 (C.D. Cal. 2010). ..................................................................... 51

*Doe By and Through Doe v. Petaluma City Sch. Dist.,*
    830 F. Supp. 1560 (N.D. Cal. 1993). ......................................................................... 32

*Doe v. FBI,*
    936 F.2d 1346 (D.C. Cir. 1991). ............................................................................... 18

*Doe v. City of Mateo,*
    No. C 07-5596, 2010 WL 1541279 (N.D.Cal. Apr. 16, 2010). ....................................... 29

*Doe v. U.S. Air Force,*
    812 F.2d 738 (D.C. Cir. 1987). ................................................................................. 22

*Dunn & Black, P.S. v. United States,*
    492 F.3d 1084 (9th Cir. 2007). ........................................................................... 23, 24

*Dyniewicz v. United States,*
    742 F.2d 484 (9th Cir. 1984). .................................................................................. 36

*El-Masri v. United States,*
    479 F.3d 296 (4th Cir. 2007). ....................................................................... 38, 40, 41

*Exner v. FBI,*
    612 F.2d 1202 (9th Cir. 1980). ................................................................................. 18

*FDIC v. Meyer,*
    510 U.S. 471, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994). ............................................ 23

*Farnsworth Cannon, Inc. v. Grimes*,
    635 F.2d 268 (4th Cir. 1980). ........................................................ 41

*Fendler v. U.S. Bureau of Prisons*,
    846 F.2d 550 (9th Cir. 1988). ........................................................ 21

*Fendler v. U.S. Parole Comm'n*,
    774 F.2d 975 (9th Cir. 1985). .................................................. 20, 21

*Fitzgerald v. Penthouse Int'l, Ltd.*,
    776 F.2d 1236 (4th Cir. 1985). ...................................................... 41

*Frigard v. United States*,
    862 F.2d 201 (9th Cir. 1988). ........................................................ 51

*Galvin v. Hay*,
    361 F.3d 1134 (9th Cir. 2004). .................................................. 27, 28

*Gasho v. United States*,
    39 F.3d 1420 (9th Cir. 1994). ........................................................ 27

*Gilbert v. DaGrossa*,
    756 F.2d 1455 (9th Cir. 1985). ...................................................... 23

*Haase v. Sessions*,
    893 F.2d 370 (D.C. Cir. 1990). ...................................................... 16

*Halkin v. Helms*,
    690 F.2d 977 (D.C. Cir. 1982). ...................................................... 39

*Hamilton v. Prudential Fin.*,
    No. 07-944, 2007 WL 2827792 (E.D. Cal. Sept. 27, 2007)................. 34

*Hernandez v. Hillsides, Inc.*,
    47 Cal. 4th 272, 211 P.2d 1063 (Cal. 2009). .................................. 52

*Hinojosa v. City of Terrell*,
    834 F.2d 1223 (5th Cir. 1988). ...................................................... 28

*Hoffa v. United States*,
    385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966)................ 10, 30

*Hughes v. Pair*,
    46 Cal. 4th 1035, 95 Cal. Rptr. 3d 636 (2009)....................... 33, 34, 35

**SER 225**

*Jasso v. U. S. Dep't of Agric. Forest Serv.*,
    2008 WL 3863503 (E.D. Cal. Aug. 18, 2008). ........................................ 51

*Kasza v. Browner*,
    133 F.3d 1159 (9th Cir. 1998). ................................................ *passim*

*Kokkonen v. Guardian Life Ins. Co.*,
    511 U.S. 375, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994). ..................... 20

*Lane v. Pena*,
    518 U.S. 187, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996). ..................... 23

*Lewis v. United States*,
    385 U.S. 206 (1966). ........................................................ 30

*Martin v. County of San Diego*,
    650 F. Supp. 2d 1094 (S.D. Cal. 2009). ...................................... 32

*Mayfield v. United States*,
    599 F.3d 964 (9th Cir. 2010). ............................................... 26

*McCue v. S. Fork Union Elementary Sch.*,
    2010 WL 3958278 (E.D. Cal. Oct. 8, 2010). .................................. 31

*Mohammed v. Jeppesen Dataplan, Inc.*,
    614 F.3d 1070 (9th Cir. 2010). ............................................ *passim*

*Morrison-Knudsen Co. v. CHG Int'l, Inc.*,
    811 F.2d 1209 (9th Cir. 1987). .............................................. 13

*In re: Nat'l Security Agency Telecomm. Records Litig.*,
*Al-Haramain Islamic Found v. Bush*,
    564 F. Supp 2d 1109 (N.D. Cal. 2008). ..................................... 24

*Navajo Nation v. U.S. Forest Serv.*,
    535 F.3d 1058 (9th Cir. 2008). .............................................. 48

*Pa. Bd. of Probation & Parole v. Scott*,
    524 U.S. 357, 118 S. Ct. 2014, 141 L. Ed.2d 344 (1998). .................... 26

*People v. Canard*,
    257 Cal. App. 2d 444, 65 Cal. Rptr. 15 (Cal. Ct. App. 1967). ............... 29

*People v. Fulton*,
    155 Cal. App. 3d 91, 201 Cal. Rptr. 879 (Cal. Ct. App. 1984). ............. 29

*People v. Murphy*,
8 Cal. 3d 349, 105 Cal. Rptr. 138 (1972)............................................................................. 29

*People v. Windham*,
145 Cal. App. 4th 881, 51 Cal. Rptr. 884 (Cal. Ct. App. 2007). ........................................... 29

*Pit River Home & Agr. Co-op. Ass'n v. United States*,
30 F.3d 1088 (9th Cir. 1994). ............................................................................................. 23

*Pitman v. City of Oakland*,
197 Cal. App. 3d 1037 (1988). ........................................................................................... 34

*Pooler v. United States*,
787 F.2d 868 (3d Cir. 1986)............................................................................................... 51

*Potter v. Firestone Tire & Rubber Co.*,
6 Cal. 4th 965, 25 Cal. Rptr. 2d 550 (1993)........................................................... 33, 34, 52

*Presbyterian Church v. United States*,
752 F. Supp. 1505 (D. Ariz. 1990). ............................................................................... 48, 49

*Presbyterian Church v. United States*,
870 F.2d 518 (9th Cir. 1989). ....................................................................................... 48, 49

*Reeves v. United States*,
No. 94-1291, 1994 WL 7822235 (E.D. Cal. Nov. 16, 1994)................................................. 13

*Reuber v. United States*,
750 F.2d 1039 (D.C. Cir. 1985) (Bork, J., concurring)......................................................... 21

*Reynolds v. County of San Diego*,
84 F.3d 1162 (9th Cir. 1996),. ............................................................................................ 31

*Reynolds v. United States*,
927 F. Supp. 91 (W.D.N.Y. 1996). ...................................................................................... 28

*Sabow v. United States*,
93 F.3d 1445 (9th Cir. 1996). ............................................................................................. 51

*Sawhney v. Allstate Ins. Co.*,
No. 95-2784, 1995 WL 500531 (C.D. Cal. June 23, 1995). .................................................. 34

*Scruggs v. United States*,
929 F.2d 305 (7th Cir. 1991). ............................................................................................. 20

*Sheehan v. San Francisco 49ers*,
    45 Cal. 4th 992, 201 P.2d 472 (Cal. 2009). ............................................ 52

*Sierra Club v. Whitman*,
    268 F.3d 898 (9th Cir. 2001). ................................................................. 23

*Socialist Workers Party v. Att'y Gen.*,
    642 F. Supp. 1357 (S.D.N.Y. 1986)........................................................ 16

*Spurlock v. FBI*,
    69 F.3d 1010 (9th Cir. 1995). ................................................................. 21

*Stamps v. Superior Court*,
    136 Cal. App. 4th 1441 (Cal. Ct. App. 2006). ....................................... 32

*Taylor v. U.S. Treasury Dep't*,
    127 F.3d 470 (5th Cir. 1997). ................................................................. 13

*Tekle v. United States, No. CV 01-3894*,
    No. 01-3894, 2009 WL 1303357 (C.D. Cal. May 8, 2009). .................. 28

*Totten v. United States*,
    92 U.S. 105, 23 L. Ed. 605 (1875). ........................................................ 37

*United States v. Aguilar*,
    871 F.2d 1436 (9th Cir. 1989). ................................................. 10, 29, 30

*United States v. Caceres*,
    440 U.S. 741, 99 S. Ct. 1465, 59 L. Ed. 2d 733 (1979)......................... 30

*United States v. Crowell*,
    374 F.3d 790 (9th Cir. 2004). ................................................................. 20

*United States v. Gaubert*,
    499 U.S. 315, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991).................... 51

*United States v. Lee*,
    359 F.3d 194 (3rd Cir. 2004). ................................................................. 10

*United States v. Meyer*,
    439 F.3d 855 (8th Cir. 2006). ................................................................. 20

*United States v. Nerber*,
    222 F.3d 597 (9th Cir. 2000). ................................................................. 10

*United States v. Reynolds*,
345 U.S. 1, 73 S. Ct. 528, 97 L. Ed. 727 (1953). ......................................................... *passim*

*United States v. Singleton*,
165 F.3d 1297 (10th Cir. 1999). ........................ 25

*United States v. Smith*,
940 F.2d 395 (9th Cir. 1991). ........................ 21

*United States v. Sumner*,
226 F.3d 1005 (9th Cir. 2000). ........................ 20

*United States v. Testan*,
424 U.S. 392, 96 S. Ct. 948, 47 L. Ed. 114 (1976). ............................ 23

*United States v. Varig Airlines*,
467 U.S. 797, 104 S. Ct. 2755, 81 L. Ed. 2d 660 (1984). ...................... 51

*United States v. White*,
401 U.S. 745, 91 S.Ct. 1122, 28 L. Ed. 2d 453 ........................ 30

*Vacek v. U.S. Postal Serv.*,
447 F.3d 1248 (9th Cir. 2006). ........................ 23

*Vt. Agency of Natural Res. v. United States*,
529 U.S. 765, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000). ................... 25

*West v. FAA*,
830 F.2d 1044 (9th Cir. 1987). ........................ 23

*Westfall v. City of Crescent City*,
No. 10-5222, 2011 WL 4024663 (N.D. Cal. Sept. 9, 2011). ................. 37

*Wilkie v. Robbins*,
551 U.S. 537, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007). ................... 46

*Will v. Mich. Dep't of State Police*,
491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). ...................... 25

*Wilson v. Libby*,
535 F.3d 697 (D.C. Cir. 2008). ........................ 46

*Xue Lu, et al. v. Powell*,
621 F.3d 944 (9th Cir. 2010). ........................ 32

## STATUTES AND REGULATIONS

28 C.F.R. § 16.41............................................................................................... 14

28 C.F.R. § 16.45............................................................................................... 14

28 C.F.R. § 16.46............................................................................................... 14

28 C.F.R. § 16.96........................................................................................... 17, 18

5 U.S.C. § 552a.......................................................................................... *passim*

28 U.S.C. § 2401(b)............................................................................................ 36

28 U.S.C. § 2671................................................................................................. 1

28 U.S.C. § 2674............................................................................................... 27

42 U.S.C. § 2000bb-1(b)..................................................................................... 48

50 U.S.C. § 1801(m).................................................................................... 24, 25

50 U.S.C. § 1806(a)........................................................................................... 24

50 U.S.C. § 1809............................................................................................... 25

50 U.S.C. § 1810........................................................................................ *passim*

50 U.S.C. § 1825(a)........................................................................................... 24

50 U.S.C. § 1845(a)........................................................................................... 24

## STATE STATUTES

Cal. Civ. Code § 52.1................................................................................. *passim*

Cal. Pen. Code § 633......................................................................................... 29

Cal. Pen. Code § 637.2....................................................................................... 29

Cal. Pen. Code § 835......................................................................................... 28

**SER 230**

# FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 16...................................................................................................... 6, 52

Fed. R. Civ. P. 26...................................................................................................... 6, 52

Fed. R. Civ. P. 56........................................................................................................... 17

# **INTRODUCTION**

On September 13, 2011, plaintiffs filed a First Amended Complaint (FAC) in this action. *See* Dkt. 49. Defendants Federal Bureau of Investigation (FBI), Robert Mueller, Director of the FBI, and Steven Martinez, Assistant Director of the FBI's Los Angeles Field Office, sued in their official capacities, renew their motion to dismiss and for summary judgment, joined by Defendant United States with respect to new claims raised in the FAC under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*

This action puts at issue whether the FBI engaged in impermissible counterterrorism investigative activity in Southern California. Plaintiffs are three residents of Southern California who allege that, through an investigation dubbed "Operation Flex," the FBI utilized a paid informant (Craig Monteilh) to "indiscriminately collect personal information on hundreds and perhaps thousands of innocent Muslim Americans in Southern California . . . simply because the targets were Muslim." *See* FAC ¶¶ 1-3, 86, 89. Plaintiffs also assert that Operation Flex was part of the FBI's effort, after the terrorist attacks of September 11, 2001, to focus counterterrorism investigations on Muslim communities in the United States under applicable policies issued after 9/11. *See id.* ¶¶ 24, 32-37.

Plaintiffs seek damages against several current and former FBI agents and officials in their individual capacities, *see id.* ¶¶ 18-22; Claims 1-7, 9-10; injunctive relief against the FBI and official capacity defendants in the form of the disclosure or destruction of the investigative information, *see id.* ¶¶ 15-17, Prayer for Relief ¶ b; and damages against the United States of America pursuant to the FTCA, *see* FAC ¶¶ 254-260, Prayer for Relief ¶¶ c-d. Plaintiffs also seek certification of a class of "[a]ll individuals targeted by Defendants for surveillance or information-gathering through Monteilh and Operation Flex, on account of their religion, and about whom the FBI thereby gathered personally identifiable information." *Id.* ¶ 219; *see also id.* ¶¶ 220-225.

The FBI has made clear that counterterrorism investigations may not be based solely on religion or First Amendment protected activities; indeed, the very policies plaintiffs again cite in their Amended Complaint set forth these FBI policies. It should be apparent, however, that moving beyond these important general principles to the details of a specific investigation in order to rebut plaintiffs' claims would risk or require the disclosure of sensitive investigative information.

While the FBI has previously acknowledged that Monteilh was a confidential source, a range of details concerning Operation Flex, for which Monteilh provided information, remains properly protected counterterrorism investigative information. This includes, principally, evidence detailing the nature and scope of Operation Flex — precisely what that investigation entailed and why it was undertaken, the identity of particular subjects, and the reasons they were investigated. This evidence is by no means at the margins of this lawsuit. The purpose of the plaintiffs' claims is to ascertain what Operation Flex entailed and to litigate its alleged unlawfulness. Accordingly, as set forth in more detail below, the Government renews its response to these allegations by seeking to protect certain evidence that cannot be disclosed in the interests of national security but without seeking dismissal of all claims on that basis.

First, the Attorney General's state secrets privilege assertion of August 1, 2011, identifies and seeks to protect certain investigative information implicated by the allegations in this case – (i) the identities of particular subjects of counterterrorism investigations, including in Operation Flex; (ii) the reasons those investigations occurred; and (iii) particular sources and methods utilized by the FBI in the investigations – because the privilege is "necessary to protect against the risk of significant harm to national security." *See* Declaration of Eric H. Holder

2

("Holder Decl.") ¶¶ 3-4, 12 (Dkt. 32-3, filed August 1, 2011).  The basis for the Attorney General's privilege assertion is set forth to the extent possible on the public record in the Attorney General's unclassified declaration, as well as in an unclassified declaration of Mark Giuliano, Assistant Director of the FBI's Counterterrorism Division (Dkt. 33, filed August 1, 2011).  Details concerning why this information is properly protected from disclosure are set forth in the classified declaration of Mr. Giuliano submitted on August 1, 2011, for the Court's *ex parte, in camera* review.  *See* Notice of Lodging at Dkt. 35.[1]  In accord with a policy announced on September 23, 2009, the Attorney General's privilege assertion in this case is "necessary to protect against the risk of significant harm to national security."  *See* Holder Decl. ¶ 12 and Exhibit 1 thereto (State Secrets Policy).

Importantly, however, the Attorney General's privilege assertion is limited in nature, and the Government's request for dismissal is narrowly tailored.  The Government does not seek dismissal of all claims at the outset based on the privilege assertion, nor to bar disclosure of all information concerning Operation Flex or Monteilh's activities.  The Government's motion relies first on considerations apart from state secrets that require dismissal of plaintiffs' claims. The Government's motion then seeks to distinguish between claims for which

_____

[1]  Mr. Giuliano has executed a supplemental classified declaration that updates the status of certain investigations discussed in his prior classified declaration.  *See* Notice of Filing Supplemental Classified Declaration filed herewith. Through these classified *ex parte, in camera* submissions, the Government seeks to inform the Court at the outset of this case as to the sensitive, privileged facts that the Government believes must be protected from disclosure and excluded from the case.  The Government does not consent to the disclosure of the information described in the classified Giuliano declarations to plaintiffs or their counsel.

3

privileged evidence would be required and claims that may not require such evidence.  Where litigation of a claim would risk or require the disclosure of privileged information, and the claim is not otherwise dismissed on non-privilege grounds, the need to protect properly privileged information would require dismissal of that claim.

With respect to non-privilege grounds for dismissal, the United States seeks dismissal of the newly raised FTCA claims for failure to state a claim upon which relief can be granted, for the reasons detailed below.  In addition, the FBI and official capacity defendants first seek dismissal or, in the alternative, summary judgment on the grounds that the relief sought by plaintiffs against these defendants — the disclosure and expungement of alleged records — is not authorized or available under the Privacy Act or other law.  Because this is the only relief plaintiffs seek for all of their claims against these defendants, the Court should dismiss the entire Amended Complaint as to the FBI and Defendants Mueller and Martinez on this ground.  In addition, plaintiffs' claims against the FBI, official capacity defendants, and the United States brought pursuant to Section 1810 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1810, should be dismissed because sovereign immunity bars this cause of action as to the United States and Government officials sued in their official capacities.

Absent dismissal on the non-privilege grounds advanced herein, the FBI and official capacity defendants do not seek to dismiss plaintiffs' Fourth Amendment and FISA claims based on the state secrets privilege.  At least at this stage of the proceedings, sufficient non-privileged evidence may be available to litigate these claims should they otherwise survive motions to dismiss on non-privilege grounds. The FBI has previously disclosed in a separate criminal proceeding that Monteilh collected audio and video information for the FBI, and some of that audio and

4

1   video information was produced in that prior case. *See* Public Declaration of

2   Mark. F. Giuliano ("Pub. Giuliano Decl.") ¶ 12 (Dkt. 33). The FBI has been

3   reviewing additional audio and video collected by Monteilh for possible disclosure

4   in connection with further proceedings on the issue of whether the FBI instructed

5   or permitted Monteilh to leave recording devices unattended in order to collect

6   non-consenting communications. *See id.* The FBI expects that the majority of the

7   audio and video will be available in connection with further proceedings. Thus,

8   while it remains possible that the need to protect properly privileged national

9   security information might still foreclose litigation of these claims, at present the

10  FBI and official capacity defendants do not seek to dismiss these claims based on

11  the privilege assertion.

12      In contrast, however, litigating plaintiffs' allegations of an indiscriminate

13  investigation based solely on religion would risk or require the disclosure of

14  properly privileged information and, unless these claims are dismissed on non-

15  privilege grounds, the Government seeks their dismissal as to all defendants at the

16  outset based on the state secrets privilege. While presented under various statutory

17  and constitutional theories, plaintiffs' discrimination claims raise one issue:

18  whether the FBI, through its agents, impermissibly investigated and collected

19  information on plaintiffs (and other putative class members) based solely on their

20  religion. *See* FAC, Causes of Action 1 to 7, at 62-65; *see also id.* Cause of Action

21  11 at 67-68 (FTCA). These claims put at issue core privileged information

22  concerning the scope and purpose of Operation Flex. Because plaintiffs allege that

23  the FBI indiscriminately collected information based solely on religion, any

24  rebuttal of this claim would risk or require disclosure of whom and what the FBI

25  was investigating under Operation Flex and why. This is precisely the kind of

26  sensitive investigative information that cannot be disclosed without risking

27

28                                        5

SER 236

1    significant harm to national security.

2         The Court should first consider the impact of the state secrets privilege

3    assertion on claims brought against the individual capacity defendants.  These

4    individuals have threshold legal defenses under the *Bivens* and qualified immunity

5    doctrines.  Moreover, because litigation of plaintiffs' religious discrimination

6    claims against the individual capacity defendants will inherently put at issue and

7    risk the disclosure of privileged information, these claims should be dismissed at

8    the outset as to the individual capacity defendants.  *Mohammed v. Jeppesen*

9    *Dataplan, Inc.,* 614 F.3d 1070, 1080-81 (9th Cir. 2010) (state secrets privilege may

10   be asserted at the pleading stage rather than waiting for an evidentiary dispute).

11   Similarly, because privileged information will also be inherently at risk of

12   disclosure in any litigation of the religious discrimination claims against the FBI,

13   official capacity defendants, and the United States, dismissal of these claims as to

14   these defendants based on the privilege assertion would also be appropriate at this

15   stage.  To the extent the Court wishes to evaluate further the impact of the privilege

16   assertion on claims against the Government, it should at least dismiss plaintiffs'

17   religious discrimination claims against the individual capacity defendants, in light

18   of their unique threshold legal defenses, and require plaintiffs to demonstrate in

19   proceedings under Fed. R. Civ. P. 16 and 26 what discovery it intends to seek

20   against the Government Defendants concerning these claims.

21        Proceeding in the foregoing manner, the Government seeks to advise the

22   Court at the outset of the underlying national security information that lies at the

23   heart of this case and must be protected, while narrowly tailoring its request for

24   dismissal by presenting non-privilege defenses first, seeking dismissal of some but

25   not all claims on privilege grounds, and focusing on the impact of the privilege on

26   the threshold defenses of the individual capacity defendants, before addressing

27

28                                            6

whether any remaining claims against the Government Defendants should also be dismissed on privilege grounds.

## **BACKGROUND**

## I.   **Plaintiffs' Allegations**

Plaintiffs allege that the FBI, through the use of Craig Monteilh as a confidential informant, indiscriminately collected information on thousands of Muslims, including hundreds of phone numbers, thousands of email addresses, hundreds of hours of video, and thousands of hours of audio.  *See* FAC ¶ 2. Plaintiffs allege that, as part of Operation Flex, Monteilh was instructed to infiltrate ten mosques in southern California, *see id.* ¶¶ 92, 94, in order to gather information on Muslims due solely to their religion.  *Id.* ¶ 3; *see also id.* ¶¶ 86, 89-91, 99.  The three named plaintiffs — Yassir Fazaga, Ali Uddin Malik, and Yasser AbdelRahim — allege that Monteilh's interactions with them were part of this alleged "dragnet" surveillance.  *Id.* ¶ 86.  These plaintiffs also make specific allegations concerning the FBI's alleged investigative interest in them.  For example, plaintiffs allege that the FBI instructed Monteilh to conduct surveillance at Orange County Islamic Foundation, where plaintiff Fazaga was imam, on the ground that the FBI believed Fazaga was radical.  *See id.* ¶¶ 168-69; *see also id*. ¶¶ 170-82.  Plaintiffs also allege that the FBI told Monteilh that it was suspicious of plaintiff Malik because he had gone to a religious school in Yemen and was allegedly involved in the Muslim Student Union.  *See id.* ¶¶ 186-87; *see also id.* ¶¶ 188-92; 194-95.  Plaintiffs also allege that the FBI told Monteilh that plaintiff AbdelRahim's home was under surveillance, and that the FBI believed AbdelRahim was the leader of a terrorist cell.  *See id.* ¶¶ 200-01; *see also id*. ¶¶ 202-14.  The Amended Complaint sets forth alleged instructions provided to Monteilh, *see id.* ¶¶ 89-119; 129-35, and asserts in particular that the FBI acquiesced in Monteilh leaving audio devices unattended to

SER 238

record proceedings inside mosques.  *See id.* ¶¶ 124-127.

## II.     **FBI Post 9/11 Counterterrorism Concerns and Policies**

Plaintiffs allege that Operation Flex was part of the FBI's effort to focus counterterrorism investigations after the attacks of September 11, 2001 on Muslim communities in the United States.  *See* FAC ¶ 24.  They assert that investigative activity based on religion is contemplated by and permissible under guidelines issued by the Attorney General and the FBI after the 9/11 attacks and the FBI's *Domestic Investigations and Operations Guides* ("DIOG") published in December 2008.  *See id.* ¶¶ 32-37.

Since the 9/11 attacks, the FBI has made clear that its top priority continues to be the prevention of terrorist attacks against the United States.  *See* Pub. Giuliano Decl. ¶ 7.  As the FBI explains, al Qaeda's intent to conduct high-profile attacks inside the United States has been unwavering.  *See id.*  Threats to the U.S. homeland can be seen, for example, in the August 2006 plan to attack U.S.-bound aircraft using improvised explosive devices, as well as terrorist plans to attack the New York City subway system and detonate a car bomb in Times Square.  *See id.* ¶¶ 7-9.  The threat of home-grown violent extremists — those who have lived primarily inside the United States and may commit acts of violence in furtherance of the objectives of a foreign terrorist organization — remains a particular concern of the FBI.  *See id.* ¶ 10. The Los Angeles area itself saw such a threat in the exposed 2005 plot of extremists to attack a military recruiting center in Santa Monica and later attack a West Los Angeles temple on Yom Kippur.  *See id.*  It is therefore beyond reasonable dispute that the FBI must remain vigilant in detecting and preventing terrorist attacks in the United States.

At the same time, FBI policy prohibits investigative activity solely on the basis of religion or First Amendment expression.  The Attorney General's

**SER 239**

1    Guidelines for FBI National Security Investigation and Foreign Intelligence

2    Collection, effective October 31, 2003, and the guidelines which superseded them

3    — the Attorney General's Guidelines for Domestic FBI Operations issued by the

4    Attorney General on September 29, 2008 — state: "These guidelines do not

5    authorize investigating or collecting or maintaining information on United States

6    persons solely for the purpose of monitoring activities protected by the First

7    Amendment or the lawful exercise of other rights secured by the Constitution or

8    law of the United States." *See* Pub. Giuliano Decl. ¶ 4, Ex. 2 (Excerpts 2008 AG

9    Guidelines) at 13.

10       Likewise, the FBI's DIOG prohibits investigative activity conducted for the

11   sole purpose of monitoring the exercise of Constitutional rights or on the basis of

12   race, ethnicity, national origin, or religion. *See* Pub. Giuliano Decl., Ex. 3 (DIOG

13   Excerpts) at 21-38. Under the DIOG, there must be an authorized purpose for

14   investigative activity that could have an impact on religious practice. *Id.* at 21.

15   The DIOG explains that this policy does not mean that religious practitioners or

16   religious facilities are completely free from being examined as part of FBI

17   investigative activity. If such practitioners are involved in — or such facilities are

18   used for — activities that are the proper subject of FBI-authorized investigative

19   activities, religious affiliation does not immunize such individuals to any degree

20   from FBI investigative action. *Id.* at 27.

21                              **ARGUMENT**

22       The allegations in this case put squarely at issue whether a specific FBI

23   investigation in Southern California complied with FBI policy and the Constitution

24   and laws of the United States. The Government has identified at the outset of the

25   case certain information implicated by plaintiffs' claims that the Attorney General

26   has determined is properly subject to exclusion from the case in the interests of

27

28                                    9

**SER 240**

national security.  But the Government does not seek to dismiss all claims in this case based on the privilege assertion.  In order to limit the impact of the Attorney General's privilege assertion, the Government first sets forth reasons, independent of the state secrets privilege, as to why plaintiffs' claims against the FBI and official capacity defendants, as well as against the United States under the FTCA, should be dismissed.  To the extent that plaintiffs' Fourth Amendment and FISA claims survive motions to dismiss by the Government and individual capacity defendants, information needed to litigate these claims may be available, and the Government does not seek to dismiss them based on the privilege assertion at this time.[2]  However, to the extent plaintiffs' claims are not dismissed on non-privilege grounds, the Court should find that litigation of plaintiffs' various claims challenging an alleged discriminatory investigation, *see* FAC, Claims 1-7, 11,

---

[2] During the conferral process prior to this motion under Local Rule 7-3, plaintiffs indicated that their Fourth Amendment challenge to the alleged collection of communications by Monteilh through an audio device extends solely to the alleged collection of audio in circumstances where a recording device was allegedly left unattended and there was no consent to Monteilh's presence.  *See* FAC ¶¶ 98, 125-128, 192; *see also id.* ¶ 251 (alleging Fourth Amendment violation through alleged audio recordings "without a warrant and where no party to the communication consented").  The law is clear that no Fourth Amendment violation would arise in the warrantless collection of consensual communications by a confidential informant.  *Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408, 17 L. E. 2d 374 (1966); *United States v. Aguilar, et al.*, 871 F.2d 1436, 1471 (9th Cir. 1989).  This "invited informer" doctrine applies regardless of the means by which communications are collected (including by video surveillance) where there was consent to the informant's presence.  *See, e.g. United States v. Nerber,* 222 F.3d 597 (9th Cir. 2000) (warrantless video surveillance of hotel room does not violate the Fourth Amendment as to communications collected in the consensual presence of a confidential informant); *United States v. Lee*, 359 F.3d 194 (3rd Cir. 2004) (Alito, J.) (same).  Thus, to the extent plaintiffs seek to challenge the alleged collection of communications where they consented to Monteilh's presence, they fail to state a Fourth Amendment claim.

SER 241

would risk or require the disclosure of properly privileged information and should

be dismissed on that basis, at least as to the individual capacity defendants, who

have the right to raise threshold legal defenses under *Bivens* and who could not

adequately defend against these claims without risking disclosure of information

properly protected by the Government.

## I. PLAINTIFFS' AMENDED COMPLAINT SHOULD BE DISMISSED ON NON-PRIVILEGE GROUNDS.

### A. Plaintiffs' Claims Against the FBI and Official Capacity Defendants Should be Dismissed Because the Relief Sought Against these Defendants is Not Available Under Applicable Law.

Plaintiffs' Amended Complaint seeks the same relief against the FBI and

official capacity defendants as to all of their claims: the destruction or disclosure of

any records pertaining to them allegedly collected by Monteilh as an FBI

confidential informant.  As set forth below, this relief is not available from the FBI

and official capacity defendants and, thus, all claims against these defendants

should be dismissed.  First, even as amended, plaintiffs fail to state a claim for

which the Privacy Act authorizes expungement, and they have failed to exhaust

administrative remedies for their claim for access to any records about them.  In

addition, the records sought by plaintiffs, to the extent they exist, would reside in

systems of records that the FBI has properly exempted from the access and

amendment provisions of the Privacy Act, further foreclosing the relief sought.

Finally, operation of the Act precludes the access and expungement relief plaintiffs

seek as to all claims against the FBI and official capacity defendants.

### 1. Plaintiffs Fail to State a Claim Upon Which Relief May Be Granted Under the Privacy Act.

Plaintiffs allege that the FBI, "through Monteilh, collected and maintained

records describing how Plaintiffs exercised their First Amendment rights, in

violation of 5 U.S.C. § 552a(e)(7)."  FAC ¶ 246.  Plaintiffs further allege that on or

11

**SER 242**

about September 6 and 12, 2011, they submitted "letters to the FBI requesting that the FBI disclose all records in the possession of the FBI, associated with each Plaintiff, that were 'gathered through the surveillance of former FBI informant Craig Monteilh and/or Operation Flex, as well as any information derived from that information'" and that the FBI expunge any such records that describe the exercise of their First Amendment rights. *Id.* ¶ 248. Plaintiffs allege that the FBI has failed to disclose any records in accordance with § 552a(d)(1) of the Privacy Act. *Id.* ¶ 249. Plaintiffs request that the Court order defendants to "destroy or return any information gathered through the unlawful surveillance program by Monteilh and/or Operation Flex . . . and any information derived from that unlawfully obtained information." *Id.* at 68-69 (Prayer for Relief ¶ b).

The Privacy Act provides civil remedies for certain violations of the Act, including in pertinent part whenever any agency:

> (A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;
>
> (B) refuses to comply with an individual request under subsection (d)(1) of this section;
>
> . . . or
>
> (D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,
>
> the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

5 U.S.C. § 552a(g)(1).[3]

In plaintiffs' initial Complaint, the only civil remedies provision their

---

[3] Plaintiffs do not seek any relief under subsection (g)(1)(C), which concerns the accuracy of records.

SER 243

1  Privacy Act claim invoked was subsection (g)(1)(D).  Although their Amended

2  Complaint continues to cite that subsection as a source of jurisdiction, *see* FAC

3  ¶ 9, plaintiffs have otherwise dropped all references to any of the civil remedies

4  provisions except by general inclusion in their citation of the entire Act.  *See* FAC,

5  Eighth Cause of Action ("Violation of the Privacy Act, 5 U.S.C. § 552a(a)-(l)").

6  However, to the extent that plaintiffs are asserting that the FBI violated subsection

7  (d)(1) of the Act by failing to provide them access to the documents they

8  requested, *see* FAC ¶ 249, their claim must be construed as an "access" suit under

9  subsection (g)(1)(B).  As to this claim, plaintiffs have failed to exhaust their

10  administrative remedies and, in any event, plaintiffs are not entitled to

11  expungement relief under either (g)(1)(A), (B) or (D).

12

13            **a.**    **Plaintiffs Have Not Exhausted Their Administrative Remedies For a (g)(1)(B) Action.**

14         Although the text of the Privacy Act does not address exhaustion of

15  administrative remedies for access claims, courts have recognized that requests for

16  access under subsection (d)(1) must comply with agency procedures and exhaust

17  all available administrative remedies.  *See, e.g., Taylor v. U.S. Treasury Dep't*, 127

18  F.3d 470, 476-77 (5th Cir. 1997) (finding that although exhaustion requirement for

19  access suit was not jurisdictional, "application of the jurisprudential exhaustion

20  doctrine" mandated dismissal of suit); *Reeves v. United States*, No. 94-1291, 1994

21  WL 7822235, *3 (E.D. Cal. Nov. 16, 1994) (dismissing Privacy Act access claim

22  for failure to exhaust administrative remedies), *aff'd*, 108 F.3d 338 (9th Cir. 1997)

23  (unpublished); *Broaddrick v. Exec. Office of the President*, 139 F. Supp. 2d 55, 61

24  (D.D.C. 2001) (same); *see also Morrison-Knudsen Co. v. CHG Int'l, Inc.*, 811 F.2d

25  1209, 1223 (9th Cir. 1987) (in applying discretionary exhaustion requirement,

26  district court "must balance the agency's interest in applying its expertise,

27

28                      13

1    correcting its own errors, making a proper record, and maintaining an efficient,

2    independent administrative system, against the interests of private parties in

3    finding adequate redress.").  The FBI has a number of regulations governing the

4    submission, handling, and administrative appeal of Privacy Act access requests.

5    *See generally* 28 C.F.R. § 16.41-16.45.

6         Although the Amended Complaint alleges that the FBI has "to date failed to

7    provide Plaintiffs with [the requested] records or otherwise to respond to their

8    requests," plaintiffs — by their own admission — submitted their requests less

9    than a week before they filed their amended complaint; indeed, one of these

10   requests was submitted on September 12, 2011, *the day before* the amended

11   complaint was filed.  *See* FAC ¶ 248; Declaration of Christopher N. Morin ("Morin

12   Decl."), Ex. A.[4]  Significantly, plaintiffs do not allege that their requests were

13   denied or that they have filed an administrative appeal of any such denial, as

14   required by 28 C.F.R. § 16.45.  Plaintiffs plainly have not exhausted their

15   administrative remedies, and for this reason alone their Privacy Act claim should

16   be dismissed.[5]

17

18

19   _____

20       [4]  On September 22, 2011, the FBI responded to plaintiffs' requests with
     form letters asking plaintiffs to provide additional information to verify their
21   identities, as required by FBI regulations.  *See* Morin Decl. ¶ 6; 28 C.F.R.
     §16.41(d).  Plaintiffs provided this information on October 13, 18, and 21, and the
22   FBI is currently processing their requests.  Morin Decl. ¶¶ 6-7.

23
         [5]Although plaintiffs also requested expungement of the same records
24   pursuant to the amendment provisions of the Privacy Act, *see* Morin Decl., Ex. A,
     their complaint does not purport to bring any claim under subsection (g)(1)(A),
25   and, in any event, plaintiffs have also failed to exhaust their administrative
     remedies with respect to any such claim.  5 U.S.C. § 552a(d)(2); *see also* 28 C.F.R.
26   § 16.46.

27

28                                       14

### b. Plaintiffs Cannot Obtain Their Requested Relief Under the Privacy Act.

The only relief plaintiffs seek against the FBI under the Privacy Act is for access to or the destruction of any records that may exist about them. *See* FAC ¶ 15. Plaintiffs do not seek damages for their Privacy Act claim. However, injunctive relief under the Privacy Act is only available for "amendment" actions brought under subsection (g)(1)(A) and "access" actions brought under (g)(1)(B). The relief for these two types of actions is set forth in subsections (g)(2) and (g)(3), respectively, while subsection (g)(4), by comparison, provides for monetary damages for "any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful."

Consistent with the plain language of the statute, the Ninth Circuit has held that "Congress limited injunctive relief to the situations described in 5 U.S.C. § 552a(g)(1)(A) and (2) and (1)(B) and (3)." *Cell Assocs. Inc. v. NIH*, 579 F.2d 1155, 1161 (9th Cir. 1978). Plaintiffs have not brought an amendment claim, and their access claim, as discussed above, is precluded for failure to exhaust administrative remedies. Moreover, the remedy for a (g)(1)(B) access claim is limited to an injunction against the agency from withholding the records and production to the complainant of any records improperly withheld; it does not include or contemplate expungement. 5 U.S.C. § 552a(g)(3)(A).

To the extent that plaintiffs continue to rely on subsection (g)(1)(D), the only remedy available to them under that provision is damages, which they have explicitly disavowed. Nor does subsection (e)(7) alone, unconnected to an amendment or access claim, confer a right to equitable relief. *See, e.g., Comm. in Solidarity with the People of El Salvador v. Sessions*, 738 F. Supp. 544, 548 (D.D.C. 1990) (denying request for disposal of records in suit alleging that FBI

15

1 investigation for terrorist activity, pursuant to tip by informant later deemed to be

2 untrustworthy, violated plaintiffs' rights under First Amendment and Privacy Act),

3 *aff'd*, 929 F.2d 742 (D.C. Cir. 1991); *Socialist Workers Party v. Att'y Gen.*, 642 F.

4 Supp. 1357, 1431 (S.D.N.Y. 1986) (noting that Privacy Act "provides for

5 injunctive relief in certain circumstances, but an (e)(7) violation alone is not one of

6 these"); *but see Haase v. Sessions*, 893 F.2d 370, 374-75 (D.C. Cir. 1990)

7 (suggesting in dicta that amendment or expungement might be available "by virtue

8 of (g)(1)(D)'s general grant of jurisdiction"). In short, plaintiffs' Privacy Act

9 claim should be dismissed for failure to state a claim upon which relief can be

10 granted.

11         **2.    FBI Investigative Records Are Exempt from the Access and Amendment Provisions of the Privacy Act and Are**

12              **Therefore Not Subject to Disclosure or Expungement.**

13       Plaintiffs are further foreclosed from the remedy they seek because the

14 records at issue, to the extent they exist, are exempt from the access and

15 amendment provisions of the Privacy Act. Their assertion to the contrary, *see* FAC

16 ¶ 249, has no support in the law. An agency may exempt any system of records

17 from any part of the Act that is not expressly designated non-exemptible if the

18 system is "maintained by an agency or component thereof which performs as its

19 principal function any activity pertaining to the enforcement of criminal laws" and

20 consists of "information compiled for the purpose of a criminal investigation,

21 including reports of informants and investigators, and associated with an

22 identifiable individual." 5 U.S.C. § 552a(j)(2)(B). The Act also authorizes

23 additional exemptions from specific parts of the Act for systems of records

24 consisting of "investigatory material compiled for law enforcement purposes, other

25 than material within the scope of subsection (j)(2)." 5 U.S.C. § 552a(k)(2). Both

26 subsections 552a(j) and (k) allow for exemption of qualifying records from

27

28                   16

**SER 247**

subsection (d), which, as noted above, governs the agency's obligations to grant individuals access to and amendment of records pertaining to them.

The FBI has attested that the records maintained by the FBI containing information gathered by Monteilh and Operation Flex constitute investigatory material compiled for law enforcement and criminal investigation purposes, and that they are contained in the Central Records System (CRS) and Electronic Surveillance (ELSUR) indices. Morin Decl. ¶ 9.[6] Pursuant to § 552a(j) and (k), the FBI has properly exempted the CRS and ELSUR from the access and amendment provisions of the Privacy Act. Morin Decl. ¶ 9; 28 C.F.R. § 16.96(a)(1), (c)(1). The CRS has been so exempted because compliance with the access requirements "could compromise sensitive information classified in the interest of national security, interfere with the overall law enforcement process by revealing a pending sensitive investigation, possibly identify a confidential source or disclose information which would constitute an unwarranted invasion of another individual's personal privacy, reveal a sensitive investigative technique, or constitute a potential danger to the health or safety to law enforcement personnel," and because requiring the FBI to amend any information "thought to be incorrect, irrelevant or untimely," given "the nature of the information collected and the essential length of time it is maintained," would "create an impossible

_____

[6] Because defendant FBI relies on facts outside the scope of the FAC to support this argument, the Court may in the alternative consider this defense pursuant to Rule 56 of the Federal Rules of Civil Procedure and grant summary judgment for the FBI. The sole issue of fact material to this question is whether the records implicated by the claims reside in a system of records exempt from the amendment provisions of the Act and, hence from expungement. If, however, the disclosure of privileged information is necessary to decide whether the records at issue are subject to an injunction ordering destruction, this claim for relief should be dismissed based on the Government's privilege assertion, discussed *infra*.

17

1  administrative and investigative burden by forcing the agency to continuously

2  retrograde its investigations attempting to resolve questions of accuracy." *See*

3  Morin Decl. ¶ 10; 28 C.F.R. § 16.96(b)(2)(i), (iii).  Similarly, the ELSUR indices

4  have been exempted because "[individual] access to records in this system would

5  compromise ongoing investigations, reveal investigatory techniques and

6  confidential informants, and invade the privacy of private citizens who provide

7  information in connection with a particular investigation." *See* Morin Decl. ¶ 11;

8  28 C.F.R. § 16.96(d)(2).

9       Because the records sought by plaintiffs, to the extent they exist, would be

10  exempt from the access provisions of the Privacy Act, it follows that they cannot

11  be disclosed to plaintiffs.  *See Exner v. FBI*, 612 F.2d 1202, 1205 (9th Cir. 1980)

12  (holding that based on (j)(2)(B) exemption and 28 C.F.R. § 16.96(a) and (b)(2),

13  plaintiff "was not entitled to disclosure of any of the information concerning her

14  that appears in the FBI files").  And because any such records would also be

15  exempt from the amendment provisions of the Privacy Act, it further follows that

16  they cannot be expunged, which is nothing more than an extreme form of

17  amendment.  *See Doe v. FBI*, 936 F.2d 1346, 1352 (D.C. Cir. 1991) ("[A]

18  determination that a civil claim for expungement may be foreclosed by an agency's

19  exemption rule is not only consistent with, but necessary to effectuate, Congress'

20  intent that certain records systems may truly be sheltered from the Act's

21  amendment procedures.").  Again, plaintiffs' claim that the FBI violated subsection

22  (e)(7) of the Act does not affect this conclusion.  The FBI does not contend that

23  any responsive records (if any) would be exempt from (e)(7), but rather that they

24  would be exempt from amendment and, thus, expungement.  *See Bassiouni v. FBI*,

25  436 F.3d 712, 723 (7th Cir. 2006) (because CRS "is not subject to the subsection

26  (d) amendment process, the FBI cannot be held liable under (g)(1)(A) for failure to

27

28                                    18

1   comply with that process" and plaintiff thus had "no avenue for relief under

2   § 552a(g)(1)(A)" for his (e)(7) claim).  The Court is therefore proscribed from

3   ordering the FBI to return or destroy any such records .

4       Moreover, even if this remedy were permitted under the Privacy Act, the

5   destruction or removal of records from FBI files could significantly impair the

6   FBI's ability to conduct ongoing or future investigations.  First, when the FBI

7   receives new information that may relate to a prior investigation, it examines and

8   seeks to verify that information in the context of information it has already

9   received.  Thus, if the FBI's existing records regarding Monteilh and Operation

10  Flex were expunged, and further information relating to the investigative matter at

11  issue were later brought to the FBI's attention, the investigating agent would not

12  have the complete context in which to evaluate the newly received information and

13  properly assess the matter.  Morin Decl. ¶¶ 12-13.  Further, the maintenance of

14  investigative records permits the FBI to assess the reliability of source of

15  information it receives over time.  The destruction of files would severely hinder

16  the FBI's ability to evaluate the accuracy and credibility of information received

17  from the source.  *Id.* ¶ 14.  In addition, the FBI maintains investigative records for

18  historic and accountability purposes.  The destruction of records relating to

19  investigative activity would impede any future inquiry into how the FBI responded

20  to information it received.  *Id.* ¶ 15.  This consideration is especially crucial where

21  counterterrorism investigations are at issue.  For these reasons, plaintiffs' request

22  for expungement would plainly conflict with the FBI's statutorily-based exemption

23  of records from the access and amendment provisions of the Privacy Act.

24      **3.      Because Plaintiffs Are Foreclosed From Obtaining
                  Expungement Under the Privacy Act, They Cannot Obtain
25                Expungement for Any of Their Causes of Action.**

26  Finally, to the extent that plaintiffs seek expungement and disclosure as a

27

28                                    19

SER 250

remedy for their other claims against the FBI and official capacity defendants, they are foreclosed from doing so because the Privacy Act speaks directly to that issue: the FBI should not be compelled to amend records that it has exempted pursuant to subsections (j) and (k) of the Act. The Amended Complaint fails to identify any other law that clearly overrides or makes exception to that rule.

To the extent plaintiffs may claim a common law right to the remedy of expungement based on the court's general equitable powers, *see, e.g., Fendler v. U.S. Parole Comm'n*, 774 F.2d 975, 979 (9th Cir. 1985), the Ninth Circuit has more recently called that right into question[7] and, in any event, even assuming, *arguendo*, that the Court has general equitable authority to order expungement, such authority is trumped by the Privacy Act in this case.

Federal common law is "subject to the paramount authority of Congress," such that "when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking

---

[7] *See United States v. Sumner*, 226 F.3d 1005, 1014-15 (9th Cir. 2000) (holding that "expungement of the record of a valid arrest and conviction usurps the powers that … the Constitution allocated to Congress, the Executive, and the States" and that "a district court does not have ancillary jurisdiction in a criminal case" to expunge such a record "where the sole basis alleged by the defendant is that he or she seeks equitable relief"); *see also United States v. Crowell*, 374 F.3d 790, 796 (9th Cir. 2004) (citing *Sumner* in holding that district court lacked jurisdiction to consider defendant's "solely 'equitable'" claim for expungement). The Ninth Circuit's retreat in *Sumner* and *Crowell* from the notion of "inherent" equitable power to grant expungement relief is based in part on *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994), in which the Supreme Court stressed that federal courts have limited subject matter jurisdiction to hear only independent actions authorized by the Constitution or statute. *See Kokkonen*, 511 U.S. at 377; *Sumner*, 226 F.3d at 1010; *Crowell*, 374 F.3d at 792-96; *see also United States v. Meyer*, 439 F.3d 855, 859-62 (8th Cir. 2006); *Scruggs v. United States*, 929 F.2d 305, 306-07 (7th Cir. 1991).

20

by federal courts disappears." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313-14, 101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981). The Privacy Act clearly reflects Congress' intent to limit equitable relief to certain types of actions and to allow agencies to exempt records relating to criminal and law enforcement investigation from those parts of the Act requiring that individuals be permitted to examine and amend those records. Indeed, the Ninth Circuit has held that where Congress has established a statutory remedy for access to or disclosure of records, that authority governs claims for such access. *See Spurlock v. FBI*, 69 F.3d 1010, 1016 (9th Cir. 1995) (district court lacked statutory or inherent authority to order FBI to produce documents that were exempt from disclosure under the Freedom of Information Act.); *see also Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 936-37 (D.C. Cir. 2003) (rejecting plaintiffs' claim of common-law right of access to records on ground that FOIA "has provided a carefully calibrated statutory scheme, balancing the benefits and harms of disclosure"). As such, the Privacy Act preempts any common-law right plaintiffs may have to access or expungement as a remedy for any of their claims.

> **4.** **Even if the Privacy Act Did Not Preempt a General Expungement Remedy, Plaintiffs Have Pled No Harm that Would Entitle Them to Such Relief Here.**

Even if the Privacy Act did not operate to foreclose expungement relief for plaintiffs' other claims, plaintiffs still have failed to state a claim for such relief. "Courts which have recognized an equitable power to expunge have unanimously observed that it is a narrow power, appropriately used only in extreme circumstances." *United States v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991). The Ninth Circuit has held that a court must find that there is a "real and immediate threat of irreparable harm before it can allow expungement." *Fendler*, 774 F.2d at 979 (citation omitted); *see also Fendler v. U.S. Bureau of Prisons*, 846 F.2d 550,

21

554-55 (9th Cir. 1988); *accord Reuber v. United States*, 750 F.2d 1039, 1068 (D.C. Cir. 1985) (Bork, J., concurring) (even under "inherent authority" doctrine, district court must find "a real and immediate threat of irreparable harm before it can allow expungement"). The propriety of an expungement order is determined by applying a balancing test in which the harm caused to an individual by the existence of any records is weighed against the utility to the Government of their maintenance. *Doe v. U.S. Air Force*, 812 F.2d 738, 741 (D.C. Cir. 1987). Plaintiffs have not alleged or shown that they are facing any threat of irreparable harm, let alone one that is real and immediate, from the mere existence of records that were allegedly unlawfully collected by the FBI. Indeed, the harms alleged by plaintiffs in the Amended Complaint relate only to the alleged impact of their *past* encounter with an FBI informant. Nowhere do plaintiffs allege that they face an imminent threat that any information about them in FBI records will be used against them in the future. By contrast, the FBI risks substantial harm for the expungement of those records, as described above. *See supra* and Morin Decl. ¶¶ 12-15.

**B.    Plaintiffs' Tenth Cause of Action Brought Under Section 1810 of the Foreign Intelligence Surveillance Act Should Be Dismissed on Sovereign Immunity Grounds.**

Plaintiffs' Tenth Cause of Action, brought against "all defendants," alleges that the defendants, acting through Monteilh, used electronic, mechanical or other surveillance devices without a warrant in violation of Section 110 of the FISA, 50 U.S.C. § 1810 (hereafter "Section 1810"). This claim is apparently based on the allegation that Monteilh left recording devices unattended with the FBI's knowledge and permission. But Section 1810 does not permit plaintiffs' cause of action against the United States and its agencies and officials sued in their official capacity.

"It is well settled that the United States is a sovereign, and as such, is

22

1   immune from suit unless it has expressly waived such immunity and consented to

2   be sued." *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985). *Accord*

3   *United States v. Testan*, 424 U.S. 392, 399, 96 S. Ct. 948, 47 L. Ed. 2d 114 (1976).

4   As a result, courts cannot award relief against officials of the United States unless a

5   statute expressly waives the Federal Government's sovereign immunity. *FDIC v.*

6   *Meyer,* 510 U.S. 471, 476-77, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994); *Sierra*

7   *Club v. Whitman*, 268 F.3d 898, 901 (9th Cir. 2001) ("suits against officials of the

8   United States . . . in their official capacity are barred if there has been no waiver [of

9   sovereign immunity]").

10      The terms of the United States' waiver of sovereign immunity constitute "an

11   important limitation on the subject matter jurisdiction of federal courts." *Dunn &*

12   *Black, P.S. v. United States,* 492 F.3d 1084, 1088 & n.2 (9th Cir. 2007) (quoting

13   *Vacek v. U.S. Postal Serv.,* 447 F.3d 1248, 1250 (9th Cir. 2006), *cert. denied,* 127

14   S. Ct. 2122 (2007)). Absent an explicit waiver, a district court lacks subject matter

15   jurisdiction over any claim against the United States. *Gilbert,* 756 F.2d at 1458.

16   The burden of showing an unequivocal waiver lies with the party who seeks to

17   bring suit against the federal government. *West v. FAA,* 830 F.2d 1044, 1046 (9th

18   Cir. 1987). And because "sovereign immunity is a jurisdictional defect, . . . [i]t

19   may be asserted by the parties at any time or by the court *sua sponte*." *Pit River*

20   *Home & Agric. Coop. Ass'n v. United States,* 30 F.3d 1088, 1100 (9th Cir. 1994).

21   Any ambiguity in the terms of the waiver is strictly construed in favor of the

22   federal government and therefore a waiver may not be implied, but "must be

23   unequivocally expressed in statutory text." *Lane v. Pena*, 518 U.S. 187, 192, 116

24   S. Ct. 2092, 135 L. Ed. 2d 486 (1996).

25      Section 1810 of Title 50 (FISA Section 110), entitled "Civil Liability," does

26   not waive the United States' sovereign immunity for plaintiffs' claims against the

27

28                                          23

SER 254

FBI and official capacity defendants.[8]  Section 1810 provides in pertinent part:

> An aggrieved person, other than a foreign power or an agent of a foreign power, as in defined in section 1801(a) or (b)(1)(A) of this title, respectively, who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action *against any person* who committed such violation . . .

50 U.S.C. § 1810 (emphasis added).  FISA defines "person" to mean "any *individual*, including any *officer* or *employee* of the Federal Government, or any group, entity, association, corporation, or foreign power."  *See* 50 U.S.C. § 1801(m) (emphasis added).  But this provision does not expressly waive sovereign immunity for a damages action against the United States or its agencies or officials in their official capacities.

First, there is no mention of the United States among the entities subject to suit in Section 1810 – a highly significant omission because Congress has expressly authorized damage actions "against the United States" for certain violations of FISA, but not in Section 1810.  Specifically, Congress has authorized an action "against the United States to recover money damages" for violations of FISA minimization and use restrictions under 50 U.S.C. §§ 1806(a), 1825(a), and 1845(a).  *See* 18 U.S.C. § 2712.  Plaintiffs do not seek damages under any of these provisions.  In specifying when damage remedies for FISA violations are available

---

[8]  A district court in the Northern District of California has ruled that Section 1810 "implicitly" waives the sovereign immunity of the United States to suit for alleged unlawful electronic surveillance.  *See In re: Nat'l Sec. Agency Telecomm. Records Litig., Al-Haramain Islamic Found v. Bush*, 564 F. Supp 2d 1109, 1125 (N.D. Cal. 2008).  This ruling applies a standard of "implicit" waiver that plainly is incorrect.  *See Dunn & Black*, 492 F.3d at 1088 (waiver of sovereign immunity "cannot be implied, but must be unequivocally expressed"); *Dep't of Energy v. Ohio*, 503 U.S. 607, 615, 112 S. Ct. 1627, 118 L. Ed. 2d 255 (1992).  *Al-Haramain* is presently on appeal to the Ninth Circuit.

1  "against the United States," Congress has waived sovereign immunity only as to

2  those violations of FISA.

3       That Section 1810 authorizes suit against "persons" – defined to include an

4  officer or employee of the United States – does not alter this conclusion.  The

5  general presumption in the law is that term "person" does *not* include the

6  sovereign.  *See Vt. Agency of Natural Res. v. United States*, 529 U.S. 765, 781, 120

7  S. Ct. 1858, 146 L. Ed. 2d 836 (2000).  This presumption may be overcome "only

8  upon some affirmative showing of statutory intent to the contrary."  *Id.*; *see also*

9  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 109 S. Ct. 2304, 105 L. Ed. 2d

10  45 (1989) ("in common usage, the term 'person' does not include the sovereign,

11  [and] statutes employing the [word] are ordinarily construed to exclude it.").[9]  No

12  such indication exists here, particularly where Congress has expressly identified

13  those FISA causes of actions that may be brought "against the United States."

14  Moreover, the phrase "any officer or employee of the Federal Government" is

15  included within the meaning of term "individual" in the FISA definition of

16  "person."  *See* 50 U.S.C. § 1801(m).

17       Most reasonably construed, Section 1810 authorizes suits against federal

18  officials in their individual capacity.  Indeed, this reading makes complete sense

19  when it is considered that Section 1810 links the *civil* liability of a person under

20  that provision to the person's *criminal* liability under 50 U.S.C. § 1809 for

21  unlawful electronic surveillance.  Even putting all other considerations aside, the

22  United States is not a "person" who may be guilty of a crime under Section 1809,

23  and for that reason also cannot be a "person" subject to civil liability under Section

24

25      [9] *See also Asmar v. U.S. Dep't. of Treasury,* 680 F. Supp. 248, 250 (E.D.

26  Mich. 1987) (remedy against "any person or entity" for unlawful interception did

27  not waive the sovereign immunity of the United States).

28                           25

1    1810.  *See, e.g., United States v. Singleton*, 165 F.3d 1297, 1299-1300 (10th Cir.

2    1999) (criminal prohibitions in 18 U.S.C. § 201(c) do not apply to United States).

3        Moreover, where, as here, plaintiffs' FISA claim is brought against not only

4    against the United States by name, but also against a federal agency — the FBI —

5    and two officials in their *official* capacities, it would be untenable for plaintiffs to

6    contend that this claim is not being brought against the United States.  *See Balser*

7    *v. Dep't of Justice,* 327 F.3d 903, 907 (9th Cir. 2003) (lawsuit against an officer of

8    the United States in his or her official capacity is considered an action against the

9    United States for sovereign immunity purposes).  The absence of an express waiver

10   of sovereign immunity in Section 1810 requires the conclusion that sovereign

11   immunity bars monetary damages claims under this provision against the United

12   States, and the FBI and Defendants Mueller and Martinez in their official

13   capacities and, thus, that plaintiffs' FISA claim should be dismissed against these

14   defendants.[10]

15   **C.    The Amended Complaint Fails to State Claims Against the United
             States Under the Federal Tort Claims Act**.

16       As set forth below, plaintiffs' claims asserted against the United States under

17   the FTCA should be dismissed for the following reasons. First, to the extent that

18   the claims are based upon the audio and video surveillance of plaintiffs'

19

20

21       [10] Even if FISA Section 1810 did authorize a cause of action against the
     United States, it does not authorize the *relief* plaintiffs seek in this case against the

22   FBI and official capacity defendants: the disclosure or destruction of records,
     rather than a claim for damages.  *See* 50 U.S.C. § 1810.  Indeed, even where a

23   Fourth Amendment violation is established, while the Government may not use

24   unlawfully obtained evidence in a particular proceeding pursuant to the
     exclusionary rule, the law does not require that it destroy or return such evidence

25   but, rather, permits the Government to retain it for other purposes.  *See Mayfield v.*

26   *United States*, 599 F.3d 964, 971 (9th Cir. 2010) (citing *Pa. Bd. of Prob. & Parole*

27   *v. Scott*, 524 U.S. 357, 362 (1998)).

28                                        -26-

communications that occurred in Monteilh's presence, this conduct is not actionable because there is no analogous state law liability. Second, with respect to claims brought under California Civil Code Section 52.1, the Amended Complaint fails to allege facts that, if proven, would establish that the United States acted violently or threatened violence and, therefore, fails to state claims for relief. Third, with respect to plaintiffs' claims for intentional infliction of emotional distress, the Amended Complaint fails to allege facts that, if proven, would establish that plaintiffs suffered severe or extreme emotional distress and, therefore, fails to state claims for relief. In addition, to the extent the emotional distress claims are based on allegations that Monteilh's conduct directly caused plaintiffs' emotional distress, they are barred by the FTCA's two-year statute of limitations. Finally, plaintiffs fail to state an emotional distress claim based on alleged surveillance. Each ground for dismissal of the FTCA claims is discussed in turn below.

### 1. Because California Law Permits Law Enforcement Officers to Conduct Consensual Monitoring, the Alleged Surveillance is Not Actionable.

To the extent that plaintiffs' claims are based upon the alleged audio and video surveillance of their communications that occurred in Monteilh's presence, this conduct is not actionable against the United States. Because law enforcement officers in California are permitted to monitor communications in situations where one party to the communications provides his consent, the FBI's alleged audio and video surveillance of the Plaintiffs' activities with Monteilh's consent was privileged and, therefore, these particular FTCA claims must be dismissed.

Pursuant to 28 U.S.C. § 2674, "[l]iablity is determined by the tort law of the state where the claim arose." *Galvin v. Hay*, 361 F.3d 1134, 1152 (9th Cir. 2004), citing *Gasho v. United States*, 39 F.3d 1420, 1427 (9th Cir. 1994). As this Court has held, in an action under the FTCA, a district "court must apply the law that the state courts would apply in the analogous tort action, including federal law." *Tekle*

-27-

1  *v. United States*, No. 01-3894, 2009 WL 1303357, at *7 (C.D. Cal. May 8, 2009)

2  (citation omitted).

3      Law enforcement officers are commonly afforded a privilege under state law

4  to engage in conduct that would be tortious if committed by a private citizen.  In

5  such instances, the conduct of law enforcement officers is privileged.  *See, e.g.,*

6  *Hinojosa v. City of Terrell*, 834 F.2d 1223, 1231 (5th Cir. 1988) (privilege to use

7  force when necessary in the performance of police officer duties), *cert. denied*, 493

8  U.S. 822 (1989); *Dalrymple v. United States*, No. 03-20588, 2005 WL 2456213,

9  *7, 12 (S.D. Fla. May 6, 2005) (privilege to use reasonable force, including tear

10 gas); *Andrade v. United States*, 116 F. Supp. 2d 778, 787-88 (W.D. Tex. 2000)

11 (privilege to engage in certain conduct which could be considered tortious where

12 police officer acts in furtherance of the public interest); *Reynolds v. United States*,

13 927 F. Supp. 91, 97 (W.D.N.Y. 1996) (right to enter private property where officer

14 acted for a public purpose).

15     For example, in *Galvin v. Hay*, the Ninth Circuit affirmed dismissal of an

16 FTCA suit based on a finding that California law protects law enforcement officers

17 from liability for false arrest if they are acting within the scope of their authority

18 and had a reasonable belief the arrest was lawful.  *Galvin*, 361 F.3d at 1152.

19 Likewise, in *Tekle*, this Court found that "the routine and lawful exercise of law

20 enforcement privileges" of the California penal code are available to the United

21 States as a defense in FTCA actions.  *Tekle*, 2009 WL 1303357 at *12.  It

22 specifically found that "[u]nder California law, law enforcement officers are

23 entitled to use reasonable force to effectuate an arrest or detention, even a

24 temporary detention."  *Id*. (citing Cal. Penal Code § 835).  The court also found

25 that because this privilege covered conduct alleged against the federal agents, the

26 "Plaintiff's FTCA claims are privileged under California law."  *Id*.

27     As pertinent to the instant case, in California, law enforcement officials and

28 agents are permitted to overhear or record communications in situations where a

-28-

party to the communications has provided his consent. *See Doe v. City of Mateo*, No. C 07-5596, 2010 WL 1541279, *5 (N.D. Cal. Apr. 16, 2010) (finding that officer's recording of telephone conversations with plaintiff was privileged under Cal. Pen. Code § 633, court denied request to amend complaint to add privacy claims under California Constitution, Article 1, section 1, and Cal. Pen. Code "§ 637.2 that provides for a private right of action by any person injured under Section 632"), quoting *People v. Windham*, 51 Cal. Rptr. 3d 884, 889-90 (Cal. Ct. App. 2007) ("[California] courts expressly held that statutory and constitutional prohibitions against the recording of telephone communications did not apply where law enforcement recorded calls with the consent of one of the parties to the conversation,'" relying on *People v. Murphy*, 8 Cal. 3d 348, 358-61 (1972) (monitoring of telephone conversations by police was not unlawful because witnesses agreed to monitoring and to wear a transmitter); *People v. Fulton*, 201 Cal. Rptr. 879, 882, 886 (Cal. Ct. App. 1984) (monitoring of communications by police was not unlawful because informant agreed to wear a "secret transmitter"); and *People v. Canard*, 65 Cal. Rptr. 15 (Cal. Ct. App. 1967)).

Moreover, the California law enforcement privilege is consistent with 18 U.S.C. § 2511(2)(c) (permitting the interception of wire or oral communications where one party has given prior consent to such interception) and "the so-called 'invited informer' cases; the cases permitting consensual recording of conversations without warrants." *United States v. Aguilar*, 871 F.2d 1436, 1471 (9th Cir. 1989). In *Aguilar*, the defendants were convicted on immigration violations for participating in smuggling, transporting, and harboring illegal aliens. "The government stipulated at trial that it had used undercover agents and informants . . . to infiltrate various church meetings and activities." *Id.* at 1470. On appeal, the appellants' principal objection was that government agents tape recorded their activities without a warrant in violation of their constitutional rights, particularly the First Amendment, which rendered the invited informer rationale

-29-

inapplicable. Rejecting the appellants' arguments, the Ninth Circuit stated:

> In approving this investigative technique the Supreme Court unmistakably declared that persons have no expectation of privacy or confidentiality in their conversations and relations with other persons, no matter how secretive the setting. While privacy, trustworthiness, and confidentiality are undoubtedly at the very heart of many instances of free association and religious expression and communication, the Court has recognized that legitimate law enforcement interests require persons to take the risk that those with whom they associate may be government agents.

*Id.* at 1472 (relying on *United States v. Caceres*, 440 U.S. 741, 99 S. Ct. 1465, 59 L. Ed. 2d 733 (1979); *United States v. White*, 401 U.S. 745, 91 S. Ct. 1122, 28 L. Ed. 2d 453 (1971); *Hoffa v. United States*, *supra*, 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966); *Lewis v. United States*, 385 U.S. 206, 87 S. Ct. 424, 17 L. Ed. 2d 312 (1966)).

Here, the Amended Complaint alleges that a substantial portion of the communications Monteilh agreed to record[11] occurred "in the [mosques] by invitation, and every conversation which he heard was either directed at him or knowingly carried on in his presence," *Hoffa*, 385 U.S. at 302. *See* FAC at ¶ 51("Congregants . . . generally welcomed Monteilh . . ., invited him to have meals or tea outside of the mosque . . . and discuss questions he might have"); ¶¶ 73-76 ("Monteilh talked frequently with Malik at the mosque"); ¶ 77 ("Malik noticed that Monteilh spoke with many others at the mosque"); ¶¶ 82-84 ("Monteilh called AbdelRahim and began socializing with AbdelRahim and his roommates"); ¶¶ 100-115 (Monteilh collected information by speaking to large numbers of people, attending events open to the public, collecting literature, and using email); ¶¶ 122-124, 128-129, 200-202 (Monteilh recorded conversations and videotaped in public places or places where he was invited).

---

[11] *See* FAC ¶ 48 (alleging the FBI hired Monteilh as an informant to covertly gather information).

-30-

Because law enforcement officers in California are permitted to conduct consensual monitoring of communications, the FBI's alleged audio and video surveillance of plaintiffs' communications with Monteilh's consent that occurred in his presence was privileged and not actionable against the United States under the FTCA.

### 2. The Amended Complaint Fails to State Claims for Relief under California Civil Code Section 52.1.

Because the Amended Complaint fails to allege that the Defendants acted violently or threatened plaintiffs with violence, the claims brought under California Civil Code Section 52.1 fail to state claims for relief and, therefore, must be dismissed.

Section 52.1, colloquially known as the Bane Act, "does not provide any substantive protections; instead, it enables individuals to sue for damages as a result of constitutional violations." *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996), *overruled on other grounds by Acri v. Varian Assoc. Inc.*, 114 F.3d 999 (9th Cir. 1997).

The prerequisites for maintaining a claim under section 52.1 are as follows:

> (1) that the defendant interfered with or attempted to interfere with the plaintiff's constitutional or statutory right by threatening or committing violent acts; (2) that the plaintiff reasonably believed that if she exercised her constitutional right, the defendant would commit violence against her or her property; that the defendant injured the plaintiff or her property to prevent her from exercising her right or retaliate against the plaintiff for having exercised her right; (3) that the plaintiff was harmed; and (4) that the defendant's conduct was a substantial factor in causing the plaintiff's harm.

*McCue v. S. Fork Union Elementary Sch.*, No. 10-cv-233, 2010 WL 3958278, at *3 (E.D. Cal. Oct. 8, 2010) (quoting *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 882 (Cal. Ct. App. 2007)).

Subsection j of section 52.1 "explicitly provides that violence is a required element where the 'threat, intimidation or coercion' is based purely upon a

-31-

defendant's statement." *Martin v. County of San Diego*, 650 F. Supp. 2d 1094, 1108 (S.D. Cal. 2009). Therefore, "to prevail on a claim under section 52.1, plaintiff must prove that the defendant(s) interfered (or attempted to interfere) with her rights by threats, intimidations, or coercion (and that the defendant(s) did so other than by speech alone, unless the speech itself threatened violence)." *Doe By and Through Doe v. Petaluma City Sch. Dist.*, 830 F. Supp. 1560, 1582 (N.D. Cal. 1993); *see also Xue Lu v. Powell*, 621 F.3d 944, 950 (9th Cir. 2010) (asylum officer who allegedly sexually assaulted plaintiffs may have interfered with their civil rights under section 52.1); Order, *Xue Lu v. Powell*, No. 01-1758, filed 05/13/2011, at 7 (C.D. Cal. May 13, 2011) (threat of violence is a required element of a section 52.1 claim).

The violence or threat of violence element is congruent with the purpose of a section 52.1 claim. Promulgated as a hate crimes bill, the Tom Bane Civil Rights Act "was intended to supplement the Ralph Civil Rights Act as an additional legislative effort to deter violence. The stated purpose of the bill was 'to fill in the gaps left by the Ralph Act' by allowing an individual to seek relief to prevent the violence from occurring before it was committed and providing for the filing of criminal charges." *Stamps v. Superior Court*, 136 Cal. App. 4th 1441, 1447 (Cal. Ct. App. 2006), quoting Assem. Comm. on Ways and Means, Analysis of Assem. Bill No. 63 (1987-1988) as amended Apr. 6, 1987, p. 2, internal citation omitted. The "broad and plain language of sections 51.7 and 52.1 was chosen to provide protection from discriminatory violence and intimidation, and from threats, intimidation and coercion that denied the civil rights of others." *Id.* at 1448.

Here, in support of their constitutional claim under section 52.1, the Amended Complaint alleges that the "Defendants have interfered, or attempted to interfere, by threats, intimidation, or coercion with the exercise or enjoyment by Plaintiffs of their rights" by subjecting them to "constant surveillance" and "publicly revealing that surveillance." FAC ¶ 258. However, the Amended

-32-

**SER 263**

1   Complaint does not allege that the surveillance was anything other than covert or
2   involved any physical or verbal confrontations threatening the Plaintiffs.  Other
3   than conclusory statements, the Amended Complaint does not allege that the FBI
4   (or any other federal employee) actually committed a violent act or threatened
5   violence against the Plaintiffs.[12]

6       Accordingly, because the Amended Complaint fails to allege that the United
7   States acted violently or threatened the Plaintiffs with violence, the claims asserted
8   under California Civil Code Section 52.1 should be dismissed.

9       3.    **Plaintiffs' Claims for Intentional Infliction of Emotional Distress Should Be Dismissed.**

10      Because the Amended Complaint fails to allege facts that, if proved, would
11  establish that the Plaintiffs suffered severe or extreme emotional distress, their
12  claims for intentional infliction of emotional distress must be dismissed.  In
13  addition, these claims are barred by the FTCA's two-year statute of limitations or
14  are fatally defective because they are based on pure speculation.

15      In California, a plaintiff must prove the following elements to establish a
16  claim for intentional infliction of emotional distress: "(1) extreme and outrageous
17  conduct by the defendant with the intention of causing, or reckless disregard of the
18  probability of causing, emotional distress; (2) the plaintiffs' suffering severe or
19  extreme emotional distress; and (3) actual and proximate causation of the
20  emotional distress by the defendant's outrageous conduct."  *Hughes v. Pair*, 46 Cal.
21  4th 1035, 1050, 95 Cal. Rptr. 3d 636, 651 (Cal. 2009) (citing *Potter v. Firestone*
22  *Tire & Rubber Co.*, 6 Cal. 4th 965, 1001, 25 Cal. Rptr. 2d 550 (1993));
23  *Christensen v. Superior Court*, 54 Cal. 3d 868, 903, 2 Cal. Rptr. 2d 79 (1991).

24  ─────────────

25      [12]  Although Plaintiffs Malik and AbdelRahim specifically allege that they
26  discussed *jihad* with Monteilh, these conversations only pertained to general, non-
    specific, threatened violence towards individuals other than the Plaintiffs.  *See*
27  FAC ¶¶ 73-76, 83-84, 147-148, and 212.

28                                    -33-

The California Supreme Court has "set a high bar" with respect to "the requirement that the plaintiff show severe emotional distress. " *Hughes*, 46 Cal. 4th at 1051. "Severe emotional distress means emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Id.* (quoting *Potter*, 6 Cal. 4th at 1004). In *Hughes*, the California Supreme Court found "discomfort, worry, anxiety, upset stomach, concern, and agitation" did not rise to the level of severe emotional distress. *Id.* This tort "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Hughes*, 46 Cal. 4th at 1051 (citing Restatement (Second) of Torts § 46.)

A cause of action for intentional infliction of emotional distress is inadequately pled where there is "the mere allegation that the plaintiffs suffered severe emotional distress, without facts indicating the nature or extent of any mental suffering." *Pitman v. City of Oakland*, 197 Cal. App. 3d 1037, 1047, 243 Cal. Rptr. 306 (Cal. Ct. App. 1988); *see also Beijing Tong Ren Tang (USA) Corp. v. TRT USA Corp.*, No. C-09-0082, 2010 WL 98957, *2 (N.D. Cal. Jan. 5, 2010) (allegations that plaintiff "suffered severe anxiety and emotional distress" were insufficient); *Hamilton v. Prudential Fin.*, No. 07-cv-944, 2007 WL 2827792, *4 (E.D. Cal. Sept. 27, 2007) (allegations that plaintiff "suffered from 'depression,' 'frustration,' 'nervousness anxiety' [were] conclusory statements [and] lack the necessary specific facts to show their nature or extent" to support the claim); *Sawhney v. Allstate Ins. Co.*, No. 95-cv-2784, 1995 WL 500531, *5 (C.D. Cal. June 23, 1995) (plaintiff's conclusory allegations that they "suffered extreme emotional distress without stating any facts to support these allegations" were insufficient).

Here, the Amended Complaint alleges that plaintiffs' emotional distress is based on covert surveillance that allegedly occurred in 2006-2007 and surveillance that <u>may</u> be ongoing, which allegedly made and is making their lives more

-34-

difficult.  In particular, plaintiff Fazaga alleges that he suffered "severe and ongoing anxiety and emotional distress" as a result of the "constant fear of being under surveillance, the scrutiny during travel, the effect on the sense of community at his mosque and others, and the additional difficulty in providing counseling to clients."  FAC ¶ 185.  Plaintiff Malik alleges that he has suffered "severe and ongoing anxiety and emotional distress" from the "constant fear of being under surveillance because of Defendants' acts," based on his belief that his "communications in the mosque and over telephones may be monitored" and his decision to "curtail[]phone and email conversations with friends and family."  FAC ¶ 199.  Plaintiff AbdelRahim alleges that he has suffered "severe and ongoing anxiety and emotional distress" from the "constant fear of being under surveillance because of the Defendants' acts," based on his belief "that any of his communications in the mosque and over the telephones or email may be monitored, and indeed that he may be under surveillance at any time."  FAC ¶¶ 216-17.

These allegations, however, are complaints of  discomfort, worry, anxiety, concern, annoyance, and/or agitation, which do not constitute severe emotional distress  "of such substantial quality or enduring quality that no reasonable [person] in civilized society" could endure it.  *Hughes*, 46 Cal. 4th at 1051.  For this reason alone, the claims for intentional infliction of emotional distress should be dismissed.

Separate and apart from plaintiffs' failure to satisfy the severe emotional distress element of these claims, the intentional infliction of emotional distress claims are barred on two independent grounds.

First, the Amended Complaint alleges that plaintiffs suffered emotional distress as a result of Monteilh's activities as an informant.  To the extent that these claims arise from Monteilh's conduct, *e.g.*, in discussing *jihad* or otherwise directly causing their distress, the emotional distress claims are barred by the

-35-

FTCA's two-year statute of limitations. *See* 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues."). *See also Dyniewicz v. United States*, 742 F.2d 484 (9th Cir. 1984). In *Dyniewicz*, the decedents' children did not discover that the negligence of national park rangers might have been responsible for their parents' death until over two years after the fatal accident. Then-Judge Anthony Kennedy wrote for the court that the claim accrued as soon as "the immediate physical cause of the injury is discovered," and that "[a plaintiff's] ignorance of the involvement of United States employees is irrelevant." *Id.* at 486-87.

Here, the Amended Complaint is replete with allegations that plaintiffs were aware of Monteilh's activities, if not the surveillance, in 2006 and 2007. *See* FAC ¶¶ 51, 53, 54, 59, 61, 70-79, 81-85, 147-149. Because plaintiffs failed to present their administrative claims until February 21, 2011, *see* FAC ¶ 260, the claims based on Monteilh's activities directly causing their emotional distress are barred by 28 U.S.C. § 2401(b).

Second, the intentional infliction of emotional distress claims based on audio and video surveillance are also defective because they are speculative and therefore do not state a claim for relief. The Amended Complaint alleges that the surveillance occurred in 2006 and 2007 and it was covert. *See* FAC ¶¶ 48,160. The Amended Complaint also alleges that plaintiffs did not know that the surveillance had taken place until the end of February 2009, which was several years after Monteilh had "disappeared from the Muslim community," *i.e.*, in July or August 2007. *See* FAC ¶¶ 148-150, 160. The prior covert surveillance, by definition, could not by itself have caused plaintiffs any emotional distress. In addition, to the extent that these claims are based on plaintiffs' current *beliefs* and *suspicion* that they are under surveillance, *see* FAC ¶¶ 185, 199, 216-217, based on the 2009 disclosure, they are "unsupported by any factual allegations (and indeed,

-36-

1 pleaded on information and belief . . . ), and need not be taken as true by this Court
2 on a motion to dismiss." *See Westfall v. City of Crescent City*, No. 10-cv-5222,
3 2011 WL 4024663, *10 (N.D. Cal. Sept. 9, 2011) (court dismissed intentional
4 infliction of emotional distress claim based on defendants' alleged "intimidation
5 tactics" and intent to charge plaintiff with "bogus felony counts," finding that
6 plaintiff's allegations relating her beliefs were "pure speculation").

7         Because the Amended Complaint fails satisfy the requisite elements of an
8 intentional infliction of emotional distress cause of action, or the claims are
9 otherwise barred by the FTCA's two-year statute of limitations or are fatally
10 defective because they are based on pure speculation, these claims must be
11 dismissed.

**II.    THE STATE SECRETS PRIVILEGE PROPERLY PROTECTS
12       CERTAIN INFORMATION IMPLICATED BY PLAINTIFFS'
       ALLEGATIONS.**

13
**A.    The State Secrets Privilege Bars the Use of Privileged
14       Information in Litigation.**

15         "The Supreme Court has long recognized that in exceptional circumstances
16 courts must act in the interest of the country's national security to prevent
17 disclosure of state secrets, even to the point of dismissing a case entirely."
18 *Jeppesen,* 614 F.3d at 1077.  The ability of the Executive to protect state secrets
19 from disclosure in litigation has been recognized from the earliest days of the
20 Republic, *see id.,* and two broad applications of the doctrine have been recognized.

21         The first application — based on the Supreme Court's 1875 decision in
22 *Totten v. United States,* 92 U.S. 105, 23 L. Ed. 605 (1875) — permits dismissal of
23 a case on the pleadings where it is apparent that the very subject matter of the
24 action will require the disclosure of state secrets that would result in harm to
25 national security.  *Jeppesen,* 614 F.3d at 1077-78 (discussing the *"Totten* bar").
26 The state secrets privilege is also an evidentiary privilege that excludes privileged
27 evidence from the case.  *Id.* at 1077 (citing *United States v. Reynolds,* 345 U.S. 1,

28

SER 268

73 S. Ct. 528, 97 L. Ed. 727 (1953)).  Unlike the *Totten* bar, a valid claim of privilege under *Reynolds* does not automatically require dismissal of the case, but may require dismissal where it is apparent that the case cannot proceed without privileged evidence, or that litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets.  *Jeppesen,* 614 F.3d at 1079.

Analyzing a state secrets privilege claim under the *Reynolds* doctrine involves three steps.  *Jeppesen,* 614 F.3d at 1080 (citing *Al-Haramain Islamic Found. v. Bush,* 507 F.3d 1190, 1202 (9th Cir. 2007); *El-Masri v. United States,* 479 F.3d 296, 304 (4th Cir. 2007)).  First, the court must ascertain that the procedural requirements for invoking the state secrets privilege have been satisfied.  *Id.*  Second, the court must make an independent determination whether the information is privileged.  *Id.*  Finally, the ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim.  *Id.*

1.      Procedural Requirements

The state secrets privilege "'belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." *Jeppesen,* 614 F.3d at 1080 (quoting *Reynolds,* 345 U.S. at 7 (footnotes omitted)).  The privilege is "'not to be lightly invoked,'" and to ensure that the privilege is invoked only when necessary, the Government must satisfy three procedural requirements: (1) there must be a "formal claim of privilege"; (2) the claim must be "lodged by the head of the department which has control over matter"; and (3) the claim be made "after actual personal consideration by that officer."  *Id.* (quoting *Reynolds,* 345 U.S. at 7-8).  The claim of privilege must reflect the certifying official's *personal* judgment."  *Id.* (emphasis in original).  The basis for the privilege assertion also must be presented "in sufficient detail for the court to make an independent determination of the validity of the claim of privilege and the scope of the evidence subject to the privilege."  *Id.*

-38-

The state secrets privilege may be asserted "at any time, even at the pleading stage." *Id.* Thus, while the Government may assert privilege in response to discovery requests, *see, e.g. Reynolds,* 345 U.S. at 3; *Kasza v. Browner,* 133 F.3d 1159, 1170 (9th Cir. 1998), the Government need not wait for an evidentiary dispute to arise during discovery or trial. *Jeppesen,* 614 F.3d at 1081; *see also Al-Haramain,* 507 F.3d at 1201 (recognizing that *Reynolds* may result in dismissal even without "await[ing] preliminary discovery"). Where the court can "determine with certainty from the nature of the allegations and the government's declarations in support of its claim of secrecy that litigation must be limited or cut off in order to protect state secrets, even before any discovery or evidentiary requests have been made . . . waiting for specific evidentiary disputes to arise would be both unnecessary and potentially dangerous." *Jeppesen,* 614 F.3d at 1081 (citing *Sterling v. Tenet,* 416 F.3d 338, 344 (4th Cir. 2005)) ("Courts are not required to play with fire and chance further disclosure — inadvertent, mistaken, or even intentional — that would defeat the very purpose for which the privilege exists.").

2.   The Court's Independent Evaluation of the Claim of Privilege

After the state secrets privilege has been properly invoked, the court "must make an independent determination whether the information is privileged." *Al-Haramain,* 507 F.3d at 1202. The privilege must be sustained when the court is satisfied, "from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged." *Reynolds,* 345 U.S. at 10. "If this standard is met, the evidence is absolutely privileged, irrespective of the plaintiffs' countervailing need for it." *Jeppesen,* 614 F.3d at 1081 (citing *Reynolds,* 345 U.S. at 11 ("[E]ven the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that [state] secrets are at stake.")); *see also Halkin v. Helms*, 690 F.2d 977, 990 (D.C. Cir. 1982). In evaluating the need for secrecy, courts must "acknowledge the need to defer to the Executive on

-39-

1  matters of foreign policy and national security and surely cannot legitimately find

2  ourselves second guessing the Executive in this arena." *Al-Haramain,* 507 F.3d at

3  1203. At the same time, the state secrets doctrine does not represent "'a surrender

4  of judicial control over access to the courts,'" *Jeppesen*, 614 F.3d at 1082 (quoting

5  *El-Masri*, 479 F.3d at 312), and "to ensure that the state secrets privilege is

6  asserted no more frequently and sweepingly than necessary, it is essential that the

7  courts continue critically to examine instances of its invocation." *Id.* (quoting

8  *Ellsberg v. Mitchell,* 709 F.2d 51, 58 (D.C. Cir. 1983)).

9        3.   <u>Impact of Privilege Assertion</u>

10        When a court sustains a claim of privilege, it must then resolve "'how the

11  matter should proceed in light of the successful privilege claim.'" *Al-Haramain,*

12  507 F.3d at 1202 (quoting *El-Masri,* 479 F.3d at 304). When successfully invoked,

13  the evidence subject to the privilege is "completely removed from the case."

14  *Kasza,* 133 F.3d at 1166. When possible, the privileged information "'must be

15  disentangled from nonsensitive information to allow for the release of the latter.'"

16  *Id.* (quoting *Ellsberg,* 709 F.2d at 57). But "when, as a practical matter, secret and

17  nonsecret information cannot be separated," the court must restrict a parties' access

18  "not only to evidence which itself risks the disclosure of a state secret, but also

19  those pieces of evidence or areas of questioning which press so closely upon highly

20  sensitive material that they create a high risk of inadvertent or indirect

21  disclosures." *Jeppesen*, 614 F.3d at 1082 (quoting *Bareford v. Gen. Dynamics

22  Corp.,* 973 F.2d 1138, 1143-44 (5th Cir. 1992)); *see also Kasza,* 133 F.3d at 1166

23  ("[I]f seemingly innocuous information is part of a . . . mosaic, the state secrets

24  privilege may be invoked to bar its disclosure and the court cannot order the

25  government to disentangle this information from [secret] information.").

26        In the normal course, after the privileged evidence is excluded, "the case will

27  proceed accordingly, with no consequences save those resulting from the loss of

28  evidence.'" *Al-Haramain,* 507 F.3d at 1204 (quoting *Ellsberg,* 709 F.2d at 64). In

some cases, however, "application of the privilege may require dismissal of the
action." *Jeppesen* 614 F.3d at 1083.  First, if  "the plaintiff cannot prove the *prima
facie* elements of her claim with nonprivileged evidence, then the court may
dismiss her claim as it with any plaintiff who cannot prove her case." *Kasza*, 133
F.3d at 1166.  Second, "if the privilege deprives the *defendant* of information that
would otherwise give the defendant a valid defense to the claim, then the court may
grant summary judgment to the defendant."  *Id*. at 1166 (quoting *Bareford*, 973
F.2d at 1141) (emphasis in original).  Third, even if the claims and defenses might
theoretically be established without privileged evidence, "it may be impossible to
proceed with the litigation because — privileged evidence being inseparable from
nonprivileged information that will be necessary to claim or defense — litigating
the case to a judgment on the merits would present an unacceptable risk of
disclosing state secrets." *Jeppesen*, 614 F.3d at 1083; *see also El-Masri*, 479 F.3d
at 308 ("[A] proceeding in which the state secrets privilege is successfully
interposed must be dismissed if the circumstances make clear that privileged
information will be so central to the litigation that any attempt to proceed will
threaten that information's disclosure."); *Fitzgerald v. Penthouse Int'l, Ltd.* 776
F.2d 1236, 1241-42 (4th Cir. 1985) ("[I]n some circumstances sensitive military
secrets will be so central to the subject matter of the litigation that any attempt to
proceed will threaten disclosure of the privileged matters."); *accord Farnsworth
Cannon, Inc. v. Grimes,* 635 F.2d 268, 279-81 (4th Cir. 1980) (*en banc*).

    4.   Attorney General's Policy

      In addition to the foregoing requirements in established case law, on
September 23, 2009, the Attorney General announced a new Executive branch
policy governing the assertion and defense of the state secrets privilege in
litigation.  Under this policy, the U.S. Department of Justice will defend an
assertion of the state secrets privilege in litigation, and seek dismissal of a claim on
that basis, only when "necessary to protect against the risk of significant harm to

-41-

national security." *See* Exhibit 1 to Holder Declaration (State Secrets Policy) at 1. Moreover, "[t]he Department will not defend an invocation of the privilege in order to: (i) conceal violations of the law, inefficiency, or administrative error; (ii) prevent embarrassment to a person, organization, or agency of the United States government; (iii) restrain competition; (iv) prevent or delay the release of information the release of which would not reasonably be expected to cause significant harm to national security." *Id*. at 2.

The Attorney General also established detailed procedures — followed in this case — for review of a proposed assertion of the state secrets privileged in a particular case. Those procedures require submissions by the relevant government departments or agencies specifying "(i) the nature of the information that must be protected from unauthorized disclosure; (ii) the significant harm to national security that disclosure can reasonably be expected to cause; [and] (iii) the reason why unauthorized disclosure is reasonably likely to cause such harm." *Id*. In addition, the Department will only defend an assertion of the privilege in court with the personal approval of the Attorney General following review and recommendations from senior Department officials. *Id*. at 3.

There can be no dispute that the Government compiled with *Reynolds*' procedural requirements by following this policy. The FBI is a component of the Department of Justice, *see* Pub. Giuliano Decl. ¶ 1, and the Attorney General of the United States is also the head of the Department of Justice, *see* Holder Decl. ¶ 1. The Attorney General has determined, upon his personal consideration, that the requirements for an assertion and defense of the state secrets privilege have been met in this case, in accord with the September 2009 policy, and that disclosure of the information subject to his claim of privilege reasonably could be expected to cause significant harm to national security. *See* Holder Decl. ¶¶ 3, 12.

-42-

**B.    The Court Should Exclude Information Subject to the Privilege Assertion from Further Proceedings in this Case.**

Procedural formalities aside, the next question is whether the privilege should be upheld and the privileged information excluded from the case.  As described in general and unclassified terms, the Attorney General's privilege assertion extends to three categories of information:

(i)    _Subject Identification_: Information that could tend to confirm or deny whether a particular individual was or was not the subject of an FBI counterterrorism investigation, including in Operation Flex.

(ii)    _Reasons for Counterterrorism Investigation and Results_: Information that could tend to reveal the initial reasons (i.e., predicate) for an FBI counterterrorism investigation of a particular person (including in Operation Flex), any information obtained during the course of such an investigation, and the status and results of the investigation.  This category includes any information obtained from the U.S. Intelligence Community related to the reasons for an investigation.

(iii)    _Sources and Methods_: Information that could tend to reveal whether particular sources and methods were used in a counterterrorism investigation of a particular subject, including in Operation Flex. This category includes previously undisclosed information related to whether court-ordered searches or surveillance, confidential human sources, and other investigative sources and methods were used in a counterterrorism investigation of a particular person, the reasons such methods were used, the status of the use of such sources and methods, and any results derived from such methods.

Holder Decl. ¶ 4; Pub. Giuliano Decl. ¶ 15.

The Attorney General, supported by the FBI's Assistant Director for the Counterterrorism Division, has explained on the public record why the disclosure of the above information reasonably could be expected to cause significant harm to national security.  _See generally_ Holder and Pub. Giuliano Decls.  Among other concerns identified by these officials, disclosure of the identities of subjects of counterterrorism investigations could alert those subjects to the FBI's interest in them and cause them to attempt to evade detection, destroy evidence, and undertake counter-actions that could put confidential informants or law

-43-

**SER 274**

1    enforcement officers at risk.  *See* Pub. Giuliano Decl. ¶ 23.  The disclosure of the

2    subjects of counterterrorism investigations could also cause their associates to take

3    similar steps to avoid FBI scrutiny and hinder investigation.  *See id.*

4         Disclosure that an individual is *not* a subject of a national security

5    investigation likewise could reasonably be expected to cause significant harm to

6    national security in several ways.  For example, individuals inclined to commit

7    terrorists acts could be motivated to do so while they know they are not being

8    monitored.  Public Giuliano Decl. ¶ 24.  In addition, disclosure that some persons

9    are not subject to investigation, while the status of others is left unconfirmed,

10   would enable individuals and terrorists groups alike to manipulate the system to

11   discover whether they or their members are subject to investigation.  *See id.*

12        Similarly, even where an investigation of a subject has been closed,

13   disclosure that an individual was formerly the subject of a counterterrorism

14   investigation could also reasonably be expected to cause significant harm to

15   national security interests.  Again, to the extent that an individual had terrorist

16   intentions that were not previously detected, the knowledge that he or she is no

17   longer the subject of investigative interest could embolden him or her to carry out

18   those intentions.  *See* Public Giuliano Decl. ¶ 25.  And even if the former subjects

19   are entirely law-abiding, disclosure that they had been investigated could still

20   provide valuable information to terrorist and terrorists organizations about the

21   FBI's intelligence and suspicions, particularly where associates of former subjects

22   may still be under investigation.  *See id.* ¶ 26.  Finally, where new information may

23   arise about a person, the fact that investigations are closed does not mean that the

24   subjects have necessarily been cleared of wrongdoing.  *See id.* ¶ 25.

25        For closely related reasons, disclosure of the reasons for and substance of a

26   counterterrorism investigation reasonably could be expected to cause significant

27   harm to national security by revealing to subjects involved in terrorist activities

28   what the FBI knows or does not know about their plans.  *See* Pub. Giuliano Decl.

-44-

¶ 29.  Further, disclosure of the reason for an investigation could provide insights to terrorists as to what type of information is sufficient to trigger an inquiry by the FBI, and what sources and methods the FBI employs to obtain information on a person.  *See id.*  Disclosure of these sources and methods would itself reasonably be expected to cause significant harm not only by revealing the identities of particular subjects, but also by providing a road map to adversaries on how the FBI goes about detecting and preventing terrorist attacks.  *See id.* ¶ 31.

The basis for the Attorney General's privilege assertion is set forth further in the classified declaration offered by the FBI.  *See generally* Classified Declaration of Mark F. Giuliano dated August 1, 2011(submitted for *in camera, ex parte* review).  The Government cannot further explain precisely those matters covered by the privilege lest the process asserting privilege jeopardize the very information the privilege is designed to protect.  *Jeppesen*, 614 F.3d at 1086.  But the Court should find that the Government has fully and sufficiently demonstrated the basis for the privilege assertion in this case, and thus should exclude the privileged information from further proceedings in this case.[13]

### C.  The Exclusion of Properly Privileged Information Requires the Dismissal of the Claims Based on Allegations of Discrimination Based on Religion.

As *Jeppesen* explains, once the state secrets privilege is upheld, the next question for the Court to decide is what consequences exclusion of the privileged information will have on further proceeding in the case.  The issue is especially appropriate for consideration at the pleading stage where it is apparent that privileged information would be needed to pursue litigation of the case, or at least

---

[13]  While *ex parte, in camera* classified submissions are not required for an assertion of the privilege, *see Reynolds*, 345 U.S. at 8, the Government has commonly provided such submission in order to assist the Court in ascertaining whether the circumstances for the privilege assertion are appropriate.  *See, e.g. Kasza*, 133 F.3d at 1169-70; *Jeppesen*, 614 F.3d at 1084 n.6.

-45-

SER 276

certain claims.  This question requires the Court to assess the nature of the proof needed to decide the claims being raised and the extent to which litigation of those claims would risk or require the disclosure of privileged information.  *Jeppesen*, 614 F.3d at 1082-83.

(1) *Individual Capacity Claims*: The Court should address the impact of the privilege assertion on the individual capacity claims first.  Most of the allegations and claims in the case center on the alleged action of the individual capacity defendants, and these defendants are entitled to early consideration of whether the lawsuit should proceed against them.  As set forth below, information properly protected by the Attorney General's privilege assertion should foreclose litigation of at least plaintiffs' claims based on an alleged indiscriminate collection of information based solely on religion.

First, where constitutional claims are raised against federal officers in their personal capacities, a key threshold question is whether a *Bivens* cause of action against the individual defendants exists in the circumstances presented.  Specifically, the Supreme Court has held that there can be no *Bivens* remedy against federal officials where "special factors counselling hesitation" exist.  *Wilkie v. Robbins*, 551 U.S. 537, 550, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007) (quoting *Bush v. Lucas*, 462 U.S. 367, 378, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983)).  National security concerns constitute just such a special factor, *see Arar v. Ashcroft*, 585 F.3d 559, 573, 575 (2d Cir. 2009), particularly where litigation of the claims would subject sensitive and classified intelligence information to judicial scrutiny.  *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008).  Permitting the claims to go forward would run the risk of disclosure that might "undermine ongoing covert operations" aimed at protecting national security.  *Id.*  Moreover, to the extent that allowing litigation to proceed would "very likely mean that some documents or information . . . would be redacted, reviewed *in camera*, and otherwise concealed from the public," the Court's potential reliance on such

-46-

information further counsels "hesitation" that precludes a *Bivens* remedy, "given the strong preference in the Anglo-American legal tradition for open court proceedings." *Arar*, 585 F.3d at 576-77. Thus, the Government's assertion of privilege in this case has a particular bearing first on the individual capacity defendants' threshold defenses under the *Bivens* doctrine.

Second, even apart from whether plaintiffs have a cause of action under *Bivens* for their constitutional claims, full and effective litigation of these claims, as well as the statutory claims plaintiffs have raised against the individual capacity defendants, would risk or require the disclosure of privileged information. Plaintiffs' allegations of a discriminatory investigation based solely on religion directly put at issue information that is subject to the Attorney General's privilege assertion. At their core is the claim that defendants' alleged surveillance and investigation of plaintiffs unlawfully burdened plaintiffs' free exercise of their religion. To advance their claims, plaintiffs would need to proffer evidence in support of their allegations concerning the nature and scope of Operation Flex, including evidence that the FBI impermissibly engaged in indiscriminate surveillance based solely on religion. Any defense would likewise put at issue and thereby risk or require the disclosure of information concerning how Operation Flex was conducted — including who may have been subject to investigation and why, as well as how and why the FBI collected information on the matter. The Court, in turn, would have to determine, whether, in fact, defendants' actions were targeted at plaintiffs based on their religion. If plaintiffs were able to overcome that hurdle, the Court would then have to determine (1) whether the Government acted pursuant to a compelling state interest, and (2) whether the government's actions were narrowly tailored to achieve that interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993); *see also Presbyterian Church v. United States*, 752 F. Supp. 1505,

-47-

1513 (D. Ariz. 1990).[14]  These are fundamentally fact-driven determinations that require detailed inquiry into the nature of, and reason for, any investigative activity undertaken by defendants with respect to plaintiffs, and thus risk or require disclosure of the privileged information.

On this point, *Presbyterian Church* is instructive.  In that case, the plaintiffs alleged that surveillance of their church services by undercover INS agents violated their First and Fourth Amendment rights.  The Ninth Circuit held that plaintiffs had established standing for their First Amendment free exercise claim, and remanded to the district court to determine whether plaintiffs had standing to pursue prospective injunctive relief.  *Presbyterian Church v. United States*, 870 F.2d 518, 528-29 (9th Cir. 1989).  On remand, the district court, finding that plaintiffs had standing and that the case was not moot, proceeded to the free exercise inquiry.  After examining the evidence presented in defendants' summary judgment motion, the court held that the government had a compelling state interest "based on border security and national sovereignty to conduct an investigation into the alleged unlawful activities of the Sanctuary Movement," a network of religious activists that aided Central and South American refugees by bringing them into the United States, and had "demonstrated a significant and intimate relationship between the conduct in which it engaged and the government interest sought to be achieved."  *Presbyterian Church*, 752 F. Supp. at 1508 n.1, 1514, 1515.  Of particular note, the facts underlying the INS investigation were made public during the criminal prosecutions of several individuals who were

---

[14]  Similarly, to evaluate plaintiffs' RFRA claim, assuming the Court finds that defendants' actions substantially burdened plaintiffs' exercise of religion (although defendants do not concede that point), it would have to determine whether that burden was (1) in furtherance of a compelling interest, and (2) the least restrictive means of furthering that interest.  *See* 42 U.S.C. § 2000bb-1(b); *Navajo Nation v. U.S. Forest Svc.*, 535 F.3d 1058, 1068 (9th Cir. 2008).

-48-

involved with the Sanctuary Movement, and thus there was no issue in that case as to whether disclosure of those facts would harm national security. *Presbyterian Church v. United States*, 870 F.2d at 520; 752 F. Supp. at 1507-08.

Here, any inquiry into whether the Government had a compelling interest and whether its actions were narrowly tailored would turn on whether defendants were conducting properly predicated investigations or, as alleged in the Amended Complaint, were indiscriminately gathering information on persons based solely on their religion. Evidence needed to establish that defendants' investigations were, in fact, properly predicated and focused again would include the specific parameters of "Operation Flex," including who may have been subject to investigation, why, and how the investigations were carried out by the FBI. Thus, litigation of plaintiffs' discrimination claims inherently would risk or require the disclosure of evidence concerning who was subject to Operation Flex investigations and the reasons these subjects were under investigation, as well as sources and methods used in these investigations. This information falls squarely within the three categories of information over which the Attorney General has asserted privilege. Thus, for plaintiffs to support their claims of religious discrimination, or for the defendants to mount a full and effective defense against the religious discrimination claims "would create an unjustifiable risk of revealing state secrets, even if plaintiffs could make a prima facie case . . . with nonprivileged evidence." *Jeppesen*, 614 F.3d at 1088 (collecting cases); *see also Kasza*, 133 F.3d at 1166.

Nor can this risk be averted by the implementation of precautionary procedures by the district court. As the Ninth Circuit has made clear:

> Adversarial litigation, including pretrial discovery of documents and witnesses and the presentation of documents and testimony at trial, is inherently complex and unpredictable. Although district courts are well equipped to wall off isolated secrets from disclosure, the challenge is exponentially greater in exceptional cases . . . where the relevant secrets are difficult or impossible

-49-

to isolate and even efforts to define a boundary between privileged and unprivileged evidence would risk disclosure by implication.

*Jeppesen*, 614 F.3d at 1089.  This is just such an exceptional case.  As demonstrated further in the classified August 1, 2011, Giuliano Declaration, even if some non-privileged evidence were available for plaintiffs to present a *prima facie* case or the defendants to respond, properly privileged information would remain at issue and would either be required to litigate the case or at the very least be at risk of disclosure in further proceedings on the issues raised by plaintiffs' claims that the FBI's investigations were improperly based solely on religion.[15]

For these reasons, the Court should, at a minimum, dismiss Causes of Action 1-7 as to the individual capacity defendants.  Dismissal of these defendants is particularly warranted because they have unique threshold arguments.  Moreover, the Government has a separate, independent interest in protecting against the disclosure of properly privileged information that would inherently be at risk of disclosure in any litigation of the individual capacity claims.

(2) *Government Defendants*: Finally, the Court should consider the impact of the privilege assertion on plaintiffs' claims against the FBI and official capacity defendants, as well as against the United States under the FTCA, to the extent they are not dismissed on the non-privileged grounds set forth above.  The same privileged evidence at issue in plaintiffs' claims of religious discrimination against the individual capacity defendants is at issue in the same claims against the Government.  In either case, litigation of the claims would either require that

---

[15] In further support of this point, the Government previously lodged a classified supplemental brief for the Court's *in camera, ex parte* review that describes the evidence subject to the Attorney General's privilege assertion that would be at risk of disclosure or needed by defendants in responding to plaintiffs' religious discrimination claims.  *See* Notice of Lodging of Classified *In Camera, Ex Parte* Supplemental Memorandum (Dkt. 36, filed August 1, 2011).

-50-

SER 281

1    evidence or create an "unacceptable risk of disclosing" this information. *Jeppesen*,

2    614 F.3d at 1083.

3         With respect to the FTCA claims in particular, newly added by the Amended

4    Complaint, information subject to the privilege assertion would be at issue with

5    respect to least two specific issues.  First, judicial review of the FBI's decisions to

6    initiate counterterrorism investigations and how those investigations should be

7    handled, including the decisions to conduct audio and video surveillance, may be

8    barred by the discretionary function exception to the FTCA.  *See e.g.*, *Sabow v.*

9    *United States*, 93 F.3d 1445, 1453-54 (9th Cir. 1996); *Frigard v. United States*,

10   862 F.2d 201, 203 (9th Cir. 1988); *Pooler v. United States*, 787 F.2d 868 (3d Cir.

11   1986).  To determine whether the discretionary function exception applies, the

12   appropriate inquiry is "whether the challenged acts . . . are of the nature and quality

13   that Congress intended to shield from tort liability."  *United States v. Varig*

14   *Airlines*, 467 U.S. 797, 813, 104 S. Ct. 2755, 2764, 81 L. Ed. 2d 660, 674 (1984);

15   *Dichter-Mad Family Partners, LLP v. United States*, 707 F. Supp. 2d 1016, 1034

16   (C.D. Cal. 2010).  To assist in this determination, the Supreme Court has

17   prescribed a two-part test.  First, the challenged conduct must involve an "element

18   of judgment or choice."  *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct.

19   1267, 1273, 113 L. Ed. 2d 335, 346 (1991) (quoting *Berkovitz v. United States*, 486

20   U.S. 531, 536 (1988)); *see also Dichter-Mad Family*, 707 F. Supp. 2d at 1027.

21   Second, the challenged conduct must involve policy considerations.  *See Gaubert*,

22   499 U.S. at 322; *Dichter-Mad Family*, 707 F. Supp. 2d at 1027.  The test's first

23   part is satisfied when there are no mandatory directives that specifically prescribe a

24   course of action for an employee to follow.  *Gaubert*, 499 U.S. at 322; *see Jasso v.*

25   *U.S. Dep't of Agric. Forest Serv.*, No. S-07-2769, 2008 WL 3863503, *7 (E.D. Cal.

26   Aug. 18, 2008) ("[T]he Constitution can limit the discretion of federal officials

27   such that the FTCA's discretionary function exception will not apply.").  Here, the

28   Amended Complaint alleges that the FBI violated plaintiffs' constitutional rights

-51-

by engaging in impermissible counterterrorism investigations "simply because the targets were Muslim" and "that Plaintiffs . . . were surveilled solely due to their religion." *See* FAC §§ 1-3, 83, 86. Thus, in order to litigate the question of whether the discretionary function exception to the FTCA applies in this case, facts concerning the nature and scope of Operation Flex—including who may have been subject to investigation, for what reasons, and how the investigation was undertaken—would be at issue or at risk of disclosure.

In addition, litigating the key issues for the invasion of privacy and intentional infliction of emotional distress claims asserted against the United States would risk or require the disclosure of privileged information. For example, litigation of these claims entails an inquiry into whether the alleged intrusions were highly offensive and/or constituted serious invasions of privacy, which may depend upon the degree and setting of each intrusion and the explanation, justification, motive, and objective. *See generally Hernandez v. Hillsides, Inc.,* 47 Cal. 4th 272, 286-87, 211 P. 2d 1063 (Cal. 2009); *Sheehan v. San Francisco 49ers*, 45 Cal. 4th 992, 998, 201 P. 2d 472 (Cal. 2009). An essential element the plaintiffs must prove to establish intentional infliction of emotional distress claims is whether the conduct was extreme and outrageous with the intention of causing, or reckless disregard of the probability of causing, their emotional distress. The resolution of this element may depend on the explanation and justification for the alleged conduct. *See generally Potter,* 6 Cal. 4th at 1001. Here again, to litigate these issues, evidence concerning what occurred under Operation Flex—who was subject to investigation, why, and how—would be at issue or at risk of disclosure.

* * *

To the extent that the Court wishes to assess the impact of the privilege assertion as to claims against the Government Defendants, it should require plaintiffs to proffer in proceedings under Rules 16 and 26 precisely what discovery it intends to seek against the Government. At that point, the Government

-52-

**SER 283**

Defendants would again address the extent to which the state secrets privilege precludes litigation of any claims remaining against them. In the meantime, there should be no doubt that the privilege assertion supports dismissal of the individual capacity claims in light of the additional threshold defenses available to these defendants.

## CONCLUSION

For the foregoing reasons, plaintiffs' claims against the Federal Bureau of Investigation and Defendants Robert Mueller, Director of FBI, and Steven Martinez, Assistant Director in Charge of FBI's Los Angeles Division, sued in their official capacities, and against the United States under the FTCA, should be dismissed. In addition, plaintiffs' First through Seventh Causes of Action should be dismissed as to the individual capacity defendants based on the state secrets privilege.

Date: November 4, 2011          Respectfully submitted,

TONY WEST
Assistant Attorney General

ANDRE BIROTTE, JR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

*/s/ Anthony J. Coppolino*
ANTHONY J. COPPOLINO
E-mail: tony.coppolino@usdoj.gov

*/s/ Lynn Y. Lee*
LYNN Y. LEE (SBN # 235531)
E-mail: lynn.lee@usdoj.gov

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Telephone: 202-514-4782
Facsimile: 202-616-8460

*Attorneys for the Federal Bureau of Investigation and Defendants Mueller and Martinez Sued in their Official Capacities*

**SER 284**

1

        */s/ Stephen E. Handler*

2        STEPHEN E. HANDLER
          Senior Trial Counsel

3        E-mail: stephen.handler@usdoj.gov
          U.S. Department of Justice

4        Civil Division, Torts Branch
          1331 Pennsylvania Avenue N.W.  Room 8070N

5        Washington, D.C. 20530
          Telephone: (202) 616-4279

6        *Attorney for the United States*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                 -54-

## CERTIFICATE OF SERVICE

The undersigned declares as follows:

I am a citizen of the United States and employed in Los Angeles County, State of California. I am over the age of 18 and not a party to the within action. My business address is Scheper Kim & Harris LLP, 601 W. Fifth Street, 12th Floor, Los Angeles, California 90071.

I hereby certify that I electronically filed the foregoing **APPELLANTS PAT ROSE, PAUL ALLEN AND KEVIN ARMSTRONG'S SUPPLEMENTAL EXCERPTS OF RECORD** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 29, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed on April 29, 2015 at Los Angeles, California.

/s/June Hibino
June Hibino