Consolidated Case Nos. 13-55017, 12-56867, 12-56874
———————————————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
———————————————————————

Yassir Fazaga, *et al.*,

Plaintiffs,

v.

Federal Bureau of Investigation; *et al.*

Defendants.
———————————————————————

On Appeal from the United States District Court, Central District of California
No. CV 11-301-CJC (VBK)
———————————————————————

### PLAINTIFFS-APPELLANTS' REPLY/CROSS-APPELLEE BRIEF
———————————————————————

PETER BIBRING
pbibring@aclusocal.org
AHILAN T. ARULANANTHAM
aarulanantham@aclusocal.org
CATHERINE A. WAGNER
cwagner@aclusocal.org
ACLU Foundation
   of Southern California
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

FATIMA DADABHOY
fdadabhoy@cair.com
Council on American-Islamic
Relations, California
2180 W. Crescent Avenue, Suite F
Anaheim, CA 92801
Telephone: (714) 776-1847
Facsimile: (714) 776-8340

DAN STORMER
dstormer@hadsellstormer.com
MOHAMMAD TAJSAR
mtajsar@hadsellstormer.com
Hadsell Stormer & Renick, LLP
128 N. Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………1

ARGUMENT……………………………………………………………………………..4

I.   THE DISTRICT COURT ERRED IN DISMISSING ANY OF
     PLAINTIFFS' CLAIMS BASED ON THE STATE SECRETS
     PRIVILEGE……………………………………………………………………4

     A.   Congress' Specially Crafted *In Camera* And *Ex Parte* Procedures For
          Reviewing Electronic Surveillance In FISA Preempt The Common Law
          State Secrets Privilege…………………………………….......................5

          1.   Congress Is Not Required To Make a "Clear Statement" of Its
               Intent to Preempt the State Secrets Common Law Evidentiary
               Privilege…………………………………………………………....6

          2.   FISA Provides Through Its Comprehensive Disclosure
               Procedures A Clear Statement Of Congressional Intent To
               Preempt The *Reynolds* Privilege………………………………...10

          3.   FISA's *In Camera* Review Procedures Govern Adjudication Of
               Non-FISA Claims……………………...………..…………......…17

          4.   Utilizing FISA's *In Camera* and *Ex Parte* Procedures Would Not
               Violate Individual Defendants' Constitutional Rights...............…20

     B.   The District Court Erred In Dismissing Plaintiffs' Claims At This
          Preliminary Stage Of The Litigation…………………………………..23

          1.   The District Court Erred in Dismissing the Search Claims
               Because the Government Did Not Seek Dismissal on That
               Basis…………………………………………………..……..24

          2.   The District Court Erred in Dismissing the Discrimination Claims
               Because It Is Not "Certain" That Those Claims Cannot Be
               Litigated Without Disclosing Information Designated as State
               Secrets………………………………………………………....26

C.    Dismissal On State Secrets Grounds Presents Serious Constitutional Problems……………………………………………………….…..31

II.    PLAINTIFFS' STATE CLAIMS AGAINST THE INDIVIDUAL CAPACITY DEFENDANTS……………………………………….....…37

    A.    The Constitution Provides A Damages Remedy For Religious Discrimination And Unlawful Surveillance Under *Bivens*……...……....39

        1.    This Case Does Not Present an Extension of *Bivens*…...........…40

        2.    Even If This Case Is an Extension, This Court Should Recognize a *Bivens* Remedy…………………………………………………..46

            a.    No Statutory Scheme Indicates Congress's Intent to Displace *Bivens* Remedies…………………………......…47

                i.    Privacy Act……………….....................…48

                ii.    RFRA……………………........................……51

                iii.    FISA……………………......................……...53

            b.    No Special Factors Justify Precluding a *Bivens* Remedy…………………………………………….....54

                i.    National Security………......................………...56

                ii.    State Secrets……………………...............………...62

    B.    Defendants Are Not Entitled To Qualified Immunity…………….…63

        1.    Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' FISA Claims, As the District Court Correctly Held, or On Their Fourth Amendment Claims……………………………........64

            a.    Warrantless Audio Recording Outside Informant's Presence……………………………………………...66

            b.    Conversations to Which the Informant Was a Party……………………………………………...…..71

2. Defendants Are Not Entitled To Qualified Immunity on Plaintiffs' First Amendment and Fifth Amendment Equal Protection Claims……………...…………………………...….73

    a. Under Clearly Established Law, Facial Discrimination on the Basis of Religion Triggers Strict Scrutiny…..………...76

        i. Establishment Clause…………........................…….77

        ii. Free Exercise Clause………………….........……..81

        iii. Equal Protection Component of Due Process Clause……………………………………....84

        iv. The Ban on Religious Discrimination is Clearly Established………………………………....86

    b. The Complaint Alleges Facial Discrimination Against Muslims……………………………………………...87

        i. Plaintiffs Need Not Show Facial Discrimination Arose From Malevolent Motives……...........……..89

        ii. The Court Must Subject Facial Religious Discrimination to Strict Scrutiny Even if Defendants Also Relied on Other Factors……………...............90

    c. Defendants' Facial Discrimination Fails Strict Scrutiny………........................................................91

3. The Complaint Establishes that the Supervisory Defendants Are Liable for Intentional Discrimination and Unlawful Searches……………………………………………...…...92

    a. The Supervisors Are Liable for Intentional Discrimination……………………………………..…94

    b. The Supervisors Are Liable for Unlawful Searches……………………………………….…100

4.      Defendants Are Not Entitled To Qualified Immunity on Plaintiffs' RFRA Claims………………………………..…..101

5.      Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Claim Under 42 U.S.C. 1985(3)…………..…………........…104

        a.      Application of the Antitrust "Intracorporate Conspiracy" Doctrine to Section 1985 Claims Would Be Wholly Inappropriate……………………………………....…104

        b.      Plaintiffs Adequately Allege a Conspiracy under Section 1985……………………………………………….......106

III.    PLAINTIFFS STATE CLAIMS AGAINST THE FEDERAL GOVERNMENT DEFENDANTS………………………….......……...109

        A.      Plaintiffs State a Claim Under The Federal Tort Claims Act…............110

                1.      The FTCA Claims Cannot Be Dismissed on State Secrets Grounds Because of the Possibility That They Implicate the Discretionary Function Exception…………………….....…….110

                2.      Plaintiffs State an FTCA Claim Under Invasion of Privacy……………………………………………….…111

                3.      Plaintiffs State a Claim for Relief under Cal. Civil Code Section 52.1……………………………….....……...115

                4.      Plaintiffs Have Sufficiently Alleged a Claim for Intentional Infliction of Emotional Distress…………………….......…116

                5.      The FTCA Judgment Bar Does Not Preclude Plaintiffs' Claims Against the Individual Defendants………………….…….....118

        B.      Plaintiffs Are Entitled To Expungement of Records Under The Privacy Act And The Constitution…………………………………..…121

                1.      Plaintiffs State a Claim for Expungement under the Privacy Act…………………………………………….....123

iv

2.      Plaintiffs State a Claim for Expungement under the
        Constitution…………………………………………………..130

CONCLUSION…………………………………………...………....………………137

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
787 F.3d 524 (D.C. Cir. 2015) ............................................................ 51, 128, 132, 133

*ACLU v. NSA*,
493 F.3d 644 (6th Cir. 2007) ................................................................ 18, 64

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995) ........................................................................... 75, 94

*Al-Haramain Islamic Found. v. Bush*,
507 F.3d 1190 (9th Cir. 2007) ................................................................ 7, 36

*Al-Kidd v. Ashcroft*,
580 F.3d 949 (9th Cir. 2009) ................................................................. 93, 96

*Allen v. Wright*,
468 U.S. 737 (1984) ............................................................................. 103

*Alpha Delta Chi-Delta Chapter v. Reed*,
648 F.3d 790 (9th Cir. 2011) ................................................................. 83, 84

*Am. Commc'ns Ass'n, v. Douds*,
339 U.S. 382 (1950) ........................................................................... 101, 103

*Am. Family Ass'n v. City & Cnty. of San Francisco*,
277 F.3d 1114 (9th Cir. 2002) ................................................................. 82, 83

*Anderson v. Creighton*,
483 U.S. 635 (1987) ............................................................................. 42

*Arar v. Ashcroft*,
585 F.3d 559 (2d Cir. 2009) ................................................................. 31, 32, 60, 61, 63

*Arevalo v. Woods,*
    811 F.2d 487 (9th Cir. 1987) ...................................................... 119

*Armstrong v. Bush,*
    924 F.2d 282 (D.C. Cir. 1991) ...................................................... 9

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..........................................................*passim*

*Azar v. Conley,*
    456 F.2d 1382 (6th Cir. 1972) .................................................. 108

*Ball v. Massanari,*
    254 F.3d 817 (9th Cir. 2001) ..................................................... 84

*Bassiouni v. FBI,*
    436 F.3d 712 (7th Cir. 2006) ................................... 128, 129, 130

*Beattie v. Boeing Co.* 43 F.3d 559 (10th Cir. 1994) ...................................... .59

*Beijing Tong Ren Tang (USA), Corp. v. TRT USA Corp.,*
    2010 WL 98957 (N.D. Cal. Jan. 5, 2010) .................................. 117

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................ 107

*Bernal v. Fainter,*
    467 U.S. 216 (1984) ................................................................. 91

*Berry v. Hollander,*
    925 F.2d 311 (9th Cir. 1991) ..................................................... 47

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
    403 U.S. 388 (1971) ..........................................................*passim*

*Black v. United States,*
    62 F.3d 1115 (8th Cir. 1995) ............................................. 62, 63

*Bond v. United States,*
    529 U.S. 334 (2000) ................................................................. 69

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ................................................................... 57

*Bowen v. Rubin*,
    2002 U.S. Dist. LEXIS 25283 (E.D.N.Y. May 17, 2002) ...................................... 108

*Braunfeld v. Brown*,
    366 U.S. 599 (1961) ................................................................... 82

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ............................................. 89, 90, 105, 107, 108, 109

*Brown v. Entm't Merchs. Ass'n*,
    131 S. Ct. 2729 (2011) ................................................................ 91

*Brown v. GSA*,
    425 U.S. 820 (1976) .................................................................. 133

*Burnsworth v. Gunderson*,
    179 F.3d 771 (9th Cir. 1999) ................................................... 131, 132

*Bush v. Lucas*,
    462 U.S. 367 (1983) .................................................................. 133

*Carlson v. Greene*
    446 U.S. 14 (446 U.S. 14) (1980) .................................................... 50

*Castaneda v. United States*,
    546 F.3d 682 (9th Cir. 2008), *reversed on other grounds sub nom. Hui v. Castaneda*, 559 U.S. 799 (2010) ....................................................... 41

*Catholic League for Religious & Civ. Rights v. City & Cnty. of San Francisco*,
    624 F.3d 1043 (9th Cir. 2010) ....................................................... 79

*Cell Associates, Inc. v. NIH*,
    579 F.2d 1155 (9th Cir. 1978) ................................................... 127, 128

*Center for Nat. Sec. Studies v. DOJ*,
    331 F.3d 918 (D.C. Cir. 2003) ...................................................... 133

*Chappell v. Wallace*,
    462 U.S. 296 (1983) ............................................................... 55, 58

*Chavez v. United States,*
  683 F.3d 1102 (9th Cir. 2012) ...............................................................99, 100

*Christensen v. Super. Ct.,*
  54 Cal. 3d 868 (1991)........................................................................... 116

*Church of Lukumi Babalu Aye v. City of Hialeah,*
  508 U.S. 520 (1993) ........................................................................*passim*

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ............................................................................ 53

*City of Emeryville v. Robinson,*
  621 F.3d 1251 (9th Cir. 2010) ............................................................. 37

*City of Milwaukee v. Illinois,*
  451 U.S. 304 (1981) ......................................................................7, 133

*City of Monterey v. Del Monte Dunes,*
  526 U.S. 687 (1999) ............................................................................ 21

*Clarkson v. IRS,*
  678 F.2d 1368 (10th Cir. 1982) ..........................................128, 129, 132, 133

*Cnty. of Allegheny v. ACLU,*
  492 U.S. 573 (1989) ......................................................................77, 78, 81

*Cnty. of Oneida v. Oneida Indian Nation,*
  470 U.S. 226 (1985) ............................................................................. 8

*Colorado Christian Univ. v. Weaver,*
  534 F.3d 1245 (10th Cir. 2008) ........................................................... 85

*Consol. Edison Co. v. Public Service Comm'n,*
  447 U.S. 530 (1980) ............................................................................ 91

*Correctional Servs. Corp. v. Malesko,*
  534 U.S. 61 (2001) ...........................................................................*passim*

*Davis v. Passman,*
  442 U.S. 228 (1979) ........................................................................*passim*

ix

*Dellums v. Powell,*
566 F.2d 167 (D.C. Cir. 1977) ...................................................................... 42

*Demery v. Kupperman,*
735 F.2d 1139 (9th Cir. 1984) .................................................................. 123

*Dep't of Navy v. Egan,*
484 U.S. 518 (1988) ...................................................................................... 59

*Devereaux v. Abbey,*
263 F.3d 1070 (9th Cir. 2001) (en banc) ................................................ 64

*Diem v. San Francisco,*
686 F. Supp. 806 (N.D. Cal. 1988) .......................................................... 106

*DiMartini v. Ferrin,*
889 F.2d 922 (9th Cir. 1989), *amended on pet. for rehearing en banc*, 906
F.2d 465 (9th Cir. 1990) ............................................................................... 42

*Dodds v. Richardson,*
614 F.3d 1185 (10th Cir. 2010) ................................................................. 95

*Doe v. FBI,*
936 F.2d 1346 (D.C. Cir. 1991) ............................................................... 130

*Doe v. Rumsfeld,*
683 F.3d 390 (D.C. Cir. 2012) .................................................................... 60

*Doe v. U.S. Air Force,*
812 F.2d 738 (D.C. Cir. 1987) ................................................................. 135

*Downie v. Middleburg Heights*
301 F.3d 688 (6th Cir. 2002) ...................................................................... 50

*Edgerly v. City & Cnty. of San Francisco,*
599 F.3d 946 (9th Cir. 2010) ................................................................... 100

*El-Masri v. United States*
479 F.3d 296 (4th Cir. 2007) ...................................................................... 25

*Employment Division v. Smith*
494 U.S. 872 (1990) ............................................................................. 52, 74

*Erickson v. United States*,
976 F.2d 1299 (9th Cir. 1992) ................................................................. 42

*Esteem v. City of Pasadena*,
2007 WL 4270360 (C.D. Cal. Sep. 11, 2007) ........................................ 117

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*,
308 F.3d 523 (6th Cir. 2002) .................................................................. 92

*FDIC v. Meyer*,
510 U.S. 471 (1994) ................................................................................ 55

*Fendler v. U.S. Parole Comm'n*,
774 F.2d 975 (9th Cir. 1985) ......................................................... 131, 136

*Fitzgerald v. Penthouse Int'l*,
776 F.2d 1236 (4th Cir. 1985) ........................................................... 24, 25

*Fletcher v. Western National Life Ins. Co.*,
10 Cal. App. 3d 376 (1970) ................................................................... 117

*Fobbs v. Holy Cross Health Sys. Corp.*,
29 F.3d 1439 (9th Cir. 1994), *overruled on other grounds as stated in
Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir.
2001) ...................................................................................................... 109

*Fowler v. Rhode Island*,
345 U.S. 67 (1953) ......................................................................... 82, 83, 86

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .................................................................................. 9

*Freeman v. Arpaio*,
125 F.3d 732 (9th Cir. 1997), *overruled on other grounds as recognized in
Shakur v. Schriro*, 514 F.3d 878 (9th Circ. 2008) ................................. 84

*Galvin v. Hay*,
374 F.3d 739 (9th Cir. 2004) ............................................................... 113

*Gasho v. United States*,
39 F.3d 1420 (9th Cir. 1994) ........................................................ 118, 119

*General Dynamics Corp. v. United States,*
  563 U.S. 478 (2011) .......................................................................................*passim*

*Gerlich v. U.S. Dep't of Justice,*
  711 F.3d 161 (D.C. Cir. 2013) ..........................................................124, 129

*Gibson v. United States,*
  781 F.2d 1334 (9th Cir. 1986) ................................................. 42, 53, 59, 61

*Gillette v. United States,*
  401 U.S. 437 (1971) ......................................................................................... 82

*Gratz v. Bollinger*
  539 U.S. 244 (2003) ..........................................................................76, 89, 90

*Griffin v. Breckenridge,*
  403 U.S. 88 (1971) ......................................................................................... 108

*Groh v. Ramirez,*
  540 U.S. 551 (2004) ....................................................................................... 42

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) ..........................................................................28, 75, 89

*Haase v. Sessions,*
  893 F.2d 370 (D.C. Cir. 1990) ................................................................... 129

*Haig v. Agee,*
  453 U.S. 280 (1981) ..................................................................................57, 91

*Halpern v. United States,*
  258 F.2d 36 (2d Cir. 1958) ......................................................................16, 17

*Hamdi v. Rumsfeld,*
  542 U.S. 507 (2004) ..................................................................................57, 58

*Hamilton v. Prudential Financial,*
  2007 WL 2827792 (E.D. Cal. 2007) ........................................................ 117

*Handschu v. Special Services Div.,*
  349 F. Supp. 766 (S.D.N.Y. 1972) .............................................................. 73

xii

*Harlow v. Fitzgerald,*
 457 U.S. 800 (1982) ............................................................ 63, 64

*Harris v. Roderick,*
 126 F.3d 1189 (9th Cir. 1997) ...................................... 42

*Hartman v. Moore,*
 547 U.S. 250 (2006) ........................................................ 42

*Hartmann v. Stone,*
 68 F.3d 973 (6th Cir. 1995) ........................................ 53, 83

*Hayden v. Cnty. of Nassau,*
 180 F.3d 42 (2nd Cir. 1999) ........................................ 77

*Hess v. United States,*
 361 U.S. 314 (1960) ........................................................ 110

*Hill v. Nat'l Collegiate Athletic Ass'n,*
 7 Cal. 4th 1 (1994) ........................................................ 112

*Holder v. Humanitarian Law Project,*
 561 U.S. 1 (2010) ............................................................ 57

*Home Bldg. & Loan Ass'n v. Blaisdell,*
 290 U.S. 398 (1934) ........................................................ 58

*Hope v. Pelzer,*
 536 U.S. 730 (2002) ........................................................ 87

*Hughes v. Pair,*
 46 Cal.4th 1035 (2009) .................................................. 117

*Ibrahim v. Dep't of Homeland Sec.,*
 538 F.3d 1250 (9th Cir. 2008) ............................... 39, 43, 45

*Indianapolis v. Edmond,*
 531 U.S. 32 (2000) .......................................................... 72

*UAW v. Johnson Controls, Inc.,*
 499 U.S. 187 (1991) .................................................... 89, 107

*Jabara v. Kelley,*
   75 F.R.D. 475 (E.D. Mich. 1977) .................................................................. 19

*Jabara v. Webster,*
   691 F.2d 272 (6th Cir. 1982) .................................................................. 19, 20

*Jewel v. NSA,*
   965 F. Supp. 2d 1090 (N.D. Cal. 2013) .................................................. 16, 18

*In re John Doe Trader,*
   894 F.2d 240 (7th Cir. 1990) ...................................................................... 70

*Johnson v. California,*
   207 F.3d 650 (9th Cir. 2000) ..................................................................... 108

*Kasza v. Browner,*
   133 F.3d 1159 (9th Cir. 1998) ................................................................. 8, 37

*Katz v. United States,*
   389 U.S. 347 (1967) .................................................................................. 66

*Kee v. City of Rowlett,*
   247 F.3d 206 (5th Cir. 2001) ...................................................................... 70

*Kizas v. Webster,*
   707 F.2d 524 (D.C. Cir 1983) .................................................................... 133

*Kreines v. United States,*
   959 F.2d 834 (9th Cir. 1992) ................................................... 118, 119, 120

*Kreisner v. City of San Diego,*
   1 F.3d 775 (9th Cir. 1993) .......................................................................... 79

*Kwai Fun Wong v. United States INS,*
   373 F.3d 952 (9th Cir. 2004) ...................................................................... 43

*Kyllo v. United States,*
   533 U.S. 27 (2001) .................................................................................... 67

*Corp. of Presiding Bishop v. Amos,*
   483 U.S. 327 (1987) ................................................................................... 79

*Larson v. Valente,*
  456 U.S. 228 (1982) ................................................................*passim*

*Lebron v. Rumsfeld,*
  670 F.3d 540 (4th Cir. 2012) ................................................. 60

*Lee v. Gregory,*
  363 F.3d 931 (9th Cir. 2004) ................................................. 42

*Lemon v. Kurtzman,*
  403 U.S. 602 (1971) ......................................... 73, 78, 79, 80, 81

*Levin v. United States,*
  ___ U.S. ___, 133 S. Ct. 1224 (2013) ................................... 119

*Little v. Barreme,*
  6 U.S. (2 Cranch) 170 (1804) ............................................... 45

*Lyall v. City of Los Angeles,*
  2011 WL 61626 (C.D. Cal. Jan. 6, 2011) ............................... 70

*MacPherson v. IRS,*
  803 F.2d 479 (9th Cir. 1986) ................................................*passim*

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ........................................... 2, 56

*Maurer v. Pitchess,*
  691 F.2d 434 (9th Cir. 1982) ......................................... 130, 132

*Mayfield v. Gonzales,*
  2005 WL 1801679 (D. Or. July 28, 2005) ......................... 43, 45

*Maynard v. San Jose,*
  37 F.3d 1396 (9th Cir. 1994) ............................................... 108

*McCreary Cnty. v. ACLU,*
  545 U.S. 844 (2005) ....................................................... 76, 81

*Menard v. Saxbe,*
  498 F.2d 1017 (D.C. Cir. 1974) ..................................... 34, 135

xv

*Mendocino Envtl. Ctr. v. Mendocino Cnty.,*
    14 F.3d 457 (9th Cir. 1994) ................................................................. 42

*Miller v. Johnson,*
    515 U.S. 900 (1995) ........................................................................... 84

*Miller v. Reed,*
    176 F.3d 1202 (9th Cir. 1999) ............................................................ 82

*Mirmehdi v. United States,*
    662 F.3d 1073 (9th Cir. 2011) ............................................................ 59

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) ................................................................*passim*

*Mockaitis v. Harcleroad,*
    104 F.3d 1522 (9th Cir. 1997), *overruled on other grounds as recognized by*
    *United States v. Antoine,* 318 F.3d 919 (9th Cir. 2003) ....................... 71

*Mohamed v. Jeppesen Dataplan, Inc.*
    614 F3d 1070 (9th Cir. 2010) ........................................................ 25, 35

*United States ex rel. Moore v. Koelzer,*
    457 F.2d 892 (3rd Cir. 1972) ......................................................... 41, 43

*Morgan v. United States,*
    304 U.S. 1 (1938) ............................................................................... 37

*Moss v. Secret Service,*
    572 F.3d 962 (9th Cir. 2009), *overruled on other grounds in Wood v. Moss,*
    ___ U.S. ___, 134 S. Ct. 2056 (2014) ................................................ 42

*Nagel v. U.S. Dep't of Health, Educ., & Welfare,*
    725 F.2d 1438 (D.C. Cir. 1984) ............................................... 128, 131

*Navajo Nation v. U.S. Forest Serv.,*
    535 F.3d 1058 (9th Cir. 2008) ............................................... 101, 102

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
    508 U.S. 656 (1993) ............................................................... 49, 103

*Niemotko v. Maryland*,
    340 U.S. 268 (1951) ........................................................................82, 83, 86

*NLRB v. Hanna Boys Ctr.*,
    940 F.2d 1295 (9th Cir. 1991) ...................................................................... 82

*Nolan v. Cleland*,
    686 F.2d 806 (9th Cir. 1982) ...................................................................... 133

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*,
    135 F.3d 1260 (9th Cir. 1998) ...........................................................34, 134

*In re NSA Telcoms. Records Litig*,
    564 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................................... 16

*Nunez v. Duncan*,
    591 F.3d 1217 (9th Cir. 2010) .................................................................... 100

*Nurre v. Whitehead*,
    580 F.3d 1087 (9th Cir. 2009) ...................................................................... 79

*Nurse v. United States*,
    226 F.3d 996 (9th Cir. 2000) ...........................................................40, 61, 111

*O'Connor v. Ortega*,
    480 U.S. 709 (1987) ...................................................................................... 69

*O.H. v. Oakland Unified Sch. Dist.*,
    2000 U.S. Dist. LEXIS 21725 (N.D. Cal. Apr. 17, 2000) ........................ 106

*Orin v. Barclay*,
    272 F.3d 1207 (9th Cir. 2001) ...................................................................... 86

*OSU Student Alliance v. Ray*,
    699 F.3d 1053 (9th Cir. 2012) ..............................................................*passim*

*Padilla v. Yoo*,
    633 F. Supp. 2d 1005 (N.D. Cal. 2009) ................................................. 43, 45

*Paton v. La Prade*,
    524 F.2d 862 (3d Cir. 1975) ...............................................................42, 135

*Pennsylvania Bd. of Probation & Parole v. Scott*,
  524 U.S. 357 (1998) ...................................................................................33, 135

*People v. Windham*,
  145 Cal. App. 4th 881 (2006) .................................................................... 114

*Peter v. Wedl*,
  155 F.3d 992 (8th Cir. 1998) ....................................................................... 85

*Pilon v. U.S. Dep't of Justice*,
  73 F.3d 1111 (D.C. Cir. 1996) ................................................................... 126

*Pitman v. City of Oakland*,
  197 Cal. App. 3d 1037 (1988) .................................................................... 117

*Portman v. Cnty. of Santa Clara*,
  995 F.2d 898 (9th Cir. 1993) ..................................................................... 105

*Presbyterian Church v. United States*,
  870 F.2d 518 (9th Cir. 1989) ..................................................................... 123

*Rashdan v. Geissberger*,
  2011 U.S. Dist. LEXIS 4792 (N.D. Cal. Jan. 14, 2011) ...................105, 106

*Rebel Van Lines v. Compton*,
  663 F. Supp. 786 (C.D. Cal. 1987) ............................................................ 106

*Resnick v. Adams*,
  348 F.3d 763 (9th Cir. 2003) ....................................................................... 43

*Saenz v. Roe*,
  526 U.S. 489 (1999) .................................................................................... 103

*Safford Unified Sch. Dist. #1 v. Redding*,
  557 U.S. 364 (2009) ...................................................................................... 87

*Saucier v. Katz*,
  533 U.S. 194 (2001) ..............................................................................63, 64

*Sawhney v. Allstate Ins. Co.*,
  1995 WL 500531 (C.D. Cal. 1995).............................................................. 117

*Schweiker v. Chilicky,*
    487 U.S. 412 (1988) ................................................... 47

*Schwenk v. Hartford,*
    204 F.3d 1187 (9th Cir. 2000) ........................................107, 108

*Scott v. Rosenberg,*
    702 F.2d 1263 (9th Cir. 1983) ....................................... 43

*Scott v. Ross,*
    140 F.3d 1275 (9th Cir. 1998) .................................. 104, 107, 109

*Sealed Appellant v. Sealed Appellee,*
    130 F.3d 695 (5th Cir. 1997), *cert. denied*, 523 U.S. 1077 (1998).............. 132

*Shipp v. Todd,*
    568 F.2d 133 (9th Cir. 1978) ............................... 131, 132, 135

*Sklar v. C.I.R.,*
    549 F.3d 1252 (9th Cir. 2008) ...................................... 78

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011) ...................................... 93

*Sweet v. Sec'y, Dept. of Corr.,*
    467 F.3d 1311 (11th Cir. 2006) .................................... 85

*Tekle v. United States,*
    511 F.3d 839 (9th Cir. 2007) ..................................... 114

*Tenet v. Doe,*
    544 U.S. 1 (2005).............................................. 34, 35

*Ting v. United States,*
    927 F.2d 1504 (9th Cir. 1991) ................................... 119

*Trujillo v. City of Ontario,*
    428 F. Supp. 2d 1094 (C.D. Cal. 2006), *aff'd sub nom. Bernhard v. City of
    Ontario*, 270 Fed. Appx. 518 (9th Cir. 2008) (unpublished)...................... 69

*Turkmen v. Hasty,*
    789 F.3d 218 (2d Cir. 2015)......................................*passim*

*United States v. Aguilar*,
883 F.2d. 662 (9th Cir. 1989) ............................................................. 71, 72

*United States v. Armstrong*,
517 U.S. 456 (1996) ............................................................. 84, 86

*United States v. Gonzalez*,
328 F.3d 543 (9th Cir. 2003) ............................................................. 70

*United States v. Koyomejian*,
970 F.2d 536 (9th Cir. 1992) (Kozinski, J., concurring) ............................................. 66

*United States v. Leon*,
468 U.S. 897 (1984) ............................................................. 33

*United States v. Little*,
753 F.2d 1420 (9th Cir. 1984) ............................................................. 70

*United States v. Mayer*,
503 F.3d 740 (9th Cir. 2007) ............................................................. 71, 72, 73

*United States v. Mesa-Rincon*,
911 F.2d 1433 (10th Cir. 1990) ............................................................. 66

*United States v. Montero-Camargo*,
208 F.3d 1122 (9th Cir. 2000) ............................................................. 92

*United States v. Nerber*,
222 F.3d 597 (9th Cir. 2000) ............................................................. 66, 68, 69

*United States v. Olson*,
546 U.S. 43 (2005) ............................................................. 114

*United States v. Ott*,
827 F.2d 473 (9th Cir. 1987) ............................................................. 21

*United States v. Reynolds*,
345 U.S. 1 (1953) ............................................................. *passim*

*United States v. Sedaghaty*,
728 F.3d 885 (9th Cir. 2013) ............................................................. 26

xx

*United States v. Stanley*,
483 U.S. 669 (1987) ........................................................................48, 55, 58

*United States v. Sumner*,
226 F.3d 1005 (9th Cir. 2000) ................................................................. 131

*United States v. Taketa*,
923 F.2d 665 (9th Cir. 1991) ................................................................67, 69

*United States v. Torres*,
751 F.2d 875 (7th Cir. 1984) ....................................................................66

*United States v. Wahchumwah*,
710 F.3d 862 (9th Cir. 2013) ....................................................................66

*Vance v. Rumsfeld*,
701 F.3d 193 (7th Cir. 2012) (en banc) ....................................................60

*Vernon v. City of Los Angeles*,
27 F.3d 1385 (9th Cir. 1994) ...............................................................*passim*

*Vision Church v. Village of Long Grove*,
468 F.3d 975 (7th Cir. 2006) ....................................................................83

*W. Radio Servs. Co. v. U.S. Forest Service*,
578 F.3d 1116 (9th Cir. 2009) ............................................................47, 54

*Washington v. Duty Free Shoppers*,
696 F. Supp. 1323 (N.D. Cal. 1988) .......................................................106

*Weinberger v. Wiesenfeld*
420 U.S. 636 (1975) ..................................................................................40

*Whren v. United States*,
517 U.S. 806 (1996) ............................................................................72, 92

*Wilkie v. Robbins*,
551 U.S. 537 (2007) ............................................................................*passim*

*Wilson v. Layne*,
526 U.S. 603 (1999) ..................................................................................42

*Wilson v. Libby*
    535 F.3d 697 (D.C. Cir. 2008) ...........................................................50, 59, 60

*Ex Parte Young*
    209 U.S. 123 (1908) ........................................................................ 123

*Wilson v. Webster,*
    467 F.2d 1282 (9th Cir. 1972) ....................................................... 134

*Wirzburger v. Galvin,*
    412 F.3d 271 (1st Cir. 2005) ........................................................... 83

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ......................................................................... 58

**Statutes and Rules**

The Privacy Act, 5 U.S.C. 552a(a)–(l) .................................................... 128

5 U.S.C. 552a(b) ...........................................................................127, 128

5 U.S.C. 552a(d) .................................................................................. 127

5 U.S.C. 552a(d)(1) .............................................................................. 123

5 U.S.C. 552a(d)(2) .............................................................................. 123

5 U.S.C. 552a(e)(1) .............................................................................. 123

5 U.S.C. 552a(e)(5) .............................................................................. 123

5 U.S.C. 552a(e)(7) .........................................................................*passim*

5 U.S.C. 552a(g) .................................................................................. 127

5 U.S.C. 552a(j), (k) ............................................................................ 124

5 U.S.C. 702 ........................................................................................ 123

8 U.S.C. 1324 ........................................................................................ 71

18 U.S.C. 2510 *et seq.* ........................................................................ 66

28 U.S.C. 1346(b)(1) ................................................................ 110

28 U.S.C. 2674 ........................................................................ 110

28 U.S.C. 2676 .................................................... 118, 119, 120

42 U.S.C. 1985 (Ku Klux Klan Act of 1871) ........................ *passim*

42 U.S.C. 2000bb–1(a), (b) ...................................................... 52

42 U.S.C. 2000bb-4 .................................................................. 52

42 U.S.C. 2000bb(a)(4) ....................................................... 52, 53

Foreign Intelligence Surveillance Act, 50 U.S.C. 1801 *et seq* ........... 2

50 U.S.C. 1810 ........................................... 11, 12, 14, 22

50 U.S.C. 1801(k) ..................................................................... 29

50 U.S.C. 1806(c) ........................................ 11, 12, 13, 14, 17, 22

50 U.S.C. 1806(d) ............................................................. 13, 14

50 U.S.C. 1806(e) ............................................................. 13, 14

50 U.S.C. 1806(f) .............................................................. *passim*

50 U.S.C. 1801(f)(2) ................................................................ 15

Cal. Civ. Code § 52.1 ............................................................ 115

Cal. Civ. Code § 52.1(a) ........................................................ 115

Cal. Civ. Code § 1708.8 ......................................................... 114

Cal. Penal Code § 632 ........................................................... 113

Cal. Penal Code § 633 ........................................................... 113

Federal Rule of Evidence 501 ............................................... 7, 8

**Constitutional Provisions**

U.S. Const. amend. I ......................................................................*passim*

U.S. Const. amend. IV ...................................................................*passim*

U.S. Const. amend. V ....................................................................*passim*

U.S. Const. amend. VII...................................................................... 21

U.S. Const. amend. VIII .............................................................. 55, 95

Cal. Const., Art. I, Section 1 ........................................................... 112

**Other Authorities**

*Guidance For Federal Law Enforcement Agencies Regarding the Use of Race,*
  *Ethnicity, Gender Identity,* U.S. Dep't of Justice, at 9-10 (Dec. 2014),
  *available at*
  http://www.justice.gov/sites/default/files/ag/pages/attachments/2
  014/12/08/use-of-race-policy.pdf ............................................... 30

Hon. Marsha S. Berzon, *Securing Fragile Foundations: Affirmative*
  *Constitutional Adjudication In Federal Courts,* 84 N.Y.U. L. Rev. 681,
  683–84 (2009).................................................................................. 55

S. Rep. No. 93-1183 (1974) ..................................................... 124, 129

S. Rep. No. 103-111 (1993) ............................................................. 52

S.Rep. No. 95-701 (1978) ................................................................. 14

H.Rep. No. 95-1283 (1978) .............................................................. 14

Henry Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts:*
  *An Exercise in Dialectic,* 66 Harv. L. Rev. 1362, 1371–72 (1953) ............ 34

Sir William Blackstone, 3 Commentaries on the Laws of England
  109 (Worcester: Isiah Thomas 1790) ..................................... 55, 56

## INTRODUCTION

In more than two hundred pages of opposition briefs, Defendants respond to Plaintiffs' appeal of the state secrets ruling by not only addressing the state secrets privilege, but also raising an array of alternative arguments for dismissal of each and every claim. Plaintiffs in this brief both respond to Defendants' arguments on state secrets and explain why their proposed alternative bases for dismissal are incorrect.

While each of Defendants' alternative bases fails on its own terms, the extraordinary result of Defendants' cumulative arguments warrants emphasis at the outset. Plaintiffs have pled with remarkable specificity—borne of detailed statements from an FBI informant—that Defendants engaged in a program of intentional religious discrimination by singling out Plaintiffs for intrusive surveillance because of their religion. Plaintiffs have also pled, with equal specificity, that Defendants used surveillance tactics that plainly violate existing Fourth Amendment law—including most obviously the warrantless use of recording devices to tape conversations to which the informant was not a party. Plaintiffs assert that these egregious tactics violate no fewer than five different federal statutes and four constitutional provisions.

Yet, remarkably, according to Defendants not a single one of these statutes or constitutional provisions gives the Court authority even to address whether their conduct was unlawful. Each and every federal statute or constitutional provision addresses some slightly different harm, provides no cause of action against these particular defendants, or happens to provide no remedy in this precise situation. In

1

Defendants' view, despite the deep commitments to religious liberty and privacy enshrined in our laws, neither Congress nor the Framers of the Constitution intended for the federal government to be held accountable for adopting a program to intrusively surveil law-abiding Americans because of their religion; and even if they did, they intended to allow the government to foreclose any legal challenge to such conduct simply by labeling it secret.

Defendants' view is not the law. As Chief Justice Marshall recognized, "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (quoted in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971)). And as Plaintiffs set forth in detail below, Defendants' analysis of each statute, constitutional provision, and common law doctrine is as unsupportable as the result is unacceptable.

Part I addresses the state secrets privilege, demonstrating that the procedures for handling secret evidence that Congress established in the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. 1801 *et seq.*, pre-empt the state secrets privilege and allow litigation of Plaintiffs' claims here. Because litigation of the FISA claim—which the district court did *not* dismiss—would require introduction of most if not all the evidence required to litigate Plaintiffs' other claims, the district court should have applied FISA's procedures rather than dismissing all but one of Plaintiffs' claims.

Part I.B. argues that, even were FISA's procedures inapplicable, the district

court's decision would still require reversal because the Government did not seek dismissal of the search claims, and because the district court could not have determined "with certainty" that state secrets would be disclosed in the course of litigating Plaintiffs' narrow discrimination claims.

Part II addresses the claims against government officials in their individual capacities.[1] Part II.A shows that Plaintiffs have a cause of action for damages under *Bivens*, because courts have consistently recognized such claims for religious discrimination and illegal searches by law enforcement, including in cases involving national security.

Part II.B demonstrates that the Individual Capacity Defendants are not entitled to qualified immunity on any of Plaintiffs' claims because, unsurprisingly, explicit discrimination on the basis of religion and warrantless electronic surveillance remain forbidden by clearly established law, even in the context of law enforcement and national security investigations.[2]

Part III addresses the claims against the Government. Part III.A shows that Plaintiffs state a claim under the Federal Tort Claims Act for various state-law torts.

---

[1] For clarity and brevity, Plaintiffs refer to Defendants FBI, United States, Mueller, and Martinez (the latter two of whom are sued in their official capacities) as the "Government." Plaintiffs refer to Defendants Tidwell and Walls as "TW," to Armstrong, Allen and Rose as "AAR," and to Defendants TW and AAR collectively as "Individual Capacity Defendants."

[2] Part II.B.1 specifically addresses qualified immunity under FISA, which is the claim the district court did not dismiss, and which is the subject of the Individual Capacity Defendants' appeal. Their reply should be restricted to the issues in that part.

3

The FTCA claim neither is barred by the discretionary function exception (as defendants have no discretion to violate the Constitution) nor does it operate as a "judgment bar" to Plaintiffs' other claims, given that it was brought contemporaneously in the same action and no double-recovery is possible.

Part III.B addresses the Government's arguments about Plaintiffs' entitlement to expungement of their records as a remedy. It demonstrates that Plaintiffs are entitled to expungement under the Privacy Act, which several circuits (including this one) have recognized as the proper form of relief to redress the precise harms the Act is intended to prevent. Such relief has also long been available under the Constitution itself, which this Court and others have recognized as providing expungement as an equitable remedy for unlawfully-maintained records.

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN DISMISSING ANY OF PLAINTIFFS' CLAIMS BASED ON THE STATE SECRETS PRIVILEGE

Although Defendants all advance a variety of arguments in defense of the district court's state secrets dismissal, they cannot repair the two fundamental flaws in the district court's decision.

First, although the district court properly allowed Plaintiffs' FISA claims to proceed, it failed to account for FISA's procedures when considering the state secrets dispute. FISA's plain text establishes the rules governing the treatment of secret information "relating to electronic surveillance" in *any* litigation. Because nearly all of

4

Defendants' activities alleged here "relat[e] to electronic surveillance," FISA preempts the *Reynolds* privilege as to the vast majority of the evidence that Defendants might argue is subject to privilege. Moreover, because the privilege is a product of the common law and subject to displacement under the Federal Rules of Evidence, the district court should have exercised its common law authority to apply FISA's procedures (or some analogue) even as to any residual evidence that would not otherwise be subject to FISA's procedures. *See infra* I.A.

Second, the district court's dismissal order was far too broad and premature. It erred in dismissing the search claims because the privilege belongs only to the Government, and the Government did not ask the Court to dismiss the search claims (and does not ask them to be dismissed here), *see infra* I.B. It also erred in dismissing the discrimination claims because it could not have determined "with certainty" that state secrets would be needed to litigate them at this extremely preliminary stage, particularly in light of the narrow nature of Plaintiffs' legal theory, which can likely be proven or disproven simply by reference to the instructions given to the informant and certain other discrete evidence. *See infra* I.C.

Finally, the district court erred in dismissing Plaintiffs' claims in light of the very serious constitutional problems produced by that result. *See infra* I.D.

### A. Congress' Specially Crafted *In Camera* and *Ex Parte* Procedures for Reviewing Electronic Surveillance in FISA Preempt the Common Law State Secrets Privilege

Defendants fail to appreciate the import of Plaintiffs' FISA argument to the

5

state secrets dispute: that the specific procedures set forth in FISA provide a framework for avoiding the draconian consequences that Defendants seek to derive from the Government's invocation of the *Reynolds* privilege. The district court will already have to use those procedures for the FISA claims, which it did not dismiss. It will also have to use them for the other search claims—which the Government did not seek to dismiss based on the privilege—because they involve largely the same evidence as in the FISA claims.

While the Government argues that some sensitive evidence at issue in this case is not within FISA's purview, the amount of relevant evidence that does not "relate[] to electronic surveillance" in this case will be small, and under these circumstances the district court should exercise its common law authority to apply FISA-like procedures to that evidence as well.

### 1. *Congress is Not Required To Make a "Clear Statement" of Its Intent to Preempt the State Secrets Common Law Evidentiary Privilege*

The Government initially argues that Congress cannot displace the privilege without a clear statement declaring its intent to do so, even though it does not dispute that the *Reynolds* privilege is a common law rule of evidence. Nonetheless, it argues that the privilege is so "well established in the law of evidence" that "Congress would need to speak clearly in order to supersede it." Govt. Br. 55 (citing *Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998) (quoting *United States v. Reynolds*, 345 U.S. 1, 6–7) (1953)). The Government also argues that Congress must speak clearly to displace it

because preemption of the privilege would infringe upon the Executive's constitutional authority to control secret information. Govt. Br. 55. Both claims are unpersuasive, for two reasons.

*First*, because the state secrets doctrine at issue in this case derives only from the *Reynolds* privilege rather than the subject matter bar established by *Totten*—which applies when the very subject matter of a case is a state secret—the Government's assertion of privilege in this case does not implicate constitutional principles that separate powers between the three branches of government. ER 39, 160–61. The *Reynolds* privilege is nothing more than "a common law evidentiary privilege," and as such it simply does not implicate separation of powers concerns. *Cf. Al-Haramain Islamic Found. v. Bush*, 507 F.3d 1190, 1196–97 (9th Cir. 2007); *see* Pl. Br. 66–67. As the Government itself has argued in this very case, "when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears." Govt. Br. 28 (quoting *City of Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981)).[3]

Common law evidentiary rules are governed by Federal Rule of Evidence 501,

---

[3] The Government advances the basic principle that Congress need not speak clearly to displace federal common law in the context of its argument that the Privacy Act has displaced the remedy of expungement for records obtained in violation of the Constitution. Govt. Br. 28-28 Plaintiffs agree with the general principle—that Congress need not speak clearly to displace federal common law—but disagree with the Government's application of that principle to court-created remedies for constitutional violations, because they derive from Constitutional law rather than the federal common law of evidence. *See infra* III.B.2.

which gives no special place to the state secrets privilege. Pl. Br. 66–67. That rule authorizes Congress to displace common law evidentiary rules simply by enacting a statute that "provides otherwise," which FISA plainly does. FISA obviously addresses the treatment of sensitive information obtained by electronic surveillance. Nothing more is required for Congress to preempt the *Reynolds* privilege.

The only case the Government cites that directly addressed a state secrets preemption argument is *Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998), but *Kasza* plainly described the rule as a "common law evidentiary privilege," *id.* at 1165, and its statement that Congress must "speak[] directly" to the issue addressed by the common law privilege simply describes the rule for all common law preemption, *id.* at 1167 (citing, *inter alia*, *Cnty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 236–37 (1985) ("In determining whether a federal statute pre-empts common-law…, the relevant inquiry is whether the statute speaks directly to the question otherwise answered by federal common law." (quotations and alterations omitted)). Nothing in *Kasza* suggests the court analyzed preemption of the state secrets privilege differently from preemption of any other common law rule. *Kasza* found no preemption because the statute at issue, which regulated hazardous waste dumps, did not speak to the treatment of evidence at all, let alone secret evidence, but instead "allow[ed] the President to exempt a federal facility from compliance with RCRA's regulatory regime" for hazardous waste dumps. *Id.* at 1167–68. In contrast, FISA's detailed and comprehensive scheme, and in particular Section 1806(f), was plainly designed by

8

Congress to govern the use of sensitive information related to electronic surveillance by the executive whenever it arises in litigation, and so speaks to exactly the same question as the state secrets privilege for purposes of this case. Pl. Br. 54–58; *see infra* I.A.2.

The Government also cites *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991), in support of an alleged "clear statement" rule for the *Reynolds* privilege, but *Armstrong* nowhere mentions state secrets, and it cannot undermine the Supreme Court's recent pronouncement, echoing various other controlling cases, establishing that *Reynolds* "decided a purely evidentiary dispute by applying evidentiary rules." *General Dynamics Corp. v. United States*, 563 U.S. 478, 131 S. Ct. 1900, 1906 (2011). In any event, *Armstrong* held that actions taken by the President *personally*, as opposed to those taken by executive agencies, are not subject to review under the Administrative Procedures Act. *Id.* It required a "clear statement" as to "legislation restricting or regulating *presidential* action." *Id.* (emphasis added). In later addressing the same issue, the Supreme Court likewise limited its "express statement" rule to legislation restricting "the President's actions," not other executive branch actors like the subordinate heads of department who assert the state secrets privilege. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *cf. Reynolds*, 345 U.S. at 7–8 (requiring "a formal claim of privilege, lodged by the head of the department which has control over the matter" when asserting the privilege).

*Second*, even if the Government could establish that Congress lacked

constitutional authority to regulate the treatment of secret evidence in some cases—a showing that it has not come close to making (and which would render FISA unconstitutional), *see* Govt. Br. 55—no such concerns are implicated here. There is no dispute that Plaintiffs can make out their prima facie case without access to secret evidence. *See* Pl. Br. 39–40 (describing evidence Plaintiffs submitted with their complaint); Govt. Br. 49 (government not disputing that Plaintiffs can make prima facie case). Under these circumstances, there is no risk that the courts will force the Government to disclose its evidence. The Government has a choice as to whether or not to introduce secret evidence when making its defense, so the use of FISA's procedures cannot possibly raise separation of powers concerns. Absent such concerns, the Government cannot invoke any clear statement canon in its favor.

### 2. *FISA Provides Through Its Comprehensive Disclosure Procedures a Clear Statement of Congressional Intent to Preempt the Reynolds Privilege*

Even were a clear statement required, FISA provides it. Its plain text explicitly addresses how courts should handle secret evidence relating to electronic surveillance in litigation. Pl. Br. 52–53. Moreover, Congress enacted FISA with the manifest purpose of restraining abuses of executive power in the areas of intelligence gathering and national security, Pl. Br. 54; *see also* EFF Amicus Brief at 5–9. Congress enacted a comprehensive regime governing the use and disclosure of electronic surveillance evidence, and then provided a specific framework for the introduction of this evidence in civil cases meant to challenge the legality of its collection—all with an eye

toward obviating the need for judicial imposition of the state secrets privilege. *See* Pl. Br. 54–58.

Although the Government resists the conclusion that FISA speaks directly to the same subject matter addressed by the *Reynolds* privilege, it nowhere engages FISA's text and structure, which create a cause of action for individuals subject to unlawful electronic surveillance, 50 U.S.C. 1810, require notification to the court and the parties whenever the Government intends to disclose evidence derived from electronic surveillance, 50 U.S.C. 1806(c), and establish procedures for the consideration of any evidence "relating to electronic surveillance" upon a showing that its disclosure would harm national security. 50 U.S.C. 1806(f).

The most obvious problem with the Government's interpretation of FISA is that it cannot be squared with the cause of action created by Section 1810—which Plaintiffs have pled here, and which the district court did *not* dismiss. ER 66. Section 1810 permits damages actions brought by individuals challenging the lawfulness of electronic surveillance. On the Government's view, the procedures set forth at Section 1806 would not apply in such cases, because they only apply where the Government seeks to introduce electronic surveillance information or where an individual seeks to suppress such information in a criminal case. If that is correct, how did Congress intend for cases brought under Section 1810 to proceed? Section 1810 suits, like this one, must make use of *some* procedures for handling sensitive information, yet on Defendants' view they cannot make use of the procedures set

11

forth in the neighboring provisions at Section 1806(c) and (f). Because claims under Section 1810 are plainly the type of proceedings in which Congress intended the procedures outlined in Section 1806 to apply, there is simply no reason not to utilize them for the other claims in this case.

Beyond this structural incongruity, the Government's arguments against the applicability of FISA all rest on limitations that find no support either in its text or in any caselaw. The Government claims that Section 1806's rules do not apply because it governs only in two discrete sets of circumstances: when the *Government* uses information derived from electronic surveillance, and when criminal defendants move to suppress evidence arising from electronic surveillance. In contrast, it asserts, the state secrets privilege concerns circumstances where the Government seeks to *prevent* the use of such evidence. Govt. Br. 56–57.

The Government's argument is doubly wrong, at least as applied to the facts of this case. Section 1806's text does not limit its procedures to cases in which the Government is "seeking to use evidence obtained or derived from FISA-authorized electronic surveillance to support a judgment in its favor on the merits," or when a criminal defendant is "seeking to suppress any such evidence." Govt. Br. 58. Rather, the Government must notify the Court and parties of the possible use of secret evidence whenever "the Government intends to enter into evidence or otherwise use or disclose in *any trial, hearing, or other proceeding* in or before any court… against an aggrieved person, any information obtained or derived from an electronic surveillance

of that aggrieved person pursuant to the authority of this subchapter…." 50 U.S.C. 1806(c) (emphasis added). *See also* Pl. Br. 52–53. Thus, it applies whenever the Government "intends to enter into evidence," "uses," or "discloses" any electronic surveillance in any manner "against an aggrieved person." *Id.*

Whatever may have been the case in other state secrets cases, here the Government has invoked the privilege because *Defendants* want to introduce evidence to respond to Plaintiffs' allegations; Plaintiffs need not introduce secret evidence to prevail on their claims. Pl. Br. 37–41. It is the Government and its officers who want to disclose information related to electronic surveillance (and presumably have already done so as part of their *ex parte* submission) to support their defenses against Plaintiffs—a situation plainly contemplated by Section 1806.

The Government also errs in arguing that non-government parties may benefit from Section 1806's procedures only in suppression motions brought by aggrieved persons in criminal cases. Govt. Br. 56–57. This again assumes that Plaintiffs need to find some way to introduce secret evidence to prove their case, but they do not. The sworn declarations submitted with the complaint more than suffice to establish their prima facie case. In addition, the plain text refutes the Government's argument. The procedures for handling sensitive information set forth at Section 1806(f) apply "[w]henever a court… is notified pursuant to subsection (c) or (d) of this section, or whenever a motion is made pursuant to subsection (e) of this section, or whenever any motion or request is made by an aggrieved person pursuant to any other statute or

13

rule….” 50 U.S.C. 1806(f). Although subsection (e) describes motions to suppress, subsections (c) or (d) apply broadly whenever the United States, a state, or a political subdivision thereof "intends to enter into evidence or use or disclose in any trial, hearing, or other proceeding" evidence derived from electronic surveillance. 50 U.S.C. 1806(c)–(d). And the "any other statute or rule" phrase of Section 1806(f) clearly serves as a catch-all that applies to, *inter alia*, affirmative challenges to the collection of electronic surveillance, whether brought under the neighboring provision at Section 1810, or under "any other" statute or constitutional rule. There is simply no textual basis for applying these procedures when an individual files a suppression motion in criminal court, but not applying them when an individual—potentially the same one—files a civil action to vindicate the right to be free from unlawful surveillance.

Although the Court need not go beyond FISA's plain text to find that Section 1806(f) preempts the *Reynolds* privilege, the legislative history the Government itself cites confirms Plaintiffs' reading of the text. Pl. Br. 54–55. The Government quotes the House and Senate reports that memorialize Congress' intent "to make very clear that procedures set out in Section 1806(f) apply whatever the underlying rule or statute referred to in the motion" in order "to prevent these carefully drawn procedures from being bypassed by the inventive litigant using a new statute, rule, or judicial construction." Govt. Br. 60 (citing H.R. Rep. No. 95-1283 at 91 & S. Rep. No. 95-701 at 63). Here, the Government is that inventive litigant attempting to use a judicial construction (the *Reynolds* privilege) to bypass FISA's carefully drawn

procedures.

The Government relies on this history to assert that Congress wanted to give it the option to "forgo the use of the surveillance-based evidence," Govt. Br. 59 (citing S. Rep. No. 95-701, at 65 (1978)), but of course it has that choice here: it can either disclose the electronic surveillance evidence, including through FISA's *in camera* and *ex parte* mechanism if the Court deems it necessary, or it can defend against Plaintiffs' allegations without relying on the evidence. The Government appears to imply that the term "forgo" is synonymous with dismissal through assertion of the privilege, but this radically misreads not only the text, but also the Senate Report on which the Government relies, as the context makes clear that the term "forgo" referred to the Government's option to not utilize electronic surveillance evidence at all, while the litigation goes forward without that evidence. In contrast, the Government's reading of FISA effectively renders its disclosure and review procedures a nullity, to be discarded as the Executive sees fit.

The Government also argues that because the FISA claims are limited only to "circumstances in which a warrant would be required for law enforcement purposes," its procedures do not apply here because warrants were not required when the informant recorded conversations in which he was participating. Govt. Br. 57–58. This argument is wrong insofar as one of the definitions of electronic surveillance under FISA does not incorporate the reasonable expectation and warrant requirement. 50 U.S.C. 1801(f)(2). In addition, it presumes the correctness of

15

Defendants' defense on the merits. If Plaintiffs are correct that they did have a reasonable expectation of privacy or that a warrant would have otherwise been required, then they should prevail under FISA as well. Plaintiffs allege electronic surveillance in violation of their reasonable expectations of privacy, including the recording of conversations for which the informant was not present, and surveillance that was part of a bad faith program of dragnet surveillance. *See* Pl. Br. 51, 61; *see also infra* II.B.1.

It is telling that the Government cites no case in support of its claim that the state secrets privilege survives FISA in cases involving electronic surveillance. It dismisses two extremely detailed district court opinions that have ruled against its position, *see In re NSA Telcoms. Records Litig*, 564 F. Supp. 2d 1109, 1118 (N.D. Cal. 2008), *and Jewel v. NSA*, 965 F. Supp. 2d 1090, 1103–06 (N.D. Cal. 2013), which are still the only two courts that have confronted the question whether FISA preempts state secrets. The Government attempts to distinguish *Halpern v. United States*, 258 F.2d 36 (2d Cir. 1958), but its attempt fails. Govt. Br. 65. The Government contends that *Halpern*, unlike *Reynolds* and *Totten*, concerned "a specific enabling statute contemplating the trial of actions that by their very nature concern security information," *id.*, but this case also concerns a specific enabling statute designed to enable review of sensitive information: FISA. *See Halpern*, 258 F.2d at 44 (distinguishing *Reynolds* and *Totten* on that grounds that "[n]either of these cases involved a specific enabling statute contemplating the trial of actions that by their very

16

nature concern security information"). Much like the Invention Secrecy Act at issue in *Halpern*, FISA prescribes specific procedures for a court's handling of sensitive security information that would not "endanger the national security" if disclosed and reviewed *in camera*. *Id.* Thus, *Halpern* provides an example of how a court used procedures enacted by Congress to displace the state secrets privilege.

### 3. *FISA's* In Camera *Review Procedures Govern Adjudication of Non-FISA Claims*

The Government also relies on the district court's conclusion that FISA cannot govern all the secret information at issue here because Operation Flex "extend[s] well beyond the purview of electronic surveillance," Govt. Br. 58, but this assertion rests on an erroneously narrow view of FISA's scope, and cannot justify the district court's broad dismissal order.

The dismissal order is plainly wrong as to the non-FISA claims that will require consideration of the same evidence at issue in the FISA claims. No court (other than the district court here) has ever held that FISA's procedures are limited to FISA claims. On the contrary, by its plain text FISA applies whenever the Government or any other litigant seeks to introduce information relating to electronic surveillance. Pl. Br. 52–53 (citing 50 U.S.C. 1806(c), (f)).

The Government does not dispute the claim made in Plaintiffs' opening brief that, for purposes of the claims in this case, the legal standard governing Plaintiffs' FISA claim is coterminous with that of the Fourth Amendment inquiry, rendering the evidence needed to litigate the unlawful search claims *the same* as that required to

litigate the FISA claim. Pl. Br. 60 (citing *ACLU v. NSA*, 493 F.3d 644, 683 (6th Cir. 2007) (Batchelder, J.)). If the Government does not (and could not) assert the privilege as to Plaintiffs' FISA claim, it makes no sense to invoke the privilege as to the very same evidence when it arises in the context of the Fourth Amendment or other search claims.

Plaintiffs' position finds further support in *Jewel v. NSA*, 965 F. Supp. 2d, which involved a situation strikingly similar to this one. The district court held that FISA preempted the state secrets privilege, and then allowed Plaintiffs' claims under *two other statutes*—the Wiretap Act and the Stored Communication Act—to proceed in light of its state secrets ruling. *Id.* at 1104–07. The Government incorrectly suggests that *Jewel* limited its preemption holding to FISA, but the court permitted the plaintiffs' other statutory claims to proceed. Just as here, those claims arose out of the same underlying conduct and the evidence needed to prove them is the same as that needed under FISA. *Jewel* is thus consistent with Plaintiffs' view that federal courts have discretion to apply the *Reynolds* privilege in a sensible manner, as befitting a common law doctrine. Pl. Br. 62, 66–69 (citing *Funk v. United States*, 290 U.S. 371, 383 (1933) ("[T]he common law is not immutable but flexible, and by its own principles adapts itself to varying conditions.")); *see also General Dynamics*, 131 S. Ct. at 1909 (recognizing that the application of the state secrets privilege, "after the fashion of the common law, is subject to further refinement where relevant factors significantly different from those before us here counsel a different outcome.").

Even as to those claims that require consideration of evidence that does not "relate[] to electronic surveillance," 50 U.S.C. 1806(f), the Government does not address the principal rationale behind Plaintiffs' argument: so long as *some* subset of evidence to be revealed during litigation is submitted to the court through FISA's procedures, the common law should not be read to require dismissal under the *Reynolds* privilege, where both sets are equally sensitive from a national security standpoint. Pl. Br. 59–62.

Plaintiffs' position that the district court should have used FISA or FISA-like procedures as to any evidence that does not relate to electronic surveillance also finds support in *Jabara v. Webster*, 691 F.2d 272 (6th Cir. 1982). *Jabara* upheld the use of an *in camera* procedure for review of a classified appendix of materials, rather than outright dismissal, in order to address the legality of the Government's conduct on the merits. *Id.* at 274. The district court had held, over the assertion of the state secrets privilege, that a classified appendix of materials in support of the Government's defenses should be submitted *in camera* to protect it from disclosure. *See Jabara v. Kelley*, 75 F.R.D. 475, 487 (E.D. Mich. 1977) ("In view of the potential risks of disclosure, the Court is satisfied that there is a sufficiently valid justification for in camera review of claims of privilege based upon military or state secrets.") The Sixth Circuit agreed, and approved of that procedure to determine the *lawfulness* of the

19

Government's conduct. *Jabara*, 691 F.2d at 274.[4]

Plaintiffs seek similar flexibility from the district court here as to any evidence that does not come within the broad purview of Section 1806.

### 4.  *Utilizing FISA's* In Camera *and* Ex Parte *Procedures Would Not Violate Individual Defendants' Constitutional Rights*

The Individual Capacity Defendants make several distinct arguments against FISA preemption, but these too are unpersuasive. Defendants AAR argue that the use of FISA's *ex parte* and *in camera* procedures to address secret evidence would raise constitutional concerns and violate their rights to a fair and open trial. AAR Br. 35–36. These Defendants paint themselves as victims of Government secrecy because they might have to use the same procedures that Plaintiffs would have to use in litigating under FISA, without making any attempt to balance Plaintiffs' right to seek redress for the harms they suffered—harms which, unlike Defendants' allegations at this stage of the litigation, are supported by plausible allegations and sworn declarations describing egregious violations of their statutory and constitutional rights.

---

[4] The Government cites a portion of the opinion for the claim that the legality of the NSA's surveillance was not at issue, but the full context makes clear that the legality of the use of the information obtained from the surveillance was at issue:

> *Jabara* does not even contend on this appeal that the interception by the NSA violated his fourth amendment rights; we may therefore take as a given that the information was legally in the hands of the NSA. What *Jabara* does contend, and the district court agreed, is that his rights were violated when the NSA turned over the information, without a warrant, to the FBI.

*Jabara*, 691 F.2d at 275. Thus, the appeal did concern the proper mechanism chosen by the district court to handle the classified evidence necessary to litigate the matter.

Defendants' attempts to strike down Congress' specially designed procedures in FISA have no merit.

First, the Individual Capacity Defendants cannot claim prejudice from the use of FISA's procedures because they allege that the secret evidence would be *helpful* to their case. If that is so, they will suffer no harm if that evidence is shown to the district court for consideration of the merits of their position under Section 1806(f).

In any event, this and other courts have consistently upheld the constitutionality of FISA's *ex parte* and *in camera* procedures against constitutional challenges brought by individual criminal defendants subjected to electronic surveillance. *See United States v. Ott*, 827 F.2d 473, 476–77 (9th Cir. 1987) (holding that Section 1806(f) process does not violate the due process rights of the target of electronic surveillance). The Constitution does not provide more protection for Government agents accused of wrongdoing than for individuals deprived of their liberty, whether in the criminal or civil contexts.

Nor would FISA's procedures violate the Individual Capacity Defendants' Seventh Amendment right to jury trial. As a threshold matter, the Seventh Amendment protects plaintiffs' right to jury trial as well. *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 709–10 (1999) (Seventh Amendment guarantees plaintiffs jury trial). Thus, Defendants' position, which would immunize their actions from constitutional scrutiny while depriving Plaintiffs of the right to a jury trial that Defendants assert, cannot possibly be mandated by the Constitution. Beyond that,

concerns about what could happen at trial cannot warrant dismissal at this stage, long before the introduction of any evidence, let alone the denial of summary judgment motions. In addition, contrary to Defendants' suggestion, FISA's procedures do not compel an entirely secret trial. While a valid assertion of the state secrets privilege in this case may require special mechanisms to prevent disclosure of sensitive information, FISA does not prevent parties from introducing whatever public evidence they may collect in support of their defenses.

Most important, the Individual Capacity Defendants themselves may utilize Section 1806 to secure discovery of any potentially exonerating evidence the Government seeks to withhold from disclosure. Should the Individual Capacity Defendants need to introduce secret evidence to defend themselves, Section 1806 provides the procedures. As explained in Plaintiffs' opening brief, FISA provides for "review in camera and ex parte [of] the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person *was lawfully authorized and conducted*." Pl. Br. 57 (quoting 50 U.S.C. 1806(f)) (emphasis added). These procedures apply to *any* civil action involving evidence within FISA's ambit, including a proceeding "to adjudicate individual officers' liability for violating the statute" under Section 1810. AAR Br. 36. *See also* 50 U.S.C. 1806(c) (FISA procedures triggered "[w]henever the Government intends to enter into evidence or otherwise use or disclose in *any* trial, hearing, or other proceeding in or before *any* court" electronic surveillance) (emphasis added). If the

Individual Capacity Defendants wish to introduce evidence over which the Government has invoked the privilege, they must make a discovery request to the Government. In response, the Government would notify the Court and the parties of its intent to "disclose" such evidence under Section 1806(c). That disclosure would then trigger the protections set forth in Section 1806(f), which would allow the Court to review the evidence, including *ex parte* and *in camera* if necessary, and disclose to the parties as appropriate under FISA's rules. Thus, FISA gives the district court discretion to fashion a mechanism for consideration of sensitive information in adjudicating Plaintiffs' claims that protects both the Government's interests in secrecy and Plaintiffs' ability to obtain redress for violations of their statutory and constitutional rights. Pl. Br. 66–69.

\* \* \*

For all of these reasons, the district court erred in dismissing any of Plaintiffs' claims under the state secrets privilege, because it should have found that FISA preempts the *Reynolds* privilege and that its procedures govern this case.

## B. The District Court Erred in Dismissing Plaintiffs' Claims at This Preliminary Stage of the Litigation

Even if this Court does not accept Plaintiffs' FISA preemption argument, it still should reverse the district court's decision to dismiss the claims in this case (other than the FISA claims) based on the state secrets privilege, because that decision was premature and because it rests on a misunderstanding of the nature of Plaintiffs' claims.

23

### 1. *The District Court Erred in Dismissing the Search Claims Because the Government Did Not Seek Dismissal on That Basis*

The Government does not defend the district court's unprecedented decision to dismiss claims that even the Government did not seek to dismiss based on the state secrets privilege. *See* Govt. Br. 48 (defending dismissal of the discrimination claims, but not the search claims). As Plaintiffs explained in their opening brief, the district court had no basis to dismiss their Fourth Amendment claims (including the claim for expungement relief on that basis), the Privacy Act claims, and those portions of the FTCA claims that arise from Defendants' unlawful searches, because the Government had not sought dismissal of those claims based on the state secrets privilege. *See* Pl. Br. 13–15 (defining the "search" and "discrimination" claims); ER 161–62 (Government's motion to dismiss the discrimination claims, but not the search claims).

In contrast, Defendants AAR do attempt to defend the district court's action, but they do not cite a single case where a court has dismissed claims on the basis of the state secrets privilege even when the Government did not move for their dismissal; despite exhaustive research, Plaintiffs have found no case (other than the decision below) ever to have done so. Instead, Defendants AAR cite a case standing for the uncontroversial proposition that individual defendants can *argue* the effect of the Government's invocation of the state secrets privilege. *See, e.g.*, *Fitzgerald v. Penthouse Int'l*, 776 F.2d 1236 (4th Cir. 1985). But *Fitzgerald* did not involve an expansion of the scope of the privilege assertion, as the government itself moved "to

24

dismiss the case"—the entire case—based on state secrets. *Id.* at 1238. Defendants AAR also cite *Mohamed v. Jeppesen Dataplan, Inc.*, but there too the government moved for dismissal in its entirety. 614 F3d 1070, 1076 (9th Cir. 2010). *Jeppesen* does state that district courts must not "surrender… judicial control over access to the courts," *id.* at 1082 (quoting *El-Masri v. United States*, 479 F.3d 296, 312 (4th Cir. 2007)), but that warning against undue deference to government requests for dismissal hardly means that the district court has authority to *expand* the scope of the Government's privilege assertion.

Defendants AAR also ask this Court to credit the district court's determination that the information that ought to be protected by the *Reynolds* privilege should extend beyond Operation Flex, because it "comprises only a small part of the classified mosaic in the FBI's larger counterterrorism investigations." AAR Br. 34 (citing ER 64). However, this assertion conflates the *classified* status of information with its status as a *state secret*. *Jeppesen* makes clear "that an executive decision to classify information is insufficient to establish that the information is privileged [under state secrets]." 614 F.3d at 1082. Thus, even were the district court empowered to expand the scope of the Government's secrecy assertion, which no court has ever held, its proffered rationale for doing so is insufficient under governing authority.

Because the state secrets privilege belongs to, and can only be asserted by, the Government, and because no other court has ever expanded the scope of a Government's state secrets privilege assertion, the district court's dismissal of the

search claims must be reversed.[5]

### 2. The District Court Erred in Dismissing the Discrimination Claims Because It Is Not "Certain" That Those Claims Cannot Be Litigated Without Disclosing Information Designated as State Secrets

All Defendants vigorously defend the district court's dismissal of the discrimination claims, but none of their arguments account for either Plaintiffs' narrow legal theory or the extremely preliminary stage at which this dismissal occurred. The simple fact of whether religion was (or was not) a factor cannot itself be a state secret. And while all of the Defendants speak of the difficulties they would face if forced to answer the complaint or put forth their own evidence disputing Plaintiffs' allegations that religion was a factor, see, e.g., Govt. Br. 51; AAR Br. 30;

---

[5] Although the Government does not attempt to expand the scope of its privilege assertion on appeal, it does suggest that it may do so later in the litigation if the search claims implicate evidence of discrimination. Govt. Br. 54. Similarly, both sets of individual Defendants argue that the district court's dismissal of the search claims could be defended on this basis. *See* AAR Br. 34-35; TW Br. 31 n.7. This argument is plainly meritless as to those aspects of the search claims that do not implicate the invited informer doctrine, which is the only portion of the search claims which requires inquiry into the Government's motives for its searches. *See infra* II.B.1. As to those portions that do implicate the invited informer doctrine, Plaintiffs would object to the Government's assertion of privilege, but the Government has not, as the Attorney General has not stated that any of the search claims need be dismissed. Thus, the dismissal cannot be affirmed now on that basis. *See United States v. Sedaghaty*, 728 F.3d 885, 904 (9th Cir. 2013) (state secrets privilege requires the government make a "formal claim. . . 'lodged by the head of the department which has actual control over the matter, after actual personal consideration by that officer'") (quoting *Reynolds*, 345 U.S. at 7–8).

TW Br. 29, the district court dismissed the complaint *before* Defendants were even asked to take either of those steps.

As a result, the district court failed to answer a critical question that will determine the scope of this litigation: whether the use of religion as even *a* factor (rather than as the *sole* factor) in deciding to surveil someone constitutes facial discrimination, and therefore must be justified by reference to strict scrutiny. Other than in a cryptic footnote, ER 62 n.11, the district court never said anything about whether the conduct alleged in the complaint violates any of the various statutory and constitutional provisions that Plaintiffs relied upon in their complaint. *See, e.g.*, Pl. Br. 37 n.9.[6]

Resolution of that threshold question is critical to determining whether this case will require disclosure of state secrets because, if Plaintiffs are correct, then they can make their prima facie case simply by showing that Defendants used religion as *a factor* in determining whether to surveil them. Pl. Br. 39.

On appeal, at least some of the Defendants continue to ignore the critical distinction between the allegations in the complaint, which plead a dragnet investigation focused largely, if not entirely, on religion, and Plaintiffs' legal theory, which requires only that religion was *a* factor in the decision to surveil them. *Compare, e.g.*, TW Br. 28 ("[e]ach of Plaintiffs' discrimination claims is predicated on… [their

---

[6] Indeed, the Government appears to ask for a resolution of those questions as well, insofar as it encourages the Court to resolve the case, "to the extent possible on grounds other than the state secrets privilege." Govt. Br. 21.

allegation that they were surveilled] *solely* on Plaintiffs' religion.") (emphasis added) *with* Pl. Br. 39 ("the fact that religion was not the sole factor in determining suspicion, but rather was only one factor… would not render the classification Defendants drew immune from analysis under strict scrutiny.").

Because the district court could not have known "with certainty" that any discovery into privileged evidence would be needed without deciding what Plaintiffs must prove to support the discrimination claims, its dismissal order was premature.

In response, all of the Defendants assert that they would need to disclose privileged evidence in order to prove that they had other, "legitimate" reasons for surveilling Plaintiffs. *See* Govt. Br. 49; TW Br. 30; AAR Br. 32.

However, if Plaintiffs' legal theory on the merits is correct, then the district court need not consider whether Defendants had any reasons *other than religion* in order to find unconstitutional discrimination on the basis of religion. To analogize again to the race discrimination context, the fact that a university admitted a student in part because he was a fine musician and the president of his class would not excuse it from having to justify by strict scrutiny its consideration of his race as another factor in the admissions decision. *See Grutter v. Bollinger*, 539 U.S. 306, 311 (2003) (describing the question presented as "whether the use of race as a factor in student admissions… is unlawful"). Conversely, if religion is *not* one of the reasons that Defendants surveilled Plaintiffs, then it is immaterial whether their actual reasons were legitimate or not.

Defendants need not provide information about their reasons for acting beyond

answering whether or not religion played any role.[7]

The Government argues that even if Plaintiffs can show that religion was a

factor, the Court would still have to examine its proffered non-discriminatory reasons

because it would have to determine if those reasons were pretextual. *See* Govt. Br. 49

(citing *Brazil v. U.S. Dep't of the Navy*, 66 F.3d 193, 196–97 (9th Cir. 1995) (describing

analytical steps for Title VII claims)). But that conclusion is also premature. It

assumes both that Defendants would deny that they use religion as even *a* factor—

which would be surprising in light of their guidelines on the subject at the time the

events occurred, *see, e.g.*, Pl. Br. 12—and that Plaintiffs would argue that Defendants'

proffered non-discriminatory reasons were pretextual, which obviously cannot be

predicted at this stage.[8]

---

[7] Relatedly, Plaintiffs need not know whether they were the *targets* or *subjects* of
investigation in any technical sense of those terms, Govt. Br. 51, because Plaintiffs'
claim is not limited to those who were subjects of the investigation, but rather to
those who were *surveilled. See* Pl. Br. 44–45; *see also* 50 U.S.C. 1801(k) (defining
"aggrieved person" as "a person who is the target of an electronic surveillance or any
other person whose communications or activities were subject to electronic
surveillance"). Thus, even if Plaintiffs were surveilled simply because they worshipped
at the same mosque as someone who was a target or subject of surveillance under the
Government's narrow definition of those terms, this would still constitute unlawful
surveillance for purposes of their legal theory. Plaintiffs already know that they were
"targets" of the surveillance in the sense that they know that they were in fact
surveilled.

[8] Defendants' new guidelines—which were not in effect at the time the surveillance at
issue here took place—narrow the permissible uses of religion in national security
investigations, but continue to permit it as a factor in some circumstances. *See
Guidance For Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender,*

Defendants also argue that they could in theory establish that their use of religion is narrowly tailored enough to satisfy strict scrutiny through the use of privileged evidence, Govt. Br. 50 n.8; TW Br. 29, but they could not satisfy strict scrutiny's demands without showing that *being Muslim* is itself sufficient to render someone more properly a target of suspicion—a proposition that, whatever its merit, need not be resolved by reference to secret evidence about any particular Muslims. Pl. Br. 43.

Finally, the Government attacks a strawman, arguing that Plaintiffs cannot prevail merely by showing that all of the individuals surveilled were Muslim. TW Br. 49–50. Of course this is not Plaintiffs' argument. The complaint plausibly alleges— relying in part on the Government's own training materials, declarations from its own informant, and declarations from others describing his behavior—that Defendants surveilled Plaintiffs and many others because of their religion—i.e., that their religion was at least one factor in the decision to surveil them. Here, the district court never decided whether such conduct, if proven, would state a claim for relief. Nor did it consider what evidence it would need to resolve the discrimination claims on that legal basis—i.e., to determine whether religion was a factor in Defendants'

---

*National Origin, Religion, Sexual Orientation,* or *Gender Identity,* U.S. Dep't of Justice, at 9-10 (Dec. 2014), *available at* http://www.justice.gov/sites/default/files/ag/pages/attachments/2014/12/08/use-of-race-policy.pdf. The Government has never suggested that it will close and expunge the files of individuals who would not have been investigated under these new guidelines.

surveillance activities. That narrow factual question can likely be resolved without resort to any secret evidence.

### C.  Dismissal on State Secrets Grounds Presents Serious Constitutional Problems

The Court should adopt either or both of Plaintiffs' prior arguments—that state secrets does not apply in this case because FISA's procedures must govern or that the dismissal was premature because Plaintiffs' claims can probably be litigated without implicating state secrets—for an additional reason: because doing so would allow the Court to avoid addressing the substantial constitutional problem arising from the district court's dismissal order. Pl. Br. 69–87.

Remarkably, Defendants make no attempt to explain how their exceedingly broad conception of the state secrets privilege can be reconciled with our fundamental constitutional structure. As the Supreme Court explained in its most recent state secrets ruling, the Government's power to insist on outright dismissal of suits under state secrets doctrine arises from its status as "a defendant only on terms to which it has consented." *General Dynamics*, 131 S. Ct. at 1906. However, Plaintiffs need not rely on any consent to suit (i.e., any waiver of sovereign immunity) where, as here, they seek injunctive relief from ongoing constitutional violations, particularly where important liberty interests are at stake. Pl. Br. 73–75, 74 n.18. Even courts that have adopted extremely deferential positions in the face of secrecy assertions have not held that they must dismiss cases under the state secrets privilege where they have a jurisdictional obligation to proceed. *See, e.g.*, *Arar v. Ashcroft*, 585 F.3d 559, 575–76 (2d

31

Cir. 2009) (finding no cause of action for damages in foreign affairs context, but noting that "courts can—with difficulty and resourcefulness—consider state secrets and even reexamine judgments made in the foreign affairs context when they must, that is, when there is an unflagging duty to exercise our jurisdiction").

Nor do Defendants dispute that the implications of their theory would give the Government authority to engage in gross violations of constitutional rights which the courts would be powerless to remedy. They do not dispute that, on their theory, the Government could adopt a policy that flagrantly violates the Constitution on a systematic basis, and then render that illegal program immune from judicial scrutiny by operating it in secret. Pl. Br. 70–71. Nor does the Government explain how its view can be reconciled with the existing limits on the state secrets privilege, including most obviously the fact that it is never asserted in habeas cases, even if they involve the most sensitive of national security matters. Pl. Br. 77–78. This case, like a habeas case, is a civil proceeding brought to enjoin the violation of critical constitutional rights that protect individual freedom. Neither this Court nor the Supreme Court have ever upheld the invocation of the state secrets privilege in such a case.

The notion that the Government could obtain dismissal of claims seeking injunctive relief from ongoing unconstitutional deprivations of liberty in a case where the federal courts otherwise would have jurisdiction to address the merits runs counter to the most fundamental principles of our constitutional system and longstanding practice.

32

The Government's first response on the constitutional issue is that this case does not involve ongoing constitutional harm because the injunctive relief that Plaintiffs seek involves only a request for expungement of records. Govt. Br. 61–63.[9] But the Government fails even to cite the controlling Ninth Circuit cases establishing that the expungement of illegally-obtained records is injunctive relief, and that it has long been available for the harms arising from the retention of such records. Pl. Br. 80 (collecting cases). Instead, the Government cites *United States v. Leon*, 468 U.S. 897, 906 (1984), *see* Govt. Br. 61, but the Fourth Amendment rule to which *Leon* refers concerns the use of the fruits of unlawful searches at trial—it has nothing to do with ongoing harms arising from the retention of records, let alone records of protected expressive activity.

Courts have long recognized that the maintenance of records of First Amendment activity constitutes an ongoing constitutional violation because it chills protected expressive activity—a rationale that obviously applies to religious activity as well. *See infra* II.B.2. In any event, Plaintiffs have pled the existence of ongoing harms at airports, in future immigration-related applications, and in other contexts. Pl. Br. 80. Those allegations are more than plausible given the vast watchlisting systems that the Government operates based in part on FBI surveillance records.

---

[9] The Government makes essentially the same argument in the context of Plaintiffs' request for expungement relief. Govt. Br. 29 (discussing *Pennsylvania Bd. of Probation & Parole v. Scott*, 524 U.S. 357 (1998)). Plaintiffs address the relevance of this argument in the context of the claims for expungement relief *infra* III.B.2.

Aside from the particular type of records at issue here, which uniquely result in ongoing harm, the Government's argument runs counter to the wealth of authority establishing that courts have authority to order expungement as an injunctive remedy for illegally-obtained records. *See* Pl. Br. 80; *see also Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1275 (9th Cir. 1998) (holding that "expungement of the [illegally-obtained] test results would be an appropriate remedy for the alleged violation"); *Menard v. Saxbe*, 498 F.2d 1017, 1023 (D.C. Cir. 1974) (same, as to arrest records). *See infra* III.B.2.

Apart from their argument that the retention of unlawfully obtained records of expressive activity is not an ongoing harm, none of the Defendants directly engage with the well over one hundred years of constitutional doctrine that forbids the result they seek here. Pl. Br. 72–76 (citing, *inter alia*, Henry Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 HARV. L. REV. 1362, 1371–72 (1953)). Instead, the Government claims that the complex constitutional question that Plaintiffs present has already been decided by various state secrets cases, but the cases on which the Government relies all involve the *Totten* bar rather than the *Reynolds* privilege, and they plainly did not address the issues Plaintiffs raise. Govt. Br. 61–65.

For example, the Government cites *Tenet v. Doe*, 544 U.S. 1 (2005), but the Supreme Court made clear in *General Dynamics* that *Tenet* is about the *Totten* bar—a subject matter jurisdiction doctrine that derives from the courts' "common-law authority to fashion contractual remedies in Government-contracting disputes," rather

34

than the *Reynolds* privilege, which involves the courts' "power to determine the procedural rules of evidence," *General Dynamics*, 131 S. Ct. at 1906; *see also Jeppesen*, 614 F.3d at 1077 (discussing two different doctrines—"One completely bars adjudication of claims premised on state secrets (the '*Totten* bar'); the other is an evidentiary privilege ('the *Reynolds* privilege') that excludes privileged evidence from the case and *may* result in dismissal of the claims.") (emphasis in original). Only the *Reynolds* privilege is at issue here, because the Government has not argued that the entire subject matter of the suit is a state secret. ER 160–63.[10]

The Government attempts to defend its reliance on *Tenet* (as well as *General Dynamics* and other government contracting cases that have nothing to do with the *Reynolds* privilege) by claiming that there is no rationale for giving the distinction between the two types of state secrets cases "controlling significance." Govt. Br. 62. But the Supreme Court in *General Dynamics* described the *Reynolds* evidentiary privilege as "quite different" from the *Totten* bar. *Id.* at 1906. The importance of that difference is apparent, from both a doctrinal and practical standpoint, from the discussion in *General Dynamics* itself. Doctrinally, the Government cannot be held liable in a contract action unless it waives immunity from suit, whereas no waiver is required for the courts to hold federal officials liable in suits seeking injunctive relief from ongoing

---

[10] Amicus EFF persuasively argues that the *Totten* bar applies only in government-contracting cases in light of the Supreme Court's explanation of the doctrine in *General Dynamics*. EFF Amicus 20. Prior to *General Dynamics*, this Court had rejected that argument in *Jeppesen*, but it need not revisit the question here given that the Government has stated unequivocally that the *Totten* bar does not apply to this case.

constitutional harms. This difference also has tremendous practical significance: a doctrine establishing that individuals who enter into national security-related contracts with the Government will lose the right to pursue injunctive relief against them does little if any violence to our constitutional structure, whereas a doctrine that bars private individuals who never entered into such contracts from seeking redress for ongoing deprivations of their liberty runs directly contrary to it.

The Government also suggests that *Al-Haramain* supports their position, but it obviously did not decide the difficult constitutional question Plaintiffs raise here. *Al-Haramain* assumed that only damages and declaratory relief were at stake, 507 F.3d at 1195, and in any event remanded for consideration whether FISA preempts the state secrets privilege. *Id.* at 1205–06. The Government contests the relevance of the fact that the plaintiffs in *Al-Haramain* sought only declaratory relief, but the distinction matters because "injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). In other words, this Court was not called upon in *Al-Haramain* to exercise its traditional authority to stop ongoing unconstitutional activity.[11]

---

[11] The Government also does not adequately address Plaintiffs' concern regarding whether the former Attorney General himself considered the evidence over which it has asserted state secrets privilege. Govt. Br. 44 n.7. It cites *nothing* in the record to support the claim that the Attorney General has actually looked at the evidence involved - a remarkable omission in light of the fact that his declaration does not say that he did so. ER 284-85 at ¶ 3. The Supreme Court has made crystal clear that "the political head of the department... should have seen and considered the *contents of the documents*" over which the Government has asserted privilege. *Reynolds*, 345 U.S. at 8

\*          \*          \*

For all of these reasons, the district court erred in dismissing any of Plaintiffs'

claims based on the state secrets privilege.

## II.  PLAINTIFFS STATE CLAIMS AGAINST THE INDIVIDUAL CAPACITY DEFENDANTS

The conduct alleged in the complaint gives rise to a variety of claims, which is

unsurprising given Plaintiffs' status as long-time law-abiding residents of Southern

California and the complaint's detailed allegations of discriminatory and intrusive

government conduct. In response, the Individual Capacity Defendants raise a

---

n.20 (emphasis added) (internal quotations omitted). The Government asserts that there is no such requirement, but the cases it cites do not support that claim. *Kasza*, 133 F.3d at 1169, involved a dispute over whether the *explanation* as to the reasons for the privilege assertion had to come from the head official. In contrast, the issue here is whether there was "actual personal consideration" of the allegedly privileged evidence by the Attorney General, as there was by the appropriate official in *Kasza. Id.* The Government also cites *Morgan v. United States*, 304 U.S. 1 (1938), but that case is not about state secrets, where the unique need for personal consideration by high level officials should be obvious.

Defendants also ask this Court to treat the potential failure of the Attorney General to have considered the underlying evidence at issue as waived, because Plaintiffs raised it in a footnote. Defendants make this argument in a footnote, citing a footnote in a case from this Court. Govt. Br. 44 n.7 (citing *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010)). *Robinson* does not hold that claims cannot be preserved in footnotes, but rather that the contention there was insufficiently explained to be preserved, perhaps in part because it was made "without supporting argument and citation to relevant authorities." *Id.* (citation omitted). Here, Plaintiffs cited the critical passage of the Holder Declaration, which Defendants have not substantively defended. Even were there a basis for finding the issue waived, the Court should not do so here given the importance of the question, and the implication that such a rule would have on the rest of the briefing in this case. To give but one example, Defendants have raised their argument that the narrow tailoring inquiry would require use of privileged information only in a footnote. Govt. Br. 50 n.8. On their view, that argument is now waived.

multitude of procedural and technical defenses, but they can be grouped into two general categories. First, they argue that the Constitution provides no damages remedy under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), for the harms alleged because, in a nutshell, this case involves national security. Second, they seek entitlement to qualified immunity on the ground that the conduct described in the complaint violates no clearly established law.

Neither set of claims has merit, and neither justifies denying Plaintiffs a remedy for Defendants' obviously unconstitutional conduct. It bears emphasizing that Plaintiffs are long-time U.S. citizens or lawful permanent residents who have never been charged with, let alone convicted of, any crime. Plaintiff Fazaga is an influential imam who has been a speaker for the U.S. State Department on radicalism and extremism. ER 199–200. Plaintiff Malik, born and raised in Orange County, started a young Republican club at his high school, then in college won prestigious awards for founding a peace-building initiative bridging the political divide on Israel and Palestine among students. ER 201–202. Plaintiff AbdelRahim came to the U.S. to attend business school, stayed to work as a consultant, and is now a lawful permanent resident. ER 184, 205. Defendants subjected each of the Plaintiffs to highly intrusive personal surveillance, and each continues to suffer to this day as a result. *See* ER 199–206. This Court should allow their claims against the Individual Capacity Defendants to proceed.

### A. The Constitution Provides a Damages Remedy for Religious Discrimination and Unlawful Surveillance under *Bivens*

Defendants TW and AAR argue that even if they engaged in facial religious discrimination by targeting Muslims in violation of the First Amendment and Equal Protection Clause, and even if they repeatedly violated the Fourth Amendment with unlawful surveillance, this Court should nonetheless uphold dismissal of Plaintiffs' constitutional claims without reaching the merits because no damages remedy for such claims can be sought against federal officers in federal court. That claim cannot be reconciled with governing authority. The Supreme Court long ago held in *Bivens* that an individual alleging a Fourth Amendment violation by federal officers could sue those officers for damages directly under the Constitution. 403 U.S. 388 (1971). It subsequently held that *Bivens* allows damages remedies for discrimination under the Fifth Amendment's Due Process Clause. *Davis v. Passman*, 442 U.S. 228, 229–30 (1979).

Defendants argue that the claim here would nonetheless constitute an extension of *Bivens*, primarily because it involves "national security." But in the one *Bivens* case to address national security, *Mitchell v. Forsyth*, 472 U.S. 511 (1985), the Court rejected the argument that "national security" justified immunity from damages actions under *Bivens*. This Court has subsequently allowed a plaintiff to proceed on *Bivens* claims involving national security, as has the Second Circuit. *See Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1253–54, 1259 (9th Cir. 2008); *Turkmen v. Hasty*, 789 F.3d 218, 235 (2d Cir. 2015). Under *Bivens*, the Supreme Court and this Circuit have

39

repeatedly addressed damages claims arising from law enforcement conduct, including discrimination and First Amendment retaliation. This case is no different.

### 1. *This Case Does Not Present an Extension of* Bivens

A court considering whether a *Bivens* remedy should proceed must first determine whether the case presents a "new context" or "new category of defendants." *Malesko*, 534 U.S. at 68. The present case does not. Indeed, the basic facts of Plaintiffs' claims—the FBI targeted them for investigation because of their religion and unlawfully surveilled them—is in the heartland of *Bivens* actions raising claims of discrimination and challenging unconstitutional conduct by law enforcement during investigations.

Courts have routinely allowed *Bivens* claims alleging discrimination, including on the basis of religion. The Supreme Court in *Davis* held that *Bivens* allows damages claims by plaintiffs alleging unconstitutional discrimination by federal officials under the equal protection component of the Fifth Amendment.[12] *Davis,* 442 U.S. at 229–30. As set forth in detail below, courts have generally recognized that religious classifications violate equal protection. *See infra* II.B.2.*iii.* Plaintiffs' claim for religious discrimination therefore can be brought directly under *Davis.*[13] Indeed, the *Davis*

---

[12] The analysis for claims of discrimination against federal officials under the Fifth Amendment's Due Process Clause is "precisely the same" as that for discrimination claims against state officials under the Equal Protection Clause. *Weinberger v. Wiesenfeld* 420 U.S. 636, 638 n.2 (1975).

[13] This Court has allowed *Bivens* actions challenging discrimination on the basis of race, *see Nurse v. United States*, 226 F.3d 996, 999-1000 (9th Cir. 2000) (reversing

Court contemplated its holding would encompass religious discrimination in a law enforcement investigation: it explicitly followed *United States ex rel. Moore v. Koelzer*, 457 F.2d 892 (3rd Cir. 1972), in which the Third Circuit held a plaintiff could bring claims under *Bivens* that FBI agents procured false testimony because of his race and religion. *See Davis*, 442 U.S. at 244 n.22. The Second Circuit recently recognized that an Equal Protection claim of religious discrimination against Muslims in a counterterrorism operation—that federal officials subjected detainees in the 9/11 investigation to harsh treatment because they were Muslim—presented no extension of *Bivens. Turkmen*, 789 F.3d at 235 ("The claim—that individual officers violated detainees' constitutional rights by subjecting them to harsh treatment with impermissible intent or without sufficient cause—stands firmly within a familiar *Bivens* context.").

Courts have also routinely found *Bivens* applicable in the factual context of misconduct by law enforcement officers during an investigation, ever since *Bivens* itself recognized a damages remedy to address claims of an unconstitutional search and detention by six federal agents. *See Bivens*, 403 U.S. at 388. Courts have allowed *Bivens* remedies for a range of constitutional violations by law enforcement, including

---

dismissal of *Bivens* action against U.S. Customs agents whom plaintiff alleged detained, arrested and searched her solely on the basis of her race and without reasonable suspicion or probable cause), and national origin*, see Castaneda v. United States*, 546 F.3d 682, 688 n.6 (9th Cir. 2008), *reversed on other grounds sub nom. Hui v. Castaneda*, 559 U.S. 799 (2010).

a variety of claims under the Fourth Amendment,[14] as well as violations of the Fifth

Amendment's Due Process Clause,[15] and the First Amendment's speech protections.[16]

In particular, courts have long allowed *Bivens* actions alleging that law enforcement

acted based on illegal motives, including discrimination and retaliation in violation of

the First Amendment.[17]

      The fact that Plaintiffs claim discrimination on the basis of religion, rather than

---

[14] *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (execution of facially unreasonable warrant); *Wilson v. Layne*, 526 U.S. 603, 608 (1999) (unreasonable search due to media presence); *Anderson v. Creighton*, 483 U.S. 635, 637 (1987) (warrantless home search); *Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004) (wrongful arrest); *Harris v. Roderick*, 126 F.3d 1189, 1205 (9th Cir. 1997) (excessive force and conspiracy).

[15] *See, e.g.*, *DiMartini v. Ferrin*, 889 F.2d 922 (9th Cir. 1989), *amended on pet. for rehearing en banc*, 906 F.2d 465, 466 (9th Cir. 1990) (*Bivens* due process claim against FBI agent who allegedly had plaintiff fired from private job for not cooperating with investigation).

[16] *See, e.g.*, *Dellums v. Powell*, 566 F.2d 167, 194-95 (D.C. Cir. 1977) (First Amendment *Bivens* claim alleging federal officers prevented plaintiffs from protesting war); *Paton v. La Prade*, 524 F.2d 862, 869–70 (3d Cir. 1975) (First Amendment *Bivens* claim that FBI agents conducted unlawful surveillance of political correspondence).

[17] *See Gibson v. United States*, 781 F.2d 1334, 1342 (9th Cir. 1986) (First Amendment *Bivens* claim against FBI agents who allegedly sought to discourage political activities by wiretapping telephone, passing defamatory information to employers, and seeking to entrap plaintiff); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (stating First Amendment retaliation claim "on the authority of *Bivens*"). Following *Gibson*, the Ninth Circuit has repeatedly entertained *Bivens* challenges to law enforcement investigations as retaliation for protected First Amendment speech. *See, e.g.*, *Moss v. Secret Service*, 572 F.3d 962, 967 n.4 (9th Cir. 2009) (First Amendment *Bivens* claim against secret service's relocation of protest critical of the president), *overruled on other grounds in Wood v. Moss*, __ U.S. __, 134 S. Ct. 2056, 2066 (2014) ("assum[ing] without deciding that *Bivens* extends to First Amendment claims" and reversing on qualified immunity); *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 14 F.3d 457, 461-64 (9th Cir. 1994) (First Amendment *Bivens* claims against FBI officers for chilling speech through unlawful arrests, release of false accusations, and interrogation of associates); *Erickson v. United States*, 976 F.2d 1299, 1301 (9th Cir. 1992).

race, speech, or political views, does not make this a new *Bivens* context. Courts have held complaints of religious discrimination framed as Due Process claims permissible under *Bivens. See Koelzer*, 457 F.2d at 894 (cited in *Davis*, 442 U.S. at 244 n.22); *Turkmen*, 789 F.3d at 235. Courts have also addressed *Bivens* claims for religious discrimination and Free Exercise violations under the First Amendment, including against law enforcement and in cases involving national security. *See Ibrahim*, 538 F.3d at 1254 n.4 (addressing *Bivens* claim of religious discrimination in detention by police and federal airport authorities); *Padilla v. Yoo*, 633 F. Supp. 2d 1005, 1019–20 (N.D. Cal. 2009) (allowing *Bivens* remedy for, *inter alia*, First Amendment religion claims against alleged architect of the policies that led to plaintiff's detention as "enemy combatant"); *Mayfield v. Gonzales*, 2005 WL 1801679, at *1 & n.1, *9–10 (D. Or. July 28, 2005) (addressing *Bivens* claim against FBI agents that arrested plaintiff on suspicion he participated in the Madrid train bombings, allegedly "based upon his Muslim religion").[18]

Plaintiffs' claims that Defendants made them targets of a law enforcement investigation for an improper reason—their religion—"stands firmly within a familiar *Bivens* context." *Turkmen*, 789 F.3d at 235.

Defendants argue that the specter of national security concerns transforms this

---

[18] *See also Kwai Fun Wong v. United States INS*, 373 F.3d 952, 959, 961 (9th Cir. 2004) (religious discrimination); *Resnick v. Adams*, 348 F.3d 763, 765–66 (9th Cir. 2003) (obstacles to obtaining kosher food in prison); *Scott v. Rosenberg*, 702 F.2d 1263, 1266, 1270–71 (9th Cir. 1983) (Free Exercise challenge to FCC investigation into television and radio programs).

case into a new *Bivens* context. It does not. Defendants' assertion that "no court has inferred a damages cause of action under the Fourth or Fifth Amendment to remedy alleged injuries" in a similar context, TW Br. 35, cannot be reconciled with *Mitchell*. Leaving aside that Defendants have not defined the contours of the "national security" category of potential *Bivens* cases and explained why this case fits within it, *see* Pl. Br. 71 n.17 (discussing malleability of "national security" as category), *Mitchell* allowed a *Bivens* action to proceed where the plaintiff sought damages for being subject to warrantless phone wiretaps during investigation of a group plotting to blow up parts of federal buildings and kidnap then-National Security Advisor Henry Kissinger. 472 U.S. at 513–14. In *Mitchell*, the Court explicitly rejected the notion that officials acting in the interests of "national security" should enjoy absolute immunity from *Bivens* claims, reasoning that "[t]he danger that high federal officials will disregard constitutional rights in their zeal to protect the national security is sufficiently real to counsel against affording such officials an absolute immunity." *Id.* at 523. Defendants argued below that *Mitchell* was irrelevant as it framed the issue as one of absolute immunity, rather than an inquiry under the *Bivens* special factors, but the *Mitchell* Court rejected the same argument that Defendants offer here: that plaintiffs should be barred from a bringing damages action because the case involved a national security investigation. *See id.* at 538 (Stevens, J., concurring in the judgment) ("The practical consequences of a holding that no remedy has been authorized against a public official are essentially the same as those flowing from a conclusion that the

44

official has absolute immunity.").[19]

Defendants' position also conflicts with the Second Circuit's decision in *Turkmen*, which allowed a *Bivens* challenge against federal officials brought by Muslims subject to solitary confinement and other brutal detention conditions while held on immigration charges in the immediate aftermath of the 9/11 attacks. The Second Circuit rejected defendants' arguments that the case presented a "new context" under *Bivens* because the challenged conduct arose in "response to an unprecedented terrorist attack." *Turkmen*, 789 F.3d at 234–35. The court reasoned that, unlike in cases involving extraordinary rendition or other unusual harms, both the rights involved and the "mechanism of injury" presented a "familiar *Bivens* context"—that "federal detainee Plaintiffs, housed in a federal facility, allege that individual federal officers subjected them to punitive conditions." *Id.* at 235. Here, the context that federal law enforcement have targeted Plaintiffs for investigation for impermissible reasons and with impermissibly invasive techniques presents a similarly familiar *Bivens* context.

Other courts, including this one, have assumed that *Bivens* creates a cause of action to address claims of religious discrimination in response to government action in the name of national security. *See Ibrahim; Padilla; Mayfield, supra.*

---

[19] Neither national security nor interference with foreign affairs deterred the Supreme Court more than 200 years ago from allowing a damages action against the commander of an American warship who seized cargo on the President's orders blockading French ports, where those orders exceeded congressional authorization. *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804).

45

### 2. *Even If This Case Is an Extension, This Court Should Recognize a* Bivens *Remedy*

Even were the Court to conclude that this case does raise a new context for *Bivens* actions, it should still recognize a damages remedy for the constitutional violations alleged here. A court considering whether a *Bivens* remedy is appropriate in a new context asks first "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). If the court concludes that "[i]t would be hard to infer that Congress expected the Judiciary to stay its *Bivens* hand, but equally hard to extract any clear lesson that *Bivens* ought to spawn a new claim," step two of the analysis directs the court to "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done," "paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Id.* at 554, 550. Courts have undertaken this analysis in light of *Bivens*' two primary purposes: "deterrence of individual officers who commit unconstitutional acts," *Malesko*, 534 U.S. at 71, and "provid[ing] a cause of action for a plaintiff who lack[s] any alternative remedy for harms caused by an individual officer's unconstitutional conduct." *Id.* at 70 (emphasis omitted). Only where "such circumstances are not present" has the Court "consistently rejected invitations to extend *Bivens*." *Id.*

46

a. <u>No Statutory Scheme Indicates Congress's Intent to Displace</u> <u>*Bivens*</u> <u>Remedies</u>

Although several statutes address harms tangentially related to those at issue here, no statutory scheme indicates Congress's intent to displace the *Bivens* remedies that Plaintiffs seek. As *Wilkie* made clear, the existence of statutory schemes figures into the *Bivens* analysis in two ways. First, at step one of the *Bivens* analysis, the court examines whether there is a statutory scheme sufficiently comprehensive that, from its enactment, a court can "infer that Congress expected the Judiciary to stay its *Bivens* hand." *Wilkie*, 551 U.S. at 554; *see Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988); *W. Radio Servs. Co. v. U.S. Forest Service*, 578 F.3d 1116, 1120–22 (9th Cir. 2009) (Administrative Procedure Act, which "expressly declares itself to be a comprehensive remedial scheme," precluded *Bivens* challenge to unfavorable agency actions). At the first stage, courts should decline to recognize a *Bivens* remedy only where "Congress' failure to provide money damages, or other significant relief, has not been inadvertent." *Berry v. Hollander*, 925 F.2d 311, 314 (9th Cir. 1991) (quotations omitted). In *Wilkie*, even where the plaintiff had "an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints," 551 U.S. at 553, the Court held that because the available remedies were "a patchwork, an assemblage of state and federal, administrative and judicial benches applying regulations, statutes and common law rules," *id.* at 554, "[i]t would be hard to infer that Congress expected the Judiciary to stay its *Bivens* hand," *id.*, and proceeded to the second step of the analysis.

Second, when the Court "weigh[s] reasons for and against the creation of a new

47

cause of action, the way common law judges have always done," *id.*, at step two of the *Bivens* analysis, the existence of alternative remedies again arises and (contrary to Defendants' suggestion, *see* TW Br. 43–44), the absence of a statutory remedy weighs *in favor* of allowing a constitutional one.[20] In *Wilkie*, although the Court noted that the plaintiff "had ready at hand a wide variety of administrative and judicial remedies to redress his injuries," 551 U.S. at 562; *see also id.* at 555, the "inadequacy of discrete, incident-by-incident remedies" in addressing the plaintiff's complaints about "the course of dealing as a whole" ultimately weighed in favor of creating a remedy. *See id.* at 554–55 ("Here, the competing arguments boil down to one on a side: from [plaintiff], the inadequacy of discrete, incident-by-incident remedies; and from the Government and its employees, the difficulty of defining" a workable standard for the cause of action). None of the statutes at issue here provide sufficient alternative remedial mechanisms to justify denying Plaintiffs a remedy under *Bivens*.

i. *Privacy Act*

Defendants argue that Plaintiffs' constitutional claims should go unremedied because "Congress fashioned the Privacy Act to remedy precisely the injury alleged

---

[20] Defendants cite *United States v. Stanley*, in which the Court held that the absence of remedies for the plaintiff was insufficient to give rise to a *Bivens* remedy in that case, but it involved the "the unique disciplinary structure of the Military Establishment and Congress' activity in the field," and the "explicit constitutional authorization for *Congress*" to regulate the Military. 483 U.S. 669, 683, 681–83 (1987) (emphasis in original). The Court subsequently made clear in *Wilkie* that the absence of a full remedy generally weighs in favor of creating one, even where a partial remedy exists. 551 U.S. at 554.

here," AAR Br. 70: that a federal agency "maintain no record describing how any individual exercises rights guaranteed by the First Amendment." 5 U.S.C. 552a(e)(7).

Defendants simply misunderstand the injury Plaintiffs allege. Plaintiffs' primary constitutional claims are that the FBI "gathered the information [about Plaintiffs] simply *because* the targets were Muslim." ER 181 (emphasis added). The constitutional injury is discrimination—not just that their religious activities were burdened because they were monitored, but that all of their activities (both religious and non-religious) were subjected to investigation because of their religion. *Cf. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case… is the denial of equal treatment…"). Section 552a(e)(7) of the Privacy Act restricts federal officials from maintaining records of religious activity, but it does not purport to provide remedies for federal officials who act for constitutionally-forbidden reasons. If it did, it would preclude *Bivens* remedies for law enforcement actions in retaliation for protected speech, a *Bivens* action the Ninth Circuit has repeatedly recognized. *See supra* II.A.1.[21]

Even if the Privacy Act did address the harms of which plaintiffs complain, its remedies do not serve *Bivens*' twin purposes of deterring individual officers and providing a meaningful remedy, because it provides a remedy only against the agency,

---

[21] In keeping with this theory, while Plaintiffs bring a claim under Section 552a(e)(7) of the Privacy Act seeking expungement of records which describe their religious activities, they also make a separate and distinct claim under the Constitution for expungement of records that the government gathered simply because they were Muslim. *See infra* III.B.2.

not against the federal officer responsible for the violation. *See Malesko*, 534 U.S. at 70, 71. In *Carlson v. Greene*, the Court relied in part on this very reason to conclude that the Federal Tort Claims Act (FTCA) does not create a sufficient deterrent to justify denial of a *Bivens* remedy. 446 U.S. 14, 21–22 (1980). *Carlson*'s reasoning applies here. *Compare Malesko*, 534 U.S. at 70, *and Carlson*, 446 U.S. at 22, *with* TW Br. 39–44; AAR Br. 67–71.[22]

Defendants point to two cases that find the Privacy Act a basis to refuse a *Bivens* remedy, but unlike the present case, both involve harms (related to the disclosure of information) that are specifically regulated by the Privacy Act. *Downie v. Middleburg Heights* held a *Bivens* remedy unavailable because the Privacy Act provided a damages remedy for the precise wrongs alleged, and the plaintiff needed only to sue under the statute, rather than the Constitution. 301 F.3d 688, 696–97 (6th Cir. 2002). In *Wilson v. Libby*, the court held that the Privacy Act generally regulated the precise injury of which plaintiffs complained (disclosure of information). 535 F.3d 697, 707 (D.C. Cir. 2008). Because the statute intentionally omitted a damages action against the particular defendants Wilson sued, the court held Congress intended to preclude a damages remedy. *Id.* at 707–08. Even accepting the D.C. Circuit's conclusion (despite Judge Rogers' powerful dissent), *Wilson* would not bar a *Bivens* remedy here. Unlike in

---

[22] Defendants' argument would be even weaker if the Court accepts any of the Government's arguments as to why Plaintiffs cannot obtain relief under the Privacy Act, including its claim that the FBI's records are entirely exempt from the Privacy Act.

50

*Wilson*, Plaintiffs' constitutional claim arises not from disclosure of "information subject to the Privacy Act's protections," *id.* at 707, but rather from Defendants' collection of information based on a discriminatory purpose or in violation of the Fourth Amendment. Courts, including the D.C. Circuit, have repeatedly held that the Privacy Act does not displace other constitutionally-compelled remedies for unlawful retention of records. *See infra* III.B.2; *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 534 (D.C. Cir. 2015) ("Abdelfattah seeks equitable relief for the Department's alleged violations of the Constitution, and Congress's provision of specific Privacy Act remedies does not bar his claims.").

Because the Privacy Act neither provides any meaningful remedy for religious discrimination by law enforcement nor evinces any intent by Congress to preclude one, it does not bar a *Bivens* remedy.

## ii. *RFRA*

Defendants TW argue that the enactment of RFRA indicates "Congress's intent that it, rather than the judiciary, should decide whether to create a damages remedy" for the claims Plaintiffs present. *See, e.g.*, TW Br. 43–44. But Defendants cite no case holding that RFRA precludes any kind of *Bivens* action, let alone a discrimination action, and for good reason: to do so would run contrary to RFRA's clear text and purpose.[23]

---

[23] RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability,"

First, Congress made its intent in enacting RFRA clear and explicit: to *expand* the remedies available for plaintiffs by overruling *Employment Division v. Smith*, 494 U.S. 872 (1990), which "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," 42 U.S.C. 2000bb(a)(4), and "to restore the compelling interest test as set forth" in pre-*Smith* cases." *Id.* 2000bb(b)(1). RFRA's provision entitled "Establishment Clause unaffected" states, "Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the 'Establishment Clause')." 42 U.S.C. 2000bb-4. To quell any lingering concerns that the act could have "unintended consequences and unsettle other areas of the law," the Senate report echoes this statutory purpose and makes "absolutely clear" that "the act does not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with the Supreme Court's free exercise jurisprudence under the compelling governmental interest test prior to *Smith*." S. Rep. No. 103-111, pt. V(f), at 12 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1902.

These explicit statements of Congressional intent establish beyond dispute that Congress did not intend RFRA to extinguish a *Bivens* remedy for religious discrimination.

---

unless the government demonstrates a "compelling governmental interest" and uses the "least restrictive means" of furthering that interest. 42 U.S.C. 2000bb–1(a), (b). *See infra* II.B.4.

52

Moreover, RFRA does not provide a remedy for the central injury Plaintiffs' allege. The core of Plaintiffs' complaint does not allege burdens arising from neutral laws or conduct, but rather intentional discrimination through facial classification on the basis of religion, which RFRA does not address. Indeed, the Supreme Court has never analyzed such facial classifications under the "substantial burden" test, but always instead under strict scrutiny. *See infra* II.B.2. As the Supreme Court has noted, RFRA simply was not concerned with intentional discrimination. *See City of Boerne v. Flores*, 521 U.S. 507, 530–31 (1997); *see also Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir. 1995) ("if the regulations are not neutral and generally applicable, we need not address [RFRA]"); *cf.* 42 U.S.C. 2000bb(a)(4) (RFRA restores protection for "burdens on religious exercise imposed by laws neutral toward religion").

### iii.  *FISA*

Defendants TW suggest that FISA provides sufficient evidence of Congress's intent to preclude *Bivens* claims under the Fourth Amendment, but Defendants point to no case holding such, and cannot explain why courts have allowed *Bivens* claims for electronic surveillance regularly since FISA's enactment. *See, e.g.*, *Mitchell*, 472 U.S. at 513. Moreover, because FISA's cause of action is not limited to national security cases, Defendants' position would extinguish all *Bivens* claims for unlawful electronic surveillance, in violation of this Court's precedent. *See, e.g.*, *Gibson v. United States*, 781 F.2d 1334, 1342 (9th Cir. 1986).

*          *          *

None of the statutory schemes on which Defendants rely either set forth an "elaborate remedial system" comprehensive enough to demonstrate that "Congress expected the Judiciary to stay its *Bivens* hand," *Wilkie*, 551 U.S. at 554, or provide an alternative remedy for the harms of religious discrimination for which Plaintiffs seek such that they could constitute a "special factor[] counselling hesitation." *Id.* at 550 (quotations omitted).

b. No Special Factors Justify Precluding a *Bivens* Remedy

Where no statute manifests Congress's intent to preclude a *Bivens* remedy, a court must "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done," "paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Wilkie*, 551 U.S. at 554, 550 (quotations omitted).[24]

Defendants vastly overstate the reluctance of courts to allow new *Bivens* remedies. While the Supreme Court has extended *Bivens* twice, to claims of discrimination under the Due Process Clause in *Davis* and cruel and unusual punishment under the Eighth Amendment in *Carlson*, the Court has relied on only two "special factors" to deny a *Bivens* remedy (other than the congressional preclusion that *Wilkie* recast as step one of the *Bivens* analysis)[25]—intrusion on "'the unique

---

[24] The mere presence of a special factor does not mean no *Bivens* remedy is available, *cf.* TW Br. 36, as the Supreme Court's balancing analysis in *Wilkie* shows. 551 U.S. at 555.

[25] *See, e.g.*, *W. Radio Servs.*, 578 F.3d at 1123 (citing *Chilicky* and other cases involving comprehensive remedial schemes in *Wilkie* step-one analysis).

54

disciplinary structure of the Military Establishment and Congress' activity in the field'" pursuant to an "explicit Constitutional authorization for *Congress*" to regulate the military, *United States v. Stanley*, 483 U.S. 669, 682–83 (1987) (quoting *Chappell v. Wallace*, 462 U.S. 296, 304 (1983) and citing U.S. Const. Art. I, § 8, cl. 14); and "difficulty in defining a workable cause of action," *Wilkie*, 551 U.S. at 555. Neither factor is present here.

While the Court has at various times declined to extend *Bivens* to defendants other than individual federal officers, *see, e.g., FDIC v. Meyer*, 510 U.S. 471, 473 (1994) (federal agency); *Malesko*, 534 U.S. at 71–74 (private prison corporation), those holdings obviously say nothing about the availability of *Bivens* remedies for constitutional claims against federal law enforcement officers for whom *Bivens* remedies were originally crafted.

Contrary to Defendants' suggestion, the rule that courts should hesitate to infer a private action from a statute (when Congress failed to do so), is not applicable to the Constitution, where the founders would not have included causes of action among the document's broad statements of principles, but nonetheless clearly intended the rights conferred to be enforced by the judiciary. *See* Hon. Marsha S. Berzon, *Securing Fragile Foundations: Affirmative Constitutional Adjudication In Federal Courts,* 84 N.Y.U. L. Rev. 681, 683–84 (2009) ("[S]tatutory causes of action (particularly so-called implied causes of action) and direct, affirmative constitutional claims are largely distinct and are not usefully analyzed as though they were the same"); Sir William Blackstone, 3

55

COMMENTARIES ON THE LAWS OF ENGLAND 109 (Worcester: Isiah Thomas 1790) ("[I]t is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress.").

Fundamentally, *Bivens* preserves the Constitution's careful balance of power by establishing a means for courts to enforce the individual rights (and limitations on government power) the Constitution already sets forth. *Davis*, 442 U.S. at 242; *Marbury v. Madison*, 5 U.S. (1 Cranch) at 163 ("The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.") (quoted in *Bivens*, 403 U.S. at 397).

Defendants point to only two "special factors" that they argue justify denying Plaintiffs a remedy for their constitutional injuries—national security issues and the assertion of state secrets privilege. TW Br. 36. Neither suffices.

### i. *National Security*

Defendants TW argue that "national security" is a special factor that justifies denying a *Bivens* remedy because this case "probes into the predicates, subjects, and methods of an FBI counterterrorism investigation." TW Br. 36–39. This argument rests on a distortion of governing law.

First, Defendants ignore *Mitchell*, the only *Bivens* action involving national security at the Supreme Court. *See supra* Part II.A.1.a (discussing *Mitchell*). *Mitchell* held that qualified immunity would provide adequate protection from frivolous lawsuits in a case involving national security, and that "[w]here an official could be expected to

56

know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate. This is as true in matters of national security as in other fields of governmental action." 472 U.S. at 524 (emphasis in original) (citations and quotations omitted). Although *Mitchell* framed the issue as absolute immunity from suits for damages, rather than the absence of a damages remedy, its rationale forecloses Defendants' argument here.

Even apart from *Mitchell*, Defendants' bold assertion that "[t]he Supreme Court consistently has held that *Bivens* should not be extended in cases involving 'determinations relating to national security,'" TW Br. 36, is flatly incorrect. The Supreme Court has *never* so held, and recent cases give little indication it would do so. The cases Defendants cite that mention "national security" are not *Bivens* cases.[26] Defendants quote the observation in *Boumediene v. Bush*, 553 U.S. 723, 797 (2008), that judges do not "begin the day with briefings" on "serious threats to our Nation," but *Boumediene rejected* the argument that courts should defer to the political branches in holding that the Suspension Clause protects enemy combatants at Guantanamo. In many other contexts, too, the Court has rejected the notion that national security issues are immune from judicial scrutiny. *See, e.g., Hamdi v. Rumsfeld*, 542 U.S. 507, 536

---

[26] *See Haig v. Agee*, 453 U.S. 280 (1981) (addressing on the merits whether Passport Act conferred on Secretary of State the authority to revoke a passport upon determining that passport hold's foreign activities damaging to national security); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33 (2010) (adjudicating whether statute prohibiting provision of "material support or resources" to groups designated as foreign terrorist organizations was unconstitutionally vague or impermissibly burdened speech and association); TW Br. 22, 37 (citing *Haig* and *HLP*).

(2004) (plurality) ("Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake."); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934) ("[E]ven the war power does not remove constitutional limitations safeguarding essential liberties."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

Defendants cite to *Stanley* and *Chappell* as if those cases addressed "national security" as a special factor, but they did not. Both declined to extend *Bivens* to claims arising from *military service* because the Constitution expressly commits authority over military matters to Congress, and because alternate remedies exist within the military system. *See Stanley*, 483 U.S. at 681–82 (no *Bivens* remedy for incidents arising out of military service because of "explicit constitutional authorization for *Congress* 'to make Rules for the [military]'" and "the insistence… with which the Constitution confers authority over the Army, Navy, and militia upon the political branches" (quoting U.S. Const. Art. I, § 8, cl. 14)); *Chappell*, 462 U.S. at 300–04 (no *Bivens* remedy in military context, relying on "the unique disciplinary structure of the military establishment and Congress' activity in the field"). Nothing in these opinions justifies withholding a *Bivens* remedy based on a generalized invocation of "national security," and they do not support Defendants' apparent view that Americans lose their constitutional rights when FBI agents claim to be acting in the name of "counterterrorism."

Finally, several circuit cases mention "national security" in discussing special

factors under *Bivens*, but all of them arise in very different factual circumstances and reflect a concern with "national security" primarily as related to interference with foreign affairs.[27] *Mirmehdi v. United States*, 662 F.3d 1073, 1077–80 (9th Cir. 2011), rejected a *Bivens* remedy for claims of wrongful immigration detention, but based its holding largely on its conclusion (under the first step of *Wilkie*) that the INA and habeas remedies constituted a "substantial, comprehensive, and intricate remedial scheme" that indicated Congressional intent to foreclose damages remedies. *See id.* at 1080 (quotation omitted). *Mirmehdi* mentioned national security only obliquely, noting that immigration issues "have the natural tendency to affect diplomacy, foreign policy, and the security of the nation" that further "counsel[ed] hesitation," and that subjecting the motives of immigration prosecution to scrutiny might disclose not "normal domestic law-enforcement priorities and techniques" but "foreign policy objectives and… foreign intelligence products." *Id.* (quotations omitted). *Mirmehdi* certainly did not base its *Bivens* holding solely on this concern, nor could it preclude a *Bivens* action for domestic surveillance given *Mitchell*, *Gibson*, and other challenges to domestic law enforcement action.

    *Wilson v. Libby*, *supra*, similarly found no *Bivens* remedy for disclosure of

---

[27] Defendants also cite *Beattie v. Boeing Co.*, in which the Tenth Circuit refused to allow a *Bivens* challenge to Boeing's revocation of an employee's security clearance, not on generalized grounds of "national security," but because the Supreme Court had explicitly held (in another context) that the granting of security clearances is committed by law to Executive discretion and beyond review. 43 F.3d 559, 564-65 (10th Cir. 1994) (relying on *Dep't of Navy v. Egan*, 484 U.S. 518 (1988)).

sensitive information because the Privacy Act provided a "comprehensive scheme" that precluded "additional remedies under *Bivens*," while also noting the difficulty inherent in "inquiry into… the job risks and responsibilities of covert CIA agents." 535 F.3d at 707, 710. *See supra* II.A.2.a.*i.* Here, unlike in *Wilson*, there is no comprehensive remedial scheme, and Plaintiffs have not pled claims that directly involve the inner workings of the CIA.

Defendants also rely on *Arar*, but it must be read in light of the Second Circuit's more recent decision in *Turkmen, supra. Arar* (over vigorous dissents) used the term "national security" as applied to a challenge to the "extraordinary rendition" program brought by a foreign citizen. The Court used "national security" to encompass issues touching on the President's plenary "international relations" power, judicial incompetence in foreign policy, and the unique context concerning treatment of "foreign subjects abroad" by "military and foreign policy officials" in light of "[t]he special needs of foreign affairs." *See Arar*, 585 F.3d at 575–76.[28] *Turkmen* makes clear

---

[28] Other circuit court decisions similarly mention "national security" in declining to extend *Bivens*, but in the context of the military. *See Vance v. Rumsfeld*, 701 F.3d 193, 200 (7th Cir. 2012) (en banc) (declining to extend *Bivens* to a claim against soldiers and commanders for abuse of military prisoners on grounds that "congressionally uninvited intrusion into military affairs by the judiciary is inappropriate" (citing *Stanley*, 483 U.S. at 683)); *Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012) (refusing to extend *Bivens* to plaintiffs challenge to his designation and detention as enemy combatant, based on constitutional commitment of military matters to the executive, the practical difficulties of members of the military testifying as to each other's decisions, and the existence of habeas corpus as an alternate remedy); *Doe v. Rumsfeld*, 683 F.3d 390 (D.C. Cir. 2012) (same regarding military contractor's claim he was wrongfully subjected to military detention and abuse in Iraq).

that *Arar*'s concerns regarding "national security" were limited to the international relations issues involved, and itself allowed a *Bivens* challenge to detention arising from the 9/11 investigations. *See Turkmen*, 789 F.3d at 234 ("*Arar* [took] pains to note that the 'context' of Arar's claims was not the nation's continuing response to terrorism, but the acts of federal officials in carrying out Arar's extraordinary rendition….") (citing *Arar*, 585 F.3d at 572). None of *Arar*'s concerns about international relations apply to Plaintiffs' claims of religious discrimination by a domestic law enforcement agency investigating Americans on American soil—a context in which courts regularly inquire into the discriminatory motives of law enforcement investigations. *See e.g., Mitchell, Gibson, Nurse, supra* II.A.1.[29]

In sum, none of the authority on which Defendants rely suggests that generalized concerns for "national security" should preclude *Bivens* remedies for American citizens and residents harmed by FBI agents on American soil, and indeed,

---

[29] Framing the *Arar* court's analysis was its conclusion that the plaintiff sought "a damages remedy against senior officials who implement [a]… policy" allowing extraordinary rendition, and that litigation of the claims would require "inquiry into the perceived need for the policy, the threats to which it responds, the substance and sources of the intelligence used to formulate it." 585 F.3d at 575. Defendants suggest that this action similarly challenges counterterrorism policies. TW Br. 38. But Plaintiffs plead claims not against officials for establishing a policy, but only against the officials directly involved in the investigation that violated their rights. Plaintiffs do point to various FBI policies and training showing an increasing tolerance of racial and religious profiling, *see* ER 187-194, but their claims do not require analysis of their underlying justifications or even their application in any context other than the particular events alleged here. Nor do plaintiffs bring claims against their drafters. Rather, plaintiffs include those allegations only to demonstrate the plausibility of religious discrimination in this particular operation. *Cf. Turkmen* (challenging detention policies).

*Mitchell* strongly counsels against such a conclusion.

        ii.    *State Secrets*

Defendants TW also offer "state secrets" as a factor counseling hesitation, arguing that because they could not defend themselves without risking disclosure of information the government has asserted is a state secret, no remedy should be recognized. TW Br. 36–39. No court has counted the assertion of state secrets as a special factor, for good reason: this argument double-counts state secrets as both an independent reason for dismissal of Plaintiffs' claims and a special factor under *Bivens*.

The Supreme Court has already recognized that concerns adequately addressed by other doctrines should not be weighed as "special factors." *Davis* recognized that the plaintiff's "suit against a Congressman for putatively unconstitutional actions taken in the course of his official conduct does raise special concerns counseling hesitation" under *Bivens*, but held that "these concerns are coextensive with the protections afforded by the Speech or Debate Clause," 442 U.S. at 246, which "shields federal legislators with absolute immunity," *id.* at 235 n.11. Because that doctrine provided a framework to analyze protection from liability, the Court rejected it as a special factor under *Bivens*.

Similarly here, that this Court can fully address issues of sensitive "national security" information through the state secrets privilege—and, more importantly, through FISA's procedures—counsels *against* allowing Defendants to treat national security and any accompanying need for secrecy as a "special factor." *See Black v.*

*United States*, 62 F.3d 1115, 1118 (8th Cir. 1995) (addressing state secrets privilege in *Bivens* case under state secrets analysis, not as *Bivens* special factor).[30] If this Court finds the state secrets privilege does not bar litigation, then the mere fact that Defendants asserted the privilege unsuccessfully can hardly justify hesitation under *Bivens*.

### B. Defendants Are Not Entitled To Qualified Immunity

Defendants' arguments that they are entitled to qualified immunity on Plaintiffs' statutory and constitutional claims are meritless. Although "[d]amages actions against high officials are… an important means of vindicating constitutional guarantees," *Harlow v. Fitzgerald*, 457 U.S. 800, 809 (1982) (quotations omitted), a government official defendant may obtain qualified immunity if: (1) taken in the light most favorable to plaintiff, the official's conduct did not "violate[] a constitutional right;" or (2) "[t]he contours of the right [were not] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001).

Defendants emphasize the particular facts of this case, arguing that no court has found similar conduct illegal in the context of a domestic national security investigation. But the Constitution has long forbidden explicit discrimination on the

---

[30] *Arar* is not to the contrary. Although *Arar* referred in passing to the fact that the government had asserted the state secrets privilege in conducting its *Bivens* analysis, 585 F.3d at 575–76, the court focused on the foreign policy implications of recognizing a cause of action, and did not suggest that the fact that the government had invoked the privilege was itself a special factor counseling hesitation.

basis of religion and warrantless electronic surveillance of private homes and offices, and none of Defendants' protestations provide any reason to think that they did not have "fair and clear warning" that their alleged violations of these core constitutional principles would be unlawful. *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) (en banc).[31] Nor can Defendants reasonably dispute that Plaintiffs' lengthy, detailed complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).

### 1. Defendants Are Not Entitled To Qualified Immunity on Plaintiffs' FISA Claims, As the District Court Correctly Held, or On Their Fourth Amendment Claims

The district court correctly held Plaintiffs stated a claim for violations of FISA under clearly established law. Plaintiffs' Fourth Amendment arguments address substantially the same searches and are evaluated under the same legal standards. *See ACLU v. NSA*, 493 F.3d at 657 n.16, 683 (Batchelder, J.) (FISA's "aggrieved person"

---

[31] The district court correctly rejected Defendants' argument that, even if they have intentionally violated a statutory or constitutional norm, they should be entitled to qualified immunity if the law is not clearly established as to procedural aspects of the claim, such as whether Section 1985 provides a right of action for unconstitutional religious discrimination, TW Br. 51 n.11. *See* ER 28 n.3. Qualified immunity exists to shield officers where there is uncertainty whether their conduct is unlawful, not where officers' actions are clearly unlawful but it is uncertain whether there will be a remedy. *See Harlow*, 457 U.S. at 819 ("Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action."); *Saucier*, 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that *his conduct was unlawful* in the situation he confronted.") (emphasis added).

definition coextensive with standing under Fourth Amendment for claims of electronic surveillance). If this Court concludes Plaintiffs' Fourth Amendment claims are not barred by state secrets, then they should survive qualified immunity for the same reasons as Plaintiffs' FISA claims.

In holding Defendants not entitled to qualified immunity, the district court agreed that Plaintiffs had set forth facts alleging electronic surveillance in clear violation of the law:

> The complaint sets forth detailed allegations that Defendants planted electronic listening devices in one Plaintiff's home and another's office, that their informant left recording devices to capture intimate religious discussion at the mosque, that the informant routinely took video in mosques and in private homes, and that the informant acted pursuant to broad instructions to gather as much information on Muslims as possible.

ER 27. The complaint further alleges that all of this took place without warrants, because, as Defendant Armstrong told the informant, while warrants might be required for criminal cases, "National security is different. Kevin [Armstrong] is God." ER 218–219. Defendants nonetheless argue that none of these activities violated clearly established Fourth Amendment law.

Defendants are wrong. Established law clearly holds that the FBI cannot drop listening devices in places of worship or private homes without a warrant or suspicion of illegal activity, and cannot engage in a fishing expedition targeting an entire

religious group without a proper law enforcement purpose.[32]

### a. Warrantless Audio Recording Outside Informant's Presence

The most obvious FISA (and Fourth Amendment) violation alleged in the complaint arises from the informant's warrantless recording of conversations to which he was *not* a party. Although Defendants argue that the informants' surveillance was reasonable under the invited informer doctrine, the complaint alleges Defendants conducted audio surveillance of Plaintiffs *outside the presence of the informant* in at least three ways: (1) by installing warrantless audio surveillance in Fazaga's office, ER 208–209; (2) by installing warrantless audio surveillance in AbdelRahim's home, car and phone, ER 237; and (3) through the informant leaving recording devices around the mosque, outside his presence, to record intimate religious discussions to which he was not a party, ER 216, 219, 232–233, 237–238. The law clearly establishes that the Fourth Amendment does not permit audio surveillance of communications without consent or a warrant. *See, e.g.*, *Katz v. United States*, 389 U.S. 347 (1967); 18 U.S.C. 2510 *et seq.*

Defendants do not contest that, under clearly established law, Fazaga had a

---

[32] Defendants AAR cite *United States v. Wahchumwah*, 710 F.3d 862 (9th Cir. 2013), for the proposition that the Constitution permits warrantless video surveillance inside a home by an informant. Plaintiffs respectfully believe that decision is incorrect. Because video surveillance is "one of the most intrusive investigative mechanisms available to law enforcement," video surveillance of the interior of a home, even by an invited informer, should not be permissible without a warrant. *United States v. Nerber*, 222 F.3d 597, 603 (9th Cir. 2000); *see also United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir. 1992) (Kozinski, J., concurring); *United States v. Mesa-Rincon*, 911 F.2d 1433, 1442 (10th Cir. 1990); *United States v. Torres*, 751 F.2d 875, 885 (7th Cir. 1984).

reasonable expectation of privacy against audio recording in his office and
AbdelRahim in his house, car and phone, nor could they. *See Kyllo v. United States*, 533
U.S. 27, 31 (2001) ("With few exceptions, the question whether a warrantless search
of a home is reasonable and hence constitutional must be answered no."); *United States
v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991) (reasonable expectation of privacy in
personal office). Instead, they argue that the allegation is "conclusory" and
implausible under *Iqbal.* This contention is absurd. First, the allegations as to both
Fazaga and AbdelRahim contain specific factual details, not merely "formulaic
recitation of the elements of a constitutional discrimination claim." *Iqbal*, 556 U.S. 662
at 681. *See, e.g.*, ER 208–09 ("Agents Allen and Armstrong caused… electronic
surveillance equipment to be installed at the Mission Viejo mosque and used it to
monitor conversations of Plaintiff Yassir Fazaga, including conversations held in parts
of the mosque not open to the public, including Sheikh Fazaga's office"); ER 237
(alleging defendants Armstrong and Allen told informant they had electronic listening
devices in AbdelRahim's house, car and phone, and citing two instances in which they
told informant about events in the house saying they learned of them through audio
surveillance). Second, these allegations are undoubtedly plausible in light of other
detailed allegations, including that Defendants had developed a specific interest in
both Fazaga and AbdelRahim (based on innocuous and protected First Amendment
activity) and had instructed the informant to gather more information on them. ER
227–30, 235–38.

67

Defendants TW argue that Plaintiffs fail to allege who is responsible and whose conversations were recorded. TW Br. 58 n.15. As set forth below, *infra* II.B.3.b, the allegations about supervisors easily render plausible the claim that Defendants Tidwell, Walls, and Rose were responsible for the surveillance, and it is obviously each Plaintiff's conversations that were recorded in his own home or office.

<u>*Surveillance In Mosques Outside the Informant's Presence:*</u> The complaint alleges instances in which the informant left recording devices in the mosque to record communications during *halaqas*, or intimate religious discussion groups, while he went elsewhere, and that he specifically recorded conversations of Plaintiffs Malik and AbdelRahim in this manner. *See* ER 216, 219, 232–233, 237–238. The invited informer doctrine does not apply where no informant is present, and warrantless audio recording in circumstances where an individual enjoys a reasonable expectation of privacy violates both FISA and clearly established Fourth Amendment law. *Nerber*, 222 F.3d at 604–05.

Defendants argue that no reasonable expectation of privacy exists in recordings made at mosques because Plaintiffs do not allege that these spaces were closed to the public. But even if Plaintiffs knew their communications could be heard by other participants in the *halaqa*, they retained a reasonable expectation of privacy against having them audio recorded.

Courts have repeatedly recognized that even where people expect to be seen and heard by a limited number of others, they retain a reasonable expectation of

privacy against audio or video recording. As this Court has recognized, "[p]rivacy does not require solitude… access of others does not defeat [people's] expectation of privacy." *Taketa*, 923 F.2d at 673; *see also Nerber*, 222 F.3d at 604 ("Even if one cannot expect total privacy…, [a] diminished privacy interest does not eliminate society's expectation to be protected from" severe intrusion); *Trujillo v. City of Ontario*, 428 F. Supp. 2d 1094, 1104 n. 6, 1105 (C.D. Cal. 2006) (holding police officers retained reasonable expectation of privacy against videotaping in station locker room, even though they could be seen by other officers), *aff'd sub nom. Bernhard v. City of Ontario*, 270 Fed. Appx. 518, 519 n.1 (9th Cir. 2008) (unpublished).

These cases rest on established Supreme Court doctrine that privacy is not an all-or-nothing concept. What a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz*, 389 U.S. at 351–52 (finding reasonable expectation of privacy in public phone booth). Similarly, even where the public nature of a space involves some degree of exposure, people may still retain reasonable expectations of privacy against more serious intrusions. *See, e.g.*, *Bond v. United States*, 529 U.S. 334, 338–39 (2000) (holding that although passenger on public bus "clearly expects that his bag [placed in overhead bin] may be handled," he nonetheless had reasonable expectation of privacy against agents "feel[ing] the bag in an exploratory manner").

The complaint's allegations make clear that the prayer groups were not "so open to… the public that no expectation of privacy is reasonable." *O'Connor v. Ortega*,

480 U.S. 709, 718 (1987). The allegations show that Plaintiffs had a reasonable expectation of privacy that the *halaqa* would not be recorded. Mosque prayer halls are not ordinary public spaces, as various rules and customs apply. Most important, there is an explicit rule against audio and video recording that derives from a religious prohibition on eavesdropping and tale-bearing. ER 233. The *halaqa* where Defendants recorded Plaintiffs are intended to be safe environments for religious discussion that are afforded "some measure of confidentiality." *Id.* These rules and customs distinguish the *halaqa* from commercial public spaces where courts have not recognized a reasonable expectation of privacy. *See United States v. Gonzalez*, 328 F.3d 543, 547 (9th Cir. 2003) (hospital mailroom); *United States v. Little*, 753 F.2d 1420, 1436 (9th Cir. 1984); *In re John Doe Trader*, 894 F.2d 240, 243–45 (7th Cir. 1990) (relying on both "noisy and frantic" environment of trading floor presence and of agents in and near the recorded conversations); *Lyall v. City of Los Angeles*, 2011 WL 61626, *4–7 (C.D. Cal. Jan. 6, 2011).

Defendants TW argue that these customs must be ones that "*society* is prepared to recognize as reasonable," TW Br. 30 (quoting *Katz*, 389 U.S. at 361 (emphasis in brief)), but this Court recognized that expectations of privacy arising out of religious custom are based on "the nation's history of respect for religion in general."[33]

---

[33] In *Kee v. City of Rowlett*, 247 F.3d 206 (5th Cir. 2001), the Fifth Circuit held plaintiffs showed no reasonable expectation of privacy at a gravesite where police had hidden a microphone. But there, plaintiffs "adduced no evidence regarding the context of the communications" and "representatives of the media and… third parties were in close proximity to the grave site." *Id.* at 216.

*Mockaitis v. Harcleroad*, 104 F.3d 1522, 1533 (9th Cir. 1997) (finding reasonable

expectation of privacy in communications made during confession), *overruled on other*

*grounds as recognized by United States v. Antoine*, 318 F.3d 919, 923 (9th Cir. 2003)

(recognizing overruling on RFRA claim).

Plaintiffs' allegations more than suffice to make plausible their claims of a

reasonable expectation of privacy in the prayer hall. *Iqbal*, 556 U.S. at 680.

### b. Conversations to Which the Informant Was a Party

The complaint also alleges a Fourth Amendment violation arising from

Defendants' use of the informant to gather "thousands of hours of audio recording of

conversations… as well as recordings of religious lectures, discussion groups, classes,

and other Muslim religious and cultural events occurring in mosques," ER 181,

including every conversation he had with Plaintiffs, ER 216 (informant would "record

all day, every moment he worked undercover, regardless of whom he was meeting or

what was discussed"). Defendants argue that the vast majority of this recording was

permissible without a warrant under the "invited informer" doctrine. *See* TW Br. 28–

30; AAR Br. 29–32. But this Court has made clear that for the invited informer

doctrine to apply, "the government's investigation must be conducted in good faith;

i.e., not for the purpose of abridging first amendment freedoms." *United States v.*

*Aguilar*, 883 F.2d. 662, 705 (9th Cir. 1989), *superseded on other grounds by* 8 U.S.C. 1324;

*see also United States v. Mayer*, 503 F.3d 740, 751 (9th Cir. 2007).

Defendants argue that this "good faith" requirement does not apply to Fourth

Amendment claims, but *Mayer* clearly contradicts that argument: "Good faith has

been an implicit requirement for investigations under the Fifth Amendment *and*

*searches under the Fourth Amendment.*" 503 F.3d at 751.[34] Indeed, even the structure of

the opinion demonstrates that *Mayer* addresses a good faith requirement to the Fourth

Amendment—the discussion of good faith is the second of three sections under the

heading "Fourth Amendment." *See id.* Defendants AAR rely on *Whren* for the

principle that Fourth Amendment analysis never examines motive. But *Whren* holds

that "motives can[not] invalidate police conduct *that is justifiable on the basis of probable*

*cause,*" *Whren v. United States*, 517 U.S. 806, 811 (1996) (emphasis added), while

recognizing that motive plays into Fourth Amendment analysis of inventory and

administrative searches because those situations "involve[] police intrusion *without the*

*probable cause that is its traditional justification.*" *Id.* at 817 (emphasis in original). *Cf.*

*Indianapolis v. Edmond*, 531 U.S. 32, 45–46 (2000) ("programmatic purpose[]" relevant

to suspicionless searches in traffic context). The invited informer doctrine, like

inventory and administrative searches and suspicionless traffic stops, creates an

exception to the probable cause requirement. Because it allows for invasive searches

without either warrant or suspicion, it has profound implications for First

Amendment freedoms, as *Mayer* and *Aguilar* recognize in imposing a good faith

---

[34] In a blatant misrepresentation to this Court, Defendants AAR quote this sentence for the proposition that *Mayer* applies a good faith requirement only under the Fifth Amendment, but simply omit the clear mention of the Fourth Amendment (emphasized above) that contradicts their position, without indicating any redaction or alteration of text. *See* AAR Br. 21.

72

limitation on its use.

Under *Mayer*'s good faith requirement, law enforcement "must not investigate for the purpose of violating First Amendment rights," and must act consistent with a "legitimate law enforcement purpose." 503 F.3d at 752. The complaint paints a detailed portrait of Defendants' explicit use of religion to target Muslims in Southern California. *See supra* II.A. Certainly the allegation that Defendants targeted Plaintiffs solely based on their religion constitutes bad faith, and even the more limited allegation that Defendants explicitly used religion as a criterion for investigation makes out an intentional constitutional violation that cannot be viewed as "good faith." *See also Handschu v. Special Services Div.*, 349 F. Supp. 766, 770 (S.D.N.Y. 1972) (no legitimate law enforcement purpose in infiltration of anti-war group).

## 2. Defendants Are Not Entitled To Qualified Immunity on Plaintiffs' First Amendment and Fifth Amendment Equal Protection Claims

The complaint sets forth detailed allegations of intentional discrimination: an investigation designed to target Muslims because of their religion, out of FBI agents' belief that "Islam is a threat to national security." Unsurprisingly, this stark facial discrimination on the basis of religion clearly violates core Equal Protection and First Amendment principles. Defendants' arguments to the contrary fail for three reasons.

First, Defendants AAR apply the wrong legal framework for a First Amendment challenge to explicit religious discrimination. They apply the *Lemon* test to evaluate Plaintiffs' Establishment Clause claim, but that analysis is "intended to

73

apply to laws affording a uniform benefit to *all* religions, and not to provisions… that discriminate *among* religions." *Larson v. Valente*, 456 U.S. 228, 252 (1982) (emphasis in original). Similarly, they apply the "substantial burden" test for the Free Exercise claim, even though that test, to the extent it survives *Smith*, applies only to *facially neutral* government conduct. Under long-established precedent, facial discrimination against a given religious group is subjected to strict scrutiny under either clause (and under equal protection analysis). *Smith*, 494 U.S. at 886 n.3. Defendants' treatment of Islam as itself suspicious and the resulting dragnet surveillance of an entire religious group cannot survive strict scrutiny.

Second, although Defendants rely heavily on *Ashcroft v. Iqbal*, they fundamentally mistake the nature of Plaintiffs' discrimination claims, and therefore miss an enormous difference between *Iqbal* and this case. The plaintiffs in *Iqbal* asked the Court to *infer* discriminatory intent from the disparate impact on Muslims created by the investigation into the 9/11 hijackings. Here, in contrast, Plaintiffs plead ample non-conclusory facts that provide *direct evidence* that Defendants *explicitly* used religion as a factor in deciding whom to target. Defendants gave their informant instructions to target people *on the basis of their religion*; they repeatedly told him to target Muslims and the Muslim community, to target more devout Muslims because they were more suspicious, and that targeting Muslims was necessary because "Islam is a threat to national security." ER 215. Those instructions were, sadly, consistent with training that FBI agents received for years, including during the time preceding the events

74

described in the complaint. ER 187–195. Such explicit use of religion needs no inference of intent; it is direct evidence of discrimination. *Turkmen*, 789 F.3d at 252; *cf. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213 (1995) ("[T]his case concerns only classifications based explicitly on race, and presents none of the additional difficulties posed by laws that, although facially race neutral, result in racially disproportionate impact and are motivated by a racially discriminatory purpose.").

Defendants argue the complaint shows an investigation conducted for counterterrorism purposes. TW Br. 48; AAR Br. 72. But even if the investigation was meant to address terrorism, the facts in the complaint show clear religious discrimination, including Defendants' use of religious activity as a basis for suspicion and Defendants' instructions to surveil people because of their religion. ER 187–195. Legally, the purportedly legitimate reasons are irrelevant, because Plaintiffs need not allege facts that show that religious discrimination was the *sole* basis for the government's actions. Rather, *any* use of religion as a facial classification is subject to strict scrutiny, *cf. Grutter*, 539 U.S. at 327 ("[S]trict scrutiny is designed to provide a framework for carefully examining… the use of race in that particular context."), and plaintiffs on a motion to dismiss need plead only sufficient facts to "nudge[] [their] claims of invidious discrimination across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quotations omitted). Under Defendants' theory, strict scrutiny would not apply to a program of law enforcement wiretapping that applied only to African-Americans so long as they asserted that the purpose of the program was to protect

75

national security. That is not the law.

      a.  <u>Under Clearly Established Law, Facial Discrimination on the Basis of Religion Triggers Strict Scrutiny</u>

The Supreme Court has repeatedly held that the Constitution guarantees government neutrality by barring government officials from favoring or disfavoring particular religions. *See, e.g.*, *McCreary Cnty. v. ACLU*, 545 U.S. 844, 860 (2005). This principle of neutrality is contained within both the Establishment and Free Exercise Clauses of the First Amendment, as well as the equal protection component of the Fifth Amendment. While the law governing facially neutral laws that have a disparate impact on particular religions is more complex, the law governing facial discrimination is clear: any facial classification is unconstitutional unless it can survive strict scrutiny.

Both the First and Fifth Amendments require strict scrutiny of facial religious discrimination—such actions are prohibited unless "justified by a compelling governmental interest" and "closely fitted to further that interest." *Larson*, 456 U.S. at 247; *see also Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993) (non-neutral government action subject to "the most rigorous of scrutiny" such that they must be "narrowly tailored in pursuit of" "interests of the highest order"); *Gratz, v. Bollinger,* 539 U.S. 244 (2003), *supra*.

*Iqbal* establishes that "the plaintiff must plead and prove that the defendant acted with discriminatory purpose" to win a claim of intentional religious discrimination, *Iqbal*, 556 U.S. at 676. But there are several ways to plead such discriminatory purpose. As the Second Circuit has described it:

> A plaintiff can show intentional discrimination by: (1) pointing to a law or policy that expressly classifies persons on the basis of a suspect classification; (2) identifying a facially neutral law or policy that has been applied in an intentionally discriminatory manner; or (3) alleging that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus.

*Turkmen*, 789 F.3d at 252 (quotations and alterations omitted); *accord Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2nd Cir. 1999). In *Iqbal*, the plaintiffs advanced the third theory—that a facially neutral policy was motivated by discrimination and had a discriminatory effect. Here, Plaintiffs plead facts establishing the first: that Defendants had an express policy of surveilling Muslims on the basis of their religion. Once a plaintiff shows that a government official has made a facially discriminatory classification on the basis of religion, that constitutes intentional discrimination that is subject to strict scrutiny under the Establishment, Free Exercise, or Due Process Clauses.[35]

### i. *Establishment Clause*

The Establishment Clause clearly forbids the type of explicit discrimination on the basis of religion at issue in this case. "In the course of adjudicating specific cases, [the Supreme Court] has come to understand the Establishment Clause to mean that government... *may not discriminate among persons on the basis of their religious beliefs and*

---

[35] As *Lukumi* recognized, facial religious discrimination is "not often at issue" in the cases addressed by the Court. 508 U.S. at 533. Indeed, most of the Court's Free Exercise cases have not involved religious discrimination at all, but instead involved the burdens placed on religious exercise by neutral laws that plaintiffs did not suggest were discriminatorily motivated.

practices…" *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 590 (1989) (emphasis added); *see also Larson*, 456 U.S. at 244 ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

Defendants AAR devote several pages to application of the familiar, three-prong test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), *see* AAR Br. 53–56, but the Supreme Court has clearly stated that the *Lemon* test does not apply to facial discrimination against a particular religion. "[T]he [*Lemon*] 'tests' are intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions… that discriminate *among* religions." *Larson*, 456 U.S. at 252 (emphasis in original). Explicit preferences between religions "must be invalidated unless [they are] justified by a compelling governmental interest, and… closely fitted to further that interest." *Id.* at 246–47; *see also Sklar v. C.I.R.*, 549 F.3d 1252, 1256 n.3 (9th Cir. 2008).

Defendants AAR argue that this Court applied the *Lemon* test to uphold the validity of a "religiously motivated investigation" in *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1397 (9th Cir. 1994). *See* AAR Br. 4, 13, 48–49. But the investigation in *Vernon* was not "religiously motivated;" rather, it pursued neutral, anti-establishment interests. Following concerns that Vernon, an assistant police chief with Los Angeles Police Department and an outspoken elder of a Christian church, had given favorable treatment to LAPD officers and citizens who held similar religious views, had pressured LAPD officers to attend religious meetings; worked to thwart the promotion of gay, lesbian, and female officers because of his religious beliefs; and had

78

used religious symbols in official correspondence, the City undertook an investigation into whether Vernon had improperly imposed his religious views through his LAPD position. As this Court noted, "[m]ost importantly, it is undisputed that the defendants' actions were aimed at determining whether Vernon's alleged on-duty conduct violated the Establishment Clause." *Id.* at 1397. Vernon sued, alleging that the investigation violated the First Amendment.

Like many other cases on which Defendants rely for application of the *Lemon* test, *Vernon* involved government action in pursuit of anti-establishment interests.[36] The Supreme Court has recognized that government action aimed at avoiding Establishment Clause violations is neutral conduct that does not discriminate among religions and, therefore, does not trigger strict scrutiny under *Larson. Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 339 (1987) ("*Larson* indicates that laws discriminating among religions are subject to strict scrutiny, and that laws 'affording a uniform benefit to all religions' should be analyzed

---

[36] *See also Nurre v. Whitehead*, 580 F.3d 1087, 1090 (9th Cir. 2009) (holding school officials' refusal to allow school band to play religious-themed songs in graduation program did not violate Establishment Clause); *Kreisner v. City of San Diego*, 1 F.3d 775, 779 (9th Cir. 1993) (city did not violate Establishment Clause by allowing private group to put on overtly religious holiday display in park's public forum through permit available on first-come, first-serve basis).

While the Ninth Circuit employed *Lemon* in one case that arguably involves discrimination against a religious group, *see Catholic League for Religious & Civ. Rights v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1047 (9th Cir. 2010) (addressing denunciation of Catholic church's stance on same sex adoption), the court appears to have assumed rather than held that the test applies, because none of the fragmented opinions in that case mention *Larson* or address whether *Lemon* should apply.

79

under *Lemon*.... [W]here a statute is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion, we see no justification for applying strict scrutiny to a statute that passes the *Lemon* test.") (citations omitted). Indeed, as *Vernon* recognized, even under *Lemon*, "[i]t is well-established that governmental actions primarily aimed at avoiding violations of the Establishment Clause have a legitimate secular purpose." 27 F.3d at 1397. Nor was the investigation "religiously motivated," as Defendants suggest, in the sense of targeting one religion over others. The Court in *Vernon* did not suggest that City officials investigated Vernon's potential Establishment Clause violations more aggressively than they would have had he belonged to some other religion. Thus, *Vernon* did not treat the investigation as "religiously motivated," as Defendants suggest, and therefore analyzed under *Lemon*, not *Larson*.[37]

In contrast, Plaintiffs allege that Defendants surveilled them because they believed Muslims more likely to engage in terrorism. *See, e.g.*, ER 206–09. Such an investigation does not serve a neutral, anti-establishment interest and it unquestionably does discriminate among religions, triggering strict scrutiny under *Larson*.

Even if the *Lemon* test did apply, the allegations more than satisfy it. First, while

---

[37] Moreover, *Vernon* did not even mention *Larson* or its holding that strict scrutiny applies to conduct that facially discriminates among religions. Defendants cannot argue that *Larson*'s prohibition of facial religious discrimination would be muddied by a case involving a government inquiry into establishment clause violations that nowhere mentions *Larson* or the principle it established.

fighting terrorism may be a valid secular purpose, the dragnet investigation of a religious group (absent any indication of criminal or terrorist activity) alleged here does not clearly advance such a secular purpose and raises the specter that the alleged purpose is a "sham," *see McCreary Cnty.*, 545 U.S. at 864. Second, the sweeping investigation of all Muslims on the basis of their religion conveys a message of disapproval that violates the Establishment Clause's prohibition on "making adherence to a religion relevant in any way to a person's standing in the political community." *Cnty. of Allegheny*, 492 U.S. at 594. The agents' assertion that "Islam is a threat to national security" confirms that the alleged policy violates *Lemon*'s second prong. ER 215. Finally, this Court has continually noted that "comprehensive, discriminating, and continuing state surveillance of religion" like that alleged here constitutes the kind of entanglement forbidden by *Lemon*'s third prong. *See Vernon*, 27 F.3d at 1399.

ii.   *Free Exercise Clause*

Similarly, allegations of facial religious discrimination trigger strict scrutiny under the Free Exercise Clause. Indeed, *Iqbal* itself relied on *Lukumi*, in which the Court held that the Free Exercise Clause requires that government action that is not "neutral and of general applicability… must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi,* 508 U.S. at 531–532; *see also Smith*, 494 U.S. at 886 n.3 ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, or on the content of speech, so

too we strictly scrutinize governmental classifications based on religion."); *Braunfeld v.*
*Brown*, 366 U.S. 599, 607 (1961) ("If the purpose or effect of a law is to… discriminate
invidiously between religions, that law is constitutionally invalid even though the
burden [on religion] may be characterized as being only indirect."); *accord Gillette v.*
*United States*, 401 U.S. 437, 462 (1971); *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951)
(denial of permit to Jehovah's Witnesses, subject to strict scrutiny); *cf. Fowler v. Rhode*
*Island*, 345 U.S. 67 (1953) (holding that discriminatory application of an ordinance
barring public preaching in parks to Jehovah's Witnesses, when the same law was not
enforced against Catholics or Protestants, violated the Free Exercise Clause).

 Defendants AAR again apply the wrong analysis by utilizing the "substantial
burden" test for Free Exercise claims.[38]  The "substantial burden" test has never
applied to facial, intentional discrimination. Where the Supreme Court has confronted

---

[38] Because *Vernon* did not involve facial discrimination against a particular religion like
that alleged here, its application of the substantial burden test is irrelevant to this case.
27 F.3d at 1398. Additionally, while the panel rejected Vernon's argument that his
claims should be analyzed as a non-neutral law under *Smith*, *see id.* at 1393 n.1, it did so
on the ground this Court had earlier held *Smith* inapplicable to non-criminal cases. *See*
*id.* (citing *NLRB v. Hanna Boys Ctr.*, 940 F.2d 1295, 1305 (9th Cir. 1991)). But this
Court has since rejected the rule on which the *Vernon* court relied. *See Miller v. Reed*,
176 F.3d 1202, 1207 (9th Cir. 1999) (characterizing *Hanna Boys* as dicta and holding
"*Smith* is not limited to challenges to criminally prohibited conduct").
 In *Am. Family Ass'n v. City & Cnty. of San Francisco*, 277 F.3d 1114, 1124 (9th
Cir. 2002), this Court applied the "substantial burden" test to analyze local resolutions
that condemned anti-gay messages on grounds that courts had not applied *Lukumi* to
a case addressing a "non-regulatory or non-compulsory government action." But the
present case presents government action far beyond mere issuance of a resolution.
And while the resolutions did not discriminate against any particular religion, the
Supreme Court's subsequent citation to *Lukumi* in *Iqbal* makes clear that *Lukumi*
governs in cases addressing religious discrimination by law enforcement.

explicit, facial discrimination against a particular religious sect, it has applied strict scrutiny. In *Fowler*, the Court held that discriminatory application of an ordinance barring public preaching in parks to Jehovah's Witnesses, when the same law was not enforced against Catholics or Protestants, violated the Free Exercise Clause. Because the evidence "plainly show[ed] that a religious service of Jehovah's Witnesses is treated differently than a religious service of other sects. That amounts to the state preferring some religious groups over this one." *See id.* 345 U.S. at 69.

No Supreme Court case in decades has addressed the kind of explicit discrimination against a particular religion at issue in *Niemotko* and *Fowler*. *See Lukumi*, 508 U.S. at 533 (noting that principles barring facial discrimination are "not often at issue in [the Court's] Free Exercise Clause cases"). However, federal appellate courts have repeatedly reiterated that strict scrutiny, not the "substantial burden" test, applies in such cases. *See Am. Family Ass'n v. City & Cnty. of San Francisco*, 277 F.3d 1114, 1124 (9th Cir. 2002) ("Under *Smith* and *Lukumi*, however, there is no substantial burden requirement when government discriminates against religious conduct."); *accord Hartmann v. Stone*, 68 F.3d 973, 979 & n.3 (6th Cir. 1995); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006); *cf. Wirzburger v. Galvin*, 412 F.3d 271, 281 & n.4 (1st Cir. 2005) (holding challenged statute would not be subject to strict scrutiny in part because it did not "discriminate on the basis of religious belief or status"); *see also Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 804 (9th Cir. 2011) (reversing grant of summary judgment for defendants where there was evidence plaintiffs had

been "treated differently because of their religious status").

Accordingly, under the Free Exercise Clause, as with the Establishment Clause, Plaintiffs must show that the FBI's actions were not neutral, in that they intentionally discriminate on the basis of religion, and that they were not justified by a compelling interest. They need not show any separate burden on religion.[39]

### iii.    *Equal Protection Component of Due Process Clause*

Both the Supreme Court and this Court have recognized that classification on the basis of religion violates equal protection unless it satisfies strict scrutiny. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (holding that government may not base decision to prosecute on "an unjustifiable standard such as race, religion, or other arbitrary classification"); *accord Miller v. Johnson*, 515 U.S. 900, 911 (1995); *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001) (under Equal Protection Clause, where government "employs a suspect class (such as race, religion, or national origin)…, then courts must apply strict scrutiny"); *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997) ("The Constitution's equal protection guarantee ensures that [government] officials cannot discriminate against particular religions."), *overruled on other grounds as recognized in Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). The law in other circuits is the same. *See, e.g., Turkmen*, 789 F.3d at 252–59 (allowing claim alleging religious discrimination in conditions of confinement under equal protection

---

[39] Even if the allegations were required to show a "substantial burden," they do. *See infra*, II.C (addressing "substantial burden" under RFRA).

84

component of the Due Process clause); *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008) ("The [Supreme] Court has called neutral treatment of religions 'the clearest command of the Establishment Clause.' Such discrimination is forbidden by the Free Exercise Clause as well. The Court has suggested that the Equal Protection Clause's requirement is parallel."); *Sweet v. Sec'y, Dept. of Corr.*, 467 F.3d 1311, 1319 (11th Cir. 2006); *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998).[40]

To state an equal protection violation under the Fifth Amendment, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Iqbal*, 556 U.S. at 676. The Second Circuit's decision in *Turkmen* shows how the analysis proceeds. There, plaintiffs claimed that defendants had subjected them to harsh detention conditions during the 9/11 investigation because they were Muslim. The court examined the allegations to determine whether they alleged purposeful discrimination. *Id.* at 252–59. Finding that they did, the court held plaintiffs stated a claim of religious discrimination and rejected defendants' motion to dismiss. *Id.*

Defendants AAR argue that the Equal Protection claim should be dismissed because courts have recognized that "[i]t is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the

---

[40] Several cases suggest that discrimination on the basis of religion is simply unconstitutional, without even applying strict scrutiny. *See e.g.*, *Turkmen*, *supra*. Here, the Court need not resolve the question because Defendants have offered no serious argument that targeting Muslims simply because they are Muslim, or treating Islam as itself suspicious, would pass strict scrutiny. There is certainly no argument to that effect sufficient to justify granting a motion to dismiss.

equal protection guarantee, because the substantive guarantees of the [First] Amendment serve as the strongest protection against the limitation of these rights." *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001). But it hardly follows from *Orin* that Plaintiffs' Equal Protection claim must be dismissed. Rather, *Orin* concluded that a plaintiff's Equal Protection claim is "subsumed by, and co-extensive with, his First Amendment claim." *Id.* Because Plaintiffs have stated a claim for religious discrimination under the First Amendment, they have also stated an Equal Protection claim.

### iv. *The Ban on Religious Discrimination is Clearly Established*

The Constitution's prohibition on facial religious discrimination has long been clearly established. Supreme Court cases dating back sixty years to *Fowler* and *Niemotko* establish that government actors may not intentionally discriminate against a religious group because of its religion—period. The Supreme Court has applied this principle in contexts as diverse as the issuance of permits, *Niemotko*, enforcement of criminal laws, *Fowler*, and selective prosecution, *Armstrong*, 517 U.S. at 464 (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)), and has repeated throughout its cases the mantra that classifications on the basis of religion are subject to strict scrutiny. *See, e.g.*, *Smith*, 494 U.S. at 886 n.3.

The fact that the Supreme Court has never squarely held that intentional religious discrimination is also forbidden in undercover law enforcement investigations does not entitle Defendants to qualified immunity. The Supreme Court

and this Court have repeatedly stated the rule that discrimination among religions is subject to strict scrutiny, without any suggestion that the rule is subject to exceptions. It is irrelevant whether any case applies that rule in the narrow context of undercover law enforcement investigations, because it has been applied universally to so many others. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful") (quotations omitted). "To be established clearly,… there is no need that the very action in question have previously been held unlawful." *Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 377 (2009) (quotation omitted).

> b. The Complaint Alleges Facial Discrimination Against Muslims

Defendants AAR make a half-hearted argument that Plaintiffs have failed to allege that Defendants acted "not for a neutral, investigative reason but for the purpose of discriminating on account of… religion." AAR Br. 71–72. But Plaintiffs' lengthy complaint is replete with allegations that Defendants did not simply conduct an investigation that happened to disproportionately affect Muslims; rather, they embarked on an investigation that explicitly targeted Muslims—discrimination that is facial and, therefore, intentional.

According to the complaint, the central and explicit purpose of Defendants'

undercover operation was to conduct surveillance and gather information simply on Muslims in Orange County. *See, e.g.*, ER 207 (agents did not limit informant to specific targets, but "repeatedly made clear that they were interested simply in Muslims"); ER 225 ("Islam is a threat to our national security."). To the extent they differentiated between targets, they told the informant to focus on Muslims who appeared more devout (for example, as demonstrated by a willingness to attend late evening or early morning prayers) because they were "more suspicious." ER 212; *see also* ER 207, 209, 211.

The complaint also alleges that Defendants consistently gave the informant instructions that made religion the primary criterion for suspicion by focusing explicitly on Muslims and the Muslim community, including through daily quotas on the number of Muslims he should get contact information from, ER 217, and through spying on lectures, classes, or any other events held at mosques. ER 211–212, 218. They discarded information inadvertently gathered on non-Muslims. ER 215. Overall, the complaint alleges with great specificity that Defendants were indiscriminate: they instructed the informant to unearth as much information about as many Muslims as possible through as many methods as possible, without specific targets. *See, e.g.*, ER 210–211.

These allegations are not mere "labels and conclusions" or "formulaic recitation of the elements of a cause of action," *cf. Iqbal*, 556 U.S. at 678, but rather detailed facts about what Defendants did, how they instructed the informant, and how

88

the investigation proceeded. While *Iqbal* requires only facts that "allow the court to draw the reasonable inference" that Defendants intentionally discriminated against Muslims, *see id.*, here no inference is necessary, because the complaint alleges that Defendants explicitly told the informant to discriminate against Muslims and that he followed these instructions in numerous ways.

   i. *Plaintiffs Need Not Show Facial Discrimination Arose from Malevolent Motives*

  While a plaintiff alleging that a *neutral* policy is actually discriminatory must plead facts from which a court can infer that it was adopted "not for a neutral, investigative reason but for the purpose of discriminating on account of… religion." *Iqbal*, 556 U.S. at 678, the *facial* discrimination at issue here itself proves the discrimination was intentional. *See Turkmen*, 789 F.3d at 252.

  Contrary to Defendants' suggestions, it does not matter whether Defendants acted with malice toward Plaintiffs or their religion. This should be obvious from the affirmative action cases, which trigger strict scrutiny even though there is unquestionably no malicious racial animus involved. *See Grutter*; *Gratz*, *supra*. As the Supreme Court has recognized, "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether [a practice] involves disparate treatment through explicit facial discrimination does not depend on why the [actor] discriminates but rather on the explicit terms of the discrimination." *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269, 271–72 (1993) (while noting that

"[d]iscriminatory purpose… implies more than intent as volition or intent as awareness of consequences," rejecting argument that "animus" requirement of 42 U.S.C. 1985 "can be met only by maliciously motivated, as opposed to assertedly benign (though objectively invidious), discrimination").

In short, it does not matter whether Defendants were motivated by a desire to prevent terrorism. The goal of preventing terrorism, though laudable in the abstract, is neither incompatible with, nor a justification for, the unconstitutional singling out of Muslims in a counterterrorism investigation.

      ii.    *This Court Must Subject Facial Religious Discrimination to Strict Scrutiny Even If Defendants Also Relied on Other Factors*

To the extent Defendants suggest that strict scrutiny does not apply because religion was not the *sole* reason for their surveillance, that argument is meritless. Facial distinctions drawn on the basis of constitutionally suspect classifications receive strict scrutiny, even if the suspect classification is only one factor considered. In *Gratz*, the Court struck down a state university's admissions scheme where the race of applicants was only one of many factors considered. The Court applied strict scrutiny to the use of race as any part of the admissions decision, even though it was not the sole or even primary factor, reasoning that "all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized," such that a plaintiff "has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest of judicial scrutiny." 539 U.S. at 270. Facial classifications on the basis of religion are treated no

differently. *Smith*, 494 U.S. at 886 n.3 ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, or on the content of speech, so too we strictly scrutinize governmental classifications based on religion.").[41]

### c. Defendants' Facial Discrimination Fails Strict Scrutiny

Defendants have presented no argument or evidence that could establish that the facial religious classification at issue here survives strict scrutiny. Defendants AAR argue that Defendants had a compelling interest, because their investigation was related to terrorism and "[i]t is obvious and unarguable that no governmental interest is more compelling than the security of the Nation," AAR Br. 51 (citing *Haig v. Agee*, 453 U.S.), and suggest that the complaint does not allege that the investigation was not "narrowly tailored" to the government's interest in preventing terrorism. *Id.* at 52–53.

While the "security of the Nation" may be compelling in the abstract, under strict scrutiny, "ambiguous proof will not suffice," *Brown v. Entm't Merchs. Ass'n*, __ U.S. __, 131 S. Ct. 2729, 2739 (2011), and "[m]ere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 543 (1980); *see also, e.g., Bernal v. Fainter*, 467 U.S. 216, 228 (1984) ("Without a factual underpinning, the State's asserted interest lacks the weight we have required of interests properly denominated as compelling."). Nothing in the complaint suggests

---

[41] Defendants argued below that the complaint's allegations revealed non-discriminatory justifications for surveilling each Plaintiff. They have wisely abandoned that spurious argument here.

Defendants had any factual basis to believe there was any threat to the security of the nation before the investigation was launched, nor did any prosecution arise from the investigation other than a single charge of naturalization fraud, which the government itself dismissed. ER 224.

More importantly, even were the government interests at stake compelling, the use of Islam *itself* as a basis for dragnet surveillance cannot be "closely fitted to further" the government's interest in preventing terrorism. *Larson*, 456 U.S. at 247; *see also Lukumi*, 508 U.S. at 546; *see also United States v. Montero-Camargo*, 208 F.3d 1122, 1134–1135 (9th Cir. 2000) (rejecting use of race as factor in law enforcement stops).[42] Plaintiffs have clearly pled facts sufficient to establish that Defendants' actions were not narrowly tailored.

### 3. The Complaint Establishes that the Supervisory Defendants Are Liable For Intentional Discrimination and Unlawful Searches

Defendants Tidwell, Walls, and Rose argue that while the allegations may demonstrate that the other individual defendants (Armstrong and Allen) intentionally discriminated against Muslims and engaged in unlawful searches, they do not show that Tidwell, Walls, and Rose as supervisors, should be held liable for these violations, because the complaint does not "allow[] the court to draw the reasonable inference"

---

[42] Defendants AAR's suggestion that the investigation is narrowly tailored to fight terrorism because use of an informant does not violate the Fourth Amendment, AAR Br. 52, defies logic. Religious discrimination is barred by the First and Fifth Amendments, whether or not the investigative techniques used also violate the Fourth Amendment. *Cf. Whren*, 517 U.S. at 813; *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir. 2002).

that these supervisors had the requisite intent to be liable for religious discrimination or unlawful searches. TW Br. 23–26; AAR Br. 42–45. This argument both mistakes the law on supervisory intent and ignores the detailed allegations establishing the supervisors' personal role in the operation that caused Plaintiffs' injuries.

While supervisors may not be held liable under a *respondeat superior* theory, "direct, personal participation is not necessary to establish liability for a constitutional violation." *Al-Kidd v. Ashcroft*, 580 F.3d 949, 965 (9th Cir. 2009), *rev'd on other grounds in* 131 S. Ct. 2074 (2011). Under *Bivens*, "[s]upervisors can be held liable for the actions of their subordinates (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional deprivation by subordinates; or (4) for conduct that shows a reckless or callous indifference to the rights of others." *Id.* (quotations omitted).

As this Court has recognized, the mental state required to hold supervisors liable turns on the nature of the constitutional tort. *See OSU Student Alliance v. Ray*, 699 F.3d 1053, 1073–74 (9th Cir. 2012); *Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011) (holding that supervisors could be held liable for deliberate indifference on Eighth Amendment claim); *Iqbal*, 556 U.S. at 676 ("The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue.").

a.  The Supervisors Are Liable For Intentional Discrimination

For a claim of intentional discrimination, a plaintiff must plead and prove that the supervising defendant possessed the requisite intent by acting with discriminatory purpose. *Iqbal*, 556 U.S. at 675. A "plaintiff can show intentional discrimination by… pointing to a law or policy that expressly classifies persons on the basis of a suspect classification," without separately proving the express classification was motivated by discriminatory animus. *Turkmen*, 789 F.3d at 252; *see also Adarand Constructors*, 515 U.S. at 213. Because it is sufficient to prove that directly involved defendants knowingly engaged in facial discrimination, it is sufficient to show the same mental state for supervisors—that they knowingly acquiesced in facial discrimination by their subordinates.

In *OSU Student Alliance*, this Court held that supervisors could be held liable for free speech violations based solely on "knowledge and acquiescence" in violations, for two reasons:  first, because under "black-letter law," "the government may violate the speech clause even if it acts without the purpose of curtailing speech. Free speech claims do not require specific intent." 699 F.3d at 1071, 1073, 1074; and second, because the Supreme Court has found constitutional torts require specific intent only in "limited situations." *Id.* at 1074.[43] As *OSU Student Alliance* recognized, "[w]hen a

---

[43] While *OSU Student Alliance* listed "invidious discrimination" as one of those circumstances, it discussed only discrimination challenges to neutral schemes allegedly applied in a discriminatory manner, which do require proof of subjective intent to discriminate. *See id.* (citing *Washington v. Davis*, 426 U.S. 229 (1976) (holding that

supervisory official advances or manages a policy that instructs its adherents to violate constitutional rights, then the official specifically intends for such violations to occur. Claims against such supervisory officials, therefore, do not fail on the state of mind requirement, be it intent, knowledge, or deliberate indifference." *Id.* at 1076 (following *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)). Because there are ample allegations to render plausible that Rose, Tidwell, and Walls managed an investigation that they knew explicitly targeted Muslims, Plaintiffs need make no further allegations of discriminatory intent.

Defendants point to *Iqbal*, arguing that Plaintiffs' allegations about the involvement of Rose, Walls, and Tidwell mirror the allegations in *Iqbal* against Attorney General Ashcroft and FBI director Mueller, which the Court held insufficient to state a claim of religious discrimination. But plaintiffs in *Iqbal* did not point to an explicit policy of religious discrimination that would have showed discriminatory purpose, and the Court held that the mere fact the 9/11 investigation disproportionately swept up Arabs and Muslims "should come as no surprise" given that Al Qaeda and the hijackers were overwhelmingly Arab Muslims, so that allegations of disparate effect on Arab Muslims did not plausibly suggest discriminatory intent. *See id.* at 1951–52. Moreover, *Iqbal* reasoned that Plaintiff had not alleged that Ashcroft and Mueller had participated in the decision of how to

---

facially neutral job examination was not unconstitutionally discriminatory solely because it had a disproportional impact on black applicants)).

classify his detention. Thus, their mere approval of facially nondiscriminatory policies under which the detentions took place did not support an inference they had acted for the purpose of discriminating against Muslims. *Iqbal*, 556 U.S. at 682.

Plaintiffs' religious discrimination claim differs fundamentally from the one discussed in *Iqbal*, because there is no need to *infer* discriminatory intent here. Plaintiffs allege an investigation that, on its face, explicitly discriminated on the basis of religion, and so itself evinces discriminatory intent. This case would be comparable to *Iqbal* only if the plaintiff there had a sworn declaration from an agent working in Mr. Ashcroft's office describing his plan to explicitly target Muslims for harsh treatment while in detention.

Thus, the only question the Court need answer for purposes of supervisory liability is whether the complaint pleads facts sufficient to render it "plausible" that Tidwell, Walls, and Rose knew of and approved the "central feature" of the operation—that it explicitly and intentionally focused on Muslims. *OSU Student Alliance*, 699 F.3d at 1076; *Al-Kidd*, 580 F.3d at 965. The complaint easily passes that test, and indeed alleges far more about the roles of Tidwell, Walls, and Rose than what plaintiffs in *Iqbal* pled about Mueller and Ashcroft.

The complaint alleges that Tidwell, Walls, and Rose "actively monitored, directed, and authorized the actions of Agents Armstrong and Allen and other agents at all times relevant in this action, for the purpose of surveilling Plaintiffs and other putative class members because they were Muslim," and "maintained extremely close

oversight and supervision of [the informant]." *See* ER 185–87. Defendants suggest that these allegations are conclusory, but they are based on evidence submitted with the complaint itself. *See generally* ER 85–138 (informant declarations).

Even apart from the evidence already submitted, the complaint provides ample supporting allegations to render these conclusions plausible. First, the complaint alleges a major undercover counterterrorism investigation that stretched over more than a year and resulted in the payment of tens or hundreds of thousands of dollars to a convicted felon sent into a Muslim community to pose as a convert. ER 206–207, 219, 225, 227. The cost, duration, and sensitivity of the operation alone render "plausible" that the immediate supervisors would review and approve the instructions given the informant. The complaint also alleges that the lead agents stated that the informant was "gold" in Los Angeles and Washington, that information from the operation was followed by people "at the highest levels," and that the operation was among the ten most important intelligence investigations going on in the country. ER 221–222. The complaint alleges that the informant recorded all his conversations, which were subsequently transcribed, and provided detailed daily notes of his activities that contained "virtually everything he did and all the information he had obtained." ER 215–216, 220. Not only is it plausible that supervisors would review these notes to monitor the operation, but the complaint alleges that supervisory Defendants did, in fact, read those notes. ER 186–187, 220.

Second, the complaint alleges specific instances of direct involvement in the

operation by Tidwell, Walls, and Rose that go far beyond the mere setting of policy alleged in *Iqbal*:

Defendant Tidwell approved the operation in advance and the recruitment of an informant, according to statements by the investigating agents, Armstrong and Allen. ER 197–198. Armstrong and Allen also told the informant that Tidwell, specifically, read all his daily notes. ER 220.

Defendant Walls was a "direct supervisor" of the agents involved, and as such read the informant's daily notes. ER 186, 220. She was involved enough that an audit team was at one point sent to examine her handling of the investigation, that she came to distrust the informant and disagreed with field agents over how to handle the operation, ultimately ordering Allen and Armstrong to cease using the informant, and that she attended one of the final meetings with the informant. ER 186, 223.

Defendant Rose was also a "direct supervisor" of the agents involved, and as such read the informant's daily notes. ER 185–186, 220. Rose also sought authorization to expand the scope of the surveillance program, in an effort to create a "Muslim gym" that the FBI would use to gather yet more information about Plaintiffs and the putative class. ER 186–187. Allen flew to Washington, D.C. with Rose to meet with high-level FBI officials to get approval to open a gym that would function in part as a mosque with a prayer room. Allen told the informant that approval to open the gym had been granted. ER 186–187.

These detailed allegations of supervisor's specific knowledge of and

participation in the investigation sharply distinguish this case from those like *Iqbal* and *Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012), where the only allegations of supervisory liability were wholly conclusory.

Third, the complaint reveals significant structural differences between the positions of Tidwell, Walls, and Rose here and Mueller and Ashcroft in *Iqbal.* Rather than being the heads of agencies allegedly involved only in setting policy, the supervisory Defendants directly oversaw the operation in question: Rose supervised counter-terrorism operations in the FBI's Santa Ana branch office, Walls supervised the FBI's Santa Ana branch office, and Tidwell headed the Los Angeles field office. ER 185–187. As the complaint alleges, the Los Angeles field office is a small part of the FBI, one of the 56 field offices that the agency maintains in addition to its national headquarters, specialized facilities, more than 400 smaller "resident agencies," and 60 international offices. ER 185–187. The Santa Ana branch office is one of ten satellite branch offices in the Los Angeles field office. ER 186. The fact that they were much closer in the chain of command to the prolonged discrimination renders plausible the allegations that they knew of its facially discriminatory character.

Finally, Plaintiffs' claim that supervisors approved an operation with a facially discriminatory focus cannot be itself implausible in light of allegations that the FBI had, for several years prior to the events in question, employed policies and practices that explicitly focused on Muslims and Islam, *see, e.g.*, ER 187–194, and utilized training that equated Islam with terrorism, ER 194–195; *supra,* n.3.

### b. The Supervisors Are Liable For Unlawful Searches

Because an officer's subjective intent is generally irrelevant under the Fourth Amendment (and FISA), *Nunez v. Duncan*, 591 F.3d 1217, 1228 (9th Cir. 2010), no additional showing of intent is necessary as to the search claims. Like a restriction on speech in violation of the First Amendment, which requires no specific intent so that a supervisor is liable simply for knowing acquiescence, *OSU Student Alliance*, 699 F.3d at 1071, 1073, 1074, a supervisor is liable for knowingly acquiescing in unlawful searches.

The complaint alleges specifically that in the informant's daily notes (which Tidwell, Walls, and Rose read), he specifically wrote down that he recorded conversations where he was not present and searched through the drawers at mosque offices when he found himself alone there. ER 218, 232–33. Nothing more is required to establish supervisory liability on the search claims.

Defendants TW argue that the complaint does not show a "sufficient causal connection exists" to hold the supervisors liable. TW Br. 27. But they rely on cases that refused to hold supervisors liable only where plaintiffs were unable to allege *any* knowledge of or personal involvement in constitutional violations. *Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 961 (9th Cir. 2010) (supervisor not aware of challenged arrest and not responsible for policy that governs challenged conduct); *Chavez*, 683 F.3d at 1111 (plaintiffs failed to allege any reason supervisor would have had reason to know that agents had "frequently stopped plaintiffs, much less that they

did so without reasonable suspicion").

Here, the detailed allegations with respect to Tidwell, Walls, and Rose on the religious discrimination claim make it equally plausible for the court "to draw the reasonable inference" that those Defendants knew of and approved ongoing Fourth Amendment violations.

### 4. Defendants Are Not Entitled To Qualified Immunity on Plaintiffs' RFRA Claims

Defendants argue that they are entitled to qualified immunity from the RFRA claims for three reasons, but their arguments are meritless.

Defendants argue that their conduct did not impose a "substantial burden" because, it did not force Plaintiffs "to choose between following the tenets of their religion and receiving a governmental benefit" or coerce them "to act contrary to their religion under the threat of civil or criminal sanctions." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008).

As the Supreme Court has recognized, "[u]nder some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes. A requirement that adherents of particular religious faiths or political parties wear identifying arm-bands, for example, is obviously of this nature." *Am. Commc'ns Ass'n, v. Douds*, 339 U.S. 382, 402 (1950).[44] By conducting surveillance on anyone who attends mosques,

---

[44] Because RFRA expressly adopted and restored federal court rulings on the

engages in certain religious practices, or identifies as Muslim, and then publicly revealing that surveillance, the FBI imposed just such a "discouragement" to mosque attendance and religious practice. While alleging a "subjective chilling effect" may not be sufficient to constitute a substantial burden under *Vernon*, 27 F.3d at 1394–95, plaintiffs here allege more than a mere chilling effect.

First, Plaintiffs experienced actual burdens on their religious activity. Because of the informant's intrusive questioning, Malik tried to avoid him to the point of staying away from the mosque. ER 234–235. Both Malik and AbdelRahim have altered their religious practice rather than risk continued surveillance, by decreasing their attendance at mosque and altering religiously motivated dress and grooming (Malik) and religiously prescribed donations (AbdelRahim). ER 234, 239. After Monteilh's status as an informant was revealed, Fazaga spent time that he would have spent in religious ministry addressing his congregants' fears about attending and participating in the mosque's services and activities. ER 231. Even under Defendants' cramped view of what constitutes a burden on free exercise, these allegations suffice.

Second, Plaintiffs do not allege only a chilling effect from some neutral government action (such as the improper religious influence in employment in *Vernon*)—they allege that the chill arises from explicit religious discrimination. In other constitutional contexts, such discrimination constitutes injury in itself sufficient

---

"substantial burden" inquiry prior to *Smith*, those cases govern RFRA analysis. *See Navajo Nation*, 535. F.3d at 1069.

for standing. *See, e.g.*, *Saenz v. Roe*, 526 U.S. 489, 505 (1999) (noting that where right "to be treated equally" is at stake, "discriminatory classification is itself a penalty"); *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 666 ("The 'injury in fact' in an equal protection case... is the denial of equal treatment resulting from the imposition of [a] barrier, not the ultimate inability to obtain the benefit."); *Allen v. Wright*, 468 U.S. 737, 755 (1984) ("There can be no doubt that [stigmatic injury caused by discrimination] is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing."). As the Supreme Court recognized in *Douds*, being subject to such explicit religious discrimination, even where the result is as harmless as wearing an armband, is itself a burden on religious practice.

Finally, by subjecting Muslims to surveillance at mosques, the FBI effectively made surveillance a *condition* of religious practice. A Muslim who wanted to practice at his or her chosen mosque would face the choice of refraining from religious practice or submitting to government surveillance. Under an investigation that targets all Muslims, investigation is effectively compulsory for those who choose to exercise their religion. *Cf. Vernon*, 27 F.3d at 1394. This burden is objective, not subjective.

Defendants AAR also argue that Plaintiffs' RFRA claim fails because Defendants' actions were narrowly tailored to a compelling interest, AAR Br. 52, but that is wrong for reasons Plaintiffs have already explained, *supra* II.B.4 .

103

## 5. *Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Claim under 42 U.S.C. 1985(3)*

Plaintiffs' lengthy and detailed allegations that Defendants targeted them for surveillance on the basis of their religion easily state a claim that Defendants "conspire[d]… for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. 1985(3). To state a claim under Section 1985(3), Plaintiffs must allege four elements: (1) a conspiracy (2) for the purpose of depriving, either directly or indirectly, Plaintiffs of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) that causes injury to plaintiffs. *Scott v. Ross*, 140 F.3d 1275 (9th Cir. 1998).

### a. Application of the Antitrust "Intracorporate Conspiracy" Doctrine to Section 1985 Claims Would Be Wholly Inappropriate

Defendants AAR argue that this Court should apply, in the Section 1985(3) context, the "intracorporate conspiracy" doctrine that courts have developed in antitrust law. Under that doctrine, employees of a single entity, acting within the scope of employment, generally cannot be held culpable for conspiring with each other to violate antitrust law. AAR Br. 59–61.

However, this Court has held that the applicability of intracorporate conspiracy doctrine to other types of conspiracies (beyond antitrust) depends upon the type of activity the statute at issue is designed to prohibit, and its application of that rule makes clear that the doctrine does not apply here. In *Webster v. Omnitrition International*,

the Ninth Circuit held the intracorporate conspiracy doctrine does not apply to conspiracies under RICO, because while "a conspiracy 'in restraint of trade' between [a subsidiary and its parent] poses no threat to the goals of antitrust law-protecting competition… [,] intracorporate conspiracies do threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits" 79 F.3d 776, 787 (9th Cir. 1996) (*quoting Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989)).

While this Court has not explicitly addressed whether the intracorporate conspiracy doctrine extends to civil rights claims under Section 1985, *see Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 910 (9th Cir. 1993) (noting circuit split and reserving question), *Webster*'s logic clearly compels the conclusion that it does not apply here. Section 1985, known as the Ku Klux Klan Act of 1871, was designed to "prevent[]… deprivations which shall attack the equality of rights of American citizens." *Bray*, 506 U.S. at 268. Unlike antitrust law, which prohibits anticompetitive conduct by corporate entities, "the conspiracy in a § 1985(3) claim is focused on the discriminatory conduct of the individuals involved" and therefore remains actionable "regardless of whether the defendants were acting as individuals or in the course and scope of their employment." *Rashdan v. Geissberger*, 2011 U.S. Dist. LEXIS 4792, at 19 (N.D. Cal. Jan. 14, 2011). Indeed, applying the doctrine to Section 1985 would have the effect of putting discriminatory law enforcement conspiracies outside the reach of Section 1985—a goal that Congress cannot possibly have intended in 1866, when it

passed the statute in the wake of massive civil rights violations by state actors. *See*

*O.H. v. Oakland Unified Sch. Dist.*, 2000 U.S. Dist. LEXIS 21725, at 26 (N.D. Cal. Apr.

17, 2000) (recognizing that application of intracorporate conspiracy doctrine to

Section 1985 "would immunize official policies of discrimination from scrutiny").

District courts in this circuit have rejected application of the intracorporate conspiracy

doctrine to Section 1985 conspiracies for this reason.[45] This Court should do

likewise.[46]

> b. <u>Plaintiffs Adequately Allege a Conspiracy Under Section 1985</u>

Defendants TW argue that Plaintiffs' complaint lacks the factual specificity to

establish that they entered an agreement to violate Plaintiffs' constitutional rights. TW

Br. 21. This assertion borders on the absurd. As discussed with respect to supervisory

---

[45] *See Rashdan,* 2011 U.S. Dist. LEXIS 4792; *Washington v. Duty Free Shoppers*, 696 F. Supp. 1323, 1326 (N.D. Cal. 1988) ("In the area of civil rights, a real danger exists from the collaboration among agents of a single business to discriminate. There is no reason to believe that discrimination by an individual business is less harmful than discrimination by multiple businesses, or that discrimination by a single business deserves to be protected because it confers any benefit on society."); *Rebel Van Lines v. Compton*, 663 F. Supp. 786, 792-793 (C.D. Cal. 1987); *Diem v. San Francisco*, 686 F. Supp. 806, 810 (N.D. Cal. 1988).

[46] Even were the intracorporate conspiracy doctrine applicable to Section 1985 claims generally, courts have held that "where various entities in a single institution have 'disparate responsibilities and functions,' a conspiracy claim could lie because the actions of those entities would not be 'actions of only one policymaking body.'" *See Turkmen*, 789 F.3d at 263 (holding intracorporate conspiracy did not bar Section 1985 claim for religious discrimination against multiple federal officials, because court could not conclude defendants "acted as members of a single policymaking entity"). Defendants here clearly had disparate responsibilities and functions, and therefore could be liable for conspiracy even under that narrower approach.

liability, *supra* Part II.B.3, Plaintiffs allege that Tidwell and Walls approved, oversaw, and supervised an investigation whose "central feature" was that it targeted Muslims on the basis of religion. And as set forth above, *see id.*, Plaintiffs have pled detailed, nonconclusory facts about these supervisors' specific roles and actions that easily satisfy the requirement that Plaintiff plead facts "plausibly suggesting… agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *see also Scott*, 140 F.3d at 1284 ("A conspiracy can be inferred from conduct and need not be proven by evidence of an express agreement." (quotation omitted)). Indeed, it is hard to know what facts a plaintiff could plead to satisfy the standard that Defendants suggest governs—a standard far beyond what Section 1985 requires.

Defendants AAR contend that Plaintiffs do not adequately plead that Defendants acted "for the purpose of depriving… [Plaintiffs] of the equal protection of the laws." AAR Br. 62–65 (citing *Bray*, 506 U.S. at 274). However, as described above, Plaintiffs have alleged that Defendants employed a facial classification on the basis of religion. *See supra* II.B.2.b. Thus, Plaintiffs allege "that some… invidiously discriminatory animus [lay] behind the conspirators' action." *Bray*, 506 U.S. at 268 (quotation and alteration omitted). *Bray* made clear that the "discriminatory animus" required for a Section 1985(3) claim need not be malicious—that the "assertedly benign (though objectively invidious), discrimination against women" would be actionable because it "focuses upon women by reason of their sex." *Id.* at 269–70; *see also Johnson Controls*, 499 U.S. at 199; *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir.

2000) (citing *Bray* and concluding that "an 'animus' requirement can be met not just by acts that are maliciously motivated, but also by acts arising out of assertedly benign or even affectionate (though objectively harmful) impulses.").

Courts have repeatedly applied this analysis to allow Section 1985(3) claims to proceed beyond the pleadings stage where plaintiffs have alleged that defendants were motivated by plaintiffs' membership in a protected class. *See, e.g., Bowen v. Rubin*, 2002 U.S. Dist. LEXIS 25283, at *8 (E.D.N.Y. May 17, 2002) (holding that plaintiffs "sufficiently alleged the required animus by alleging that they were targeted for the very reason of their group characteristic"); *see also Azar v. Conley*, 456 F.2d 1382, 1386 (6th Cir. 1972). Plaintiffs' allegations that Defendants targeted them for surveillance because of their religion establish the required animus for Plaintiffs' Section 1985(3) claim.

Defendants AAR place great weight on their argument that the complaint alleges "no deliberate disruption of their religious activities or other actions to dissuade members from attending services." AAR Br. 64. But the Supreme Court and this Court have repeatedly held that allegations of intentional discrimination constitute allegations of interference with a protected right sufficient to survive a motion to dismiss.[47] *See, e.g., Griffin v. Breckenridge*, 403 U.S. 88, 90–91 (1971) (holding

---

[47] *See also, e.g., Maynard v. San Jose*, 37 F.3d 1396 (9th Cir. 1994) (allowing Section 1985 claim to proceed where plaintiff alleged he was intentionally discriminated against based on race); *Johnson v. California*, 207 F.3d 650, 655 (9th Cir. 2000) (reversing dismissal of Section 1985(3) claim where plaintiff alleged policy of racial prison

Section 1985(3) claim sufficiently pled where African-American plaintiffs alleged that defendants engaged in a conspiracy to prevent them "from seeking the equal protection of the laws" on the basis of race); *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1450 (9th Cir. 1994), *overruled on other grounds as stated in Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001) (African-American's allegations that employer deprived him of equal protection by discriminating on the basis of race satisfied both the animus requirement and the denial of "his right to be free from improper racial discrimination").

Defendants cite at length the Supreme Court's decision in *Bray*, which notes that "the 'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." 506 U.S. at 275–76. But the complaint easily passes this test, as it alleges in great detail that Defendants intentionally discriminated against them by targeting them for investigation and surveillance because of their religion. *See supra* II.B.2.b.

## III. PLAINTIFFS STATE CLAIMS AGAINST THE FEDERAL GOVERNMENT DEFENDANTS

Plaintiffs also raise two sets of claims against the Government. They seek damages against the United States under the Federal Tort Claims Act, and also seek disclosure and expungement of two overlapping sets of records obtained in violation

---

segregation); *Scott*, 140 F.3d at 1284 (affirming jury verdict for plaintiff on Section 1985 claim that he was targeted because of religious affiliation).

of their statutory and Constitutional rights under the Privacy Act and under the Constitution itself. Like Plaintiffs' claims against the Individual Capacity Defendants, these claims clearly cannot be dismissed at the pleading stage given the complaint's specificity and the blatantly unlawful conduct that it alleges.

## A. Plaintiffs State a Claim Under the Federal Tort Claims Act

Plaintiffs allege three claims for damages against the United States under the Federal Tort Claims Act ("FTCA"), which provides that "the United States shall be liable… in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. 2674. Liability under the FTCA is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. 1346(b)(1); *see Hess v. United States*, 361 U.S. 314, 318 (1960) (applying state tort law to determine liability under FTCA).

### 1. The FTCA Claims Cannot Be Dismissed on State Secrets Grounds Because of the Possibility That They Implicate the Discretionary Function Exception

The Government makes a threshold argument for dismissal of the FTCA claims based on a combination of the state secrets privilege and the discretionary function exception, claiming that because the management of informants is generally a matter of discretion, its conduct with respect to this informant is therefore immune from all challenge under the FTCA. Govt. Br. 36–40. However, Plaintiffs do not allege mere "alarming instances of poor judgment," Govt. Br. 38, as the basis for their FTCA claim, but rather violations of governing law. The Government cannot dispute

110

that the FBI has no discretion to act in violation of governing law, including the

Constitution. *See* Pl. Br. 33–34 (citing, *inter alia*, *Nurse*, 226 F.3d at 1001).

The discretionary function exception therefore adds nothing to the analysis of

the district court's dismissal order. If Plaintiffs have plausibly alleged that Defendants

engaged in unlawful searches or discrimination, then the discretionary function

exception cannot shield the Government from liability. If the pleadings are

insufficient, then Plaintiffs lose whether or not their claims implicate discretionary

functions or require disclosure of state secrets. In its response, the Government

appears to acknowledge that its argument concerning the discretionary function

exception to FTCA liability collapses back into its other arguments. Govt. Br. 38

("[l]itigation of plaintiffs' FTCA claims is thus intertwined with the litigation of their

constitutional claims").

### 2. *Plaintiffs State an FTCA Claim Under Invasion of Privacy*

The Government does not contest that Plaintiffs have set forth a *prima facie*

case establishing an invasion of privacy under California tort law, including Section 1

of the California Constitution. It also has not disputed that the California

Constitution's privacy protection forbids the Government from compiling and

maintaining records based on Plaintiffs' religion. ER 247–248. These concessions are

significant. Even if the *methods* by which the FBI gathered information might not be

actionable under a common law invasion of privacy tort, the continued *maintenance* of

information about Plaintiffs, based on their religion and without articulable suspicion,

111

still violates the right to privacy in Article I, Section 1 of the California Constitution. That provision "prevents government and business interests from collecting and stockpiling unnecessary information." *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 17 (1994) (quoting ballot language); *see also id.* at 16 (noting that ballot language indicates intent behind right to privacy) and at 20–21 (noting that the initiative's "principal focus" was on "unnecessary information gathering" that suggests "government snooping, computer stored and generated 'dossiers' and 'cradle-to-grave' profiles on every American").

The Government does argue that because liability under the FTCA is determined by state law, and because "California case law has recognized that parties acting at the direction of law enforcement may lawfully record their own conversations," Govt. Br. 31, this Court should dismiss the claim for recordings made in the informant's presence. That argument fails for three reasons.

First, Plaintiffs' privacy tort claims are not based only upon the audio surveillance taken *in the informant's presence*. Rather, Plaintiffs allege in great detail a much broader pattern of privacy invasion that includes audio and video surveillance placed in homes and mosques, even when the informant was *not present*. ER 211–212, 215–217, 235, 237. The Government argues that Plaintiffs state no claim because the complaint does not allege that Defendants instructed the informant to record outside his presence. *See* ER 209–10, 216, 232–44. But the allegations more than render plausible that Defendants intended the informant to continue recording conversations

outside his presence: they had discussions with him about those recordings (in which they did not tell him recording outside his presence was unlawful), ER 218; they closely supervised him through constant recording and review of daily written notes, *id.*; including detailed notes regarding recording outside his presence, *id.*; and they told him that they did not always need warrants because information could still be useful even if it could not be used in court, and because "National security is different." ER 218–19.

Second, because the FTCA looks to state law to establish liability, including any privileges, immunities, or affirmative defenses, any "law enforcement privilege" available to Defendants must arise from California law. *See, e.g.*, *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004) (looking to California law on false arrest by law enforcement to determine liability for IRS agents under FTCA). While California Penal Code Section 632 bars recording confidential conversations "without the consent of all parties," Penal Code Section 633 provides that the provision does not prohibit law enforcement from "recording any communication that they could lawfully… record" before the provision's enactment, when California courts had held that law enforcement could record conversations with one party's consent. But importantly, any privilege under Section 633 is limited to *lawful* recording—so while recording conversations in which an informant participated might be lawful, the privilege does not extend to any recording that might *otherwise* violate state or federal law. *See supra,* II.B.1.a (arguing that informant's recordings violated Fourth Amendment even when

113

he was present, because investigation lacked good faith).[48] Nor does the Government argue that there is any privilege applicable to video recording, which is governed by a separate statute. *See* Cal. Civ. Code § 1708.8 (rendering law enforcement "liable for constructive invasion of privacy when the [officer] attempts to capture" video images "in a manner that is offensive to a reasonable person," unless "supported by an articulable suspicion"). Thus, under California law, the "invited informer" doctrine cannot shield the Government from liability for video surveillance.

Finally, although the Government's brief presupposes that federal officials may obtain the benefit of the privilege law governing state law enforcement officers for purposes of determining liability under the FTCA, recent Supreme Court and Ninth Circuit law have called that assumption into doubt. *See United States v. Olson*, 546 U.S. 43, 45–46 (2005) (holding that relevant question for purposes of FTCA liability was whether private party would be liable under state law, not whether state official would be liable); *Tekle v. United States*, 511 F.3d 839, 841 (9th Cir. 2007) (opinion of Tashima, J.) (arguing that *Olson* reverses pre-existing Ninth Circuit authority permitting federal law enforcement officials to benefit from state law enforcement privileges); *id.* at 857 (Fisher, J., concurring) (agreeing with Judge Tashima as to *Olson*, but arguing that the FTCA may nonetheless incorporate federal privilege law). Here, the federal

---

[48] The Government cites *People v. Windham*, 145 Cal. App. 4th 881 (2006), for the proposition that an informant acting at the direction of the government can record his own conversations, but that case reached no such holding and did not involve informants at all, but only telephone calls on a recorded jail phone line. *Id.* at 885.

government has not argued that any federal privilege shields it from liability.

### 3. *Plaintiffs State a Claim for Relief Under Cal. Civil Code Section 52.1*

Section 52.1 provides for a civil action against a defendant who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws" of California or the United States. Cal. Civ. Code § 52.1(a). Defendants argue they cannot have been employing intimidation and coercion because the surveillance was covert—and had it stayed covert, they might be right. But Defendants publicly revealed the surveillance. ER 224. By indiscriminately surveilling plaintiffs based upon their religious practices, beliefs and affiliation, and then revealing that surveillance, Defendants used intimidation and coercion to interfere with Plaintiffs' rights under the First and Fourteenth Amendments, as well as the analogous rights to religious freedom under the California constitution, creating Plaintiffs' fear that they would be subjected to increased law enforcement scrutiny if they continued to exercise their First Amendment rights. *See, e.g.*, ER 231 (describing Plaintiff's "constant fear of being under surveillance" and anxiety over "the scrutiny during travel"); ER 239 (describing how Plaintiff "has also been subjected to extensive secondary questioning and searches most of the times he has returned to the U.S. from trips abroad").

### 4. *Plaintiffs Have Sufficiently Alleged a Claim for Intentional Infliction of Emotional Distress*

The Government's argument that Plaintiffs have failed to plead sufficient facts to show they suffered severe or extreme emotional distress is also meritless.[49]

As the Government recognizes, the complaint alleges in detail the nature and severity of emotional distress Plaintiffs suffer. *See* Govt. Br. 34–35; ER 231 (describing how Plaintiff Fazaga "has suffered severe and ongoing anxiety and emotional distress" from his "constant fear of being under surveillance"); ER 234–235 (describing how Plaintiff Malik "has suffered severe and ongoing anxiety and distress" from the "interference with his religious practice" and his "constant fear of being under surveillance"); ER 239 (describing how Plaintiff AbdelRahim "has suffered severe and ongoing anxiety and distress" from the "interference with his religious practice" and his "constant fear of being under surveillance").

The Government argues that Plaintiffs allege distress that is insufficiently severe under California law and alleged with insufficient particularity. But California courts have long recognized that a plaintiff need not demonstrate that he or she has suffered "traumatic emotional distress of the character of shock, horror or nausea;" rather, "requisite emotional distress may consist of any highly unpleasant mental

---

[49] Under California law, the tort of intentional infliction of emotional distress has three elements: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Christensen v. Super. Ct.*, 54 Cal. 3d 868, 903 (1991).

reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry." *Fletcher v. Western National Life Ins. Co.*, 10 Cal. App. 3d 376, 397 (1970); *Esteem v. City of Pasadena*, 2007 WL 4270360, at *18 (C.D. Cal. Sep. 11, 2007) (citing *Fletcher*). Plaintiffs' allegations more than satisfy this standard, particularly given that "the duration of the emotional distress is one of the factors to be considered in determining its severity." *Fletcher*, 10 Cal. App. 3d at 398.

Moreover, allegations of government conduct as outrageous as those here certainly "allow[] the court to draw the reasonable inference" that Plaintiffs' allegations of severe emotional distress are "plausible." *Iqbal*, 556 U.S. at 678. The cases on which the Government relies involve far less egregious conduct; where the burden on the plaintiff to establish that severe emotional distress occurred was correspondingly higher. Govt. Br. 33–34; *see Hughes v. Pair,* 46 Cal.4th 1035, 1051 (2009) ("inappropriate comments" about defendant's physical attraction to plaintiff); *Pitman v. City of Oakland,* 197 Cal. App. 3d 1037, 1047–48 (1988) (plaintiff fired after defendant learned of his criminal history); *Beijing Tong Ren Tang (USA), Corp. v. TRT USA Corp.*, 2010 WL 98957, at *3 (N.D. Cal. Jan. 5, 2010) (vague threats made during a business dispute); *Hamilton v. Prudential Financial*, 2007 WL 2827792, at *4 (E.D. Cal. 2007) (cessation of disability benefits for plaintiff's alcoholism); *Sawhney v. Allstate Ins. Co.*, 1995 WL 500531, at *5–6 (C.D. Cal. 1995) (denial of plaintiff's home insurance claim).

117

5. *The FTCA Judgment Bar Does Not Preclude Plaintiffs' Claims Against the Individual Capacity Defendants*

Contrary to Defendants' claims, *see* AAR Br. 39–40; TW Br. 31–33; Govt. Br. 40–42; the court's judgment on Plaintiffs' FTCA claims does not bar their *Bivens* claims against the individual defendants, as a straightforward reading of the authority on which Defendants rely makes clear. No court has held that judgment *in favor* of the government would trigger the bar when the claims are brought *in the same action*, and the rationale behind the rule and this Court's cases applying it foreclose that result.

Under this Court's caselaw, Section 2676 of the FTCA operates to preclude recovery against individual defendants in two circumstances: (1) where the claims against the government and individual defendants are brought as part of the same action, and the plaintiff obtains a recovery against the government. *See Kreines v. United States,* 959 F.2d 834, 838 (9th Cir. 1992), and (2) where the plaintiff brings a *subsequent action* against individual defendants after losing his suit against the government, *see Gasho v. United States*, 39 F.3d 1420, 1437–38 (9th Cir. 1994). These two circumstances mirror the two purposes of the judgment bar—to avoid "dual recoveries" given their obvious unfairness, *Kreines*, 959 F.2d at 838, and to mitigate the risk of "multiple suits" and instead promote "judicial economy" by "encourage[ing]" plaintiffs "to pursue their claims concurrently in the same action, instead of in separate actions," *Gasho*, 39 F.3d at 1437–38.

By contrast, in this case Plaintiffs have brought their claims as part of the same action (rather than in two separate actions), and they have *not* recovered against the

Government. This Court addressed precisely this circumstance in *Kreines*, when it "held that an FTCA judgment in favor of the government did not bar the *Bivens* claim when the judgments are 'contemporaneous' and part of the same action." *Gasho*, 39 F.3d at 1437 (discussing *Kreines*). Contrary to Defendants' suggestions, this Court has never applied Section 2676 in such circumstances, because it has only applied the bar to preclude the possibility of "dual recoveries" or "multiple lawsuits"—neither of which is present here. *See Gasho*, 39 F.3d at 1437–38; *Kreines*, 959 F.2d at 838 ("The statutory bar was conceived by Congress primarily to prevent dual recoveries arising from additional, subsequent litigation."); *see also Levin v. United States*, __ U.S. __, 133 S. Ct. 1224, 1228 (2013) (characterizing the judgment bar as precluding subsequent actions after a successful suit against the government); *Ting v. United States*, 927 F.2d 1504, 1513 n.10 (9th Cir. 1991) (a plaintiff "may not receive double recovery," as "judgment *against* the government will completely bar any *subsequent* action against the individual officers") (emphasis added). The authorities Defendants cite are all consistent with this rule and the underlying purposes of the judgment bar. *See Kreines*, 959 F.2d at 835–36, 838 (judgment bar did not apply where plaintiffs filed claims as part of same suit and there would be no dual recovery); *Arevalo v. Woods*, 811 F.2d 487, 490 (9th Cir. 1987) (bar applied where plaintiffs had already won recovery under FTCA); *Gasho*, 39 F.3d at 1437–38 (bar applied because plaintiff filed subsequent lawsuit against individual defendants after losing against federal government under FTCA). Because here there is no possibility of either dual recovery or repeat litigation,

Section 2676 does not insulate the individual defendants from liability.

Defendants claim that, to avoid the bar, a plaintiff requires a "favorable judgment against individual defendants before or together with the [unfavorable] FTCA judgment," Gov't Br. 40; *see also* TW Br. 32. But no case they cite creates an additional requirement that the district court's rulings come at the same stage of proceedings within the same case, and such a requirement finds no support in either the text of the statute or the rationale described in any of this Court's cases.

Defendants rest their argument on the fact that *Kreines* referred to a need for judgments to be "contemporaneous," but the context makes clear that it uses the term to mean contemporaneously *brought*, not to require that judgments be entered simultaneously. The judgments in *Kreines* itself were not contemporaneous as Defendants use the term: as here, the plaintiff brought FTCA and *Bivens* claims in the same action, but the court entered judgment against the individual defendants several months before ruling for the government on the FTCA claims. 959 F.2d at 835–36. After the ruling, the individual defendants moved to vacate their judgments. *Id.* at 836. Reasoning from the text and legislative history, this Court rejected application of the judgment bar, concluding that Section 2676 bars subsequent "actions," not judgments, and that subsequent judgments within a single action are only barred where they result in dual recovery. *Id.* at 838.

Defendants' interpretation of the mechanics of the judgment bar would, perversely, incentivize claimants to bring multiple actions: by first suing individual

defendants and then bringing subsequent actions against the government if those suits fail, thus leading to the multiple lawsuits that the judgment bar is designed to avoid. Under Defendants' view, the only way for a plaintiff to ensure that she can obtain even one recovery would be to obtain it against the individual defendants first. Any judgment involving the government—whether favorable or not, and whether brought in the same suit or another, would bar recovery against the individual defendants. Thus, Defendants' rule would undermine the very goals of preserving judicial economy that Congress intended to enhance in enacting that provision.

### B.   Plaintiffs Are Entitled To Expungement of Records Under the Privacy Act and the Constitution

Plaintiffs also state a claim for disclosure and expungement relief against the Government. *See* ER 245–246. Plaintiffs seek disclosure and expungement of two somewhat different (albeit overlapping) types of records, under two different theories. First, they seek expungement of records documenting their free exercise of religion (e.g., of them praying, of their sermons, etc.) under 5 U.S.C. 552a(e)(7) of the Privacy Act. *See, e.g.*, ER 229–30 ("Agents Armstrong and Allen instructed Monteilh to monitor Fazaga at the prayers he conducted, to record and report on what he said"); ER 245 (Defendants "collected and maintained records describing how Plaintiffs exercised their First Amendment rights" and such collection was "neither pertinent to nor within the scope of an authorized law enforcement activity"). Second, they seek expungement of any records pertaining to them—whether or not depicting religious activity—if the FBI gathered those records because of Plaintiffs' religion or in

121

violation of their reasonable expectations of privacy. They seek that relief directly under the Constitution. *See, e.g.,* ER 206 (Defendants "instructed Monteilh to gather information on Muslims in general, and instructed him to adopt strategies of information-gathering and surveillance that ensured that he would obtain that information in an indiscriminate manner, such that Plaintiffs and numerous other people were surveilled solely due to their religion."); ER 250–257.[50]

Contrary to Defendants' claims, there can be no serious dispute that both sets of claims are cognizable. Every circuit to consider the question has held that individuals alleging that the government maintains records of their First Amendment activity may seek expungement under the Privacy Act, and this Court agreed in its only decision on the issue (which Defendants fail to cite). In addition, this Court has made equally clear that courts retain inherent power under the Constitution to order

---

[50] Plaintiffs seek expungement of records describing their First Amendment activities under Section 552a(e)(7) of the Privacy Act because it expressly bars the government from maintaining such records. The Privacy Act contains no comparable provision expressly barring the maintenance of records gathered in violation of other constitutional provisions (such as the anti-discrimination protections of the Establishment Clause). Therefore, Plaintiffs seek expungement of those records under the Constitution itself. If the Court concludes that the Privacy Act itself permits an action to expunge records obtained in violation of the Establishment Clause and other constitutional provisions (beyond Section 552a(e)(7)), Plaintiffs request that the Court instruct the district court to permit them leave to amend their pleadings on remand to seek such relief. Similarly, if the Court concludes that the Constitution itself (presumably the First Amendment) provides a cause of action to expunge records of First Amendment activity, Plaintiffs would request leave to amend to plead that claim. Plaintiffs made the same request for leave to amend in the district court. *See* Further Excerpts of Record ("FER") 1.

expungement when a federal agency maintains records in violation of the Constitution, as have the other circuits to consider the question.[51]

### 1. *Plaintiffs State a Claim for Expungement Under the Privacy Act*

The Privacy Act creates various rules governing how federal agencies collect and maintain records. Amongst these, the Act requires agencies to *disclose* records under certain circumstances, to *refrain from maintaining* records under certain circumstances, and to *correct* certain records upon request. *See, e.g.*, 5 U.S.C. 552a(d)(1) (creating rules governing disclosure of records); 5 U.S.C. 552a(d)(2) (creating rules governing correction of records); 552a(e)(1) (requiring maintenance of only relevant records); 552a(e)(5) (requiring maintenance of accurate and complete records).

Of central concern here, Section 552a(e)(7) establishes that an agency may "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. 552a(e)(7).

---

[51] To the extent that the liability of particular Defendants is relevant for purposes of injunctive relief, Plaintiffs here clarify that they bring their expungement claims under Section 552a(e)(7) against the FBI, and bring their expungement claims under the Constitution against both the official capacity Defendants and against the United States. *See Demery v. Kupperman,* 735 F.2d 1139, 1146 (9th Cir. 1984) ("a suit against a state official seeking injunctive relief from unconstitutional state action is not a suit against the state") (citing *Ex Parte Young*, 209 U.S. 123 (1908)); *Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989) (holding that Congress waived the United States' sovereign immunity for claims seeking injunctive relief for both statutory and constitutional violations in 5 U.S.C. 702).

As this Court has explained, "[t]he purpose of the section (e)(7) First Amendment protection is to *prevent* 'collection of protected information not immediately needed, about law-abiding Americans, on the off-chance that Government or the particular agency might possibly have to deal with them in the future.'" *MacPherson v. IRS*, 803 F.2d 479, 483 (9th Cir. 1986) (quoting S. Rep. 1183, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News 6916, 6971) (emphasis added). *See also id.* at 482 ("Section (e)(7) of the Privacy Act, however, is intended to restrict the information about individuals' First Amendment activities that the government may collect and maintain at all.").

Section 552a(e)(7)'s free expression rule constitutes a separate, remarkably broad statutory requirement within the Privacy Act. For example, while federal agencies have authority to exempt certain systems of records from some of the Privacy Act's requirements, they have no such authority with respect to Section 552a(e)(7). *See* 5 U.S.C. 552a(j) (allowing agency to exempt itself from sections *other* than, *inter alia*, (e)(7)); 552a(k) (listing sections that are exempt, but not listing (e)(7)). Relatedly, the rule barring the maintenance of records of First Amendment activity does not apply only to particular systems of records. "In view of Congress' own special concern for the protection of First Amendment rights… the obligations imposed by subsection (e)(7) are not limited to records maintained in a system of records," but instead apply to *all* government records. *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 169 (D.C. Cir. 2013).

Plaintiffs clearly allege that Defendants maintain records of their First Amendment activity, that those records are not pertinent, and that they gathered them through unauthorized (that is, unconstitutional) law enforcement activity. *See, e.g.*, ER 228–30 (informant attended and recorded Fazaga's religious sermons, titles of religious books, content of prayers); ER 232–33 (informant recorded Malik's religious discussion after prayer and gave notes on them to Defendants); ER 236–37 (informant gathered records on AbdelRahim's travel plans, soccer games, charitable donations). Defendants did not argue below, and do not argue now, either that they do not maintain records of Plaintiffs' First Amendment activities or that they gathered those records through authorized law enforcement activity under Section 552a(e)(7). *See* Govt. Br. 24–27 (making various arguments about why the records should be exempt, but never asserting that the records fall within Section 552a(e)(7)'s law enforcement exemption). Instead, their *only* argument against Plaintiffs' Privacy Act claim is that Congress forbade the courts from ordering the government to expunge records obtained in violation of Section 552a(e)(7).

It is worth pausing at the outset to consider the nature of Defendants' argument: they assert that a statute enacted to "prevent collection of protected information not immediately needed, about law-abiding Americans," *MacPherson*, 803 F.2d at 483, actually prevents the courts from ordering the Government to *stop* collecting such information.

Unsurprisingly, Defendants' arguments are meritless. Defendants argue that the

Court has no authority to issue injunctive relief to remedy violations of the free expression requirement of Section 552a(e)(7) because a request for expungement is really a request for "amendment," and while the Act authorizes injunctive relief for amendments, it permits agencies to exempt certain record systems from the amendment requirements, which the FBI has done here. Govt. Br. 25. Thus, they claim, the only remedy the statute makes available for violations of the First Amendment rule of Section 552a(e)(7) is damages. *Id.* at 26 n.4.[52]

The most serious problem with this argument is that binding Ninth Circuit authority that Defendants fail to cite forecloses it, and makes clear that courts have authority to order expungement of records maintained in violation of its requirements. In *MacPherson,* 803 F.2d at 485 n.9, this Court decided a case seeking injunctive relief for a violation of Section 552a(e)(7), established an approach for resolving such claims, and rejected that claim on the merits in a very narrow ruling. *Id.* at 484, 485 n.9 (holding that courts should apply "an individual, case-by-case"

---

[52] Defendants describe their argument as that the "Privacy Act does not recognize the remedy plaintiffs seek," Govt. Br. 23, but what they argue is far more draconian: Defendants assert that the Privacy Act *prohibits* a court from ordering the Government to expunge records of First Amendment activity, and that it does so whether the Plaintiff seeks such relief under the Privacy Act or the Constitution. *See* Govt. Br. 24–27. Defendants' arguments are similar to many that the D.C. Circuit has rejected when considering Privacy Act claims: "Recognizing the Act's varied ambiguities, we have consistently turned back neat legal maneuvers attempted by the government that, while literally consistent with the Act's terms, were not in keeping with the privacy-protection responsibilities that Congress intended to assign to agencies under the Act." *Pilon v. U.S. Dep't of Justice*, 73 F.3d 1111, 1118 (D.C. Cir. 1996) (internal quotations omitted).

approach when "consider[ing] the factors for and against the maintenance of []

records of First Amendment activities"). *MacPherson* would have had no occasion to

articulate an approach for resolving the claim—virtually the entire opinion would be

dicta—had no injunctive relief been available under Section 552a(e)(7).

    *MacPherson* also rejected Defendants' implicit argument that claims for

expungement should be understood as claims for amendment, relief for which is

made available in Section 552a(g). It noted that MacPherson could have brought a

separate amendment action under Section 552a(g) to remedy any *inaccuracies* in the

IRS's records, but did not analyze the free expression claim under Section 552a(g). *Id.*

at 485 n. 8 ("To the extent that MacPherson alleges that the IRS notes on his

speeches are inaccurate, we note that the Privacy Act makes specific provision for

access to and correction and amendment of inaccurate records, *see* 5 U.S.C. 552a(d),

and provides a civil remedy if the agency does not comply, 5 U.S.C. 552a(g)."). Given

that *MacPherson* separately addressed the Section 552a(e)(7) claim on the merits, it

refutes Defendants' argument that Section (e)(7) is unenforceable except by way of

damages actions. Govt. Br. 27 n.4.

    Defendants seek support from a different Ninth Circuit case, relying heavily on

*Cell Associates, Inc. v. NIH*, 579 F.2d 1155, 1158–1162 (9th Cir. 1978), but it nowhere

mentions Section 552a(e)(7), and *MacPherson* never even cited it. *Cell Associates* holds

that injunctive relief is unavailable for a different provision—Section (b)—which

concerns the disclosure rather than the retention of records, and relied on the

legislative history of that provision in support of that conclusion. *Id.* at 1161 (relying on the fact that an equitable remedy for subsection (b) violations "was contained in the Senate version of the bill."). It is irrelevant to Plaintiffs' claim here, which arises under Section 552a(e)(7), not Section 552a(b).

Nor is the Ninth Circuit alone on this question. Three other circuits have held that injunctive relief is available under Section 552a(e)(7), in direct contradiction to the position taken by the Government here, while none have adopted the Government's view. *See Nagel v. U.S. Dep't of Health, Educ., & Welfare*, 725 F.2d 1438, 1441 (D.C. Cir. 1984) ("The appropriate relief for violations of Section (e)(7) includes damages as well as amendment or expungement of unlawful records"); *Abdelfattah*, 787 F.3d at 534 ("[w]e have repeatedly recognized a plaintiff may request expungement of agency records for… violations of the Privacy Act"); *Clarkson v. IRS*, 678 F.2d 1368, 1376–77 (10th Cir. 1982) (holding that expungement is available for (e)(7) violations); *Bassiouni v. FBI*, 436 F.3d 712, 723, 724 (7th Cir. 2006) (same).

While these cases rely on somewhat different sources for the statute's expungement authority in (e)(7) cases, the source is irrelevant here, as Plaintiffs have not limited their request for relief under the Privacy Act to any particular provision of the statute, and in any event would be entitled to amend the complaint to refer specifically to those subsections should the Court conclude that they have not pled with sufficient specificity. *See* ER 245–246 (complaint Eighth Cause of Action) (pleading a violation of 5 U.S.C. 552a(a)–(l)); *see also* ER 248–249 (requesting

injunctive relief under Section 552a). Whatever the source of the authority to order expungement, all the circuits to address it have agreed that the government may not exempt itself from judicial oversight in that respect.[53]

Aside from the fact that every circuit court to consider the question has rejected Defendants' view, this Court should also reject the argument that the only relief available for Section 552a(e)(7) violations is damages because it produces bizarre results. Most obviously, this would mean that the government could persist in maintaining records of law-abiding citizens' First Amendment activity even after having paid damages for doing so. It also would allow weaker remedies for records kept in violation of the First Amendment than for records that are simply erroneous, despite Section 552a(e)(7)'s strong mandatory language imposing an independent duty on federal agencies and the manifest purpose of the Privacy Act. And it would require a showing of "intentional and willful" violations before they could be corrected even by damages, even though Congress made clear its concern for the chilling effects created by the maintenance of such records. *See* S. REP. NO. 93-1183 (1974) at 53

---

[53] The D.C. Circuit strongly suggested that it is the "catch-all" provision at Section (g)(1)(D) and the language that follows it that creates authority to order expungement of records under Section 552a(e)(7). *See Haase v. Sessions*, 893 F.2d 370, 374 n.6 (D.C. Cir. 1990); *Gerlich*, 711 F.3d at 169. The Seventh Circuit has assumed without deciding that expungement might be available even apart from Section (g)(1)(D). *Bassiouni*, 436 F.3d at 723, 724. However, *MacPherson* appears to foreclose Section (g)(1)(D) as the source of expungement authority, in light of its discussion of subsection (g) as providing authority only for amendment. 803 F.2d at 485 n.8. Thus, *MacPherson* (like the Eleventh Circuit in *Clarkson*) suggests that expungement authority derives directly from (e)(7) itself.

129

(discussing the first draft of (e)(7)) ("This Section's restraint is aimed particularly at preventing collection of protected information not immediately needed, about law-abiding Americans, on the off-chance that Government or the particular agency might possibly have to deal with them in the future."). Strikingly, the FBI's argument in the district court that it must maintain the records it gathered on Plaintiffs advanced precisely the rationale that Congress rejected. *See* FER 2–3 (citing Morin Decl.). Given Congress' strong opposition to the collection of records "not immediately needed," it obviously intended to permit courts to order the expungement of such records. Plaintiffs' Privacy Act claim cannot be dismissed on that basis.[54]

### 2. **Plaintiffs State a Claim for Expungement Under the Constitution**

Plaintiffs also seek expungement of all records that Defendants still maintain that were obtained in violation of the Constitution. Contrary to the Government's claim, Govt. Br. 27, it is "well settled" that federal courts have equitable power to order the expungement of records to vindicate constitutional rights. *See, e.g.*, *Maurer v. Pitchess*, 691 F.2d 434, 437 (9th Cir. 1982) (reversing dismissal of suit brought directly

---

[54] Defendants also cite *Doe v. FBI*, 936 F.2d 1346, 1352 (D.C. Cir. 1991) for the uncontroversial proposition that it can exempt files from the amendment requirement. But as noted above, it cannot exempt files from the prohibition on maintenance of records of First Amendment activity, because the statute does not permit exemptions on that basis. *See* 5 U.S.C. 552a (j-k) (allowing exemptions from other obligations, but not (e)(7)). They also cite *Bassiouni*, 436 F.3d at 725, but *Bassiouni* found that the records there fit within the law enforcement exception to Section 552a(e)(7), an argument that Defendants have never made in this case. *Bassiouni* rejected any suggestion that the FBI could exempt itself from (e)(7)'s requirements. *Id.* at 721 n.6.

under Constitution for expungement of arrest records that occurred without probable cause); *Shipp v. Todd*, 568 F.2d 133, 134 (9th Cir. 1978) ("It is established that the federal courts have inherent power to expunge criminal records when necessary to preserve basic legal rights."); *Burnsworth v. Gunderson*, 179 F.3d 771, 774–75 (9th Cir. 1999) (ordering expungement of prison disciplinary record where "no evidence" supported the disciplinary sanction). As *Todd* explains, while the inherent expungement power is "reserved for unusual or extreme cases," those include cases "where the arrest itself was an unlawful one, or where the arrest represented harassing action by the police, or where the statute under which the arrestee was prosecuted was itself unconstitutional." *Todd*, 568 F.2d at 134 n.1. For obvious reasons, the same rule applies with even greater force to people who were *not* arrested, but about whom the government has collected information in violation of their constitutional rights. *See Burnsworth*, 179 F.3d 771, 774–75 (decided in 1999); *MacPherson*, 803 F.2d at 484 ("The mere compilation by the government of records describing the exercise of First Amendment freedoms creates the possibility that those records will be used to the speaker's detriment, and hence has a chilling effect on such exercise."); *Nagel*, 725 F.2d at 1441 (same).[55]

---

[55]The Government cites other Ninth Circuit cases that support Plaintiffs' position. For example, *United States v. Sumner*, 226 F.3d 1005 (9th Cir. 2000) cites a variety of authority for the power to expunge records, including "the Constitution itself." *Id.* at 1012. It rejected the request for expungement there only because the underlying conviction violated no statute or constitutional provision. *Id.* at 1014-15. *See also Fendler v. U.S. Parole Comm'n*, 774 F.2d 975 (9th Cir. 1985) (holding expungement available where necessary to vindicate constitutional rights).

As with its cases governing the Privacy Act, this Court's cases holding that courts have authority to order expungement directly under the Constitution are consistent with the law in all circuits to have addressed the question. *See, e.g.,* *Abdelfattah*, 787 F.3d at 534 (recognizing availability of expungement for "both violations of the Privacy Act and the Constitution"); *Sealed Appellant v. Sealed Appellee*, 130 F.3d 695, 698 (5th Cir. 1997), *cert. denied*, 523 U.S. 1077 (1998) (litigant who "assert[s] an affirmative rights violation by the executive actors holding the records" of a conviction may seek expungement "when no other remedy existed to vindicate important legal rights."); *Clarkson*, 678 F.2d at 1370 ("[C]ourts have often recognized actions arising under the Constitution for expungement of agency records collected and maintained in violation of the First Amendment."). The government cites no case holding otherwise.

Instead, the Government's primary argument appears to be that the Privacy Act—a statute that, as noted above, was designed to *prevent* the Government from maintaining records on innocent members of society—has displaced the federal courts' authority to order expungement relief to vindicate the Constitution. Govt. Br. 27–30. This argument borders on the frivolous. All of this Court's cases on expungement authority to remedy constitutional violations cited above post-date the Privacy Act. *See, e.g.,* *Burnsworth*, 179 F.3d 771 (decided in 1999); *Maurer*, 691 F.2d at 437; *Shipp*, 568 F.2d 133 (1978). In addition, while Congress can displace federal *common law* through legislation, it obviously cannot eliminate an injunctive remedy

132

created by the *Constitution*.[56] Unsurprisingly, then, every circuit court to consider this particular argument has rejected it. *Abdelfattah*, 787 F.3d at 534 ("Abdelfattah seeks equitable relief for the Department's alleged violations of the Constitution, and Congress's provision of specific Privacy Act remedies does not bar his claims."); *Clarkson*, 678 F.2d at 1378 n.13 ("[W]e of course do not intend to suggest that the enactment of the Privacy Act in any way precludes a plaintiff from asserting a constitutional claim for violation of his privacy or First Amendment rights."). The cases the Government cites in this section concern the displacement of federal common law, and therefore have no relevance to the question here, which concerns whether Congress can displace the courts' power to remedy constitutional violations.[57]

Finally, Defendants make a distinct argument that Plaintiffs have shown "no plausible claim of an ongoing constitutional violation" from their maintenance of the

---

[56] Whether Congress can establish exclusive statutory remedies that may supplant constitutional *claims*, as Defendants contend, does not settle the question whether it can eliminate constitutionally-compelled *remedies*. In the district court, Defendants cited three cases on this issue—*Brown v. GSA*, 425 U.S. 820, 835 (1976); *Nolan v. Cleland*, 686 F.2d 806, 815 (9th Cir. 1982); and *Kizas v. Webster*, 707 F.2d 524, 542 (D.C. Cir 1983)—but they all address claims falling within the scope of Title VII, and hold only that a comprehensive remedial scheme of that nature may preempt more general judicially-crafted remedies.

[57] Defendants cite *City of Milwaukee*, 451 U.S. at 312-17, but that case concerns the displacement of federal common law, not constitutional law. It is relevant to the state secrets dispute only because state secrets is a common law doctrine, and therefore can be displaced by statute. *See supra* III.A.1. They also cite *Bush v. Lucas*, 462 U.S. 367, 387 (1983), but it is inapposite because it involved preclusion of a *Bivens* claim for damages where Congress had already designed an comprehensive remedial scheme meant to provide full compensation. Similarly, *Center for Nat. Sec. Studies v. DOJ*, 331 F.3d 918 (D.C. Cir. 2003), is a FOIA case that never mentions the Privacy Act, and does not involve a claim for injunctive relief from ongoing unconstitutional conduct.

records at issue here. Govt. Br. 30. This is obviously wrong as to records of First Amendment activity, as this Court has held that "[t]he mere compilation by the government of records describing the exercise of First Amendment freedoms creates the possibility that those records will be used to the speaker's detriment, and hence has a chilling effect on such exercise." *MacPherson*, 803 F.2d at 484.

Defendants' argument is equally meritless as to the other records at issue. Plaintiffs allege that the Government collected information on them *because they were Muslim*, and the "chilling" rationale that this Court and others have articulated in defense of expungement of records of First Amendment activity obviously applies for the same reason to records maintained on people because of their religion. *See* ER 207–10. As to records obtained from searches in violation of the Fourth Amendment, courts have repeatedly held that plaintiffs need not show any definitive harm that may come from the maintenance of unconstitutionally-obtained records in order to obtain expungement. Rather, the maintenance of records obtained in violation of the Constitution itself constitutes a legal injury, or at a minimum is sufficient to support a claim for equitable relief from unconstitutional conduct. *Lawrence Berkeley Lab.*, 135 F.3d at 1275 ("[e]ven if the continued storage, [of medical information obtained] by unconstitutional means does not *itself* constitute a violation of law, it is clearly an ongoing 'effect'… and expungement of the test results would be an appropriate remedy") (internal quotations omitted); *Wilson v. Webster*, 467 F.2d 1282, 1283–84 (9th Cir. 1972) (holding that arrest records' "continued existence may seriously and

unjustifiably serve to impair fundamental rights of the persons to whom they relate");
*Todd*, 568 F.2d at 133 ("the maintenance of his criminal records continues to operate
to his detriment."). *See also Menard v. Saxbe*, 498 F.2d 1017, 1023–24 (D.C. Cir. 1974)
(holding that maintenance of file alleges "cognizable legal injury" even though
plaintiff "cannot point with mathematical certainty to the exact consequences of his
criminal file"); *Doe v. U.S. Air Force*, 812 F.2d 738, 740 (D.C. Cir. 1987) (retention of
copies of documents unlawfully seized "prevents the 'eradication' [of the effects of
the violation] from being complete"); *Paton v. La Prade*, 524 F.2d 862, 868 (3d Cir.
1975) ("[t]he maintenance of such records results in 'injuries and dangers' that are
'plain enough,'" including that the "file possibly could endanger [plaintiff's] future
educational and employment opportunities.") (quoting *Sullivan v. Murphy*, 478 F.2d
938, 970 (D.C. Cir. 1973), *cert. denied*, 414 U.S. 880 (1973)).

Defendants cite to *Pennsylvania Board of Probation & Parole v. Scott*, 524 U.S. 357,
362 (1998), to contend that retention of records cannot possibly violate the
Constitution because the government's *use* of unlawfully obtained evidence in judicial
proceedings is not itself considered a violation. *See* Govt. Br. 29. But that case dealt
with application of the exclusionary rule as a remedy for a Fourth Amendment
violation, where the "violation is fully accomplished by the illegal search or seizure,
and no exclusion of evidence from a judicial or administrative proceeding can cure the
invasion of the defendant's rights which he has already suffered." *Scott*, 524 U.S. at
362 (internal quotations omitted).

135

Here, however, the existence of the records itself gives rise to a chilling effect on Plaintiffs' exercise of their religion—a harm that Defendants can cure through expungement. Moreover, Plaintiffs do not seek to avoid use of the unlawfully-obtained records in a subsequent proceeding, but rather to stop further constitutional harm through their placement on various watchlists, such as at airports, which result in intensive interrogation, long delays, and concomitant anxiety. *See* ER 211, 230–231, 236, 239. As discussed above, courts have consistently held that such retention and potential use does constitute injury.

Indeed, Defendants cite no case in which a court permitted the continued maintenance of records obtained in violation of the Constitution on the ground that the plaintiff could not show harm, and the language in the cases they cite suggests that they would not have endorsed such a rule. Govt. Br. 29–30 (citing *Fendler*, 774 F.2d at 979 (holding that "[f]ederal courts have the equitable power to order the expungement of Government records where necessary to vindicate rights secured by the Constitution or by statute").

Plaintiffs are all American citizens or lawful residents with no criminal history of any kind whose names remain under a cloud of suspicion because of the Government's unlawful surveillance of them. Plaintiffs continue to suffer harms, separate and apart from the harm inherent in the maintenance of records gathered in violation of the Constitution, that this Court has the authority to remedy.

\*     \*     \*

136

For these reasons, this Court must consider on the merits Plaintiffs' claims for expungement of records under both the Privacy Act and the various constitutional provisions that Defendants violated.[58]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court uphold the district court's denial of qualified immunity to the Individual Capacity Defendants on Plaintiff's FISA claim, and reverse the district court's dismissal of Plaintiffs' other claims as to all Defendants.

Respectfully submitted,

Dated:  September 21, 2015

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA

HADSELL STORMER & RENICK, LLP

By: _s/ Ahilan T. Arulanantham_
     Ahilan T. Arulanantham

By: _s/ Peter Bibring_____
     Peter Bibring

Attorneys for Plaintiffs

---

[58] Defendants argued in the district court that Plaintiffs had failed to exhaust their Privacy Act claims, but they have waived that argument here.

137

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiffs-Appellants are not aware of any

related cases pending in this court.


Dated: September 21, 2015                   Respectfully submitted,

                                            s/ Peter Bibring
                                            PETER BIBRING
                                            Counsel for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(c), and Ninth Circuit Rule 32-1, I certify that Plaintiffs-Appellants' Reply/Cross-Appellee Brief is proportionately spaced, has a typeface of 14 points or more, and contains 36,884 words.

A motion to exceed the page limitations pursuant to Ninth Circuit Rule 32-2 has been concurrently filed with the foregoing brief.

Dated: September 21, 2015                    Respectfully submitted,

                                             s/ Peter Bibring
                                             PETER BIBRING
                                             Counsel for Plaintiffs-Appellants