# EXHIBIT "A"

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ZIGLAR *v.* ABBASI ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 15–1358.  Argued January 18, 2017—Decided June 19, 2017*

In the immediate aftermath of the September 11 terrorist attacks, the Federal Government ordered hundreds of illegal aliens to be taken into custody and held pending a determination whether a particular detainee had connections to terrorism.  Respondents, six men of Arab or South Asian descent, were detained for periods of three to six months in a federal facility in Brooklyn.  After their release, they were removed from the United States.  They then filed this putative class action against petitioners, two groups of federal officials.  The first group consisted of former Attorney General John Ashcroft, former Federal Bureau of Investigation Director Robert Mueller, and former Immigration and Naturalization Service Commissioner James Ziglar (Executive Officials).  The second group consisted of the facility's warden and assistant warden Dennis Hasty and James Sherman (Wardens).  Respondents sought damages for constitutional violations under the implied cause of action theory adopted in *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, alleging that petitioners detained them in harsh pretrial conditions for a punitive purpose, in violation of the Fifth Amendment; that petitioners did so because of their actual or apparent race, religion, or national origin, in violation of the Fifth Amendment; that the Wardens subjected them to punitive strip searches, in violation of the Fourth and Fifth Amendments; and that the Wardens knowingly allowed the guards to abuse them, in violation of the Fifth Amendment.  Respondents also brought a claim under 42 U. S. C. §1985(3), which forbids certain

————————

*Together with No. 15–1359, *Ashcroft, Former Attorney General, et al.* v. *Abbasi et al.,* and No. 15–1363, *Hasty et al.* v. *Abbasi et al.,* also on certiorari to the same court.

2                          ZIGLAR *v.* ABBASI

Syllabus

conspiracies to violate equal protection rights. The District Court dismissed the claims against the Executive Officials but allowed the claims against the Wardens to go forward. The Second Circuit affirmed in most respects as to the Wardens but reversed as to the Executive Officials, reinstating respondents' claims.

*Held:* The judgment is reversed in part and vacated and remanded in part.

789 F. 3d 218, reversed in part and vacated and remanded in part.

JUSTICE KENNEDY delivered the opinion of the Court, except as to Part IV–B, concluding:

1. The limited reach of the *Bivens* action informs the decision whether an implied damages remedy should be recognized here. Pp. 6–14.

(a) In 42 U. S. C. §1983, Congress provided a specific damages remedy for plaintiffs whose constitutional rights were violated by state officials, but Congress provided no corresponding remedy for constitutional violations by agents of the Federal Government. In 1971, and against this background, this Court recognized in *Bivens* an implied damages action to compensate persons injured by federal officers who violated the Fourth Amendment's prohibition against unreasonable searches and seizures. In the following decade, the Court allowed *Bivens*-type remedies twice more, in a Fifth Amendment gender-discrimination case, *Davis* v. *Passman*, 442 U. S. 228, and in an Eighth Amendment Cruel and Unusual Punishments Clause case, *Carlson* v. *Green*, 446 U. S. 14. These are the only cases in which the Court has approved of an implied damages remedy under the Constitution itself. Pp. 6–7.

(b) *Bivens*, *Davis*, and *Carlson* were decided at a time when the prevailing law assumed that a proper judicial function was to "provide such remedies as are necessary to make effective" a statute's purpose. *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 433. The Court has since adopted a far more cautious course, clarifying that, when deciding whether to recognize an implied cause of action, the "determinative" question is one of statutory intent. *Alexander* v. *Sandoval*, 532 U. S. 275, 286. If a statute does not evince Congress' intent "to create the private right of action asserted," *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 568, no such action will be created through judicial mandate. Similar caution must be exercised with respect to damages actions implied to enforce the Constitution itself. *Bivens* is well-settled law in its own context, but expanding the *Bivens* remedy is now considered a "disfavored" judicial activity. *Ashcroft* v. *Iqbal*, 556 U. S. 662, 675.

When a party seeks to assert an implied cause of action under the Constitution, separation-of-powers principles should be central to the

Syllabus

analysis. The question is whether Congress or the courts should decide to authorize a damages suit. *Bush* v. *Lucas*, 462 U. S. 367, 380. Most often it will be Congress, for *Bivens* will not be extended to a new context if there are " 'special factors counselling hesitation in the absence of affirmative action by Congress.' " *Carlson, supra*, at 18. If there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, courts must refrain from creating that kind of remedy. An alternative remedial structure may also limit the Judiciary's power to infer a new *Bivens* cause of action. Pp. 8–14.

2. Considering the relevant special factors here, a *Bivens*-type remedy should not be extended to the claims challenging the confinement conditions imposed on respondents pursuant to the formal policy adopted by the Executive Officials in the wake of the September 11 attacks. These "detention policy claims" include the allegations that petitioners violated respondents' due process and equal protection rights by holding them in restrictive conditions of confinement, and the allegations that the Wardens violated the Fourth and Fifth Amendments by subjecting respondents to frequent strip searches. The detention policy claims do not include the guard-abuse claim against Warden Hasty. Pp. 14–23.

(a) The proper test for determining whether a claim arises in a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new. Meaningful differences may include, *e.g.*, the rank of the officers involved; the constitutional right at issue; the extent of judicial guidance for the official conduct; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors not considered in previous *Bivens* cases. Respondents' detention policy claims bear little resemblance to the three *Bivens* claims the Court has approved in previous cases. The Second Circuit thus should have held that this was a new *Bivens* context and then performed a special factors analysis before allowing this damages suit to proceed. Pp. 15–17.

(b) The special factors here indicate that Congress, not the courts, should decide whether a damages action should be allowed. With regard to the Executive Officials, a *Bivens* action is not "a proper vehicle for altering an entity's policy," *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 74, and is not designed to hold officers responsible for acts of their subordinates, see *Iqbal, supra*, at 676. Even an action confined to the Executive Officers' own discrete conduct would call into question the formulation and implementation of a high-level executive policy, and the burdens of that litigation could prevent officials from properly discharging their duties, see *Cheney* v.

*United States Dist. Court for D. C.*, 542 U. S. 367, 382. The litigation process might also implicate the discussion and deliberations that led to the formation of the particular policy, requiring courts to interfere with sensitive Executive Branch functions. See *Clinton* v. *Jones*, 520 U. S. 681, 701.

Other special factors counsel against extending *Bivens* to cover the detention policy claims against any of the petitioners. Because those claims challenge major elements of the Government's response to the September 11 attacks, they necessarily require an inquiry into national-security issues. National-security policy, however, is the prerogative of Congress and the President, and courts are "reluctant to intrude upon" that authority absent congressional authorization. *Department of Navy* v. *Egan*, 484 U. S. 518, 530. Thus, Congress' failure to provide a damages remedy might be more than mere oversight, and its silence might be more than "inadvertent." *Schweiker* v. *Chilicky*, 487 U. S. 412, 423. That silence is also relevant and telling here, where Congress has had nearly 16 years to extend "the kind of remedies [sought by] respondents," *id.*, at 426, but has not done so. Respondents also may have had available " 'other alternative forms of judicial relief,' " *Minneci* v. *Pollard*, 565 U. S. 118, 124, including injunctions and habeas petitions.

The proper balance in situations like this, between deterring constitutional violations and freeing high officials to make the lawful decisions necessary to protect the Nation in times of great peril, is one for the Congress to undertake, not the Judiciary. The Second Circuit thus erred in allowing respondents' detention policy claims to proceed under *Bivens*. Pp. 17–23.

3. The Second Circuit also erred in allowing the prisoner abuse claim against Warden Hasty to go forward without conducting the required special factors analysis. Respondents' prisoner abuse allegations against Warden Hasty state a plausible ground to find a constitutional violation should a *Bivens* remedy be implied. But the first question is whether the claim arises in a new *Bivens* context. This claim has significant parallels to *Carlson*, which extended *Bivens* to cover a failure to provide medical care to a prisoner, but this claim nevertheless seeks to extend *Carlson* to a new context. The constitutional right is different here: *Carlson* was predicated on the Eighth Amendment while this claim was predicated on the Fifth. The judicial guidance available to this warden with respect to his supervisory duties was less developed. And there might have been alternative remedies available. And Congress did not provide a standalone damages remedy against federal jailers when it enacted the Prison Litigation Reform Act some 15 years after *Carlson*. Given this Court's expressed caution about extending the *Bivens* remedy, this context

Cite as: 582 U. S. ____ (2017)　　　5

Syllabus

must be regarded as a new one. Pp. 23–26.

    4. Petitioners are entitled to qualified immunity with respect to respondents' claims under 42 U. S. C. §1985(3). Pp. 26–32.

    (a) Assuming that respondents' allegations are true and well pleaded, the question is whether a reasonable officer in petitioners' position would have known the alleged conduct was an unlawful conspiracy. The qualified-immunity inquiry turns on the "objective legal reasonableness" of the official's acts, *Harlow* v. *Fitzgerald*, 457 U. S. 800, 819, "assessed in light of the legal rules that were 'clearly established' at the time [the action] was taken," *Anderson* v. *Creighton*, 483 U. S. 635, 639. If it would have been clear to a reasonable officer that the alleged conduct "was unlawful in the situation he confronted," *Saucier* v. *Katz*, 533 U. S. 194, 202, the defendant officer is not entitled to qualified immunity. But if a reasonable officer might not have known that the conduct was unlawful, then the officer is entitled to qualified immunity. Pp. 27–29.

    (b) Here, reasonable officials in petitioners' positions would not have known with sufficient certainty that §1985(3) prohibited their joint consultations and the resulting policies. There are two reasons. First, the conspiracy is alleged to have been among officers in the same Department of the Federal Government. And there is no clearly established law on the issue whether agents of the same executive department are distinct enough to "conspire" with one another within the meaning of 42 U. S. C. §1985(3). Second, open discussion among federal officers should be encouraged to help those officials reach consensus on department policies, so there is a reasonable argument that §1985(3) liability should not extend to cases like this one. As these considerations indicate, the question whether federal officials can be said to "conspire" in these kinds of situations is sufficiently open that the officials in this suit would not have known that §1985(3) applied to their discussions and actions. It follows that reasonable officers in petitioners' positions would not have known with any certainty that the alleged agreements were forbidden by that statute. Pp. 29–32.

    KENNEDY, J., delivered the opinion of the Court with respect to Parts I, II, III, IV–A, and V, in which ROBERTS, C. J., and THOMAS and ALITO, JJ., joined, and an opinion with respect to Part IV–B, in which ROBERTS, C. J., and ALITO, J., joined. THOMAS, J., filed an opinion concurring in part and concurring in the judgment. BREYER, J., filed a dissenting opinion, in which GINSBURG, J., joined. SOTOMAYOR, KAGAN, and GORSUCH, JJ., took no part in the consideration or decision of the cases.

Cite as: 582 U. S. ____ (2017)　　　　1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 15–1358, 15–1359 and 15–1363

————

JAMES W. ZIGLAR, PETITIONER
15–1358　　　　　　　　　　*v.*
AHMER IQBAL ABBASI, ET AL.

JOHN D. ASHCROFT, FORMER ATTORNEY
GENERAL, ET AL., PETITIONERS
15–1359　　　　　　　　　　*v.*
AHMER IQBAL ABBASI, ET AL.

DENNIS HASTY, ET AL., PETITIONERS
15–1363　　　　　　　　　　*v.*
AHMER IQBAL ABBASI, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 19, 2017]

JUSTICE KENNEDY delivered the opinion of the Court,
except as to Part IV–B.

After the September 11 terrorist attacks in this country,
and in response to the deaths, destruction, and dangers
they caused, the United States Government ordered hun-
dreds of illegal aliens to be taken into custody and held.
Pending a determination whether a particular detainee
had connections to terrorism, the custody, under harsh
conditions to be described, continued. In many instances
custody lasted for days and weeks, then stretching into
months. Later, some of the aliens who had been detained

2                          ZIGLAR *v.* ABBASI

Opinion of the Court

filed suit, leading to the cases now before the Court.

The complaint named as defendants three high executive officers in the Department of Justice and two of the wardens at the facility where the detainees had been held. Most of the claims, alleging various constitutional violations, sought damages under the implied cause of action theory adopted by this Court in *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971). Another claim in the complaint was based upon the statutory cause of action authorized and created by Congress under Rev. Stat. §1980, 42 U. S. C. §1985(3). This statutory cause of action allows damages to persons injured by conspiracies to deprive them of the equal protection of the laws.

The suit was commenced in the United States District Court for the Eastern District of New York. After this Court's decision in *Ashcroft* v. *Iqbal*, 556 U. S. 662 (2009), a fourth amended complaint was filed; and that is the complaint to be considered here. Motions to dismiss the fourth amended complaint were denied as to some defendants and granted as to others. These rulings were the subject of interlocutory appeals to the United States Court of Appeals for the Second Circuit. Over a dissenting opinion by Judge Raggi with respect to the decision of the three-judge panel—and a second unsigned dissent from the court's declining to rehear the suit en banc, joined by Judge Raggi and five other judges—the Court of Appeals ruled that the complaint was sufficient for the action to proceed against the named officials who are now before us. See *Turkmen* v. *Hasty*, 789 F. 3d 218 (2015) (panel decision); *Turkmen* v. *Hasty*, 808 F. 3d 197 (2015) (en banc decision).

The Court granted certiorari to consider these rulings. 580 U. S. ___ (2016). The officials who must defend the suit on the merits, under the ruling of the Court of Appeals, are the petitioners here. The former detainees who seek relief under the fourth amended complaint are the

Opinion of the Court

respondents. The various claims and theories advanced for recovery, and the grounds asserted for their dismissal as insufficient as a matter of law, will be addressed in turn.

## I

Given the present procedural posture of the suit, the Court accepts as true the facts alleged in the complaint. See *Iqbal*, 556 U. S., at 678.

## A

In the weeks following the September 11, 2001, terrorist attacks—the worst in American history—the Federal Bureau of Investigation (FBI) received more than 96,000 tips from members of the public. See *id.,* at 667. Some tips were based on well-grounded suspicion of terrorist activity, but many others may have been based on fear of Arabs and Muslims. FBI agents "questioned more than 1,000 people with suspected links to the [September 11] attacks in particular or to terrorism in general." *Ibid.*

While investigating the tips—including the less substantiated ones—the FBI encountered many aliens who were present in this country without legal authorization. As a result, more than 700 individuals were arrested and detained on immigration charges. *Ibid.* If the FBI designated an alien as not being "of interest" to the investigation, then he or she was processed according to normal procedures. In other words the alien was treated just as if, for example, he or she had been arrested at the border after an illegal entry. If, however, the FBI designated an alien as "of interest" to the investigation, or if it had doubts about the proper designation in a particular case, the alien was detained subject to a "hold-until-cleared policy." The aliens were held without bail.

Respondents were among some 84 aliens who were subject to the hold-until-cleared policy and detained at the

4                                   ZIGLAR *v.* ABBASI

                              Opinion of the Court

Metropolitan Detention Center (MDC) in Brooklyn, New
York. They were held in the Administrative Maximum
Special Housing Unit (or Unit) of the MDC. The com-
plaint includes these allegations: Conditions in the Unit
were harsh. Pursuant to official Bureau of Prisons policy,
detainees were held in "'tiny cells for over 23 hours a
day.'" 789 F. 3d, at 228. Lights in the cells were left on 24
hours. Detainees had little opportunity for exercise or
recreation. They were forbidden to keep anything in their
cells, even basic hygiene products such as soap or a tooth-
brush. When removed from the cells for any reason, they
were shackled and escorted by four guards. They were
denied access to most forms of communication with the
outside world. And they were strip searched often—any
time they were moved, as well as at random in their cells.
   Some of the harsh conditions in the Unit were not im-
posed pursuant to official policy. According to the com-
plaint, prison guards engaged in a pattern of "physical and
verbal abuse." *Ibid.* Guards allegedly slammed detainees
into walls; twisted their arms, wrists, and fingers; broke
their bones; referred to them as terrorists; threatened
them with violence; subjected them to humiliating sexual
comments; and insulted their religion.

                                      B
   Respondents are six men of Arab or South Asian de-
scent. Five are Muslims. Each was illegally in this coun-
try, arrested during the course of the September 11 inves-
tigation, and detained in the Administrative Maximum
Special Housing Unit for periods ranging from three to
eight months. After being released respondents were
removed from the United States.
   Respondents then sued on their own behalf, and on
behalf of a putative class, seeking compensatory and
punitive damages, attorney's fees, and costs. Respond-
ents, it seems fair to conclude from the arguments pre-

sented, acknowledge that in the ordinary course aliens who are present in the United States without legal authorization can be detained for some period of time. But here the challenge is to the conditions of their confinement and the reasons or motives for imposing those conditions. The gravamen of their claims was that the Government had no reason to suspect them of any connection to terrorism, and thus had no legitimate reason to hold them for so long in these harsh conditions.

As relevant here, respondents sued two groups of federal officials in their official capacities. The first group consisted of former Attorney General John Ashcroft, former FBI Director Robert Mueller, and former Immigration and Naturalization Service Commissioner James Ziglar. This opinion refers to these three petitioners as the "Executive Officials." The other petitioners named in the complaint were the MDC's warden, Dennis Hasty, and associate warden, James Sherman. This opinion refers to these two petitioners as the "Wardens."

Seeking to invoke the Court's decision in *Bivens*, respondents brought four claims under the Constitution itself. First, respondents alleged that petitioners detained them in harsh pretrial conditions for a punitive purpose, in violation of the substantive due process component of the Fifth Amendment. Second, respondents alleged that petitioners detained them in harsh conditions because of their actual or apparent race, religion, or national origin, in violation of the equal protection component of the Fifth Amendment. Third, respondents alleged that the Wardens subjected them to punitive strip searches unrelated to any legitimate penological interest, in violation of the Fourth Amendment and the substantive due process component of the Fifth Amendment. Fourth, respondents alleged that the Wardens knowingly allowed the guards to abuse respondents, in violation of the substantive due process component of the Fifth Amendment.

6 ZIGLAR *v.* ABBASI

Opinion of the Court

Respondents also brought a claim under 42 U. S. C. §1985(3), which forbids certain conspiracies to violate equal protection rights. Respondents alleged that petitioners conspired with one another to hold respondents in harsh conditions because of their actual or apparent race, religion, or national origin.

C

The District Court dismissed the claims against the Executive Officials but allowed the claims against the Wardens to go forward. The Court of Appeals affirmed in most respects as to the Wardens, though it held that the prisoner abuse claim against Sherman (the associate warden) should have been dismissed. 789 F. 3d, at 264–265. As to the Executive Officials, however, the Court of Appeals reversed, reinstating respondents' claims. *Ibid.* As noted above, Judge Raggi dissented. She would have held that only the prisoner abuse claim against Hasty should go forward. *Id.,* at 295, n. 41, 302 (opinion concurring in part in judgment and dissenting in part). The Court of Appeals declined to rehear the suit en banc, 808 F. 3d, at 197; and, again as noted above, Judge Raggi joined a second dissent along with five other judges, *id.,* at 198. This Court granted certiorari. 580 U. S. ___ (2016).

II

The first question to be discussed is whether petitioners can be sued for damages under *Bivens* and the ensuing cases in this Court defining the reach and the limits of that precedent.

A

In 1871, Congress passed a statute that was later codified at Rev. Stat. §1979, 42 U. S. C. §1983. It entitles an injured person to money damages if a state official violates his or her constitutional rights. Congress did not create an analogous statute for federal officials. Indeed, in the

Opinion of the Court

100 years leading up to *Bivens*, Congress did not provide a specific damages remedy for plaintiffs whose constitutional rights were violated by agents of the Federal Government.

In 1971, and against this background, this Court decided *Bivens*. The Court held that, even absent statutory authorization, it would enforce a damages remedy to compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizures. See 403 U. S., at 397. The Court acknowledged that the Fourth Amendment does not provide for money damages "in so many words." *Id.,* at 396. The Court noted, however, that Congress had not foreclosed a damages remedy in "explicit" terms and that no "special factors" suggested that the Judiciary should "hesitat[e]" in the face of congressional silence. *Id.,* at 396–397. The Court, accordingly, held that it could authorize a remedy under general principles of federal jurisdiction. See *id.,* at 392 (citing *Bell* v. *Hood,* 327 U. S. 678, 684 (1946)).

In the decade that followed, the Court recognized what has come to be called an implied cause of action in two cases involving other constitutional violations. In *Davis* v. *Passman,* 442 U. S. 228 (1979), an administrative assistant sued a Congressman for firing her because she was a woman. The Court held that the Fifth Amendment Due Process Clause gave her a damages remedy for gender discrimination. *Id.,* at 248–249. And in *Carlson* v. *Green,* 446 U. S. 14 (1980), a prisoner's estate sued federal jailers for failing to treat the prisoner's asthma. The Court held that the Eighth Amendment Cruel and Unusual Punishments Clause gave him a damages remedy for failure to provide adequate medical treatment. See *id.,* at 19. These three cases—*Bivens, Davis,* and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself.

B

To understand *Bivens* and the two other cases implying a damages remedy under the Constitution, it is necessary to understand the prevailing law when they were decided. In the mid-20th century, the Court followed a different approach to recognizing implied causes of action than it follows now. During this "*ancien regime,*" *Alexander* v. *Sandoval*, 532 U. S. 275, 287 (2001), the Court assumed it to be a proper judicial function to "provide such remedies as are necessary to make effective" a statute's purpose, *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 433 (1964). Thus, as a routine matter with respect to statutes, the Court would imply causes of action not explicit in the statutory text itself. See, *e.g., id.,* at 430–432; *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 557 (1969); *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 239 (1969) ("The existence of a statutory right implies the existence of all necessary and appropriate remedies").

These statutory decisions were in place when *Bivens* recognized an implied cause of action to remedy a constitutional violation. Against that background, the *Bivens* decision held that courts must "adjust their remedies so as to grant the necessary relief" when "federally protected rights have been invaded." 403 U. S., at 392 (quoting *Bell, supra*, at 678); see also 403 U. S., at 402 (Harlan, J., concurring) (discussing cases recognizing implied causes of action under federal statutes). In light of this interpretive framework, there was a possibility that "the Court would keep expanding *Bivens* until it became the substantial equivalent of 42 U. S. C. §1983." Kent, Are Damages Different?: *Bivens* and National Security, 87 S. Cal. L. Rev. 1123, 1139–1140 (2014).

C

Later, the arguments for recognizing implied causes of action for damages began to lose their force. In cases

Opinion of the Court

decided after *Bivens*, and after the statutory implied cause-of-action cases that *Bivens* itself relied upon, the Court adopted a far more cautious course before finding implied causes of action. In two principal cases under other statutes, it declined to find an implied cause of action. See *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1, 42, 45–46 (1977); *Cort* v. *Ash*, 422 U. S. 66, 68–69 (1975). Later, in *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979), the Court did allow an implied cause of action; but it cautioned that, where Congress "intends private litigants to have a cause of action," the "far better course" is for Congress to confer that remedy in explicit terms. *Id.*, at 717.

Following this expressed caution, the Court clarified in a series of cases that, when deciding whether to recognize an implied cause of action, the "determinative" question is one of statutory intent. *Sandoval*, 532 U. S., at 286. If the statute itself does not "displa[y] an intent" to create "a private remedy," then "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.*, at 286–287; see also *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11, 15–16, 23–24 (1979); *Karahalios* v. *Federal Employees*, 489 U. S. 527, 536–537 (1989). The Court held that the judicial task was instead "limited solely to determining whether Congress intended to create the private right of action asserted." *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 568 (1979). If the statute does not itself so provide, a private cause of action will not be created through judicial mandate. See *Transamerica, supra*, at 24.

The decision to recognize an implied cause of action under a statute involves somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself. When Congress enacts a statute, there are

specific procedures and times for considering its terms and the proper means for its enforcement. It is logical, then, to assume that Congress will be explicit if it intends to create a private cause of action. With respect to the Constitution, however, there is no single, specific congressional action to consider and interpret.

Even so, it is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation. When determining whether traditional equitable powers suffice to give necessary constitutional protection—or whether, in addition, a damages remedy is necessary—there are a number of economic and governmental concerns to consider. Claims against federal officials often create substantial costs, in the form of defense and indemnification. Congress, then, has a substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government. In addition, the time and administrative costs attendant upon intrusions resulting from the discovery and trial process are significant factors to be considered. In an analogous context, Congress, it is fair to assume, weighed those concerns in deciding not to substitute the Government as defendant in suits seeking damages for constitutional violations. See 28 U. S. C. §2679(b)(2)(A) (providing that certain provisions of the Federal Tort Claims Act do not apply to any claim against a federal employee "which is brought for a violation of the Constitution").

For these and other reasons, the Court's expressed caution as to implied causes of actions under congressional statutes led to similar caution with respect to actions in the *Bivens* context, where the action is implied to enforce the Constitution itself. Indeed, in light of the changes to

Opinion of the Court

the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today. To be sure, no congressional enactment has disapproved of these decisions. And it must be understood that this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose. *Bivens* does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere.

Given the notable change in the Court's approach to recognizing implied causes of action, however, the Court has made clear that expanding the *Bivens* remedy is now a "disfavored" judicial activity. *Iqbal*, 556 U. S., at 675. This is in accord with the Court's observation that it has "consistently refused to extend *Bivens* to any new context or new category of defendants." *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 68 (2001). Indeed, the Court has refused to do so for the past 30 years.

For example, the Court declined to create an implied damages remedy in the following cases: a First Amendment suit against a federal employer, *Bush* v. *Lucas*, 462 U. S. 367, 390 (1983); a race-discrimination suit against military officers, *Chappell* v. *Wallace*, 462 U. S. 296, 297, 304–305 (1983); a substantive due process suit against military officers, *United States* v. *Stanley*, 483 U. S. 669, 671–672, 683–684 (1987); a procedural due process suit against Social Security officials, *Schweiker* v. *Chilicky*, 487 U. S. 412, 414 (1988); a procedural due process suit against a federal agency for wrongful termination, *FDIC* v. *Meyer*, 510 U. S. 471, 473–474 (1994); an Eighth Amend-

ment suit against a private prison operator, *Malesko*, *supra*, at 63; a due process suit against officials from the Bureau of Land Management, *Wilkie* v. *Robbins*, 551 U. S. 537, 547–548, 562 (2007); and an Eighth Amendment suit against prison guards at a private prison, *Minneci* v. *Pollard*, 565 U. S. 118, 120 (2012).

When a party seeks to assert an implied cause of action under the Constitution itself, just as when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis. The question is "who should decide" whether to provide for a damages remedy, Congress or the courts? *Bush*, 462 U. S., at 380.

The answer most often will be Congress. When an issue "'involves a host of considerations that must be weighed and appraised,'" it should be committed to "'those who write the laws'" rather than "'those who interpret them.'" *Ibid.* (quoting *United States* v. *Gilman*, 347 U. S. 507, 512–513 (1954)). In most instances, the Court's precedents now instruct, the Legislature is in the better position to consider if "'the public interest would be served'" by imposing a "'new substantive legal liability.'" *Schweiker*, *supra*, at 426–427 (quoting *Bush*, *supra*, at 390). As a result, the Court has urged "caution" before "extending *Bivens* remedies into any new context." *Malesko*, *supra*, at 74. The Court's precedents now make clear that a *Bivens* remedy will not be available if there are "'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Carlson*, 446 U. S., at 18 (quoting *Bivens*, 403 U. S., at 396).

This Court has not defined the phrase "special factors counselling hesitation." The necessary inference, though, is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. Thus, to be a "special

Opinion of the Court

factor counselling hesitation," a factor must cause a court to hesitate before answering that question in the affirmative.

It is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others. It is true that, if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations. Yet the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies. These and other considerations may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case.

Sometimes there will be doubt because the case arises in a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere. See *Chappell, supra,* at 302 (military); *Stanley, supra,* at 679 (same); *Meyer, supra,* at 486 (public purse); *Wilkie, supra,* at 561–562 (federal land). And sometimes there will be doubt because some other feature of a case—difficult to predict in advance—causes a court to pause before acting without express congressional authorization. In sum, if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature

Opinion of the Court

and extent of federal-court jurisdiction under Article III.

In a related way, if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action. For if Congress has created "any alternative, existing process for protecting the [injured party's] interest" that itself may "amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie, supra,* at 550; see also *Bush, supra,* at 385–388 (recognizing that civil-service regulations provided alternative means for relief); *Malesko,* 534 U. S., at 73–74 (recognizing that state tort law provided alternative means for relief); *Minneci, supra,* at 127–130 (same).

## III

It is appropriate now to turn first to the *Bivens* claims challenging the conditions of confinement imposed on respondents pursuant to the formal policy adopted by the Executive Officials in the wake of the September 11 attacks. The Court will refer to these claims as the "detention policy claims." The detention policy claims allege that petitioners violated respondents' due process and equal protection rights by holding them in restrictive conditions of confinement; the claims further allege that the Wardens violated the Fourth and Fifth Amendments by subjecting respondents to frequent strip searches. The term "detention policy claims" does not include respondents' claim alleging that Warden Hasty allowed guards to abuse the detainees. That claim will be considered separately, and further, below. At this point, the question is whether, having considered the relevant special factors in the whole context of the detention policy claims, the Court should extend a *Bivens*-type remedy to those claims.

Cite as: 582 U. S. \_\_\_\_ (2017)                    15

Opinion of the Court

A

Before allowing respondents' detention policy claims to proceed under *Bivens*, the Court of Appeals did not perform any special factors analysis at all. 789 F. 3d, at 237. The reason, it said, was that the special factors analysis is necessary only if a plaintiff asks for a *Bivens* remedy in a new context. 789 F. 3d, at 234. And in the Court of Appeals' view, the context here was not new. *Id.*, at 235.

To determine whether the *Bivens* context was novel, the Court of Appeals employed a two-part test. First, it asked whether the asserted constitutional right was at issue in a previous *Bivens* case. 789 F. 3d, at 234. Second, it asked whether the mechanism of injury was the same mechanism of injury in a previous *Bivens* case. 789 F. 3d, at 234. Under the Court of Appeals' approach, if the answer to both questions is "yes," then the context is not new and no special factors analysis is required. *Ibid.*

That approach is inconsistent with the analysis in *Malesko*. Before the Court decided that case, it had approved a *Bivens* action under the Eighth Amendment against federal prison officials for failure to provide medical treatment. See *Carlson*, 446 U. S., at 16, n. 1, 18–19. In *Malesko*, the plaintiff sought relief against a private prison operator in almost parallel circumstances. 534 U. S., at 64. In both cases, the right at issue was the same: the Eighth Amendment right to be free from cruel and unusual punishment. And in both cases, the mechanism of injury was the same: failure to provide adequate medical treatment. Thus, if the approach followed by the Court of Appeals is the correct one, this Court should have held that the cases arose in the same context, obviating any need for a special factors inquiry.

That, however, was not the controlling analytic framework in *Malesko*. Even though the right and the mechanism of injury were the same as they were in *Carlson*, the Court held that the contexts were different. 534 U. S., at

70, and n. 4. The Court explained that special factors counseled hesitation and that the *Bivens* remedy was therefore unavailable. 534 U. S., at 74.

For similar reasons, the holding of the Court of Appeals in the instant suit is inconsistent with this Court's analytic framework in *Chappell*. In *Davis*, decided before the Court's cautionary instructions with respect to *Bivens* suits, see *supra,* at 11–12, the Court had held that an employment-discrimination claim against a Congressman could proceed as a *Bivens*-type action. *Davis*, 442 U. S., at 230–231. In *Chappell*, however, the cautionary rules were applicable; and, as a result, a similar discrimination suit against military officers was not allowed to proceed. It is the *Chappell* framework that now controls; and, under it, the Court of Appeals erred by holding that this suit did not present a new *Bivens* context.

The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new. Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

In the present suit, respondents' detention policy claims challenge the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in

Opinion of the Court

the wake of a major terrorist attack on American soil. Those claims bear little resemblance to the three *Bivens* claims the Court has approved in the past: a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma. See *Bivens*, 403 U. S. 388; *Davis*, 442 U. S. 228; *Chappell*, 462 U. S. 296. The Court of Appeals therefore should have held that this was a new *Bivens* context. Had it done so, it would have recognized that a special factors analysis was required before allowing this damages suit to proceed.

B

After considering the special factors necessarily implicated by the detention policy claims, the Court now holds that those factors show that whether a damages action should be allowed is a decision for the Congress to make, not the courts.

With respect to the claims against the Executive Officials, it must be noted that "a *Bivens* action is not 'a proper vehicle for altering an entity's policy.'" *Malesko, supra*, at 74. Furthermore, a *Bivens* claim is brought against the individual official for his or her own acts, not the acts of others. "The purpose of *Bivens* is to deter the *officer*." *Meyer*, 510 U. S., at 485. *Bivens* is not designed to hold officers responsible for acts of their subordinates. See *Iqbal*, 556 U. S., at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*").

Even if the action is confined to the conduct of a particular Executive Officer in a discrete instance, these claims would call into question the formulation and implementation of a general policy. This, in turn, would necessarily require inquiry and discovery into the whole course of the discussions and deliberations that led to the policies and

governmental acts being challenged. These consequences
counsel against allowing a *Bivens* action against the Exec-
utive Officials, for the burden and demand of litigation
might well prevent them—or, to be more precise, future
officials like them—from devoting the time and effort
required for the proper discharge of their duties. See
*Cheney* v. *United States Dist. Court for D. C.*, 542 U. S.
367, 382 (2004) (noting "the paramount necessity of pro-
tecting the Executive Branch from vexatious litigation
that might distract it from the energetic performance of its
constitutional duties").

A closely related problem, as just noted, is that the
discovery and litigation process would either border upon
or directly implicate the discussion and deliberations that
led to the formation of the policy in question. See *Federal
Open Market Comm.* v. *Merrill*, 443 U. S. 340, 360 (1979)
(noting that disclosure of Executive Branch documents
"could inhibit the free flow of advice, including analysis,
reports, and expression of opinion within an agency").
Allowing a damages suit in this context, or in a like con-
text in other circumstances, would require courts to inter-
fere in an intrusive way with sensitive functions of the
Executive Branch. See *Clinton* v. *Jones*, 520 U. S. 681,
701 (1997) (recognizing that "'[e]ven when a branch does
not arrogate power to itself . . . the separation-of-powers
doctrine requires that a branch not impair another in the
performance of its constitutional duties'" (quoting *Loving*
v. *United States*, 517 U. S. 748, 757 (1996))). These con-
siderations also counsel against allowing a damages claim
to proceed against the Executive Officials. See *Cheney,
supra,* at 385 (noting that "special considerations control"
when a case implicates "the Executive Branch's interests
in maintaining the autonomy of its office and safeguarding
the confidentiality of its communications").

In addition to this special factor, which applies to the
claims against the Executive Officials, there are three

other special factors that apply as well to the detention policy claims against all of the petitioners. First, respondents' detention policy claims challenge more than standard "law enforcement operations." *United States* v. *Verdugo-Urquidez*, 494 U. S. 259, 273 (1990). They challenge as well major elements of the Government's whole response to the September 11 attacks, thus of necessity requiring an inquiry into sensitive issues of national security. Were this inquiry to be allowed in a private suit for damages, the *Bivens* action would assume dimensions far greater than those present in *Bivens* itself, or in either of its two follow-on cases, or indeed in any putative *Bivens* case yet to come before the Court.

National-security policy is the prerogative of the Congress and President. See U. S. Const., Art. I, §8; Art. II, §1, §2. Judicial inquiry into the national-security realm raises "concerns for the separation of powers in trenching on matters committed to the other branches." *Christopher* v. *Harbury*, 536 U. S. 403, 417 (2002). These concerns are even more pronounced when the judicial inquiry comes in the context of a claim seeking money damages rather than a claim seeking injunctive or other equitable relief. The risk of personal damages liability is more likely to cause an official to second-guess difficult but necessary decisions concerning national-security policy.

For these and other reasons, courts have shown deference to what the Executive Branch "has determined . . . is 'essential to national security.'" *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 24, 26 (2008). Indeed, "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs" unless "Congress specifically has provided otherwise." *Department of Navy* v. *Egan*, 484 U. S. 518, 530 (1988). Congress has not provided otherwise here.

There are limitations, of course, on the power of the

Opinion of the Court

Executive under Article II of the Constitution and in the
powers authorized by congressional enactments, even with
respect to matters of national security. See, *e.g., Hamdi* v.
*Rumsfeld*, 542 U. S. 507, 527, 532–537 (2004) (plurality
opinion) ("Whatever power the United States Constitution
envisions for the Executive . . . in times of conflict, it most
assuredly envisions a role for all three branches when
individual liberties are at stake"); *Boumediene* v. *Bush*,
553 U. S. 723, 798 (2008) ("Liberty and security can be
reconciled; and in our system they are reconciled within
the framework of the law"). And national-security con-
cerns must not become a talisman used to ward off incon-
venient claims—a "label" used to "cover a multitude of
sins." *Mitchell* v. *Forsyth*, 472 U. S. 511, 523 (1985). This
"'danger of abuse'" is even more heightened given "'the
difficulty of defining'" the "'security interest'" in domestic
cases. *Ibid.* (quoting *United States* v. *United States Dist.
Court for Eastern Dist. of Mich.*, 407 U. S. 297, 313–314
(1972)).

Even so, the question is only whether "congressionally
uninvited intrusion" is "inappropriate" action for the
Judiciary to take. *Stanley*, 483 U. S., at 683. The factors
discussed above all suggest that Congress' failure to pro-
vide a damages remedy might be more than mere over-
sight, and that congressional silence might be more than
"inadvertent." *Schweiker*, 487 U. S., at 423. This possibil-
ity counsels hesitation "in the absence of affirmative ac-
tion by Congress." *Bivens*, 403 U. S., at 396.

Furthermore, in any inquiry respecting the likely or
probable intent of Congress, the silence of Congress is
relevant; and here that silence is telling. In the almost 16
years since September 11, the Federal Government's
responses to that terrorist attack have been well docu-
mented. Congressional interest has been "frequent and
intense," *Schweiker, supra*, at 425, and some of that inter-
est has been directed to the conditions of confinement at

Opinion of the Court

issue here. Indeed, at Congress' behest, the Department of Justice's Office of the Inspector General compiled a 300-page report documenting the conditions in the MDC in great detail. See 789 F. 3d, at 279 (opinion of Raggi, J.) (noting that the USA PATRIOT Act required "the Department's Inspector General to review and report semiannually to Congress on any identified abuses of civil rights and civil liberties in fighting terrorism"). Nevertheless, "[a]t no point did Congress choose to extend to any person the kind of remedies that respondents seek in this lawsuit." *Schweiker,* 487 U. S., at 426.

This silence is notable because it is likely that high-level policies will attract the attention of Congress. Thus, when Congress fails to provide a damages remedy in circumstances like these, it is much more difficult to believe that "congressional inaction" was "inadvertent." *Id.,* at 423.

It is of central importance, too, that this is not a case like *Bivens* or *Davis* in which "it is damages or nothing." *Bivens, supra,* at 410 (Harlan, J., concurring in judgment); *Davis,* 442 U. S., at 245. Unlike the plaintiffs in those cases, respondents do not challenge individual instances of discrimination or law enforcement overreach, which due to their very nature are difficult to address except by way of damages actions after the fact. Respondents instead challenge large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners. To address those kinds of decisions, detainees may seek injunctive relief. And in addition to that, we have left open the question whether they might be able to challenge their confinement conditions via a petition for a writ of habeas corpus. See *Bell* v. *Wolfish,* 441 U. S. 520, 526, n. 6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement"); *Preiser* v. *Rodriguez,* 411 U. S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his

lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal").

Indeed, the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief than a suit for money damages. A successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately; yet this damages suit remains unresolved some 15 years later. (As in *Bell* and *Preiser*, the Court need not determine the scope or availability of the habeas corpus remedy, a question that is not before the Court and has not been briefed or argued.) In sum, respondents had available to them "'other alternative forms of judicial relief.'" *Minneci,* 565 U. S., at 124. And when alternative methods of relief are available, a *Bivens* remedy usually is not. See *Bush,* 462 U. S., at 386–388; *Schweiker, supra,* at 425–426; *Malesko,* 534 U. S., at 73–74; *Minneci, supra,* at 125–126.

There is a persisting concern, of course, that absent a *Bivens* remedy there will be insufficient deterrence to prevent officers from violating the Constitution. In circumstances like those presented here, however, the stakes on both sides of the argument are far higher than in past cases the Court has considered. If *Bivens* liability were to be imposed, high officers who face personal liability for damages might refrain from taking urgent and lawful action in a time of crisis. And, as already noted, the costs and difficulties of later litigation might intrude upon and interfere with the proper exercise of their office.

On the other side of the balance, the very fact that some executive actions have the sweeping potential to affect the liberty of so many is a reason to consider proper means to impose restraint and to provide some redress from injury. There is therefore a balance to be struck, in situations like this one, between deterring constitutional violations and freeing high officials to make the lawful decisions necessary to protect the Nation in times of great peril. Cf.

Opinion of the Court

*Stanley, supra,* at 681 (noting that the special-factors
analysis in that case turned on "how much occasional,
unintended impairment of military discipline one is will-
ing to tolerate").  The proper balance is one for the Con-
gress, not the Judiciary, to undertake.  For all of these
reasons, the Court of Appeals erred by allowing respond-
ents' detention policy claims to proceed under *Bivens.*

### IV
### A

One of respondents' claims under *Bivens* requires a
different analysis: the prisoner abuse claim against the
MDC's warden, Dennis Hasty.  The allegation is that
Warden Hasty violated the Fifth Amendment by allowing
prison guards to abuse respondents.

The warden argues, as an initial matter, that the com-
plaint does not "'state a claim to relief that is plausible on
its face.'" *Iqbal,* 556 U. S., at 678 (quoting *Bell Atlantic
Corp.* v. *Twombly,* 550 U. S. 544, 570 (2007)).  Applying its
precedents, the Court of Appeals held that the substantive
standard for the sufficiency of the claim is whether the
warden showed "deliberate indifference" to prisoner abuse.
789 F. 3d, at 249–250.  The parties appear to agree on this
standard, and, for purposes of this case, the Court as-
sumes it to be correct.

The complaint alleges that guards routinely abused
respondents; that the warden encouraged the abuse by
referring to respondents as "terrorists"; that he prevented
respondents from using normal grievance procedures; that
he stayed away from the Unit to avoid seeing the abuse;
that he was made aware of the abuse via "inmate com-
plaints, staff complaints, hunger strikes, and suicide
attempts"; that he ignored other "direct evidence of [the]
abuse, including logs and other official [records]"; that he
took no action "to rectify or address the situation"; and
that the abuse resulted in the injuries described above, see

*supra,* at 4. These allegations—assumed here to be true, subject to proof at a later stage—plausibly show the warden's deliberate indifference to the abuse. Consistent with the opinion of every judge in this case to have considered the question, including the dissenters in the Court of Appeals, the Court concludes that the prisoner abuse allegations against Warden Hasty state a plausible ground to find a constitutional violation if a *Bivens* remedy is to be implied.

Warden Hasty argues, however, that *Bivens* ought not to be extended to this instance of alleged prisoner abuse. As noted above, the first question a court must ask in a case like this one is whether the claim arises in a new *Bivens* context, *i.e.,* whether "the case is different in a meaningful way from previous *Bivens* cases decided by this Court." *Supra,* at 16.

It is true that this case has significant parallels to one of the Court's previous *Bivens* cases, *Carlson* v. *Green,* 446 U. S. 14. There, the Court did allow a *Bivens* claim for prisoner mistreatment—specifically, for failure to provide medical care. And the allegations of injury here are just as compelling as those at issue in *Carlson.* This is especially true given that the complaint alleges serious violations of Bureau of Prisons policy. See 28 CFR §552.20 (2016) (providing that prison staff may use force "only as a last alternative after all other reasonable efforts to resolve a situation have failed" and that staff may "use only that amount of force necessary to [ensure prison safety and security]"); §552.22(j) ("All incidents involving the use of force . . . must be carefully documented"); §542.11 (requiring the warden to investigate certain complaints of inmate abuse).

Yet even a modest extension is still an extension. And this case does seek to extend *Carlson* to a new context. As noted above, a case can present a new context for *Bivens* purposes if it implicates a different constitutional right; if

Opinion of the Court

judicial precedents provide a less meaningful guide for official conduct; or if there are potential special factors that were not considered in previous *Bivens* cases. See *supra,* at 13.

The constitutional right is different here, since *Carlson* was predicated on the Eighth Amendment and this claim is predicated on the Fifth. See 446 U. S., at 16. And the judicial guidance available to this warden, with respect to his supervisory duties, was less developed. The Court has long made clear the standard for claims alleging failure to provide medical treatment to a prisoner—"deliberate indifference to serious medical needs." *Estelle* v. *Gamble,* 429 U. S. 97, 104 (1976). The standard for a claim alleging that a warden allowed guards to abuse pre-trial detainees is less clear under the Court's precedents.

This case also has certain features that were not considered in the Court's previous *Bivens* cases and that might discourage a court from authorizing a *Bivens* remedy. As noted above, the existence of alternative remedies usually precludes a court from authorizing a *Bivens* action. *Supra,* at 14. And there might have been alternative remedies available here, for example, a writ of habeas corpus, *Wolfish,* 441 U. S., at 526, n. 6; an injunction requiring the warden to bring his prison into compliance with the regulations discussed above; or some other form of equitable relief.

Furthermore, legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation. See *supra,* at 14. Some 15 years after *Carlson* was decided, Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. See 42 U. S. C. §1997e. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs. This Court has said in dicta that the

Act's exhaustion provisions would apply to *Bivens* suits. See *Porter* v. *Nussle*, 534 U. S. 516, 524 (2002). But the Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.

The differences between this claim and the one in *Carlson* are perhaps small, at least in practical terms. Given this Court's expressed caution about extending the *Bivens* remedy, however, the new-context inquiry is easily satisfied. Some differences, of course, will be so trivial that they will not suffice to create a new *Bivens* context. But here the differences identified above are at the very least meaningful ones. Thus, before allowing this claim to proceed under *Bivens*, the Court of Appeals should have performed a special factors analysis. It should have analyzed whether there were alternative remedies available or other "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" in a suit like this one. *Supra,* at 15.

B

Although the Court could perform that analysis in the first instance, the briefs have concentrated almost all of their efforts elsewhere. Given the absence of a comprehensive presentation by the parties, and the fact that the Court of Appeals did not conduct the analysis, the Court declines to perform the special factors analysis itself. The better course is to vacate the judgment below, allowing the Court of Appeals or the District Court to do so on remand.

V

One issue remains to be addressed: the claim that petitioners are subject to liability for civil conspiracy under 42 U. S. C. §1985(3). Unlike the prisoner abuse claim just discussed, this claim implicates the activities of

Opinion of the Court

all the petitioners—the Executive Officials as well as the Wardens—in creating the conditions of confinement at issue here.

The civil-conspiracy prohibition contained in §1985(3) was enacted as a significant part of the civil rights legislation passed in the aftermath of the Civil War. See *Carpenters* v. *Scott*, 463 U. S. 825, 834–837 (1983) (detailing the legislative history of §1985(3)); *Griffin* v. *Breckenridge*, 403 U. S. 88, 99–101 (1971) (same); *Great American Fed. Sav. & Loan Assn.* v. *Novotny*, 442 U. S. 366, 379 (1979) (Powell, J., concurring) (describing §1985(3) as a "Civil War Era remedial statute"). The statute imposes liability on two or more persons who "conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws." §1985(3). In the instant suit, respondents allege that petitioners violated the statute by "agreeing to implement a policy" under which respondents would be detained in harsh conditions "because of their race, religion, ethnicity, and national origin." Assuming these allegations to be true and well pleaded, the question is whether petitioners are entitled to qualified immunity.

## A

The qualified immunity rule seeks a proper balance between two competing interests. On one hand, damages suits "may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow* v. *Fitzgerald*, 457 U. S. 800, 814 (1982). "On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson* v. *Creighton*, 483 U. S. 635, 638 (1987). As one means to accommodate these two objectives, the Court has held that Government officials are entitled to qualified immunity with respect to "discretionary functions" per-

Opinion of the Court

formed in their official capacities. *Ibid.* The doctrine of
qualified immunity gives officials "breathing room to make
reasonable but mistaken judgments about open legal
questions." *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 743 (2011).

The Court's cases provide additional instruction to
define and implement that immunity. Whether qualified
immunity can be invoked turns on the "objective legal
reasonableness" of the official's acts. *Harlow, supra*, at
819. And reasonableness of official action, in turn, must
be "assessed in light of the legal rules that were clearly
established at the time [the action] was taken." *Anderson,
supra*, at 639 (internal quotation marks omitted); see also
*Mitchell*, 472 U. S., at 528. This requirement—that an
official loses qualified immunity only for violating clearly
established law—protects officials accused of violating
"extremely abstract rights." *Anderson, supra*, at 639.

The Fourth Amendment provides an example of how
qualified immunity functions with respect to abstract
rights. By its plain terms, the Amendment forbids unrea-
sonable searches and seizures, yet it may be difficult for
an officer to know whether a search or seizure will be
deemed reasonable given the precise situation encoun-
tered. See *Saucier* v. *Katz*, 533 U. S. 194, 205 (2001) ("It is
sometimes difficult for an officer to determine how the
relevant legal doctrine, here excessive force, will apply to
the factual situation the officer confronts"). For this rea-
son, "[t]he dispositive question is 'whether the violative
nature of *particular* conduct is clearly established.'"
*Mullenix* v. *Luna*, 577 U. S. ___, ___ (2015) (*per curiam*)
(slip op., at 5) (quoting *Ashcroft, supra*, at 742).

It is not necessary, of course, that "the very action in
question has previously been held unlawful." *Anderson,
supra*, at 640. That is, an officer might lose qualified
immunity even if there is no reported case "directly on
point." *Ashcroft, supra*, at 741. But "in the light of pre-
existing law," the unlawfulness of the officer's conduct

Opinion of the Court

"must be apparent." *Anderson, supra*, at 640. To subject officers to any broader liability would be to "disrupt the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Davis* v. *Scherer*, 468 U. S. 183, 195 (1984). For then, both as a practical and legal matter, it would be difficult for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Ibid.*

In light of these concerns, the Court has held that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986). To determine whether a given officer falls into either of those two categories, a court must ask whether it would have been clear to a reasonable officer that the alleged conduct "was unlawful in the situation he confronted." *Saucier, supra*, at 202. If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however—*i.e.,* if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability.

### B

Under these principles, it must be concluded that reasonable officials in petitioners' positions would not have known, and could not have predicted, that §1985(3) prohibited their joint consultations and the resulting policies that caused the injuries alleged.

At least two aspects of the complaint indicate that petitioners' potential liability for this statutory offense would not have been known or anticipated by reasonable officials in their position. First, the conspiracy recited in the complaint is alleged to have been between or among officers in the same branch of the Government (the Executive Branch) and in the same Department (the Department of

Justice). Second, the discussions were the preface to, and the outline of, a general and far-reaching policy.

As to the fact that these officers were in the same Department, an analogous principle discussed in the context of antitrust law is instructive. The Court's precedent indicates that there is no unlawful conspiracy when officers within a single corporate entity consult among themselves and then adopt a policy for the entity. See *Copperweld Corp* v. *Independence Tube Corp.*, 467 U. S. 752, 769–771 (1984). Under this principle—sometimes called the intracorporate-conspiracy doctrine—an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy. *Ibid.* The rule is derived from the nature of the conspiracy prohibition. Conspiracy requires an agreement—and in particular an agreement to do an unlawful act—between or among two or more separate persons. When two agents of the same legal entity make an agreement in the course of their official duties, however, as a practical and legal matter their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people. See *id.*, at 771 (analogizing to "a multiple team of horses drawing a vehicle under the control of a single driver").

To be sure, this Court has not given its approval to this doctrine in the specific context of §1985(3). See *Great American,* 442 U. S., at 372, n. 11. There is a division in the courts of appeals, moreover, respecting the validity or correctness of the intracorporate-conspiracy doctrine with reference to §1985 conspiracies. See *Hull* v. *Shuck*, 501 U. S. 1261, 1261–1262 (1991) (White, J., dissenting from denial of certiorari) (discussing the Circuit split); *Bowie* v. *Maddox*, 642 F. 3d 1122, 1130–1131 (CADC 2011) (detailing a longstanding split about whether the intracorporate-conspiracy doctrine applies to civil rights conspiracies). Nothing in this opinion should be interpreted as either

Opinion of the Court

approving or disapproving the intracorporate-conspiracy doctrine's application in the context of an alleged §1985(3) violation. The Court might determine, in some later case, that different considerations apply to a conspiracy respecting equal protection guarantees, as distinct from a conspiracy in the antitrust context. Yet the fact that the courts are divided as to whether or not a §1985(3) conspiracy can arise from official discussions between or among agents of the same entity demonstrates that the law on the point is not well established. When the courts are divided on an issue so central to the cause of action alleged, a reasonable official lacks the notice required before imposing liability. See *Wilson* v. *Layne*, 526 U. S. 603, 618 (1999) (noting that it would be "unfair" to subject officers to damages liability when even "judges . . . disagree"); *Reichle* v. *Howards*, 566 U. S. 658, 669–670 (2012) (same).

In addition to the concern that agents of the same legal entity are not distinct enough to conspire with one another, there are other sound reasons to conclude that conversations and agreements between and among federal officials in the same Department should not be the subject of a private cause of action for damages under §1985(3). To state a claim under §1985(3), a plaintiff must first show that the defendants conspired—that is, reached an agreement—with one another. See *Carpenters*, 463 U. S., at 828 (stating that the elements of a §1985(3) claim include "a conspiracy"). Thus, a §1985(3) claim against federal officials by necessity implicates the substance of their official discussions.

As indicated above with respect to other claims in this suit, open discussion among federal officers is to be encouraged, so that they can reach consensus on the policies a department of the Federal Government should pursue. See *supra*, at 17–18. Close and frequent consultations to facilitate the adoption and implementation of policies are essential to the orderly conduct of governmental affairs.

Opinion of the Court

Were those discussions, and the resulting policies, to be the basis for private suits seeking damages against the officials as individuals, the result would be to chill the interchange and discourse that is necessary for the adoption and implementation of governmental policies. See *Cheney*, 542 U. S., at 383 (discussing the need for confidential communications among Executive Branch officials); *Merrill*, 443 U. S., at 360 (same).

These considerations suggest that officials employed by the same governmental department do not conspire when they speak to one another and work together in their official capacities. Whether that contention should prevail need not be decided here. It suffices to say that the question is sufficiently open so that the officials in this suit could not be certain that §1985(3) was applicable to their discussions and actions. Thus, the law respondents seek to invoke cannot be clearly established. It follows that reasonable officers in petitioners' positions would not have known with any certainty that the alleged agreements were forbidden by law. See *Saucier*, 533 U. S., at 202. Petitioners are entitled to qualified immunity with respect to the claims under 42 U. S. C. §1985(3).

\*    \*    \*

If the facts alleged in the complaint are true, then what happened to respondents in the days following September 11 was tragic. Nothing in this opinion should be read to condone the treatment to which they contend they were subjected. The question before the Court, however, is not whether petitioners' alleged conduct was proper, nor whether it gave decent respect to respondents' dignity and well-being, nor whether it was in keeping with the idea of the rule of law that must inspire us even in times of crisis.

Instead, the question with respect to the *Bivens* claims is whether to allow an action for money damages in the absence of congressional authorization. For the reasons

Opinion of the Court

given above, the Court answers that question in the negative as to the detention policy claims. As to the prisoner abuse claim, because the briefs have not concentrated on that issue, the Court remands to allow the Court of Appeals to consider the claim in light of the *Bivens* analysis set forth above.

The question with respect to the §1985(3) claim is whether a reasonable officer in petitioners' position would have known the alleged conduct was an unlawful conspiracy. For the reasons given above, the Court answers that question, too, in the negative.

The judgment of the Court of Appeals is reversed as to all of the claims except the prisoner abuse claim against Warden Hasty. The judgment of the Court of Appeals with respect to that claim is vacated, and that case is remanded for further proceedings.

*It is so ordered.*

JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE GORSUCH took no part in the consideration or decision of these cases.

Cite as: 582 U. S. ____ (2017)          1

Opinion of THOMAS, J.

# SUPREME COURT OF THE UNITED STATES

———

Nos. 15–1358, 15–1359 and 15–1363

———

JAMES W. ZIGLAR, PETITIONER
15–1358          *v.*
AHMER IQBAL ABBASI, ET AL.

JOHN D. ASHCROFT, FORMER ATTORNEY
GENERAL, ET AL., PETITIONERS
15–1359          *v.*
AHMER IQBAL ABBASI, ET AL.

DENNIS HASTY, ET AL., PETITIONERS
15–1363          *v.*
AHMER IQBAL ABBASI, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 19, 2017]

JUSTICE THOMAS, concurring in part and concurring in
the judgment.

I join the Court's opinion except for Part IV–B.  I write
separately to express my view on the Court's decision to
remand some of respondents' claims under *Bivens* v. *Six
Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), and
my concerns about our qualified immunity precedents.

I

With respect to respondents' *Bivens* claims, I join the
opinion of the Court to the extent it reverses the Second
Circuit's ruling.  The Court correctly applies our prece-
dents to hold that *Bivens* does not supply a cause of action
against petitioners for most of the alleged Fourth and

Opinion of THOMAS, J.

Fifth Amendment violations. It also correctly recognizes that respondents' claims against petitioner Dennis Hasty seek to extend *Bivens* to a new context. See *ante,* at 24.

I concur in the judgment of the Court vacating the Court of Appeals' judgment with regard to claims against Hasty. *Ante,* at 29. I have previously noted that "'*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action.'" *Wilkie* v. *Robbins*, 551 U. S. 537, 568 (2007) (concurring opinion) (quoting *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 75 (2001) (Scalia, J., concurring)). I have thus declined to "extend *Bivens* even [where] its reasoning logically applied," thereby limiting "*Bivens* and its progeny . . . to the precise circumstances that they involved." *Ibid.* (internal quotation marks omitted). This would, in most cases, mean a reversal of the judgment of the Court of Appeals is in order. However, in order for there to be a controlling judgment in this suit, I concur in the judgment vacating and remanding the claims against petitioner Hasty as that disposition is closest to my preferred approach.

II

As for respondents' claims under 42 U. S. C. §1985(3), I join Part V of the Court's opinion, which holds that respondents are entitled to qualified immunity. The Court correctly applies our precedents, which no party has asked us to reconsider. I write separately, however, to note my growing concern with our qualified immunity jurisprudence.

The Civil Rights Act of 1871, of which §1985(3) and the more frequently litigated §1983 were originally a part, established causes of action for plaintiffs to seek money damages from Government officers who violated federal law. See §§1, 2, 17 Stat. 13. Although the Act made no mention of defenses or immunities, "we have read it in harmony with general principles of tort immunities and

defenses rather than in derogation of them." *Malley* v. *Briggs*, 475 U. S. 335, 339 (1986) (internal quotation marks omitted). We have done so because "[c]ertain immunities were so well established in 1871 . . . that 'we presume that Congress would have specifically so provided had it wished to abolish' them." *Buckley* v. *Fitzsimmons*, 509 U. S. 259, 268 (1993); accord, *Briscoe* v. *LaHue*, 460 U. S. 325, 330 (1983). Immunity is thus available under the statute if it was "historically accorded the relevant official" in an analogous situation "at common law," *Imbler* v. *Pachtman*, 424 U. S. 409, 421 (1976), unless the statute provides some reason to think that Congress did not preserve the defense, see *Tower* v. *Glover*, 467 U. S. 914, 920 (1984).

In some contexts, we have conducted the common-law inquiry that the statute requires. See *Wyatt* v. *Cole*, 504 U. S. 158, 170 (1992) (KENNEDY, J., concurring). For example, we have concluded that legislators and judges are absolutely immune from liability under §1983 for their official acts because that immunity was well established at common law in 1871. See *Tenney* v. *Brandhove*, 341 U. S. 367, 372–376 (1951) (legislators); *Pierson* v. *Ray*, 386 U. S. 547, 553–555 (1967) (judges). We have similarly looked to the common law in holding that a prosecutor is immune from suits relating to the "judicial phase of the criminal process," *Imbler*, *supra*, at 430; *Burns* v. *Reed*, 500 U. S. 478, 489–492 (1991); but see *Kalina* v. *Fletcher*, 522 U. S. 118, 131–134 (1997) (Scalia, J., joined by THOMAS, J., concurring) (arguing that the Court in *Imbler* misunderstood 1871 common-law rules), although not from suits relating to the prosecutor's advice to police officers, *Burns*, *supra*, at 493.

In developing immunity doctrine for other executive officers, we also started off by applying common-law rules. In *Pierson*, we held that police officers are not absolutely immune from a §1983 claim arising from an arrest made

pursuant to an unconstitutional statute because the common law never granted arresting officers that sort of immunity. 386 U. S., at 555. Rather, we concluded that police officers could assert "the defense of good faith and probable cause" against the claim for an unconstitutional arrest because that defense was available against the analogous torts of "false arrest and imprisonment" at common law. *Id.*, at 557.

In further elaborating the doctrine of qualified immunity for executive officials, however, we have diverged from the historical inquiry mandated by the statute. See *Wyatt, supra*, at 170 (KENNEDY, J., concurring); accord, *Crawford-El* v. *Britton*, 523 U. S. 574, 611 (1998) (Scalia, J., joined by THOMAS, J., dissenting). In the decisions following *Pierson*, we have "completely reformulated qualified immunity along principles not at all embodied in the common law." *Anderson* v. *Creighton*, 483 U. S. 635, 645 (1987) (discussing *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982)). Instead of asking whether the common law in 1871 would have accorded immunity to an officer for a tort analogous to the plaintiff's claim under §1983, we instead grant immunity to any officer whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix* v. *Luna*, 577 U. S. ___, ___–___ (2015) (*per curiam*) (slip op., at 4–5) (internal quotation marks omitted); *Taylor* v. *Barkes*, 575 U. S. ___, ___ (2015) (slip op., at 4) (a Government official is liable under the 1871 Act only if "'existing precedent . . . placed the statutory or constitutional question beyond debate'" (quoting *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 741 (2011))). We apply this "clearly established" standard "across the board" and without regard to "the precise nature of the various officials' duties or the precise character of the particular rights alleged to

Opinion of THOMAS, J.

have been violated." *Anderson, supra,* at 641–643 (internal quotation marks omitted).* We have not attempted to locate that standard in the common law as it existed in 1871, however, and some evidence supports the conclusion that common-law immunity as it existed in 1871 looked quite different from our current doctrine. See generally Baude, Is Qualified Immunity Unlawful? 106 Cal. L. Rev. (forthcoming 2018) (manuscript, at 7–17), online at https://papers.ssrn.com/abstract=2896508 (as last visited June 15, 2017).

Because our analysis is no longer grounded in the common-law backdrop against which Congress enacted the 1871 Act, we are no longer engaged in "interpret[ing] the intent of Congress in enacting" the Act. *Malley, supra,* at 342; see *Burns, supra,* at 493. Our qualified immunity precedents instead represent precisely the sort of "free-wheeling policy choice[s]" that we have previously disclaimed the power to make. *Rehberg* v. *Paulk,* 566 U. S. 356, 363 (2012) (internal quotation marks omitted); see also *Tower, supra,* at 922–923 ("We do not have a license to establish immunities from" suits brought under the Act "in the interests of what we judge to be sound public policy"). We have acknowledged, in fact, that the "clearly established" standard is designed to "protec[t] the balance between vindication of constitutional rights and government officials' effective performance of their duties." *Reichle* v. *Howards,* 566 U. S. 658, 664 (2012) (internal quotation marks omitted); *Harlow, supra,* at 807 (explaining that "the recognition of a qualified immunity defense . . . reflected an attempt to balance competing values").

———————

*Although we first formulated the "clearly established" standard in *Bivens* cases like *Harlow* and *Anderson,* we have imported that standard directly into our 1871 Act cases. See, *e.g., Pearson* v. *Callahan,* 555 U. S. 223, 243–244 (2009) (applying the clearly established standard to a §1983 claim).

Opinion of THOMAS, J.

The Constitution assigns this kind of balancing to Congress, not the Courts.

In today's decision, we continue down the path our precedents have marked. We ask "whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted," *ante,* at 29 (internal quotation marks omitted), rather than whether officers in petitioners' positions would have been accorded immunity at common law in 1871 from claims analogous to respondents'. Even if we ultimately reach a conclusion consistent with the common-law rules prevailing in 1871, it is mere fortuity. Until we shift the focus of our inquiry to whether immunity existed at common law, we will continue to substitute our own policy preferences for the mandates of Congress. In an appropriate case, we should reconsider our qualified immunity jurisprudence.

Cite as: 582 U. S. ____ (2017)          1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

Nos. 15–1358, 15–1359 and 15–1363

15–1358
JAMES W. ZIGLAR, PETITIONER
*v.*
AHMER IQBAL ABBASI, ET AL.

15–1359
JOHN D. ASHCROFT, FORMER ATTORNEY
GENERAL, ET AL., PETITIONERS
*v.*
AHMER IQBAL ABBASI, ET AL.

15–1363
DENNIS HASTY, ET AL., PETITIONERS
*v.*
AHMER IQBAL ABBASI, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 19, 2017]

JUSTICE BREYER, with whom JUSTICE GINSBURG joins,
dissenting.

In *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403
U. S. 388 (1971), this Court held that the Fourth Amend-
ment provides a damages remedy for those whom federal
officials have injured as a result of an unconstitutional
search or seizure. In *Davis* v. *Passman*, 442 U. S. 228
(1979), the Court held that the Fifth Amendment provides
a damages remedy to an individual dismissed by her
employer (a Member of Congress) on the basis of her sex in
violation of the equal protection component of that
Amendment's Due Process Clause. And in *Carlson* v.
*Green*, 446 U. S. 14 (1980), the Court held that the Eighth
Amendment provides a damages remedy to a prisoner who

2                           ZIGLAR *v.* ABBASI

died as a result of prison official's deliberate indifference
to his medical needs, in violation of the Amendment's
prohibition against cruel and unusual punishment.

   It is by now well established that federal law provides
damages actions at least in similar contexts, where claims
of constitutional violation arise.  Congress has ratified
*Bivens* actions, plaintiffs frequently bring them, courts
accept them, and scholars defend their importance.  See J.
Pfander, Constitutional Torts and the War on Terror
(2017) (canvassing the history of *Bivens* and cataloguing
cases).  Moreover, the courts, in order to avoid deterring
federal officials from properly performing their work, have
developed safeguards for defendants, including the re-
quirement that plaintiffs plead "plausible" claims, *Ashcroft*
v. *Iqbal*, 556 U. S. 662, 679 (2009), as well as the defense
of "qualified immunity," which frees federal officials from
both threat of liability and involvement in the lawsuit,
unless the plaintiffs establish that officials have violated
"'clearly established . . . constitutional rights,'" *id.,* at 672
(quoting *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982)).
"[This] Court has been reluctant to extend *Bivens* liability
'to any new context or new category of defendants.'" *Iqbal,*
*supra,* at 675 (quoting *Correctional Services Corp.* v.
*Malesko*, 534 U. S. 61, 68 (2001)).  But the Court has made
clear that it would not narrow *Bivens'* existing scope.  See
*FDIC* v. *Meyer*, 510 U. S. 471, 485 (1994) (guarding
against "the evisceration of the *Bivens* remedy" so that its
"deterrent effects . . . would [not] be lost").

   The plaintiffs before us today seek damages for uncon-
stitutional conditions of confinement.  They alleged that
federal officials slammed them against walls, shackled
them, exposed them to nonstop lighting, lack of hygiene,
and the like, all based upon invidious discrimination and
without penological justification.  See *ante*, at 4–5.  In my
view, these claims are well-pleaded, state violations of
clearly established law, and fall within the scope of

BREYER, J., dissenting

longstanding *Bivens* law. For those reasons, I would affirm the judgment of the Court of Appeals. I shall discuss at some length what I believe is the most important point of disagreement. The Court, in my view, is wrong to hold that permitting a constitutional tort action here would "extend" *Bivens*, applying it in a new context. To the contrary, I fear that the Court's holding would significantly shrink the existing *Bivens* contexts, diminishing the compensatory remedy constitutional tort law now offers to harmed individuals.

I shall explain why I believe this suit falls well within the scope of traditional constitutional tort law and why I cannot agree with the Court's arguments to the contrary. I recognize, and write separately about, the strongest of the Court's arguments, namely, the fact that plaintiffs' claims concern detention that took place soon after a serious attack on the United States and some of them concern actions of high-level Government officials. While these facts may affect the substantive constitutional questions (*e.g.*, were any of the conditions "legitimate"?) or the scope of the qualified-immunity defense, they do not extinguish the *Bivens* action itself. If I may paraphrase Justice Harlan, concurring in *Bivens*: In wartime as well as in peacetime, "it is important, in a civilized society, that the judicial branch of the Nation's government stand ready to afford a remedy" "for the most flagrant and patently unjustified," unconstitutional "abuses of official power." 403 U. S., at 410–411 (opinion concurring in judgment); cf. *Boumediene* v. *Bush*, 553 U. S. 723, 798 (2008).

## I

The majority opinion well summarizes the particular claims that the plaintiffs make in this suit. All concern the conditions of their confinement, which began soon after the September 11, 2001, attacks and "lasted for days

BREYER, J., dissenting

and weeks, then stretching into months." *Ante,* at 1. At some point, the plaintiffs allege, all the defendants knew that they had nothing to do with the September 11 attacks but continued to detain them anyway in harsh conditions. Official Government policy, both before and after the defendants became aware of the plaintiffs' innocence, led to the plaintiffs being held in "tiny cells for over 23 hours a day" with lights continuously left on, "shackled" when moved, often "strip searched," and "denied access to most forms of communication with the outside world." *Ante,* at 4 (internal quotation marks omitted). The defendants detained the plaintiffs in these conditions on the basis of their race or religion and without justification.

Moreover, the prison wardens were aware of, but deliberately indifferent to, certain unofficial activities of prison guards involving a pattern of "physical and verbal abuse," such as "slam[ming] detainees into walls; twist[ing] their arms, wrists, and fingers; [breaking] their bones;" and subjecting them to verbal taunts. *Ibid.* (internal quotation marks omitted).

The plaintiffs' complaint alleges that all the defendants—high-level Department of Justice officials and prison wardens alike—were directly responsible for the official confinement policy, which, in some or all of the aspects mentioned, violated the due process and equal protection components of the Fifth Amendment. The complaint adds that, insofar as the prison wardens were deliberately indifferent to the unofficial conduct of the guards, they violated the Fourth and the Fifth Amendments.

I would hold that the complaint properly alleges constitutional torts, *i.e., Bivens* actions for damages.

A

The Court's holdings in *Bivens, Carlson,* and *Davis* rest upon four basic legal considerations. First, the *Bivens* Court referred to longstanding Supreme Court precedent

BREYER, J., dissenting

stating or suggesting that the Constitution provides fed-
eral courts with considerable legal authority to use tradi-
tional remedies to right constitutional wrongs. That
precedent begins with *Marbury* v. *Madison*, 1 Cranch 137
(1803), which effectively placed upon those who would
deny the existence of an effective legal remedy the burden
of showing why their case was special. Chief Justice John
Marshall wrote for the Court that

> "[t]he very essence of civil liberty [lies] in the right of
> every individual to claim the protection of the laws,
> whenever he receives an injury." *Id.*, at 163.

The Chief Justice referred to Blackstone's Commentaries
stating that there

> "'is a general and indisputable rule, that where there
> is a legal right, there is also a legal remedy . . . [and
> that] it is a settled and invariable principle in the
> laws of England, that every right, when withheld,
> must have a remedy, and every injury its proper re-
> dress.'" 1 Cranch, at 163.

The Chief Justice then wrote:

> "The government of the United States has been em-
> phatically termed a government of laws, and not of
> men. It will [not] deserve this high appellation, if the
> laws furnish no remedy for the violation of a vested
> legal right." *Ibid.*

He concluded for the Court that there must be something
"peculiar" (*i.e.*, special) about a case that warrants "ex-
clu[ding] the injured party from legal redress . . . [and
placing it within] that class of cases which come under the
description of *damnum absque injuria*—a loss without an
injury." *Id.*, at 163–164; but cf. *id.*, at 164 (placing "politi-
cal" questions in the latter, special category).

Much later, in *Bell* v. *Hood*, 327 U. S. 678, 684 (1946),

the Court wrote that,

> "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief."

See also *Bivens*, 403 U. S., at 392 (citing opinions of Justices Cardozo and Holmes to similar effect).

The *Bivens* Court reiterated these principles and confirmed that the appropriate remedial "adjust[ment]" in the case before it was an award of money damages, the "remedial mechanism normally available in the federal courts." *Id.*, at 392, 397. Justice Harlan agreed, adding that, since Congress' "general" statutory "grant of jurisdiction" authorized courts to grant equitable relief in cases arising under federal jurisdiction, courts likewise had the authority to award damages—the "traditional remedy at law"—in order to "vindicate the interests of the individual" protected by the Bill of Rights. *Id.*, at 405–407 (opinion concurring in judgment).

Second, our cases have recognized that Congress' silence on the subject indicates a willingness to leave this matter to the courts. In *Bivens*, the Court noted, as an argument favoring its conclusion, the absence of an "explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents." *Id.*, at 397. Similarly, in *Davis* v. *Passman*, the Court stressed that there was "no evidence . . . that Congress meant . . . to foreclose" a damages remedy. 442 U. S., at 247. In *Carlson*, the Court went further, observing that not only was there no sign "that Congress meant to pre-empt a *Bivens* remedy," but there was also "clear" evidence that Congress intended to preserve it. 446 U. S., at 19–20.

Third, our *Bivens* cases acknowledge that a constitutional tort may not lie when "special factors counsel[l]

BREYER, J., dissenting

hesitation" and when Congress has provided an adequate alternative remedy. 446 U. S., at 18–19. The relevant special factors in those cases included whether the court was faced "with a question of 'federal fiscal policy,'" *Bivens*, *supra,* at 396, or a risk of "deluging federal courts with claims," *Davis*, *supra,* at 248 (internal quotation marks omitted). *Carlson* acknowledged an additional factor—that damages suits "might inhibit [federal officials'] efforts to perform their official duties"—but concluded that "the qualified immunity accorded [federal officials] under [existing law] provides adequate protection." 446 U. S., at 19.

Fourth, as the Court recognized later in *Carlson*, a *Bivens* remedy was needed to cure what would, without it, amount to a constitutional anomaly. Long before this Court incorporated many of the Bill of Rights' guarantees against the States, see Amar, The Bill of Rights and the Fourteenth Amendment, 101 Yale L. J. 1193 (1992), federal civil rights statutes afforded a damages remedy to any person whom a state official deprived of a federal constitutional right, see 42 U. S. C. §1983; *Monroe* v. *Pape*, 365 U. S. 167, 171–187 (1961) (describing this history). But federal statutory law did not provide a damages remedy to a person whom a federal official had deprived of that same right, even though the Bill of Rights was at the time of the founding primarily aimed at constraining the Federal Government. Thus, a person harmed by an unconstitutional search or seizure might sue a city mayor, a state legislator, or even a Governor. But that person could not sue a federal agent, a national legislator, or a Justice Department official for an identical offense. "[Our] 'constitutional design,'" the Court wrote, "would be stood on its head if federal officials did not face at least the same liability as state officials guilty of the same constitutional transgression." *Carlson*, *supra,* at 22 (quoting *Butz* v. *Economou*, 438 U. S. 478, 504 (1978)).

The *Bivens* Court also recognized that the Court had previously inferred damages remedies caused by violations of certain federal statutes that themselves did not explicitly authorize damages remedies. 403 U. S., at 395–396. At the same time, *Bivens, Davis,* and *Carlson* treat the courts' power to derive a damages remedy from a constitutional provision not as included within a power to find a statute-based damages remedy but as flowing from those statutory cases *a fortiori.*

As the majority opinion points out, this Court in more recent years has indicated that "*expanding* the *Bivens* remedy is *now* a 'disfavored' judicial activity." *Ante,* at 11 (quoting *Iqbal,* 556 U. S., at 675; emphasis added). Thus, it has held that the remedy is not available in the context of suits against *military* officers, see *Chappell* v. *Wallace,* 462 U. S. 296, 298–300 (1983); *United States* v. *Stanley,* 483 U. S. 669, 683–684 (1987); in the context of suits against *privately* operated prisons and their employees, see *Minneci* v. *Pollard,* 565 U. S. 118, 120 (2012); *Malesko,* 534 U. S., at 70–73; in the context of suits seeking to vindicate procedural, rather than substantive, constitutional protections, see *Schweiker* v. *Chilicky,* 487 U. S. 412, 423 (1988); and in the context of suits seeking to vindicate two quite different forms of important substantive protection, one involving free speech, see *Bush* v. *Lucas,* 462 U. S. 367, 368 (1983), and the other involving protection of land rights, see *Wilkie* v. *Robbins,* 551 U. S. 537, 551 (2007). Each of these cases involved a context that differed from that of *Bivens, Davis,* and *Carlson* with respect to the kind of defendant, the basic nature of the right, or the kind of harm suffered. That is to say, as we have explicitly stated, these cases were "*fundamentally different* from anything recognized in *Bivens* or subsequent cases." *Malesko, supra,* at 70 (emphasis added). In each of them, the plaintiffs were asking the Court to "'authoriz[e] a *new kind* of federal litigation.'" *Wilkie, supra,*

BREYER, J., dissenting

at 550 (emphasis added).

Thus the Court, as the majority opinion says, repeatedly wrote that it was not "expanding" the scope of the *Bivens* remedy. *Ante,* at 11. But the Court nowhere suggested that it would narrow *Bivens*' existing scope. In fact, to diminish any ambiguity about its holdings, the Court set out a framework for determining whether a claim of constitutional violation calls for a *Bivens* remedy. See *Wilkie, supra,* at 549–550. At Step One, the court must determine whether the case before it arises in a "new context," that is, whether it involves a "new category of defendants," *Malesko, supra,* at 68, or (presumably) a significantly different kind of constitutional harm, such as a purely procedural harm, a harm to speech, or a harm caused to physical property. *If the context is new, then* the court proceeds to Step Two and asks "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie,* 551 U. S., at 550. *If there is none, then* the court proceeds to Step Three and asks whether there are "'any special factors counselling hesitation before authorizing a new kind of federal litigation.'" *Ibid.*

Precedent makes this framework applicable here. I would apply it. And, doing so, I cannot get past Step One. This suit, it seems to me, arises in a context similar to those in which this Court has previously permitted *Bivens* actions.

### B
#### 1

The context here is not "new," *Wilkie, supra,* at 550, or "fundamentally different" than our previous *Bivens* cases, *Malesko, supra,* at 70. First, the plaintiffs are civilians, not members of the military. They are not citizens, but the Constitution protects noncitizens against serious

BREYER, J., dissenting

mistreatment, as it protects citizens. See *United States* v. *Verdugo-Urquidez*, 494 U. S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country"). Some or all of the plaintiffs here may have been illegally present in the United States. But that fact cannot justify physical mistreatment. Nor does anyone claim that that fact deprives them of a *Bivens* right available to other persons, citizens and noncitizens alike.

Second, the defendants are Government officials. They are not members of the military or private persons. Two are prison wardens. Three others are high-ranking Department of Justice officials. Prison wardens have been defendants in *Bivens* actions, as have other high-level Government officials. One of the defendants in *Carlson* was the Director of the Bureau of Prisons; the defendant in *Davis* was a Member of Congress. We have also held that the Attorney General of the United States is not entitled to absolute immunity in a damages suit arising out of his actions related to national security. See *Mitchell* v. *Forsyth*, 472 U. S. 511, 520 (1985).

Third, from a *Bivens* perspective, the injuries that the plaintiffs claim they suffered are familiar ones. They focus upon the conditions of confinement. The plaintiffs say that they were unnecessarily shackled, confined in small unhygienic cells, subjected to continuous lighting (presumably preventing sleep), unnecessarily and frequently strip searched, slammed against walls, injured physically, and subject to verbal abuse. They allege that they suffered these harms because of their race or religion, the defendants having either turned a blind eye to what was happening or themselves introduced policies that they knew would lead to these harms even though the defendants knew the plaintiffs had no connections to terrorism.

These claimed harms are similar to, or even worse than,

BREYER, J., dissenting

the harms the plaintiffs suffered in *Bivens* (unreasonable search and seizure in violation of the Fourth Amendment), *Davis* (unlawful discrimination in violation of the Fifth Amendment), and *Carlson* (deliberate indifference to medical need in violation of the Eighth Amendment). Indeed, we have said that, "[i]f a federal prisoner in a [Bureau of Prisons] facility alleges a constitutional deprivation, he may bring a *Bivens* claim against the offending individual officer, subject to the defense of qualified immunity." *Malesko*, 534 U. S., at 72; see also *Farmer* v. *Brennan*, 511 U. S. 825, 832 (1994) (*Bivens* case about prisoner abuse). The claims in this suit would seem to fill the *Bivens'* bill. See *Sell* v. *United States*, 539 U. S. 166, 193 (2003) (Scalia, J., dissenting) ("[A] [*Bivens*] action . . . is available to federal pretrial detainees challenging the conditions of their confinement").

It is true that the plaintiffs bring their "deliberate indifference" claim against Warden Hasty under the Fifth Amendment's Due Process Clause, not the Eighth Amendment's Cruel and Unusual Punishment Clause, as in *Carlson*. But that is because the latter applies to convicted criminals while the former applies to pretrial and immigration detainees. Where the harm is the same, where this Court has held that both the Fifth and Eighth Amendments give rise to *Bivens'* remedies, and where the only difference in constitutional scope consists of a circumstance (the absence of a conviction) that makes the violation here worse, it cannot be maintained that the difference between the use of the two Amendments is "fundamental." See *City of Revere* v. *Massachusetts Gen. Hospital*, 463 U. S. 239, 244 (1983) ("due process rights" of an unconvicted person "are at least as great as the Eighth Amendment protections available to a convicted prisoner"); *Kingsley* v. *Hendrickson*, 576 U. S. ___, ___–___ (2015) (slip op., at 10–11) ("pretrial detainees (unlike convicted prisoners) cannot be punished at all"); *Zadvydas* v. *Davis*,

533 U. S. 678, 721 (2001) (KENNEDY, J., dissenting) (detention "incident to removal . . . cannot be justified as punishment nor can the confinement or its conditions be designed in order to punish"). See also *Bistrian* v. *Levi*, 696 F. 3d 352, 372 (CA3 2012) (permitting *Bivens* action brought by detainee in administrative segregation); *Thomas* v. *Ashcroft*, 470 F. 3d 491, 493, 496–497 (CA2 2006) (detainee alleging failure to provide adequate medical care); *Magluta* v. *Samples*, 375 F. 3d 1269, 1271, 1275–1276 (CA11 2004) (detainee in solitary confinement); *Papa* v. *United States*, 281 F. 3d 1004, 1010–1011 (CA9 2002) (due process claims arising from death of immigration detainee); *Loe* v. *Armistead*, 582 F. 2d 1291, 1293–1296 (CA4 1978) (detainee's claim of deliberate indifference to medical need). If an arrestee can bring a claim of excessive force (*Bivens* itself), and a convicted prisoner can bring a claim for denying medical care (*Carlson*), someone who has neither been charged nor convicted with a crime should also be able to challenge abuse that causes him to need medical care.

Nor has Congress suggested that it wants to withdraw a damages remedy in circumstances like these. By its express terms, the Prison Litigation Reform Act of 1995 (PLRA) does not apply to immigration detainees. See 42 U. S. C. §1997e(h) ("[T]he term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law . . . "); see also *Agyeman* v. *INS*, 296 F. 3d 871, 886 (CA9 2002) ("[W]e hold that an alien detained by the INS pending deportation is not a 'prisoner' within the meaning of the PLRA"); *LaFontant* v. *INS*, 135 F. 3d 158, 165 (CADC 1998) (same); *Ojo* v. *INS*, 106 F. 3d 680, 683 (CA5 1997) (same). And, in fact, there is strong evidence that Congress assumed that *Bivens* remedies would be available to prisoners when it enacted the PLRA—*e.g.*, Congress continued to permit prisoners to

BREYER, J., dissenting

recover for physical injuries, the typical kinds of *Bivens* injuries. See 28 U. S. C. §1346(b)(2); Pfander, Constitutional Torts, at 105–106.

If there were any lingering doubt that the claim against Warden Hasty arises in a familiar *Bivens* context, the Court has made clear that conditions-of-confinement claims and medical-care claims are subject to the same substantive standard. See *Hudson* v. *McMillian*, 503 U. S. 1, 8 (1992) ("[*Wilson* v. *Seiter*, 501 U. S. 294, 303 (1991)] extended the deliberate indifference standard applied to Eighth Amendment claims involving medical care to claims about conditions of confinement"). Indeed, the Court made this very point in a *Bivens* case alleging that prison wardens were deliberately indifferent to an inmate's safety. See *Farmer, supra,* at 830, 834.

I recognize that the Court finds a significant difference in the fact that the confinement here arose soon after a national-security emergency, namely, the September 11 attacks. The short answer to this argument, in respect to at least some of the claimed harms, is that some plaintiffs continued to suffer those harms up to eight months after the September 11 attacks took place and after the defendants knew the plaintiffs had no connection to terrorism. See App. to Pet. for Cert. in No. 15–1359, p. 280a. But because I believe the Court's argument here is its strongest, I will consider it at greater length below. See Part III–C, *infra.*

Because the context here is not new, I would allow the plaintiffs' constitutional claims to proceed. The plaintiffs have adequately alleged that the defendants were personally involved in imposing the conditions of confinement and did so with knowledge that the plaintiffs bore no ties to terrorism, thus satisfying *Iqbal*'s pleading standard. See 556 U. S., at 679 (claims must be "plausible"); see also *id.,* at 699–700 (BREYER, J., dissenting). And because it is clearly established that it is unconstitutional to subject

detainees to punitive conditions of confinement and to
target them based solely on their race, religion, or national
origin, the defendants are not entitled to qualified immun-
ity on the constitutional claims. See *Bell* v. *Wolfish,* 441
U. S. 520, 535–539, and n. 20 (1979); *Davis,* 442 U. S., at
236 ("It is equally clear . . . that the Fifth Amendment
confers on petitioner a constitutional right to be free from
illegal discrimination"). (Similarly, I would affirm the
judgment of the Court of Appeals with respect to the
plaintiffs' statutory claim, namely, that the defendants
conspired to deprive the plaintiffs of equal protection of
the laws in violation of 42 U. S. C. §1985(3). See *Turkmen*
v. *Hasty,* 789 F. 3d 218, 262–264 (CA2 2015). I agree with
the Court of Appeals that the defendants are not entitled
to qualified immunity on this claim. See *ibid.*)

2

Even were I wrong and were the context here "funda-
mentally different," *Malesko,* 534 U. S., at 70, the plain-
tiffs' claims would nonetheless survive Step Two and Step
Three of the Court's framework for determining whether
*Bivens* applies, see *supra,* at 9. Step Two consists of ask-
ing whether "any alternative, existing process for protect-
ing the interest amounts to a convincing reason for the
Judicial Branch to refrain from providing a new and free-
standing remedy in damages." *Wilkie,* 551 U. S., at 550. I
can find no such "alternative, existing process" here.

The Court does not claim that the PLRA provides plain-
tiffs with a remedy. *Ante,* at 25–26. Rather, it says that
the plaintiffs *may* have "had available to them" relief in
the form of a prospective injunction or an application for a
writ of habeas corpus. *Ante,* at 22. Neither a prospective
injunction nor a writ of habeas corpus, however, will nor-
mally provide plaintiffs with redress for harms they have
*already* suffered. And here plaintiffs make a strong claim
that neither was available to them—at least not for a

BREYER, J., dissenting

considerable time. Some of the plaintiffs allege that for two or three months they were subject to a "communications blackout"; that the prison "staff did not permit them visitors, legal or social telephone calls, or mail"; that their families and attorneys did not know where they were being held; that they could not receive visits from their attorneys; that subsequently their lawyers could call them only once a week; and that some or all of the defendants "interfered with the detainees' effective access to legal counsel." Office of Inspector General (OIG) Report, App. 223, 293, 251, 391; see App. to Pet. for Cert. in No. 15–1359, at 253a (incorporating the OIG report into the complaint). These claims make it virtually impossible to say that here there is an "elaborate, comprehensive" alternative remedial scheme similar to schemes that, in the past, we have found block the application of *Bivens* to new contexts. *Bush*, 462 U. S., at 385. If these allegations are proved, then in this suit, it is "damages or nothing." *Bivens*, 403 U. S., at 410 (Harlan, J., concurring in judgment).

There being no "alternative, existing process" that provides a "convincing reason" for not applying *Bivens*, we must proceed to Step Three. *Wilkie, supra*, at 550. Doing so, I can find no "special factors [that] counse[l] hesitation before authorizing" this *Bivens* action. 551 U. S., at 550. I turn to this matter next.

## II
## A

The Court describes two general considerations that it believes argue against an "extension" of *Bivens*. First, the majority opinion points out that the Court is now far less likely than at the time it decided *Bivens* to imply a cause of action for damages from a statute that does not explicitly provide for a damages claim. See *ante,* at 8–9. Second, it finds the "silence" of Congress "notable" in that Con-

gress, though likely aware of the "high-level policies" involved in this suit, did not "choose to extend to any person the kind of remedies" that the plaintiffs here "seek." *Ante,* at 20–21 (internal quotation marks omitted). I doubt the strength of these two general considerations.

The first consideration, in my view, is not relevant. I concede that the majority and concurring opinions in *Bivens* looked in part for support to the fact that the Court had implied damages remedies from *statutes* silent on the subject. See 403 U. S., at 397; *id.,* at 402–403 (Harlan, J., concurring in judgment). But that was not the main argument favoring the Court's conclusion. Rather, the Court drew far stronger support from the need for such a remedy when measured against a common-law and constitutional history of allowing traditional legal remedies where necessary. *Id.,* at 392, 396–397. The Court believed such a remedy was necessary to make effective the Constitution's protection of certain basic individual rights. See *id.,* at 392; *id.,* at 407 (opinion of Harlan, J.). Similarly, as the Court later explained, a damages remedy against federal officials prevented the serious legal anomaly I previously mentioned. Its existence made basic constitutional protections of the individual against *Federal* Government abuse (the Bill of Rights' pre-Civil War objective) as effective as protections against abuse by *state* officials (the post-Civil War, post selective-incorporation objective). See *supra,* at 7.

Nor is the second circumstance—congressional silence—relevant in the manner that the majority opinion describes. The Court initially saw that silence as indicating an absence of congressional hostility to the Court's exercise of its traditional remedy-inferring powers. See *Bivens, supra,* at 397; *Davis,* 442 U. S., at 246–247. Congress' subsequent silence contains strong signs that it accepted *Bivens* actions as part of the law. After all, Congress rejected a proposal that would have eliminated

BREYER, J., dissenting

*Bivens* by substituting the U. S. Government as a defendant in suits against federal officers that raised constitutional claims. See Pfander, Constitutional Torts, at 102. Later, Congress expressly immunized federal employees acting in the course of their official duties from tort claims *except* those premised on violations of the Constitution. See Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, 28 U. S. C. §2679(b)(2)(A). We stated that it is consequently "crystal clear that Congress views [the Federal Tort Claims Act] and *Bivens* as [providing] parallel, complementary causes of action." *Carlson*, 446 U. S., at 20; see *Malesko*, 534 U. S., at 68 (similar). Congress has even assumed the existence of a *Bivens* remedy in suits brought by noncitizen detainees suspected of terrorism. See 42 U. S. C. §2000dd–1 (granting qualified immunity—but not absolute immunity—to military and civilian federal officials who are sued by alien detainees suspected of terrorism).

B

The majority opinion also sets forth a more specific list of factors that it says bear on "whether a case presents a new *Bivens* context." *Ante,* at 16. In the Court's view, a "case might differ" from *Bivens* "in a meaningful way because of [1] the rank of the officers involved; [2] the constitutional right at issue; [3] the generality or specificity of the individual action; [4] the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; [5] the statutory or other legal mandate under which the officer was operating; [6] the risk of disruptive intrusion by the Judiciary into the functioning of other branches; [7] or the presence of potential special factors that previous *Bivens* cases did not consider." *Ante,* at 16. In my view, these factors do not make a "meaningful difference" at Step One of the *Bivens* frame-

BREYER, J., dissenting

work. Some of them are better cast as "special factors"
relevant to Step Three. But, as I see it, none should nor-
mally foreclose a *Bivens* action and none is determinative
here. Consider them one by one:

(1) *The rank of the officers.* I can understand why an
officer's rank might bear on whether he violated the Con-
stitution, because, for example, a plaintiff might need to
show the officer was willfully blind to a harm caused by
lower ranking officers or that the officer had actual
knowledge of the misconduct. And I can understand that
rank might relate to the existence of a legal defense, such
as qualified, or even absolute, immunity. But *if*—and I
recognize that this is often a very big if—a plaintiff proves
a clear constitutional violation, say, of the Fourth
Amendment, *and* he shows that the defendant does not
possess any form of immunity or other defense, *then* why
should he not have a damages remedy for harm suffered?
What does rank have to do with *that* question, namely, the
*Bivens* question? Why should the law treat differently a
high-level official and the local constable where each has
similarly violated the Constitution and where neither can
successfully assert immunity or any other defense?

(2) *The constitutional right at issue.* I agree that this
factor can make a difference, but only when the substance
of the right is distinct. See, *e.g., Wilkie,* 551 U. S. 537
(land rights). But, for reasons I have already pointed out,
there is no relevant difference between the rights at issue
here and the rights at issue in our previous *Bivens* cases,
namely, the rights to be free of unreasonable searches,
invidious discrimination, and physical abuse in federal
custody. See *supra,* at 10–11.

(3) *The generality or specificity of the individual action.*
I should think that it is not the "generality or specificity"
of an official action but rather the nature of the official
action that matters. *Bivens* should apply to some generally
applicable actions, such as actions taken deliberately to

BREYER, J., dissenting

jail a large group of known-innocent people. And it should not apply to some highly specific actions, depending upon the nature of those actions.

(4) *The extent of judicial guidance.* This factor may be relevant to the existence of a constitutional violation or a qualified-immunity defense. Where judicial guidance is lacking, it is more likely that a constitutional violation is not clearly established. See *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987) (Officials are protected by qualified immunity unless "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right"). But I do not see how, assuming the violation is clear, the presence or absence of "judicial guidance" is relevant to the existence of a damages remedy.

(5) *The statutory (or other) legal mandate under which the officer was operating.* This factor too may prove relevant to the question whether a constitutional violation exists or is clearly established. But, again, assuming that it is, I do not understand why this factor is relevant to the existence of a damages remedy. See *Stanley*, 483 U. S., at 684 (the question of immunity is "analytically distinct" from the question whether a *Bivens* action should lie).

(6) *Risk of disruptive judicial intrusion.* All damages actions risk disrupting to some degree future decisionmaking by members of the Executive or Legislative Branches. Where this Court has authorized *Bivens* actions, it has found that disruption tolerable, and it has explained why disruption is, from a constitutional perspective, desirable. See *Davis*, 442 U. S., at 242 (Unless constitutional rights "are to become merely precatory, . . . litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for . . . protection"); *Malesko, supra,* at 70 ("The purpose of *Bivens* is to

BREYER, J., dissenting

deter individual federal officers from committing constitu-
tional violations"). Insofar as the Court means this con-
sideration to provide a reason why there should be no
*Bivens* action where a Government employee acts in time
of security need, I shall discuss the matter next, in Part C.

(7) *Other potential special factors.* Since I am not cer-
tain what these other "potential factors" are and, since the
Court does not specify their nature, I would not, and the
Court cannot, consider them in differentiating this suit
from our previous *Bivens* cases or as militating against
recognizing a *Bivens* action here.

### C

In my view, the Court's strongest argument is that
*Bivens* should not apply to policy-related actions taken in
times of national-security need, for example, during war or
national-security emergency. As the Court correctly
points out, the Constitution grants primary power to
protect the Nation's security to the Executive and Legisla-
tive Branches, not to the Judiciary. But the Constitution
also delegates to the Judiciary the duty to protect an
individual's fundamental constitutional rights. Hence
when protection of those rights and a determination of
security needs conflict, the Court has a role to play. The
Court most recently made this clear in cases arising out of
the detention of enemy combatants at Guantanamo Bay.
Justice O'Connor wrote that "a state of war is not a blank
check." *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 536 (2004)
(plurality opinion). In *Boumediene*, 553 U. S., at 732–733,
the Court reinforced that point, holding that noncitizens
detained as enemy combatants were entitled to challenge
their detention through a writ of habeas corpus, notwith-
standing the national-security concerns at stake.

We have not, however, answered the specific question
the Court places at issue here: Should *Bivens* actions
continue to exist in respect to policy-related actions taken

BREYER, J., dissenting

in time of war or national emergency? In my view, they should.

For one thing, a *Bivens* action comes accompanied by many legal safeguards designed to prevent the courts from interfering with Executive and Legislative Branch activity reasonably believed to be necessary to protect national security. In Justice Jackson's well-known words, the Constitution is not "a suicide pact." *Terminiello* v. *Chicago*, 337 U. S. 1, 37 (1949) (dissenting opinion). The Constitution itself takes account of public necessity. Thus, for example, the Fourth Amendment does not forbid *all* Government searches and seizures; it forbids only those that are "unreasonable." Ordinarily, it requires that a police officer obtain a search warrant before entering an apartment, but should the officer observe a woman being dragged against her will into that apartment, he should, and will, act at once. The Fourth Amendment makes allowances for such "exigent circumstances." *Brigham City* v. *Stuart*, 547 U. S. 398, 401 (2006) (warrantless entry justified to forestall imminent injury). Similarly, the Fifth Amendment bars only conditions of confinement that are not "reasonably related to a legitimate governmental objective." *Bell* v. *Wolfish*, 441 U. S., at 539. What is unreasonable and illegitimate in time of peace may be reasonable and legitimate in time of war.

Moreover, *Bivens* comes accompanied with a qualified-immunity defense. Federal officials will face suit only if they have violated a constitutional right that was "clearly established" at the time they acted. *Harlow*, 457 U. S., at 818.

Further, in order to prevent the very presence of a *Bivens* lawsuit from interfering with the work of a Government official, this Court has held that a complaint must state a claim for relief that is "plausible." *Iqbal*, 556 U. S., at 679. "[C]onclusory" statements and "[t]hreadbare" allegations will not suffice. *Id.*, at 678.

And the Court has protected high-level officials in particular by requiring that plaintiffs plead that an official was personally involved in the unconstitutional conduct; an official cannot be vicariously liable for another's misdeeds. *Id.,* at 676.

Finally, where such a claim is filed, courts can, and should, tailor discovery orders so that they do not unnecessarily or improperly interfere with the official's work. The Second Circuit has emphasized the "need to vindicate the purpose of the qualified immunity defense by dismissing non-meritorious claims against public officials at an early stage of litigation." *Iqbal* v. *Hasty,* 490 F. 3d 143, 158 (2007). Where some of the defendants are "current or former senior officials of the Government, against whom broad-ranging allegations of knowledge and personal involvement are easily made, a district court" not only "may, but '*must* exercise its discretion in a way that protects the substance of the qualified immunity defense . . . so that'" those officials "'are not subjected to unnecessary and burdensome discovery or trial proceedings.'" *Id.,* at 158–159. The court can make "all such discovery subject to prior court approval." *Id.,* at 158. It can "structure . . . limited discovery by examining written responses to interrogatories and requests to admit before authorizing depositions, and by deferring discovery directed to high-level officials until discovery of front-line officials has been completed and has demonstrated the need for discovery higher up the ranks." *Ibid.* In a word, a trial court can and should so structure the proceedings with full recognition that qualified immunity amounts to immunity from suit as well as immunity from liability.

Given these safeguards against undue interference by the Judiciary in times of war or national-security emergency, the Court's abolition, or limitation of, *Bivens* actions goes too far. If you are cold, put on a sweater, perhaps an overcoat, perhaps also turn up the heat, but do

BREYER, J., dissenting

not set fire to the house.

At the same time, there may well be a particular need for *Bivens* remedies when security-related Government actions are at issue. History tells us of far too many instances where the Executive or Legislative Branch took actions during time of war that, on later examination, turned out unnecessarily and unreasonably to have deprived American citizens of basic constitutional rights. We have read about the Alien and Sedition Acts, the thousands of civilians imprisoned during the Civil War, and the suppression of civil liberties during World War I. See W. Rehnquist, All the Laws but One: Civil Liberties in Wartime 209–210, 49–50, 173–180, 183 (1998); see also *Ex parte Milligan*, 4 Wall. 2 (1866) (decided *after* the Civil War was over). The pages of the U. S. Reports themselves recite this Court's refusal to set aside the Government's World War II action removing more than 70,000 American citizens of Japanese origin from their west coast homes and interning them in camps, see *Korematsu* v. *United States*, 323 U. S. 214 (1944)—an action that at least some officials knew at the time was unnecessary, see *id.*, at 233–242 (Murphy, J., dissenting); P. Irons, Justice at War 202–204, 288 (1983). President Franklin Roosevelt's Attorney General, perhaps exaggerating, once said that "[t]he Constitution has not greatly bothered any wartime President." Rehnquist, *supra*, at 191.

Can we, in respect to actions taken during those periods, rely exclusively, as the Court seems to suggest, upon injunctive remedies or writs of habeas corpus, their retail equivalent? Complaints seeking that kind of relief typically come during the emergency itself, when emotions are strong, when courts may have too little or inaccurate information, and when courts may well prove particularly reluctant to interfere with even the least well-founded Executive Branch activity. That reluctance may itself set an unfortunate precedent, which, as Justice Jackson

pointed out, can "li[e] about like a loaded weapon" awaiting discharge in another case. *Korematsu, supra,* at 246 (dissenting opinion).

A damages action, however, is typically brought after the emergency is over, after emotions have cooled, and at a time when more factual information is available. In such circumstances, courts have more time to exercise such judicial virtues as calm reflection and dispassionate application of the law to the facts. We have applied the Constitution to actions taken during periods of war and national-security emergency. See *Boumediene,* 553 U. S., at 732–733; *Hamdi* v. *Rumsfeld,* 542 U. S. 507; cf. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952). I should think that the wisdom of permitting courts to consider *Bivens* actions, later granting monetary compensation to those wronged at the time, would follow *a fortiori.*

As is well known, Lord Atkins, a British judge, wrote in the midst of World War II that "amid the clash of arms, the laws are not silent. They may be changed, but they speak the same language in war as in peace." *Liversidge* v. *Anderson,* [1942] A. C. 206 (H. L. 1941) 244. The Court, in my view, should say the same of this *Bivens* action.

With respect, I dissent.

## CERTIFICATE OF SERVICE

The undersigned declares as follows:

I am a citizen of the United States and employed in Los Angeles County, State of California. I am over the age of 18 and not a party to the within action. My business address is Scheper Kim & Harris LLP, 601 W. Fifth Street, 12th Floor, Los Angeles, California 90071.

I hereby certify that I electronically filed the foregoing **CROSS-APPELLANTS PAT ROSE, PAUL ALLEN AND KEVIN ARMSTRONG'S LETTER RE THE ZIGLAR MATTER** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 23, 2017

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed on June 23, 2017 at Los Angeles, California

_____/s/ Alexander H. Cote_____
Attorneys for Cross-Appellants Pat Rose,
Paul Allen and Kevin Armstrong