Consolidated Case Nos. 13-55017, 12-56867, 12-56874

# In the United States Court of Appeals for the Ninth Circuit

YASSIR FAZAGA, *et al.*,

*Plaintiffs-Appellants*,

v.

FEDERAL BUREAU OF INVESTIGATION, *et al.*,

*Defendants-Appellees*.

*On Appeal from the United States District Court
for the Central District of California*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
CONSTITUTIONAL
 ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF *AMICUS CURIAE* ................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 1

ARGUMENT ................................................................................... 3

I.    The State Secrets Privilege Is a Product of Federal Common Law, Not Constitutional Analysis ............................................... 3

    A.    Nineteenth-century precursors to the state secrets privilege were rooted in English common law and public policy ............ 3

    B.    Courts developed the state secrets privilege in the twentieth century based on the federal common law authority to shape evidentiary rules ........................................................ 6

    C.    The modern state secrets privilege is based on U.K. standards that the Supreme Court borrowed as a matter of federal common law ................................................................. 8

II.    Early Dicta and Historical Episodes Have No Clear Connection to the State Secrets Privilege ..................................................... 11

III.    Any Relationship Between Article II and the State Secrets Privilege Remains Undefined ........................................................ 14

CONCLUSION ................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bank Line v. United States*,
    163 F.2d 133 (2d Cir. 1947) ................................................................ 7

*Cresmer v. United States*,
    9 F.R.D. 203 (E.D.N.Y. 1949) ........................................................... 8

*Duncan v. Cammell, Laird & Co.*,
    [1942] A.C. 624 (H.L.) ................................................................ 7, 10

*El-Masri v. United States*,
    479 F.3d 296 (4th Cir. 2007) ........................................................... 15

*Fazaga v. FBI*,
    916 F.3d 1202 (9th Cir. 2019) ........................................................... 1

*Fazaga v. FBI*,
    965 F.3d 1015 (9th Cir. 2020) ........................................ 1, 2, 11, 15

*FBI v. Fazaga*,
    142 S. Ct. 1051 (2022) .................................................................. 2, 14

*Firth Sterling Steel Co. v. Bethlehem Steel Co.*,
    199 F. 353 (E.D. Pa. 1912) ............................................................ 6, 7

*Gen. Dynamics Corp. v. United States*,
    563 U.S. 478 (2011) ................................................................... 3, 5, 9

*In re NSA Telecomms. Recs. Litig.*,
    564 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................... 9, 10

*Marbury v. Madison*,
    5 U.S. 137 (1803) ............................................................................ 11

*O'Neill v. United States*,
    79 F. Supp. 827 (E.D. Pa. 1948) .................................................... 7, 8

*Pollen v. Ford Instrument Co.*,
    26 F. Supp. 583 (E.D.N.Y. 1939) ..................................................... 7

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Pollen v. United States*,
  85 Ct. Cl. 673 (1937) ........................................................................ 6, 7

*Robinson v. United States*,
  50 Ct. Cl. 159 (1915) ......................................................................... 6

*Tenet v. Doe*,
  544 U.S. 1 (2005) .............................................................................. 4

*Totten v. United States*,
  92 U.S. 105 (1875) ........................................................................ 4, 5

*Trump v. Mazars USA, LLP*,
  140 S. Ct. 2019 (2020) ..................................................................... 14

*United States ex rel. Touhy v. Ragen*,
  340 U.S. 462 (1951) .......................................................................... 8

*United States v. Burr*,
  25 F. Cas. 187 (C.C.D. Va. 1807) ................................................... 12, 13

*United States v. Nixon*,
  418 U.S. 683 (1974) ...................................................................... 14, 15

*United States v. Reynolds*,
  345 U.S. 1 (1953) .................................................................... 2, 9, 10, 11

## BOOKS, ARTICLES, AND OTHER AUTHORITIES

Robert M. Chesney, *State Secrets and the Limits of National Security
  Litigation*, 75 Geo. Wash. L. Rev. 1249 (2007) ......................................... *passim*

Simon Greenleaf, *A Treatise on the Law of Evidence* (7th ed. 1854) ............ 3, 4, 13

25 Op. Att'y Gen. 326 (1905) ....................................................................... 8

20 Op. O.L.C. 253 (1996) ............................................................................ 13

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Sudha Setty, *Litigating Secrets: Comparative Perspectives on the State Secrets Privilege*, 75 Brook. L. Rev. 201 (2009) ....................... 4, 6, 10, 11

Thomas Starkie, *A Practical Treatise on the Law of Evidence* (7th Am ed. 1842) ............................................................................. 3, 13

Anthony John Trenga, *What Judges Say and Do in Deciding National Security Cases: The Example of the State Secrets Privilege*, 9 Harv. Nat'l Sec. J. 1 (2018) .................................................... 6, 9, 13

William G. Weaver & Robert M. Pallitto, *State Secrets and Executive Power*, 120 Pol. Sci. Q. 85 (2005) ....................................................... 10

*The Writings of Thomas Jefferson* (Andrew Lipscomb ed., 1903) .......................................................... 13

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC has a strong interest in ensuring meaningful access to the courts, in accordance with constitutional text and history, and therefore has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The panel decision in this case noted that the state secrets privilege is fundamentally "an evidentiary rule rooted in common law, not constitutional law." *Fazaga v. FBI*, 916 F.3d 1202, 1231 (9th Cir. 2019). By contrast, the dissent from denial of rehearing *en banc* described the privilege as "a core constitutional privilege," rooted in Article II and stemming from "the earliest days of our Nation's history." 965 F.3d 1015, 1073 (9th Cir. 2020) (Bumatay, J., dissenting from the denial of rehearing *en banc*) (hereinafter "Bumatay Op.").

The panel was right; the dissent was wrong. Courts have never grounded the state secrets privilege in the Constitution, and the privilege does not date to the nation's origins. Instead, beginning in the late nineteenth century, courts gradually developed the privilege as a matter of federal common law, relying on English

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. Counsel for all parties have consented to the filing of this brief.

precedent, the prescriptions of treatise writers, pragmatic considerations, and their inherent authority to shape evidentiary rules in service of public policy. The early historical episodes and judicial dicta cited by the dissent reveal, at most, early expressions of the general concept of executive privilege, and they played no role in the later development of the state secrets privilege. Indeed, far from representing a construction of the president's Article II authority, the standards of the modern state secrets privilege were drawn from twentieth-century United Kingdom law, which the Supreme Court imported nearly wholesale into federal common law when it established the contours of the privilege in *United States v. Reynolds*, 345 U.S. 1 (1953).

No Supreme Court decision addressing state secrets questions has ever relied on Article II or the separation of powers, and none of the specific components of the modern privilege has ever been linked to constitutional imperatives. Any relationship between those imperatives and the state secrets privilege remains undefined—as the Supreme Court's opinion in this very case indicates. *See FBI v. Fazaga*, 142 S. Ct. 1051, 1060 (2022). Thus, claims about the privilege's supposed "constitutional design," Bumatay Op., 965 F.3d at 1073, should not factor into this Court's resolution of the issues in dispute here.

## ARGUMENT

**I.    The State Secrets Privilege Is a Product of Federal Common Law, Not Constitutional Analysis.**

**A.    Nineteenth-century precursors to the state secrets privilege were rooted in English common law and public policy.**

Until the late nineteenth century, no American case law recognized any "privilege against court-ordered disclosure of state and military secrets." *Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 484 (2011). Indeed, the idea of such a privilege was first introduced by mid-century treatise authors, attempting to "rationalize and systematize the body of common law evidentiary rules." Robert M. Chesney, *State Secrets and the Limits of National Security Litigation*, 75 Geo. Wash. L. Rev. 1249, 1270 (2007). Given "the absence of on-point case law in the United States," these authors relied on English precedent. *Id.* at 1273.

Combining "disparate threads" of English decisions with general public-policy notions, treatises described an "umbrella concept of a multifaceted 'public interest' privilege, some aspects of which were referred to under the subheading of 'state secrets.'" *Id.* at 1270-71; *see, e.g.*, 1 Thomas Starkie, *A Practical Treatise on the Law of Evidence* 69, 71 (7th Am. ed. 1842) (discussing exclusion of evidence "on grounds of public policy," including where "disclosure might be prejudicial to the community"); 1 Simon Greenleaf, *A Treatise on the Law of Evidence* 327 (7th ed. 1854) (discussing evidence "excluded from motives of

public policy," including "secrets of State . . . the disclosure of which would be prejudicial to the public interest"). In Greenleaf's influential treatise, for example, the "secrets of state" discussion relied on English precedent, did not reference American constitutional law, and was not tied to military or foreign affairs. *Id.* at 329.

Not until *Totten v. United States*, 92 U.S. 105 (1875), did the Supreme Court establish any barrier against court-ordered disclosure of state secrets. *Totten* "preclude[d] judicial review" in cases "where success depends upon the existence of [a] secret espionage relationship with the Government," *Tenet v. Doe*, 544 U.S. 1, 8 (2005), essentially concluding that "some claims against the government are simply not justiciable based on the nature of the claim being made," Sudha Setty, *Litigating Secrets: Comparative Perspectives on the State Secrets Privilege*, 75 Brook. L. Rev. 201, 233 (2009). *Totten*'s "unique and categorical" bar to suit is distinct from the more limited evidentiary privilege recognized in later cases, *Tenet*, 544 U.S. at 6 n.4, but it was "a significant extension of the still-evolving concept of a state secrets privilege," Chesney, *supra*, at 1278.

*Totten* "at no point described its holding in separation of powers or other constitutional terms." *Id.* "Rather, the Court simply spoke in terms of the detrimental 'public policy' ramifications of permitting lawsuits regarding unacknowledged espionage contracts to proceed," *id.* at 1278-79, reasoning that

4

secrecy was an implied term of such contracts, precluding "any action for their enforcement," *Totten*, 92 U.S. at 107; *cf. Gen. Dynamics*, 563 U.S. at 490 ("As in *Totten*, our refusal to enforce this contract captures what the *ex ante* expectations of the parties were or reasonably ought to have been." (citation omitted)).

Likening the enforcement of an espionage contract to suits that would reveal secrets "of the confessional," "between husband and wife," "by a client to his counsel," or by "a patient to his physician," *Totten* explained that such actions would "lead to the disclosure of matters which the law itself regards as confidential." 92 U.S. at 107. Because exposing such matters would be to the "serious detriment of the public," *id.*, suits to enforce espionage agreements were prohibited based on the same rationale supporting other common law evidentiary privileges. "[P]ublic policy," the Court held, "forbids the maintenance of any [such] suit." *Gen. Dynamics*, 563 U.S. at 486 (quoting *Totten*, 92 U.S. at 107).

*Totten* thus stemmed from the judiciary's "common-law authority to fashion contractual remedies," and specifically from the power to refuse, "on grounds of public policy," to aid an "unenforceable promise." *Gen. Dynamics*, 563 U.S. at 485, 488; *see id.* at 487 ("the traditional course is to leave the parties where they stood"). It involved no constitutional reasoning. And the original rationale endures. *Id.* at 491 ("what we promulgate today is . . . a common-law opinion").

5

**B.   Courts developed the state secrets privilege in the twentieth century based on the federal common law authority to shape evidentiary rules.**

"By the late nineteenth century, treatise writers in the United States had begun to refer expressly to a 'state secrets' privilege."  Chesney, *supra*, at 1280.  But they were still using that term "as an umbrella concept integrating cases like *Totten* . . . with precedents concerning the informer's privilege, the deliberative-process privilege, and the government-communications privilege."  *Id.*

Only "in the early twentieth century" did the "[t]he core of a distinctive 'state secrets' privilege . . . begin to emerge."  *Id.* at 1281.  Over the first half of the century, "a handful of lower courts considered what was in substance a state secrets privilege, typically described as a 'military or national security privilege.'"  Anthony John Trenga, *What Judges Say and Do in Deciding National Security Cases: The Example of the State Secrets Privilege*, 9 Harv. Nat'l Sec. J. 1, 12 (2018).  Without any "unifying doctrine," Setty, *supra*, at 234, these decisions cited English precedent, evidentiary treatises, and *Totten* to justify a "rule of public policy forbidding the disclosure of military secrets," *Firth Sterling Steel Co. v. Bethlehem Steel Co.*, 199 F. 353, 355 (E.D. Pa. 1912); *accord Robinson v. United States*, 50 Ct. Cl. 159, 167 (1915); *Pollen v. United States*, 85 Ct. Cl. 673, 679 (1937).

Courts universally described the emerging privilege as a common law evidentiary doctrine. *See O'Neill v. United States*, 79 F. Supp. 827, 829 (E.D. Pa. 1948) (citing "the general policy of the common law" protecting "state secrets the publication of which might . . . harm . . . diplomatic relations, military operations or measures for national security"); *Firth Sterling*, 199 F. at 355 (citing the "common law" rule). When they elaborated on its justification, courts described the privilege as a practical necessity emanating from an "inherent right of self-preservation." *Pollen v. Ford Instrument Co.*, 26 F. Supp. 583, 584 (E.D.N.Y. 1939); *see Pollen*, 85 Ct. Cl. at 681 (the privilege is "predicated upon the principle of the public good and the right of the Sovereign to maintain an efficient National defense"). The reasoning was pragmatic, not constitutional, and no emphasis was placed on executive branch authority vis-à-vis the other branches.

Because courts were crafting a common law doctrine, not discerning the president's constitutional authority, they felt free to look to foreign law for inspiration. *E.g.*, *Bank Line v. United States*, 163 F.2d 133, 139 (2d Cir. 1947) (instructing the district court to "consider the views of the English House of Lords recently expressed . . . in *Duncan v. Cammell, Laird & Co.*, (1942) A.C. 624, when discussing the nature of the privilege").

When the government raised constitutional arguments against disclosure, rather than basing those arguments on the president's military or foreign affairs

7

powers, it simply claimed a broad executive privilege to withhold information *of any kind* from the other branches. *See O'Neill*, 79 F. Supp. at 830 (describing attorney general's argument that he was "free to refuse disclosure of any evidence in his possession, regardless of its character, for any reason which may seem to him sufficient"); *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 469 (1951) (similar); 25 Op. Att'y Gen. 326, 331 (1905) (advising department head that he could withhold records "whenever in your judgment the production of such papers . . . might prove prejudicial for any reason to the Government or to the public interest").

Significantly, too, courts saw no tension between the state secrets privilege and *in camera* review of allegedly privileged materials. *See Cresmer v. United States*, 9 F.R.D. 203, 204 (E.D.N.Y. 1949) ("[T]o make sure that the report in question contained no military or service secrets . . . I requested counsel to produce the report for my examination.").

### C. The modern state secrets privilege is based on U.K. standards that the Supreme Court borrowed as a matter of federal common law.

*United States v. Reynolds* established the standards governing the modern state secrets privilege. Those standards were imported nearly wholesale from contemporary case law in the United Kingdom. *Reynolds* borrowed those standards without suggesting that any of them have any relationship to the president's Article II authority.

8

*Reynolds* was a dispute "about the admission of evidence." *Gen. Dynamics*, 563 U.S. at 485. The Federal Rules of Civil Procedure authorized discovery of materials "not privileged," which was construed as referring to "'privileges' as that term is understood in the law of evidence." *Reynolds*, 345 U.S. at 6. "Congress had not yet approved the Federal Rules of Evidence, and therefore the only 'law of evidence' to apply in federal court was an amalgam of common law, local practice and statutory provisions with indefinite contours." *In re NSA Telecomms. Recs. Litig.*, 564 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008). Citing treatises and the limited American precedent available, *Reynolds* described a privilege against revealing state secrets as "well established in the law of evidence." 345 U.S. at 6-7. *Reynolds* also "adopted for the first time a methodology" for administering this privilege. Trenga, *supra*, at 13.

*Reynolds* did not draw on Article II, the separation of powers, or any other constitutional principles concerning executive authority. Although the government asserted a "power to suppress documents" based on "an inherent executive power which is protected in the constitutional system of separation of power," *id.* at 6 n.9, the Court disclaimed any reliance on constitutional considerations, finding it "unnecessary to pass upon" these "broad propositions," *id.* at 6. Instead, *Reynolds* "decided a purely evidentiary dispute by applying evidentiary rules." *Gen. Dynamics*, 563 U.S. at 485.

9

Having "declined to address the constitutional question" raised by the government, *Reynolds* simply "interpreted and applied federal common law." *In re NSA*, 564 F. Supp. 2d at 1123. And because "[j]udicial experience with the privilege" had "been limited in this country," *Reynolds*, 345 U.S. at 7, the Court turned to foreign law—specifically, contemporary standards in the United Kingdom. "English experience has been more extensive," *Reynolds* explained, and "the principles which control the application of the privilege emerge quite clearly from the available precedents." *Id.*; *see* William G. Weaver & Robert M. Pallitto, *State Secrets and Executive Power*, 120 Pol. Sci. Q. 85, 97 (2005) (American decisions "proved too thin a resource, . . . and so [the] Court turned to the law of the United Kingdom and the development of the doctrine of 'crown privilege'").

More specifically, *Reynolds* "adopted the framework," *id.* at 98, of the recent decision *Duncan v. Cammell, Laird & Co.*, [1942] A.C. 624 (H.L.). *See Reynolds*, 345 U.S. at 7-8 & nn.15, 20-22.

Among other things, *Duncan* essentially ruled that "if a government officer offers a good faith affidavit as to the need for nondisclosure," it should be accepted "at face value." Setty, *supra*, at 228-29. A validly taken objection to production, "on the ground that this would be injurious to the public interest," was "conclusive." *Duncan*, A.C. 624. But while largely adopting the *Duncan* framework, the Supreme Court made an important change. Under *Reynolds*, an

10

official's assertion of the state secrets privilege is not "conclusive." Instead, drawing on experience with the privilege against self-incrimination, *Reynolds* fashioned a "like formula of compromise," permitting courts to require a "disclosure to the judge before the claim of privilege will be accepted," including, if necessary, a "complete disclosure." 345 U.S. at 9-10.

In short, like *Totten* before it, *Reynolds* was a common law decision decided on common law principles, deriving none of its rules from Article II.

## II. Early Dicta and Historical Episodes Have No Clear Connection to the State Secrets Privilege.

The dissent from the denial of *en banc* rehearing attempts to trace a line between episodes in the early Republic and the modern state secrets privilege. But those episodes "dealt with a series of evidentiary questions that were quite distinct from one another and which did not necessarily concern matters of a diplomatic or military nature." Chesney, *supra*, at 1270. At best, as the dissent itself acknowledges, *see* Bumatay Op., 965 F.3d at 1075 n.4, these episodes simply reveal nascent expressions of a "general notion of executive privilege," Setty, *supra*, at 232.

In *Marbury v. Madison*, 5 U.S. 137 (1803), a witness claimed he could withhold "any facts" that "came officially to his knowledge while acting as secretary of state." 5 U.S. at 143. Chief Justice Marshall disagreed, noting "[t]here was nothing confidential required to be disclosed," while suggesting that

11

the witness "was not bound" to disclose anything "communicated to him in confidence." *Id.* at 144.

"The *Marbury* dicta raised more questions than it answered." Chesney, *supra*, at 1272. "Did the Court mean to suggest that confidential communications to executive branch officials are privileged," and if so, was that rule "rooted in the common law of evidence, in constitutional considerations associated with the independence of the executive branch, or both?" *Id.* "Or was the point to suggest that courts lack the capacity to subject a cabinet official to judicial process . . . ?" *Id.* In any event, *Marbury* involved no conceivable claim of military or diplomatic secrets.

*United States v. Burr* is no more illuminating. On trial for treason, Aaron Burr sought to subpoena a letter to President Jefferson. *See* 25 F. Cas. 30, 31 (C.C.D. Va. 1807). The prosecutor raised a bevy of objections: "it was a private letter," it "probably contained confidential communications," it might include information "which could not be divulged without endangering the national safety," it "could not be material to the defence." *Id.* Rejecting each argument, Marshall approved the subpoena. *Id.* at 37-38.

Marshall noted that "there may be matter, the production of which the court would not require," but explained that "the question does not occur at this time," because there was "nothing before the court which shows that the letter in question

contains any matter the disclosure of which would endanger the public safety." *Id.* at 37; *see also id.* ("If [the letter] does contain any matter which it would be imprudent to disclose, which it is not the wish of the executive to disclose, such matter, *if it be not immediately and essentially applicable to the point*, will, of course, be suppressed." (emphasis added)).

Neither *Burr* nor *Marbury* clearly relates to the state secrets privilege. They "are best thought of" as pertaining to the "deliberative process privilege," Chesney, *supra*, at 1274, or executive privilege generally, Trenga, *supra*, at 11 n.21. They were later cited only regarding the confidentiality of communications among government officials, a privilege enjoyed by state as well as federal officers. *See* Greenleaf, *supra*, at 329; Starkie, *supra*, at 71 n.1.

Early episodes involving *congressional* inquiries are even less relevant. Responding to a 1792 document request, after consulting English parliamentary precedents, President Washington's cabinet concluded it could withhold documents "the disclosure of which would injure the public." 1 *The Writings of Thomas Jefferson* 304 (Andrew Lipscomb ed., 1903). Nevertheless, the cabinet "agreed in this case, that there was not a paper which might not be properly produced." *Id.* at 305; *see* 20 Op. O.L.C. 253, 270 (1996). The legal basis for the cabinet's position is unknown. And while Congress later narrowed its request to papers "of a public nature," the import of that change was also "ambiguous." *Id.* at

270 & n.54 (quotation marks omitted).  This and similar incidents fundamentally

concerned the "tradition of negotiation and compromise" between the political

branches.  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020).

Whatever insight might lurk in early judicial dicta and these historical

episodes, they played no role in the creation of the state secrets privilege a century

later.

## III.   Any Relationship Between Article II and the State Secrets Privilege Remains Undefined.

While the Supreme Court has hinted that Article II might imply *some* kind of

authority to withhold military and diplomatic secrets, it has never said that the state

secrets privilege as we know it is constitutionally compelled.  Indeed, in this very

case, the Court acknowledged that it remains unresolved whether the privilege "is

rooted only in the common law" or whether it "also" has a constitutional

component.  *Fazaga*, 142 S. Ct. at 1060.

*United States v. Nixon*, 418 U.S. 683 (1974), provides some support for the

idea that a privilege against disclosing state secrets implicates Article II authority.

The Court implied that it might have accorded greater protection to President

Nixon's "interest in confidentiality" in his "Presidential communications" if they

concerned "military or diplomatic secrets."  *Id.* at 706, 711.  And it commented

that "to the extent" an interest in confidentiality "relates to the effective discharge

of a President's powers, it is constitutionally based."  *Id.* at 711.

14

"*Nixon* was not, of course, a state secrets privilege case," and its discussion of military and diplomatic matters was dicta. Chesney, *supra*, at 1294. That discussion, moreover, concerned only "confidential conversations between a President and his close advisors." *Nixon*, 418 U.S. at 703. Even there, the Court endorsed *in camera* review of such materials to excise any portions privileged under *Reynolds*. *Id.* at 715 n.21.

"Plainly," too, any constitutional imperative demanding secrecy "does not account for the full scope of the privilege as it has come to be understood." Chesney, *supra*, at 1309. The substantive and procedural standards of *Reynolds*, and the rule of the *Totten* bar—in other words, the rules at issue here—did not come from the Constitution but from common law and foreign law.

Nor does it suffice to respond that, "[a]lthough the state secrets privilege was developed at common law, it performs a function of constitutional significance." *El-Masri v. United States*, 479 F.3d 296, 304 (4th Cir. 2007). *Any* doctrine allowing the concealment of information for public safety, whatever its scope or rationale, would arguably have "constitutional significance" because of its impact on military or foreign affairs efforts. That does not mean the existing doctrine, or any of its particular rules, are "constitutionally based." Bumatay Op., 965 F.3d at 1078. The history of the privilege belies that assertion.

15

## CONCLUSION

For the foregoing reasons, assertions that the state secrets privilege derives from the Constitution should not affect this Court's analysis of Plaintiffs' claims.

Respectfully submitted,

Dated: July 7, 2022

*/s/ Elizabeth B. Wydra*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

16

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s) 13-55017, 12-56867, 12-56874**

I am the attorney or self-represented party.

**This brief contains 3,496 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Elizabeth B. Wydra_____ **Date** July 7, 2022
*(use "*s/[typed name]*" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/18*